2019-09716

# N

## Section 8

**FILED**

2019 SEP 17  A 12:30

CIVIL

DISTRICT COURT

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

### STATE OF LOUISIANA

NO.                    SECTION                    DIVISION

**CAROLYN BRINDELL, JOHN BRINDELL III,
CONNIE DUPAY, AND CHRISTOPHER BRINDELL,
Each Individually and on Behalf of Decedent JOHN BRINDELL JR.**

### VERSUS

### CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., et al

FILED: _____

                              _____
                              DEPUTY CLERK

## PETITION FOR DAMAGES FOR WRONGFUL DEATH AND SURVIVAL ACTION

TO THE HONORABLE CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS.
STATE OF LOUISIANA. AND THE JUDGES THEREOF:

The Petition of Carolyn Brindell, John Brindell III, Connie Dupay, and Christopher

Brindell, the statutory heirs and wrongful death beneficiaries of Petitioner-Decedent John Brindell

Jr.. through their attorneys, states:

1.      Made Petitioners herein are:

A.      **CAROLYN BRINDELL,** an adult resident citizen of the State of Louisiana. St.

Tammany Parish, and the surviving spouse and statutory survivor of Decedent John

Brindell, Jr. Mrs. Carolyn Brindell and Decedent John Brindell. Jr. were married at all

times relevant to this petition, including his date of death.

B.      **JOHN BRINDELL, III,** an adult resident citizen of the State of Louisiana. St.

Tammany Parish. natural son and statutory survivor of Decedent John Brindell.

C.      **CONNIE DUPAY,** an adult resident citizen of the State of Louisiana. St. Tammany

Parish. natural daughter and statutory survivor of Decedent John Brindell.

D.      **CHRISTOPHER BRINDELL,** an adult resident citizen of the State of Louisiana.

**EXHIBIT A**

2019-09716

# N

## Section 8

FILED

2019 SEP 17  A 12:30

CIVIL

DISTRICT COURT

2.     Made Defendants herein are:

### A.     PREMISES OWNER DEFENDANT:

**1) PORT OF NEW ORLEANS, LLC.**
A limited liability company domiciled in Louisiana, who is authorized to do and doing business in Louisiana, and has a Registered Agent in Louisiana.
May be served through its registered agent for service of process:
Pamala Bishop
526 Andry Street
New Orleans, Louisiana 70117
This Defendant is being named for Premises Liability.

### B.     SUPPLIER/MANUFACTURER/SELLER/CONTRACTOR/DISTRIBUTOR /PRODUCT DEFENDANTS

**2) CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC.**
A business corporation headquartered in Ohio, may be served via the Long Arm Statute at:
United Agent Group, Inc.
350 South Northwest Highway, #300
Park Ridge, Illinois 60068
This Defendant is being sued as a seller/supplier/manufacturer/product defendant.

**3) EAGLE, INC.** (f/k/a Eagle Asbestos & Packing Co., Inc. and Eagle Packing & Equipment Co.), a Louisiana Corporation, domiciled in Orleans Parish, which may be served through its registered agent for service of process: Susan B. Kohn
1100 Poydras Street, 30th Floor
New Orleans, Louisiana 70163
This Defendant is being sued as a seller/supplier/contractor/distributor defendant.

**4) EATON CORPORATION**
A business corporation domiciled in the State of Ohio, who is authorized to do and doing business in Louisiana, and has a Registered Agent in Louisiana:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816
This Defendant is being sued as a seller/supplier/manufacturer/product defendant.

**5) GREAT DANE LLC (f/k/a Great Dane Limited Partnership)**
A limited liability company domiciled in the State of Delaware, who is authorized to do and doing business in Louisiana, and has a Registered Agent in Louisiana:
Universal Registered Agents, Inc.
1011 North Causeway Boulevard, Suite 3

2019-09716

# N
## Section 8

FILED
2019 SEP 17 A 12:30
CIVIL
DISTRICT COURT

Corporation Service Company
501 Louisiana Ave.
Baton Rouge, Louisiana 70802
This Defendant is being sued as a seller/supplier/manufacturer/product defendant.

### 7) KELSEY-HAYES COMPANY
A company domiciled in the State of Michigan, who has a Registered Agent who may be served via the Long Arm Statute at:
CSC – Lawyers Incorporating Service Company
601 Abbott Road
East Lansing, Michigan 48823
This Defendant is being sued as a seller/supplier/manufacturer/product defendant.

### 8) LUFKIN INDUSTRIES, LLC
A limited liability company domiciled in the State of Texas, who is authorized to do and doing business in Louisiana, and has a Registered Agent in Louisiana:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816
This Defendant is being sued as a seller/supplier/manufacturer/product defendant.

### 9) MERITOR, INC., Individually and f/k/a Arvinmeritor, Inc., f/k/a Meritor Automotive, Inc.
A business corporation domiciled in the State of Nevada, who is authorized to do and doing business in Louisiana, and has a Registered Agent in Louisiana:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816
This Defendant is being sued as a seller/supplier/manufacturer/product defendant.

### 10) PNEUMO-ABEX CORPORATION
A company domiciled in the State of New Jersey, who has a Registered Agent who may be served via the Long Arm Statute at:
Corporation Service Company
251 Little Falls Dr.
Wilmington, DE 19808
This defendant is being sued as a seller/supplier/product/manufacturer defendant.

### 11) STRICK TRAILERS, LLC
A limited liability company domiciled in the State of Delaware, who is authorized to do and doing business in Louisiana, and has a Registered Agent in Louisiana:
CT Corporation System

2019-09716

**N**

**Section 8**

**FILED**

2019 SEP 17  A 12:30

CIVIL

**DISTRICT COURT**

Orleans. Louisiana and may be served through its registered agent for service
in the State of Louisiana:
Robert I. Shepard
731 South Scott Street
New Orleans, Louisiana 70119
This Defendant is being sued as a seller/supplier/contractor/distributor
defendant.

**13) UTILITY TRAILER MANUFACTURING COMPANY**
A business corporation domiciled in the State of California, who is authorized
to do and doing business in Louisiana, and has a Registered Agent in Louisiana:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, Louisiana 70802
This Defendant is being sued as a seller/supplier/manufacturer/product
defendant.

**14) WILSON TRAILER COMPANY**
A business corporation domiciled in the State of Iowa, who is authorized to do
and doing business in Louisiana, and has a Registered Agent in Louisiana:
Business Filings International, Inc.
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816
This Defendant is being sued as a seller/supplier/manufacturer/product
defendant.

**C.    INSURANCE DEFENDANTS**

**15) FIRST STATE INSURANCE COMPANY,**
As the Insurer of Eagle, Inc., f/k/a Eagle Asbestos & Packing Co.. Inc.
Through the Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, LA 70809

**16) UNITED STATES FIDELITY AND GUARANTY COMPANY,**
As the Insurer of Eagle, Inc., f/k/a Eagle Asbestos & Packing Co., Inc.
Through the Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, LA 70809

## **BACKGROUND**

3.      Decedent John Brindell Jr. was diagnosed with malignant mesothelioma on or about May

15, 2019, which was caused by and a consequence of his exposure to asbestos as set forth herein.

As a direct and proximate result of the delictual conduct of the defendants, Decedent John Brindell

# N

## Section 8

Petitioners assert survival and wrongful death claims pursuant to Louisiana Civil Code articles 2315.1 and 2315.2.

4.      Orleans Parish is a proper venue based on the following:

   a.      Orleans Parish is a proper venue for this matter pursuant to La. Stat. Ann. §22:1269B(1) because events, accident or injury occurred or in Orleans Parish. Orleans Parish is a proper venue for this matter pursuant to La. C. Civ. Proc. Art. 74 because Orleans Parish is where wrongful conduct occurred or where the damages were sustained.

   b.      Orleans Parish is a proper venue for this matter pursuant to Louisiana Code of Civil Procedure Article 42(2) because the Defendants Eagle, Inc., and Taylor-Seidenbach Inc., are domestic corporations licensed to do business in this State and have designated as its primary business office and/or primary place of business in Louisiana as Orleans Parish. Furthermore, Orleans Parish is a proper venue for this matter pursuant to Louisiana Code of Civil Procedure Article 73, because each of the Defendants listed in Paragraph 2(A) contributed to Mr. John Brindell, Jr.'s exposure to asbestos, diagnosis of mesothelioma, and subsequent death, and therefore, each is solidarily liable to Petitioners with each of its co-Defendants, and Defendants Eagle, Inc. and Taylor Seidenbach Inc. have each designated their primary business office or primary place of business in Orleans Parish.

5.      The damages sought by the Petitioners, exclusive of interest and costs, exceed the minimum jurisdictional limits of the court.

6.      Petitioners specifically disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in, or on the grounds of, a federal enclave. Petitioners also disclaim any cause of action or recovery for any injuries resulting from any exposure to asbestos dust caused by any conduct, action, acts or omissions of any and all federal officers, or committed at the direction of an officer of the United States Government.

2019-09716

**N**

Section 8

FILED

2019 SEP 17  A 12:30
CIVIL
DISTRICT COURT

equipment, and/or friction products, including but not limited to brakes. This work exposed him to dangerously high levels of asbestos fibers, which escaped into the ambient air of the work place, resulting in Decedent John Brindell Jr. breathing those fibers.

8.     In connection with Decedent John Brindell Jr.'s work at the Port of Orleans as a mechanic for Puerto Rico Marine Management from approximately 1970 through 1984, Decedent suffered exposure to asbestos and asbestos-containing products which were designed, manufactured, sold, supplied, used and/or maintained at and/or to the Port of New Orleans by Defendants.

9.     Before and during Decedent John Brindell Jr's exposure periods, each of the defendants designed, tested, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, used, supplied and/or sold asbestos-containing products for use at, including but not limited to the facility listed in Paragraph 7 above, from which the Decedent John Brindell Jr. was exposed to asbestos-containing products, friction materials, insulation, and other equipment that contained fibrous, incombustible, chemical-resistant mineral substances commonly called "asbestos".

10.     When inhaled or otherwise ingested, asbestos causes irreparable and progressive lung damage that can manifest itself as asbestos-related pleural disease, asbestosis, mesothelioma, pulmonary and bronchogenic carcinoma, gastrointestinal cancer, cardiac problems, other lung diseases, pneumoconiosis, and various other injuries.

11.     Each of the defendants knew or should have known through industry and medical studies, the existence of which was unknown to Decedent John Brindell Jr. of the health hazards inherent in the asbestos-containing products they were selling and/or using. Instead of warning Decedent John Brindell Jr. and general public about these dangers, the defendants ignored or concealed such information, or condoned such concealment, in order to sell or use asbestos or asbestos-containing products to avoid litigation by those who were injured from asbestos inhalation.

· 2019-09716

# N

·Section 8

FILED
2019 SEP 17 A 12:30
CIVIL
DISTRICT COURT

as described above.

13.    Because of the latency period between exposure to asbestos and the onset of cancer, and because of the concealment by some defendants of the causes and effects of exposure to asbestos, Decedent John Brindell Jr. did not know, nor could he have reasonably known, that his injuries were caused by his asbestos exposure until recently, which occurred less than one year prior to the filing of the instant Petition for Damages. Further, Petitioners have only recently discovered his injuries, not more than one year preceding the filing of this Original Petition for Damages.

14.    In connection with his own work at the aforementioned job site(s). Decedent John Brindell Jr. inhaled great quantities of asbestos fibers as a result of his work experience, having neither knowledge or reason to believe that asbestos was dangerous. Further, Petitioners allege, as more specifically set out below, that Decedent suffered injuries proximately caused by his exposure to asbestos from asbestos-containing products designed, manufactured, distributed, utilized, and/or sold by Defendants. More specifically, on May 15, 2019, John Brindell, Jr. was diagnosed with malignant mesothelioma, a progressive, non-curable, and ultimately fatal cancer. On or about July 9, 2019, John Brindell, Jr. passed away as a result of his mesothelioma.

15.    Decedent's death was due to or a consequence of his exposure to dust and fibers from asbestos and/or asbestos-containing materials, as a direct and proximate result of his exposure to asbestos products that were unreasonably dangerous per se, defective in composition or construction, defective in design, lacking suitable warnings or instructions concerning the hazards presented, as a result of negligent, willful, and/or reckless misconduct, and as a result of intentional misconduct of certain of the Defendants. As a direct and proximate result of the delictual conduct of the Defendants, Petitioners have lost the love, affection, society, support, services of their father/husband, and bring these claims each individually on their own behalf for any/all other damages due pursuant to Louisiana Civil Code Article 2315.2, and assert this wrongful death

2019-09716

**N**

Section 8

FILED

2019 SEP 17 A 12:30

CIVIL

DISTRICT COURT

Decedent with safe premises in order to protect life health, safety, and welfare of Decedent, and had the following responsibilities:

A.     Inspection, approval, and supervision of these various premises for hazards and vices that may present a hazard to Decedent;

B.     To see that proper safety rules were adopted, promulgated, and enforced concerning the use and handling of hazardous materials that may present harm to people on the premises;

C.     To see that workers performed their duties pertaining to their work in a proper, safe and workmanlike manner so as not to present an unreasonable risk of harm to the workers, as well as Decedent;

D.     To see that the Defendants and their employees used safe and sound principles and practices in their work involving the use and storage of hazardous materials;

E.     To make health and hygiene decisions on any and all questions regarding the use of respiratory protection devices involving the use and storage of hazardous materials;

F.     To keep abreast of state-of-the-art-knowledge, as it pertains to the dangers of asbestos inhalation, involving the use and storage of hazardous materials;

G.     To provide adequate warnings, safety equipment, ventilation, and breathing apparatus, where such was unnecessary, in order to prevent Decedent from being harmed by exposure to asbestos in the environment in which he was required to be present;

H.     To make certain that Decedent was provided safe environment, free from excess asbestos dust inhalation and operations free from excess asbestos dust; and

I.     To comply with applicable state and federal regulations regulating exposure to asbestos, including but not limited to, those regulations regulating exposure to asbestos, including but not limited to, those regulations promulgated by the U.S. Department of

# N

## Section 8

FILED

2019 SEP 17  A 12:30

CIVIL

DISTRICT COURT

the dust laden atmosphere in which Decedent was required to enter. and work, which was damaging and dangerous to Decedent, and each knew or should have known of the dangers to Decedent's health posed by working in an atmosphere polluted with asbestos dust without proper protection or warnings. Petitioners allege that these defendants knew or should have known that the lung cancer sustained by Decedent could have been avoided by the use of adequate ventilation, warnings, packaging and safety equipment.

18.     On information and belief, Defendants negligently failed in the performance of their responsibilities and/or actual undertakings to provide Decedent with safe premises and operations in the following particulars:

    A.      Failing to properly ventilate the area in which Decedent were required to enter in connection with their/his work;

    B.      Failing to warn or provide proper safety appliances, including but not limited to respirators, air-fed hoods, etc. for Decedent's use;

    C.      Failure to institute safety procedures and plans for the adequate protection of Decedent;

    D.      Failing to warn Decedent of the dangers posed by the polluted atmosphere in which he/they were required to work including, but not limited to the risk of asbestosis, pleural disease, mesothelioma, lung cancer, other cancers, and the carcinogenic effect of the risk of lung cancer caused by asbestos exposure to persons with pre-existing smoking habits from the handling and use of asbestos;

    E.      Failing to enforce applicable safety rules after such rules were actually adopted;

    F.      Failing to keep abreast of the scientific and engineering knowledge regarding the dangers of, and protection against, the occupational exposure to asbestos;

    G.      Failing to properly supervise operations;

2019-09716

# N
## Section 8

S. Department of Labor, pursuant to the Walsh/Healy Act and the Occupational Safety and

Health Act; and

J.       Failing to measure the levels of asbestos dust in the premises working environment.

19.     The negligence of these defendants was a substantial factor and contributed in causing

injuries and damages to Decedent and Petitioners.

## NEGLIGENCE AND STRICT LIABILITY ALLEGATIONS AGAINST MANUFACTURER/SELLER/SUPPLIER/CONTRACTOR/ DISTRIBUTOR/PRODUCT DEFENDANTS

20.     The Defendants identified in Paragraph 2B above as manufacturers, sellers, contractors,

distributors and/or suppliers of asbestos/asbestos-containing products were engaged in or

materially participated in the business of manufacturing, or assisted in the manufacturing, or

facilitating the manufacturing of asbestos products, or representing themselves as manufacturers

of asbestos products, or are professional vendors of asbestos or asbestos-containing products, or

as a contractor, which were expected to and did reach Decedent's job site(s) where he was exposed

to them.

21.     The products manufactured, distributed, supplied, sold and/or used by these defendants

were defective, and unreasonably dangerous per se to Decedent who was an intended and

foreseeable user and bystander that was exposed to these products. These defects include, without

limitation, the following:

A.       the manufacture, sale, supply and use of products that are unreasonably dangerous,

or unreasonably dangerous per se;

B.       manufacture, sale, supply and use of products that possess inherent and known

properties that make them unreasonably dangerous by presenting high potential for causing

serious injury, such as respiratory disease, cancer, and other health problems to those who

would be foreseeably exposed to them in the Decedent's trade;

E.      failure of defendants to inspect these products to assure sufficiency and adequacy of warnings and safety cautions;

F.      failure to test or adequately test these products for defects or hazards that they could present to the intended or foreseeable users;

G.      failure to truthfully report or adequately report the results of product testing, and medical studies associated with foreseeable hazards of these products by intended or foreseeable users;

H.      failure to properly design these products where the nature of the product did not require use of asbestos mineral or where alternate, equally suitable substances were readily available;

I.      defects in the composition and construction of these products;

J.      failure to recall these products manufactured, sold and supplied;

K.      failure to properly package these products so that they could be safely transported, handled, stored or disposed of;

L.      over-warranting the safety of these products; and

M.      are liable to Decedent and Petitioners in strict liability for things in their guard, possession, custody or control, pursuant to article 2317 of the Louisiana Civil Code that have caused harm to Decedent and Petitioners.

22.     The defective conditions of defendants' products and fault, as noted above, are a cause of Decedent and Petitioner's injuries and damages complained of herein.

23.     Petitioners also allege that each and every one of the foregoing defendants were also negligent in engaging in the substandard conduct enumerated above and that this negligence was also a proximate cause of Decedent and Petitioner's injuries and damages.

**STRICT LIABILITY AND NEGLIGENCE ALLEGATIONS AGAINST
PREMISES OWNER(S)**

2019-09716

# N
## Section 8

FILED

2019 SEP 17   A 12:30

CIVIL

DISTRICT COURT

25.     The Premises defendant is liable to Decedent for the damages described in this Petition the following acts of negligence while Decedent was working within their respective work site(s):

    A.     Failing to provide respiratory protection to the Decedent;

    B.     Failing to provide safety equipment to Decedent;

    C.     Failure to provide general ventilation in Decedent's work areas;

    D.     Failing to provide local exhaust in Decedent's work areas;

    E.     Failing to provide air free from airborne asbestos fibers in Decedent's work areas;

    F.     Failing to provide Decedent with proper medical monitoring;

    G.     Failing to educate Decedent of the hazards of asbestos;

    H.     Failing to post warning or caution signs regarding the hazards of asbestos;

    I.     Failing to implement wet methods to control the level of airborne asbestos fibers in Decedent's work areas;

    J.     Failing to implement the use of asbestos-free materials; and

    K.     Inducing Decedent to work in areas polluted with respirable asbestos fibers.

26.     As a direct result of the aforementioned acts, Decedent inhaled and otherwise ingested asbestos fibers from the asbestos and asbestos-containing products present within his work sites, and as a direct result, Decedent and Petitioners suffered the injuries and damages complained herein.

27.     During the course of the Decedent's work, Decedent John Brindell Jr. was exposed to asbestos and/or asbestos containing products, which were in the care, control and custody of these defendants. Because of the extreme hazard it poses to humans, asbestos constitutes a defect or vice in the products to which Decedent was exposed, which defect or vice was a cause in fact of Decedent's injuries described herein. Accordingly, these defendants are strictly liable to Decedent and Petitioners in accordance with Louisiana Civil Code article 2315 and 2317.

2019-09716

**N**

**Section 8**

**FILED**

2019 SEP 17 A 12:30

CIVIL

DISTRICT COURT

29.     The premises owner defendant knew or should have known that asbestos posed a hazard

to humans and that there were specific engineering and industrial hygiene controls that could help

reduce the levels of airborne asbestos fibers, nonetheless failed or suppressed, through silence,

neglect or inaction, the truth regarding asbestos to Decedent so as to obtain an unjust advantage

for themselves over and at expense of Decedent or to cause loss or inconvenience to Decedent.

This action or inaction by the defendants was a direct and proximate cause of the damages and

injuries described herein.

## INSURANCE COVERAGE

30.     Defendant FIRST STATE INSURANCE COMPANY, on information and belief, had in

full force and effect a policy or policies of liability or excess insurance insuring Defendant

Eagle, Inc., against the causes of action asserted herein and covering the premises, matters,

persons, things, actions, inactions, and damages that are the subject of this petition, and, as such,

Defendant FIRST STATE INSURANCE is directly liable to Petitioners under the provisions of

the Louisiana Revised Statutes, Title 22, Section 655 (now 22:1269).

31.     Defendant UNITED STATES FIDELITY AND GUARANTY COMPANY ("USF&G),

on information and belief, had in full force and effect a policy or policies of liability or excess

insurance insuring Defendant Eagle, Inc., against the causes of action asserted herein and

covering the premises, matters, persons, things, actions, inactions, and damages that are the

subject of this petition, and, as such, Defendant UNITED STATES FIDELITY AND

GUARANTY COMPANY ("USF&G) is directly liable to Petitioners under the provisions of

the Louisiana Revised Statutes, Title 22, Section 655 (now 22:1269).

## DAMAGES

32.     The conduct of Defendants, as alleged herein, was a direct, proximate and producing cause

of the damages resulting from the development of Decedent John Brindell Jr's asbestos-related

2019-09716

# N

## Section 8

FILED

2019 SEP 17  A 12:30
CIVIL
DISTRICT COURT

B.      The physical impairment and disfigurement suffered by Decedent;

C.      Reasonable and necessary medical expenses incurred by Decedent;

D.      Funeral and burial expenses;

E.      All past, present, and future lost earnings and loss of earning capacity;

F.      Loss of consortium, love, affection, services, and society;

G.      Loss of quality of life;

H.      All damages caused by witnessing intimately the suffering of their husband and father; and

I.      All forms of relief or categories of damages allowed by Louisiana law against parties the law allows such claims to be alleged against, with interest, from the date of injury until paid, plus costs of these proceedings.

**WHEREFORE,** Petitioners demand judgment against the Defendants, and each of them, jointly, severally and/or *in solido* for all damages, for their costs expended herein, for judicial interest from the date of judicial demand, and for such other and further relief, both at law and in equity, to which Petitioners may show themselves justly entitled.

Respectfully submitted,
**THE CHEEK LAW FIRM LLC**

LINDSEY A. CHEEK, Bar No. 34484
Bridget B. Truxillo, Bar No. 36982
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
BTruxillo@thecheeklawfirm.com
JStRomain@thecheeklawfirm.com

**-And-**

2019-09716

# N

## Section 8

FILED

2019 SEP 17   A 12:30

CIVIL

DISTRICT COURT

## SERVICE INSTRUCTIONS

PLEASE SERVE THE FOLLOWING DEFENDANTS WITH PETITIONERS' ORIGINAL
PETITION FOR DAMAGES:

1.  **CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC.**
    May be served via the Louisiana Long Arm Statute:
    United Agent Group, Inc.
    350 South Northwest Highway, #300
    Park Ridge. IL 60068

2.  **EAGLE, INC.**
    May be served through its registered agent for service of process:
    Susan B. Kohn
    1100 Poydras Street. 30th Floor
    New Orleans, LA 70163

3.  **EATON CORPORATION**
    May be served through its registered agent for service of process:
    CT Corporation System
    3867 Plaza Tower Drive
    Baton Rouge, LA 70816

4.  **GREAT DANE LLC (f/k/a Great Dane Limited Partnership)**
    May be served through its registered agent for service of process:
    Universal Registered Agents. Inc.
    1011 North Causeway Boulevard. Suite 3
    Mandeville, LA 70471

5.  **HONEYWELL INTERNATIONAL, INC. f/k/a Allied Signal Inc., Individually and
    as Successor in Interest to Allied Corporation as Successor in Interest to Bendix
    Corporation**
    May be served through its registered agent for service of process:
    Corporation Service Company
    501 Louisiana Ave.
    Baton Rouge, LA 70802

6.  **KELSEY-HAYES COMPANY**
    May be served via the Louisiana Long Arm Statute:
    CSC – Lawyers Incorporating Service Company
    601 Abbott Road
    East Lansing. MI 48823

7.  **LUFKIN INDUSTRIES, LLC**
    May be served through its registered agent for service of process:
    CT Corporation System
    3867 Plaza Tower Drive
    Baton Rouge, LA 70816

2019-09716

# N
## Section 8

9.   **PNEUMO-ABEX CORPORATION**
     May be served via the Louisiana Long Arm Statute on its registered agent:
     Corporation Service Company
     251 Little Falls Dr.
     Wilmington, DE 19808

10.  **PORT OF NEW ORLEANS, LLC,**
     May be served through its registered agent for service of process:
     Pamala Bishop
     526 Andry Street
     New Orleans, LA 70117

11.  **STRICK TRAILERS, LLC**
     May be served through its registered agent for service of process:
     CT Corporation System
     3867 Plaza Tower Drive
     Baton Rouge, LA 70816

12.  **TAYLOR-SEIDENBACH, INC.**
     May be served through its registered agent for service of process:
     Robert I. Shepard
     731 South Scott Street
     New Orleans, LA 70119

13.  **UTILITY TRAILER MANUFACTURING COMPANY**
     May be served through its registered agent for service of process:
     Corporation Service Company
     501 Louisiana Avenue
     Baton Rouge, LA 70802

14.  **WILSON TRAILER COMPANY**
     May be served through its registered agent for service of process:
     Business Filings International, Inc.
     3867 Plaza Tower Drive
     Baton Rouge, LA 70816

15.  **FIRST STATE INSURANCE COMPANY,** As the Insurer of Eagle, Inc., f/k/a Eagle
     Asbestos & Packing Co., Inc.
     Through the Louisiana Secretary of State:
     8585 Archives Avenue
     Baton Rouge, LA 70809

16.  **UNITED STATES FIDELITY AND GUARANTY COMPANY,** As the Insurer of
     Eagle, Inc., f/k/a Eagle Asbestos & Packing Co., Inc.
     Through the Louisiana Secretary of State:
     8585 Archives Avenue
     Baton Rouge, LA 70809

# EXHIBIT AA –

Placeholder for Deposition of Dr. Staggs. As Dr. Staggs was deposed just a day ago, his deposition transcript is not yet available. However, upon receipt of same, Defendants will supplement this exhibit with the deposition transcript.

FILED

2020 JAN 27  P 04:44

CIVIL

DISTRICT COURT

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716          **SECTION: 8**          **DIVISION "N"**

**CAROLYN BRINDELL, ET AL**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL**

FILED: _____          _____

                                                                      DEPUTY CLERK

**PLAINTIFF'S FIRST SUPPLEMENTAL AND AMENDING PETITION FOR
DAMAGES WITH INCORPORATED MOTION FOR LEAVE OF COURT**

NOW INTO COURT, through undersigned counsel, comes Plaintiffs CAROLYN

BRINDELL, JOHN BRINDELL III, CONNIE DUPAY, and CHRISTOPHER BRINDELL, the

statutory heirs and wrongful death beneficiaries of Decedent, JOHN BRINDELL, JR., who

respectfully move the Court for leave to file this *First Supplemental and Amending Petition* to

their *Original Petition for Damages* in the following particulars:

I.

Plaintiffs wish to supplement and amend the Original Petition for Damages to amend and

add the following Defendants to this action:

17.   **BOARD OF COMMISSIONERS FOR THE PORT OF NEW ORLEANS**, a
      company domiciled in the State of Louisiana, who is authorized to do and doing
      business in Louisiana, with its principal place of business in Orleans Parish. This
      defendant is being sued as a Premises Defendant.

18.   **CRA TRAILERS INC., f/k/a Great Dane Trailers Inc.,** a foreign company
      domiciled in the State of Delaware, who is authorized to do and doing business in
      Louisiana. This defendant is being sued as a seller/supplier/manufacturer/product
      Defendant.

19.   **UNION CARBIDE CORPORATION**, a foreign company domiciled in the State
      of Delaware, transacting business in Louisiana with a principal business
      establishment in Louisiana at 355 Highway 3142, Hahnville, Louisiana 70057. This
      defendant is being sued as a Supplier Defendant.

II.

Plaintiffs reiterate all matters contained in the Original Petition for Damages and allege the

same against these Defendants, including the prayer of their original petition as though set forth at

length herein.

**EXHIBIT B**

FILED

2020 JAN 27  P 04:44
CIVIL
DISTRICT COURT

WHEREFORE, Plaintiffs pray that the Original Petition for Damages be supplemented and amended in the above particulars and, after due proceedings had, there be judgment entered in favor of Plaintiffs in appropriate amounts to be determined by the fact finder, said judgments against all defendants jointly, severally and *in solido*, the amounts to bear legal interest from the date of the judicial demand until paid, for all costs of these proceedings, and for all general and equitable relief.

THE CHEEK LAW FIRM, LLC

Lindsey A. Cheek LA Bar No.34484
Jeanne L. St. Romain, LA Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Tel: (504) 304-4333
Fax: (504) 324-0629
LCheek@thecheeklawfirm.com
JStRomain@thecheeklawfirm.com

AND

SIMMONS HANLY CONROY
Michael K. Hibey, IL Bar No. 6285982
*Admitted Pro Hac Vice*
1 Court Street
Alton, Illinois 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mhibey@simmonsfirm.com

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I do hereby certify that I have on this 27th day of January 2020, I served a copy of the foregoing pleading on counsel to all parties to this proceeding, by electronic transmission, facsimile and/or United States mail, properly addressed, and first class postage prepaid.

Lindsey A. Cheek

FILED

2020 JAN 27  P 04:44

CIVIL

DISTRICT COURT

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

### STATE OF LOUISIANA

NO. 2019-09716                SECTION: 8                DIVISION "N"

### CAROLYN BRINDELL, ET AL

### VERSUS

### CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL

FILED: _____          _____

                                                                DEPUTY CLERK

### ORDER

The Court having reviewed Plaintiffs' Motion for Leave to File their First Supplemental and Amended Petition for Damages, GRANTS said Motion.   It is further, ORDERED, ADJUDGED AND DECREED that Plaintiffs may file their First Supplemental and Amended Petition for Damages.

New Orleans, Louisiana this the 30 day of ____ , 2020.

Sgd. Ethel Simms Julien

_____

Hon. Ethel S. Julien

SERVICE INSTRUCTIONS ON FOLLOWING PAGE

A TRUE COPY

DEPUTY CLERK CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

## SERVICE INSTRUCTIONS

**PLAINTIFFS WILL SERVE THE DEFENDANTS NAMED IN THEIR ORIGINAL PETITION FOR DAMAGES THROUGH COUNSEL OF RECORD PURSUANT TO LA. C.C.P. ART. 1313.**

**PLEASE SERVE PLAINTIFFS' ORIGINAL PETITION AND PLAINTIFFS' FIRST SUPPLEMENTAL AND AMENDED PETITION FOR DAMAGES ON THE FOLLOWING DEFENDANTS:**

1. **BOARD OF COMMISSIONERS FOR THE PORT OF NEW ORLEANS**
   Through its Registered Agent for Service
   Michelle W. Scelson
   1350 Port of New Orleans Place
   New Orleans, Louisiana 70130

2. **CRA TRAILERS INC., f/k/a Great Dane Trailers Inc.**
   Through its Registered Agent for Service
   Glen Darbyshire
   Bouhan Falligant LLP
   One West Park Avenue
   PO Box 2139
   Savannah, Georgia 31402

3. **UNION CARBIDE CORPORATION**
   Through its Registered Agent for service:
   CT Corporation System
   3867 Plaza Tower Drive
   Baton Rouge, Louisiana 70816

Civil District Court for the Parish of Orleans
**STATE OF LOUISIANA**

No: 2020 - 06964

Division/Section: N-08

AARON, STEVEN SR.
versus
BANCROFT BAG, INC.  et al ET AL

Date Case Filed: 8/17/2020

NOTICE OF SIGNING OF JUDGMENT

TO:

Lindsey A Cheek Esq      34484
650 Poydras Street, Suite 2519
New Orleans, LA 70130

Forrest R Wilkes Esq     22897
650 Poydras Street
Suite 1530
New Orleans, LA 70130

Joseph H Hart Esq      21434
1100 Poydras Street
Suite 3300
New Orleans, LA 70163

Lee B Ziffer Esq      32783
1615 Poydras street
Suite 1300
New Orleans, LA 70112

Amber B Barlow Esq      34433
1615 Poydras St
Ste 1300
New Orleans, LA 70112

Gabriel J Veninata Esq      23582
3624 Iberville St
New Orleans, LA 70119-5213

Lacey T McCoy Esq      37790
1100 Poydras St Ste 3700
New Orleans, LA 70163

Zackary A Faal Esq      30009
201 St. Charles Ave
Ste 4120
New Orleans, LA 70170

In accordance with Article 1913 C.C.P., you are hereby notified that Judgment
in the above entitled and numbered cause was signed on February 1, 2021

New Orleans, Louisiana
February 1, 2021

MINUTE CLERK

**EXHIBIT BB**

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 20-6964                           DIVISION "N"                           SECTION 8

STEVEN AARON, SR.

VERSUS

BANCROFT BAG, INC.

<u>JUDGMENT</u>

This matter came before the court on January 29, 2021, on Exceptions of Improper Venue filed on behalf of Defendants, Monroe Spring & Brake, Inc. and Blue Bird Body Company.     At the close of oral argument, the court took the Exceptions under advisement to review the law and evidence.

> **PRESENT: Lindsey Cheek, Jeanne St. Romain, Daniel Blouin, Casey Cira, and Todd Neilson, Counsel for Plaintiff**
>
> **Forrest Ren Wilks and Jason Elam, Counsel for Defendant, Blue Bird Body Co.**
>
> **Joseph Hart, Counsel for Defendant, Monroe Spring & Brake, Inc.**
>
> **Lee Ziffer, Counsel for Defendants, Ford Motor Co. and Thomas Built Buses, Inc.**
>
> **Allison Benoit, Counsel for Defendant, Bancroft Bag, Inc.**
>
> **Amber Barlow, Counsel for Defendants, Pneumo-Abex Corp. and BWDAC Inc. f/k/a BWD Automotive Corp.**
>
> **Gabriel Veninata, Counsel for Defendant, Taylor Seidenbach, Inc.**
>
> **Lacey McCoy, Counsel for Defendants, Genuine Parts Co. and Carlisle Industrial Brake and Friction, Inc.**
>
> **Zachary Paal, Counsel for Defendant, Navistar, Inc.**

Considering the law and evidence:

**IT IS ORDERED, ADJUDGED, AND DECREED** that there be judgment herein in favor of Defendants, Blue Bird Body Co. and Monroe Spring & Brake, Inc. and against Plaintiff, Steven Aaron, Sr. granting Defendants' Exceptions of Improper Venue.

New Orleans, Louisiana this _1st_ day of February, 2021.

JUDGE ETHEL S. JULIEN

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 20-6964                    DIVISION "N"                    SECTION 8

STEVEN AARON, SR.

VERSUS

BANCROFT BAG, INC.

<u>REASONS FOR JUDGMENT</u>

Plaintiff, Steven Aaron, Sr., a resident of Union Parish filed a Petition for Damages on August 17, 2020.    [See the Petition at paragraph 1.]    Plaintiff alleges that he was exposed to asbestos while working as a mechanic in both West Monroe and Monroe, LA, and as an operator for Defendant, Bancroft Bag Co. in West Monroe, LA.    [See the Petition at paragraphs 6, 7, and 8.]    He asserts that due to this exposure, he has developed malignant mesothelioma.    [See the Petition at paragraph 12.]    Also named as Defendants are Taylor Seidenbach, Inc. and eleven other alleged suppliers/manufacturers/sellers/contractors/distributors of asbestos containing products. [See the Petition at paragraph 2 (B).]

Plaintiff alleged that venue is proper in Orleans Parish because that is where Defendant, Taylor Seidenbach, Inc. has designated as its domicile, primary business office and/or primary place of business in Louisiana and because that is where wrongful conduct occurred and/or where Plaintiff's damages were sustained.    [See the Petition at paragraphs 4(a)(b)(c).]    There are no specific allegations in this Petition as to where, when, or how Defendant, Taylor Seidenbach, Inc. exposed Plaintiff to asbestos.    [See the Petition.]

Two of the named Defendants, Blue Bird Corporation and Monroe Spring & Brake, Inc. filed Exceptions of Improper Venue.    While Plaintiff relies on the bare bones allegations in his Petition to argue that venue is proper in Orleans Parish, Defendants have submitted uncontroverted evidence that the lone Orleans Parish domiciliary, Taylor Seidenbach, Inc. did not supply any asbestos containing materials to any company around which Plaintiff worked, nor did any alleged wrongful conduct occurred in Orleans Parish, nor did Plaintiff sustain any damages in Orleans Parish.    Specifically, Defendants have

NO. 20-6964                          DIVISION "N"                          SECTION 8

STEVEN AARON, SR.

VERSUS

BANCROFT BAG, INC.

produced Deposition excerpts from Plaintiff's Deposition; Deposition excerpts from the

Deposition Defendant, Taylor Seidenbach Inc.'s corporate representative, Ralph Shepard in

CDC# 16-02507, Johnson v. Bancroft Bag, Inc., et al; Bancroft Bag's Response To Plaintiffs'

Notice of Records Deposition Of Bancroft Bags, Inc. in CDC#16-02507, Johnson v. Bancroft

Bag, et al; Bancroft Bag, Inc.'s Reply Memorandum in Support of Defendant's Exception of

Improper Venue and Motion to Dismiss Based Upon Forum Non Conveniens in CDC316-

02507, Johnson v. Bancroft Bag, et al; and, Taylor Seidenbach, Inc.'s Responses to Request

For Admissions, Interrogatories, And Requests For Production Of Documents Of Genuine

Parts Company in this case.

      As there is no evidence in this record at this time that venue is proper in Orleans

Parish, this court grants the Exceptions of Improper Venue filed on behalf of Defendants,

Blue Bird Body Co. and Monroe Spring & Brake, Inc.

      New Orleans, Louisiana this _1st_ day of February, 2021.

      JUDGE ETHEL S. JULIEN

2

FILED

2020 FEB -4  PM 2: 26

CIVIL
DISTRICT COURT

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                    SECTION 8                    DIVISION N

**CAROLYN BRINDELL, JOHN BRINDELL III, CONNIE DUPAY, AND CHRISTOPHER BRINDELL,**
**Each Individually and on Behalf of Decedent JOHN BRINDELL, JR.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED:_____      _____
                                                              **DEPUTY CLERK**

## MOTION TO DISMISS WITHOUT PREJUDICE

NOW INTO COURT through undersigned counsel come plaintiffs, Carolyn Brindell, John Brindell III, Connie Dupay, and Christopher Brindell, individually and on behalf of decedent John Brindell, Jr., who move to dismiss all of their claims, including those brought on behalf of the late John Brindell, Jr., against Honeywell International Inc., as successor in interest to AlliedSignal, Inc., as successor in interest to The Bendix Corporation, without prejudice, and with each party to bear its respective costs. Plaintiffs expressly reserve all other rights which they may have as to all other parties, named or unnamed, in this matter.

**EXHIBIT C**

Respectfully submitted,

**THE CHEEK LAW FIRM, LLC**

_____
Lindsey A. Cheek (LA Bar No. 34484)
Jeanne L. St. Romain, (LA Bar No. 36035)
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone (504) 304-0629
Facsimile (504) 324-0629

AND

**SIMMONS HANLY CONROY**

Michael K. Hibey, IL Bar No. 6285982
Admitted _Pro Hac Vice_
1 Court Street
Alton, Illinois 62002
Telephone: (618) 259-2222
Facsimile: (618) 259-2251

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served

upon all counsel of record by email, facsimile transmission, and/or depositing same in the U.S.

Mail, postage prepaid and properly addressed, this ___4ᵗʰ___ day of ___February___, 2020.

_____
SARAH E. McMILLAN

2



**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                SECTION 8                DIVISION N

**CAROLYN BRINDELL, JOHN BRINDELL III, CONNIE DUPAY, AND
CHRISTOPHER BRINDELL,**
**Each Individually and on Behalf of Decedent JOHN BRINDELL, JR.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED:_____          _____
                                                    **DEPUTY CLERK**

**ORDER**

Considering the foregoing Motion To Dismiss Without Prejudice:

IT IS ORDERED that the claims of plaintiffs, Carolyn Brindell, John Brindell III, Connie

Dupay, and Christopher Brindell, including those brought on behalf of the late John Brindell, Jr.,

against Honeywell International Inc., as successor in interest to AlliedSignal, Inc., as successor in

interest to The Bendix Corporation, be and are hereby dismissed, without prejudice, with each

party to bear its respective costs, reserving plaintiffs' rights against all other parties, whether name

or unnamed, in this matter.

New Orleans, Louisiana, this _____ day of _____, 2020.

FEB 0 6 2020

(Sgd.) ELLEN M. HAZEUR
Judge - Division "A"

_____
HONORABLE

(Sgd.) ELLEN M. HAZEUR
Judge, Division "A"
A TRUE COPY

CIVIL DISTRICT COURT
PARISH OF ORLEANS, STATE OF LA

FILED

2019 OCT 29 PM 1: 27

CIVIL
DISTRICT COURT

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2019-09716      SECTION "8"      DIVISION: "N"

CAROLYN BRINDELL, JOHN BRINDELL III,
CONNIE DUPAY, AND CHRISTOPHER BRINDELL,
Each Individually and on behalf of Decedent JOHN BRINDELL, JR.

VERSUS

CARLISLE INDUSTRIAL BRAKE AND FRACTION, INC., ET AL

FILED: _____      _____
                                                       DEPUTY CLERK

**MOTION AND ORDER OF DISMISSAL WITHOUT PREJUDICE**

**NOW INTO COURT,** through undersigned counsel, come plaintiffs, **Carolyn Brindell, John Brindell, III, Connie Dupay and Christopher Brindell, individually and on behalf of the Decedent, John Brindell, Jr.,** who hereby move this Court to dismiss all of their claims against defendant, Meritor, Inc. without prejudice with each party to bear its own costs, reserving all rights of plaintiffs against all other parties and entities.

**IT IS ORDERED, ADJUDGED AND DECREED,** that all claims of plaintiffs against defendant, Meritor, Inc. are hereby dismissed, without prejudice, reserving all rights to plaintiffs, , **Carolyn Brindell, John Brindell, III, Connie Dupay and Christopher Brindell, individually and on behalf of the Decedent, John Brindell, Jr.,** against other parties and entities with each party to bear its own costs.

New Orleans, Louisiana this 8 day of November 2019.

JUDGE ETHEL S. JULIEN

DEPUTY CLERK

VERIFIED

RECEIVED

VERIFIED

11-13-19

**EXHIBIT D**



Deposition of
# J. Keith Poleto

**Volume I**

**Date:** February 19, 2020

**Case:** CAROLYN BRINDELL, ET AL v. CARLISLE INDUSTRIAL
BRAKE AND FRICTION, INC., ET AL

**No.** 2019-09716

**Court Reporter:**  Tara W. Wilson, CCR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513

**EXHIBIT E**

CIVIL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

CAROLYN BRINDELL, ET AL          NO. 2019-09716
                                 SECTION: 8
VERSUS                           DIVISION "N"

CARLISLE INDUSTRIAL BRAKE
AND FRICTION, INC., ET AL


        Volume I of II of the videotaped deposition
of J. KEITH POLETO, 114 Oak Court, Westwego,
Louisiana 70094, taken at the Hampton Inn & Suites,
5150 Mounes Street, Harahan, Louisiana 70123, on
Wednesday, the 19th day of February 2020,
commencing at 10:05 a.m. and concluding at 1:24
p.m.

J. Keith Poleto
February 19, 2020

## Page 2

```
1
2
3   APPEARANCES:
    SIMMONS HANLY CONROY
    (BY:  MICHAEL K. HIBEY)
4   One Court Street
    Alton, Illinois  62002
5   (ATTORNEYS FOR THE PLAINTIFFS)
6
7   CHRISTOVICH & KEARNEY, LLP
    (BY:  ADREJIA B. SWAFFORD)
    601 Poydras Street, Suite 2300
8   New Orleans, Louisiana  70130-6078
    (ATTORNEYS FOR FIRST STATE INSURANCE,
9   DEFENDANT)
10
11  COURINGTON, KIEFER, SOMMERS, MARULLO,
    MATHERNE, LLC
    (BY:  JAMIE M. ZANOVEC)
12  616 Girod Street
    New Orleans, Louisiana  70130
13  (ATTORNEYS FOR LUFKIN INDUSTRIES, LLC,
    DEFENDANT)
14
15  DEUTSCH KERRIGAN
    (BY:  JENNIFER E. ADAMS
16  AND BARBARA B. ORMSBY)
    755 Magazine Street
17  New Orleans, Louisiana  70130
    (ATTORNEYS FOR ZF ACTIVE SAFETY US, INC.
18  (F/K/A KELSEY-HAYES COMPANY, AND WILSON
    TRAILER COMPANY, DEFENDANTS)
19
20  FOLEY & MANSFIELD
    (BY:  KAY BARNES BAXTER)
21  650 Poydras Street, Suite 2450
    New Orleans, Louisiana  70130
22  (ATTORNEYS FOR STRICK TRAILERS, LLC,
    DEFENDANT)
23
24
25
```

## Page 3

```
1
2   APPEARANCES, CTD:
3   HAILEY, McNAMARA, HALL,
    LARMANN & PAPALE, LLP
    (BY:  EDWARD J. LASSUS, JR.)
4   (VIA TELEPHONE)
    One Galleria Boulevard, Suite 1400
5   Metairie, Louisiana  70001
    (ATTORNEYS FOR TAYLOR-SEIDENBACH, INC.,
6   DEFENDANT)
7
8   FRILOT LLC
    (BY:  ANGELA M. BOWLIN)
    1100 Poydras Street, Suite 3700
9   New Orleans, Louisiana  70163
    (ATTORNEYS FOR CARLISLE INDUSTRIAL BRAKE AND
10  FRICTION, INC., DEFENDANT)
11
12  MG+M THE LAW FIRM
    (BY:  VIKRAM S. BHATIA)
13  One Canal Place
    365 Canal Street, Suite 3000
    New Orleans, Louisiana  70130
14  (ATTORNEYS FOR EATON CORPORATION, DEFENDANT)
15
16  MG+M THE LAW FIRM
    (BY:  AMANDA L. DETO)
17  One Canal Place
    365 Canal Street, Suite 3000
    New Orleans, Louisiana  70130
18  (ATTORNEYS FOR CRA TRAILERS, INC., F/K/A
    GREAT DANE, DEFENDANT)
19
20  PUGH ACCARDO, LLC
    (BY:  DAVID M. STEIN)
21  1100 Poydras Street
    Suite 3300
22  New Orleans, Louisiana  70163-1132
    (ATTORNEYS FOR UNION CARBIDE, DEFENDANT)
23
24
25
```

## Page 4

```
1   APPEARANCES, CTD:
2   PUGH, ACCARDO, HAAS & RADECKER
    (BY:  JOSEPH H. HART)
3   1100 Poydras Street
    Suite 3300
4   New Orleans, Louisiana  70163-1132
    (ATTORNEYS FOR UTILITY TRAILER MANUFACTURING
5   COMPANY, DEFENDANT)
6
7   SIMON, PERAGINE, SMITH & REDFEARN
    (BY:  DOUGLAS W. REDFEARN)
    1100 Poydras Street, 30th Floor
8   New Orleans, Louisiana  70163
    (ATTORNEYS FOR EAGLE, INC., DEFENDANT)
9
10  STAINES & EPPLING
    (BY:  ANTHONY J. STAINES)
11  3500 North Causeway Boulevard, Suite 820
    Metairie, Louisiana  70002
12  (ATTORNEYS FOR BOARD OF COMMISSIONERS FOR
    THE PORT OF NEW ORLEANS, DEFENDANT)
13
14  Also Present:
    Mark Ancalade, Videographer
15
16  Reported by:
    TARA W. WILSON
    Certified Court Reporter
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1          I N D E X
2
3
4
5                    Page
6   SUIT CAPTION...................... 1
7   APPEARANCES....................... 2-4
8   STIPULATION....................... 6
9
10  EXAMINATION INDEX
11  BY MR. HIBEY.............. 9, 205
12  BY MS. BOWLIN.............. 80
13  BY MR. HART............... 162
14
15
16  EXHIBIT INDEX
17  EXHIBIT A (DRAWING)................. 126
18  EXHIBIT B (WARNING LABELS).......... 160
19  EXHIBIT C (RECOMMENDED PROCEDURES FOR REDUCING
20  ASBESTOS DUST DURING BRAKE
21  SERVICING)........................ 161
22  EXHIBIT D (OCTOBER 1978 FRICTION MATERIALS WORK
23  PRACTICES GUIDE).................. 161
24
25
```

2 (Pages 2 to 5)

J. Keith Poleto
February 19, 2020

---

Page 6

1     S T I P U L A T I O N
2
3         It is stipulated and agreed by and between
4     counsel for the parties hereto that the videotaped
5     deposition of the aforementioned witness is hereby
6     being taken under the Louisiana Code of Civil
7     Procedure, for all purposes, in accordance with the
8     law pursuant to notice.
9         The formalities of sealing, certification,
10    and filing are specifically waived.  The witness
11    reserves the right to read and sign the deposition.
12        All objections, save those as to the form of
13    the question and the responsiveness of the answer,
14    are hereby reserved until such time as this
15    deposition, or any part thereof, may be used or
16    sought to be used in evidence.
17
18                  * * * * * *
19
20        TARA W. WILSON, Certified Court Reporter, in
21    and for the Parish of Orleans, State of Louisiana,
22    officiated in administering the oath to the
23    witness.
24
25

---

Page 7

1         MS. BAXTER:
2             Before we get started, can we put on
3     the stenographic record?
4             Plaintiff counsel, I am asking you if
5     it's all right.  We are reserving all objections
6     except as to form and responsiveness.  Is that all
7     right?
8         MR. HIBEY:
9             Sorry.  What?
10        MS. BAXTER:
11            I said, is it okay if we -- what we
12    normally do is we reserve all objections except as
13    to form and responsiveness, and objection by one is
14    good for all.  Is that all right?
15        MR. HIBEY:
16            Yes.
17        MR. STAINES:
18            Put that on the record?
19        MS. BAXTER:
20            Yes, please put that on the record.
21        THE REPORTER:
22            I'll put that on.
23        MS. BAXTER:
24            Thank you.
25        MR. STEIN:

---

Page 8

1             I need to put something on the record,
2     too.  My name is David Stein representing --
3         THE REPORTER:
4             Wait.  Slow down just a little.  Say it
5     a little louder for me.
6         MR. STEIN:
7             Sure.  David Stein representing Union
8     Carbide.  And appearance here today is not waiving
9     any rights.  We have not been properly served yet
10    or answered the case.
11        THE REPORTER:
12            Thank you, sir.
13        MR. STAINES:
14            Are you going to go through a rough --
15    ask everybody to --
16        VIDEOGRAPHER:
17            No.
18        MR. STAINES:
19            No?
20        VIDEOGRAPHER:
21            Counsel will be noted on stenographic
22    record.
23        MR. STAINES:
24            Okay.  Tony Staines for the Board of
25    Commissioners, Port of New Orleans.  I join in that

---

Page 9

1     objection just now.  We have also not appeared yet
2     in this case.  Reserve all rights, therefore.
3         THE VIDEOGRAPHER:
4             This is the videotaped deposition of
5     Mr. Jonathan K. Poleto.  Today's date is February
6     the 19th, 2020 at the time indicated on the video
7     screen which is 10:05.
8             This is the case of Carolyn Brindell,
9     et al versus Carlisle Industrial Brakes and
10    Friction, Inc., et al.  Cause number is 2019-09716,
11    Division N.  This case is pending in the Civil
12    District Court, Parish of Orleans, State of
13    Louisiana.  My name is Mark Ancalade, the
14    videographer.  Today's court reporter is Ms. Tara
15    Wilson.  We are with Paszkiewicz Court Reporting.
16    Today's deposition is being held in Harahan,
17    Louisiana.  Counsel will be noted on the
18    stenographic record only, and I would ask that the
19    court reporter please swear in the witness.
20        J. KEITH POLETO,
21    after having first been duly sworn by the
22    above-mentioned Court Reporter, did testify as
23    follows:
24    EXAMINATION BY MR. HIBEY:
25        Q.   Good morning.

3 (Pages 6 to 9)

J. Keith Poleto
February 19, 2020

Page 10

1      A.    Good morning.
2      Q.    Could you please state your name for
3   the record?
4      A.    Jonathan Keith Poleto.
5      Q.    And that is P-O-L-E-T-O?
6      A.    Correct.
7      Q.    Where do you currently live?
8      A.    114 Oak Court, Westwego, Louisiana.
9      Q.    And what is your date of birth?
10     A.    2/25/58, next week.
11     Q.    All right.  Well, happy birthday early.
12   MS. BOWLIN:
13          Mardi Gras day.
14   THE WITNESS:
15          It is.
16   EXAMINATION BY MR. HIBEY:
17     Q.    Mr. Poleto, am I saying that correctly,
18   Poleto?
19     A.    Poleto, Poleto.  I answer to anything.
20     Q.    All right.  Well, I will probably say
21   it wrong all day.  I am going to ask you some
22   questions about your work with Mr. Brindell, okay?
23     A.    Yes.
24     Q.    And I'm going to try to get through it
25   as quickly as I can.  I understand you've given up

Page 11

1   some other things that you'd rather be doing today
2   to be here for us today and I appreciate that, so
3   let's get right to it.
4          You knew Mr. Brindell, correct?
5     A.    Yes, he was -- yeah.
6     Q.    And you knew him from childhood, you
7   knew him from work, you knew him -- how did you
8   know Mr. Brindell?
9     A.    I've been knowing him most of my life
10   mainly from work.  He was my supervisor.
11     Q.    Where did you work with Mr. Brindell?
12     A.    Puerto Rican Marine.
13     Q.    So I want to talk about that.  When did
14   you first start working at Puerto Rico Marine?
15     A.    The end of 1979.  October I think was
16   the month.
17     Q.    Was Mr. Brindell already working there?
18     A.    Yes.
19     Q.    And when did you stop working for
20   Puerto Rico Marine?
21     A.    '90 -- 1996.  I don't remember the
22   month.
23     Q.    Okay.  And when you worked at Puerto
24   Rico Marine from 1979 to 1996, did you have the
25   same job throughout or did your roles, duties, and

Page 12

1   responsibilities change over time?
2     A.    No, we pretty much had the same job all
3   the time.
4     Q.    What was your job there?
5     A.    We were maintenance for the 18 wheel
6   trailers for the company.
7     Q.    All right.  Now, Mr. Brindell, you said
8   he was already out there at Puerto Rico Marine when
9   you started in October 1979, right?
10     A.    Correct.
11     Q.    Do you know when Mr. Brindell stopped
12   working at Puerto Rico Marine?
13     A.    Not exactly.  I'd say six to eight
14   years after I started.  Probably closer to eight
15   years.  I'm not sure.
16     Q.    Okay.  Now, tell us a little bit about
17   Puerto Rico Marine in general.  What was that
18   business?
19     A.    It was a -- sea containers and cargo
20   trailers that came off the rail or the highway,
21   they came into our terminal.  We did all
22   maintenance on them.  They went onto a ship and
23   went directly to Puerto Rico.  That's how the
24   people in Puerto Rico got their goods, food, and
25   whatnot.

Page 13

1     Q.    And you said "terminal," so where were
2   you located, where did you do your work?
3     A.    Inside the terminal, it was a big
4   cement yard that would accommodate 3,000 trailers
5   maybe.  And we had a front shop and a rear shop and
6   a mechanic shop for the yard trucks.  We had yard
7   trucks.  We had a shop next to us for that.  Our
8   shop was a suspension shop for all the underneath
9   of the trailer:  The wheels, brakes, axles, landing
10   gear, lights.  That was our responsibility.
11     Q.    Okay.
12     A.    The back shop did the structure to the
13   boxes themself.
14     Q.    All right.  So there is three different
15   sort of mechanical shops --
16     A.    Correct.
17     Q.    -- out there?
18     A.    Correct.
19     Q.    One you called the front shop, one you
20   called the rear shop, the other was the yard shop;
21   is that correct?
22     A.    Handled all the yard equipment.  It was
23   mostly the motors and stuff like that, you know,
24   for the trucks and the forklifts.
25     Q.    Okay.  And you were stationed and

4 (Pages 10 to 13)

J. Keith Poleto
February 19, 2020

Page 14

1  worked as a mechanic in the rear shop; is that
2  correct?
3      A.   In what?
4      Q.   I am sorry.  The front shop?
5      A.   I was in the front shop in charge of
6  the suspensions and everything on the units.
7  That's what our shop was responsible for.  It was a
8  four-bay shop.  You had four bays.  Each bay had
9  two mechanics.
10     Q.   Okay.  And was that the same shop that
11  Mr. Brindell was working at?
12     A.   Mr. Brindell was responsible for all
13  the shops, but he was mainly in our shop.  Our shop
14  was like the hub.
15     Q.   All right.  And as a mechanic working
16  in the front shop on suspensions, what type of
17  mechanical work did you perform?
18     A.   The brake jobs.  We didn't do the
19  tires, we had separate people did tires.  We did
20  brake jobs, suspensions, springs, axles, brake
21  boosters, wiring, lights, and the landing gear, the
22  dolly wheels that raise the front of the trailer.
23     Q.   Okay.  And you said that there were
24  four bays, two mechanics assigned to each bay?
25     A.   Two mechanics assigned to each bay,

Page 15

1  correct.
2      Q.   Can you tell us some of the other
3  mechanics that were in the shop at the same time as
4  you?
5      A.   The names?
6      Q.   Yes.
7      A.   My partner was D.J. Lockhart.
8  MS. ADAMS:
9          Last name?
10 THE WITNESS:
11          Pardon me?
12 MS. ADAMS:
13          Last name?
14 THE WITNESS:
15          Lockhart, just like it sounds.
16 L-O-C-K-H-A-R-T, Lockhart.
17          The next bay over was Vic Hildebrand
18 and Aubrey Mathis.  And the next bay from that was
19 Arthur Lirette and Kyle Curry.
20 MR. STAINES:
21          What was the last name?
22 THE WITNESS:
23          Kyle Curry.
24 MR. STAINES:
25          Thank you.

Page 16

1  THE WITNESS:
2          And then the last bay was my foreman,
3  Raymond Cain; and Paul Kullem.
4  MS. BOWLIN:
5          Cullen?
6  THE WITNESS:
7          Kullem.  K-U-L-L something M, U-M, E-M.
8  MS. BOWLIN:
9          Thank you.
10 THE WITNESS:
11          I know them all.  We were together
12 quite a few years.
13 EXAMINATION BY MR. HIBEY:
14     Q.   All right.  And all of the mechanics
15 that you just mentioned were working in that same
16 shop?
17     A.   Correct.
18     Q.   And that's the shop that fell
19 underneath Mr. Brindell's?
20     A.   Directly under Mr. Brindell.  He was in
21 charge of all of them, but he mainly stayed in the
22 front shop because that's where -- the head shop.
23 We had the parts department there.  It was next to
24 the mechanic shop, all that, so forth.
25     Q.   All right.  So let's talk about brake

Page 17

1  work, okay?
2      A.   Uh-huh (affirmative response).
3      Q.   And I guess we will be very basic here
4  and start at the beginning.  Can you describe for
5  us the types of brake jobs that you performed out
6  at Puerto Rico Marine in '79, '80, '81, '82, '83,
7  that time frame?
8      A.   Well, we would inspect all the units in
9  the yard and if they needed brakes, they would be
10 written up for brakes.  And then you bring them
11 through the shop and you perform brake jobs.
12 Sometimes you change the pads, the shoes, sometimes
13 the drums needed replacing, sometimes you had to
14 change -- I mean, we did everything.
15     Q.   Okay.  The brakes are on what?
16     A.   Each -- each axle is -- there is tandem
17 axle on a trailer:  A front axle, a rear axle.
18 Each axle had two, four, six, eight brake shoes,
19 four per axle, four per each axle.
20     Q.   Okay.  What is an axle?
21     A.   The axle is what the wheels mount onto
22 that rolls down the road.
23     Q.   All right.  So the axle goes underneath
24 the trailer?
25     A.   Right.

5 (Pages 14 to 17)

J. Keith Poleto
February 19, 2020

Page 18

1     Q.    And --
2     A.    You have the main unit and then you
3  have the suspension bogie and you have the four
4  springs that support the axle and then brake
5  boosters which make the brakes operate.  And then
6  you had the brake liners and the cam that made them
7  operate and the brake drum and the hub and wheels.
8  Two wheels per side, so eight wheels on two axles.
9     Q.    There would be you, said, eight brake
10  shoes on one trailer?
11     A.    Correct.
12     Q.    Right?  So what we are talking about is
13  four on each side?
14     A.    Correct.
15     Q.    Two per drum; is that correct?
16     A.    Two per hub, correct.
17     Q.    And how were those brake shoes held in
18  place?
19     A.    Held in place?  There was the anchor
20  pin that hold them on the front side and the cam
21  was on the backside.  And they had rollers that
22  attached to the shoe itself that when the air
23  booster was applied from the truck pulling it, the
24  booster would push the cam, the cam would turn and
25  would push the roller pins out and make the brakes

Page 19

1  touch the drum and stop the trailer.
2     Q.    Okay.  Let me ask you a little bit
3  about some brands.  Do you recall any brands' names
4  for --
5     A.    Twenty something years, but I can
6  probably remember some.
7     Q.    All right.  Well, let's start first
8  with brake shoes and brake linings.  What brands of
9  brakes did you guys use?
10     A.    Mostly Carlisle, some Abex.
11     Q.    What about Bendix?
12     A.    We had some Bendix.  Carlisle was the
13  most popular, most common.
14     Q.    Let me ask you about the axles
15  themselves.  Do you know who manufactured the
16  axles?
17     A.    Majority of the axles were Eaton, you
18  had some Rockwells.
19     Q.    And then lastly, these trailers
20  themselves, do you know who manufactured the
21  trailers?
22     A.    Oh, there were so many different ones.
23  Fruehauf, Strick, Great Dane, Utility.  Give me a
24  minute.  There was probably 15, 18 different ones.
25     Q.    All right.  What about Wilson trailers?

Page 20

1     A.    We had Wilson, yes.
2  DEFENSE COUNSEL:
3     Object to form.
4  EXAMINATION BY MR. HIBEY:
5     Q.    And Lufkin?
6     A.    Yes, Lufkin.
7     Q.    All right.  So let's go back to a --
8  walk me through a specific brake job that you
9  performed as a mechanic out at Puerto Rico, the
10  steps that you went through to perform --
11     A.    The units in the shop, you would have
12  to jack up both axles, put a jack stand, four jack
13  stands to support every wheel.  Then you would take
14  each wheel off with a master nut in the center, you
15  take the oil bath cap off, take the master nut off.
16  The whole hub assembly with the brake drum and the
17  two wheels would pull off with a dolly, a special
18  dolly you took them off.  Then once you had that
19  off, there was the worn brake shoes and sometimes
20  worn or cracked drums.  So then we would blow all
21  that stuff off, blow all that out to get it to
22  where we could inspect it and see what needed to be
23  done.
24     Q.    Okay.  What did you use to blow out?
25     A.    All the dust so you can read the

Page 21

1  numbers and see what's going on.
2     Q.    So you are blowing out dust, but
3  what -- was it an air hose, was it something else?
4     A.    The air hose.
5  DEFENSE COUNSEL:
6     Objection.
7  THE WITNESS:
8     The blow-off tip on the air hose.
9  EXAMINATION BY MR. HIBEY:
10     Q.    And the air hose that you were using to
11  blow out that dust, where did the dust go?
12     A.    On the ground, in the air, all over.
13     Q.    Could you see it?
14     A.    Yeah.  It was a dust cloud.  You could
15  blow it out your nose for a half hour afterwards.
16  DEFENSE COUNSEL:
17     Object to the nonresponsive portion.
18  EXAMINATION BY MR. HIBEY:
19     Q.    What was that dust coming from?
20     A.    The brake shoes, probably.  Yeah, had
21  to be.
22  DEFENSE COUNSEL:
23     Object to form.
24  EXAMINATION BY MR. HIBEY:
25     Q.    After you would blow out that dust, you

6 (Pages 18 to 21)

J. Keith Poleto
February 19, 2020

Page 22

1  said that you could see and inspect the brakes?
2      A.   So the damage, that would be the damage
3  was sometimes you would have fine hairline cracks
4  inside the brake drum.  And if you had too many
5  cracks per inch, you had to replace the drums
6  before it split because then that trailer wasn't
7  safe for the road.  You had to look at all that.
8      Q.   Okay.  What other -- take the next
9  step, though.  If the drum isn't the issue, what
10  else would you need to do?
11     A.   Then you replace all what needed
12  replacing.  You would unbolt the drum from the hub,
13  throw it out and get a new drum, put it on, blow
14  everything off real good, get it all nice and clean
15  before you reassemble everything.
16     Q.   Did you remove the two shoes?
17     A.   Yeah, we remove all the shoes.
18     Q.   And then what would you do to get
19  brakes back onto that?
20     A.   Blow it all off, wire brush it real
21  good with a wire brush and blow it all off again,
22  put the new shoes on and grease all the grease
23  fittings.
24     Q.   The new shoes, what did they look like?
25     A.   Brand new shoes.  Sometimes they -- the

Page 23

1  new shoes, if you had a new brake drum and new
2  shoes, sometimes to get it to mount back up and you
3  couldn't let them off enough to where they would --
4  it would fit, you would have to grind bevels on the
5  corners of the shoes to get the brake drum to go
6  back on.
7      Q.   Okay.  And when you are talking about
8  shoes, can you --
9      A.   The pads on the brake shoe.
10     Q.   Okay.  So when you are talking about
11  bevelling or grinding, what are you grinding on?
12     A.   You bevel the edges because they were
13  like this thick and they come around like this both
14  sides, and they were totally the same thickness all
15  the way through.  So with a brand new drum was
16  thick.  To get it back on, it would hit and it
17  wouldn't let you go on, so it would have to bevel the
18  edges where they came to the end.  You 45 degree
19  the edge with a grinder and then the drum would go
20  right back on.
21     Q.   Okay.  And just so we are clear, what
22  you are talking about bevelling or grinding on is
23  the pad itself, correct?
24     A.   Yes.
25     Q.   When you performed that work, grinding

Page 24

1  on a new shoe, the pad of the new shoe, what were
2  the conditions like?
3      DEFENSE COUNSEL:
4      Object to the form.
5      THE WITNESS:
6      Plenty more dust.
7  EXAMINATION BY MR. HIBEY:
8      Q.   Could you see that dust?
9      DEFENSE COUNSEL:
10     Object to the form.
11     THE WITNESS:
12     Oh, yeah.  Big dust cloud.
13  EXAMINATION BY MR. HIBEY:
14     Q.   Okay.  When you were performing brake
15  jobs in the shop, what were the other mechanics
16  doing?
17     DEFENSE COUNSEL:
18     Object to the form.
19     THE WITNESS:
20     Most of them, a lot of times what they
21  will do is you will have equipment sheet with all
22  the equipment that needed to go out and they would
23  have a rash (sic) that, okay, everybody bring in
24  brake jobs, you know, this week.  So for a whole
25  week, everybody -- every bay would have a brake job

Page 25

1  in it, and then you would probably do -- with you
2  and a partner, you could probably do four a day if
3  you wasn't, you know, playing around.
4      Q.   All right.  And you mentioned that each
5  bay there was two mechanics assigned to, correct?
6      A.   Correct.
7      Q.   So if you are working on doing a brake
8  job, is your partner assisting you and also --
9      A.   Oh, yeah, yeah, because it took two
10  people to do everything.  A lot of times the pins
11  that held the shoe in themself, you have to heat
12  them up to get them up.  They freeze inside.  Yeah,
13  took two people to do all that.
14     Q.   And you mentioned at times doing up to
15  four brake jobs a day.
16     A.   If you really putting out, you can do,
17  yeah, four a day.
18     Q.   And when you say four, is that four
19  separate --
20     A.   Four -- four units and doing complete
21  brake job, all four wheels, both axles, eight
22  shoes.
23     Q.   What were your typical work hours out
24  at Puerto Rico Marine?
25     A.   Normal work hours were 8 to 5, but you

7 (Pages 22 to 25)

J. Keith Poleto
February 19, 2020

Page 26

1  didn't see that very often.  It was mostly 6 to 5
2  to keep up -- to keep up with the workload.
3      Q.   Get in early?
4      A.   Pardon me?
5      Q.   You were saying you have to get in
6  early like at 6 a.m.?
7      A.   6 a.m. to 5 p.m., yeah, ten-hour days.
8      Q.   Is that Monday through Friday?
9      A.   Monday through Friday.  Sometimes you
10  work -- well, we work the weekends mainly on the
11  ship.  That's when they load and off-load the ship.
12  We had to be there for breakdowns.
13      Q.   So if we took from when you started in
14  October of 1979 up through, let's say, a full
15  year's worth of time, could you give us an estimate
16  of how many brake jobs you would have performed in
17  one year's time?
18      A.   Just me?
19      Q.   Yes.
20      A.   Or me and my partner?
21      Q.   Yeah.  You and your partner.
22  DEFENSE COUNSEL:
23          Object to the form.
24  DEFENSE COUNSEL:
25          Object to the form.

Page 27

1  THE WITNESS:
2          Multiply it out.  Thousand.
3  EXAMINATION BY MR. HIBEY:
4      Q.   Can you describe for us what Mr.
5  Brindell was doing while you were performing brake
6  work?
7      A.   That was Sergeant Carter.  He was
8  behind your back watching you.  He was supervisor,
9  so he went through, constantly went through the
10  shop each day, make sure everybody was doing their,
11  their work, getting their work out.
12      Q.   Would -- would Mr. Brindell assist with
13  any of the brake work?
14  DEFENSE COUNSEL:
15          Object to form.
16  THE WITNESS:
17          Did he help?
18  EXAMINATION BY MR. HIBEY:
19      Q.   Yes.
20      A.   If we got in a bind maybe, but not too
21  often.  He was mostly supervisor, just watching,
22  make sure you were getting your work out.
23      Q.   All right.  And you described earlier
24  conditions when you were removing old brake shoes
25  as being dusty, correct?

Page 28

1          DEFENSE COUNSEL:
2              Object to the form.
3          DEFENSE COUNSEL:
4              Object to the form.
5          THE WITNESS:
6              I am sorry.
7  EXAMINATION BY MR. HIBEY:
8      Q.   You described earlier the conditions
9  when using an air hose to remove an old brake shoe
10  being dusty, correct?
11      A.   Correct.
12          DEFENSE COUNSEL:
13              Object to the form.
14  EXAMINATION BY MR. HIBEY:
15      Q.   Do you believe that Mr. Brindell was
16  exposed to that dust?
17          DEFENSE COUNSEL:
18              Object to the form.
19          THE WITNESS:
20              Of course.
21  EXAMINATION BY MR. HIBEY:
22      Q.   Why do you say that?
23          DEFENSE COUNSEL:
24              Object to form.
25          THE WITNESS:

Page 29

1          Because that shop was all closed in.
2  Had four walls -- I mean, they had walls all
3  around, they had a roof that came down.  Only thing
4  that opened was the garage doors and he was
5  constantly walking the floor and that dust was
6  always in the air.  Everybody in that shop got mega
7  exposed.
8          DEFENSE COUNSEL:
9              Object to the form.
10          DEFENSE COUNSEL:
11              Object to the nonresponsive portion.
12  EXAMINATION BY MR. HIBEY:
13      Q.   Mr. Poleto, I've got to ask you a few
14  specific questions about some of the brands that
15  you've already mentioned, okay?  So we have talked
16  generally about brake work and the type of brake
17  jobs that you performed out at Puerto Rico Marine
18  and you mentioned some specific brands.  So I just
19  wanted to run through those as quickly as I can and
20  then I'll be done, okay?
21      A.   Uh-huh (affirmative response).
22      Q.   The first brake shoe that you mentioned
23  or brake that you mentioned was Carlisle brakes.
24      A.   Carlisle.  Yes, that was the most
25  popular one.

8 (Pages 26 to 29)

J. Keith Poleto
February 19, 2020

## Page 30

1    Q.    What are Carlisle brakes?
2    A.    Pardon me?
3    Q.    What are Carlisle brakes?
4    A.    That's just the manufacturer who makes
5  them.
6    Q.    How did you know that you were working
7  with Carlisle brakes?
8    A.    It was stamped on the shoe or if they
9  came in a box, it was on the box.
10   Q.    And what did the shoe or the box say
11  besides --
12   A.    Carlisle brake parts.
13   Q.    What were the size of the Carlisle
14  brakes?
15   A.    I am sorry?
16   Q.    What were the size of the Carlisle
17  brakes?
18   A.    Size?
19   Q.    Yeah.
20   A.    I don't know if they had a size.  By
21  telling them what axle you had, they knew what
22  brakes went on it.
23   Q.    Right.  Can you give us an estimate for
24  how big of a brake --
25   A.    How big a brake is?

## Page 31

1    Q.    Yes.
2    A.    Oh, it is wide as this book, eight
3  inches, ten inches.  And a radius about like this,
4  so from here to here radius because the drum itself
5  was this big (indicating).
6    Q.    Well, that will make for a very --
7    A.    Right, right.
8    Q.    -- unclear record.
9    A.    It is not like a car.  It's not like a
10  car.  I mean, it is big.
11   Q.    Bigger than a car?
12   A.    (Witness nodded head affirmatively.)
13  Four times bigger than a car.
14   Q.    And the Carlisle brake itself, was
15  there a metal component to it?
16   DEFENSE COUNSEL:
17      Object to form.
18   THE WITNESS:
19      Yeah.  Want me to draw a picture?
20   EXAMINATION BY MR. HIBEY:
21   Q.    Maybe.
22   A.    You had a metal component went around
23  like this and there was a C on this end where it
24  rolled on the cam pins, and there was a round
25  circle on this end where the holding pin held it to

## Page 32

1  the axle.  And it was two pieces of metal two
2  inches wide next to each other that came around
3  like this, a flat piece of metal went over it and
4  the shoes were riveted to the metal, the pads,
5  the --
6    Q.    And how thick were the pads?
7    A.    -- the liner (indicating).  Three
8  quarters of an inch to an inch.
9    Q.    Do you believe that those pads
10  contained asbestos?
11   DEFENSE COUNSEL:
12      Object to the form.
13   THE WITNESS:
14      I'm sure they did back in the day,
15  yeah.
16   EXAMINATION BY MR. HIBEY:
17   Q.    Did you ever remove Carlisle brakes at
18  Puerto Rico Marine?
19   DEFENSE COUNSEL:
20      Object to the form.
21   THE WITNESS:
22      Yeah, we were taking them off the
23  Rockwell axles.
24   EXAMINATION BY MR. HIBEY:
25   Q.    Did you remove --

## Page 33

1    A.    I mean, the Eaton.
2    Q.    -- Carlisle -- did you remove Carlisle
3  brakes using the same tools that you mentioned
4  earlier?
5    DEFENSE COUNSEL:
6      Object to the form.
7    THE WITNESS:
8      All the brakes pretty much use the same
9  tools.
10   EXAMINATION BY MR. HIBEY:
11   Q.    And those tools included what?
12   A.    An impact -- air impact wrench.
13  Half-inch air impact wrench, sockets.
14   Q.    What else?
15   A.    A pin pusher, which is the big C-shaped
16  clamp with a big threaded rod in the middle.  And
17  if the pins wasn't frozen, you could put it on the
18  pin that secured the brake shoe to the axle and it
19  would push it out.  But a lot of times from being
20  on the ships with the saltwater, they would freeze
21  up and you would have to heat them up real good
22  with a torch, get them red hot and then push them
23  out.
24   Q.    All right.  Before you could use the
25  pin pusher, the torch sockets, air impact wrenches,

9 (Pages 30 to 33)

J. Keith Poleto
February 19, 2020

Page 34

```
 1    what would you have to do to access all of this?
 2        A.    You blew everything off and took the
 3    snap pins out.
 4        Q.    And again, you blew it off with what?
 5        DEFENSE COUNSEL:
 6            Object to the form.
 7        THE WITNESS:
 8            Air.
 9        EXAMINATION BY MR. HIBEY:
10        Q.    When you used air to blow off the
11    Carlisle brakes, what were those conditions like?
12        A.    Lot of dust.
13        Q.    Was Mr. Brindell there?
14        DEFENSE COUNSEL:
15            Object to the form.
16        THE WITNESS:
17            He was always in and out the shop, yes.
18    We were blowing them off with 120 pounds of
19    pressure if you need to know that.  The air, that's
20    what the air pressure was set at.
21        EXAMINATION BY MR. HIBEY:
22        Q.    Now, after using the air and removing
23    the old brakes, did you install new Carlisle
24    brakes?
25        A.    Yes.
```

Page 35

```
 1        Q.    Did you install new Carlisle brakes in
 2    a similar manner as you described earlier when you
 3    were talking about brakes in general?
 4        DEFENSE COUNSEL:
 5            Object to the form.
 6        THE WITNESS:
 7            Yes.
 8        EXAMINATION BY MR. HIBEY:
 9        Q.    Did you have to do anything to the new
10    Carlisle brakes to get them prepared and ready to
11    be installed?
12        A.    Like I told you before, we had to bevel
13    the edges, grind the edges down when we changed to
14    put new drums.  It was too tight a fit.
15        Q.    And when you beveled the edges or
16    grinded down on the Carlisle brakes, were you doing
17    that directly onto the padding material?
18        DEFENSE COUNSEL:
19            Object to the form.
20        THE WITNESS:
21            Right, yes.
22        EXAMINATION BY MR. HIBEY:
23        Q.    And what were the conditions like when
24    that work was done?
25        A.    Plenty dust.
```

Page 36

```
 1        Q.    Could you see that dust?
 2        DEFENSE COUNSEL:
 3            Object to the form.
 4        THE WITNESS:
 5            Yes.
 6        EXAMINATION BY MR. HIBEY:
 7        Q.    Was Mr. Brindell there?
 8        DEFENSE COUNSEL:
 9            Object to the form.
10        THE WITNESS:
11            He was always in and out the shop,
12    yeah.  I am sure he got into some of the dust.
13        DEFENSE COUNSEL:
14            Object to the form, responsiveness of
15    the answer.
16        EXAMINATION BY MR. HIBEY:
17        Q.    And earlier you talked about sometimes
18    doing up to four full complete brake jobs in a day
19    and mentioned perhaps doing up to a thousand brake
20    jobs in a year.  Do you remember saying that?
21        DEFENSE COUNSEL:
22            Object to form.
23        THE WITNESS:
24            Uh-huh (affirmative response).
25        EXAMINATION BY MR. HIBEY:
```

Page 37

```
 1        Q.    Okay.  What I want to knois could you
 2    give us an estimate for the number of times you
 3    were in dusty conditions from blowing out Carlisle
 4    brakes?
 5        DEFENSE COUNSEL:
 6            Object to form.
 7        THE WITNESS:
 8            Me?
 9        EXAMINATION BY MR. HIBEY:
10        Q.    Yeah.
11        A.    Almost constantly.
12        Q.    Just in terms of numbers of times,
13    could you give us an estimate?
14        DEFENSE COUNSEL:
15            Object to the form.
16        THE WITNESS:
17            Ten times a day.  That be fair?
18    Because not only what I'm doing, what the guy next
19    to me is doing and the guy next to that and the guy
20    next to that, so you was constantly in that dust.
21        DEFENSE COUNSEL:
22            Object to the form, responsiveness of
23    the answer.
24        EXAMINATION BY MR. HIBEY:
25        Q.    And we are talking specifically about
```

10 (Pages 34 to 37)

J. Keith Poleto
February 19, 2020

Page 38

1  Carlisle brake dust, true?
2  **A.    That's the majority of what we used.**
3      Q.    What about --- could you estimate for
4  us how often you were in those dusty conditions
5  from grinding and bevelling directly on Carlisle
6  brake pads?
7  DEFENSE COUNSEL:
8      Object to the form.
9  THE WITNESS:
10      Couple of times a day.
11 EXAMINATION BY MR. HIBEY:
12     Q.    And again, with respect to Carlisle,
13 could you estimate how many times in a larger
14 period of time, say for example in a year, how many
15 times were you in dusty conditions from grinding
16 and bevelling on Carlisle brakes?
17 DEFENSE COUNSEL:
18     Object to the form.
19 THE WITNESS:
20     Talking about a whole year.  Hard to
21 say.  Five hundred times, is that fair if I said a
22 thousand on brake jobs?  Because we didn't grind
23 every one.
24 DEFENSE COUNSEL:
25     Objection to the nonresponsive portion

Page 40

1      Q.    Well, you said he would be in the shop
2  up to four hours.
3      **A.    Right.**
4      Q.    I guess just in terms of total number
5  of times in a given year that Mr. Brindell would be
6  in dusty conditions from Carlisle.
7  DEFENSE COUNSEL:
8      Object to the form.
9  THE WITNESS:
10     If we did a thousand brake jobs, he
11 would be -- well, he wasn't in there the whole
12 time, so say 4 or 500.  How is that?  Per year.
13 DEFENSE COUNSEL:
14     Object to the speculative portion of
15 the answer.
16 EXAMINATION BY MR. HIBEY:
17     Q.    You mentioned Carlisle name being on
18 the shoe or on a box, correct?
19     **A.    Yeah, it comes on a box.  When they**
20 **came in a box, sometimes they come in bulk, but you**
21 **always knew because on the liner it is that digital**
22 **electronic markings in there.  It was wrote in**
23 **there.**
24     Q.    Did you recall ever seeing any warnings
25 from Carlisle about the hazards of asbestos?

Page 39

1  of the answer.
2  EXAMINATION BY MR. HIBEY:
3      Q.    Now, specifically when Mr. Brindell --
4  I understand you are doing these brake jobs you've
5  said, you know, up to four times a day, up to a
6  thousand in a year almost constantly in dust from
7  it, but with respect to Mr. Brindell, could you
8  give us an estimate for how often he would have
9  been in dusty conditions from Carlisle brake work?
10 DEFENSE COUNSEL:
11     Objection to form.
12 THE WITNESS:
13     Well, if we worked an 8-hour day, I
14 would say he would be in the shop probably close to
15 four of those hours.  He was constantly patrolling.
16 EXAMINATION BY MR. HIBEY:
17     Q.    And in terms of a number of times,
18 could you give us an estimate for the number of
19 times you saw Mr. Brindell in dusty conditions from
20 Carlisle brake work?
21 DEFENSE COUNSEL:
22     Object to the form.
23 THE WITNESS:
24     In a day?
25 EXAMINATION BY MR. HIBEY:

Page 41

1      **A.    No, not really.**
2      Q.    And do you recall in that shop did --
3  did you wear a mask when you were working on
4  brakes?
5      **A.    Well, they didn't supply a mask when I**
6  **first started there because for the first say five**
7  **or six years I was there, we were working strictly**
8  **for -- directly for Puerto Rican government.  Then**
9  **after about the fifth year, the union came in and**
10 **took us and once we went union, they were a lot**
11 **more conscious of safety and stuff, so then you got**
12 **masks and ear protection and all that once they**
13 **came in.**
14     Q.    All right.  Do you ever recall seeing
15 Mr. Brindell wearing a mask of any kind when he was
16 in that shop?
17     **A.    Nah.**
18     Q.    Okay.  Let me ask you a little bit
19 about Abex brakes.  You guys also worked with Abex
20 brakes; is that correct?
21     **A.    Yes, some were Abex.**
22     Q.    And would you have done the same type
23 of work with Abex brakes?
24     **A.    Everything the same.**
25 DEFENSE COUNSEL:

11 (Pages 38 to 41)

J. Keith Poleto
February 19, 2020

---

Page 42

1        Objection to form.
2    THE WITNESS:
3        All brake jobs, everything the same
4    way.
5    EXAMINATION BY MR. HIBEY:
6        Q.    And I will -- I will move along quickly
7    through this, but I wanted to ask you just a few
8    questions specific to Abex, okay? First of all,
9    how did you know a brake was an Abex brake?
10       **A.    All the brake pads had some kind of
11   stamping on them as to who made them.  Might be a
12   sticker, it might be engraved in the pad itself.**
13       Q.    You talked about earlier how you
14   performed work using an air hose on the Carlisle
15   brakes.  Did you also use an air hose on the Abex
16   brakes?
17   DEFENSE COUNSEL:
18       Objection.
19   THE WITNESS:
20       I'm sorry?
21   EXAMINATION BY MR. HIBEY:
22       Q.    Did you also use an air hose on the
23   Abex brakes?
24       **A.    Yeah.  We use an air hose on all brake
25   jobs.**

---

Page 43

1        Q.    Did it create the same conditions?
2    DEFENSE COUNSEL:
3        Object to form.
4    THE WITNESS:
5        Sorry?
6    EXAMINATION BY MR. HIBEY:
7        Q.    Created the same dusty conditions?
8        **A.    Yes.**
9    DEFENSE COUNSEL:
10       Object to form.
11   EXAMINATION BY MR. HIBEY:
12       Q.    Could you see the dust?
13       **A.    Yes.**
14   DEFENSE COUNSEL:
15       Object to form.
16   EXAMINATION BY MR. HIBEY:
17       Q.    Was Mr. Brindell present when you
18   performed brake jobs on Abex brakes?
19       **A.    Like I said, he was in and out the shop
20   all the time, so I'm sure he was.**
21   DEFENSE COUNSEL:
22       Object to speculative portions.
23   EXAMINATION BY MR. HIBEY:
24       Q.    And did you see him in those dusty
25   conditions --

---

Page 44

1        **A.    Yes.**
2        Q.    -- when you were working on Abex
3    brakes?
4        **A.    Yes, yes.**
5    DEFENSE COUNSEL:
6        Objection.
7    EXAMINATION BY MR. HIBEY:
8        Q.    Could you give us an estimate for how
9    many times Mr. Brindell was present when you were
10   using an air hose to blow off Abex brakes out at
11   Puerto Rico Marine?
12   DEFENSE COUNSEL:
13       Objection.
14   THE WITNESS:
15       That is a hard question to answer.
16   EXAMINATION BY MR. HIBEY:
17       Q.    What were you --
18       **A.    In a year's time?**
19       Q.    Sure.
20       **A.    What I told you before, 4 or 500.  Use
21   that for a reference.  How is that?  I know he used
22   to complain because we used to get his white shirt
23   dirty.**
24   DEFENSE COUNSEL:
25       Object to the nonresponsive portions.

---

Page 45

1    EXAMINATION BY MR. HIBEY:
2        Q.    All right.  And then the same thing
3    with Carlisle brakes, you mentioned having to grind
4    and bevel on the pads.  Did you have to do that on
5    the Abex brakes as well?
6    DEFENSE COUNSEL:
7        Objection to form.
8    THE WITNESS:
9        Yes, if we used a new drum.
10   EXAMINATION BY MR. HIBEY:
11       Q.    And what were the conditions like when
12   you performed that work?
13   DEFENSE COUNSEL:
14       Objection.
15   THE WITNESS:
16       Dusty.
17   DEFENSE COUNSEL:
18       Objection.
19   EXAMINATION BY MR. HIBEY:
20       Q.    Could you see the dust?
21       **A.    Yes.**
22       Q.    Did you see Mr. Brindell present while
23   you were in those dusty conditions?
24       **A.    At times, yes.**
25       Q.    How many times was he in dusty

---

12 (Pages 42 to 45)

J. Keith Poleto
February 19, 2020

Page 46

```
1    conditions from your work grinding and beveling on
2    Abex brakes?
3        DEFENSE COUNSEL:
4            Objection to form.
5        THE WITNESS:
6            About the same as what I told you.
7    EXAMINATION BY MR. HIBEY:
8        Q.  Okay.
9        A.  In a year.  In a year.
10       Q.  You said 4 to 500 in a year for the
11   blowing with the air hose.  Same thing for grinding
12   and beveling?
13       A.  For the year, for Mr. Brindell, yes.
14       DEFENSE COUNSEL:
15           Objection to form.
16   EXAMINATION BY MR. HIBEY:
17       Q.  And then lastly, Bendix brakes, that's
18   another brand of brakes that you also used out
19   there?
20       A.  Yeah.  We used Bendix, also.
21       Q.  All right.  You have told us a few
22   times that Carlisle was the most common brake; is
23   that correct?
24       DEFENSE COUNSEL:
25           Objection to form, asked and answered.
```

Page 47

```
1        THE WITNESS:
2            Most common.
3    EXAMINATION BY MR. HIBEY:
4        Q.  And what would be the second most
5    common?  Would it be the Abex?
6        A.  Probably.
7        DEFENSE COUNSEL:
8            Object to form.
9        THE WITNESS:
10           I would say that, yes.
11   EXAMINATION BY MR. HIBEY:
12       Q.  All right.  Let's move over to Eaton
13   axles, okay?
14       A.  Uh-huh (affirmative response).
15       Q.  You kind of described an axle earlier.
16   How would you know that an axle was manufactured by
17   Eaton?
18       A.  There was a football-shaped tag on
19   every axle right in the middle, told you who made
20   them.
21       Q.  What would it say, specifically?
22       A.  Either said Eaton or Rockwell.
23       Q.  And then the axle is the whole system
24   that would be underneath or part of the suspension,
25   correct?
```

Page 48

```
1        A.  Correct.
2        DEFENSE COUNSEL:
3            Object to the form.
4    EXAMINATION BY MR. HIBEY:
5        Q.  And attached to an Eaton axle would be
6    the brakes and the tires?
7        DEFENSE COUNSEL:
8            Object to the form.
9        THE WITNESS:
10           The brakes, the hub assembly, and the
11   wheels.
12   EXAMINATION BY MR. HIBEY:
13       Q.  Do you know whether any of the brakes
14   on the Eaton axles were actually Eaton brakes?
15       DEFENSE COUNSEL:
16           Object to the form.
17       THE WITNESS:
18           No, I couldn't say if they were or not.
19   Not a lot of markings on old brakes.  All that gets
20   worn off.
21   EXAMINATION BY MR. HIBEY:
22       Q.  What other work did you have to do on
23   the Eaton axles besides brake jobs?
24       A.  Change the boosters, the air boosters
25   that made the brakes work; bushings, change the
```

Page 49

```
1    bushings on the cams.
2        Q.  How did you remove brake shoes from
3    Eaton axles?
4        DEFENSE COUNSEL:
5            Object to the form.
6        THE WITNESS:
7            How did I remove what?
8    EXAMINATION BY MR. HIBEY:
9        Q.  The brake shoes from the Eaton axles.
10       A.  The same way we did all the other --
11   everything was done the same way.  Heat them up if
12   they frozen, use the pin-driving tool.
13       Q.  Okay.  The same description that you
14   gave for performing brake jobs in general, the same
15   description that you gave for performing brake jobs
16   on say Carlisle brakes, it's the same process?
17       A.  Same every -- yeah.
18       Q.  Remove the brakes off --
19       DEFENSE COUNSEL:
20           Objection.
21       THE WITNESS:
22           A brake job is a brake job no matter
23   whose equipment you are using.  They are all the
24   same.
25   EXAMINATION BY MR. HIBEY:
```

13 (Pages 46 to 49)

J. Keith Poleto
February 19, 2020

Page 50

1      Q.    Same thing for the Rockwell axles?
2   There is no difference between --
3      A.    No difference.  No difference.
4      Q.    Is there any distinguishable difference
5   between an Eaton or Rockwell axle that you can tell
6   us about today?
7      A.    Well, they each took a different shoe.
8   One shoe would have a notch in the back.  It was
9   offset a little bit.  The -- which one was it?  The
10  Eaton axle had an offset.  The Rockwell axle was
11  smooth on the shoe itself.  It is something that
12  you wouldn't notice because a lot of times you got
13  the wrong shoe from the parts department, you go
14  put it on and then the drum won't go on because
15  it's the wrong one.  It was a half-inch difference
16  on the diameter.  That was the only difference they
17  had between the two.
18     Q.    Okay.  Now, going specifically to some
19  of the trailer manufacturers, you mentioned a
20  Fruehauf trailer.  Did you work on Fruehauf
21  trailers?
22     A.    Yes.
23     Q.    How did you know it was a Fruehauf
24  trailer?
25     A.    Big word right across the front.  They

Page 51

1   all had identification labels on them.  Great Dane
2   had, you know, everybody had their own logo.
3      Q.    What work did you do on the Fruehauf
4   trailers?
5      A.    All suspension underneath with brakes,
6   brake jobs, landing gear, electrical wiring and
7   lights, any welding the trailer, any cracks or
8   anything.
9      Q.    When you performed brake jobs on
10  Fruehauf trailers, did you perform them
11  substantially in the same manner as you previously
12  described?
13         DEFENSE COUNSEL:
14            Objection to form.
15     EXAMINATION BY MR. HIBEY:
16     Q.    I am sorry.  When you performed brake
17  jobs on Fruehauf trailers --
18     A.    Uh-huh (affirmative response).
19     Q.    -- did you perform those brake jobs in
20  substantially the same manner as you previously
21  described performing brake jobs?
22     A.    Right, right, right.  Yes, yes, yes.
23         DEFENSE COUNSEL:
24            Objection to form.
25     EXAMINATION BY MR. HIBEY:

Page 52

1      Q.    Is there anything different about doing
2   a brake job on a Fruehauf trailer?
3      A.    No.
4         DEFENSE COUNSEL:
5            Objection to form.
6   EXAMINATION BY MR. HIBEY:
7      Q.    You use the same tools, correct?
8         DEFENSE COUNSEL:
9            Objection.
10        THE WITNESS:
11            Same tools.  Brake job is a brake job.
12  Yeah, they are all the same.
13     EXAMINATION BY MR. HIBEY:
14     Q.    All right.  I don't want to belabor the
15  point, but you mentioned earlier using an air hose
16  on brake jobs.  You also used air hoses on Fruehauf
17  trailers, correct?
18        DEFENSE COUNSEL:
19            Object to form.
20        THE WITNESS:
21            You have to, yeah.
22     EXAMINATION BY MR. HIBEY:
23     Q.    And what were the conditions like?
24        DEFENSE COUNSEL:
25            Object to form.

Page 53

1         THE WITNESS:
2            Dusty.
3      EXAMINATION BY MR. HIBEY:
4      Q.    Could you see the dust?
5      A.    Yes.
6         DEFENSE COUNSEL:
7            Object to form.
8      EXAMINATION BY MR. HIBEY:
9      Q.    Was Mr. Brindell present when that dust
10  was being blown around?
11        DEFENSE COUNSEL:
12            Object to form.
13        THE WITNESS:
14            Yes.
15     EXAMINATION BY MR. HIBEY:
16     Q.    Also with other brake jobs you talked
17  about sometimes having to grind and bevel on brake
18  shoes for installation.  Did you have to do that to
19  install brakes onto Fruehauf trailers?
20     A.    Sometimes, yes.
21        DEFENSE COUNSEL:
22            Object to the form.
23     EXAMINATION BY MR. HIBEY:
24     Q.    And what were the conditions like?
25     A.    Dusty.

14 (Pages 50 to 53)

J. Keith Poleto
February 19, 2020

Page 54

1  DEFENSE COUNSEL:
2      Object to form.
3  EXAMINATION BY MR. HIBEY:
4      Q.   Was Mr. Brindell present there as well?
5  DEFENSE COUNSEL:
6      Object to form.
7  THE WITNESS:
8      I'm sure he was passing through the
9  shop when it was going on.
10  DEFENSE COUNSEL:
11      Objection.
12  EXAMINATION BY MR. HIBEY:
13      Q.   Could you tell us how many times
14  between say '79 and '85 on an annual basis you were
15  in dusty conditions from performing brake jobs on
16  Fruehauf trailers, specifically?
17  DEFENSE COUNSEL:
18      Objection.
19  THE WITNESS:
20      How many times?
21  EXAMINATION BY MR. HIBEY:
22      Q.   Sure.  Just in a given year on Fruehauf
23  trailers.
24  DEFENSE COUNSEL:
25      Objection to form.

Page 55

1  THE WITNESS:
2      In a given year, Fruehauf trailers,
3  three hours a day.
4  EXAMINATION BY MR. HIBEY:
5      Q.   Okay.  Could you --
6      A.   It wasn't that many.  It wasn't as many
7  Fruehauf trailers as some of the other things.
8      Q.   Okay.
9      A.   There was just numerous different kinds
10  of trailers.
11      Q.   Yeah.  And we have mentioned a couple
12  of different brands, so maybe I will approach it
13  this way.  Let's say from October '79 when you
14  started until October of 1980, so a full year --
15      A.   One year, okay.
16      Q.   -- how many trailers came through your
17  shop for brake work?
18      A.   That's mainly what they came in for.
19      Q.   All right.
20      A.   How many?  Four a day times a year.  Do
21  the math.  Or you want me to guess?
22  MR. HART:
23      No.
24  EXAMINATION BY MR. HIBEY:
25      Q.   Obviously, don't want you to guess, but

Page 56

1  your math would be over a thousand trailers through
2  that shop?
3      A.   Roughly close to a thousand, yes.
4  DEFENSE COUNSEL:
5      Object to the form.
6  THE WITNESS:
7      Yeah, that's just in my bay.  And you
8  got three other bays, so I am not vouching for what
9  those people had.
10  EXAMINATION BY MR. HIBEY:
11      Q.   Would it be your best estimate that
12  over a thousand trailers came through the shop for
13  brake work during each year that you were at Puerto
14  Rico Marine?
15      A.   Good estimate.
16  DEFENSE COUNSEL:
17      Object to the form.
18  EXAMINATION BY MR. HIBEY:
19      Q.   First five years of your time there?
20      A.   Yes.
21  DEFENSE COUNSEL:
22      Object to the form.
23  EXAMINATION BY MR. HIBEY:
24      Q.   So then working off of that, Fruehauf
25  trailers specifically, how many Fruehauf trailers

Page 57

1  did you perform brake jobs on say in a given year?
2  DEFENSE COUNSEL:
3      Object to form.
4  THE WITNESS:
5      I'll say 400.  We will use a nice,
6  round figure.
7  EXAMINATION BY MR. HIBEY:
8      Q.   When you performed brake jobs on
9  Fruehauf trailers out at Puerto Rico Marine, what
10  were the conditions like?
11  DEFENSE COUNSEL:
12      Object to form.
13  THE WITNESS:
14      Dusty.
15  EXAMINATION BY MR. HIBEY:
16      Q.   Was Mr. Brindell present?
17  DEFENSE COUNSEL:
18      Object to form.
19  THE WITNESS:
20      A lot of times, yes.
21  EXAMINATION BY MR. HIBEY:
22      Q.   All right.  Another brand of trailer
23  that you mentioned was a Strick trailer.  Did you
24  work on Strick trailers?
25  DEFENSE COUNSEL:

15 (Pages 54 to 57)

J. Keith Poleto
February 19, 2020

Page 58

```
1          Object to form.
2     THE WITNESS:
3          Yes.
4     EXAMINATION BY MR. HIBEY:
5     Q.   What work did you perform on Strick
6  trailers?
7     A.   Probably the same brake jobs.
8     Q.   How did you know a trailer was a Strick
9  trailer?
10    A.   They all had the big sticker on the
11 side with the manufacturer.
12    Q.   How did you perform brake jobs on
13 Strick trailers?
14    A.   The same as all the rest of them.
15    Q.   Is there anything different about it?
16    A.   Nope.
17    Q.   You used the same tools?
18    A.   Yes.
19    Q.   What were the conditions like when you
20 used an air hose on a Strick trailer?
21    DEFENSE COUNSEL:
22         Object to form.
23    THE WITNESS:
24         Plenty dust.
25    EXAMINATION BY MR. HIBEY:
```

Page 59

```
1     Q.   Where was the dust coming from?
2     A.   Blowing off the brakes and the brake
3  drum.
4     Q.   Would you see the dust?
5     A.   Yes.
6     Q.   What were the conditions like?  Or let
7  me ask it this way:  Did you have to grind and
8  bevel on brake pads for installation on Strick
9  trailers?
10    A.   Sometimes, yes.
11    DEFENSE COUNSEL:
12         Object to form.
13    EXAMINATION BY MR. HIBEY:
14    Q.   And what were those conditions like?
15    A.   More dust.
16    Q.   Could you see the dust?
17    A.   Yes.
18    Q.   Between 1979 and say 1985, how many
19 times were you in dusty conditions from brake work
20 on Strick trailers?
21    DEFENSE COUNSEL:
22         Object to form.
23    THE WITNESS:
24         Four hundred.
25    EXAMINATION BY MR. HIBEY:
```

Page 60

```
1     Q.   Is that --
2     A.   That was a year's time.
3     Q.   Is that 400 in a year?
4     DEFENSE COUNSEL:
5          Object to form.
6     THE WITNESS:
7          Probably.  If there was a thousand
8  units total, I will say about 400 were probably
9  Strick, 400 were probably Fruehauf.
10    EXAMINATION BY MR. HIBEY:
11    Q.   And how often was Mr. Brindell in dusty
12 conditions from the brake work on Strick trailers?
13    A.   It would be the same estimate as what I
14 gave you for the Fruehauf one.
15    DEFENSE COUNSEL:
16         Object to form.
17    EXAMINATION BY MR. HIBEY:
18    Q.   Let me ask you about Utility trailers.
19 Did you guys also work on Utility trailers?
20    DEFENSE COUNSEL:
21         Object to form.
22    THE WITNESS:
23         Yeah, at times.
24    EXAMINATION BY MR. HIBEY:
25    Q.   How did you know they were Utility
```

Page 61

```
1  trailers?
2     A.   The big stamp on the side.
3     Q.   What work, if any, did you perform on
4  Utility trailers?
5     A.   Probably brake jobs, also.
6     Q.   Were brake jobs on Utility trailers
7  different than brake jobs on other trailers?
8     DEFENSE COUNSEL:
9          Object to form.
10    THE WITNESS:
11         No, they were all the same.
12    EXAMINATION BY MR. HIBEY:
13    Q.   When you performed brake jobs on
14 Utility trailers, what did you have to do?
15    A.   Same thing I did with all the other
16 brake jobs.  Use the same tools, take them off,
17 blow them off, clean it up, put new stuff on it.
18    DEFENSE COUNSEL:
19         Object to the responsiveness.
20    EXAMINATION BY MR. HIBEY:
21    Q.   When you blew off the brake shoes from
22 the Utility trailers, could you see anything in
23 there?
24    DEFENSE COUNSEL:
25         Object to the form.
```

16 (Pages 58 to 61)

J. Keith Poleto
February 19, 2020

Page 62

1    THE WITNESS:
2        See any -- the dust.
3    EXAMINATION BY MR. HIBEY:
4        Q.   When you installed new brake shoes on
5    Utility trailers, did you ever have to manipulate
6    those brake shoes?
7    DEFENSE COUNSEL:
8        Object to form.
9    THE WITNESS:
10       Sometimes.
11   EXAMINATION BY MR. HIBEY:
12       Q.   What would you have to do?
13       **A.   Grind a bevel on the edge of the shoe**
14   **pad, liner.  Some people say pad, some people say**
15   **liner.  Same thing.**
16       Q.   When you grinded and beveled on the
17   pads and liners for installation on the Utility
18   trailers, what were the conditions in the air?
19   DEFENSE COUNSEL:
20       Object to form.
21   THE WITNESS:
22       Dusty.
23   EXAMINATION BY MR. HIBEY:
24       Q.   Could you see the dust?
25   DEFENSE COUNSEL:

Page 63

1        Object to form.
2    THE WITNESS:
3        Yes.
4    EXAMINATION BY MR. HIBEY:
5        Q.   Was Mr. Brindell ever in those dusty
6    conditions --
7        **A.   I'm sure he was.**
8        Q.   -- on Utility trailers?
9    DEFENSE COUNSEL:
10       Object to the form.
11   THE WITNESS:
12       I'm sure he was.
13   EXAMINATION BY MR. HIBEY:
14       Q.   And why are you sure he was?
15   DEFENSE COUNSEL:
16       Object to the form.
17   THE WITNESS:
18       Because he was always walking through
19   the shop.
20   EXAMINATION BY MR. HIBEY:
21       Q.   Could you give us an estimate for how
22   many times Mr. Brindell was in dusty conditions
23   from your work on Utility trailers?
24   DEFENSE COUNSEL:
25       Object to form.

Page 64

1    THE WITNESS:
2        Couple of hundred times, I'm sure.
3    EXAMINATION BY MR. HIBEY:
4        Q.   All right.  You mentioned some --
5    another brand of trailers, Great Dane trailers?
6        **A.   Yes.**
7        Q.   Do you recall performing work on Great
8    Dane trailers at Puerto Rico Marine?
9        **A.   Yes.**
10       Q.   What work did you perform on Great Dane
11   trailers?
12       **A.   The same as all the rest.  Brake jobs.**
13   DEFENSE COUNSEL:
14       Object to the nonresponsiveness.
15   EXAMINATION BY MR. HIBEY:
16       Q.   How did you know a trailer was a Great
17   Dane trailer?
18       **A.   Big sticker on the side of the unit.**
19       Q.   And you said that the work you did on
20   Great Dane trailers was the same as all the rest,
21   brake jobs.
22   DEFENSE COUNSEL:
23       Object to form.
24   EXAMINATION BY MR. HIBEY:
25       Q.   Was there anything different about the

Page 65

1    brake jobs --
2        **A.   No.**
3        Q.   -- you performed on Great Dane
4    trailers?
5        **A.   No.  Was all the same.**
6    DEFENSE COUNSEL:
7        Object to form.
8    EXAMINATION BY MR. HIBEY:
9        Q.   Were the conditions substantially the
10   same when you performed brake jobs on Great Dane
11   trailers?
12   DEFENSE COUNSEL:
13       Object to form.
14   THE WITNESS:
15       Same.
16   EXAMINATION BY MR. HIBEY:
17       Q.   You've told us with respect to all the
18   other trailers using -- that you used an air hose
19   to blow out the --
20       **A.   Correct.**
21       Q.   -- brake dust.
22   DEFENSE COUNSEL:
23       Object to form.
24   EXAMINATION BY MR. HIBEY:
25       Q.   Did you also do than on Great Dane

17 (Pages 62 to 65)

J. Keith Poleto
February 19, 2020

## Page 66

1  trailers?
2  **A.   Yes, we did it on every trailer.**
3  DEFENSE COUNSEL:
4      Object to form.
5  EXAMINATION BY MR. HIBEY:
6    Q.   Did that create any conditions in the
7  air?
8  DEFENSE COUNSEL:
9      Object to form.
10  THE WITNESS:
11      Yes, the dust.
12  EXAMINATION BY MR. HIBEY:
13    Q.   Could you see it?
14  DEFENSE COUNSEL:
15      Object to form.
16  THE WITNESS:
17      Yes.
18  EXAMINATION BY MR. HIBEY:
19    Q.   Was Mr. Brindell present in those dusty
20  conditions?
21  DEFENSE COUNSEL:
22      Object to form.
23  THE WITNESS:
24      I'm sure he was.
25  EXAMINATION BY MR. HIBEY:

## Page 67

1    Q.   You also talked about grinding and
2  bevelling on other brake pads and liners?
3    **A.   Periodically, yes.**
4    Q.   On other trailers?
5    **A.   Periodically, you had to do it on all**
6  **of them.**
7    Q.   And so that would also cover --
8    **A.   Dust in the air.**
9    Q.   -- Great Dane trailers, correct?
10    **A.   Right.**
11  DEFENSE COUNSEL:
12      Object to form.
13  EXAMINATION BY MR. HIBEY:
14    Q.   When you ground and beveled on brake
15  pads and liners for installation onto Great Dane
16  trailers --
17    **A.   Yes.**
18    Q.   -- what were the conditions like?
19  DEFENSE COUNSEL:
20      Object to form.
21  THE WITNESS:
22      Dusty.
23  EXAMINATION BY MR. HIBEY:
24    Q.   Could you see it?
25    **A.   Yes.**

## Page 68

1    Q.   And was Mr. Brindell present?
2  DEFENSE COUNSEL:
3      Object to form.
4  THE WITNESS:
5      Yes, I'm sure.
6  EXAMINATION BY MR. HIBEY:
7    Q.   Could you tell us in a given year or in
8  a particular year --
9    **A.   How many Great Danes?**
10    Q.   Yes.  How many Great Dane trailers?
11    **A.   If you're adding up all what I am**
12  **telling you, it is going to go over a thousand when**
13  **I guess we did a thousand brake jobs a year.**
14  DEFENSE COUNSEL:
15      Object to the nonresponsive portion.
16  EXAMINATION BY MR. HIBEY:
17    Q.   All right.  Well, you told us Fruehauf
18  was about 400 in a year, Strick was about 400 in a
19  year?
20    **A.   Right.  And I gave you 200 on the other**
21  **one, so if I tell you 200 on this one, it is going**
22  **to go to 1200.**
23    Q.   Well, what would it be?  What's your
24  best estimate?
25    **A.   Say a hundred.**

## Page 69

1  DEFENSE COUNSEL:
2      Object to form.
3  THE WITNESS:
4      We didn't have as many Great Danes as
5  we had everything else.  There were less Great Dane
6  trailers in the yard.
7  EXAMINATION BY MR. HIBEY:
8    Q.   Okay.
9    **A.   Mostly Strick and Fruehauf was the most**
10  **common.  Utility.**
11    Q.   So is it your -- it is your testimony
12  that you performed brake jobs on about 100 Great
13  Dane trailers in a year; is that right?
14  DEFENSE COUNSEL:
15      Object to the form.
16  THE WITNESS:
17      Yeah, that would be fair.
18      Bless you.
19  DEFENSE COUNSEL:
20      Thank you.
21  EXAMINATION BY MR. HIBEY:
22    Q.   And how often was Mr. Brindell present
23  when you performed that work?
24  DEFENSE COUNSEL:
25      Object to form.

18 (Pages 66 to 69)

J. Keith Poleto
February 19, 2020

## Page 70

1    THE WITNESS:
2       Periodically.
3    EXAMINATION BY MR. HIBEY:
4       Q.   Did you -- did you have any Wilson
5    trailers?
6    DEFENSE COUNSEL:
7       Objection.
8    THE WITNESS:
9       Yeah, we had some.
10   EXAMINATION BY MR. HIBEY:
11      Q.   Did you perform any work on Wilson
12   trailers at Puerto Rico Marine?
13   DEFENSE COUNSEL:
14      Objection to form.
15   THE WITNESS:
16      Yes.
17   EXAMINATION BY MR. HIBEY:
18      Q.   Could you describe for us the brake
19   work that you performed on Wilson trailers at
20   Puerto Rico Marine?
21      **A.   Yes, the same as all the rest.**
22      Q.   Anything different?
23   DEFENSE COUNSEL:
24      Objection to form.
25   THE WITNESS:

## Page 71

1       No.
2    EXAMINATION BY MR. HIBEY:
3       Q.   Did you use the same tools to perform
4    brake work on Wilson trailers?
5       **A.   Correct.**
6       Q.   Did you use an air hose?
7       **A.   Pardon me?**
8    DEFENSE COUNSEL:
9       Object to form.
10   EXAMINATION BY MR. HIBEY:
11      Q.   Did you use an air hose?
12      **A.   Oh, yeah.  All the brake jobs done the**
13   **same way.**
14      Q.   When you used an air hose on the Wilson
15   trailers, what were you using the air hose to do?
16      **A.   Blow the dust from the brake drum and**
17   **the brake shoes.**
18      Q.   Could you see that dust in the air?
19   DEFENSE COUNSEL:
20      Objection to form.
21   THE WITNESS:
22      Yes.
23   EXAMINATION BY MR. HIBEY:
24      Q.   Was Mr. Brindell present?
25   DEFENSE COUNSEL:

## Page 72

1       Objection to form.
2    THE WITNESS:
3       Yes, I'm sure.
4    EXAMINATION BY MR. HIBEY:
5       Q.   Did you have to grind and bevel any of
6    the --
7       **A.   At times.**
8       Q.   -- brake shoes that went onto the
9    Wilson trailers?
10   DEFENSE COUNSEL:
11      Object to the form.
12   THE WITNESS:
13      At times.
14   EXAMINATION BY MR. HIBEY:
15      Q.   What were the conditions created by
16   that work, if any?
17   DEFENSE COUNSEL:
18      Object to form.
19   THE WITNESS:
20      More dust.
21   EXAMINATION BY MR. HIBEY:
22      Q.   Could you see the dust?
23   DEFENSE COUNSEL:
24      Objection to form.
25   THE WITNESS:

## Page 73

1       Yes.
2    EXAMINATION BY MR. HIBEY:
3       Q.   Was Mr. Brindell present when you were
4    grinding and bevelling on brake jobs --
5       **A.   I'm sure he was.**
6       Q.   -- for Wilson trailers?
7    DEFENSE COUNSEL:
8       Object to the nonresponsive portion.
9    Object to the speculative portion.
10   THE WITNESS:
11      I'm sure he was.
12   EXAMINATION BY MR. HIBEY:
13      Q.   Could you give us an estimate for how
14   many times Mr. Brindell was in dusty conditions
15   from your brake work on Wilson trailers?
16   DEFENSE COUNSEL:
17      Objection to form.
18   THE WITNESS:
19      What you want to know, how many times
20   in a year?
21   DEFENSE COUNSEL:
22      Object to the nonresponsiveness.
23   EXAMINATION BY MR. HIBEY:
24      Q.   Well, two separate things going on.
25   One is, you know, you are doing Wilson trailer

19 (Pages 70 to 73)

J. Keith Poleto
February 19, 2020

Page 74

1  brake work. And I am not asking you specifically
2  for the number of times you did that, although it's
3  a -- let me just -- how many times was Mr. Brindell
4  present when you were doing the Wilson trailer and
5  brake work?
6      DEFENSE COUNSEL:
7          Objection to form.
8      THE WITNESS:
9          Oh, in a year?
10 EXAMINATION BY MR. HIBEY:
11     Q.   Sure.
12     A.   **Hundred times. I mean, I'm just taking**
13 **numbers off the top of my head.**
14     DEFENSE COUNSEL:
15         Object to the nonresponsive portion.
16 EXAMINATION BY MR. HIBEY:
17     Q.   Well, I don't want --
18     A.   **I didn't count every unit that went**
19 **through the shop.**
20     Q.   I know. And I know it's a difficult
21 question. I'm just asking for your best estimate.
22     A.   **Best estimate.**
23     Q.   Is what you have given us, correct?
24     A.   **Right.**
25     DEFENSE COUNSEL:

Page 75

1          Objection to form.
2      EXAMINATION BY MR. HIBEY:
3      Q.   Last trailer I want to ask you about is
4  a Lufkin trailer. Did you work on any Lufkin
5  trailers?
6      A.   **Yes, we had Lufkin trailers.**
7      Q.   How did you know it was a Lufkin
8  trailer?
9      A.   **Big sticker on the side said "Lufkin."**
10     Q.   What work, if any, did you perform on
11 those trailers?
12     DEFENSE COUNSEL:
13         Object to form.
14     THE WITNESS:
15         Same thing. All the same.
16 EXAMINATION BY MR. HIBEY:
17     Q.   When you say same thing, all the same,
18 are you referring to brake work?
19     DEFENSE COUNSEL:
20         Object to form.
21     THE WITNESS:
22         Brake work. Same tools, brake jobs,
23 yes.
24     DEFENSE COUNSEL:
25         Object to nonresponsiveness.

Page 76

1      EXAMINATION BY MR. HIBEY:
2      Q.   Was there anything different about the
3  brake work that you had to perform on Lufkin
4  trailers?
5      A.   **No.**
6      Q.   You performed that work in
7  substantially the same manner as you previously
8  testified when talking about brake jobs, correct?
9      A.   **Yes.**
10     DEFENSE COUNSEL:
11         Object to form.
12 EXAMINATION BY MR. HIBEY:
13     Q.   That included using an air hose,
14 correct?
15     DEFENSE COUNSEL:
16         Object to form.
17     THE WITNESS:
18         Correct.
19 EXAMINATION BY MR. HIBEY:
20     Q.   When you used an air hose on the Lufkin
21 trailers for those brake jobs, what were the
22 conditions like?
23     DEFENSE COUNSEL:
24         Object to form.
25     THE WITNESS:

Page 77

1          Dusty.
2      EXAMINATION BY MR. HIBEY:
3      Q.   Could you see the dust?
4      A.   **Yes.**
5      Q.   Was Mr. Brindell present?
6      DEFENSE COUNSEL:
7          Object to form.
8      THE WITNESS:
9          Yes, at times.
10 EXAMINATION BY MR. HIBEY:
11     Q.   Previously, you testified multiple
12 times now that at times you would have to grind and
13 bevel the pads and liners on brake shoes, correct?
14     A.   **Correct.**
15     Q.   Did you ever have to grind and bevel --
16     A.   **I'm sure sometimes.**
17     Q.   -- on liners and brake pads that were
18 being installed onto Lufkin trailers?
19     A.   **I'm sure at times we did.**
20     DEFENSE COUNSEL:
21         Object to the form.
22 EXAMINATION BY MR. HIBEY:
23     Q.   What were the conditions like when you
24 performed that work?
25     A.   **Dusty.**

20 (Pages 74 to 77)

J. Keith Poleto
February 19, 2020

Page 78

1    Q.   Could you see the dust?
2    A.   Yes.
3    Q.   Was Mr. Brindell present?
4    A.   At times.
5    DEFENSE COUNSEL:
6         Form.
7    EXAMINATION BY MR. HIBEY:
8    Q.   And now, how many times in a given year
9    was Mr. Brindell in dusty conditions from Lufkin
10   brake work?
11   A.   A hundred times, I think.
12   Q.   All right.  Just a few questions and
13   then I'll be done.
14   A.   Good.
15   Q.   You mentioned earlier that you did not
16   see warnings about the hazards of asbestos on any
17   of the brakes, correct?
18   A.   Not back in those early days, early
19   years, no.
20   Q.   But just so we are clear, I want to ask
21   you about warnings about the hazards of asbestos in
22   general and then a little bit more specifically.
23   Do you recall seeing any warnings about the hazards
24   of asbestos in say 1979, 1980, '81, '82, '83, that
25   time frame?

Page 79

1    A.   No.  We didn't learn about that until
2    later on.
3    Q.   All right.  And do you recall seeing
4    any warnings on any of the trailers about the
5    hazards of asbestos?
6    A.   No.
7    DEFENSE COUNSEL:
8         Object to form.
9    EXAMINATION BY MR. HIBEY:
10   Q.   Or on any of the axles about the
11   hazards of asbestos?
12   A.   No.
13   DEFENSE COUNSEL:
14        Object to form.
15   EXAMINATION BY MR. HIBEY:
16   Q.   And during that same time period, '79
17   to '83 or '84, you said that that was the time
18   period when there was not a union?
19   A.   We didn't have the union, no.
20   Q.   And during that whole time period you
21   guys didn't wear masks or have any ear protection,
22   correct?
23   A.   No, no.
24   Q.   And Mr. Brindell obviously wouldn't
25   have worn a mask?

Page 80

1    A.   No, he never had a mask on.
2    MR. HIBEY:
3         We kind of ran through things pretty
4    quickly there, so I might have some questions to
5    fill in some things later on, but for now I think
6    that is all I have to ask you about.  I'm going to
7    let some other people ask you some questions, okay?
8    THE WITNESS:
9         You finished?
10   MR. HIBEY:
11        For now, yes.
12   THE WITNESS:
13        Okay.  I can go?
14   MR. HART:
15        Take five.
16   THE VIDEOGRAPHER:
17        We are now off the record at 11:01.
18        (Brief recess.)
19   THE VIDEOGRAPHER:
20        We are now back on the record at 11:16.
21   EXAMINATION BY MS. BOWLIN:
22   Q.   Good morning, sir.
23   A.   Good morning.
24   Q.   My name is an Angie Bowlin and I'm
25   going to be the next attorney to ask you some

Page 81

1    questions this morning.
2    A.   Yes, ma'am.
3    Q.   If you need to take a break before I'm
4    finished with my questions, please let me know.
5    A.   Okay.
6    Q.   I would also like to ask you to try to
7    let me finish the whole question before you provide
8    your answer because the court reporter is taking
9    down everything that I am saying and then
10   everything that you say, so it's really for her
11   benefit so that we try not to talk over each other
12   because it is hard for her to do both people
13   speaking at one time.
14   A.   Might do it -- might do it on purpose.
15   Q.   Well, you might, but she might get mad
16   at you.
17        All right, sir.  You told us your
18   address and your date of birth.  Are you currently
19   employed?
20   A.   No, ma'am.
21   Q.   You are retired?
22   A.   Yes, ma'am.
23   Q.   And what year did you retire?
24   A.   I retired from that job in '96.
25   Q.   You retired from Puerto Rican Marine --

21 (Pages 78 to 81)

J. Keith Poleto
February 19, 2020

Page 82

1      A.    In '96.
2      Q.    -- in 1996. Did you work for anyone
3  after 1996?
4      A.    Yes, ma'am.
5      Q.    And you don't have to tell me all of
6  your employers after 1996, but did you stay in the
7  same type of work?
8      A.    For awhile.
9      Q.    Okay. And what business did you retire
10 from when you last worked for wages?
11     A.    Well, I'm retiring at this time from
12 being a fishing charter captain.
13     Q.    And do you work for a particular
14 company or do you have your own company?
15     A.    My company.
16     Q.    And what's the name of that company?
17     A.    My company?
18     Q.    Yes, sir.
19     A.    Sufficient Charters.
20     Q.    All right. When did you first meet Mr.
21 Brindell?
22     A.    Before I worked for him, I knew him
23 from before that. '77 maybe.
24     Q.    1977?
25     A.    It's a round guess. That's when I

Page 83

1  graduated, so it was around that time.
2      Q.    That's when you graduated from high
3  school?
4      A.    Yes, ma'am.
5      Q.    And how did you meet him?
6      A.    We used to hunt together.
7      Q.    So you were personal friends?
8      A.    Yeah.
9      Q.    Are you related to Mr. Brindell?
10     A.    Oh, no.
11     Q.    Did you go -- did you belong to the
12 same hunting camp?
13     A.    Yeah, pretty -- yeah, club, hunting
14 club.
15     Q.    From 1977 until you started working for
16 Puerto Rico Marine in 1979, did you do any work for
17 wages with Mr. Brindell?
18     A.    Did I do what with him?
19     Q.    Any work with him?
20     A.    Uh-uh (negative response).
21     Q.    So the only connection that you had
22 with Mr. Brindell before you went to work for
23 Puerto Rico Marine was hunting?
24     A.    Hunting, yes.
25     MR. HART:

Page 84

1      Wait. Interject and add one more
2  request. Try to avoid the uh-huhs and uh-uhs
3  because they are really hard to take down, too. If
4  you can give us yes or nos.
5      THE WITNESS:
6      Yes or no is better.
7      MS. BOWLIN:
8      Thanks, Jody.
9      THE WITNESS:
10     She is still smiling.
11     MR. HART:
12     She will smile.
13     EXAMINATION BY MS. BOWLIN:
14     Q.    We have received some information from
15 Mr. Brindell's attorneys which include his Social
16 Security earnings printout, and we have information
17 that he began working with Puerto Rico Marine in
18 1976. Because you didn't start working there in
19 1979, you are not able to offer us any testimony
20 about his particular work for Puerto Rico Marine in
21 1976, 1977 or 1978, correct?
22     A.    Correct.
23     Q.    The Social Security earnings
24 information that we received also indicates that
25 Mr. Brindell stopped working or last worked for

Page 85

1  Puerto Rico Marine in 1981. Would you have any
2  reason to dispute that?
3      A.    It seemed longer, but I'm not sure.
4      Q.    All right. But if the information we
5  received from the federal government turns out to
6  be correct --
7      A.    I got you.
8      Q.    -- you would have no reason to dispute
9  that, right?
10     A.    No.
11     Q.    Okay. So the time frame that we are
12 going to talk about today is going to be 1979,
13 1980, and 1981 when you both worked for Puerto Rico
14 Marine.
15     A.    Yes, ma'am.
16     Q.    All right. Did you do any work with
17 Mr. Brindell for any company other than Puerto Rico
18 Marine?
19     A.    No.
20     Q.    Do you know Mr. Brindell's family?
21     A.    Yes.
22     Q.    Do you know his wife?
23     A.    Yes.
24     Q.    What's her name?
25     A.    Carolyn.

22 (Pages 82 to 85)

J. Keith Poleto
February 19, 2020

Page 86

1    Q.   All right.  Did you have an opportunity
2   to speak to Miss Carolyn before this deposition
3   today?
4    A.   No.
5    Q.   Do you know how it is that Mr.
6   Brindell's family's attorneys got your name as a
7   possible coworker?
8    A.   No.
9    Q.   How were you contacted about being a
10  witness in this case?
11   A.   (Indicating.)
12   Q.   You are pointing to Mr. Hibey?
13   A.   Yes.
14   Q.   Okay.  Were you contacted by phone or
15  were you contacted in writing?
16   A.   Phone, I think.  Phone.
17   Q.   Do you remember when you were first
18  contacted?
19   A.   No.
20   Q.   Do you remember, was it in 2019 or was
21  it in 2020?
22   A.   '19.
23   Q.   Do you remember what month of 2019?
24   A.   No.
25   Q.   Do you remember if it was before or

Page 87

1   after Christmas in 2019?
2    A.   Before Christmas, I think.
3    Q.   All right.
4    A.   Yes.
5    Q.   How many times have you spoken with an
6   attorney representing Mr. Brindell's family?
7    A.   Once.
8    Q.   Once.  Was that just on the phone?
9    A.   Yes.
10   Q.   Okay.  Did you meet with anyone,
11  including Mr. Hibey, this morning prior to the
12  deposition?
13   A.   No.
14   Q.   Did you meet with anyone yesterday to
15  prepare for the deposition?
16   A.   No.
17   Q.   Have you been provided with any
18  documents to review by the attorneys for Mr.
19  Brindell's family in preparation for this
20  deposition?
21   A.   No.
22   Q.   Did you reach out to any of your fellow
23  coworkers from Puerto Rico Marine to discuss the
24  work that you did with Mr. Brindell?
25   A.   No.

Page 88

1    Q.   You mentioned Mr., is it Holbrook?
2    A.   Holbrook?
3    Q.   No.  What was his name?  I wrote down
4   the -- you told us the name of the gentleman who
5   worked in the bay.
6    A.   Oh, that worked with us, with me?
7    Q.   Yes, sir.
8    A.   D.J.
9    Q.   D.J.  What's D.J.'s last name?
10   A.   Lockhart.
11   Q.   Lockhart.  Did you speak to
12  Mr. Lockhart before the deposition today?
13   A.   No.
14   Q.   Do you know where Mr. Lockhart lives?
15   A.   Yes.
16   Q.   And where is that?
17   A.   Bush.
18   Q.   In Bush, Louisiana?
19   A.   Yes.
20   Q.   Do you know what his health is like?
21   A.   His health?
22   Q.   Is he in good health?
23   A.   I don't know.
24   Q.   When was the last time you spoke with
25  him?

Page 89

1    A.   New Year's.
2    Q.   Of 2019/2020?
3    A.   Yeah, I saw him for New Year's.
4    Q.   And when you called him, did you
5   discuss any of your work at Puerto Rico Marine?
6    A.   No.
7    Q.   At any time have you discussed your
8   work with Mr. Lockhart from Puerto Rico Marine?
9    A.   No.
10   Q.   Now, I wrote down that Puerto Rico
11  Marine is actual -- well, is or was Puerto Rico
12  Marine Management.
13   A.   Correct.
14   Q.   That was the name of the company?
15   A.   Right.
16   Q.   And where was this company
17  headquartered?
18   A.   Puerto Rico.
19   Q.   But it had a New Orleans office?
20   A.   Yeah.  Across the street from the main
21  shop was the corporate office.
22   Q.   Okay.  Do you remember the address of
23  the corporate office?
24   A.   No.
25   Q.   And you say across the street from the

23 (Pages 86 to 89)

J. Keith Poleto
February 19, 2020

Page 90

1    main shop.  And I believe you said earlier at the
2    Port of New Orleans?
3        A.    Right.
4        Q.    But do you know, was there, is there --
5        A.    France Road.
6        Q.    France Road.
7              So there was an office, like a main
8    business office?
9        A.    Correct.
10       Q.    And that was across the street from
11   where the mechanic work was done?
12       A.    Shop, terminal, yes.
13       Q.    And all of the three shops that you
14   identified were across the street from the main
15   office?
16       A.    Yes.
17       Q.    Did Mr. Brindell have an office in the
18   main office because he was a supervisor?
19       A.    No.  His office was in the shop where
20   we were.
21       Q.    And he had an office within the shop?
22       A.    Yes.
23       Q.    And did that office have a closed door,
24   a door that would close?
25       A.    It had a door, but I don't know if he

Page 91

1    closed it or not.  It was always open.
2        Q.    But it did have a door?
3        A.    Yeah.
4        Q.    And is that where Mr. Brindell would go
5    to do his paperwork?
6        A.    Correct.
7        Q.    And do you know a percentage of the day
8    that Mr. Brindell would need to spend doing office
9    work or paperwork?
10       A.    I would say it was probably half a day
11   he would -- office work, half the day he would be
12   in the shop.
13       Q.    Who was stationed, for lack of a better
14   word, in the main office across the street from the
15   shops?
16       A.    Oh, I don't even know.  The people that
17   were working directly for Puerto Rico.
18       Q.    You said that Mr. Brindell was your
19   supervisor?
20       A.    Right.
21       Q.    Were there other shop supervisors?
22       A.    No.  We had a foreman.
23       Q.    Who was the shop foreman?
24       A.    Raymond Cain.
25       Q.    Do you know if Mr. Cain is still

Page 92

1    living?
2        A.    Yes, he's still living.
3        Q.    Do you know where he lives?
4        A.    Lacombe.
5        Q.    Have you spoken with him about this
6    case?
7        A.    No.
8        Q.    Who would have been Mr. Brindell's
9    boss?
10       A.    It would have been in the main office
11   across the street.  Reggie Sykes I think was the
12   man's name.
13       Q.    Do you know if Mr. Sykes is still
14   living?
15       A.    I have no idea.
16       Q.    And do you know what his title was?
17       A.    Manager.  He was a manager, a regional
18   manager, some kind of manager.
19       Q.    Do you know if Puerto Rico Marine
20   Management had offices in the United States other
21   than in New Orleans?
22       A.    I think they might have had one in
23   Charleston, but I'm not sure.
24       Q.    Is that Charleston, South Carolina?
25       A.    Right, yes.

Page 93

1        Q.    Do you know how many people worked in
2    the main office?
3        A.    25, 30.
4        Q.    Do you know the address on France Road
5    of the main office or the shops?
6        A.    Nope.
7        Q.    Can you describe for me the business of
8    Puerto Rico Marine Management?
9        A.    It's a shipping industry.  We ship sea
10   containers and road trailers directly to Puerto
11   Rico.
12       Q.    So the trailers and the containers went
13   from the United States to Puerto Rico?
14       A.    Directly.
15       Q.    And did the same containers and
16   trailers come back to the United States?
17       A.    Yes.
18       Q.    Do you know who was in charge of the
19   paperwork regarding the shipping of the containers
20   and trailers to Puerto Rico?
21       A.    That main office.
22       Q.    The main office.  And then there was an
23   office in Puerto Rico?
24       A.    Yeah.
25       Q.    Was the office in Puerto Rico a Puerto

24 (Pages 90 to 93)

J. Keith Poleto
February 19, 2020

1  Rico Marine Management office if you know?
2  **A.   I couldn't tell you for sure.**
3  Q.   Do you know the names of any of the
4  individuals who worked on the Puerto Rico side of
5  this business?
6  **A.   No.**
7  Q.   Did you ever go to Puerto Rico with any
8  of the sea containers or trailers?
9  **A.   No.**
10  Q.   Do you know if Mr. Brindell ever went
11  on the vessels with any of the sea containers or
12  trailers?
13  **A.   I -- I don't know.**
14  Q.   Other than Reggie Sykes, do you know
15  the names of any other individuals who worked in
16  the main office?
17  **A.   Dottie Boudreaux.**
18  Q.   What was Miss Boudreaux's position?
19  **A.   She was a secretary.**
20  Q.   All right.  Anyone else?
21  **A.   That is it.**
22  Q.   Do you know anything about the
23  corporate structure of Puerto Rico Marine
24  Management?
25  **A.   Not at all.**

1  Q.   Do you know if it was a Puerto Rican
2  business doing business in the United States or if
3  it was a United States business?
4  **A.   Well, Puerto Rico is a --**
5  Q.   Well, it's a territory of the United
6  States.
7  **A.   Commonwealth, yes.**
8  Q.   That was a dumb question.  Sorry.
9  **A.   But, yeah.  I mean, the way they**
10  **explained to us, we pretty much feed those people.**
11  **We make sure that they have their goods that they**
12  **need.  That's what our company was.**
13  Q.   Okay.  So you were sending provisions
14  to Puerto Rico from the United States?
15  **A.   Correct.**
16  Q.   All right.  Got it.
17       And Mr. Brindell was considered a
18  supervisor?
19  **A.   Correct.**
20  Q.   And so he --
21  **A.   On the maintenance department where we**
22  **were.**
23  Q.   So he was the supervisor over the
24  entire maintenance department?
25  **A.   Yes.**

1  Q.   And you've told us about the work that
2  was going on in the maintenance department.  Do you
3  know what Mr. Brindell's other duties were as a
4  supervisor of the maintenance department?
5  **A.   I don't know what else he did.  He did**
6  **paperwork and he would hound us.**
7  Q.   Do you know if he was responsible for
8  ordering the parts and materials that were used in
9  the maintenance department?
10  **A.   I don't think he was, but I don't know.**
11  Q.   Do you know who was responsible then
12  for ordering parts and materials needed for use in
13  the maintenance department?
14  **A.   I sure don't.**
15  Q.   Did you ever have any responsibilities
16  for ordering parts or materials needed for use in
17  the maintenance department?
18  **A.   No.**
19  THE WITNESS:
20       Better?
21  EXAMINATION BY MS. BOWLIN:
22  Q.   Did Puerto Rico Marine Management have
23  a safety department?
24  **A.   No.**
25  Q.   Was there anyone who worked for Puerto

1  Rico Marine Management who was responsible for
2  safety?
3  **A.   Not that I know of.**
4  Q.   Were you provided any safety training
5  before you went to work for Puerto Rico Marine
6  Management?
7  **A.   No.**
8  Q.   When you went -- you said that you had
9  graduated from high school in --
10  **A.   '77.**
11  Q.   -- '77.  Between '77 and '79 when you
12  went to work for Puerto Rico Marine Management, had
13  you already learned how to do maintenance work such
14  as brake work on semis?
15  **A.   No, I learned there.**
16  Q.   So you learned on the job?
17  **A.   Correct.**
18  Q.   In 1979 when you started there, were
19  you considered an apprentice or were you hired as a
20  mechanic?
21  **A.   Hired as a mechanic.**
22  Q.   And did you always work with J.D.
23  Lockhart?
24  **A.   Yes.**
25  Q.   Do you know how long he had worked

25 (Pages 94 to 97)

J. Keith Poleto
February 19, 2020

Page 98

1    there before?
2    A.    Before me?
3    Q.    Yes.
4    A.    Couple years.
5    Q.    So did he teach you the business?
6    A.    Pretty much, yeah.
7    Q.    Was Mr. Brindell ever responsible for
8    teaching you how to perform maintenance work on the
9    semi-trailers?
10    A.    He did sometimes, yes.
11    Q.    He did sometimes.  Do you remember what
12    Mr. Brindell taught you how to do?
13    A.    The repair work.  The brakes, do them
14    correctly.  The landing gear that supported the
15    front of the trailer, how to do it correctly.
16    Q.    Did you ever witness Mr. Brindell
17    personally doing brake work on any of these
18    semi-trailers at Puerto Rico Marine Management?
19    A.    Did I see him do it?  No.
20    Q.    Yes, sir.  No.
21          You just saw him walking around
22    supervising the work?
23    A.    Correct.
24    Q.    During -- between '79 and '81 when you
25    worked with Mr. Brindell at Puerto Rico Marine

Page 99

1    Management, did he ever leave and go to work
2    somewhere else and then come back?
3    A.    No.
4    Q.    Do you recall if he ever left for a
5    period of time for any reason?
6    A.    No.
7    Q.    Do you recall if Mr. Brindell was a
8    smoker?
9    A.    I don't know.
10    Q.    You don't know.
11          Were the employees of Puerto Rico
12    Marine Management allowed to smoke in the shop?
13    A.    Yes.
14    Q.    You described a little bit for us
15    earlier the shop and you said that there were three
16    separate shops.  But were they all contained in the
17    same building?
18    A.    Connected?  No.
19    Q.    Okay.  So there were three separate
20    shops?
21    A.    Right.
22    Q.    Can you tell me the names of those
23    shops again?  You said the front shop is where the
24    mechanic work was done on the trucks?
25    A.    Front shop had -- was divided into

Page 100

1    three portions.  You had our shop, which you could
2    call shop A.  We did suspension, brakes, landing
3    gear, wiring, lights.  Then you had the mechanic
4    shop that worked on the 18 wheel trucks that were
5    used in the yard was attached to our backside.
6    Q.    Would that be B?
7    A.    B.  And you had the parts department
8    behind them.
9    Q.    Would that be C?
10    A.    Yeah, put C on that one.
11    Q.    Okay.
12    A.    And then you had the inspection garage
13    on the outside of that.  You could put that one as
14    D.
15    Q.    Okay.  D.  So the front shop consisted
16    of A, B, C, and D?
17    A.    Correct.
18    Q.    And then what were the other two shops?
19    A.    There was a shop behind us that was --
20    the container structure of the trailers, all the
21    aluminum and stuff what the actual box trailer was
22    made of.
23    Q.    All right.
24    A.    That was their maintenance of that.
25    Q.    Okay.  And what was the last one?

Page 101

1    A.    Tire shop.
2    Q.    Tire shop.  Was Mr. Brindell the
3    supervisor for the front shop, the container shop,
4    and the tire shop?
5    A.    Yeah, he was supervisor for all shops.
6    Q.    So during the course of the day, he
7    supervised the work going on in all of these
8    different shops?
9    A.    Pretty much, but he stayed mostly in
10    our shop, but -- because each shop had a foreman,
11    so he didn't have to go to each shop.
12    Q.    Okay.  Do you know who the foreman was
13    in the container shop?
14    A.    James, James, James.  Think of his last
15    name.  Taylor.
16    Q.    Do you know if Mr. Taylor is still
17    living?
18    A.    I have no idea.
19    Q.    All right.  And who was the foreman of
20    the tire shop?
21    A.    Rayford Browder.
22    Q.    What's the last name?
23    A.    Browder.
24    Q.    Browder.  Do you know if Mr. Browder is
25    still living?

26 (Pages 98 to 101)

J. Keith Poleto
February 19, 2020

Page 102

1     A.   I doubt it.
2     Q.   Okay.  You have not been in contact
3  with him?
4     A.   No.
5     Q.   All right.  On a daily basis, as the
6  supervisor of these three different shops, how much
7  time would Mr. Brindell spend in the front shop?
8     A.   Majority of the time.
9     Q.   Okay.  And then you said 50 percent of
10 that time he would spend in his office?
11    A.   Office.
12    Q.   Doing paperwork and things like that?
13    A.   Correct.
14    Q.   Was it his job to at least daily go, go
15 to each of these shops and see what was going on?
16    A.   He would probably go once, he would
17 probably make one trip a day to the other ones.
18    Q.   Did you ever work in the container
19 shop?
20    A.   For a small period of time.
21    Q.   All right.  Are you able to estimate
22 for me what a small period of time is?
23    A.   About a year, but it was after that
24 time frame.
25    Q.   It was after 1981?

Page 103

1     A.   Yeah, it was after that.
2     Q.   Did you ever work in the tire shop?
3     A.   No.  Didn't want to work there.
4     Q.   And the three portions of the front
5  shop, were there partitions of those three?
6     A.   Yeah.
7     Q.   Actually, it is four:  A, B, C, and D.
8  Were there partitions?
9     A.   Yeah, pretty much.
10    Q.   And so there were --
11    A.   There was a hallway went from one end
12 to the other end and then this one was broke off
13 over here and this one was in the middle and his
14 office was up here in the front.
15    Q.   Okay.  So in A, B, C, or D, where was
16 Mr. Brindell's office located?
17    A.   In between A and D.  Want me to draw a
18 picture for you?
19    Q.   I don't think we need to do that.
20 Okay.  Well, that's fine.  Somebody might ask you
21 to do that.  I guess we can just do it, I guess.
22    A.   Okay.  Keep asking.  I will do it
23 eventually.
24    Q.   Okay.  So Mr. Brindell's office was
25 located between part A and part D of the front

Page 104

1  shop?
2     A.   Yes.
3     Q.   And it was -- it had a door.  Whether
4  he closed it or not, we don't know?
5     A.   Right.
6     Q.   And then each of these parts of the
7  front shop had a hallway and a door?
8     A.   No door.
9     Q.   No door, just a hallway?
10    A.   Hallway.
11    Q.   And were there -- I assume -- and
12 that's always a bad thing --
13    A.   It has a bathroom, yeah.
14    Q.   -- that there were big bays that came
15 up?
16    A.   Oh, yeah, they were tall.
17    Q.   Because you needed to get these big
18 trailers in?
19    A.   Right.
20    Q.   And were those bay doors left open
21 during the day when work was going on?
22    A.   Sometimes.  It depends.  If there was
23 welding going on, you would close them because the
24 wind would blow the gas from the welding, so they
25 would pull the doors down if they were doing

Page 105

1  welding.  Cold, winter, rain, they would be closed.
2  But other than that, they were open.
3     Q.   Was there ventilation in these four
4  different parts of the front shop?
5     A.   No, we had some fans.
6     Q.   You had some fans?
7     A.   A couple.
8     Q.   Were they ceiling fans or floor fans?
9     A.   No, no, just the one next to where you
10 are working will blow on you.
11    Q.   All right.  Other than the big bay
12 doors, were there windows on the ends of the
13 building?
14    A.   Nope.
15    Q.   So during the course of Mr. Brindell's
16 supervision of the front shop, he would go from
17 section A to section B to section C to section D to
18 do his supervisory work?
19    A.   He would, but he mainly stayed on our
20 side.
21    Q.   And your side was A?
22    A.   Right.  He mainly stayed in A because
23 that was right out the office.  When you left the
24 office, you came into A.
25    Q.   So his office was right off A?

27 (Pages 102 to 105)

J. Keith Poleto
February 19, 2020

Page 106

1   A.   **Right.**
2   Q.   And you said that he would, he would be
3   standing behind the different mechanics making sure
4   that the work was being done correctly, but I think
5   you said that there were eight different mechanics?
6   A.   **Right.**
7   Q.   So he was not always supervising your
8   work in particular?
9   A.   **Correct.**
10  Q.   Did he -- did he have any system for
11  how he supervised the four different bays where the
12  mechanic work was going on?
13  A.   **No.  He pretty much did it random.**
14  Q.   He would just walk around?
15  A.   **Wander.**
16  Q.   And he hired people that he thought
17  were competent to do the work?
18  A.   **Correct.**
19  Q.   Are you familiar with OSHA?
20  A.   **Yes.**
21  Q.   Are you familiar with the fact that
22  OSHA in the -- in the late 19 -- in late 1971,
23  early 1972 put out regulations with regard to steps
24  that employers had to take if their employees were
25  working with or around asbestos-containing

Page 107

1   materials?
2   A.   **I didn't know.**
3   Q.   During the course of the time that you
4   worked for Puerto Rico Marine Management, were you
5   ever provided with any training regarding how to
6   identify an asbestos-containing material?
7   A.   **No.**
8   Q.   Were you ever provided with any
9   training regarding what you should do to safely
10  work with or around any asbestos-containing
11  materials?
12  A.   **No.**
13  Q.   Would you have liked for Puerto Rico
14  Marine Management to have given you that
15  information if they had it?
16  A.   **Nowadays, yeah.**
17  Q.   Have you ever personally been screened
18  for an asbestos-related illness?
19  A.   **No.**
20  Q.   Have you been diagnosed with an
21  asbestos-related illness?
22  A.   **No.**
23  Q.   Have you ever given a deposition before
24  like we are doing here today?
25  A.   **No.**

Page 108

1   Q.   Have you ever been asked to serve as a
2   coworker for anyone else who worked for Puerto Rico
3   Marine Management who may have been exposed to
4   asbestos?
5   A.   **No.**
6   Q.   And you are not represented by an
7   attorney here today, right?
8   A.   **No.  All of y'all.**
9   Q.   Did Puerto Rico Marine Management
10  provide its employees with uniforms?
11  A.   **Yes.**
12  Q.   Did you get your uniforms from a
13  service?
14  A.   **Yes.**
15  Q.   And do you remember what the name of
16  that service was?
17  A.   **Cintas.**
18  Q.   Cintas?
19  A.   **That one.**
20  Q.   And did you wear the uniforms from home
21  to work and then back home or did you --
22  A.   **No.  I took mine off at work.**
23  Q.   Okay.  So there was a --
24  A.   **Most people wore them home, but I took**
25  **mine off.**

Page 109

1   Q.   All right.  Let's start with you.  Was
2   there a locker room at Puerto Rico Marine
3   Management?
4   A.   **Yes.**
5   Q.   And each of the employees had a locker?
6   A.   **Yes.**
7   Q.   Did Mr. Brindell have a locker?
8   A.   **No.**
9   Q.   Did he have a locker in his office if
10  you know?
11  A.   **No.**
12  Q.   And you said that the employees were
13  provided uniforms and you wore yours?
14  A.   **Yes.**
15  Q.   Did Mr. Brindell wear a uniform to
16  work?
17  A.   **No.**
18  Q.   What kind of clothes did he wear to
19  work?
20  A.   **White shirt, slacks, and a tie.**
21  **Sometimes a coat.**
22  Q.   Sometimes a coat?
23  A.   **He would come in with a coat.**
24  Q.   All right.  So the mechanics wore the
25  uniforms?

28 (Pages 106 to 109)

J. Keith Poleto
February 19, 2020

Page 110

1    A.    Correct.
2    Q.    And Mr. Brindell came in a coat,
3  sometimes a tie, a white shirt, and slacks?
4    A.    Yes.
5    Q.    And in that attire, he was going around
6  and supervising the mechanic shop?
7    A.    Yes.
8    Q.    And you already said you don't remember
9  him doing any hands-on brake work.
10    A.    I never saw him.  You asked me if I saw
11  him.
12    Q.    Did you ever see him doing any other
13  hands-on work on these semi-trailers in the
14  mechanic shop?
15    A.    I didn't see him.
16    Q.    And did anyone with Puerto Rico Marine
17  Management ever tell you that you should leave your
18  uniform at work?
19    A.    No.
20    Q.    Did Puerto Rico Marine Management
21  through Cintas provide you with laundering services
22  for these uniforms?
23    A.    Yes, yeah, they cleaned them.
24    Q.    During the 1979 to 1981 time period,
25  were dust masks available at Puerto Rico Marine

Page 111

1  Management for use if you wanted one?
2    A.    Was what available?
3    Q.    Dust masks.
4    A.    Dust masks?
5    Q.    Yes, sir.
6    A.    I don't recall.  I don't remember
7  seeing that.
8    Q.    Did you ever ask anyone for a dust
9  mask?
10    A.    Yeah.
11    Q.    Who did you ask?
12    A.    The parts -- the parts department.
13    Q.    And did they give you one?
14    A.    They went got them when we asked for
15  them, yeah.
16    Q.    And do you remember what year that was?
17    A.    That was probably when union came in
18  when they got more strict with everything.
19    Q.    What year did the union come in?
20    A.    '84, '85.
21    Q.    '84, '85.  We will get to that.
22    A.    I say '5.  I'm guessing.
23    Q.    Who was in charge of the parts
24  department?
25    A.    Byron Dickel.

Page 112

1    Q.    Any idea how to spell that last name?
2    A.    D-I-C-K-E-L.
3    Q.    Do you know if Mr. Dickel is still
4  living?
5    A.    I don't know.
6    Q.    Do you know where he was living when he
7  worked for Puerto Rico Marine Management?
8    A.    Mandeville when he worked with us.
9    Q.    And do you know -- strike that.
10        The parts department, is that where all
11  of the parts that were needed to maintain the
12  semi-trailers were kept?
13    A.    The ones that would fit.
14    Q.    The ones that would fit?
15    A.    Much larger pieces went somewhere.
16    Q.    Was going to ask you about the much
17  larger pieces next.  What sorts of parts were kept
18  in the parts department that were needed for
19  maintaining the semi-trailers?
20    A.    All the brake parts were there.
21    Q.    Do you know -- you've identified some
22  names of brake materials --
23    A.    Uh-huh (affirmative response).
24    Q.    -- that were used at Puerto Rico Marine
25  Management.  My question to you is:  Do you know

Page 113

1  the names of any companies or suppliers from whom
2  Mr. Dickel ordered these -- the replacement parts?
3    A.    I don't know.
4    Q.    Do you have any personal information
5  that Mr. Dickel ordered replacement parts from any
6  of the brake companies that you identified earlier
7  today?
8    A.    I don't know what Mr. Dickel did.  I
9  mean, I just did my job.
10    Q.    Okay.  During the 1979 to 1981 time
11  period when you worked with Mr. Brindell, did Mr.
12  Brindell provide you, as the supervisor, with any
13  warnings regarding the potential hazards of
14  asbestos?
15    A.    No.
16    Q.    And he was your supervisor, right?
17    A.    Yes.
18    Q.    He was responsible for the safety of
19  the individuals who were working in the mechanic
20  shop, correct?
21    MR. HIBEY:
22        Objection.  Form, foundation.
23    THE WITNESS:
24        I guess.
25  EXAMINATION BY MS. BOWLIN:

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

J. Keith Poleto
February 19, 2020

Page 114

1      Q.    Was there anyone else with Puerto Rico
2  Marine Management that supervised you on a daily
3  basis?
4      A.    No.
5      Q.    Was there anyone with Puerto Rico
6  Marine Management who came into the front shop in
7  particular to determine whether the mechanics were
8  doing the job in a safe manner?
9      A.    No.
10     Q.    Did you ever make any complaints to Mr.
11 Brindell about safe working conditions or unsafe
12 working conditions in the front shop?
13     A.    No.
14     Q.    Did you ever personally ask Mr.
15 Brindell for a dust mask or a respirator?
16     A.    No.
17     Q.    Did you ever make any complaints to Mr.
18 Brindell about dusty working conditions in the
19 front shop?
20     A.    **I don't think.  No.  Simple answers.**
21     Q.    Except?
22     A.    **I said, "No."  You wanted a simple**
23 **answer.**
24     Q.    Other than the mechanics and Mr.
25 Brindell, did anyone else work in the front shop?

Page 115

1  We talked about the different bays and each bay had
2  two mechanics?
3      A.    **Did anybody work other than what I told**
4  **you already?  No.**
5      Q.    You talked about some welding work.
6  Did the mechanics do the welding work?
7      A.    **Yes.**
8      Q.    So each of the individual mechanics
9  were welders as well?
10     A.    **Yes.**
11     Q.    Did you have to be certified to weld at
12 Puerto Rico Marine Management?
13     A.    **No.**
14     Q.    You just learned that on the job, too?
15     A.    **Pardon me?**
16     Q.    You just learned that on the job, too?
17     A.    **Well, no, I knew that before I went**
18 **over there.**
19     Q.    You talked about the larger parts that
20 might be needed for the trailers.  Where were those
21 larger parts kept?
22     A.    **They were kept in trailers next to the**
23 **shop.**
24     Q.    So they would be kept in the
25 containers?

Page 116

1      A.    **Correct.**
2      Q.    And what -- can you describe for me the
3  different larger parts that would be kept in the
4  containers?
5      A.    **Like the landing gears, the legs that**
6  **support the front of the trailer.**
7  THE REPORTER:
8      Like the what?  Say again.
9  EXAMINATION BY MS. BOWLIN:
10     Q.    Landing gear?
11     A.    **The landing gear that supported the**
12 **front of the trailer.  They was in a container next**
13 **to the shop and the brake drums theirself were next**
14 **to the shop because they were big.**
15     Q.    What about replacement axles?
16     A.    **They were in the trailer next to the**
17 **shop.**
18     Q.    Did Puerto Rico Marine Management order
19 from any companies the whole assembly, the axle
20 with the drums and the brakes already assembled,
21 that would just been -- that would just then be
22 taken out of the containers and replaced?
23     A.    **No, most of the axles came bare.  You**
24 **had to put everything on them.**
25     Q.    So I've never worked on a semi-trailer.

Page 117

1  I'm sure that's shocking to you, but --
2      A.    **Sure.**
3      Q.    -- I haven't.  So I don't -- I don't
4  know how often brakes need to be changed on a
5  semi-trailer.  I assume that not every time a
6  trailer came into the shop, you had to replace all
7  the brakes, correct?
8      A.    **Correct.**
9      Q.    Was there -- is there any sort of rule
10 for semi-trailers as to how often brakes are
11 changed?
12     A.    **After they get a quarter inch thick.**
13     Q.    Okay.  From your personal knowledge
14 working on these trailers for several years, do you
15 have a sense of how long a trailer could operate
16 before the brake materials got down to a quarter
17 inch?
18     A.    **Basically, similar to an automobile.**
19 **But a lot more weight in the trailer, so it's**
20 **not -- it doesn't have the longevity of a car**
21 **because all the weight.  I would say yearly, six**
22 **months to a year.  I would say yearly.**
23     Q.    Okay.  And you've talked about the
24 different trailer manufacturers.  Did the same
25 trailers -- was there just a group of trailers that

30 (Pages 114 to 117)

J. Keith Poleto
February 19, 2020

Page 118

1  were dedicated to the Puerto Rico Marine Management
2  business going from the US to Puerto Rico and back?
3      A.    The containers, some -- now, we got
4  multiple.  We had some containers that were owned
5  directly by Puerto Rican Marine and those went back
6  and forth, but then they also leased, they leased
7  other trailers --
8      Q.    Okay.
9      A.    -- from other companies.
10     Q.    So Puerto Rico Marine Management did
11  own some of its own trailers?
12     A.    They owned some of their own, yes.
13     Q.    Do you know how many of their own
14  trailers they had?
15     A.    No.
16     Q.    Do you know the makeup of the
17  manufacturers of the trailers that Puerto Rico
18  Marine Management owned?
19     A.    No.
20     Q.    Do you know the names of the companies
21  from whom Puerto Rico Marine Management leased
22  other trailers?
23     A.    I mean, the ones that I described
24  earlier, I mean, the names of the trailers.  That
25  doesn't mean -- that is not the company that owned

Page 119

1  them, though.
2      Q.    I understand that.  So you provided us
3  with a list of trailer manufacturers.
4      A.    Manufacturers, right.  But, no, I don't
5  have any idea who owned them.
6      Q.    And if I appreciate your testimony,
7  Puerto Rico Marine Management owned some of those
8  trails?
9      A.    They did own some.
10     Q.    And then they also leased other
11  trailers when they needed them?
12     A.    Right.
13     Q.    And my question was:  Do you know the
14  names of the leasing companies?
15     A.    No.
16     Q.    Is Puerto Rico Marine Management still
17  in business?
18     A.    I don't think so.
19     Q.    Do you know if they were bought out by
20  anyone?
21     A.    I don't know.
22     Q.    Do you know the last year that Puerto
23  Rico Marine Management was in business?
24     A.    No.  If it helps you to make it
25  shorter, everybody called it PRMMI.  They used the

Page 120

1  letters.
2      Q.    PRMMI.
3      A.    So you don't have to keep --
4      Q.    I will try.
5            Okay.  Did you have safety meetings at
6  PRMMI?
7      A.    Every once in awhile.
8      Q.    Who ran those meetings?
9      A.    Mr. Brindell would run some of them.
10  Sometimes shop foreman would do it.
11     Q.    So either the shop foreman or the
12  supervisor, Mr. Brindell --
13     A.    Right.
14     Q.    -- since there was no safety
15  department, were in charge of safety?
16     A.    They would run safety meetings, yeah.
17     Q.    Do you recall any of the topics that
18  were discussed during those safety meetings?
19     A.    OSHA type things, picking your air
20  lines up off the floor, don't leave them stretched
21  out because OSHA would get -- they don't like any
22  lines across the floor that you can trip on.  Stuff
23  like that.  Basic safety things.
24     Q.    So the company was familiar with OSHA?
25     A.    Yeah.

Page 121

1      Q.    Do you recall any OSHA inspectors ever
2  coming to PRMMI?
3      A.    I don't remember ever seeing any when I
4  was there.
5      Q.    Did -- were you provided with or
6  required to wear any safety equipment such as
7  steel-toed shoes?
8      A.    No.
9      Q.    Were you provided with safety glasses?
10     A.    Yeah.  The hard hat, yeah, and safety
11  glasses, yeah.
12     Q.    And were those provided to you by
13  PRMMI?
14     A.    Yes.  Now you got it.
15     Q.    Trying.
16           Do you have any information whether
17  PRMMI was ever cited by OSHA for any violations
18  regarding asbestos?
19     A.    No.
20     Q.    Between '79 and '81 when you worked
21  with Mr. Brindell, were you given any information
22  regarding the potential hazards of working with
23  asbestos-containing materials?
24     A.    No.
25     Q.    You were asked some questions about

31 (Pages 118 to 121)

J. Keith Poleto
February 19, 2020

Page 122

1  whether the brake materials that were used at PRMMI
2  contained asbestos and you said that you thought
3  that they did.  Did anyone with PRMMI ever tell you
4  that those materials contained asbestos?
5      A.   No.
6      Q.   How -- what do you base your knowledge
7  on that those materials contained asbestos?
8      A.   All what you see on the television
9  today.
10     Q.   Okay.  So you've seen advertisements on
11 television about certain products or materials that
12 contained asbestos at one point?
13     A.   Correct.
14     Q.   Is that right?
15          But you never personally saw anything,
16 any documents --
17     A.   No.
18     Q.   -- at PRMMI that suggested to you that
19 these materials contained asbestos?
20     A.   I didn't.
21     Q.   Other than the brake materials that you
22 were asked about earlier, do you think you worked
23 with any other materials at PRMMI that contained
24 asbestos?
25     A.   I don't think so.

Page 123

1      Q.   The maintenance work on these trailers,
2  did any of that involve gaskets?
3      A.   Acid?
4      Q.   Gaskets.
5      A.   Gaskets?
6      Q.   Gaskets.
7      A.   No, there was a gasket on the
8  liquid-filled hubs.  Some of the hubs had 90 weight
9  oil in them, so for the bearings.
10     Q.   These gaskets would have been some of
11 the parts that were kept in the parts department?
12     A.   Yeah.
13     Q.   Do you know the brand name --
14     A.   The gaskets seemed like they were made
15 out of cork material.
16     Q.   Cork.
17          Did you have to do any clutch work on
18 these big trucks?
19     A.   No.  That would have been the other
20 department.
21     Q.   The other department.  So the clutch
22 work would have gone on in which part of the shop?
23     A.   C.
24     Q.   C.
25     A.   Is that -- is C the back?

Page 124

1      Q.   C what?
2      A.   Is C the back?
3      Q.   I don't know because Jody is going to
4  get you to draw a picture.
5      A.   Draw it for you.
6  MR. HART:
7          C was the parts department.
8  MS. BOWLIN:
9          Oh, C is --
10 MS. ADAMS:
11         B was the other.
12 THE WITNESS:
13         Not the parts department.  Behind the
14 parts department.  All the equipment was automatic
15 except the forklifts had clutches.
16 EXAMINATION BY MS. BOWLIN:
17     Q.   Forklifts had clutches?
18     A.   Forklifts had clutches.
19     Q.   And were the forklifts maintained at
20 PRMMI?
21     A.   Yeah, in this building.  Let me draw it
22 (drawing).
23 DEFENSE COUNSEL:
24         That air-conditioning is still blowing
25 hard.

Page 125

1  MS. BOWLIN:
2          It doesn't seem quite as frigid as it
3  was before, but maybe that's because I'm asking all
4  the questions.
5          What?  Yeah, let's just go off and let
6  him draw the picture.
7  THE VIDEOGRAPHER:
8          This is the end of media No. 1.  We are
9  now off the record at 11:56.
10         (Brief recess.)
11 THE VIDEOGRAPHER:
12         This is the beginning of media No. 2.
13 We are now back on the record at 12:06.
14 DEFENSE COUNSEL:
15         We are going back on the record.
16 MS. BOWLIN:
17         Like a cocktail party.
18 THE WITNESS:
19         Many more hours?
20 MS. BOWLIN:
21         I hope not.
22 THE WITNESS:
23         I've gotta go.  I've gotta go buy a
24 house.
25 EXAMINATION BY MS. BOWLIN:

32 (Pages 122 to 125)

J. Keith Poleto
February 19, 2020

Page 126

1    Q.    Okay.  We are back on the record, sir.
2  And we took a short break and I believe that you
3  were -- you went outside and you took a break.  And
4  did you have any discussions with Mr. Hibey about
5  the deposition?
6    A.    **No, uh-uh (negative response).**
7    Q.    All right.  And during the break you
8  drew for us a picture or a depiction of the shop,
9  the --
10   A.    **Yes, ma'am, best I could do.**
11   Q.    The best you could do.  And we will --
12 I think this will be the first exhibit, so this
13 will be Exhibit A.  I will have you sign this in a
14 moment just so we can know that you drew this for
15 us.  But what you have drawn on here is A, the
16 letter A, which is the main shop?
17   A.    **Correct.**
18   Q.    Which is where you worked?
19   A.    **Yes, ma'am.**
20   Q.    That had the four different bays?
21   A.    **Yes, ma'am.**
22   Q.    Where the work such as brake work, axle
23 work, drum work, things like that, were done on the
24 trailers?
25   A.    **Yes, ma'am.**

Page 127

1    Q.    Okay.  And then you also have enclosed
2  an office for Mr. Brindell?
3    A.    **Correct.**
4    Q.    And you said that there was a door on
5  that office?
6    A.    **Yes.**
7    Q.    And then you have put bath for the
8  bathroom?
9    A.    **Yes, ma'am.**
10   Q.    So the bathroom is outside of his
11 office and between the A shop?
12   A.    **Well, he had -- he had a door going**
13 **straight into the shop.**
14   Q.    Was there a wall between the bathroom
15 and the A shop?
16   A.    **Yeah.**
17   Q.    So for Mr. Brindell to go from his
18 office to the main shop, did he have to go outside
19 and then go into the main shop?
20   A.    **No, no, no.**
21   Q.    Draw for us how you would get from his
22 office --
23   A.    **I didn't draw -- I didn't draw very**
24 **good.**
25   Q.    Well, we are not -- you know, we are

Page 128

1  not going to put it in the museum.
2    A.    **Let me explain it to you and then you**
3  **can show her.**
4    Q.    Yes.
5    A.    **I made the bathroom smaller so you**
6  **could see the door from his office went straight**
7  **into the shop.**
8    Q.    Okay.  So there was --
9    A.    **I made the bathroom too big.**
10   Q.    Was there a door that shut off the
11 shop?
12   A.    **He had a door in his office.**
13   Q.    Okay.  And then was there also a door?
14   A.    **No, no, just that one.**
15   Q.    You could go out of his office door and
16 into shop A?
17   A.    **Into the shop.**
18   Q.    Then you've also noted for us where the
19 parts department is?
20   A.    **Right.**
21   Q.    You've noted for us that there was a
22 break room and that is where the employees would
23 have breaks like coffee and lunch and things?
24   A.    **Correct.**
25   Q.    Do you know if Mr. Brindell ate his

Page 129

1  lunch in the break room or in his office?
2    A.    **He sometimes ate in the break room,**
3  **sometimes went out.**
4    Q.    Okay.  So he wasn't there every day for
5  lunch?
6    A.    **Not every day.**
7    Q.    So then you have -- also, the next
8  section is power, P-O-W-E-R?
9    A.    **That's where they worked on the trucks.**
10   Q.    That's where they worked on the --
11   A.    **The truck that pulls the trailer.**
12   Q.    The trucks themselves?
13   A.    **Right.**
14   Q.    And you also mentioned some forklifts?
15   A.    **Forklifts.**
16   Q.    And maintenance was done on the
17 forklifts in power as well?
18   A.    **Correct.**
19   Q.    Then you've also indicated that there
20 was an inspection area?
21   A.    **Right.  That was to check each trailer**
22 **before it went on the road.**
23   Q.    Who was over the inspection department?
24   A.    **Hirschel Walker.**
25   Q.    Hirschel Walker?

33 (Pages 126 to 129)

J. Keith Poleto
February 19, 2020

Page 130

1    A.   Huh?
2    Q.   The football player?
3    A.   Huh?  What?
4    Q.   The football player?
5    A.   No, that was his name.
6    Q.   But there is also a football player
7  named Hirschel Walker.
8    A.   Oh.
9    Q.   Was Mr. Brindell the supervisor of the
10 inspection department as well?
11   A.   Yes, yes.  He supervised everything on
12 this side of the road.
13   Q.   Got you.
14       The forklifts that you mentioned, do
15 you know who made the forklifts, the brand?
16   A.   Yale.
17   Q.   Yale.  And there were individuals who
18 worked in power who maintained those forklifts?
19   A.   Yes.
20   Q.   And Mr. Brindell supervised their work
21 as well?
22   A.   Yes.
23   Q.   And you said -- I think you said they
24 had to do clutch work on the Yale forklifts?
25   A.   The Yale forklifts had clutches in

Page 131

1  them, yes.
2    Q.   Did they also have brakes?
3    A.   Yes.
4    Q.   And the clutches and the brakes were
5  maintained on those forklifts?
6    A.   Maintained in that shop.
7    Q.   In power.  Do you know how many Yale
8  forklifts PRMMI had?
9    A.   Ten.
10   Q.   Is there any other equipment that was
11 maintained in the front shop?
12   A.   No.
13   Q.   You've talked about using compressed
14 air.
15   A.   Yes.
16   Q.   Was there compressed air used in all
17 these different shops?
18   A.   Yes.
19   Q.   And PRMMI provided the compressors that
20 were used to compress the air?
21   A.   Yes.
22   Q.   Were the compressors overhauled at the
23 shop at any time?
24   A.   Not that I know of.  What you mean
25 overhauled?  They had --

Page 132

1    Q.   Maintained, overhauled.
2    A.   The same guys that did the power
3  maintained the compressors.
4    Q.   They would maintain the compressors in
5  all the different shops?
6    A.   Right.
7    Q.   Have you spoken with Mr. Brindell's
8  wife about what illness he may have had before he
9  passed away?
10   A.   Well, I knew he got sick and he didn't
11 last very long.
12   Q.   And how did you find that information
13 out?
14   A.   He told me.
15   Q.   So you had a conversation with Mr.
16 Brindell before he passed away?
17   A.   Yeah.
18   Q.   So perhaps that's how his wife knew
19 that you could possibly be a coworker in the case?
20   A.   I guess.
21   Q.   Okay.  Did you go and visit him before
22 he passed away?
23   A.   Yeah.
24   Q.   Did you go to his funeral?
25   A.   Yes.

Page 133

1    Q.   When you visited him before he passed
2  away, did you discuss his pending lawsuit?
3    A.   I didn't know anything about it.
4    Q.   Did you have any discussions with
5  him -- did you have any discussions with him about
6  any asbestos products that you may have worked with
7  at PRMMI?
8    A.   No.  The man was dying.  We didn't talk
9  about any of that.
10   Q.   I understand.  I just need to ask the
11 question.
12       Do you know anything about Mr.
13 Brindell's service in the United States Navy?
14   A.   I knew he served in the Navy.
15   Q.   Did you and he ever discuss his service
16 in the Navy?
17   A.   No.
18   Q.   Do you know the name of any ships that
19 he might have served on in the Navy?
20   A.   No.
21   Q.   When you went to his funeral, did you
22 happen to meet any of his fellow Navy servicemen?
23   A.   No.
24   Q.   You told me that you have not -- you
25 didn't personally work with Mr. Brindell anywhere

34 (Pages 130 to 133)

J. Keith Poleto
February 19, 2020

Page 134

1    other than PRMMI.  Do you know anything about any
2    of his other jobs that he had during his lifetime?
3         A.    No.
4         Q.    Okay.  If I were to go through his
5    Social Security printout and ask you about his
6    different employers, you wouldn't be able to give
7    me any information about anything other than PRMMI;
8    is that right?
9         A.    Correct.
10        Q.    Do you even know what sorts of jobs he
11   had before or after he worked for PRMMI?
12        A.    No.
13        Q.    After -- after he left PRMMI, did you
14   all continue to hunt together?
15        A.    Yes.
16        Q.    You just never talked about work?
17        A.    No.
18        Q.    Did you belong to a hunting camp then
19   as well?
20        A.    Yes.
21        Q.    Did that hunting camp have a name?
22        A.    Dixie Ranch.
23   MR. HART:
24             Dixie what?
25   EXAMINATION BY MS. BOWLIN:

Page 135

1         Q.    Ranch?
2         A.    Dixie Ranch.
3         Q.    Can you describe Mr. Brindell for me?
4         A.    Fun guy.
5         Q.    You know about how tall he was?
6         A.    Oh, a little shorter than I am.
7         Q.    And how tall are you?
8         A.    I'm six foot, so I guess he was five
9    ten.
10        Q.    Okay.  Did -- what color hair did he
11   have?
12        A.    I am sorry?
13        Q.    What color hair did he have?
14        A.    Dark, black.
15        Q.    And do you remember what color eyes he
16   had?
17        A.    Brown.  He wore glasses all the time.
18        Q.    Glasses.  Okay.
19             You told us that you spoke with Mr.
20   Hibey on the telephone prior to the deposition.
21        A.    (Indicating.)
22        Q.    Yes.  And that's the only time that you
23   spoke with anyone representing the Brindell family
24   about the deposition?
25        A.    Yes.

Page 136

1         Q.    Did you conduct any Internet research
2    about any of the brake products or trailers that
3    you worked with or around for PRMMI?
4         A.    No.
5         Q.    You were asked some questions about
6    dust earlier and you said the dust came from the
7    brake materials.
8         A.    Yes.
9         Q.    You -- you never personally tested any
10   of the dust that you blew out of any trailer drum
11   system or axle system when you worked for PRMMI,
12   correct?
13        A.    Correct.
14        Q.    Okay.  And these were over-the-road
15   trucks, right?
16        A.    Yes.
17        Q.    And they ultimately got on a shipping
18   container and they went to Puerto Rico and then
19   they got on a -- I mean, on a ship and they came
20   back.  So they could -- some of the dust that
21   accumulated in the brake drums could have come from
22   other, other places besides just from the brakes,
23   correct?
24        A.    Possibly, yeah.
25        Q.    Because they were going on the road,

Page 137

1    correct?
2         A.    Yes.
3         Q.    And then they were going on a ship?
4         A.    Right.
5         Q.    And then they got off in Puerto Rico
6    and then they went on the road somewhere?
7         A.    Right.
8         Q.    And then the same process back?
9         A.    Right.
10        Q.    So just the course of a truck driving
11   on the road, you can drive over things that create
12   dust, correct?
13        A.    Oh, yeah.
14        Q.    So you don't know, as we sit here
15   today, the actual makeup of any of the dust that
16   you blew out of any trailer?
17        A.    Well, it was mostly from the brakes.
18        Q.    Okay.  You say it was mostly from the
19   brakes, but you didn't do any testing on that,
20   right?
21        A.    No.
22        Q.    You said that ultimately you were
23   provided with dust masks by PRMMI.  Do you remember
24   the first year that you were provided a dust mask
25   at PRMMI?

35 (Pages 134 to 137)

J. Keith Poleto
February 19, 2020

Page 138

1     A.    It was after the period what you are
2 talking about, what you are talking of.
3     Q.    After 1981?
4     A.    It's around 1985 maybe.  When the
5 union, around the time the union came in.
6     Q.    So you talked about the fact that the
7 union came in at some point.
8     A.    Right.
9     Q.    The union came in after Mr. Brindell
10 left?
11     A.    Yes.
12     Q.    What -- do you remember the local
13 number of that union?
14     A.    2036.
15 MR. STAINES:
16     Say it again.
17 THE WITNESS:
18     2036, container maintenance.
19 EXAMINATION BY MS. BOWLIN:
20     Q.    Container maintenance.  So to your
21 knowledge, was Mr. Brindell ever a member of that
22 union?
23     A.    No.
24     Q.    Do you know if anyone with PRMMI ever
25 conducted any air monitoring or sampling of the air

Page 139

1 that was in the front shop?
2     A.    No.
3     Q.    When you began working with PRMMI, were
4 you required to undergo a pre-employment physical?
5     A.    Yes.
6     Q.    And do you remember, was there a
7 particular doctor that you had to go to?
8     A.    They sent us to a particular place, but
9 I couldn't tell you the name of it.  It was right
10 here in Elmwood, though.
11     Q.    And it was a doctor's office?
12     A.    Yes.
13     Q.    And did you periodically have to go
14 back to that doctor's office and have any follow-up
15 medical tests?
16     A.    No.
17     Q.    Did anyone with PRMMI ever require that
18 you undergo a chest x-ray?
19     A.    No.
20     Q.    Did anyone with PRMMI ever require that
21 you undergo a pulmonary function test?
22     A.    No.
23     Q.    And you said that your typical work
24 hours -- well, you should have worked 8 to 5, but
25 you really worked 6 to 5.  Did you get overtime for

Page 140

1 6 to 8?
2     A.    Yes.
3     Q.    What were Mr. Brindell's work hours?
4     A.    He -- he didn't have to be there when
5 we did the overtime.  It was kind of like voluntary
6 for him to be there.  He stayed sometimes,
7 sometimes he didn't.
8     Q.    But his traditional work hours would
9 have been 8 to 5?
10     A.    8 to 5, yeah.
11     Q.    All right.  I'm going to shift gears on
12 you a little bit and I am going to talk to you
13 about the Carlisle brakes that you identified, all
14 right?
15     You recall that -- you definitely
16 recall Carlisle brakes from PRMMI?
17     A.    Yes.
18     Q.    Okay.  And would it have been the parts
19 department that obtained the Carlisle brakes for
20 use at PRMMI?
21     A.    Yes.
22     Q.    And specifically, what is it that
23 Carlisle made that you used at PRMMI?
24     A.    Specifically, what?
25     Q.    Specifically, which brake parts or

Page 141

1 materials were made by Carlisle that you used at
2 PRMMI?
3     A.    The pad on the brake shoe.
4     Q.    And you never personally saw Mr.
5 Brindell handle a Carlisle brake pad, correct?
6     A.    I didn't see him, no.
7     Q.    And so that would include removing a
8 Carlisle brake pad from any of the trucks; you
9 didn't see him do that, correct?
10     A.    I didn't see him.
11     Q.    And you didn't see him install a
12 Carlisle brake pad on any of the trucks, correct?
13     A.    I didn't see him.
14     Q.    And you said that you remembered the
15 name Carlisle.  Do you specifically remember the
16 name Carlisle from the brake pad itself?
17     A.    Yes.
18     Q.    And how was the name -- how was the
19 name Carlisle affixed to the brake pad itself?
20     A.    It was stenciled in the side of the
21 pad itself.  Not stenciled, but that electronic way
22 to write, like stamped.
23     Q.    Okay.  So sort of written into it?
24     A.    Yeah.
25     Q.    And what exactly did it say?

36 (Pages 138 to 141)

J. Keith Poleto
February 19, 2020

Page 142

```
 1        A.   Carlisle number, number, number,
 2   number, number.
 3        Q.   So it said Carlisle and it had a series
 4   of numbers?
 5        A.   Right.
 6        Q.   Do you remember any of those series of
 7   numbers?
 8        A.   No.
 9        Q.   And do you remember how the letters
10   were printed?  Were they -- was it block letters,
11   was it script letters, do you remember how the name
12   was written out?
13        A.   It was black computerized-looking
14   letters.
15        Q.   Do you remember the name Carlisle on
16   any of the boxes?
17        A.   Yes.
18        Q.   And how was the name written out on the
19   boxes?
20        A.   Just said Carlisle on the corner.
21        Q.   Just said Carlisle?
22        A.   Yes.  Other writing on there, brake
23   shoes or whatever.
24        Q.   And did it also have a series of
25   numbers?
```

Page 143

```
 1        A.   Had numbers on the box.
 2        Q.   To your knowledge, did Mr. Brindell
 3   personally order any parts from Carlisle?
 4        A.   I don't think he did any of the
 5   ordering.
 6        Q.   Do you remember if Carlisle brake pads
 7   were being used at PRMMI in 1979 when you started
 8   there?
 9        A.   Yes.
10        Q.   Do you remember if Carlisle brake pads
11   were being used at PRMMI in 1981 when Mr. Brindell
12   left?
13        A.   Yes.
14        Q.   And you don't know if they ordered
15   these parts directly from Carlisle or from some
16   other parts house or supplier; is that right?
17        A.   I have no idea.
18        Q.   Do you know if PRMMI kept records of
19   the parts that they purchased from the different
20   companies?
21        A.   I'm a mechanic.  I have no idea what
22   went on in the office.
23        Q.   Do you have any information regarding
24   where invoices were kept at PRMMI?
25        A.   Parts room, I guess.  Parts department,
```

Page 144

```
 1   I guess.
 2        Q.   Do you know if any invoices were kept
 3   in Mr. Brindell's office?
 4        A.   I have no idea.
 5        Q.   Did you ever see any new Carlisle brake
 6   pads delivered to PRMMI?
 7        A.   Did I see them delivered?
 8        Q.   Yes.
 9        A.   Sometimes.
10        Q.   And how were they delivered?
11        A.   By truck.
12        Q.   And do you remember any names on those
13   trucks?
14        A.   No.
15        Q.   And the names of any of the companies
16   that were operating those trucks?
17        A.   No.
18        Q.   Do you ever -- do you remember if any
19   of those trucks were coming directly from Carlisle?
20        A.   I don't know.
21        Q.   And when various parts, including brake
22   pads, would come to PRMMI, they would be delivered
23   to the parts room?
24        A.   Correct.
25        Q.   And Mr. Dickel or anybody else who
```

Page 145

```
 1   worked in the parts room would be responsible for
 2   getting them off the truck and sorting them into
 3   the parts room?
 4        A.   Right.
 5        Q.   Was it ever Mr. Brindell's job to
 6   remove parts from the trucks and sort them out in
 7   the parts room?
 8        A.   I don't think so.  He might supervise
 9   it, but I don't think he actually did it.
10        Q.   Do you know the manufacturer or brand
11   of any of the dust masks that were provided to you
12   at any time?
13        A.   No, they -- no.
14        Q.   Do you know the names of any companies
15   that sold those dust masks to PRMMI?
16        A.   No.
17        Q.   The Carlisle brake pads, do you know if
18   those materials were precision molded for use on
19   any of the trucks at PRMMI?
20        A.   They -- they were standard mold.  I
21   don't think nothing was -- standard brake pads.
22        Q.   All right.  Do you remember if there
23   were different grades of the Carlisle brake pads?
24        A.   Oh, no, I didn't -- well, I didn't have
25   no idea on that.  The guy that ordered them might
```

37 (Pages 142 to 145)

J. Keith Poleto
February 19, 2020

Page 146

1  know.
2      Q.   So when you were -- strike that.  Bad
3  question.
4          If you needed brake pads to put on a
5  truck, would you go to the parts room and get them
6  or would they be brought to you?
7      A.   **I would go to the parts room and get**
8  **them.**
9      Q.   So when you went to the parts room, did
10 you request a specific brand of brake pad or you
11 just went and said I need X brake pad for Y truck
12 and they gave you what was available for use?
13     A.   **X for Y truck and what was available to**
14 **use.**
15     Q.   So you did not go to the parts room and
16 specifically request a Carlisle brake pad; is that
17 right?
18     A.   **No, I didn't do that.  I went and told**
19 **them I needed brakes for this particular unit, this**
20 **particular axle.**
21     Q.   And they would give you whatever they
22 had available that would fit on that unit and that
23 particular axle?
24     A.   **Correct.**
25     Q.   Do you remember the color or colors of

Page 147

1  the boxes that the Carlisle brake pads came in?
2      A.   **That's so long ago.**
3      Q.   I understand.  Just have to ask the
4  question.
5      A.   **No, I don't, I can't say that I**
6  **remember.**
7      Q.   All right.  And so you gave us a
8  description earlier of the Carlisle materials that
9  you recall being used.
10     A.   **Uh-huh (affirmative response).**
11     Q.   And --
12     A.   **Yes.**
13     Q.   I know.  Probably should be sitting
14 over there.
15          Was there just one type of box that the
16 Carlisle products came in?
17     A.   **They would -- couple of different**
18 **boxes, but a lot of times they would come in bulk**
19 **on a pallet board wrapped in plastic.  They didn't**
20 **even have a box up there.**
21     Q.   So if they came in a box, was the box
22 always the same?
23     A.   **Pretty much.**
24     Q.   And you just don't remember the color.
25 Was it cardboard?

Page 148

1      A.   **Cardboard, yes.**
2      Q.   And do you remember if it was a colored
3  cardboard or just cardboard tan?
4      A.   **They had colors on it, but I don't**
5  **remember the colors.**
6      Q.   Do you remember if the name Carlisle
7  was written in a particular color?
8      A.   **No, I don't remember.**
9      Q.   And if the -- if the brake pads just
10 came in bulk on a pallet, you would identify them
11 again by the name that was --
12     A.   **Stamped inside of the pad.**
13     Q.   You said that you did not recall or you
14 weren't -- maybe I didn't quite understand your
15 testimony, so I will just ask you the question
16 again.  Do you ever recall seeing warnings on any
17 of the Carlisle boxes that were delivered to PRMMI?
18     A.   **They may have been on there.  We took**
19 **the boxes off and put the brakes on.  We didn't pay**
20 **attention to that.**
21     Q.   Do you know the year that Carlisle
22 started putting warnings on their boxes?
23     A.   **Oh, I don't know if they were on there**
24 **or not.**
25     Q.   You just opened the box and used the

Page 149

1  materials?
2      A.   **I opened the box, got my parts, put**
3  **them on, did my job.**
4      Q.   Do you recall if there were any
5  instructions or written materials in the boxes of
6  Carlisle brake pads?
7      A.   **I don't remember if there were or not.**
8      Q.   Did you ever see any Carlisle
9  salespeople at PRMMI?
10     A.   **No.  I mean, not that I know of.**
11     Q.   Okay.  If the -- if the Carlisle brake
12 pads came in a box instead of in bulk, how many
13 brake pads would be in one box?
14     A.   **Enough for one wheel.**
15     Q.   Okay.  How many --
16     A.   **Two.**
17     Q.   That would be two?
18     A.   **Two.**
19     Q.   So if you had to do more than one wheel
20 and you went to the parts department, let's say you
21 had to do all of the wheels and you had to go get
22 the brake pads for all of the wheels, would
23 somebody help you bring those materials back?
24     A.   **They -- on the back of the parts room**
25 **there was a rollup garage door.  You rolled your**

38 (Pages 146 to 149)

J. Keith Poleto
February 19, 2020

Page 150

1    hand truck around there and you got them, you
2    stacked them on the hand truck and you rolled them
3    back to your bay.
4        Q.   All right.  And you've already told me
5    that you just used whatever the parts man gave you.
6    Would he sometimes give you an assortment of
7    different parts?
8        A.   No.
9        Q.   So if you were doing all the wheels on
10   one trailer at a time --
11       A.   Everything matched.
12       Q.   He gave you matching parts?
13       A.   Right.
14       Q.   And whether that is Carlisle or
15   somebody else?
16       A.   Always matched.
17       Q.   And do you know whether Carlisle made
18   different grades of brake parts?
19       A.   I don't even know that.
20       Q.   Okay.  So you wouldn't be able to tell
21   me if the materials you were using were standard or
22   premium?
23       A.   No.
24       Q.   And when you opened a box of brand new
25   brake pads, the -- new pads wouldn't be dusty,

Page 151

1    right?
2        A.   No.
3        Q.   And you've not seen any information or
4    documentation confirming that any of the Carlisle
5    materials when you -- when you were at PRMMI from
6    '79 to '81, in fact, contained asbestos, right?
7        A.   I -- I didn't know anything about it.
8        Q.   Do you know --
9        A.   I did --
10       Q.   I'm sorry.  I didn't mean to cut you
11   off.
12            Do you know when Carlisle came out with
13   a non-asbestos alternative brake material?
14       A.   I don't know when it happened.  I --
15       Q.   Do you -- I'm sorry.  Go ahead.
16       A.   I know the newer ones don't have it
17   anymore, but I don't know when it happened.
18       Q.   All right.  Do you know the year that
19   non-asbestos-containing brake materials became
20   available to the industry?
21       A.   No.
22       Q.   Do you know when Mr. Brindell became
23   aware of the potential hazards of asbestos?
24       A.   Do I know?  No.
25       Q.   When did you first become aware of the

Page 152

1    potential hazards of asbestos?
2        A.   When I started seeing it on the
3    television probably.
4        Q.   And is that the only way that you know
5    about it is from television?
6        A.   I don't remember anybody saying
7    anything when we were working.
8        Q.   Now, you told us earlier that you
9    would -- you would wire brush and then sometimes
10   you would have to grind the new brake materials to
11   get them to fit onto the trucks.
12       A.   Yes.
13       Q.   Did anyone provide you with
14   instructions that you were supposed to grind the
15   new brake materials to make them fit?
16       A.   No.
17       Q.   Did any -- do you recall seeing
18   anything from Carlisle suggesting that you should
19   grind brand new Carlisle materials to make them
20   fit?
21       A.   No.
22       Q.   And did sometimes the new brake
23   materials fit and didn't have to be --
24       A.   Sometimes, yes.
25       Q.   -- ground?

Page 153

1        A.   Sometimes.
2        Q.   Do you have a percentage of time that
3    the -- the new brake materials, whoever
4    manufactured them, would fit without grinding?
5            DEFENSE COUNSEL:
6                Object to the form.
7            THE WITNESS:
8                Probably 50/50.
9        EXAMINATION BY MS. BOWLIN:
10       Q.   50/50?
11           Did anyone with PRMMI suggest to you
12   that you should wear a dust mask when grinding
13   brake materials?
14       A.   No.
15       Q.   Did anyone with PRMMI tell you that not
16   wearing a dust mask could be hazardous to your
17   health when grinding a brake material that may have
18   contained asbestos?
19       A.   No.
20       Q.   And what sort of machine did you use to
21   grind the new brake materials if you had to?
22       A.   A grinder.
23       Q.   And that grinder was provided to you by
24   PRMMI?
25       A.   No, we had our own tools.

39 (Pages 150 to 153)

J. Keith Poleto
February 19, 2020

Page 154

1  Q.   You had your own tools.  Was that a
2  handheld grinder?
3  A.   Handheld.
4  Q.   All right.  So you brought that to work
5  with you?
6  A.   It stayed in my tool box at work.
7  Q.   Did PRMMI provide you with grinders if
8  you needed them?
9  A.   Yeah.  If I needed one, yeah.
10  Q.   Do you remember the brand of any of the
11  grinders that PRMMI had available?
12  A.   If it was electric, it was Dewalt and
13  Makita.
14  MS. ADAMS:
15      Nakita?
16  MR. HART:
17      Makita.
18  THE WITNESS:
19      Makita.
20  EXAMINATION BY MS. BOWLIN:
21  Q.   And if you had to grind a new piece of
22  brake material, how long did that take you?
23  A.   Not long.  Fifteen minutes.
24  Q.   Fifteen minutes.
25      Did you ever have to saw or cut into a

Page 155

1  piece of new Carlisle brake material?
2  A.   No.
3  Q.   And you -- you testified earlier that
4  you remembered removing some old Carlisle brake
5  materials.  How would you identify an old, used
6  piece of brake material as Carlisle?
7  A.   I couldn't.
8  Q.   All right.  So you are not able to tell
9  me that any of the old materials removed were
10  actually made by Carlisle, correct?
11  A.   Sometimes if it wasn't damaged too bad,
12  you'd have -- you'd have part of the writing left
13  on it and you can tell that way.
14  Q.   Okay.  Do you specifically remember
15  removing an old piece of Carlisle material at
16  PRMMI?
17  A.   Yeah.  Yeah.
18  Q.   Yeah.  Can you tell me that
19  Mr. Brindell would have been watching you or
20  supervising you when you specifically removed an
21  old piece of Carlisle brake material?
22  A.   I -- I can't tell you that.
23  Q.   Okay.  Are you able --
24  A.   I can't answer that question.
25  Q.   All right.  And that's fair.

Page 156

1      Are you able to tell me how many times
2  you personally would have removed an old piece of
3  brake material that you think was made by Carlisle?
4  A.   Twenty-five percent of the time.
5  Q.   And you knew that because you could
6  still see the name?
7  A.   Could still see the name and most --
8  most Rockwell axles and Eaton axles had Carlisle on
9  them.
10  Q.   Okay.  And -- and why is that?
11  A.   From the manufacturer.
12  Q.   From the manufacturer.
13      So these would have been pieces that
14  had already been put together?
15  A.   Right.  When you buy a unit, everything
16  is together.
17  Q.   Okay.  And how did you know this
18  information?
19  A.   We didn't buy it that way, but that's
20  how it was put together when it was new.
21  Q.   So these are new materials?
22  A.   Whenever they buy a trailer, you buy a
23  trailer new.
24  Q.   Well, right.
25  A.   Everything is on it.

Page 157

1  Q.   I understand that.
2      But so the new materials, the Rockwell
3  or Eaton axles that had Carlisle brake materials --
4  A.   Most of them had Carlisle brakes on
5  them.
6  Q.   And those were new?
7  A.   Right.
8  Q.   And those would have been put in there?
9  A.   Right.
10  Q.   Do you remember removing either Eaton
11  or Rockwell axles that had Carlisle brake materials
12  on them?
13  A.   Yes.
14  Q.   Okay.  You think that you may have done
15  that 25 percent of the time?
16  A.   Correct.
17  Q.   But you don't remember Mr. Brindell
18  specifically being around when that was done?
19  A.   It's hard to say.
20  Q.   Okay.  When the -- who instructed you
21  with PRMMI to use compressed air to blow out the
22  brake drums?
23  A.   No one.
24  Q.   And so how did you know to do that?
25  A.   You are a mechanic.  It's self taught.

40 (Pages 154 to 157)

J. Keith Poleto
February 19, 2020

Page 158

1    Q.   Did anybody ever tell you that doing
2  that process, you should wear a dust mask?
3    A.   No.
4    Q.   Did you ever wear a dust mask between
5  '79 and '81 when you used this compressed air?
6    A.   I don't think during that time I did.
7    Q.   And -- and we talked about the fact
8  that Mr. Brindell came to work in -- in nicer
9  clothing.  So was he ever standing around when you
10 or the other mechanics were using the compressed
11 air to blow out the old dust?
12   A.   I'm sure he was.
13   Q.   You are sure he was, but do you
14 specifically remember him being around?
15   A.   Well, yeah, because he would holler
16 about his white shirt.
17   Q.   All right.  So he would holler
18 about his white shirt and get out of the way?
19   A.   Right.  He -- yeah.
20   Q.   Okay.  At the end of the day, were
21 Mr. Brindell's nicer clothes still in good
22 condition when he left work?
23   A.   Sometimes.
24   Q.   Was it the majority of the time that
25 his clothes were --

Page 159

1    A.   Sometimes they was dirty.
2    Q.   Sometimes he was dirty, but was it the
3  majority of the time that he would try to keep his
4  nicer clothes clean?
5    A.   Yeah.
6    Q.   Did you ever make any complaints to
7  Mr. Brindell about unsafe working conditions when
8  you were using the Carlisle brake materials?
9    A.   I didn't, no.
10   Q.   You don't know or you --
11   A.   I did not.
12   Q.   You did not.
13        Do you know -- strike that.  I already
14 asked you that.
15        Do you recall seeing any warnings on
16 any of the other brake materials that were bought
17 and used by PRMMI?
18   A.   (Witness shook head negatively.)  I --
19 we didn't pay attention to that.  We just took them
20 out the box and put them on.
21   Q.   Okay.  Did you ever attend any brake
22 clinics or training seminars?
23   A.   No.
24   Q.   Do you know if Mr. Brindell attended
25 any brake clinics or training seminars?

Page 160

1    A.   I don't know that.
2    Q.   Do you know -- do you know personally
3  if Mr. Brindell before you started working with him
4  ever did any hands-on brake work?
5    A.   I don't know.
6    Q.   I have some documents that I am going
7  to show you.  The first one that we will mark as
8  Exhibit B.  Yeah.  How many pages is this?  It is
9  one, two, three, four.  It's four pages of caution
10 or warning labels.
11   A.   That's what I was supposed to be
12 reading that was on the box?
13   MS. BOWLIN:
14        Oh, shoot.  Don't fall.
15 EXAMINATION BY MS. BOWLIN:
16   Q.   It's -- it's -- what I've marked as
17 Exhibit B is a -- it's four pages in globo.  Will
18 you please take a look at these four pages?
19        And just for reference, page 1 is a
20 Carlisle warning from 1973.  Page 2 is a Carlisle
21 warning from 1978.  Page 4 is a Carlisle warning
22 from 1985.  And page 4 is a Carlisle warning from
23 1986.
24        And I understand that you did not start
25 with PRMMI until 1979, but assume for me that

Page 161

1  Carlisle had a series of warnings that they placed
2  on their boxes.  Do you recall ever seeing any one
3  of these particular warnings --
4    A.   They were probably on there.  I just
5  didn't pay attention to them.
6    Q.   Probably on there, just didn't pay
7  attention.  Fair enough.
8        I'm going to mark this as Exhibit C.
9  This is just one page.  And for reference, this
10 is -- it's just a one-page document, Carlisle
11 recommended procedures dated 1977, "RECOMMENDED
12 PROCEDURES FOR REDUCING ASBESTOS DUST DURING BRAKE
13 SERVICING."
14        Do you know whether Mr. Brindell was
15 provided any of this information as the supervisor
16 for PRMMI?
17   A.   I have no idea.
18   Q.   Have you -- were you ever provided with
19 this information?
20   A.   No.
21   Q.   All right.  The last one I have is,
22 let's see, Exhibit D.  This is Exhibit D.  Hand
23 this to him.  Hand this to you.  Exhibit D is
24 "FRICTION MATERIALS WORK PRACTICES GUIDE."  You can
25 look through it if you want or I can just ask you

41 (Pages 158 to 161)

J. Keith Poleto
February 19, 2020

Page 162

1    generally as a mechanic at a place such as PRMMI
2    where work was being done on friction materials on
3    these semi-trailers, were you ever provided by your
4    employer with anything such as a FRICTION MATERIALS
5    WORK PRACTICES GUIDE?
6        **A.   No.**
7        Q.   And if it's established that PRMMI had
8    access to these documents, would you have liked for
9    PRMMI have to -- have given you these documents?
10       **A.   Oh, yeah.**
11       Q.   Okay.
12       **A.   I might wind up with the same stuff.**
13   MS. BOWLIN:
14           All right. Sir, what I'm going to do
15   is I'm going to look through my notes and let the
16   next attorney ask you their questions because I
17   know you are trying to get out of here.
18   THE WITNESS:
19           Yeah.
20   MS. BOWLIN:
21           And if I have a few more for you at the
22   end, I will come back.
23   THE WITNESS:
24           Okay.
25   EXAMINATION BY MR. HART:

Page 163

1        Q.   Okay, sir. I think I -- I hope I
2    introduced myself outside. I'm Jody Hart. And
3    basically, what I'm going to be doing is asking you
4    follow-up questions, which means I'm going to be
5    bouncing around. And you've done a really good job
6    of following so far. I am not trying to confuse
7    you by bouncing around, so if you ever start to get
8    confused, just stop me.
9        **A.   Oh, I will let you know.**
10       Q.   And let me know. And I am going to
11   basically work backwards.
12           When you were use -- first of all, did
13   you use compressed air in addition to blowing
14   off -- is it okay to call them hubs? What would
15   you -- what do you refer them to?
16       **A.   The hub?**
17       Q.   Yeah.
18       **A.   Well, the hub is the -- you got the 18**
19   **wheel wheel and then you have the brake drum and**
20   **then inside the brake drum, what holds the entire**
21   **unit onto the axle is the hub. Inside the hub, you**
22   **have the inner bearing and outer bearing and big**
23   **spindle on the outside.**
24       Q.   Okay. So I should say drum? When
25   you're blowing --

Page 164

1        **A.   Drum is the brake drum.**
2        Q.   When you're blowing out, I understand
3    you use compressed air?
4        **A.   When you're blowing, you're blowing**
5    **the -- the drum and the hub both --**
6        Q.   Okay.
7        **A.   -- because they are a unit.**
8        Q.   Did you ever use the compressed air
9    to -- to blow yourself off to get --
10       **A.   Yeah.**
11       Q.   -- dust off?
12       **A.   Yeah, all the time.**
13       Q.   And never at any time when you worked
14   at PRMMI were you ever told you shouldn't blow
15   yourself off --
16       **A.   No.**
17       Q.   -- with compressed air?
18       **A.   No. That's the easiest way to clean.**
19       Q.   Well, I will tell you just for -- for
20   background purposes, around the same time I was
21   working as a mechanic, not on big rigs but on
22   vehicles.
23       **A.   You were blowing things off, wasn't**
24   **you?**
25       Q.   I'm not going to answer that question.

Page 165

1            Did you ever -- prior to working for
2    PRMMI, did you ever do a brake job on any type of
3    vehicle?
4        **A.   I did my own cars, yeah.**
5        Q.   Okay. And am I correct that it's
6    pretty much the same steps that you have to take
7    but for the fact that the -- the trailer wheels
8    were much bigger?
9        **A.   Yeah. Basically, yes.**
10   **Eighteen-wheeler brake jobs are easier.**
11       Q.   How so? Why is that?
12       **A.   Because there's less moving parts.**
13       Q.   Gotcha. Okay.
14           And that's because they are
15   air-operated brakes or --
16       **A.   Well, I mean, yeah, air-operated is**
17   **nice, too.**
18       Q.   When you would blow off the -- the --
19   the -- the drums and the hubs, would you -- and I
20   know you said you didn't have dust masks until
21   after the period we're talking about, but would you
22   use a handkerchief or cover your face with your --
23       **A.   Sometimes. Sometimes we'd take a --**
24   **a -- a rag, shop rag and cover your face, yeah,**
25   **sometimes when it was really bad because after you**

42 (Pages 162 to 165)

J. Keith Poleto
February 19, 2020

Page 166

1  did it, you'd go to the bathroom and blow your nose
2  and gag and spit all that stuff out.
3    Q.   You learned that over time, right?
4    A.   Uh-huh (affirmative response).
5    Q.   So you would use the rags?
6    A.   Right.
7    Q.   Once you learned, you would start --
8    A.   Once you --
9    Q.   -- using the rags?
10   A.   Yes, once you get tired of spitting and
11  blowing that stuff out, yeah.
12   Q.   And when you refer to a shop rag, I'm
13  picturing -- for some reason, I'm picturing a red
14  rag.  Did you --
15   A.   Little red rags that they supplied to
16  you.  The uniform company gives them to the shop.
17   Q.   And those aren't soft like a dinner
18  napkin?  They're just --
19   A.   No, no.
20   Q.   -- some sort of chemical or something
21  in there, isn't there?
22   A.   Yeah, yeah.  They're tough.
23   Q.   And in addition to using the rag, would
24  you also kind of try to hold your breath while you
25  were -- you were doing it?

Page 167

1    A.   Yeah, yeah, yeah.
2    Q.   And to blow out a single drum, hub
3  assembly, how many seconds do you estimate you
4  would take?
5    A.   Thirty seconds, a minute.
6    Q.   And then that dust would dissipate
7  relatively quickly?
8    A.   A minute or two.
9    Q.   Okay.  And these fans that you
10  described, are -- are they portable fans?
11   A.   Fans?
12   Q.   Yes.
13   A.   Yeah, yeah.  Just a portable on a
14  stand.  You put them wherever you working, aim it
15  on you to cool you off.
16   Q.   Were they reciprocating, the type that
17  move?
18   A.   No, they didn't move.  You had to face
19  it where you wanted it to go.
20   Q.   Okay.  And when you were -- when you'd
21  use a fan, is it fair to say that you would direct
22  the fan to blow in a direction to blow the dust
23  away from you rather than into your face?
24   A.   Well, I wanted the fan to blow on me
25  and a lot of times, it would blow the dust away.

Page 168

1    Q.   Away.
2          How was the work divided between you
3  and -- you said that Mr. Lockhart was your -- your
4  partner, right?
5    A.   Correct.
6    Q.   How was the work divided between the
7  two of y'all?  How did y'all divide it up?
8    A.   It was just equal.  One person pull the
9  wheels, the other one started taking the brakes
10  off, you know.
11   Q.   But if it was equal, so half the time,
12  he would be doing the blowing and half the time,
13  you --
14   A.   Right.
15   Q.   -- would be doing the blowing?
16   A.   Right.  Exactly.
17   Q.   You know, you also referenced earlier
18  on when -- when plaintiff's counsel was asking you
19  questions having used a -- a wire brush?
20   A.   Yeah, sometimes you had to use a wire
21  brush on the end of the axle where the brake shoes
22  attached to the spindle.
23   Q.   Uh-huh (affirmative response).
24   A.   You had to wire brush that because some
25  of the grease would come from the -- the hub and

Page 169

1  they make the brake dust stick to it.  You'd have
2  to wire brush it all off and then blow it.
3    Q.   And in those situations where you're
4  wire brushing greasy brake wear material, I will
5  call it, that's not getting dust up in the air
6  because of the grease, fair?
7    A.   No, but that was only if the hub was
8  leaking, it would get like that.
9    Q.   And with regard to the grinding of new
10  brake material before you put the shoes on --
11   A.   Uh-huh (affirmative response).
12   Q.   -- was I correct in my understanding
13  that that was needed when you were putting new
14  drums on?
15   A.   Mostly when you put new drums on
16  because it was so thick.
17   Q.   And when you were using the existing
18  drum, the used drums, it -- you wouldn't have to --
19   A.   No, most of the time you didn't have
20  to.
21   Q.   Hardly ever, right?
22   A.   Sometimes.  Depends how old the drum
23  was.  Some -- if it would be a old drum, it would
24  be -- you know, still be real thick.  Then you'd
25  have to.

43 (Pages 166 to 169)

J. Keith Poleto
February 19, 2020

Page 170

```
 1       Q.   Did you-all have the equipment to turn
 2  the drums in your shop?
 3       A.   No.
 4       Q.   Did you send them out?
 5       A.   No.
 6       Q.   Did you -- so no drums were ever
 7  turned?  You either used the old ones as they were
 8  or got new ones?
 9       A.   You used the old ones if they were in
10  good shape and if they wasn't in good shape, you
11  replaced them.
12       Q.   At any time during these two years
13  we're talking about, from when you started until
14  Mr. Brindell stopped working at PRMMI -- am I
15  saying that right?  PRMMI?
16       A.   PRMMI.
17       Q.   Yeah.  Did you ever read any manuals
18  regarding any of your brake work?
19       A.   No.
20       Q.   Did you ever read any manuals regarding
21  anything?
22       A.   Nobody supplied any manuals, so I
23  didn't read anything.
24       Q.   So -- and I will tell you, I represent
25  Utility Trailer.  You've never read any manual that
```

Page 171

```
 1  was produced or published or provided by Utility
 2  Trailer, correct?
 3       A.   Nobody ever gave us anything to read.
 4       Q.   So that's a no, you never read any of
 5  it?
 6       A.   (Witness shook head negatively.)
 7       Q.   No?
 8       A.   I never read anything.
 9       Q.   Okay.  Very good.
10            Would you agree with me that there is
11  nothing dusty about removing the new brake shoes
12  from the box or the bag that they came in?
13       A.   New brake shoes?
14       Q.   Yeah.
15       A.   No, there's no dust in the box.
16       Q.   And would you agree with me that
17  putting the bevelling aside on those occasions when
18  you had to do that --
19       A.   Right.
20       Q.   -- that there is nothing dusty about
21  the actual installation process of the drum into
22  the assembly?
23       A.   No.
24       Q.   You do agree with me, it's not dusty?
25       A.   No dust.
```

Page 172

```
 1       Q.   Okay.  At any -- based upon your
 2  testimony thus far, which I understood that you've
 3  given us a number of brands of brake shoes that you
 4  would use for these brake jobs, correct?
 5       A.   (Witness nodded head affirmatively.)
 6            Uh-huh (affirmative response).
 7       Q.   Yes?
 8       A.   Yes.  Oh, I'm sorry.
 9       Q.   Am I correct that at no time did any of
10  the brakes, shoes, or any of the boxes or bags that
11  they came in, none of them said Utility Trailer on
12  them, did they?
13       A.   No.
14       Q.   I am correct?
15       A.   Correct.
16       Q.   Okay.
17       A.   Said, "No."  She wanted it correct.
18       Q.   When Mr. Brindell was present while you
19  were performing brake work -- and let me be more
20  specific.  When Mr. Brindell was present while you
21  were blowing off drums or hubs while performing a
22  brake job, how far away would he be?
23       A.   Me to you.
24       Q.   So what?
25       A.   Four to five, five feet.
```

Page 173

```
 1       Q.   And how much room was there between the
 2  side of the trailer and either the neck -- well,
 3  let me back up.
 4            Were these bays separated by any
 5  partitions?
 6       A.   No.  You just had the exterior walls.
 7       Q.   Okay.  And did I understand correctly
 8  that your bay, your bay remained the same during
 9  these two years?
10       A.   Oh, yes.  I stayed all the -- yeah, the
11  whole time.
12       Q.   And that was a bay closest to the wall
13  or was it one of the middle bays?
14       A.   Closest to the wall.
15       Q.   And was that the bay that would have
16  been closest to the wall --
17       A.   By the office?  No.  I was farthest
18  from the office.
19       Q.   Okay.  So you were farthest from the
20  bathroom and the office?
21       A.   Correct.
22       Q.   Okay.  How much space was there between
23  the wall and the side of the trailer that you were
24  working on?
25       A.   About ten feet.
```

44 (Pages 170 to 173)

J. Keith Poleto
February 19, 2020

Page 174

1   Q.   Am I correct that when you were
2   performing work that was being observed or
3   supervised by Mr. Brindell, that he would be behind
4   you?
5   **A.   Correct.**
6   Q.   And you would be facing the work?
7   **A.   Correct.**
8   Q.   How would you know he was five feet
9   away when you were -- when he was observing?
10  **A.   I would turn around and talk to him**
11  **while I'm doing my work.**
12  Q.   You wouldn't turn around and talk to
13  him while you were actually blowing off a drum or a
14  hub?
15  **A.   Sometimes.**
16  Q.   When you obtained -- let me back up
17  and -- and -- and ask this because in trailer --
18  with trailers, it's a little different from -- from
19  vehicles in the sense that -- tell me if you agree
20  with this.  You drive -- so you drive a Chevy
21  truck, right?
22  **A.   Yes.**
23  Q.   And you understand that Chevy designed
24  that entire truck, including the axles and the
25  brakes and so forth?

Page 175

1   **A.   Yes.**
2   Q.   It's different with trailers, isn't it,
3   in that trailer manufacturers buy these entire axle
4   assemblies --
5   **A.   Bogie.**
6   Q.   -- from somebody else?
7   **A.   The bogie assembly.**
8   Q.   Bogie assembly is what you --
9   **A.   Bogie.**
10  Q.   And that bolts on, right?
11  **A.   Yes.**
12  Q.   It's not a welded thing --
13  **A.   Sometimes they welded on.  Sometimes.**
14  **It all depends if they slide or not because you put**
15  **your bogie on and they put rails and there's pins**
16  **in them and then you can move your whole tandem to**
17  **an east coast or a west coast setting, depending**
18  **where you driving.  Driving in a city, you put it**
19  **on a east coast setting where it's more forward to**
20  **where you can make a sharper turn.  And then the**
21  **west coast setting is all the way back is for when**
22  **you are going coast to coast, long hauls on the**
23  **highway.**
24  Q.   Was it ever your part of your job to
25  change that setting?

Page 176

1   **A.   Nah.  That's up to the truck driver.**
2   **The truck driver does that.**
3   Q.   And so when you think of these
4   bogies -- and when you -- when you say "bogie,"
5   you're talking about the actual brake suspension
6   combination, correct?
7   **A.   Correct.**
8   Q.   When you speak of these bogies, you
9   think of them as the brand or the manufacturer of
10  the bogie, correct?
11  **A.   Sometimes.  But, I mean, this guy might**
12  **have made the bogie, but he used Eaton axles or he**
13  **used, you know, Dayton axle or some other axle.**
14  **Axle manufacturers, whoever makes this bogie, could**
15  **get the axles from whoever they want and then they**
16  **mount that underneath whatever, Fruehauf,**
17  **Trailmobile, Great Dane, Utility, whatever trailer**
18  **they want to mount it under.**
19  Q.   Okay.  Do you have any specific reco --
20  recollection of what combinations were used with
21  any particular brands of trailers?
22  **A.   No.  They -- they vary.**
23  Q.   So when you would obtain parts to do a
24  brake job on a particular trailer, what language
25  would you use to make sure you got the right parts?

Page 177

1   **A.   Sometimes you could give them the unit**
2   **of the trailer and they can look it up in the**
3   **computer and they know what's under it.**
4   Q.   Uh-huh (affirmative response).
5   **A.   Other times, you get the number from**
6   **the bearings and the bearings tell you what's on**
7   **that axle.**
8   Q.   And the bear --
9   **A.   Sometimes you get the tag off of the**
10  **axle itself and tell them what axle you have.**
11  Q.   So, in other words, it would be the
12  man -- it would -- it would -- the language you
13  would use would pertain to the manufacturer of the
14  bogie as opposed to the manu --
15  **A.   Well, the axle, actually the axles.**
16  Q.   The manufacturer of the axle?
17  **A.   I go over there and tell him because**
18  **the bogies were made by a different company.  I go**
19  **over there and say, "I got a Eaton axle.  I need**
20  **brake shoes for one axle, two axles."**
21  Q.   To be clear, you would never go and
22  say, "I need brake -- brake -- brake shoes for a
23  Utility trailer"?
24  **A.   Sometimes you can.**
25  Q.   And why, why -- how would that be?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

J. Keith Poleto
February 19, 2020

Page 178

1    A.    Because they had a computer they can
2   put the, the -- the serial number --
3    Q.    Uh-huh (affirmative response).
4    A.    -- on -- in the computer and they know
5   what's under that unit.
6    Q.    Okay.  Would that be the exception
7   rather than the rule?  Usually you would say Eaton
8   or whatever other brand of bogie it was --
9    A.    It de -- whatever is easy --
10    Q.    -- or axle?
11    A.    Whatever is easier.  Sometimes you see
12   the axle clearly and all and say, "Okay.  This is
13   what I needed for this axle."  Sometimes you can't
14   see the axle clearly.  You go to the front and you
15   get the serial of the Fruehauf, Utility, the Great
16   Dane, you bring them that.  They cross-reference on
17   the computer and they know from that number what's
18   underneath there.
19    Q.    To your -- well, tell me if you even
20   have an understanding about what I'm about to ask.
21   You may not.
22         Were these trailers used simply to
23   drive within the ports to, to -- to move the
24   material or do you know whether they actually went
25   on the roads in Puerto Rico or in the road -- roads

Page 179

1   of the United States?
2    A.    They -- they went all over.  They went
3   on the roads here.  They went to the rail yard.
4   From the rail yard, they put them on a train.  They
5   wind up in California.  Put them on a ship.  They
6   go on a ship, they go to Puerto Rico.  They don't
7   usually leave the island but, I mean, they go all
8   over.
9    Q.    Okay.  So is it fair to say that you
10   don't have a -- feel for whether you would ever
11   have done a repeat brake job on a particular
12   trailer?
13    A.    It -- it's -- it's not too often, but
14   sometimes you do.  If you painted something a
15   certain way on it or something, you would remember
16   it.
17    Q.    You can't sit here and -- and testify
18   today that you have personal knowledge that you did
19   a repeat brake job on a Utility brand trailer, can
20   you?
21    A.    No, I can't say that.
22    Q.    There have been references during your
23   testimony to trailers and to containers.
24    A.    Correct.
25    Q.    There is a distinction between the two,

Page 180

1   correct?
2    A.    Trailer stays married to its bogie.
3   Containers come off and off -- off and on of a
4   chassis.
5    Q.    And can you give me a percentage during
6   those two years when you worked with Mr. Brindell
7   as to how it divided up between trailers and
8   containers?
9    A.    Fifty/fifty.
10    Q.    Fifty/fifty.
11         And the containers, am I correct that
12   that those are loaded onto container ships with the
13   gantry cranes?
14    A.    Correct.  Containers are loaded on.
15   But if have you a drive on/drive off ship, they
16   drive on and drive off just like a big ferry boat.
17    Q.    And -- and the -- and the bogies stay
18   with them or not necessarily?
19    A.    No, the bogies stay with them.
20    Q.    Okay.
21    A.    We had two kinds of ships.
22    Q.    Uh-huh (affirmative response).
23    A.    We had lift on/lift off ships and we
24   also had drive on/drive off ships.  So sometimes we
25   -- you could only use the ones -- well, container

Page 181

1   on a chassis for the load on/load off ship --
2    Q.    Uh-huh (affirmative response).
3    A.    -- with the gantry, and then drive
4   on/drive off ship, either unit was driven on.
5    Q.    Okay.  And then if, if -- if it was a
6   container on a trailer that was on, on a drive-on
7   ship, that trailer stayed with the container?
8    A.    Yeah.
9    Q.    Okay.  How often were ships setting
10   sail?
11    A.    I'm sorry?
12    Q.    How often were ships leaving the port?
13    A.    We'd get one a week except for awhile,
14   we got two a week.  It changed.  When things get
15   real busy, we had two a week, but for the most
16   part, safe to say rule of thumb 75, 70 percent of
17   the time, one a week.
18    Q.    Okay.  And do you have a specific
19   recollection as to this early period when you first
20   started working there through 1981 whether it was
21   ever two a week or always one a week?
22    A.    I think it was two a week when I first
23   started.
24    Q.    For how long?
25    A.    A couple of years.

46 (Pages 178 to 181)

J. Keith Poleto
February 19, 2020

Page 182

1    Q.    Okay.
2    A.    **Then it went down to one for awhile and**
3    **then it went back to two. It varied. Depends on**
4    **demand because we supplied all the islands, not**
5    **just Puerto Rico. Dominican Republic, Haiti, all**
6    **those islands depend on us to feed them.**
7    Q.    And I'm -- I'm -- am I correct in
8    assuming that the same number of ships left as came
9    in the Port of New Orleans that you -- you were
10   involved with?
11   A.    **Right.**
12   Q.    Earlier -- and I'm going back to the
13   grinding because I -- I failed to follow up on
14   this. Earlier you had testified that maybe 50/50
15   as to whether you had to grind or not. In light of
16   the fact that you generally -- most of the time,
17   the grinding was associated with the replacement
18   with new hubs?
19   A.    **A new brake drum.**
20   Q.    Drums, I'm sorry.
21   A.    **Yes.**
22   Q.    Are you telling me that 50 percent of
23   the time, you had to replace the -- the drums?
24   A.    **Yeah. If they had -- if they had six**
25   **cracks within an inch, you had to change it.**

Page 183

1    Q.    Uh-huh (affirmative response).
2    A.    **Or sometimes they had one big crack**
3    **just went down the whole drum, you had to change**
4    **it. So I'd say 40, 50 percent of the time, you had**
5    **to change the drum.**
6    Q.    And would that be true -- and that
7    would vary from -- from -- see if I can phrase this
8    correctly. You might have a situation where you
9    have an axle that you're changing the brakes on
10   where you had to change one drum but not the other?
11   A.    **Yes.**
12   Q.    Okay. Was that typical?
13   A.    **Yeah.**
14   Q.    Do you know where Mr. Brindell lived
15   when you worked with him?
16   A.    **He lived in Slidell.**
17   Q.    Slidell.
18         Do you know where he grew up?
19   A.    **I think he grew up in Metairie.**
20   Q.    Have you ever been to his -- any of his
21   houses that he ever lived in?
22   A.    **I'm sorry?**
23   Q.    Have you ever been to any house that
24   he's ever lived in?
25   A.    **I been to the house in Slidell a couple**

Page 184

1    of times.
2    Q.    In where?
3    A.    **The house he lived in in Slidell --**
4    Q.    Slidell?
5    A.    **-- I've been there a few times.**
6    Q.    Okay. You mentioned that there were
7    occasional safety meetings at --
8    A.    **Correct.**
9    Q.    -- PRMMI. Where did those take place?
10   Did they take place in the shop, in the break room
11   or --
12   A.    **Break room most of the time.**
13   Q.    Do you have any knowledge as to during
14   this '79 and '81 time period how many tractors,
15   meaning the -- the trucks that pulled the trailers
16   PRMMI had?
17   A.    **How many PRMMI had?**
18   Q.    Yeah.
19   A.    **Trucks that pulled the trailers?**
20   Q.    Yeah.
21   A.    **About 30.**
22   Q.    Do you have any knowledge -- you know
23   how on a passenger vehicle you have to change your
24   front brakes more frequently than you have to
25   change your rear brakes, correct?

Page 185

1    A.    **That's what they say.**
2    Q.    That's different from -- is that
3    consistent with your experience?
4    A.    **I change all of mine when I change.**
5    Q.    Okay. That's just personal choice?
6    A.    **Right. Well, if you don't, you are**
7    **going to be changing the back ones soon after.**
8    Q.    But you are familiar with this concept?
9    A.    **Right.**
10   Q.    Do you -- do you know whether the same
11   is true for tractor-trailer combinations, such that
12   the tractor brakes have to be changed more
13   frequently than the trailer brakes?
14   A.    **I wouldn't know the answer to that.**
15   Q.    Okay. Do you know of anybody who
16   worked in that -- I think you called it the power
17   department?
18   A.    **I never worked in the power department.**
19   Q.    Do you know the names of anybody who
20   did?
21   A.    **Charlie Bowman.**
22   Q.    B-O-W-M-A-N?
23   A.    **Yes.**
24   Q.    Do you know when he -- did he work
25   there back in '79, '81?

47 (Pages 182 to 185)

J. Keith Poleto
February 19, 2020

Page 186

1    A.    Back when we were there, yes.  Yes.
2    Q.    Do you know where he lives?
3    A.    No idea.
4    Q.    Do you know if he is still alive?
5    A.    No idea.
6    Q.    Was he old back then?
7    A.    Older than me.
8    Q.    Oh, you're pretty young.  How, how --
9    how much older than you?
10   A.    I'm 60.
11   Q.    How much older, guesstimate?
12   A.    Oh, I guess he's probably 70.
13   Q.    Okay.
14   A.    Ten years, I would guess.  We haven't
15   worked together in 20 years, so I don't have no
16   idea.
17   Q.    I respect that, man.  We always are
18   facing that situation.  We're always asking about
19   way back in the past.
20         Do you know why Mr. Brindell left
21   PRMMI?
22   A.    No.
23   Q.    Never had any discussion with him?
24   A.    Uh-uh (negative response).
25   Q.    Never heard any scuttlebutt?

Page 187

1    A.    I don't have no idea.  Never talk about
2    it.
3    Q.    You mentioned earlier that you know
4    that newer brakes don't contain asbestos, correct?
5    A.    The newer ones nowadays don't.
6    Q.    How did you learn that?  How do you
7    know that?
8    A.    TV.  Learn a lot from TV, National
9    Geographic.
10   Q.    At any time during the '79 through '81
11   period, can you testify that you ever saw the word
12   "asbestos" written on any brake shoe, box, or bag
13   that they came -- that the shoes came in?
14   A.    I can't say I saw that because I didn't
15   read it.
16   Q.    Okay.  Do you -- can you testify that
17   you ever saw the word "metallic" written on any
18   brake shoe, box, or bag that the shoes came in?
19   A.    I can't say I recall that.
20   Q.    Okay.  Are you familiar with metallic
21   brake shoes?
22   A.    Not really.  I think those were the
23   tougher ones that eat the drums up.
24   Q.    Now, I understand from your earlier
25   testimony -- I don't think we ever got into too

Page 188

1    much detail about this -- that in addition to doing
2    brake jobs in the sense of changing the -- the
3    shoes and/or the drums, you performed other work in
4    the same shop?
5    A.    Correct.
6    Q.    And some of that work was -- that work
7    included welding?
8    A.    Yes.
9    Q.    Okay.  And what type of -- why would
10   you have to weld?
11   A.    When they drive these trailers around
12   the yard, the longshoremen are responsible for
13   moving around the yard.  From them going on and off
14   the ship, they get different types of damage.
15   There's a bumper on the back.  They might rip a
16   bumper off.  They might jackknife it too hard and
17   run off of a ramp and crack -- crack one of the
18   cross members.  After awhile, the back will replace
19   it.
20   Q.    It's a relatively frequent occurrence
21   that welding had to be done because of that sort of
22   damage?
23   A.    A little bit.  A little bit.
24   Q.    Be doing it every week?
25   A.    Yeah.

Page 189

1    Q.    Every day?
2    A.    Not necessarily.
3    Q.    Sometimes?
4    A.    Sometimes.
5    Q.    Might go a week where you do it every
6    day?
7    A.    Could, yeah.
8    Q.    Okay.  And was that work randomly
9    assigned amongst the the, four teams in --
10   A.    No.  They kind of -- they like to get
11   the easier stuff out first, whatever takes less
12   time, because they want the units on the road.
13   That's the main thing, turnout.  So not really.
14   Q.    I meant randomly assigned between the
15   four teams, pairs of mechanics that you worked
16   with.
17   A.    How much what?
18   Q.    Was it randomly assigned amongst you
19   and Mr. Lockhart versus one of the other pairs?
20   A.    Some -- some bays specialized in doing
21   better work and quicker work on certain type of
22   jobs and some -- you know, sometimes you'd say,
23   "Oh, you go get that unit right there because it
24   needs this" --
25   Q.    Uh-huh (affirmative response).

48 (Pages 186 to 189)

J. Keith Poleto
February 19, 2020

Page 190

```
 1      A.    -- "because you better at that and
 2 these are much quicker at the brake job, so I want
 3 to keep running brake jobs through that bay."
 4      Q.    What were you and Mr. Lockhart better
 5 at or specialized at?
 6      A.    We were good at all of it.
 7      Q.    You were good at all of it?
 8      A.    Yeah.
 9      Q.    So you'd get a good distribution of
10 work?
11      A.    Right.
12      Q.    I think you said sometimes you'd have
13 to change brake boosters?
14      A.    Yeah.
15      Q.    How frequent --
16      A.    Sometimes.
17      Q.    How frequently would that be?
18      A.    There's a rubber diaphragm in there
19 that makes them work.  Not that often.  They --
20 they didn't go out too often, but sometimes they'd
21 get hit or the pressure from the air would break
22 the bracket that holds them and the bracket would
23 break.
24      Q.    And is that a welding job or is that --
25      A.    That's a welding job.
```

Page 191

```
 1      Q.    -- a bolt-on job?
 2      A.    That's welding.  If the bracket breaks,
 3 welding.
 4      Q.    And if you -- the diaphragm, you
 5 wouldn't replace the entire brake booster?  You'd
 6 just replace the diaphragm?
 7      A.    No, usually we re -- we replaced it
 8 because they extremely dangerous to take apart.
 9 They can take your head off.
10      Q.    Because of the pressure, internal
11 pressure?
12      A.    There's a huge spring inside.
13      Q.    Okay.  Would you have to change a -- a
14 brake booster in a typical week?
15      A.    In a typical what?
16      Q.    Week, in a typical week.
17      A.    Nah.  You wouldn't get them every week,
18 no.
19      Q.    Welding, brake boosters, what other
20 sort of work did you do?
21      A.    The legs that support the trailer,
22 landing gear.
23      Q.    That's what you meant by landing gear,
24 the legs that support it when it's not hooked up to
25 a tractor?
```

Page 192

```
 1      A.    Right.  Correct.
 2      Q.    And what would you have to do with
 3 those?
 4      A.    Replace them if they got damaged.
 5      Q.    That's an entire bolt-on assembly?
 6      A.    They bolt on, yes.
 7      Q.    Nothing dusty about that process,
 8 correct?
 9      A.    No.
10      Q.    How frequently would you on average
11 from '79 to '81 do you believe you changed landing
12 gears?
13      A.    Couple times a week.
14      Q.    How long does it take to change a
15 landing gear?
16      A.    Two hours.
17      Q.    With your -- with your helper?  With --
18 I mean, not helper, your partner, Mr. Lockhart?
19      A.    Yeah.  You have to because they heavy.
20 You need a partner.
21      Q.    Y'all didn't have lifts in these bays,
22 did you?
23      A.    No overhead lift, nah.  If you needed a
24 lift, you had to go get a forklift or a whole bunch
25 of other people.
```

Page 193

```
 1      Q.    Well, in order to jack up the, the, the
 2 -- the trailers to change the, the brakes, you use
 3 a forklift or do you have floor-mounted jacks or --
 4      A.    We had -- we had air jacks and
 5 forklifts.  Depends if you were in a hurry or not.
 6      Q.    You were free to use either?
 7      A.    Pardon me?
 8      Q.    You were free to use either one?
 9      A.    Yeah, you free to use either way.
10      Q.    Did you have a forklift assigned to
11 your shop?
12      A.    No.  You had the first come, first
13 serve.
14      Q.    What do you call the part of a trailer
15 that slides up and hooks onto the -- to the
16 tractor?
17      A.    Fifth wheel.
18      Q.    The fifth wheel.
19            Did you ever have to do any work on
20 those?
21      A.    Not very often.
22      Q.    Is there any maintenance associated
23 with those, greasing or anything like that?
24      A.    (Witness shook head negatively.)
25      Q.    No?
```

49 (Pages 190 to 193)

J. Keith Poleto
February 19, 2020

Page 194

1       A.    No.  The truck -- the truck driver
2   greased his plate and it gets greased from that.
3       Q.    Okay.  What other sort of maintenance
4   has to be done to a chassis of -- of a trailer?
5       A.    Chassis?  Pretty much the same as the
6   regular trailer:  Landing gear, brake jobs, wiring,
7   lights.
8       Q.    Did you -- and you did wiring and
9   lights?
10      A.    Sometimes.  White lights don't go out
11  that often.
12      Q.    Well, is it fair to say that lights go
13  out less often towards the end of your career
14  than -- at PRMMI than at the beginning because they
15  switched to LEDs at some point?
16      A.    Yeah, that and -- and longevity.  You
17  got lights that's been on a trailer for a long
18  time, they are susceptible to water and damage and
19  stuff like that.
20      Q.    And so typically if you had to do any
21  light or electrical repairs, would that just be
22  changing a single bulb or would you change them
23  all, all the bulbs on a trailer at one time?
24      A.    Just whatever's out.
25      Q.    How long would a typical light bulb

Page 195

1   replacement take?
2       A.    Fifteen minutes.
3       Q.    How frequently would you do a light
4   bulb?  Would that be an everyday occurrence?
5       A.    About every day you may have one, yeah.
6   Running out of tape.
7       Q.    Is there any reason that you know of --
8   you've, you've described Mr. Brindell as having
9   supervisory responsibilities over a number of
10  different groups of workers at PRMMI, but that he
11  spent a lot of time in your shop, correct?
12      A.    Yeah.  He spent most of the time up in
13  the front shop.
14      Q.    Do you have any understanding as to
15  why --
16      A.    No.
17      Q.    -- the focus was on you guys?
18      A.    Just to aggravate us, I guess.
19      Q.    And that's as -- that's as much as you
20  know?
21      A.    That's as much as I know.
22      Q.    I know that you were asked earlier
23  whether you had -- and, and I'm going to preface
24  with I know some of these questions are silly and
25  that I probably already know the answer, but I --

Page 196

1   but I've got to ask you and I apologize ahead of
2   time.  You were asked earlier if you had ever
3   tested any of the dust from blowing out a brake
4   drum and, of course, you answered no.
5             And my question for you is:  Have you
6   ever seen any analyses, any laboratory analyses of
7   any brake dust samples that may have been taken
8   from your workplace at PRMMI?
9       A.    Never.
10      Q.    And so am I also correct that you've
11  never seen any specifications for any particular
12  brake shoes that you used at PRMMI that would
13  reflect the composition, what they were made out
14  of?
15      A.    They may have had it.  We didn't pay
16  attention to it.  We were just doing our job.
17      Q.    So you never saw any such
18  specifications?
19      A.    I never, no.
20      Q.    Do you have any knowledge of what --
21  of, of what other jobs Mr. Brindell had, had either
22  before or after he worked with you?
23      A.    I have no idea.
24      Q.    Was there ever a work stoppage or -- I
25  know the union didn't come in until later, but was

Page 197

1   there ever a work stoppage for whatever reason or a
2   shutdown that took place from '79 through '81?
3       A.    No.
4       Q.    What kind of lighting was in the shop
5   in which you and Mr. Lockhart performed your work?
6       A.    Big overhead hanging lights.
7       Q.    Like those mercury vapor or sodium
8   type?
9       A.    Yeah, some kind of thing.  They was
10  huge.
11      Q.    And the floor was concrete?
12      A.    Yes.
13      Q.    Was it painted or epoxied or anything?
14      A.    No, just plain old cement.
15      Q.    Gray?
16      A.    (Witness nodded head affirmatively.)
17      Q.    As far as the trailers were concerned
18  that you worked on, am I correct that -- that they
19  were not refrigerated trailers?
20      A.    Sometimes we had refrigerated trailers.
21      Q.    Okay.  What, what percentage would have
22  been refrigerated during that period, during that
23  '79 --
24      A.    Percentage, 20 percent of the time.
25      Q.    Twenty percent.

50 (Pages 194 to 197)

J. Keith Poleto
February 19, 2020

Page 198

1          Do you associate refrigerated
2   containers with any particular brand of -- I mean,
3   refrigerated trailers with any particular brand?
4       A.    No.
5       Q.    Now, I think you even observed earlier
6   during your -- the questioning by plaintiff's
7   counsel that you had given us like a thousand per
8   year total brake jobs and then when you started
9   going down the different brands, that we got over a
10  thousand?
11      A.    Right. Right. Right. I realized
12  that. That's why I was just guesstimating numbers.
13      Q.    And, and that's what I wanted to ask
14  you about. I mean, you were, you were -- you don't
15  really know, do you, what --
16      A.    No.
17      Q.    Okay.
18      A.    It's hard to say, but, I mean, that's a
19  guesstimation of percentages. Let's use that.
20  Let's use that for example.
21      Q.    But you didn't keep any diary of your
22  work?
23      A.    No, no.
24      Q.    Did you ever take any photographs while
25  you worked there?

Page 199

1       A.    No.
2       Q.    Are you aware of any photographs of you
3   working while -- with PRMMI?
4       A.    No. Why? You saw some?
5       Q.    No.
6       A.    Okay.
7       Q.    I'd love to see some.
8             Is it correct that you do not know the
9   maintenance history of any particular trailer
10  that -- that you worked on?
11      A.    No.
12      Q.    You don't know whether a particular
13  bogie on a particular trailer had ever been
14  replaced prior to you working on it?
15      A.    No idea.
16      Q.    You don't know whether if a bogie was
17  replaced on a particular trailer that you worked
18  on, that bogie was replaced with the same brand of
19  bogie that came with the trailer originally?
20      A.    I have no idea.
21      Q.    With regard to yours and Mr. Brindell's
22  hunting together, being a member of the same club,
23  do y'all fill your own shells?
24      A.    Did we do what?
25      Q.    Fill your own shells?

Page 200

1       A.    Fill our own shells?
2       Q.    Yeah. I don't know the proper term,
3   but I know --
4       A.    Reload.
5       Q.    Reload. Did you reload your own?
6       A.    No.
7       Q.    Do you know if he ever did?
8       A.    I don't think he did.
9       Q.    Are you aware of what the -- there
10  is -- there is wadding of some sort in a shotgun
11  shell, correct?
12      A.    Yeah.
13      Q.    And you-all would hunt with shotguns,
14  right?
15      A.    Sometimes, yeah.
16      Q.    Are you aware of what the wadding
17  material in a shot -- shotgun shell is made of?
18      A.    I have no idea.
19            Is that asbestos?
20      Q.    I believe so.
21      A.    Really?
22      Q.    At some point, yeah.
23      A.    Have to quit hunting. Sling shot.
24      Q.    Bow hunting.
25            The brake shoes that you installed, the

Page 201

1   new brake shoes that you would have installed back
2   during the '79 to '81 period, did they look the
3   same as the brake shoes that you would have
4   installed at the end of your career at PRMMI?
5       A.    They all looked the same.
6       Q.    Okay. You can't tell by looking at
7   them whether one did --
8       A.    No.
9       Q.    -- or did not contain asbestos?
10      A.    No.
11      Q.    You, you agree with what I just said?
12      A.    I can't -- I can't tell.
13      Q.    Did Mr. Brindell have any assistants?
14      A.    Did he have any what?
15      Q.    Any assistants that helped him with his
16  supervisory responsibilities?
17      A.    No.
18      Q.    Do you know what type of paperwork
19  Mr. Brindell was required to complete as part of
20  his job?
21      A.    No idea.
22      Q.    I know I asked you the maintenance --
23  whether you had any knowledge of the maintenance
24  history of any of the trailers you worked on. What
25  I didn't ask you was do you know the ownership

51 (Pages 198 to 201)

J. Keith Poleto
February 19, 2020

Page 202

1  history of any of the trailers you worked on?
2  A.  No.
3  Q.  I can't remember if I asked you this or
4  not.  I think I did.
5      You testified that on occasion, you
6  would replace an entire bogie?
7  A.  On occasion, yes.
8  Q.  With what frequency?
9  A.  Not very often.
10  Q.  Once a month?
11  A.  Once a month, that would be fair for
12  the shop.  Not for my bay, for the whole shop.
13  Q.  Okay.  Have you ever undergone this
14  process before?  Have you ever been deposed?
15  A.  Ever --
16  Q.  Have you ever sat for a deposition like
17  you are doing today?
18  A.  No, not -- no, like this, no.
19  Q.  Have you ever testified in court?
20  A.  No.
21  Q.  I'm sorry.  Almost done.  I don't want
22  to ask you stuff if I already asked you.  Just
23  going through.
24      Is it fair to say that you really have
25  no idea of how many times Mr. Brindell may have

Page 203

1  been present while you were changing brakes --
2  A.  I have --
3  Q.  -- on a Utility brand trailer?
4  A.  I have no idea.
5  MR. HIBEY:
6      Objection.  Asked and answered,
7  misstates testimony.
8  THE WITNESS:
9      What?
10  MR. HART:
11      Just -- that's for the record.
12  THE WITNESS:
13      Oh.
14  MR. HART:
15      Thank you.
16  EXAMINATION BY MR. HART:
17  Q.  Subject to the objection, you have no
18  idea how many times Mr. Brindell may have been
19  present while you changed the brakes on a Utility
20  brand trailer?
21  A.  No idea.
22  MR. HIBEY:
23      Objection, form.
24  EXAMINATION BY MR. HART:
25  Q.  And the same would be true --

Page 204

1  MR. HIBEY:
2      Asked and answered, misstates
3  testimony.
4  EXAMINATION BY MR. HART:
5  Q.  And the same would be true for all the
6  other brands that we discussed as well, correct?
7  A.  Correct.
8  MR. HART:
9      I may have a couple of follow-ups
10  later, but I think that's all I've got for now.
11  Thank you, sir.  I appreciate your kindness and we
12  are done.
13  MR. HIBEY:
14      I've got a follow-up question there at
15  the end.
16  DEFENSE COUNSEL:
17      No, no, no.  That's not the way we do
18  it here.  They go --
19  MR. HIBEY:
20      I have a follow-up question for what
21  was just asked.
22  DEFENSE COUNSEL:
23      -- and then you go at the end.
24  MR. HIBEY:
25      I'm going to ask my question.

Page 205

1  DEFENSE COUNSEL:
2      Well, I'm objecting to you --
3  MR. HIBEY:
4      Go ahead.
5  DEFENSE COUNSEL:
6      -- interrupting.
7  MR. HIBEY:
8      I'm not interrupting anything.  You
9  said you were finished and I have a follow-up
10  question for what you just asked.
11  DEFENSE COUNSEL:
12      You wouldn't be able to do this at
13  trial and you can't do it at deposition.
14  MR. HIBEY:
15      I'm doing it.
16  EXAMINATION BY MR. HIBEY:
17  Q.  Sir --
18  MR. STAINES:
19      Object to this procedure as well.
20  EXAMINATION BY MR. HIBEY:
21  Q.  -- you were just asked a question
22  about --
23  DEFENSE COUNSEL:
24      Join.
25  DEFENSE COUNSEL:

52 (Pages 202 to 205)

J. Keith Poleto
February 19, 2020

Page 206

```
 1         Objection, objection.
 2    EXAMINATION BY MR. HIBEY:
 3         Q.   -- having no idea how many times
 4    Mr. Brindell was present when brake work was being
 5    performed --
 6         A.   Uh-huh (affirmative response).
 7         Q.   Your testimony is that you don't have
 8    any idea of the exact number of times that he was
 9    present, correct?
10    DEFENSE COUNSEL:
11         Object to the form.  The question was
12    clear.  It's asked and answered.  You're trying to
13    put words into his mouth.
14    MR. HIBEY:
15         I'm not.
16    DEFENSE COUNSEL:
17         It is improper to ask a follow-up
18    question at this time and you're -- I'm going to
19    let you do it.
20    MR. HIBEY:
21         Okay.
22    DEFENSE COUNSEL:
23         But --
24    MR. HIBEY:
25         I have already asked it.
```

Page 207

```
 1    DEFENSE COUNSEL:
 2         What you're doing is improper under
 3    Louisiana.  You are pro hac'd into this case.  You
 4    do not have local counsel present with you and you
 5    are not adhering to --
 6    MR. HIBEY:
 7         I'm trying to --
 8    DEFENSE COUNSEL:
 9         -- our practices.
10    MR. HIBEY:
11         I'm trying to get a follow-up on the
12    question that you just asked.
13    DEFENSE COUNSEL:
14         I'm telling you that's not the way --
15    MR. HIBEY:
16         Okay.
17    DEFENSE COUNSEL:
18         -- we do it in Louisiana.
19    EXAMINATION BY MR. HIBEY:
20         Q.   Sir, your testimony is that you don't
21    have an exact number of times that he was present
22    when you were doing --
23         A.   I don't have an exact number or no
24    times that he was present.
25    DEFENSE COUNSEL:
```

Page 208

```
 1         Objection.
 2    THE WITNESS:
 3         How I'm going to have an exact number?
 4    MR. HIBEY:
 5         All right.  Thank you.
 6    THE WITNESS:
 7         I didn't count how many times he came
 8    in the shop.
 9    DEFENSE COUNSEL:
10         Objection.
11    THE VIDEOGRAPHER:
12         We are now off the record at 1:24.
13    MR. HIBEY:
14         This is Mike Hibey, counsel for the
15    plaintiff.  Our witness has left and we will be
16    back tomorrow morning at 9 a.m. to resume the
17    deposition.
18         (Deposition adjourned.)
19
20
21
22
23
24
25
```

Page 209

```
 1         WITNESS CERTIFICATION
 2    I, J. KEITH POLETO, VOLUME I, have read or
 3    have had the foregoing testimony read to me and
 4    hereby certify that it is a true and correct
 5    transcription of my testimony with the exception of
 6    the following corrections or changes, if any:
 7    Page   Line         Correction
 8    ____  _____
 9    ____  _____
10    ____  _____
11    ____  _____
12    ____  _____
13    ____  _____
14    ____  _____
15    ____  _____
16    ____  _____
17    ____  _____
18    ____  _____
19    ____  _____
20    ____  _____
21    ____  _____
22
23    _____
24    J. KEITH POLETO, VOLUME I
25    REPORTER:  TARA WILSON, CCR
```

53 (Pages 206 to 209)

J. Keith Poleto
February 19, 2020

Page 210

1      REPORTER'S CERTIFICATE
2
3          This certification is valid only for a
       transcript accompanied by my original signature
       and original required seal on this page.
4
5          I, TARA W. WILSON, Certified Court
       Reporter, in and for the State of Louisiana, as
       the officer before whom this testimony was
6      taken, do hereby certify that J. Keith Poleto, to
       whom oath was administered, after having been duly
7      sworn by me upon authority of R.S. 37:2554, did
       testify as hereinbefore set forth in the foregoing
8      209 pages;
           That this testimony was reported by me in
9      the stenotype reporting method, was prepared
       and transcribed by me or under my personal
10     direction and supervision, and is a true and
       correct transcript to the best of my ability and
11     understanding;
           That the transcript has been prepared in
12     compliance with transcript format guidelines
       required by statute or by rules of the Board, and
13     that I am informed about the complete arrangement,
       financial or otherwise, with the person or entity
14     making arrangements for deposition services;
           That I have acted in compliance with the
15     prohibition on contractual relationships, as
       defined by Louisiana Code of Civil Procedure
16     Article 1434 and in rules and advisory opinions of
       the board;
17         That I have no actual knowledge of any
       prohibited employment or contractual relationship,
18     direct or indirect, between a court reporting firm
       and any party litigant in this matter nor is there
19     any such relationship between myself and a party
       litigant in this matter.  I am not related to
20     counsel or to the parties herein, nor am I
       otherwise interested in the outcome of this matter.
21         This 27th day of February, 2020, at
       Gonzales, Louisiana.
22
23
       _____
24     TARA W. WILSON, CCR #85133
       Certified Court Reporter
25

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577



Deposition of

# J. Keith Poleto

**Volume II**

**Date:** February 20, 2020

**Case:** CAROLYN BRINDELL, ET AL v. CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL

**No.** 2019-09716

**Court Reporter:**  Tara W. Wilson, CCR

Paszkiewicz Court Reporting
Phone: 618-307-9320
Toll-Free: 855-595-3577
Fax: 618-855-9513

---

Page 211

CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA

CAROLYN BRINDELL, ET AL        NO. 2019-09716
                                SECTION: 8
VERSUS                          DIVISION "N"

CARLISLE INDUSTRIAL BRAKE
AND FRICTION, INC., ET AL

        Volume II of II of the videotaped deposition
of J. KEITH POLETO, 114 Oak Court, Westwego,
Louisiana 70094, taken at the Hampton Inn & Suites,
5150 Mounes Street, Harahan, Louisiana 70123, on
Thursday, the 20th day of February 2020, commencing
at 9:04 a.m. and concluding at 10:43 a.m.

---

J. Keith Poleto
February 20, 2020

Page 212

1  APPEARANCES:
2        SIMMONS HANLY CONROY
         (BY:  MICHAEL K. HIBEY)
3        One Court Street
         Alton, Illinois  62002
4        (ATTORNEYS FOR THE PLAINTIFFS)
5
         CHRISTOVICH & KEARNEY, LLP
6        (BY:  JAMES A. HOLMES)(VIA TELEPHONE)
         601 Poydras Street, Suite 2300
7        New Orleans, Louisiana  70130-6078
         (ATTORNEYS FOR FIRST STATE INSURANCE,
8        INC.)
9
         COURINGTON, KIEFER, SOMMERS, MARULLO,
10       MATHERNE, LLC
         (BY:  JAMIE M. ZANOVEC)
11       616 Girod Street
         New Orleans, Louisiana  70130
12       (ATTORNEYS FOR LUFKIN INDUSTRIES, LLC,
         DEFENDANT)
13
14       DEUTSCH KERRIGAN
         (BY:  BARBARA B. ORMSBY)
15       755 Magazine Street
         New Orleans, Louisiana  70130
16       (ATTORNEYS FOR ZF ACTIVE SAFETY US, INC.
         (F/K/A KELSEY-HAYES COMPANY, AND WILSON
17       TRAILER COMPANY, DEFENDANT)
18
         FOLEY & MANSFIELD
19       (BY:  KAY BARNES BAXTER)
         650 Poydras Street, Suite 2450
20       New Orleans, Louisiana  70130
         (ATTORNEYS FOR STRICK TRAILERS, LLC,
21       DEFENDANT)
22
         FRILOT|LLC
23       (BY:  JAMES H. BROWN, JR.)
         1100 Poydras Street, Suite 3700
24       New Orleans, Louisiana  70163
         (ATTORNEYS FOR CARLISLE INDUSTRIAL BRAKE AND
25       FRICTION, INC., DEFENDANT)

---

J. Keith Poleto
February 20, 2020

Page 213

1  APPEARANCES, CTD:
2        MG+M THE LAW FIRM
         (BY:  MEGHAN B. SENTER)
3        One Canal Place
         365 Canal Street, Suite 3000
4        New Orleans, Louisiana  70130
         (ATTORNEYS FOR EATON CORPORATION, DEFENDANT)
5
         MG+M THE LAW FIRM
6        (BY:  AMANDA L. DETO)
         One Canal Place
7        365 Canal Street, Suite 3000
         New Orleans, Louisiana  70130
8        (ATTORNEYS FOR CRA TRAILERS, INC., F/K/A
         GREAT DANE, DEFENDANTS)
9
10
         PUGH ACCARDO, LLC
11       (BY:  DAVID M. STEIN)(VIA TELEPHONE)
         1100 Poydras Street
12       Suite 3300
         New Orleans, Louisiana  70163-1132
13       (ATTORNEYS FOR UNION CARBIDE, DEFENDANT)
14
         PUGH ACCARDO, LLC
15       (BY:  JOSEPH H. HART)
         1100 Poydras Street
16       Suite 3300
         New Orleans, Louisiana  70163-1132
17       (ATTORNEYS FOR UTILITY TRAILER MANUFACTURING
         COMPANY, DEFENDANT)
18
19       SIMON, PERAGINE, SMITH & REDFEARN, LLP
         (BY:  DOUGLAS W. REDFEARN)
20       1100 Poydras Street, 30th Floor
         New Orleans, Louisiana  70163
21       (ATTORNEYS FOR EAGLE, INC., DEFENDANT)
22
23
24
25

**EXHIBIT F**

Keith Poleto
February 20, 2020

Page 214

```
 1   APPEARANCES:
 2       STAINES & EPPLING
         (BY:  ANTHONY J. STAINES)
 3       3500 North Causeway Boulevard, Suite 820
         Metairie, Louisiana  70002
 4       (ATTORNEYS FOR BOARD OF COMMISSIONERS FOR
         THE PORT OF NEW ORLEANS, DEFENDANT)
 5
 6   Also Present:
         Bernel Davis, Videographer
 7
     Reported by:
 8       TARA W. WILSON
         Certified Court Reporter
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**

---

J. Keith Poleto
February 20, 2020

Page 215

```
 1       I N D E X
 2
 3
 4
 5                                Page
 6   SUIT CAPTION.......................... 211
 7   APPEARANCES....................... 212-214
 8   STIPULATION.......................... 216
 9
10   EXAMINATION INDEX
11   BY MR. STAINES....................... 217
12   BY MS. ZANOVEC....................... 225
13   BY MS. BAXTER.................... 233, 295
14   BY MS. ORMSBY................... 248, 302
15   BY MS. SENTER........................ 263
16   BY MS. DETO..................... 271, 294
17   BY MR. HART.......................... 280
18
19
20
21
22
23
24
25
```

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**

---

J. Keith Poleto
February 20, 2020

Page 216

```
 1       S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and between
 4   counsel for the parties hereto that the videotaped
 5   deposition of the aforementioned witness is hereby
 6   being taken under the Louisiana Code of Civil
 7   Procedure, for all purposes, in accordance with the
 8   law pursuant to notice.
 9       The formalities of sealing, certification,
10   and filing are specifically waived.  The witness
11   reserves the right to read and sign the deposition.
12       All objections, save those as to the form of
13   the question and the responsiveness of the answer,
14   are hereby reserved until such time as this
15   deposition, or any part thereof, may be used or
16   sought to be used in evidence.
17
18       *  *  *  *  *  *
19
20       TARA W. WILSON, Certified Court Reporter, in
21   and for the Parish of Orleans, State of Louisiana,
22   officiated in administering the oath to the
23   witness.
24
25
```

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**

---

J. Keith Poleto
February 20, 2020

Page 217

```
 1   THE VIDEOGRAPHER:
 2       Good morning.  This is the continuation
 3   of the videotaped deposition of Keith Poleto.
 4   Today's date is February the 20th, 2020.  The time
 5   is 9:04 a.m.  This is the case of Brindell, et al,
 6   plaintiff, versus Carlisle Brake, et al,
 7   defendants, case No. 2019-09716.  The case is
 8   pending in the Civil District Court for the Parish
 9   of Orleans, State of Louisiana.
10       My name is Bernel Davis and I am
11   representing Paszkiewicz Court Reporting.  The
12   court reporter is Tara Wilson also representing
13   Paszkiewicz.
14       This deposition is taking place in the
15   Hampton Inn & Suites in New Orleans, Louisiana.
16   All attorneys present will be indicated on the
17   stenographic record.  The court reporter will now
18   swear in the witness.
19       J. KEITH POLETO,
20   after having first been duly sworn by the
21   above-mentioned Court Reporter, did testify as
22   follows:
23   EXAMINATION BY MR. STAINES:
24       Q.    Good morning, Mr. Poleto.  My name is
25   Tony Staines.  I represent the Board of
```

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**

Page 218

```
1   Commissioners for the Port of New Orleans.  I'm
2   going to refer to that company as the port, okay,
3   for our discussion today.  Okay with you?
4       A.    Fine.
5       Q.    Okay.  As I understand it, you worked
6   as an employee of Puerto Rico Marine Management,
7   right?
8       A.    Correct.
9       Q.    Okay.  And it's your understanding that
10  Mr. Brindell also worked for Puerto Rico Marine
11  Management, correct?
12      A.    Correct.
13      Q.    Okay.  And, as I understand your
14  testimony yesterday, Mr. Brindell was your direct
15  supervisor?
16      A.    Correct.
17      Q.    Okay.  Now, the work that you did and
18  which he supervised was all performed at the France
19  Road -- is it called terminal?
20      A.    Terminal --
21      Q.    Okay.
22      A.    -- yeah.
23      Q.    And that's located on France Road here
24  in New Orleans, correct?
25      A.    It's directly on France Road, yes.
```

Page 219

```
1       Q.    Okay.  Now, that's -- that facility
2   that we just talked about, the terminal, that's
3   where all the work that you did and Mr. Brindell
4   did and supervised regarding brake work, that was
5   performed there, correct?
6       A.    Yes.
7       Q.    Okay.  Now, Mr. Brindell, as you
8   explained yesterday, also, in addition to
9   performing supervisory work in that -- in that
10  terminal, he also had an office in, in that
11  terminal and did, did his office work in there, as
12  well, right?
13      A.    Yes.
14      Q.    So it would be fair to say that all of
15  Mr. Brindell's work was confined to that one
16  terminal facility, correct?
17      A.    Correct.
18      Q.    Now, describe that terminal facility
19  for me.  Is it a building, bricks, what -- made out
20  of brick?  What is it made out of?  Just describe
21  it for me.
22      A.    The interior -- the interior walls were
23  cinder block --
24      Q.    Okay.
25      A.    -- and the exterior walls were cinder
```

Page 220

```
1   block part of the way up and then sheet, you know,
2   sheet metal.
3       Q.    Okay.  So, so we're talking about an
4   all-enclosed presumably large building because you
5   had trailers in there that you did work on, as
6   well, correct?
7       A.    Correct.
8       Q.    Okay.  You had a door that you would
9   enter into that facility?
10      A.    Mr. Brindell?
11      Q.    No.  You.  Is there a door --
12      A.    Yeah.  There was a main door you came
13  in, yes.
14      Q.    You called it shops or is it shops
15  within the terminal?  How do you -- how do you
16  describe it?
17      A.    It's -- it was a big building and
18  majority of it was shop with an office and a
19  bathroom in it.
20      Q.    Okay.  All right.  Okay.  Now -- and
21  your testimony, as I understand it, is that Mr.
22  Brindell supervised mechanics and other workers
23  within the shops there in that building, correct?
24      A.    Correct.
25      Q.    Okay.  The only times that dust was
```

Page 221

```
1   created -- that you talked about dust yesterday --
2   the only times that dust was created that you
3   described in your deposition occurred in that
4   particular building that we just have talked about,
5   correct?
6       A.    Correct.
7       Q.    Okay.  Now, you don't know who owned
8   that building or do you?
9       A.    I assume Puerto Rican Marine unless
10  they were leasing it.  I don't know.
11      Q.    Okay.  You don't have any direct
12  knowledge one way or another who owned it?
13      A.    No, I don't.
14      Q.    Okay.  And you have no information that
15  the port had anything to do with the trailers or
16  brake pads or any of the equipment used during your
17  work there in that building, correct?
18      A.    I don't -- no.  I don't know anything
19  about that.
20      Q.    Okay.  Now, just to make clear, you
21  were an employee of Puerto Rico Marine Management,
22  not an employee of the Port of New Orleans,
23  correct?
24      A.    Correct.
25      Q.    Okay.  Now -- and you don't -- to your
```

Page 222

```
 1   knowledge, no port employee or representative was
 2   ever involved in working there in the shop or
 3   supervising the work done in the shop, correct?
 4        A.     Correct.
 5        Q.     Okay.  And, to your knowledge, no port
 6   employee was ever involved in supervising Mr.
 7   Brindell, correct?
 8        A.     Correct.
 9        Q.     You identified Mr. Brindell's
10   supervisor as -- who was it yesterday?  I forgot.
11        A.     Oh, his supervisor of him?
12        Q.     Yes, sir.
13        A.     Reggie Sykes.
14        Q.     Okay.  And Mr. Sykes, you said, was
15   located across the street in the offices?
16        A.     Across the street in the main office.
17        Q.     Okay.  Where is that facility, the
18   terminal that you were talking about that had the
19   shops and the building, where is that located there
20   on France Road in relation to the Industrial Canal?
21        A.     We worked on the Industrial Canal.  The
22   Industrial Canal, we had a dock on the canal, and
23   our terminal held probably 2,000 containers and
24   trailers in it.
25        Q.     Okay.
```

Page 223

```
 1        A.     And then we bordered the canal with the
 2   gantry cranes were back there and France Road on
 3   the front.
 4        Q.     Okay.  About how far a distance was the
 5   facility, the terminal facility with the shops,
 6   just the shop, the building -- the building that
 7   contained the shops, how far was that from the
 8   Industrial Canal about?
 9        A.     From the water itself?
10        Q.     Yes, sir.
11        A.     Couple thousand yards.
12        Q.     Okay.  Now, if you or Mr. Brindell
13   would have been provided any safety devices while
14   working in the shop, such as masks or similar
15   devices, that would have been -- you would have
16   expected that to have been provided to you by
17   Puerto Rico Marine Management, correct?
18        A.     I would have, yeah.
19        Q.     Okay.  And you wouldn't have expected
20   the port to have any role in any type of safety
21   devices that you should have been provided if you
22   should have been provided any at all?
23        A.     I don't think it was up to the port.
24        Q.     Okay.  Puerto Rico Marine Management
25   controlled the work you did as your employer,
```

Page 224

```
 1   correct?
 2        A.     Correct.
 3        Q.     Okay.  To your knowledge, the port had
 4   no role whatsoever in the work that you did,
 5   correct?
 6        A.     Not at all.
 7        Q.     Now, just a couple more questions.  As
 8   far as, as your safety is concerned, if you had to
 9   look to somebody to make sure that they ensured
10   that you worked in a safe environment, in a safe
11   manner, that would have been Puerto Rico Marine
12   Management, correct?
13        A.     Correct.
14        Q.     Okay.  You have no information, do you,
15   that the port manufactured or used or handled any
16   asbestos-containing products or materials there at
17   that France Road facility where you worked?
18        A.     Not to my knowledge.
19        Q.     Okay.  And lastly, during the course of
20   your work there at the -- at the shops there at the
21   France Road facility, you didn't see any port
22   employees or representatives, to your knowledge,
23   there at the shops involved in any of the work that
24   you did on brakes or similar -- or the trailers,
25   correct?
```

Page 225

```
 1        A.     Correct.
 2   MR. STAINES:
 3             Okay.  That's all I have.  Thank you
 4   very much.  Appreciate it.
 5   MR. HIBEY:
 6             We need someone else to ask questions.
 7   MR. HART:
 8             Don't everybody all get up at once.
 9   THE WITNESS:
10             Could have finished yesterday.  This
11   side, we could have finished yesterday.
12   EXAMINATION BY MS. ZANOVEC:
13        Q.     Good morning, Mr. Poleto.  My name
14   is --
15        A.     Good morning.
16        Q.     -- Jamie Zanovec and I represent
17   Lufkin.  I have a few questions for you and
18   hopefully won't keep you too long.
19             Is it Mr. Brindell or Mr. Brindell?
20        A.     I called him -- I call him Brindell.
21        Q.     Brindell?  Okay.
22             In your earlier testimony, you said
23   that Lufkin was one of the less common trailers you
24   worked on.  Do you recall seeing them when you
25   first started at Puerto Rico Marine or was it in
```

Page 226

1  the later years?
2      A.    I'm sorry?
3      Q.    Do you recall seeing Lufkin trailers or
4  working on them when you first started at Puerto --
5  Puerto Rico Marine or was it in the later years?
6      A.    When I first started, I remember seeing
7  them.
8      Q.    Can you describe how you knew it was a
9  Lufkin trailer?
10     A.    There was stickers on the side of them
11 telling you who made them.
12     Q.    Can you describe the sticker or the way
13 the name was written?
14     A.    It was just on a stamp and it said
15 "Lufkin."
16     Q.    And where was the sticker?
17     A.    Yeah, sticker.
18     Q.    Where was the sticker?
19     A.    Oh, usually on the front at the bottom
20 left or right side.
21     Q.    And you know what color was the
22 sticker?
23     A.    I'm sorry?
24     Q.    What color was the sticker?
25     A.    Oh, Lord.  White and black, maybe.

Page 227

1  Talking a long time ago.
2      Q.    I know.  And some of these may seem a
3  little --
4      A.    A lot of the stuff is faded off.  You
5  got to really look at it to see what it really
6  said.
7      Q.    Right, but I just have to ask to see
8  what you know.  And if you don't know, that is
9  perfectly fine.
10     A.    Okay.  I'll try to do the best I can.
11     Q.    You're doing a great job.  I just have
12 to ask you --
13     A.    Thank you.
14     Q.    -- the questions.  Thank you.
15           You never saw paperwork concerning the
16 ownership or lease of any Lufkin trailers, correct?
17     A.    No, I did not.
18     Q.    Okay.  So that's correct?
19     A.    Correct.
20     Q.    Sorry.
21           Mr. Brindell never personally performed
22 work on a Lufkin trailer, correct?
23     A.    Not to my knowledge.
24     Q.    You never saw it?
25     A.    I didn't see it.

Page 228

1      Q.    And these were the older trailers,
2  trailers that had a lot of miles on them?  You were
3  just talking about the stickers being rubbed off
4  and everything.
5      A.    Yeah.  These were older trailers.
6      Q.    Older trailers.
7            Do you believe there was asbestos
8  anywhere on the Lufkin trailer?
9      A.    Nowadays I probably do.
10     Q.    What do you believe asbestos --
11     A.    I meant from the wheels now that I know
12 it was in the brakes.
13     Q.    What type of work do you recall doing
14 on Lufkin trailers?  Did you do some of the welding
15 repairs to damaged Lufkin trailers?
16     A.    We probably did some welding, yes.
17     Q.    Do you know how often you did that
18 welding work?
19     A.    It's hard to say.
20     Q.    Did you change lights on Lufkin
21 trailers or do wiring work like you described
22 yesterday?
23     A.    Yes, I'm sure.
24     Q.    Did you do some welding repairs on the
25 landing gear as you described yesterday?

Page 229

1      A.    Probably so, yes.
2      Q.    Do you recall doing any brake work on
3  Lufkin trailers?
4      A.    I'm sure.
5      Q.    You say that you're sure, but I need to
6  know if you specifically recall doing brake jobs on
7  Lufkin trailers.
8      A.    Yes.
9      Q.    About how many times do you think you
10 performed that work on a Lufkin trailer?  And I
11 want to narrow you down.  Do you think you did work
12 on a Lufkin trailer during your first year at
13 Puerto Rico Marine?
14     A.    Yes.
15     Q.    So that would be about October 1979,
16 let's say through the end of 1980.  About how many
17 Lufkin trailers do you think you worked on?
18     A.    That's very hard to say.
19     Q.    Okay.  So you are not able to say how
20 often you would have worked on a Lufkin trailer?
21     MR. HIBEY:
22           Objection to form.
23     THE WITNESS:
24           Hard to come up with a number.  I'd be
25 guessing.

Page 230

```
1    EXAMINATION BY MS. ZANOVEC:
2        Q.    Okay.  But it certainly wasn't the 400
3    times you described earlier?
4        A.    No, no.  It wouldn't have been 400
5    times.
6        Q.    Okay.  And it wouldn't have been even a
7    hundred times?
8        A.    Possibly 100.
9        Q.    Do you know the manufacturer of any of
10   the axles on Lufkin trailers?
11       A.    Probably Eaton.
12       Q.    And you said "probably Eaton."  Are you
13   certain that there was an Eaton axle or are you
14   just guessing?
15       A.    Well, I mean, most trailers had two
16   different -- two types -- two different axles on
17   them, and Eaton was one of the most popular.
18       Q.    Do you know the manufacturer of any of
19   the old brake pads you would have removed from a
20   Lufkin trailer?
21       A.    No.
22       Q.    Do you know the manufacturer of any of
23   the new brake pads you would have installed?
24       A.    Yeah, Carlisle.
25       Q.    And you're certain of that, that you
```

Page 231

```
1    would have installed a Carlisle brake?
2        A.    That's who we used mostly, yes.
3        Q.    And Lufkin would never have
4    manufactured the brake pads, correct?
5        A.    Did Lufkin manufacture brake --
6        Q.    They did not, correct?
7        A.    Not that I know of.
8        Q.    Okay.  Did you ever see anything
9    published or produced by Lufkin that required the
10   use of asbestos brake pads on those trailers?
11       A.    No.
12       Q.    You never read anything from Lufkin,
13   correct?
14       A.    No.  Correct.
15       Q.    Okay.  And, as you discussed with Mr.
16   Hart yesterday, you actually have no idea how many
17   times, if any, Mr. Brindell would have been present
18   when you were changing brakes on a Lufkin trailer,
19   correct?
20       A.    Well, like I said, he was in the shop
21   about -- (phone rang).  I thought I had that off.
22   Sorry.
23       Q.    That's okay.
24       A.    Like I said yesterday, he was in the
25   shop roughly half of the eight-hour day.
```

Page 232

```
1        Q.    Right.  But do you have any specific
2    recollection of seeing him in the shop when you
3    were working on a Lufkin trailer or you just can't
4    say?
5        A.    I'm sure he was present, but I can't
6    give you an amount of time.
7        Q.    And you're saying you're sure he was
8    present, but I guess I just need to know -- well,
9    I'm going to move on.
10            You cannot testify that Mr. Brindell
11   was ever present when an original brake lining was
12   replaced on a Lufkin trailer, correct?
13       A.    I'm sorry.  Repeat that.
14       Q.    You can't testify that Mr. Brindell was
15   ever present when an original brake lining was
16   replaced on a Lufkin trailer because there were
17   older trailers with a lot of miles, correct?
18       A.    He was present half the day so, I mean,
19   it's hard for me to say if he was there or not.
20       Q.    Right.  But you can't testify that he
21   ever was present when an original brake liner on a
22   newer trailer was replaced?
23       MR. HART:
24            First-time brake job.
25       THE WITNESS:
```

Page 233

```
1            I don't understand the question.
2    EXAMINATION BY MS. ZANOVEC:
3        Q.    I'm sorry.  That's a good one.  Okay.
4            Earlier we talked about how you had
5    difficulty describing the labels because the
6    sticker was rubbed off and things like that, so
7    these were older trailers with a lot of miles,
8    correct?
9        A.    Correct.
10       Q.    So what I'm saying is, you can't
11   testify he was ever there when a first-time brake
12   job was done on a Lufkin trailer?
13       A.    When a new -- no, I can't say that.  I
14   can't -- no.
15       MS. ZANOVEC:
16            Okay.  Thank you.  That's all I have.
17       THE WITNESS:
18            You just had -- I was confused with
19   your question.
20       MS. ZANOVEC:
21            I'm sorry about that.  Glad we got
22   through to it.  Thank you very much.
23       THE WITNESS:
24            Thank you.
25   EXAMINATION BY MS. BAXTER:
```

Page 234

```
 1    Q.    Good morning.
 2    A.    Good morning.
 3    Q.    Mr. Poleto?
 4    A.    Yes.  That sounds good.
 5    Q.    I got it sort of close?
 6    A.    You got it.
 7    Q.    All right.  Hi, I'm Kay Baxter.  I'm
 8  not expecting a lot of questions, but first of all,
 9  something I don't know that was explained to you or
10  not, but if you don't know the answer to our
11  question, the correct answer is I don't know.
12    A.    Oh, okay.
13    Q.    Yeah.
14    A.    I try and give you the most detail I
15  can, but sometimes I can't give you perfect
16  details.
17    Q.    Right.  Exactly.
18    A.    Okay.
19    Q.    And, and so that should have been
20  explained to you up front.  We don't want you to
21  guess.  If you don't know the answer, then just say
22  I don't know that answer.
23    A.    Okay.
24    Q.    You know, asking you what happened back
25  in 1979, a lot of stuff has happened since then.
```

Page 235

```
 1    A.    Exactly.
 2    Q.    Yeah.  So please don't guess.  If I ask
 3  you, you know, for your best estimate, you can --
 4  you can give me that.  Then we're clear on it.
 5    A.    Okay.
 6    Q.    All right.  So tell me this:  Why do
 7  you think you're here today?  What do you think
 8  your purpose is here today?
 9    A.    To clarify the atmosphere in which we
10  were working, where Mr. Brindell was working.
11    Q.    Okay.  And what does that mean to you,
12  clarify the atmosphere?
13    A.    To know what was going on in the shop.
14    Q.    All right.  And you don't know for
15  certain that anything that you worked with
16  contained asbestos, do you?
17    A.    At that time I did not know.
18    Q.    And you don't know that today, do you?
19    A.    No, I don't.  I just know what I see
20  that asbestos was everywhere.
21    Q.    And let's talk about that for a second.
22  You said you see it.  What is it you see?
23    A.    On the television.  They're always
24  talking about the bad asbestos, how bad it was.
25    Q.    The ads being run by plaintiff
```

Page 236

```
 1  attorneys, is that what you're talking about?
 2    A.    That and some of the educational shows
 3  that show you all about how they make things.
 4    Q.    Is that educational show, does that
 5  have a man and a female doctor who are talking
 6  about it?
 7    A.    Uh-uh (negative response).
 8    Q.    Okay.  What educational shows are you
 9  talking about then?
10    A.    How it's made, National Geographic
11  stuff.
12    Q.    Okay.  And you -- do you know that
13  asbestos is a naturally occurring mineral?
14    A.    No, I don't.
15    Q.    Okay.  It's not man-made, it's actually
16  mined.
17    A.    Oh.
18    Q.    Okay.
19    A.    Learn something new.
20    Q.    Yeah.  All right.  And I'm going to
21  jump around here a little bit.  There were some --
22  yesterday you testified that there were -- you
23  named certain trailers -- and, by the way, I
24  represent Strick.  And you named certain trailers,
25  but you said there were 15 to 18 different ones
```

Page 237

```
 1  that you didn't name.  And sometimes, after I've
 2  had a chance to think about things, things come
 3  back to me.  Have you recalled any other names of
 4  trailers that you worked with during the time
 5  period that you worked at Puerto Rico Marine with
 6  Mr. Brindell?
 7    A.    The ones I named yesterday are the only
 8  ones I can remember.
 9    Q.    Okay.  So no new ones have come back to
10  you?
11    A.    (Witness shook head negatively.)
12    Q.    Okay.  No?
13    A.    No.  No, ma'am.  Sorry.
14    Q.    This is hard work.  I tell everybody
15  this deposition stuff is hard work.
16          All right.  So -- but you acknowledge
17  that there were 15 to 18 additional trailer types
18  in addition to the ones you named yesterday?
19    A.    I would guess.  Yeah, that's what I
20  would say.
21    MR. HIBEY:
22          Objection to form, misstates testimony.
23  EXAMINATION BY MS. BAXTER:
24    Q.    Okay.  So that's what -- that's your
25  memory.  All right.
```

Page 238

1    And did you work on those equally?  Do
2  you know what I'm --
3      A.    Pretty much.
4      Q.    Okay.  So we're talking about -- I
5  think yesterday you named about six different
6  trailer types?
7      A.    Something like that.  Somewhere around
8  there.
9      Q.    Yeah.  And then plus the 15 to 18 more.
10  So we're talking about -- math is not my strong
11  subject.  Let me try to do this.  Twenty-two to 25
12  different trailer types you worked on in that time
13  period when Mr. Brindell was there?
14      A.    That sounds like a higher number than I
15  said but, I mean, it sounds like a lot.  It's
16  probably more like 18 total.
17      Q.    Total, okay.
18      And when you left here yesterday,
19  overnight, was there anything you testified about
20  yesterday that you want to change today?
21      A.    No.
22      Q.    Okay.  And you were -- you told us that
23  you met Mr. Brindell because you were in the
24  hunting club together.  And you were asked if you
25  were related to him.  Were you related to his wife

Page 239

1  in any way?
2      A.    No.
3      Q.    Okay.  Do you know what schools Mr.
4  Brindell went to?
5      A.    School?
6      Q.    Yeah.
7      A.    No.
8      Q.    You know, around here it's what high
9  school did you go to.
10      A.    I don't know anything about that.
11      Q.    Okay.  Checking off my notes --
12      A.    Okay.
13      Q.    -- so that I don't ask you the same
14  question that's already been asked.
15      A.    I can relax.
16      Q.    Let me ask this:  When you were working
17  in the shop where Mr. Brindell was your supervisor,
18  was there any type of insulated pipes in that shop?
19      A.    No.
20      Q.    Okay.  Did you ever see any contractors
21  come into the shop and do any type of work with
22  insulation?
23      A.    No.
24      Q.    Okay.  And when I say insulation, do
25  you know what I'm talking about?

Page 240

1      A.    Yeah, yeah.
2      Q.    Okay.  What is insulation to you?
3      A.    A layer of foam or something to keep
4  the weather out or quiet the sound.
5      Q.    Okay.  Were there any pipes running
6  through the shop that had a protective covering on
7  them to keep people from being burned or anything
8  like that?
9      A.    No.
10      Q.    Okay.  And we're in South Louisiana,
11  but how was that shop heated?
12      A.    Had electric heaters that hung from the
13  roof.
14      Q.    Okay.  When you worked on any of these
15  trailers, had any of them come off of a ship and
16  had not been cleaned out before you guys worked on
17  them?
18      A.    Sometimes.
19      Q.    Okay.  And do you know what any of
20  these trailers contained that hadn't been cleaned
21  out before you worked on them?
22      A.    No.  I don't know.  Most of them were
23  washed before they came in unless it was an urgent
24  job that you had to get it out.
25      Q.    Okay.  Were any of these trailers, were

Page 241

1  they ever covered in dust, the trailers themselves?
2      A.    No.
3      Q.    Okay.  Do you know if Mr. -- well, were
4  you aware that Mr. Brindell had been diagnosed with
5  lung cancer in 2016?
6      A.    No.
7      Q.    Okay.  He didn't call you after his
8  diagnosis with lung cancer?
9      A.    He must have kept that to himself.
10      Q.    Okay.  Do you know anything about Mr.
11  Brindell's health issues?
12      A.    I knew he had some kind of blood
13  pressure problem.
14      Q.    Okay.  Have any of your other coworkers
15  from Puerto Rico Marine contacted you to say that
16  they have any type of disease or health-related
17  issues that they believe that they contracted when
18  they were working at Puerto Rico Marine?
19      A.    We lost contact with each other.
20      Q.    Okay.  So when is the last time you had
21  gone hunting with Mr. Brindell?
22      A.    Last year.
23      Q.    Okay.  Did Puerto Rico Marine have any
24  cleanup crews that would come in and clean up the
25  shop after you guys did your work?

J. Keith Poleto
February 20, 2020

Page 242

```
1       A.      Once in awhile.
2       Q.      And when you say "once in awhile," what
3   does that mean?
4       A.      Not very often.  Maybe twice a year.
5   We were responsible for cleaning it ourselves.
6       Q.      Okay.  And what did you guys do to
7   clean up your work area?
8       A.      Mostly swept.
9       Q.      Okay.  And I don't remember if this was
10  asked or not.  When you swept, did you put some of
11  that -- I'm trying to remember --
12      A.      FLOOR-DRY?
13      Q.      Yeah.
14      A.      If you had an oil spill, you did.
15      Q.      Okay.  Was -- I'm thinking back to
16  school when they used to put some kind of material
17  on the floor before they would do the sweeping to
18  keep down the dust.  Did you guys have that, other
19  than the OIL-DRI?
20      A.      No.  We didn't have anything.
21      Q.      Okay.  And did Mr. Brindell instruct
22  you guys to do the sweeping?
23      A.      Yes.
24      Q.      Okay.  Was Mr. Brindell's office air
25  conditioned?
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 243

```
1       A.      Yes.
2       Q.      Yeah.  Too hot here not to be.
3               So, in the summer, he'd have to keep
4   the door closed to keep the air condition in,
5   right?
6       A.      Yeah, I would say so.  But he left it
7   open a lot.  I don't know why.
8       Q.      Okay.  Was the shop air conditioned
9   that you guys worked in?
10      A.      No.
11      Q.      Had to ask.  All right.
12              All right.  You told us yesterday --
13  and I'm a visual person, so looking at that drawing
14  you did was very informative to me.  Your bay was
15  at the end furthest away from his office and it was
16  next to a wall?
17      A.      Correct.
18      Q.      Okay.  Now, you told us that you had a
19  fan and you would position the fan to blow on you
20  so it would blow the cool air on you; is that
21  right?
22      A.      Yes.
23      Q.      All right.  So I'm trying to figure
24  this out.  Was the fan between the wall and the
25  bay?
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 244

```
1       A.      It depends on what side of the trailer
2   you were working on.
3       Q.      That's what I was wondering.  Yeah.
4   Okay.  So help me with that.
5               So sometimes the fan would be between
6   the wall and the bay if you were working on the --
7       A.      On that side.
8       Q.      Okay.  And then, when you would work on
9   the other side of the trailer, where would you
10  position the fan then?
11      A.      Put it by the back door blowing onto
12  you.
13      Q.      Okay.  So it's by the back door.  Would
14  it be blowing, let's say toward the front, so it's
15  positioned so if you're working on either the front
16  or the back of the truck, the fan is already
17  positioned so it's blowing -- and I don't know how
18  you park these trailers in there, what you call the
19  front and the back, but you see what I'm saying?
20      A.      I just -- I just had them blowing on me
21  to keep me cool while I'm working and trying to
22  keep the dust off of my body.
23      Q.      Right.  So you had it position -- so
24  you would never position it so it would blow the
25  dust right into you?
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 245

```
1       A.      No.  I tried to get it to blow the dust
2   away from me.
3       Q.      Exactly.  Okay.
4               And so when Mr. Brindell was coming up,
5   he would stand behind you, and the dust was blowing
6   away from him, as well, right?
7       A.      Sometimes away, sometimes on.
8       Q.      Oh.  More often than not, he wouldn't
9   stand in the dust, would he?
10      A.      No, but he'd probably walk through it.
11  How is that?
12      Q.      Okay.  He may have walked through it?
13  Oh.  He didn't stand there and let it blow on him;
14  is that a fair statement?
15      A.      Yeah.  That's a fair statement for
16  sure.
17      Q.      Okay.  Good, good.
18              You, you told Mr. Hart something
19  yesterday about the axle manufacturers.  And you
20  said sometimes you knew it was -- I think maybe you
21  said a utility trailer because of the computer, it
22  could tell you --
23      A.      The serial number.
24      Q.      -- if you couldn't see the name?
25      A.      The serial number can tell you.
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Page 246

```
 1      Q.      Okay.  Was that after 1981 when that
 2  happened?
 3      A.      I don't know that answer.
 4      Q.      Okay.  You can't give us a time frame,
 5  right?
 6      A.      Correct.
 7      Q.      Okay.  Thank you.  All right.
 8              And you've given us -- you've talked
 9  today -- well, you talked yesterday to Mr. Hart
10  about utility trailers and you talked today to Ms.
11  Zanovec about the Lufkin trailers.
12              The Strick trailers, did you work on
13  these Strick trailers any differently than you
14  worked on any of the other trailers?
15      A.      We worked on them all the same.
16      Q.      Okay.  So the answers you gave to Mr.
17  Hart and Ms. Zanovec would be the same if I asked
18  you those questions about the Strick trailers,
19  right?
20      A.      Yes.
21      Q.      Okay.  And one of the things I have to
22  ask:  You don't know the maintenance history of any
23  Strick trailer you worked on, right?
24      A.      Correct.
25      Q.      Okay.  Do you recall ever working on a
```

Page 247

```
 1  brand new Strick trailer?
 2      A.      No, I can't.
 3      Q.      Okay.  And I know you told us that you
 4  saw the name on the side of the trailer.  Can you
 5  describe for me what the Strick name looked like?
 6      A.      Hard to say.  Strick, I think was in
 7  the middle at the top in the front.  I don't think
 8  they were on the side.
 9      Q.      Okay.  Do you remember --
10      A.      And they were on the door in the back.
11      Q.      What?
12      A.      It was on the door in the back.
13      Q.      Okay.  And do you recall the color?
14      A.      No.
15      Q.      Okay.  And do you know what, what size
16  it was?  Could you describe big or small or --
17      A.      Twelve, 14 inches oval (indicating).
18  MS. BAXTER:
19              Okay.  I think that's all my questions.
20  THE WITNESS:
21              Thank you.
22  MS. BAXTER:
23              If I think of some more, I'll be back,
24  but thank you very much.
25              Oh, let me remember to take this off
```

Page 248

```
 1  before I walk away.
 2      THE WITNESS:
 3              I almost did it yesterday.  Kind of
 4  like a football player.
 5      MS. ORMSBY:
 6              I'll go, okay.
 7  EXAMINATION BY MS. ORMSBY:
 8      Q.      Make sure I have you in here.
 9              Hi.
10      A.      Hello.
11      Q.      I'm Barbara Ormsby.  Good to meet you.
12  I'm sort of pinch hitting, so just bear with me a
13  little bit from yesterday.
14              I just need to ask you some follow-ups
15  about a few products or names that you mentioned.
16  The first is Wilson.  You mentioned Wilson
17  yesterday?
18      A.      Yes, ma'am.
19      Q.      Are you able to tell me the first time
20  you saw a Wilson trailer at --
21      A.      That's hard for me to answer that.
22  Probably within the first year I worked there, I
23  would say.
24      Q.      And the last time you saw a Wilson
25  trailer there?
```

Page 249

```
 1      A.      When I left there in '96.
 2      Q.      All right.  And you're not able to tell
 3  me the number of Wilson trailers serviced when you
 4  worked with Mr. Brindell, are you?
 5      A.      What, the three years he was there?
 6  Couple of hundred.
 7      Q.      Are you able to tell me the number of
 8  Wilson trailers serviced when Mr. Brindell was
 9  present?
10      A.      I'm sorry?
11      Q.      When Mr. Brindell was present when you
12  were working on a Wilson trailer.
13      A.      I would say half of those.
14      Q.      Were the Wilson trailers too big to fit
15  in the garage?
16      A.      No, uh-uh (negative response).
17      Q.      Okay.  What was the type of trailer
18  serviced; was it flat -- for Wilson?  Was it a
19  flatbed, gooseneck, grain; do you know?
20      A.      We had flatbeds and we had boxes, cargo
21  box and flatbeds.
22      Q.      And this was -- these are the Wilson
23  trailers we're talking about?
24      A.      Yes.
25      Q.      Are you able to tell me the serial
```

Page 250

1  number or model number of the Wilson trailers?
2      A.    No.
3      Q.    Are you able to tell me who purchased
4  the Wilson trailers?
5      A.    Pardon me?
6      Q.    Who purchased the Wilson trailers?
7      A.    Did I --
8      Q.    Are you able to tell me who purchased
9  the Wilson trailer?
10     A.    Oh, no.  I can't say.  I don't know.
11     Q.    Do you know if they were leased?
12     A.    More than likely, they were leased or
13  the company that was using them to ship something
14  came through our terminal.
15     Q.    Okay.  But you wouldn't be able to tell
16  me then who owned the Wilson trailers?
17     A.    I couldn't tell you who owned it.
18     Q.    Are you able to tell me or describe the
19  decal or logo of the Wilson on the trailer?
20     A.    The logo?
21     Q.    Uh-huh (affirmative response).
22     A.    It was a metal plate.
23     Q.    All right.
24     A.    Silver and black, I'm pretty sure.
25     Q.    All right.  What type of service was

Page 251

1  performed on the Wilson trailer when you worked
2  there?
3      A.    Well, the shop -- the work we did in
4  the shop would be the landing -- the landing gear,
5  the legs or the brakes or the lights.
6      Q.    Tell me, who else was present when the
7  Wilson trailer was being serviced?
8      A.    Repeat it.
9      Q.    Who else was present when the Wilson
10  trailer was being serviced?
11     A.    All the mechanics in the shop.
12     Q.    All right.  The mechanics you mentioned
13  earlier?
14     A.    All the mechanics I mentioned earlier.
15     Q.    Okay.  Anybody else that we haven't
16  spoken about?
17     A.    Mr. Brindell would pass through the
18  shop.
19     Q.    Right.  Okay.
20         Anybody else, as you sit here today,
21  that you can think of that may have been present
22  when the Wilson trailers were being serviced?
23     A.    No.
24     Q.    You told us everybody?  Nobody else
25  popped in your head?

Page 252

1      A.    I don't think anybody else, to the best
2  of my whatever (indicating).
3      Q.    Okay.  And I believe you mentioned some
4  brake replacement.  My question is:  On what type
5  of drum for the Wilson trailers, what type of drum
6  were on the Wilson trailers where the brake
7  replacement was being performed?  The type of drum.
8      A.    What type of drum?
9      Q.    Uh-huh (affirmative response).
10     A.    I don't know what the drums were.
11     Q.    All right.  You would agree that a
12  brake replacement on a Wilson trailer was a
13  relatively fairly short process?
14     A.    Was what?
15     Q.    A fairly short process.
16     A.    Fairly?
17     Q.    Short.  Sorry.
18     A.    Short?
19     Q.    Process, yes.
20     A.    Short process?  Not really short, but a
21  few hours.
22     Q.    A few hours.
23         And then, to physically remove a brake,
24  it would take about 15 minutes?  I think you said
25  that earlier.

Page 253

1      A.    To do one complete axle takes about an
2  hour.
3      Q.    And the old -- the old brake -- brakes
4  on Wilson trailers, I mean, they were pretty dirty,
5  dusty?
6      A.    (Witness nodded head affirmatively.)
7      Q.    You believe the dust was from dirt on
8  the old trailers?
9      A.    It's mostly from the brake shoes
10  disintegrating over time.
11     Q.    Did -- the trucks picked up a lot of
12  dirt just from --
13     A.    They had some dirt and dust on them,
14  yeah.
15     Q.    Where were the replacement materials
16  purchased for the Lincoln trailers?
17     A.    Where was what purchased?
18     Q.    The replacement materials.
19     A.    I don't know.
20     Q.    You don't know.  Okay.
21         Do you know who was in charge of that
22  over at Puerto Rico Marine?
23     A.    It would have been through the parts
24  department.  I don't know who would be in charge of
25  it.

J. Keith Poleto
February 20, 2020

Page 254

```
1       Q.     You don't know who was in charge of the
2  parts department at Puerto Rico Marine?
3       A.     No.  Byron Dickel ran it, but I don't
4  know if he did the ordering.
5       Q.     Okay.  None of the brake shoes said
6  Wilson Trailer on them, did they?
7       A.     None of the brakes had Wilson on the
8  brake shoe itself, no.
9       Q.     Okay.  And you can't -- are you able to
10 tell me there was a repeat brake job on any Wilson
11 trailer?
12      A.     A what?
13      Q.     A repeat brake job on any Wilson
14 trailer.
15      A.     I couldn't answer that question.
16      Q.     Okay.  All right.  I also have
17 Fruehauf, so I need to ask you some follow-ups
18 about that, that one, too.
19      A.     Okay.
20      Q.     Okay.  So basically, the same line of
21 questions.
22             Are you able to tell me the first time
23 you saw a Fruehauf trailer?
24      A.     When I first started there.
25      Q.     Okay.  And you said the same, you
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 255

```
1  saw -- you think you saw it through '79 through
2  '85?
3       A.     Yeah.
4       Q.     Okay.  And you can't tell me the number
5  of times a Fruehauf trailer was serviced when you
6  worked with Mr. Brindell, can you?
7       A.     Well, the Fruehaufs were the more
8  common.  We worked on a lot of Fruehaufs.
9       Q.     Okay.  I believe earlier you said there
10 weren't as many Fruehauf trailers.  Do I have that
11 wrong?
12      A.     Who?
13      Q.     I believe earlier you said there were
14 not as many Fruehauf trailers there as others.
15      A.     I said there was not as many?
16      Q.     Uh-huh (affirmative response).
17 MR. HIBEY:
18             No, he did not say that.
19 MS. ORMSBY:
20             He didn't?
21 THE WITNESS:
22             Fruehauf seemed like the most popular
23 ones.
24 EXAMINATION BY MS. ORMSBY:
25      Q.     All right.  Fair enough.
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 256

```
1       A.     And their logo was red and silver if
2  you need that.
3       Q.     Red and silver.  Okay.  Thank you.
4             Are you able to tell me the type of
5  trailer serviced?  Again, was it flatbed,
6  gooseneck; do you know?
7       A.     Fruehauf was mostly box trailer.
8       Q.     Box trailer.
9             And you can't tell me the serial number
10 or model number of a Fruehauf trailer that was
11 serviced there?
12      A.     No.  I can't answer that.
13      Q.     And again, you don't know who purchased
14 the Fruehauf trailer, whether they were leased and
15 you can't tell me who owned them?
16      A.     I cannot.
17      Q.     All right.  And similar type of service
18 that we've already been discussing that was
19 performed --
20      A.     Same service, yes.
21      Q.     -- on the Fruehauf?
22             Okay.  Are you able to tell me
23 regarding brake replacement what type of drums were
24 on these Fruehauf trailers?
25      A.     It was the drum that was manufactured
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 257

```
1  for that trailer.
2       Q.     All right.  But you can't tell me the
3  type of drum, not --
4       A.     I can't tell you that.
5       Q.     Right, right.  And same thing,
6  replacement materials were purchased or they were
7  in charge by this Byron P. --
8       A.     Yes.
9       Q.     Okay.  Got it.
10             And again, you can't tell me -- or none
11 of the brake shoes said Fruehauf on them, did they?
12      A.     I don't think so.  I don't recall.
13      Q.     And again, you can't -- you don't
14 recall a repeat brake job on a Fruehauf trailer, do
15 you?
16      A.     A repeat?
17      Q.     Right.
18      A.     I can't answer that.
19      Q.     Okay.  You can't say you saw the word
20 "asbestos" on a brake shoe box, can you?
21      A.     Did I see it?
22      Q.     Yeah.
23      A.     It was probably on there.  I didn't pay
24 attention to it.
25      Q.     But you don't recall seeing asbestos on
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Page 258

1  any brake shoe box, do you?

2      A.    Uh-uh (negative response).

3      Q.    Okay.  And then -- oh, you don't -- you

4  don't know the maintenance history of any trailers,

5  and that would include Fruehauf and Wilson,

6  correct?

7      A.    I'm sorry?

8      Q.    You don't know the maintenance history

9  of any trailers --

10     A.    I don't know the history of them, no.

11     Q.    -- including Wilson or Fruehauf?

12           All right.  Last one.  You mentioned

13  Abex.  What specifically do you associate with

14  Abex?

15     A.    We had some Abex.

16     Q.    Abex what?

17     A.    Brake shoes.

18     Q.    Do you associate Abex with any

19  particular part of the brake shoe?

20     A.    No.

21     Q.    Just the brake shoe?

22     A.    It was the brake pad, brake shoe, all

23  one unit.

24     Q.    Ever see Mr. Brindell personally handle

25  an Abex product?

---

Page 259

1      A.    I didn't see him with my eyes.

2      Q.    You never saw him install or remove an

3  Abex product?

4      A.    Not with my eyes.

5      Q.    And how do you know Abex; did you

6  see --

7  MS. ORMSBY:

8           Bless you.

9  MR. STAINES:

10          Sorry.

11  THE WITNESS:

12          Bless you.

13  EXAMINATION BY MS. ORMSBY:

14     Q.    Did you see it somewhere?

15     A.    The Abex?

16     Q.    Yes.

17     A.    It was stamped on the shoe.

18     Q.    Stamped on the shoe?

19     A.    On the liner.

20     Q.    Was there any logo, lettering that

21  stands out to you, color?  Was it raised, was it

22  printed?

23     A.    No.  It was just stamped inside.

24     Q.    Stamped.

25           Do you know if these were new or

---

Page 260

1  refurbished?

2      A.    I can't answer that.

3      Q.    Ever seen new boxes or packaging for

4  these Abex brake shoes?

5      A.    They came in boxes sometimes.

6      Q.    Who delivered those?

7      A.    I don't know that.

8      Q.    Who received them?

9      A.    The parts department.

10     Q.    Okay.  That's this same guy, Byron?

11     A.    Uh-huh (affirmative response).

12     Q.    And where were they housed?

13     A.    Pardon me?

14     Q.    Where were they housed, these Abex

15  brake shoes?

16     A.    Inside the parts -- the back of the

17  parts room where the garage door was.

18     Q.    Okay.  You recall anything on the box

19  or the packaging?

20     A.    Not specifically.

21     Q.    What color were they, the boxes?

22     A.    Red, white, and black, I'm pretty sure.

23  It's a long time ago.

24     Q.    These were pre-fitted to slip on?

25     A.    Yes.

---

Page 261

1      Q.    You didn't have to cut or saw a new

2  Abex brake, did you?

3      A.    No, unless you had to grind them to get

4  them to go over the drum.

5      Q.    And again, you never saw Mr. Brindell

6  perform any of that work?

7      A.    I didn't see him, no.

8      Q.    When you removed an old brake, these

9  were all used up, gunky and greasy?

10     A.    Were they what?

11     Q.    All used up, gunky and greasy.

12     A.    They were full of dust and -- yeah.

13  Nasty, yeah.

14     Q.    Can't say for sure the brand name of

15  old brakes removed, can you?

16     A.    Can I do what?

17     Q.    You can't say for sure the brand name

18  of old brakes removed, can you?

19  MR. HIBEY:

20          Objection, asked and answered.

21  THE WITNESS:

22          You can't see them all the time.

23  Sometimes you can.

24  EXAMINATION BY MS. ORMSBY:

25     Q.    All right.  And you can't say for

Page 262

1 sure -- well, do you have any specific recollection
2 of seeing any manufacturer on a brake shoe that you
3 removed if it was all, you know, used up?
4 **A.     We usually didn't pay attention to**
5 **that.  We took them off and discarded them.**
6 Q.     Got it.
7 You've never seen asbestos on an Abex
8 box packaging, have you?
9 **A.     We didn't read it.**
10 Q.     You don't recall seeing asbestos on it,
11 though?
12 **A.     I didn't read it.  I didn't read the**
13 **print on the box.**
14 Q.     Okay.  But, as we sit here today, you
15 don't recall seeing asbestos on there, do you?
16 **A.     I don't know if it was on there or not.**
17 **I didn't read it.**
18 Q.     Got it.
19 And I don't know if I asked you this,
20 but do you recall the first time you saw Abex at
21 the Puerto Rico Marine, the first time?
22 **A.     The first year I was there.**
23 Q.     All right.  And the last would have
24 been in '85 time frame?
25 **A.     Probably, yes.**

Page 263

1 **MS. ORMSBY:**
2 Okay.  I think that's all I have.
3 Again, I'm kind of pinch hitting, so I'm going to
4 go through my notes and see if there's anything
5 else I need --
6 THE WITNESS:
7 I like your earrings.
8 MS. ORMSBY:
9 Thank you.
10 THE REPORTER:
11 Say again.
12 THE WITNESS:
13 I like her earrings.
14 Hello.
15 EXAMINATION BY MS. SENTER:
16 Q.     Hello.
17 **A.     Questioning for two.**
18 Q.     I'm sorry?
19 **A.     You're questioning for two.**
20 Q.     That's right.
21 MR. HART:
22 Don't impose that on that poor baby.
23 MS. SENTER:
24 I promise I won't take any longer
25 because of the second questioner.

Page 264

1 EXAMINATION BY MS. SENTER:
2 Q.     Good morning, Mr. Poleto.  Is it Poleto
3 or Poleto?  I'm sorry.  I've heard it both ways and
4 I really -- I hate to get people's names --
5 **A.     I answer to anything, but it's Poleto.**
6 Q.     Poleto.  Okay.
7 My name is Meghan Senter.  I'm going to
8 have just a few questions for you, I think.  I
9 shouldn't be too long.
10 I'd just like to start out to remind
11 you that if you don't understand me, if I ask a bad
12 question that you don't understand, please let me
13 know, okay?
14 **A.     Okay.**
15 Q.     Okay.  If I do ask you a question and
16 you answer it, I'm going to assume you understood
17 it.  Is that fair?
18 **A.     Okay.**
19 Q.     Okay.  You were here yesterday giving
20 testimony, right?
21 **A.     Yes.**
22 Q.     I wasn't, so I apologize for missing
23 you, but between yesterday and today, did you meet
24 with Mr. Hibey at all?
25 **A.     Who is that?**

Page 265

1 Q.     This guy (indicating).
2 **A.     No.**
3 Q.     No.  Okay.
4 Did you look at any documents between
5 yesterday and today?
6 **A.     No.**
7 Q.     So I want to make sure that I have your
8 testimony clear from what I've looked at.  You've
9 talked about some axles and you associate the name
10 Eaton only with axles; right?
11 **A.     Uh-huh (affirmative response).**
12 Q.     Is that a yes?
13 **A.     Yes.**
14 Q.     Okay.  You don't recall ever working on
15 any Eaton brakes; is that right?
16 **A.     Correct.**
17 Q.     Now, the trailers that came into the
18 shop, I think you've talked about it a few times,
19 they've been in service for awhile, right?
20 **A.     Correct.**
21 Q.     They were kind of beat up and old?
22 **A.     Some, yes.**
23 Q.     Okay.  Would you agree with me that you
24 wouldn't be able to tell me how long any of the
25 axles on those trailers had been in service before

Page 266

1  you first put hands on them?

2      A.    I can't tell you that.

3      Q.    Okay.  And it's just like what you

4  testified to with Ms. Baxter, Ms. Zanovec today,

5  you wouldn't know the prior service history on any

6  of those axles?

7      A.    No, I wouldn't.

8      Q.    You mentioned two manufacturers of

9  axles.  The first was Eaton and the second was

10  Rockwell; is that right?

11      A.    Correct.

12      Q.    Did those axles look different?

13      A.    Not really.

14      Q.    The brakes that you would work on that

15  were attached to the axles, the Eaton axles in

16  particular, do you know what style they were?

17      A.    What style?

18      Q.    Yes.

19      A.    Old style.  What they call old style.

20      Q.    Old style.

21      Q.    Were they wedge brakes?

22      A.    Wedge?

23      Q.    Yes.

24      A.    I think you call them wedge.  They

25  would work by roller cam.

Page 267

1      Q.    Okay.  Do you recall how they were

2  attached; were there anchor pins?

3      A.    Yes, anchor pin.

4      Q.    How many anchor pins were there?

5      A.    Two per set of shoes per wheel.

6      Q.    Do you recall on the lining, was it --

7  that you would put on, were they tapered or were

8  they uniform in thickness?

9      A.    The pads on the shoe?

10      Q.    Right.

11      A.    Were they tapered or uniform?

12      Q.    Yes.

13      A.    Uniform.

14      Q.    How were the linings attached to the

15  shoes?

16      A.    Riveted.

17      Q.    Now, the axles that you talked about

18  for Eaton, how did you know that they were Eaton?

19      A.    The insignia on the axle.

20      Q.    I'm sorry?

21      A.    They had a tag on the axle.

22      Q.    What did it look like, the tag?

23      A.    Oval, football shape.

24      Q.    What color was it?

25      A.    Usually black, sometimes silver,

Page 268

1  depending if it was repainted or not.

2      Q.    So sometimes they've been repainted?

3      A.    It was probably silver originally, but

4  when they spray the axles, it winds up black.

5      Q.    About how big was that football-shaped

6  tag?

7      A.    Oh, (indicating).

8      Q.    Okay.  So you're gesturing with your

9  hand, and that will be on the video, but for the --

10  for the written record, can you estimate?

11      A.    About four-inch oval.

12      Q.    A four-inch oval.

13      Q.    And was anything written on the tag?

14      A.    Eaton axle and their serial number.

15      Q.    Okay.  How was -- how was that written;

16  what color was it?

17      A.    I can't answer that.

18      Q.    Do you remember if it was in all

19  capital letters or if there were lower case

20  letters, too?

21      A.    All capital, I'm pretty sure.

22      Q.    Was Eaton axle one word or two words?

23      A.    Eaton was bigger words, axle was wrote

24  underneath.

25      Q.    Was there a hyphen or anything?

Page 269

1      A.    No.

2      Q.    What was the font like, if you

3  remember?

4      A.    The what?

5      Q.    The font, you know, was it --

6      A.    Oh, I don't remember.

7      Q.    You don't remember.

8            Can you spell Eaton for me?

9      A.    E-A-T-O-N.  That's how I spell it.

10      Q.    That's how you spell it.

11            Is that what you remember seeing or is

12  that just how you spell it?

13      A.    I think that's what I saw.  I'm not a

14  good speller.

15      Q.    The, the shoes that you were working

16  on, I know you told me they weren't Eaton, but do

17  you remember what color they were?

18      A.    The metal part or the pad?

19      A.    The metal part.

20      A.    The metal part was black.

21      Q.    Black.

22      A.    The pad was gray.

23  MS. SENTER:

24            All right.  I think those are all my

25  questions for you today.  I told you I'd be quick.

Page 270

```
1    THE WITNESS:
2          The baby must be crying.
3    MS. SENTER:
4          Thank you.
5    THE WITNESS:
6          You didn't type that, did you?
7    THE REPORTER:
8          (Nodded head affirmatively.)
9    MR. HART:
10         We've been going about an hour.  Do we
11   want to take a five-minute break or --
12   MS. DETO:
13         Sure.
14   MS. BAXTER:
15         Yes.  I vote yes.
16   THE WITNESS:
17         Oh, you want the break?
18   MS. BAXTER:
19         I said "I vote yes."
20   THE VIDEOGRAPHER:
21         The time is 9:59 a.m. and we're going
22   off the record.
23         (Brief recess.)
24   THE VIDEOGRAPHER:
25         We are back on the record.  The time is
```

Page 271

```
1    10:11 a.m.
2    EXAMINATION BY MS. DETO:
3          Q.    Good morning.  My name is Amanda Deto.
4    I have been here yesterday and here we are today.
5    I should be pretty quick, as well.
6                Just a few things.  I know other people
7    have mentioned it, but I tend to talk a little
8    fast, so I'll try to slow down.  But if you don't
9    understand me or my question, please let me know,
10   okay?
11         A.    Okay.
12         Q.    And if I ask you a question and you
13   answer it, I'll assume that you understood the
14   question.  Fair?
15         A.    Fair.
16         Q.    Okay.  So you told us earlier, it might
17   have also been yesterday, that you thought there
18   were about 15 to maybe 18 different brands of
19   trailers, correct?
20         A.    Correct.
21         Q.    And you mentioned that you recalled
22   Great Dane as one of those trailers?
23         A.    Yes.
24         Q.    Okay.  Now, you told us that there were
25   less Great Dane trailers than some of the other
```

Page 272

```
1    brands, true?
2          A.    A little less, yes.
3          Q.    Okay.  Do you recall the first time you
4    saw a Great Dane trailer?
5          A.    Had to be the first year I was there.
6          Q.    Okay.  So that was '79?
7          A.    Yes, ma'am.
8          Q.    Okay.  And do you recall maybe the
9    month?  I know it was awhile ago.
10         A.    No.  It was a long time ago.
11         Q.    And the last time you would have seen a
12   Great Dane trailer there?
13         A.    When I left.
14         Q.    And that was '96?
15         A.    '96.
16         Q.    Okay.  Now, how many Great Dane
17   trailers do you believe were present?  And I'll
18   narrow it down for you.  Just between '79 to '81.
19   And I don't -- if you don't know, it's fair, but if
20   you can provide an estimate.
21         A.    How many I brought through the shop or
22   how many were in the terminal?
23         Q.    Maybe that you brought through the
24   shop.
25         A.    I would say three years' time,
```

Page 273

```
1    hundreds.
2          Q.    Hundreds?  Okay.
3                And you told us that you had never
4    reviewed any manuals, and that includes for Great
5    Dane trailers, correct?
6          A.    Correct.
7          Q.    Okay.  And you also told us that you
8    had never seen any paperwork about the ownership or
9    lease status of trailers; that also is correct for
10   Great Dane?
11         A.    Correct.
12         Q.    Okay.  And you don't know who owned any
13   of the Great Dane trailers?
14         A.    No.
15         Q.    You don't know if any of the Great Dane
16   trailers were leased?
17         A.    I don't know.
18         Q.    Okay.  So you don't have any
19   information about where any of the Great Dane
20   trailers came from originally?
21         A.    I wouldn't know that.
22         Q.    Okay.  Now, if you can estimate for me,
23   what was the size of a Great Dane trailer?
24         A.    A 40 foot by eight foot.
25         Q.    Okay.  And you told us yesterday you
```

J. Keith Poleto
February 20, 2020

Page 274

1  were able to identify a Great Dane trailer because
2  of a big sticker, right?
3      A.    Yeah.  Great Dane had the dog on it.
4      Q.    The dog.  Okay.
5            Do you remember anything else about the
6  sticker?
7      A.    No.  I think it was silver and black
8  with a dog on it.
9      Q.    Okay.  Do you know where it was on the
10 trailer?
11     A.    Great Dane was usually on the front at
12 the top.
13     Q.    Okay.  And when you say the front --
14     A.    The very front.  Not the side front,
15 the front-front.
16     Q.    The front of the trailer?
17     A.    Right.
18     Q.    Okay.  And were the -- now -- skipping
19 around a little bit.  Mr. Brindell -- you don't
20 know if Mr. Brindell ever personally performed work
21 on a Great Dane trailer, correct?
22     A.    I didn't see him, no.
23     Q.    Okay.  And you told me that there were
24 not as many Great Dane trailers as the other
25 brands.  Would you agree that you would have

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 275

1  personally worked on less Great Dane trailers?
2      A.    Less than what?
3      Q.    Than other brands of trailers.
4      A.    Good assumption.
5      Q.    Okay.  Can you tell me the type of
6  Great Dane trailers you worked on?
7      A.    A box container.
8      Q.    A box container.
9            Okay.  Do you happen to recall the
10 serial number for any Great Dane trailers?
11     A.    I wouldn't know that.
12     Q.    I know they're a little crazy.
13           The license plate number for any --
14     A.    I wouldn't know that.
15     Q.    It's been awhile.  I understand.
16           Do you ever recall working on a brand
17 new Great Dane trailer?
18     A.    No.
19     Q.    Okay.  And you don't know how many
20 miles were on any Great Dane trailer you would have
21 worked on?
22     A.    No idea.
23     Q.    Okay.  And you told us you don't know
24 the maintenance history for any of the trailers you
25 worked on, correct?  And that applies to Great

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 276

1  Dane, as well?
2      A.    Correct.
3      Q.    Okay.  And you don't know if any of the
4  parts of any Great Dane trailer you worked on would
5  have been original to the trailer, correct?
6      A.    I wouldn't know that.
7      Q.    Okay.  Did you also do some welding
8  work on Great Dane trailers?
9      A.    Sometimes.
10     Q.    Okay.  How frequently?
11     A.    I don't know that answer.
12     Q.    That's okay.  Maybe monthly?
13     A.    Oh, it would be weekly.
14     Q.    Weekly.  Okay.
15           Any estimate for how many times a week?
16     A.    It's hard to say.
17     Q.    Okay.
18     A.    Ten, 15, I think.
19     Q.    Okay.  And did you also change the
20 lights on any Great Dane trailers?
21     A.    Sometimes.
22     Q.    Sometimes.  Okay.
23           Did you also do wiring work?
24     A.    Sometimes.
25     Q.    Okay.  And working on the landing gears

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

---

J. Keith Poleto
February 20, 2020

Page 277

1  of the Great Dane trailers?
2      A.    Sometimes.
3      Q.    Okay.  And do you specifically recall
4  doing brake, brake jobs on a Great Dane trailer?
5      A.    Yes.
6      Q.    Okay.  And you would do the brake jobs
7  on the Great Dane trailer in the same way as you've
8  already spoken to the other lawyers about; nothing
9  unique for Great Dane, correct?
10     A.    Same way.
11     Q.    Okay.  Now, you wouldn't know the
12 manufacturer of any of the old brake parts you were
13 removing from a Great Dane trailer, correct?
14     A.    Sometimes you would see them and you
15 would see the writing on it, sometimes you
16 wouldn't.
17     Q.    Okay.  And for the time specific to
18 Great Dane that you would be able to see the
19 writing on it, do you recall any of the brands you
20 saw?
21     A.    Carlisle most of the time.
22     Q.    Okay.
23     A.    That was the most common.
24     Q.    And for any of the -- I guess we can do
25 the brake pads you would be putting back into the

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Page 278

```
 1   Great Dane trailer, do you recall any of the
 2   brands?
 3        A.     Carlisle.
 4        Q.     Okay.  I probably can streamline this a
 5   bit.  You don't know where any of the replacement
 6   parts, including the brake pads and brake linings,
 7   would have came from that you would have installed
 8   or removed on a Great Dane trailer?
 9        A.     I wouldn't know where they came from.
10        Q.     Okay.  Now, you cannot testify that Mr.
11   Brindell was ever present when you were working on
12   a Great Dane trailer, correct?
13        A.     Repeat.
14        Q.     Can, can you testify that Mr. Brindell
15   was ever present when you were working --
16        A.     Oh, I'm sure he was.
17        Q.     -- on a Great Dane trailer?
18        A.     I'm sure he was.
19        Q.     And you're sure you were, but do you
20   specifically recall him being present?
21        A.     Yes.
22        Q.     Okay.  Can you testify that Mr.
23   Brindell was ever present during a first-time brake
24   job on a Great Dane trailer?
25        A.     I'm sure he was because he was in the
```

Page 279

```
 1   shop quite, quite a lot.
 2        Q.     Okay.  But you don't have any specific
 3   recollection?
 4   MR. HIBEY:
 5             Objection, form.
 6   THE WITNESS:
 7             Yes.  He was in there.
 8   MS. DETO:
 9             Okay.  And I think that may be all the
10   questions I have for you.  I'll look over my notes,
11   but I will let somebody else go next.
12   MR. HART:
13             Anybody else?
14   MS. DETO:
15             Thank you so much for your time.
16   THE WITNESS:
17             You're welcome.
18   MR. HIBEY:
19             We're done with everybody in the room
20   asking questions except for some follow-up.  Is
21   there anybody on the phone that hasn't asked
22   questions that wants to?
23   MR. HOLMES:
24             No questions.
25   MR. HIBEY:
```

Page 280

```
 1             Thank you.
 2   THE REPORTER:
 3             Is that Mr. Holmes?
 4   MR. HOLMES:
 5             Yes.
 6   THE REPORTER:
 7             Thank you.
 8   MR. STEIN:
 9             This is David Stein.  No questions from
10   me.
11   EXAMINATION BY MR. HART:
12        Q.     Sir, this is Jody Hart again.  I just
13   have a few follow-ups for you.
14             First of all, how many weeks -- back
15   during the '79 through '81 time frame, how many
16   weeks vacation did y'all get?
17        A.     Two weeks, I think.
18        Q.     Okay.  So you would work about 50
19   hours -- I mean, 50 weeks per year minus whatever
20   holidays you got off.  Fair?
21        A.     Yeah.  If you took your vacation.  A
22   lot of us didn't take it if we wanted the extra
23   money.  You had the option.
24        Q.     Did Mr. Brindell, as far as you recall,
25   as a management employee, take his vacation?
```

Page 281

```
 1        A.     I don't recall.  He was there quite a
 2   bit.
 3        Q.     Okay.  And we talked yesterday about
 4   some of the other work besides brake work that
 5   you-all performed in your particular shop, the
 6   landing gear and lights and things like that.  What
 7   percentage of your time, of your overall work time
 8   during that '79 through '81 time period do you
 9   believe that you were performing brake work as
10   opposed to the other work that you were responsible
11   for?
12        A.     I'd say the brake work was 70, 75
13   percent of the time.  That was the most common work
14   we did.
15        Q.     And you testified that there were --
16   and tell me if this is an okay term to use, but
17   basically four teams in that shop, you and
18   Mr. Lockhart being one of them?
19        A.     Correct.
20        Q.     Did Mr. Brindell observe, supervise,
21   whatever term you want to use, the work of the four
22   teams equally?
23        A.     Pretty much.
24        Q.     So, for an eight-hour workday, you
25   testified that he would have been in that shop, you
```

Page 282

```
 1  estimated four hours per day, correct?
 2       A.   Correct.
 3       Q.   Okay.  So that would have been one --
 4  basically, if we look at it as being evenly
 5  divided, he was observing yours and Mr. Lockhart's
 6  work approximately one hour per day?
 7       A.   I guess you could say that.
 8       Q.   And, at the beginning of your
 9  deposition yesterday when plaintiffs' counsel was
10  asking you questions, you made reference to some
11  weeks would be like brake job weeks and -- do you
12  recall what I'm talking about?
13       A.   Yes.
14       Q.   And, on those weeks when you were --
15  well, not -- would you exclusively be performing
16  brake jobs on those weeks?
17       A.   Exclusively.
18       Q.   And those would be the weeks where you
19  estimated a good day was about four brake jobs?
20       A.   A real good day, yes, four.
21       Q.   Okay.  Typically, it would be less than
22  that, three?
23       A.   Three to four, yeah.
24       Q.   Three to four?
25       A.   But most of the time you can do four.
```

Page 283

```
 1       Q.   Okay.
 2       A.   Because when we were doing brake jobs,
 3  they had us on those ten-hour days, and you could
 4  do four in ten hours.
 5       Q.   Okay.  And how often would, would those
 6  exclusive brake-job weeks occur during that '79
 7  through '81 time period?
 8       A.   Quite often.
 9       Q.   Can you be more specific?
10       A.   Seventy-five percent of the time.
11       Q.   Okay.  We talked about some numbers
12  yesterday, and I think you were pretty candid that
13  you were estimating numbers of total brake jobs
14  that he might have been present for.  Fair?
15       A.   Yeah.
16       Q.   If we're looking at 50 weeks per
17  year --
18       A.   Okay.
19       Q.   -- and we're looking at four brake jobs
20  being a good day --
21       A.   Right.
22       Q.   -- then would you agree with me that 50
23  times five days in a week would be 250?
24       A.   I don't have a calculator in front of
25  me.
```

Page 284

```
 1       Q.   Will you take my word for it that --
 2       A.   I'll take your word for it.
 3       Q.   -- 50 times five is 250?
 4       A.   Okay.
 5       Q.   Okay.
 6       A.   Times four -- times four bays, right?
 7       Q.   Yes.  But is it -- and that's a great
 8  question.  Is it fair to say that when you were
 9  performing your work at PRMMI, that you were
10  concerned with yours and Mr. Lockhart's work in
11  paying attention to that?
12       A.   Right.
13       Q.   You certainly weren't paying attention
14  to what particular work the other gentlemen on the
15  other three teams were performing at any given
16  time?
17       A.   Well, we could see what everybody was
18  doing because it was an open shop.  And you walk
19  past each other constantly going to the parts room
20  to get your parts and everything.
21       Q.   And that's, that's fair enough.  And
22  you would certainly see that sometimes they'd be
23  performing a brake job?
24       A.   Yeah.
25       Q.   Okay.  But you certainly wouldn't be
```

Page 285

```
 1  cognizant of their performing a brake job on a
 2  Great Dane trailer, for instance?
 3       A.   I wouldn't know what unit they were
 4  working on.  I'd only know the unit I'm working on,
 5  but I know everybody in the shop would be doing
 6  brake jobs.
 7       Q.   Sure, sure.  Okay.
 8            And so you couldn't sit here and
 9  testify today as to what brands of trailers or
10  brakes or brake shoes the other teams were using
11  because you were paying attention to the job that
12  you and Mr. Lockhart were performing?
13       A.   I wasn't paying attention to what they
14  were doing.  As far as what you're saying, I'd
15  paying attention to mine, but we mostly put
16  Carlisles back on, so I knew they were doing that.
17       Q.   Okay.  But as far as the brand of
18  trailer they were working on.
19       A.   No.  I couldn't say the brand of
20  trailer that they had.
21       Q.   Or the brand of bogie, for that matter?
22       A.   Right.
23       Q.   Okay.  So if we're at 250 for you and
24  Mr. Lockhart in a year -- and it's actually less
25  than that because you weren't exclusively doing
```

Page 286

1  brake jobs.
2       A.    Right.
3       MR. HIBEY:
4            You're at 250 days.  That's where you
5  got to.
6       MR. HART:
7            Oh, okay.  Thank you.
8  EXAMINATION BY MR. HART:
9       Q.    And we're looking at two years -- I
10  think the record will reflect that we've
11  established that the overlap between yours and Mr.
12  Brindell's work was pretty close to two years,
13  okay?
14      A.    (Witness nodded head affirmatively.)
15      Q.    Then that would be 250 days times two
16  years, which is 500 days, fair?  Two times 250 is
17  500?
18      A.    Fair.  I'm that quick.
19      Q.    And he'd be -- and I think you said
20  that about 75 percent of the work, if you looked at
21  the total amount of time, 70 to 75 would be brake
22  jobs?
23      A.    Correct.
24      Q.    So if we take that 500 days and we
25  go 70 -- we give it the bigger number, 75 percent,

Page 287

1  then we're looking 500 days times 75 percent, which
2  is going to be 375, correct?
3       A.    You doing the math.
4       Q.    Take my word for it on that?
5       A.    Yeah.  I'm taking your word for it.
6  How's that?
7       Q.    And, of that work, Mr. Brindell would
8  have been observing you and Mr. Lockhart
9  approximately one-eighth of the time, four teams,
10  he'd be watching you about one hour a day?
11      A.    Something like that, yeah.
12      Q.    And I want to go over a list that I
13  found of brake -- brake -- trailer manufacturers.
14  And you tell -- I know you couldn't remember but a
15  handful, but you said there were 15, 18 or so
16  different brands you worked on.
17            Could you tell me whether each one of
18  these would be ones that you recall working on or
19  you don't recall working on?
20      A.    Sure.
21      Q.    East Manufacturing Company?
22      A.    Who?
23      Q.    East?
24      A.    E-A-S-T?
25      Q.    Yeah.

Page 288

1       A.    I don't remember that one.
2       Q.    What about Felling Trailers?
3       A.    Felling?
4       Q.    Yeah, F-E-L-L-I-N-G.
5       A.    Don't recall.
6       Q.    Fontaine?
7       A.    Yes.  We had some Fontaine.
8       Q.    Heil?
9       A.    Who?
10      Q.    H-E-I-L, Heil --
11      A.    Don't recall.
12      Q.    -- Trailer.
13      A.    Don't recall.
14      Q.    Hyundai?
15      A.    Yes.
16      MS. BAXTER:
17            What is that?
18      MR. HART:
19            Hyundai, Hyundai.  I've never known
20  exactly.
21      THE WITNESS:
22            Hyundai, Hyundai.
23  EXAMINATION BY MR. HART:
24      Q.    Kentucky?
25      A.    Don't recall.

Page 289

1       Q.    MAC Trailer, M-A-C, all caps?
2       A.    Don't recall.
3       Q.    Manac, M-A-N-A-C?
4       A.    Don't recall.
5       Q.    Pitts, P-I-T-T-S?
6       A.    Don't recall that one.
7       Q.    Polar, P-O-L-A-R?
8       A.    Don't recall.
9       Q.    Premier?
10      A.    Don't recall that one.
11      Q.    This one I'm not sure if I can
12  pronounce right, Reitnouer or Reitnouer,
13  R-E-I-T-N-O-U-E-R?
14      A.    Don't recall.
15      Q.    What about Stroughton, Stroughton,
16  S-T-R-O-U-G-H-T-O-N?
17      A.    Don't recall.
18      Q.    Trail King?
19      A.    Don't recall.
20      Q.    Travis Body & Trailer?
21      A.    Yes.
22      Q.    Travis.
23            Vanguard?
24      A.    Yes.
25      Q.    Wabash, W-A-B-A-S-H?

Page 290

```
 1    A.    Don't recall.
 2    Q.    Western?  Western?
 3    A.    Don't recall.
 4    Q.    XPO Logistics?
 5    A.    Don't recall.
 6    Q.    Doepker, D-O-E-P-K-E-R?
 7    A.    Never heard of it.
 8    Q.    And I can't -- I already asked you
 9 about that one.  Okay.
10       So that added, I think four more that
11 we hadn't identified so far in the deposition.
12    A.    Those wasn't real popular ones
13 probably, but I recall the names.
14    Q.    But just like all the other trailer
15 manufacturers that you identified yesterday, I
16 mean, they had to have their brakes changed, too,
17 right?
18    A.    Uh-huh (affirmative response).
19    Q.    Yes?
20    A.    Yes.
21    Q.    And your work, and it wouldn't be
22 evenly divided, but it wouldn't be -- it would be
23 divided amongst these various trailer manufacturers
24 that we've identified over the course of the past
25 two days?
```

Page 291

```
 1    A.    Yes.
 2    Q.    Okay.  And all of those brands would
 3 have been brands of trailers that you would have
 4 worked on back during your initial employment with
 5 PRMMI from '79 to '81?
 6    A.    Yes.
 7    Q.    Would you agree with me, based upon
 8 some of the numbers and the math that we discussed
 9 in the past couple of minutes, that perhaps your
10 estimates yesterday regarding how many hundreds of
11 brake jobs Mr. Brindell may have been present for
12 that you were working on may have been a little bit
13 higher than, than reality?
14    A.    I can't say that.  You, you throwing
15 too many mixed numbers at me.
16    Q.    Okay.  Do you feel confident about the
17 numbers you've given us in terms of the four
18 being -- four brake jobs being a good number of
19 brake jobs to be able to perform in a day?
20    A.    Correct.
21    Q.    And, you know, I think the record will
22 speak for itself as to how many days there are in a
23 year.
24    A.    Correct.
25    Q.    Okay.  And you're confident that you
```

Page 292

```
 1 were at least allowed two weeks of vacation per
 2 year?
 3    A.    Correct.
 4    Q.    And you're confident that, although it
 5 wasn't even, that the work you -- the brake jobs
 6 you performed were spread out over multiple
 7 manufacturers that we've discussed?
 8    A.    Correct.
 9    Q.    And, in fact, the brake jobs you
10 performed were divided amongst not just the
11 manufacturers we've identified yesterday and today
12 during your testimony, but there were also other
13 manufacturers that we haven't been able to identify
14 that you performed brake jobs on during the course
15 of that '79 through '81 time frame?
16    A.    I would presume.
17    Q.    You were asked a question earlier that
18 you gave the response drums -- and I think I'm
19 quoting you correctly, I put quotation marks around
20 it -- "drums that were manufactured for that
21 trailer."
22       Isn't it true that the drums were
23 manufactured for the bogies as opposed -- for the
24 type of bogie that was on the trailer?
25    A.    Pretty much, yeah, for the bogie.  But,
```

Page 293

```
 1 I mean, some trailers had their original bogies on
 2 them.  They wasn't changed.  So it might have been
 3 manufactured for that trailer.
 4    Q.    Do you know that for a fact or is that
 5 an assumption?  And let me, let me tell you where
 6 I'm coming from.  My understanding is these bogies
 7 are somewhat generic and the same bogie would be
 8 used by multiple manufacturers.  Is that incorrect?
 9    A.    Some, some manufacturers have their --
10 you know, their bogie was on their unit, but if
11 they were replaced, they would use a general bogie.
12 So I couldn't tell if they were replaced or not.
13    Q.    And you couldn't tell whether a
14 particular bogie had been specially spec'd out and
15 manufactured for a given trailer manufacturer or
16 whether that same specification bogie was used on
17 multiple trailer manufacturers' products?
18    A.    I can't answer that.
19    Q.    And, while there were certain times
20 that we've discussed where it would be exclusively
21 brake job week, there would be other times that
22 weren't exclusive brake job weeks, correct?
23    A.    There were weeks that you wasn't
24 strictly brake jobs, yeah.
25    Q.    And, on those weeks, you might be
```

Page 294

```
1   performing a brake job, but the, the other teams
2   may be working on some other aspect of the trailer,
3   correct?
4        A.    Yes.  It could be.  Yes.
5        MR. HART:
6              I think that's all I have.  I
7   appreciate your time, sir.
8        MR. HIBEY:
9              Anybody else have follow-up?
10       MS. DETO:
11             I do, but.
12       MS. BAXTER:
13             You go ahead.
14       THE REPORTER:
15             Watch your mic.
16       MR. HART:
17             I'm looking for my power cord.  I knew
18  I had something that was going to mess me up.
19       THE WITNESS:
20             I did the same thing.
21  EXAMINATION BY MS. DETO:
22       Q.    I should be extremely quick.  I just
23  have a few questions for you.  I was looking
24  through my notes.
25             And you told me that you had never
```

Page 295

```
1   worked on a brand new Great Dane trailer and you
2   didn't know the maintenance history for any Great
3   Dane trailer you had worked on.  So it's fair for
4   me to say that you can't say that you are the
5   first person to ever change brakes on a Great Dane
6   trailer, correct?
7        A.    I can't say that, correct.
8        MS. DETO:
9              Okay.  I think that's all.  Thank you
10  very much.
11  EXAMINATION BY MS. BAXTER:
12       Q.    Okay.  Kay Baxter back again.  I don't
13  have a lot of questions.  But, you know, you were
14  asked questions about the type of trailers,
15  gooseneck boxes, flatbed.  For the Strick trailers,
16  can you tell me what type of Strick trailers you
17  recall working on in the time frame when you were
18  there at Puerto Rico Marine with Mr. Brindell?
19       A.    They were box trailers.
20       Q.    Okay.  All of them?
21       A.    Strick?  Yeah, I would say all of them.
22       Q.    And -- excuse me.  And
23  since this is my chance to talk to you, do you have
24  a specific memory -- I realize that -- I think what
25  you've been testifying about is because you know
```

Page 296

```
1   you did the work and you know Mr. Brindell was
2   there, that he would have been around when you were
3   doing a job on a Strick trailer, right?
4        A.    Uh-huh (affirmative response).
5        Q.    So -- yes?
6        A.    Yes.
7        Q.    So my question is:  Do you have a
8   specific memory of working on a Strick trailer when
9   Mr. Brindell was there?  You know, you can say --
10  if we go to trial, you can say, Ms. Baxter, I
11  remember that I was doing such and such a job on
12  this Strick trailer and I remember it because Mr.
13  Brindell was right there and he was talking to me
14  about this or that.  Do you understand?
15       A.    Yeah.
16       Q.    Okay.  Do you have a specific memory of
17  Mr. Brindell being there in the area right behind
18  you when you were working on a Strick trailer?
19       A.    Yes.
20       Q.    Okay.  Can you tell me about that?
21       A.    Tell you about it?
22       Q.    Yes.
23       A.    Yeah.  He was making fun of the name.
24       Q.    Okay.  Do you remember when that was?
25       A.    Oh, I can't tell you that.
```

Page 297

```
1        Q.    Do you remember exactly what you were
2   doing on that Strick trailer when he was making fun
3   of the name?
4        A.    A brake job.
5        Q.    Okay.  And what part of the process
6   were you in on the brake job when he was doing
7   that?
8        A.    I don't remember.
9        Q.    Okay.  So you described the brake job
10  for us, but the only time there's any dust is when
11  you're blowing it out or grinding it; would you
12  agree with that?
13       A.    Yes.
14       Q.    Okay.  And you can't tell me today if
15  Mr. Brindell was making fun of the name when you
16  were grinding or blowing it out, right?
17       A.    I can't tell you.
18       Q.    Okay.  That's what I thought.
19             All right.  When Mr. Brindell called
20  you after he got sick and he called you about his
21  illness, did he talk to you about any bankruptcy
22  trust that he was going to apply to?
23       A.    Uh-uh (negative response).  No.
24       Q.    No?
25             Did he, did he talk to you about any
```

J. Keith Poleto
February 20, 2020

Page 298

1  settlements he anticipated?
2      A.    No.
3      Q.    Okay.  And let me ask this:  How would
4  you describe yourself as, as a worker at Puerto
5  Rico Marine?
6      A.    I was a good worker.
7      Q.    Were you good at your -- the
8  jobs you were assigned, like welding, were you good
9  at that?
10     A.    Yes.
11     Q.    Okay.  And what about brake jobs?
12     A.    I was efficient.
13     Q.    Okay.  Did you -- were you required to
14  redo a lot of your brake jobs?
15     A.    Redo mine?
16     Q.    Yeah.
17     A.    Nope.
18     Q.    Okay.  Did Mr. Brindell ever come to
19  you and say, you're doing that wrong, you've got to
20  redo this?
21     A.    No.
22     Q.    Okay.  So what -- I guess what I'm
23  trying to figure out is why he would spend four
24  hours in the shop.  He would not spend -- as Mr.
25  Hart came, discussed with you, if you divided it

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

J. Keith Poleto
February 20, 2020

Page 299

1  out, to be about an hour a day, you say?
2      A.    Uh-huh (affirmative response).
3      Q.    In your area?
4      A.    Uh-huh (affirmative response).
5      Q.    What would he be doing there for an
6  area -- for an hour?  He would not be telling you
7  how to do your job, was he?
8      A.    He wouldn't be there the entire hour.
9  Four hours out of the day is about the time he
10  spent in the shop, and he would go periodically
11  here or there to each bay, talk to the guys, shoot
12  the bull.
13     Q.    That's what I figured.
14     A.    He didn't like being in an office.
15     Q.    Okay.  So he wasn't standing there over
16  your shoulder trying to tell you how to do your
17  job, right?
18     A.    No.  He knew we knew what we were
19  doing.
20     Q.    And what else was he doing besides just
21  talking to you guys in the shop for four hours --
22  out in the shop?
23     A.    Wandering around talking to everybody.
24     Q.    Okay.  Was there anyone else in that
25  shop area -- well, did he go into parts and talk to

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

J. Keith Poleto
February 20, 2020

Page 300

1  them there?
2      A.    Sometimes.
3      Q.    Okay.  I'm trying to remember what that
4  chart looks like.  I remember the parts department
5  on there.
6      A.    You want it?
7      Q.    Maybe so.
8      A.    (Handing.)
9      Q.    Thank you.  Thank you.
10           All right.  That says power; is that
11  right?
12     A.    Power.  Where they worked on the
13  trucks.
14     Q.    Oh, okay.
15           So when you're saying four hours he
16  was -- a day he was out of his office, would that
17  include the time he went into parts and power?
18     A.    Probably.
19     Q.    Okay.  All right.  Well, and
20  inspection, is that part of it, too?
21     A.    He didn't go out there.
22     Q.    Okay.  He was not over the inspection
23  part?
24     A.    It was out in the elements.  He didn't
25  like going out in the elements.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

J. Keith Poleto
February 20, 2020

Page 301

1      Q.    Okay.  And he had -- but you told us he
2  was over -- and I could be wrong about this.  Was
3  he over all three buildings?
4      A.    Uh-huh (affirmative response).
5      Q.    Yes?
6      A.    Yes.
7      Q.    Okay.  And so he would have -- and
8  would he go to each of those buildings every day?
9      A.    Not very much.
10     Q.    Okay.  Just stayed --
11     A.    He pretty much hung out up in the front
12  shop.
13     Q.    Okay.  All right.  All right.  Okay.
14  Okay.  I was trying to think of -- you don't know
15  the serial number on any Strick trailer you worked
16  on, right?
17     A.    No.
18     Q.    Wouldn't think so.  Just got to ask
19  these questions.
20     MS. BAXTER:
21           And -- that's all I have.
22     THE WITNESS:
23           Thank you.
24     MS. BAXTER:
25           Thank you so much.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Page 302

```
1    THE WITNESS:
2         You can have it (indicating).
3    MR. HART:
4         No, she can't.
5    MR. HIBEY:
6         All right.  Anybody else have
7  questions?
8    MS. ORMSBY:
9         Just one quick one.
10 EXAMINATION BY MS. ORMSBY:
11   Q.   Hi, sir.  I just have one quick
12 follow-up similar to what you sort of testified to
13 with other attorneys regarding trailers.
14        Specifically regarding Fruehauf and
15 Wilson, you can't tell me if you ever removed the
16 original brakes from a Fruehauf or Wilson trailer,
17 can you?
18   A.   I can't say I -- I can't say that.
19 MS. ORMSBY:
20        All right.  Thank you, sir.
21 MR. HIBEY:
22        All right.  That concludes the
23 deposition.
24 MR. HART:
25        Thank you.
```

Page 303

```
1    THE REPORTER:
2         Sir, reading and signing, yes?
3    MR. HIBEY:
4         Yes.
5    THE WITNESS:
6         Take this off?
7    VIDEOGRAPHER:
8         We are going off the record.  The time
9  is 10:43 a.m.
10        (End of deposition.)
```

Page 304

```
1         WITNESS CERTIFICATION
2    I, J. KEITH POLETO, VOLUME II, have read or
3  have had the foregoing testimony read to me and
4  hereby certify that it is a true and correct
5  transcription of my testimony with the exception of
6  the following corrections or changes, if any:
7  Page   Line           Correction
```

```
24        J. KEITH POLETO, VOLUME II
25        REPORTER:  TARA WILSON, CCR
```

Page 305

```
1         REPORTER'S CERTIFICATE
3    This certification is valid only for a
transcript accompanied by my original signature
and original required seal on this page.
5    I, TARA W. WILSON, Certified Court
Reporter, in and for the State of Louisiana, as
the officer before whom this testimony was
taken, do hereby certify that J. Keith Poleto, to
whom oath was administered, after having been duly
7  sworn by me upon authority of R.S. 37:2554, did
testify as hereinbefore set forth in the foregoing
94 pages;
9    That this testimony was reported by me in
the stenotype reporting method, was prepared
and transcribed by me or under my personal
10 direction and supervision, and is a true and
correct transcript to the best of my ability and
11 understanding;
    That the transcript has been prepared in
12 compliance with transcript format guidelines
required by statute or by rules of the Board, and
13 that I am informed about the complete arrangement,
financial or otherwise, with the person or entity
14 making arrangements for deposition services;
    That I have acted in compliance with the
15 prohibition on contractual relationships, as
defined by Louisiana Code of Civil Procedure
16 Article 1434 and in rules and advisory opinions of
the board;
17    That I have no actual knowledge of any
prohibited employment or contractual relationship,
18 direct or indirect, between a court reporting firm
and any party litigant in this matter nor is there
19 any such relationship between myself and a party
litigant in this matter.  I am not related to
20 counsel or to the parties herein, nor am I
otherwise interested in the outcome of this matter.
21    This 28th day of February, 2020, at
Gonzales, Louisiana.

24        TARA W. WILSON, CCR #85133
25        Certified Court Reporter
```

**From:** Kelsey J. Cheek
**To:** abowlin@frilot.com; ADeto@mgmlaw.com; Mandy Dobronich; ALBoutte@christovich.com; asbestos@courington-law.com; Asbestos Group; AsbLitLA@mgmlaw.com; bormsby@deutschkerrigan.com; bsmall@christovich.com; CBurciaga@mgmlaw.com; CMassenburg@mgmlaw.com; CWalther@mcglinchey.com; cwilliams@deutschkerrigan.com; david@staines-eppling.com; dculotta@courington-law.com; dmcglinchey@mcglinchey.com; Daniel E. Oser; douglask@spsr-law.com; Dustin Santos; dwedge@foleymansfield.com; eguidry@frilot.com; Francis X. deBlanc, III; fp-asbestos@frilot.com; jadams@deutschkerrigan.com; JAHolmes@christovich.com; jamesg@spsr-law.com; Jason@staines-eppling.com; jboltin@foleymansfield.com; jdransfield@deutschkerrigan.com; jhainkel@frilot.com; Joseph Hart; JKNieset@christovich.com; jlewis@foleymansfield.com; jriggins@mgmlaw.com; JScott@hmhlp.com; jzanovec@courington-law.com; kbaxter@foleymansfield.com; keagan@frilot.com; khannan@lawla.com; Katie Jordan; Katie Jordan; klightfoot@hmhlp.com; kwilson@lawla.com; LHardke@mcglinchey.com; louiso@spsr-law.com; mkloumassis@deutschkerrigan.com; mpuente@frilot.com; McGready L. Richeson; msenter@mgmlaw.com; Milele St. Julien; NO-Asbestos-all@foleymansfield.com; ppenton@lawla.com; rgarvey@hmhlp.com; rhotard@hmhlp.com; rjenkins@deutschkerrigan.com; rvictoriano@deutschkerrigan.com; semcmillan@mcglinchey.com; sgreen@courington-law.com; Susan Johnson; Stacyv@spsr-law.com; Susan B. Kohn (Suek@spsr-law.com); Tammy Gegenheimer; Tony@staines-eppling.com; Thomas A. Porteous; UCCLAasbestos; wharrison@deutschkerrigan.com; zdieterich@mcglinchey.com
**Cc:** Lindsey A. Cheek; Jeanne St. Romain; Melissa Schopfer; Mike Hibey; "Kelley Hotz"; Kari Frey
**Subject:** Case No. 2019-09716; Carolyn Brindell, et al vs. Carlisle Industrial Brake and Friction, Inc., et al
**Date:** Tuesday, January 28, 2020 12:06:46 PM
**Attachments:** Brindell - NOVD CW DJ Lockhart set 2-13-2020.pdf
Brindell - NOVD CW Keith Poletto set 2-19-2020.pdf

Dear Counsel,

Attached hereto, please find the following Notices of Videotaped Depositions in the above-referenced matter:

-DJ Lockhart set for February 13, 2020 at 2:00pm
-Keith Poletto set for February 19, 2020 at 10:00am

Thank you,



**KELSEY J. CHEEK**
PARALEGAL
650 POYDRAS, SUITE 2310
NEW ORLEANS, LA 70130
TEL: 504-304-4333
FAX: 504-324-0629
WWW.THECHEEKLAWFIRM.COM

The information in this email is intended for the named recipients only. It may contain privileged and confidential matter. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this email in error, please delete the email and notify the sender immediately by replying to this email.

--
[ Block ]  [ Allow ]  [ Report ]

**EXHIBIT G**

From:       Kelsey J. Cheek
To:         abowlin@frilot.com; ADeto@mgmlaw.com; Mandy Dobronich; ALBoutte@christovich.com; asbestos@courington-
            law.com; Asbestos Group; AsbLitLA@mgmlaw.com; bormsby@deutschkerrigan.com; bsmall@christovich.com;
            CBurciaga@mgmlaw.com; CMassenburg@mgmlaw.com; CWalther@mcglinchey.com;
            cwilliams@deutschkerrigan.com; david@staines-eppling.com; dculotta@courington-law.com;
            dmcglinchey@mcglinchey.com; Daniel E. Oser; douglask@spsr-law.com; Dustin Santos;
            dwedge@foleymansfield.com; eguidry@frilot.com; Francis X. deBlanc, III; fp-asbestos@frilot.com; Jason@staines-eppling.com;
            jadams@deutschkerrigan.com; JAHolmes@christovich.com; jamesg@spsr-law.com; Jason@staines-eppling.com;
            jboltin@foleymansfield.com; jdransfield@deutschkerrigan.com; jriggins@mgmlaw.com; JScott@hmhlp.com;
            JKNieset@christovich.com; jlewis@foleymansfield.com; kbaxter@foleymansfield.com; keagan@frilot.com; khannan@lawla.com; Katie
            Jzanovec@courington-law.com; kbaxter@foleymansfield.com; keagan@frilot.com; khannan@lawla.com; Katie
            Jordan; Katie Jordan; klightfoot@hmhlp.com; kwilson@lawla.com; LHardke@mcglinchey.com; louiso@spsr-
            law.com; mkloumassis@deutschkerrigan.com; mpuente@frilot.com; McGready L. Richeson;
            msenter@mgmlaw.com; Milele St. Julien; NQ-Asbestos-all@foleymansfield.com; ppenton@lawla.com;
            rgarvey@hmhlp.com; rhotard@hmhlp.com; rjenkins@deutschkerrigan.com; rvictoriano@deutschkerrigan.com;
            semcmillan@mcglinchey.com; sgreen@courington-law.com; Susan Johnson; Stacyv@spsr-law.com; Susan B.
            Kohn (Suek@spsr-law.com); Tammy Gegenheimer; Tony@staines-eppling.com; Thomas A. Porteous;
            UCCLAasbestos; wharrison@deutschkerrigan.com; zdieterich@mcglinchey.com
Cc:         Lindsey A. Cheek; Jeanne St. Romain; Melissa Schopfer (mschopfer@simmonsfirm.com); Mike Hibey; Kelley Hotz
            (khotz@simmonsfirm.com); Kari Frey
Subject:    RE: Case No. 2019-09716; Carolyn Brindell, et al vs. Carlisle Industrial Brake and Friction, Inc., et al
Date:       Thursday, January 30, 2020 10:22:59 AM

Dear Counsel,

Please be advised DJ Lockhart and Keith Poletto are both coworkers of Mr. Brindell's who worked
with Mr. Brindell at Puerto Rico Marine in the 1970s and 1980s. They will testify about Mr. Brindell's
work exposures at Puerto Rico Marine in the 1970s and 1980s. Lockhart lives in Bush, Louisiana at
81500 Bob Baxter Road and Poletto lives in Westwego, LA at 114 Oak Court.

Thank you,



**KELSEY J. CHEEK**
PARALEGAL
650 POYDRAS, SUITE 2310
NEW ORLEANS, LA 70130
TEL: 504-304-4333
FAX: 504-324-0629
WWW.THECHEEKLAWFIRM.COM

The information in this email is intended for the named recipients only. It may contain privileged and confidential matter. If
you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited.
If you have received this email in error, please delete the email and notify the sender immediately by replying to this email.

**From:** Kelsey J. Cheek
**Sent:** Tuesday, January 28, 2020 12:07 PM
**To:** abowlin@frilot.com; ADeto@mgmlaw.com; adobronich@pugh-law.com;
ALBoutte@christovich.com; asbestos@courington-law.com; asbestos@pugh-law.com;
AsbLitLA@mgmlaw.com; bormsby@deutschkerrigan.com; bsmall@christovich.com;
CBurciaga@mgmlaw.com; CMassenburg@mgmlaw.com; CWalther@mcglinchey.com;
cwilliams@deutschkerrigan.com; david@staines-eppling.com; dculotta@courington-law.com;
dmcglinchey@mcglinchey.com; doser@pugh-law.com; douglask@spsr-law.com; dsantos@pugh-
law.com; dwedge@foleymansfield.com; eguidry@frilot.com; fdeblanc@pugh-law.com; fp-
asbestos@frilot.com; jadams@deutschkerrigan.com; JAHolmes@christovich.com; jamesg@spsr-

law.com; Jason@staines-eppling.com; jboltin@foleymansfield.com;
jdransfield@deutschkerrigan.com; jhainkel@frilot.com; jhart@pugh-law.com;
JKNieset@christovich.com; jlewis@foleymansfield.com; jriggins@mgmlaw.com; JScott@hmhlp.com;
jzanovec@courington-law.com; kbaxter@foleymansfield.com; keagan@frilot.com;
khannan@lawla.com; kjordan@pugh-law.com; kjordan@pugh-law.com; klightfoot@hmhlp.com;
kwilson@lawla.com; LHardke@mcglinchey.com; louiso@spsr-law.com;
mkloumassis@deutschkerrigan.com; mpuente@frilot.com; mricheson@pugh-law.com;
msenter@mgmlaw.com; mstjulien@pugh-law.com; NO-Asbestos-all@foleymansfield.com;
ppenton@lawla.com; rgarvey@hmhlp.com; rhotard@hmhlp.com; rjenkins@deutschkerrigan.com;
rvictoriano@deutschkerrigan.com; semcmillan@mcglinchey.com; sgreen@courington-law.com;
sjohnson@pugh-law.com; Stacyv@spsr-law.com; Susan B. Kohn (Suek@spsr-law.com) <Suek@spsr-
law.com>; tgegenheimer@pugh-law.com; Tony@staines-eppling.com; tporteous@pugh-law.com;
UCCLAAsbestos@pugh-law.com; wharrison@deutschkerrigan.com; zdieterich@mcglinchey.com
**Cc:** Lindsey A. Cheek <lcheek@thecheeklawfirm.com>; Jeanne St. Romain
<JStromain@thecheeklawfirm.com>; Melissa Schopfer <mschopfer@simmonsfirm.com>; Mike
Hibey <mhibey@simmonsfirm.com>; 'Kelley Hotz' <khotz@simmonsfirm.com>; Kari Frey
<kfrey@simmonsfirm.com>
**Subject:** Case No. 2019-09716; Carolyn Brindell, et al vs. Carlisle Industrial Brake and Friction, Inc., et
al

Dear Counsel,

Attached hereto, please find the following Notices of Videotaped Depositions in the above-
referenced matter:

-DJ Lockhart set for February 13, 2020 at 2:00pm
-Keith Poletto set for February 19, 2020 at 10:00am

Thank you,



**KELSEY J. CHEEK**
PARALEGAL
650 POYDRAS, SUITE 2310
NEW ORLEANS, LA 70130
TEL: 504-304-4333
FAX: 504-324-0629
WWW.THECHEEKLAWFIRM.COM

The information in this email is intended for the named recipients only. It may contain privileged and confidential matter. If
you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited.
If you have received this email in error, please delete the email and notify the sender immediately by replying to this email.

**From:** Kelsey J. Cheek
**To:** abowlin@frilot.com; ADeto@mgmlaw.com; Mandy Dobronich; ALBoutte@christovich.com; asbestos@courington-law.com; Asbestos Group; AsbLitLA@mgmlaw.com; bormsby@deutschkerrigan.com; bsmall@christovich.com; CBurciaga@mgmlaw.com; CMassenburg@mgmlaw.com; CWalther@mcglinchey.com; cwilliams@deutschkerrigan.com; david@staines-eppling.com; dculotta@courington-law.com; dmcglinchey@mcglinchey.com; Daniel E. Oser; douglask@spsr-law.com; Dustin Santos; dwedge@foleymansfield.com; equidry@frilot.com; Francis X. deBlanc, III; fp-asbestos@frilot.com; jadams@deutschkerrigan.com; JAHolmes@christovich.com; jamesg@spsr-law.com; Jason@staines-eppling.com; jboltin@foleymansfield.com; jdransfield@deutschkerrigan.com; jhainkel@frilot.com; Joseph Hart; JKNieset@christovich.com; jlewis@foleymansfield.com; jriggins@mgmlaw.com; JScott@hmhlp.com; jzanovec@courington-law.com; kbaxter@foleymansfield.com; keagan@frilot.com; khannan@lawla.com; Katie Jordan; Katie Jordan; klightfoot@hmhlp.com; kwilson@lawla.com; LHardke@mcglinchey.com; louiso@spsr-law.com; mkloumassis@deutschkerrigan.com; mpuente@frilot.com; McGready L. Richeson; msenter@mgmlaw.com; Milele St. Julien; NO-Asbestos-all@foleymansfield.com; ppenton@lawla.com; rgarvey@hmhlp.com; rhotard@hmhlp.com; rjenkins@deutschkerrigan.com; rvictoriano@deutschkerrigan.com; semcmillan@mcglinchey.com; soreen@courington-law.com; Susan Johnson; Stacyvi@spsr-law.com; Susan B. Kohn (Suek@spsr-law.com); Tammy Gegenheimer; Tony@staines-eppling.com; Thomas A. Porteous; UCCLAasbestos; wharrison@deutschkerrigan.com; zdieterich@mcglinchey.com
**Cc:** Lindsey A. Cheek; Jeanne St. Romain; Melissa Schopfer (mschopfer@simmonsfirm.com); Mike Hibey; Kelley Hotz (khotz@simmonsfirm.com); Kari Frey; JM Lecointre (jlecointre@simmonsfirm.com)
**Subject:** RE: Case No. 2019-09716; Carolyn Brindell, et al vs. Carlisle Industrial Brake and Friction, Inc., et al
**Date:** Wednesday, February 12, 2020 12:52:41 PM
**Attachments:** Brindell - NOVD CW DJ Lockhart set 2-13-2020.pdf

Dear Counsel,

Please be advised the attached/below deposition of DJ Lockhart scheduled for February 13, 2020 will **not** be going forward at this time.

Thank you,

 THE CHEEK LAW FIRM LLC

**KELSEY J. CHEEK**
PARALEGAL
650 POYDRAS, SUITE 2310
NEW ORLEANS, LA 70130
TEL: 504-304-4333
FAX: 504-324-0629
WWW.THECHEEKLAWFIRM.COM

The information in this email is intended for the named recipients only. It may contain privileged and confidential matter. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this email in error, please delete the email and notify the sender immediately by replying to this email.

**From:** Kelsey J. Cheek
**Sent:** Thursday, January 30, 2020 10:21 AM
**To:** 'abowlin@frilot.com' <abowlin@frilot.com>; 'ADeto@mgmlaw.com' <ADeto@mgmlaw.com>; 'adobronich@pugh-law.com' <adobronich@pugh-law.com>; 'ALBoutte@christovich.com' <ALBoutte@christovich.com>; 'asbestos@courington-law.com' <asbestos@courington-law.com>; 'asbestos@pugh-law.com' <asbestos@pugh-law.com>; 'AsbLitLA@mgmlaw.com' <AsbLitLA@mgmlaw.com>; 'bormsby@deutschkerrigan.com' <bormsby@deutschkerrigan.com>; 'bsmall@christovich.com' <bsmall@christovich.com>; 'CBurciaga@mgmlaw.com' <CBurciaga@mgmlaw.com>; 'CMassenburg@mgmlaw.com' <CMassenburg@mgmlaw.com>; 'CWalther@mcglinchey.com' <CWalther@mcglinchey.com>; 'cwilliams@deutschkerrigan.com' <cwilliams@deutschkerrigan.com>; 'david@staines-eppling.com' <david@staines-eppling.com>; 'dculotta@courington-law.com' <dculotta@courington-law.com>; 'dmcglinchey@mcglinchey.com'

**EXHIBIT H**

<dmcglinchey@mcglinchey.com>; 'doser@pugh-law.com' <doser@pugh-law.com>; 'douglask@spsr-law.com' <douglask@spsr-law.com>; 'dsantos@pugh-law.com' <dsantos@pugh-law.com>; 'dwedge@foleymansfield.com' <dwedge@foleymansfield.com>; 'eguidry@frilot.com' <eguidry@frilot.com>; 'fdeblanc@pugh-law.com' <fdeblanc@pugh-law.com>; 'fp-asbestos@frilot.com' <fp-asbestos@frilot.com>; 'jadams@deutschkerrigan.com' <jadams@deutschkerrigan.com>; 'JAHolmes@christovich.com' <JAHolmes@christovich.com>; 'jamesg@spsr-law.com' <jamesg@spsr-law.com>; 'Jason@staines-eppling.com' <Jason@staines-eppling.com>; 'jboltin@foleymansfield.com' <jboltin@foleymansfield.com>; 'jdransfield@deutschkerrigan.com' <jdransfield@deutschkerrigan.com>; 'jhainkel@frilot.com' <jhainkel@frilot.com>; 'jhart@pugh-law.com' <jhart@pugh-law.com>; 'JKNieset@christovich.com' <JKNieset@christovich.com>; 'jlewis@foleymansfield.com' <jlewis@foleymansfield.com>; 'jriggins@mgmlaw.com' <jriggins@mgmlaw.com>; 'JScott@hmhlp.com' <JScott@hmhlp.com>; 'jzanovec@courington-law.com' <jzanovec@courington-law.com>; 'kbaxter@foleymansfield.com' <kbaxter@foleymansfield.com>; 'keagan@frilot.com' <keagan@frilot.com>; 'khannan@lawla.com' <khannan@lawla.com>; 'kjordan@pugh-law.com' <kjordan@pugh-law.com>; 'kjordan@pugh-law.com' <kjordan@pugh-law.com>; 'klightfoot@hmhlp.com' <klightfoot@hmhlp.com>; 'kwilson@lawla.com' <kwilson@lawla.com>; 'LHardke@mcglinchey.com' <LHardke@mcglinchey.com>; 'louiso@spsr-law.com' <louiso@spsr-law.com>; 'mkloumassis@deutschkerrigan.com' <mkloumassis@deutschkerrigan.com>; 'mpuente@frilot.com' <mpuente@frilot.com>; 'mricheson@pugh-law.com' <mricheson@pugh-law.com>; 'msenter@mgmlaw.com' <msenter@mgmlaw.com>; 'mstjulien@pugh-law.com' <mstjulien@pugh-law.com>; 'NO-Asbestos-all@foleymansfield.com' <NO-Asbestos-all@foleymansfield.com>; 'ppenton@lawla.com' <ppenton@lawla.com>; 'rgarvey@hmhlp.com' <rgarvey@hmhlp.com>; 'rhotard@hmhlp.com' <rhotard@hmhlp.com>; 'rjenkins@deutschkerrigan.com' <rjenkins@deutschkerrigan.com>; 'rvictoriano@deutschkerrigan.com' <rvictoriano@deutschkerrigan.com>; 'semcmillan@mcglinchey.com' <semcmillan@mcglinchey.com>; 'sgreen@courington-law.com' <sgreen@courington-law.com>; 'sjohnson@pugh-law.com' <sjohnson@pugh-law.com>; 'Stacyv@spsr-law.com' <Stacyv@spsr-law.com>; Susan B. Kohn (Suek@spsr-law.com) <Suek@spsr-law.com>; 'tgegenheimer@pugh-law.com' <tgegenheimer@pugh-law.com>; 'Tony@staines-eppling.com' <Tony@staines-eppling.com>; 'tporteous@pugh-law.com' <tporteous@pugh-law.com>; 'UCCLAAsbestos@pugh-law.com' <UCCLAAsbestos@pugh-law.com>; 'wharrison@deutschkerrigan.com' <wharrison@deutschkerrigan.com>; 'zdieterich@mcglinchey.com' <zdieterich@mcglinchey.com>
**Cc:** Lindsey A. Cheek <lcheek@thecheeklawfirm.com>; Jeanne St. Romain <JStromain@thecheeklawfirm.com>; Melissa Schopfer (mschopfer@simmonsfirm.com) <mschopfer@simmonsfirm.com>; 'Mike Hibey' <mhibey@simmonsfirm.com>; Kelley Hotz (khotz@simmonsfirm.com) <khotz@simmonsfirm.com>; 'Kari Frey' <kfrey@simmonsfirm.com>
**Subject:** RE: Case No. 2019-09716; Carolyn Brindell, et al vs. Carlisle Industrial Brake and Friction, Inc., et al

Dear Counsel,

Please be advised DJ Lockhart and Keith Poletto are both coworkers of Mr. Brindell's who worked with Mr. Brindell at Puerto Rico Marine in the 1970s and 1980s. They will testify about Mr. Brindell's work exposures at Puerto Rico Marine in the 1970s and 1980s. Lockhart lives in Bush, Louisiana at

81500 Bob Baxter Road and Poletto lives in Westwego, LA at 114 Oak Court.

Thank you,



**KELSEY J. CHEEK**
PARALEGAL
650 POYDRAS, SUITE 2310
NEW ORLEANS, LA 70130
TEL: 504-304-4333
FAX: 504-324-0629
WWW.THECHEEKLAWFIRM.COM

The information in this email is intended for the named recipients only. It may contain privileged and confidential matter. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this email in error, please delete the email and notify the sender immediately by replying to this email.

**From:** Kelsey J. Cheek
**Sent:** Tuesday, January 28, 2020 12:07 PM
**To:** abowlin@frilot.com; ADeto@mgmlaw.com; adobronich@pugh-law.com; ALBoutte@christovich.com; asbestos@courington-law.com; asbestos@pugh-law.com; AsbLitLA@mgmlaw.com; bormsby@deutschkerrigan.com; bsmall@christovich.com; CBurciaga@mgmlaw.com; CMassenburg@mgmlaw.com; CWalther@mcglinchey.com; cwilliams@deutschkerrigan.com; david@staines-eppling.com; dculotta@courington-law.com; dmcglinchey@mcglinchey.com; doser@pugh-law.com; douglask@spsr-law.com; dsantos@pugh-law.com; dwedge@foleymansfield.com; eguidry@frilot.com; fdeblanc@pugh-law.com; fp-asbestos@frilot.com; jadams@deutschkerrigan.com; JAHolmes@christovich.com; jamesg@spsr-law.com; Jason@staines-eppling.com; jboltin@foleymansfield.com; jdransfield@deutschkerrigan.com; jhainkel@frilot.com; jhart@pugh-law.com; JKNieset@christovich.com; jlewis@foleymansfield.com; jriggins@mgmlaw.com; JScott@hmhlp.com; jzanovec@courington-law.com; kbaxter@foleymansfield.com; keagan@frilot.com; khannan@lawla.com; kjordan@pugh-law.com; kjordan@pugh-law.com; klightfoot@hmhlp.com; kwilson@lawla.com; LHardke@mcglinchey.com; louiso@spsr-law.com; mkloumassis@deutschkerrigan.com; mpuente@frilot.com; mricheson@pugh-law.com; msenter@mgmlaw.com; mstjulien@pugh-law.com; NO-Asbestos-all@foleymansfield.com; ppenton@lawla.com; rgarvey@hmhlp.com; rhotard@hmhlp.com; rjenkins@deutschkerrigan.com; rvictoriano@deutschkerrigan.com; semcmillan@mcglinchey.com; sgreen@courington-law.com; sjohnson@pugh-law.com; Stacyv@spsr-law.com; Susan B. Kohn (Suek@spsr-law.com) <Suek@spsr-law.com>; tgegenheimer@pugh-law.com; Tony@staines-eppling.com; tporteous@pugh-law.com; UCCLAAsbestos@pugh-law.com; wharrison@deutschkerrigan.com; zdieterich@mcglinchey.com
**Cc:** Lindsey A. Cheek <lcheek@thecheeklawfirm.com>; Jeanne St. Romain <JStromain@thecheeklawfirm.com>; Melissa Schopfer <mschopfer@simmonsfirm.com>; Mike Hibey <mhibey@simmonsfirm.com>; 'Kelley Hotz' <khotz@simmonsfirm.com>; Kari Frey <kfrey@simmonsfirm.com>
**Subject:** Case No. 2019-09716; Carolyn Brindell, et al vs. Carlisle Industrial Brake and Friction, Inc., et al

Dear Counsel,

Attached hereto, please find the following Notices of Videotaped Depositions in the above-referenced matter:

-DJ Lockhart set for February 13, 2020 at 2:00pm
-Keith Poletto set for February 19, 2020 at 10:00am

Thank you,

 THE
CHEEK
LAW FIRM LLC

**KELSEY J. CHEEK**
PARALEGAL
650 POYDRAS, SUITE 2310
NEW ORLEANS, LA 70130
TEL: 504-304-4333
FAX: 504-324-0629
WWW.THECHEEKLAWFIRM.COM

The information in this email is intended for the named recipients only. It may contain privileged and confidential matter. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this email in error, please delete the email and notify the sender immediately by replying to this email.

| | |
|---|---|
| **From:** | Chelsea Nabers |
| **To:** | Joseph Hart |
| **Subject:** | J. Keith Poleto (Vol. 1) - 02-19-2020 |
| **Date:** | Monday, March 2, 2020 11:47:58 AM |
| **Attachments:** | image001.png |

Re: **Carolyn Brindell, et al. vs. Carlisle Industrial Brake and Friction, Inc., et al.**

Hello,

The transcript concerning the deposition of J. Keith Poleto (Vol. 1) taken February 19, 2020 has been prepared. Would you like to receive a copy? If so, please indicated your preferred format; i.e., paper copy or electronic.

Thank you,

Chelsea Nabers
Production Department

Paszkiewicz
court reporting
& records retrieval

Ph: 618-307-9320 / Toll-free: 855-595-3577 / Fax: 618-855-9513
www.spreporting.com / chelsea@spreporting.com

🖐 **Please consider the environment before printing this e-mail**
The content of this e-mail is intended solely for the use of the Individual or entity to whom it is addressed. If you have received this communication in error, be aware that forwarding it, copying it, or in any way disclosing its content to any other person, is strictly prohibited. If you have received this communication in error, please notify the author by replying to this e-mail immediately.

**EXHIBIT I**

| | |
|---|---|
| **From:** | Chelsea Nabers |
| **To:** | Joseph Hart |
| **Subject:** | J. Keith Poleto (Vol. 2) - 02-20-2020 |
| **Date:** | Monday, March 2, 2020 11:29:13 AM |
| **Attachments:** | image001.png |

Re: **Carolyn Brindell, et al. vs. Carlisle Industrial Brake and Friction, Inc., et al.**

Hello,

The transcript concerning the deposition of J. Keith Poleto (Vol. 2) taken February 20, 2020 has been prepared. Would you like to receive a copy? If so, please indicated your preferred format; i.e., paper copy or electronic.

Thank you,

Chelsea Nabers
Production Department

*aszkiewicz
court reporting
& records retrieval
Ph: 618-307-9320 / Toll-free:  855-595-3577 / Fax: 618-855-9513
www.spreporting.com / chelsea@spreporting.com

🖨️ **Please consider the environment before printing this e-mail**
The content of this e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you have received this communication in error, be aware that forwarding it, copying it, or in any way disclosing its content to any other person, is strictly prohibited. If you have received this communication in error, please notify the author by replying to this e-mail immediately.

--
[ Block ]  [ Allow ]  [ Report ]

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC'S CONSENT TO REMOVAL

With full reservation of any and all defenses, objections, and exceptions, Carlisle Industrial Brake and Friction, Inc., through undersigned counsel, hereby consents to the Notice of Removal filed by Eaton Corporation, removing *"Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc."* Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana.

Carlisle Industrial Brake and Friction, Inc. was at the time suit was instituted against it and is now a Delaware corporation with its principal place of business in Ohio.

New Orleans, Louisiana, this 2 day of February, 2021.

[SIGNATURE BLOCK ON NEXT PAGE]

1

**EXHIBIT J**

FRILOT L.L.C.

_____

**JOHN J. HAINKEL, III – 18246**
**ANGELA M. BOWLIN – 20714**
**JAMES H. BROWN, JR. – 3564**
**MAGALI A. PUENTE MARTIN – 27279**
**KELSEY A. EAGAN – 35764**
**KELLY L. LONG – 34945**
**LACEY T. MCCOY – 37790**
**ROTH M. HAINKEL – 38765**
3700 Energy Centre, 1100 Poydra Street
New Orleans, Louisiana 70163
T: (504) 599-8000; F: (504) 599-8100

**COUNSEL FOR CARLISLE INDUSTRIAL**
**BRAKE AND FRICTION, INC.**

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |

**\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \***

## EATON CORPORATION'S CONSENT TO REMOVAL

With full reservation of any and all defenses, objections, and exceptions, Eaton Corporation, through undersigned counsel, hereby consents to Its Notice of Removal, removing "*Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc.*" Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana.

Eaton Corporation was at the time suit was instituted against it and is now an Ohio corporation with its principal place of business in Ohio.

New Orleans, Louisiana, this ___ day of February, 2021.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

1

**Exhibit K**

**MG+M LAW FIRM**

Christopher O. Massenburg (LSBA No. 26989)
Jeanette S. Riggins (LSBA No. 27056)
B. Adam Hays (LSBA No. 30255)
Meghan B. Senter (LSBA No. 34088)
Amanda L. Deto (LSBA No. 38190)

One Canal Place
365 Canal Street, Suite 3000
New Orleans, Louisiana 70130
Phone: (504) 535-2880
Fax:    (504) 535-2886
Email:  AsbLitLA@mgmlaw.com

**ATTORNEYS FOR EATON CORPORATION**

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>GREAT DANE LLC'S CONSENT TO REMOVAL</u>

With full reservation of any and all defenses, objections, and exceptions, Great Dane LLC, through undersigned counsel, hereby consents to the Notice of Removal filed by Eaton Corporation and other removing defendants, removing *"Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc."* Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana.

Great Dane LLC was at the time suit was instituted against it and is now a Delaware limited liability company.  Great Dane LLC has three members:

(1) Trailer Investors LLC, an Illinois limited liability company with eighty-eight (88) members:

    a.  Thirty-four (34) of the members are trusts, the trustee of which is an individual who is a citizen of the State of Illinois;

    b.  Fifty-three (53) of the members are trusts, the trustee of which is Longview Trust Company LLC, a South Dakota limited liability company;

1

Exhibit L

        *i.* The members of the Longview Trust Company LLC are one individual who is a citizen of the State of Arizona, two individuals who are citizens of the State of California, one individual who is a citizen of the State of Colorado, ten individuals who are citizens of the State of Illinois, two individuals who are citizens of the State of New York, and one individual who is a citizen of the State of Massachusetts;

    c. One of the members is Two Point Zero LLC, a Delaware limited liability company with seventeen (17) members, which are trusts, the trustee of which is an individual who is a citizen of the State of Illinois

(2) Pines S LLC, is an Illinois limited liability company with twenty-five (25) members:

    a. One of the members is an individual, who is a citizen of the State of Illinois;

    b. Twenty-four (24) of the members are trusts, the trustee of which is an individual who is a citizen of the State of Illinois;

(3) The third member of Great Dane LLC is HCNI I LLC, an Illinois limited liability company with thirty-seven (37) members:

    a. Two of the members are individuals, each of whom is a citizen of the State of Illinois;

    b. Thirty-four (34) of the members are trusts, the trustee of which is an individual who is a citizen of the State of Illinois;

    c. One of the members is HCC Manager LLC, an Illinois limited liability company with three members, two of whom are individuals who are citizens of the State of Illinois and one of whom is an individual who is a citizen of the State of California.

New Orleans, Louisiana, this 2nd day of February, 2021.

**MG+M LAW FIRM**

Christopher O. Massenburg (LSBA No. 26989)
Jeanette S. Riggins (LSBA No. 27056)
B. Adam Hays (LSBA No. 30255)
Meghan B. Senter (LSBA No. 34088)
Amanda L. Deto (LSBA No. 38190)

One Canal Place
365 Canal Street, Suite 3000
New Orleans, Louisiana 70130
Phone: (504) 535-2880
Fax:    (504) 535-2886
Email:  AsbLitLA@mgmlaw.com

**ATTORNEYS FOR GREAT DANE LLC**

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CRA TRAILERS, INC.'S CONSENT TO REMOVAL

With full reservation of any and all defenses, objections, and exceptions, CRA Trailers, Inc., f/k/a Great Dane Trailers, Inc., through undersigned counsel, hereby consents to the Notice of Removal filed by Eaton Corporation, removing "*Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc.*" Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana.

CRA Trailers, Inc. was at the time suit was instituted against it and is now a Georgia corporation with its principal place of business in Georgia.

New Orleans, Louisiana, this 2nd day of February, 2021.

[SIGNATURE BLOCK ON NEXT PAGE]

1

**EXHIBIT M**

**MG+M LAW FIRM**

Christopher O. Massenburg (LSBA No. 26989)
Jeanette S. Riggins (LSBA No. 27056)
B. Adam Hays (LSBA No. 30255)
Meghan B. Senter (LSBA No. 34088)
Amanda L. Deto (LSBA No. 38190)

One Canal Place
365 Canal Street, Suite 3000
New Orleans, Louisiana 70130
Phone: (504) 535-2880
Fax:    (504) 535-2886
Email:  AsbLitLA@mgmlaw.com

**ATTORNEYS FOR CRA TRAILERS, INC.,
F/K/A GREAT DANE TRAILERS, INC.**

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### <u>ZF ACTIVE SAFETY US INC. F/K/A KELSEY-HAYES COMPANY'S CONSENT TO REMOVAL</u>

With full reservation of any and all defenses, objections, and exceptions, ZF Active Safety US Inc. f/k/a Kelsey-Hayes Company, through undersigned counsel, hereby consents to the Notice of Removal filed by Eaton Corporation, removing "*Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc.*" Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana.

ZF Active Safety US Inc. f/k/a Kelsey-Hayes Company was at the time suit was instituted against it and is now a Delaware corporation with its principal place of business in Michigan. Further, prior to Kelsey-Hayes Company changing its name to ZF Active Safety US Inc., which took place prior to the filing of Plaintiffs' Petition in state court, Kelsey-Hayes Company was a Delaware corporation with its principal place of business in Michigan. By responding to Plaintiffs' Petition and consenting to removal as ZF Active Safety US Inc. (f/k/a Kelsey-Hayes Company), this defendant is not substituting parties; rather, it is appearing in the current name of the company joined by Plaintiffs as a defendant to this matter.

1

**EXHIBIT N**

New Orleans, Louisiana, this 2nd day of February, 2021.

**DEUTSCH KERRIGAN, L.L.P.**

**JENNIFER E. ADAMS          #26588**
**WILLIAM C. HARRISON, JR.    #6616**
**BARBARA B. ORMSBY       #27388**
**AMBER B. BARLOW          #34433**
755 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-5141
Facsimile: (504) 566-1201

Attorneys for Defendant, ZF Active Safety US Inc.
(f/k/a Kelsey-Hayes Company)

2

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |

* * * * * * * * * * * * * * * * * * * * * * * * *

### LUFKIN GEARS LLC, FORMERLY KNOWN AS LUFKIN INDUSTRIES, LLC'S CONSENT TO REMOVAL

With full reservation of any and all defenses, objections, and exceptions, Lufkin Gears, LLC, formerly known as Lufkin Industries, LLC (hereinafter "Lufkin"), through undersigned counsel, hereby consents to the Notice of Removal filed by Eaton Corporation, removing "*Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc.*" Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana. Lufkin was at the time suit was instituted against it and is now a Texas limited liability company. Lufkin's only member is Druck, LLC. The only member of Druck, LLC is Baker Hughes, a GE company, LLC, which is a Delaware limited liability company. The members of Baker Hughes, a GE company, LLC are: (1) GE Oil & Gas Holdings I, Inc., which is a Delaware corporation with its principal place of business in Ohio, (2) EHHC NewCo, LLC, which is a Delaware limited liability company whose only member is Baker Huges, a GE Company, LLC (the citizenship of which is described herein), (3) Baker Hughes Company, a Delaware corporation with its principal place of business in Texas, and (4)

1

**EXHIBIT O**

CFC Holdings LLC, a Delaware limited liability company whose only member is EHHC NewCo, LLC (the citizenship of which is described above).

New Orleans, Louisiana, this 2nd day of February, 2021.

> **COURINGTON, KIEFER, SOMMERS, MARULLO AND MATHERNE, LLC**
>
> Kaye N. Courington (#18582)
> Jamie M. Zanovec (#29995)
> 616 Girod Street
> New Orleans, Louisiana 70130
> Phone: (504) 524-5510
> Fax:    (504) 524-7887
> Email:  kcourington@courington-law.com
>            jzanovec@courington-law.com
>
> *ATTORNEYS FOR LUFKIN GEARS LLC, FORMERLY KNOWN AS LUFKIN INDUSTRIES, LLC*

2

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

## PNEUMO ABEX, LLC'S CONSENT TO REMOVAL

With full reservation of any and all defenses, objections, and exceptions, Pneumo Abex, LLC, through undersigned counsel, hereby consents to the Notice of Removal filed by Eaton Corporation, removing *"Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc."* Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana. Pneumo Abex, LLC was at the time suit was instituted against it and is now a limited liability company whose sole member is the Pneumo Abex Asbestos Claims Settlement Trust, which is a Delaware statutory trust, and is an IRS qualified settlement fund.  For purposes of citizenship, the trustees of the Pneumo Abex Asbestos Claims Settlement Trust are residents of, and are domiciled in, Maryland, Pennsylvania, and Delaware. Pneumo Abex LLC is the beneficiary of the Pneumo Abex Asbestos Claims Settlement Trust.  No individual, or entity, has any form of beneficial ownership interest in the Pneumo Abex Asbestos Claims Settlement Trust.  The principal place of business for Pneumo Abex LLC is Spring, TX. The principal place of business for the Pneumo Abex Asbestos Claims Settlement Trust is Delaware.

New Orleans, Louisiana, this 2nd day of February, 2021.

1

**Exhibit P**

Respectfully submitted,

**DEUTSCH KERRIGAN, L.L.P.**

William C. Harrison    #  6616
Jennifer E. Adams       #26588
Barbara B. Ormsby      #27388
Amber B. Barlow         #34433
abarlow@deutschkerrigan.com
wharrison@deutschkerrigan.com
jadams@deutschkerrigan.com
bormsby@deutschkerrigan.com
755 Magazine Street
New Orleans, Louisiana 70130
Telephone: 504 581 5141
Facsimile: 504 566 1201
**Attorneys for Defendant,**
**Pneumo Abex, LLC**

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION NO:** _____ |
| | * | |
| **v.** | * | **SECTION " "** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **JUDGE:** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **MAG. JUDGE:** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### STRICK TRAILERS LLC'S CONSENT TO REMOVAL

With full reservation of any and all defenses, objections, and exceptions, Strick Trailers LLC, through undersigned counsel, hereby consents to the Notice of Removal filed by Eaton Corporation, removing *"Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc."* Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana. Strick Trailers LLC was, at the time this suit was instituted against it, and is now a Delaware limited liability company with its principle place of business as the Commonwealth of Pennsylvania. Strick Trailers LLC's sole member is Diamatrix, Inc. which is a Delaware Corporation with its principle place of business as the Commonwealth of Pennsylvania.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

**Exhibit Q**

Respectfully submitted,

**FOLEY & MANSFIELD, PLLP**

*Kay B. Baxter*
Kay Baxter (LSBA No. 22938)
Jay R. Boltin (LSBA No. 29765)
650 Poydras Street, Suite 2450
New Orleans, Louisiana 70130
Telephone: (504) 302-4800
Facsimile: (504) 208-3726
kbaxter@foleymansfield.com
jboltin@foleymansfield.com

*Attorneys for Strick Trailers LLC*

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the above and foregoing was electronically filed with the Clerk of Court of the Eastern District of Louisiana by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, on this 2nd day of February 2021.

*Kay B. Baxter*
**KAY B. BAXTER**

2

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |

* * * * * * * * * * * * * * * * * * * * * * * * *

## UTILITY TRAILER MANUFACTURING COMPANY'S CONSENT TO REMOVAL

With full reservation of any and all defenses, objections, and exceptions, Utility Trailer Manufacturing Company, through undersigned counsel, hereby consents to the Notice of Removal, by Eaton Corporation, removing "*Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc.*" Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana. Utility Trailer Manufacturing Company was at the time suit was instituted against it and is now a California corporation with its principal place of business in California.

New Orleans, Louisiana, this 2nd day of February, 2021.

[SIGNATURE BLOCK ON NEXT PAGE]

1

**EXHIBIT R**

5565

**PUGH, ACCARDO, HAAS,
RADECKER & CAREY, LLC**

_____

JOSEPH H. HART, IV (#21434)
THOMAS A. PORTEOUS (#27039)
DANIEL E. OSER (#27027)
1100 Poydras Street, Suite 3300
New Orleans, Louisiana 70163
Telephone:  (504) 799-4500
Facsimile:  (504) 799-4520
Email: jhart@pugh-law.com
          tporteous@pugh-law.com
          doser@pugh-law.com

*Counsel for Utility Trailer Manufacturing
Company*

2

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CAROLYN BRINDELL,** *ET AL.* | * | **CIVIL ACTION** |
| | * | |
| **V.** | * | **NO. _____** |
| | * | |
| **CARLISLE INDUSTRIAL BRAKE** | * | **SECTION " "** |
| **AND FRICTION, INC.,** *ET AL.* | * | |
| | * | **JUDGE:** |
| | * | |
| | * | **MAG. JUDGE:** |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

**WILSON TRAILER COMPANY'S CONSENT TO REMOVAL**

With full reservation of any and all defenses, objections, and exceptions, Wilson Trailer Company, through undersigned counsel, hereby consents to the Notice of Removal filed by Eaton Corporation, removing *"Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc."* Case No. 2019-09716 in the Civil District Court for the Parish of Orleans, State of Louisiana, to this Honorable Court, the United States District Court for the Eastern District of Louisiana.

Wilson Trailer Company was at the time suit was instituted against it and is now an Iowa corporation with its principal place of business in Iowa.

New Orleans, Louisiana, this 2nd day of February, 2021.

[SIGNATURE BLOCK ON NEXT PAGE]

1

**EXHIBIT S**

**DEUTSCH KERRIGAN, L.L.P.**

_____
**JENNIFER E. ADAMS          #26588**
**WILLIAM C. HARRISON, JR.   #6616**
**BARBARA B. ORMSBY          #27388**
**AMBER B. BARLOW            #34433**
755 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-5141
Facsimile: (504) 566-1201

Attorneys for Defendant, Wilson Trailer Company

2

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO.: 2019-09716                    **SECTION 8**                    **DIVISION "N"**

**CAROLYN BRINDELL, et., al,**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION INC.,** *et., al.*

FILED: _____          _____

                                        **DEPUTY CLERK**

**PLAINTIFFS' RESPONSES TO MASTER INTERROGATORIES AND**
**<u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>**

        NOW COME Plaintiffs, through undersigned counsel, who respectfully submit the following

responses to Master Interrogatories and Requests for Production of Documents:

**<u>PRELIMINARY STATEMENT</u>**

        Plaintiffs expressly reserve the right to amend, add to, delete from, or otherwise modify or

supplement each and every response to these and any other discovery requests propounded upon

them throughout the discovery process and to make such claims and contentions as may be

appropriate when Plaintiffs have concluded all discovery and has ascertained all relevant facts.  To

the extent that any Interrogatory calls for information prepared in anticipation of litigation or for

trial, or which is otherwise protected from disclosure by the work product doctrine, the attorney-

client privilege, or any other privilege, Plaintiffs will not supply or provide information protected

from discovery by virtue of such doctrine or privileges.  No response herein is, or should be

construed to be, a waiver of the protection by such doctrine privilege.

**<u>GENERAL OBJECTIONS</u>**

        Plaintiffs make the following objections that are applicable to each of these Interrogatories

and Requests for Production of Documents (hereinafter referred to as "Discovery Requests") as if

expressly incorporated in each and every of Plaintiffs' Answers to same:

        1.        Plaintiffs object to the extent these Discovery Requests seek disclosure of information

                and documents exempt from discovery on the following privileged grounds:

                a.        Seek attorney work product or are subject to attorney-client privilege;

*1*

**EXHIBIT T**

      b.     Seek the identity, mental impressions or opinions of non-testifying experts whose opinions or mental impressions have not been reviewed by a testifying expert; and

      c.     Seek privileged party communications.

    2.     Plaintiffs further assert that any inadvertent production of any documents, which are privileged under these or any other privilege, is not intended and shall not constitute a waiver of any privilege or any other applicable objection to the production of any such document, the subject matter thereof, or the information contained therein, nor shall it constitute waiver of the right of the Plaintiffs to object to the use of any such document or its contents during subsequent proceedings herein.

    3.     The Discovery Requests seek information which has yet to be determined, as discovery in this litigation is ongoing, and the requested information will be provided in accordance with the Court's orders.

## INTERROGATORIES

### INERROGATORY NO. 1

Please state your full name, Social Security number, driver's license number, and date of birth.

### RESPONSE TO INTERROGATORY NO. 1

    John Brindell, Jr. ("Decedent")
    SSN:   xxx-xx-6973
    DOB:  07/16/1947
    DOD:  07/06/2019

    Carolyn Brindell, widow
    SSN: xxx-xx-
    DOB:11/19/1949

    Connie Depuy, daughter
    SSN: xxx-xx-9638
    DOB: 05/17/1968

    John Brindell, III, son
    SSN:  xxx-xx-9733
    DOB:  07/07/1971

    Christopher Brindell, son
    SSN: xxx-xx-1511
    DOB: 02/28/1977

### INTERROGATORY NO. 2

    List every address where you have ever resided, list every individual with whom you have lived at every residence, and list every such individual's employer(s) and occupation(s) during the time you resided with said person. If specific address or addresses are unknown, identify the street; block number, nearest cross street or other description of such residence.

**RESPONSE TO INTERROGATORY NO. 2**

Objection.  Unduly burdensome and Plaintiffs cannot possibly recall every address where Decedent ever resided throughout his life.  Subject to said objections and without waiving same, Plaintiffs submit the following known information:

At the time of his death, Decedent's residential address was 59168 Transmitter Rd, Lacombe, LA, 70445; he lived there with his wife, Carolyn Brindell.   Presently, his children (see Answer to Interrogatory No. 1) live at the following addresses:

Ms. Connie B Depuy
435 Lenwood Dr
Slidell, 70458

Mr. John Brindell, III
3522 Peachtree St.
Slidell, LA 70458

Mr. Christopher M Brindell
105 Acadian Cr
Slidell, LA 70458

**INTERROGATORY NO. 3**

Identify your employment history from your first employment to the present, including periods of part-time and self-employment.  With respect to each employment, provide the following information:

      a.    Identify the employer;

      b.    Identify the premises, location(s) or facilities where you were employed for each employer;

      c.    Identify as precisely as possible the time period(s) during which you were employed on each premises or facility;

      d.    For each employer and/or premises, describe your title or craft (*e.g.,* mechanic), your duties and responsibilities, the type of work you were doing, the time period you were doing it and the specific place (*e.g.,* particular building, room, ship or vessel) where you performed your job duties;

      e.    List every vessel or vessels, if any, which you went upon while employed by each employer.  For each such vessel:

            i.    Identify the reason you were aboard each such vessel;

            ii.    Identify the approximate amount of time spent aboard each such vessel;

            iii.    Identify the work you engaged in on each such vessel; and

            iv.    Describe any alleged exposure to harmful substance on each such vessel.

**RESPONSE TO INTERROGATORY NO. 3**

(a-e) Objection. Plaintiffs object to those portions of this Interrogatory which seek information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to this Interrogatory as vague, overly broad and unduly burdensome. Without waiving these objections, Plaintiffs respond as follows with regard to Decedent's employment history: *See* Decedent's Social Security Earnings Statement attached hereto.

In addition, please see the testimony given or to be given by Plaintiffs and/or Decedent's coworkers in this case, via deposition or otherwise. Please also see various employment records produced in discovery, as well as, any and all supplements thereto. Further, discovery is continuing and Plaintiffs reserve the right to supplement this response.

Plaintiffs reserve the right to supplement this response.

**INTERROGATORY NO. 4**

With regard to each and every harmful substance to which you believe you were exposed, please provide the following information:

    a.    Identify every harmful substance, by brand name where possible, to which you were exposed or believe you may have been exposed while at each premises and which caused or potentially contributed to any injury or illness for which you seek compensation in this suit, the date of each such exposure, the nature of the exposure, describe how you were allegedly exposed and describe how the use of the harmful substances at each premises created a dangerous condition;

    b.    Identify by premises, the name of the manufacturer(s) and/or suppliers of the harmful substances you believe you were exposed to while at each premises;

    c.    State specifically the conditions which you and/or your experts or witnesses contend each premises owner should have provided to Plaintiffs at the time of the exposure event and the technology that should have been used to eliminate the potential of developing the occupational diseases claimed by you;

    d.    Identify the source including name, address, and phone number), if any, of your information that the harmful substance(s) to which you allege you were exposed while on each premises was actually present at the premises;

    e.    Identify by name, address and telephone number each and every individual, including your co-workers, foremen and supervisors, who can give first-hand eyewitness testimony concerning your work at each work site or premises where you had known or potential exposure to asbestos. In answering please designate which worksite(s) each individual has knowledge of;

    f.    Identify by name, address and telephone number all such individuals who were workers, foremen or supervisors who, although unable to give first-hand eyewitness testimony concerning your work, can give any factual testimony regarding your work environment and working conditions. In answering, please designate which worksite(s) each individual has knowledge of;

    g.    Identify by name, address and phone number any person known to you or your attorney to have relevant information regarding your exposure at each such premises not previously identified above; and

    h.    List any contractors or sub-contractors that may have used asbestos-containing products on each work site, specifying which contractors and subcontractors were at each worksite.

**RESPONSE TO INTERROGATORY NO. 4**

(a-h) Objection. Plaintiffs object to those portions of this Interrogatory which seek information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to this Interrogatory as vague, overly broad and unduly burdensome. Without waiving these objections, Plaintiffs respond as follows:

Decedent's work for Puerto Rico Marine at the Port of New Orleans exposed him to injurious levels of asbestos when he worked with and around asbestos. All of this work was dusty

and performed by Decedent without the benefit of appropriate protective clothing or breathing equipment.

In addition, Plaintiffs will exchange witness and exhibit lists pursuant to the Court's Scheduling Order. Please see Answer to Interrogatory No. 3 and see the testimony given or to be given by Plaintiffs and/or Decedent's coworkers in this case, via deposition or otherwise. Please also see Decedent's Social Security Earnings Statement attached hereto. Further, discovery is continuing and Plaintiffs reserve the right to supplement this response.

**INTERROGATORY NO. 5**

Did you ever have any job (paid or unpaid) not shown on your Social Security Itemized Statement of Earnings?  If your answer to this Interrogatory is "yes," please list each such job and the nature of the work performed.

**RESPONSE TO INTERROGATORY NO. 5**

Plaintiffs object to this Interrogatory as being overbroad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs will supplement if additional information becomes available.

**INTERROGATORY NO. 6**

Please state:

a.    The full name of your current spouse;

b.    The date of your marriage;

c.    Whether or not you are currently living together;

d.    if (c) is negative, the spouse's current address;

e.    Parish of the marriage;

f.    The full name and address of any previous spouse or spouses and date(s);

g.    The date, manner of, and reason for termination of each previous marriages;

h.    Please state the following:

   1.    Identity of each employer of each spouse during your marriage;

   2.    Identify the job title and description of job duties of each spouse's employment during your marriage.

**RESPONSE TO INTERROGATORY NO. 6**

a.    Carolyn Brindell

b.    11/04/1967

c.    Yes; Carolyn Brindell and John Brindell, Jr. were living together until Mr. Brindell passed away on 07/06/2019

d.    Not applicable.

e.    To be supplemented.

f.      Not applicable.

g.      Not applicable.

h.      Objection. Plaintiffs object to those portions of this Interrogatory which seek information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to this Interrogatory as vague, overly broad and unduly burdensome. Without waiving these objections, Plaintiffs respond as follows: to be supplemented.

**INTERROGATORY NO. 7**

Is anyone financially dependent upon you?  If so, please state the following:

a.      Identify the individual, his address, and his relationship to you;

b.      Please state the amount of annual financial support you have provided to this individual between 1999 and 2006;

c.      Please state whether you claim this individual as a dependent for state of federal tax purposes.

**RESPONSE TO INTERROGATORY NO. 7**

a.       Carolyn Brindell, widow;

b-c.    Plaintiffs, at this time, do not have the requested information.  Plaintiffs reserve the right to amend and/or supplement this response.

**INTERROGATORY NO. 8**

Have you ever been convicted of a crime other than a misdemeanor traffic offense that was punishable by death or imprisonment in excess of six months, or a crime that involved dishonesty or a false statement, within the last ten (10) years? If yes, state fully and in detail the date, place and nature of each conviction, and the court which handled the matter.

**RESPONSE TO INTERROGATORY NO. 8**

Objection. Plaintiffs object to this Interrogatory as being overly broad and seeking information which is irrelevant and immaterial to these proceedings and is not reasonably calculated to lead to the discovery of relevant, material, or admissible evidence. Without waiving these objections, Plaintiffs respond as follows: Decedent was never convicted of a crime that was punishable by death or imprisonment in excess of six months, or a crime that involved dishonesty or a false statement, within the last ten (10) years.

**INTERROGATORY NO. 9**

Identify fully any trade association or labor union of which you were a member and please give the following:

a.      Identify the occupation and/or job titles for each trade or labor Union to which you have belonged;

b.      The name of the union(s) to which you have belonged;

c.      Inclusive dates of your membership in each;

d.      Numbers and complete addresses of the local unions to which you have belonged; and

e. All offices or other positions which you have held in each union, identifying the office, position, and union in which held and inclusive dates the position or office was held.

**RESPONSE TO INTERROGATORY NO. 9**

a.-e.  Decedent was not a member of Union.  Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 10**

Have you ever served in the military?  If so, please state:

1. The dates of service;

2. The particular branch or branches of the military in which you served;

3. Selective Service Number;

4. Description of jobs and job duties;

5. Bases of which you served;

6. The status of your discharge.

**RESPONSE TO INTERROGATORY NO. 10**

Yes.

1. 1964-1968;
2. United States Navy;
3. Will supplement;
4. Machinist;
5. USS Princeton – San Diego, CA & Long Beach, CA;
6. Honorable.

**INTERROGATORY NO. 11**

Have you ever been denied health or life insurance or have you ever been canceled from any health or life insurance policy?  If yes, why?

**RESPONSE TO INTERROGATORY NO. 11**

Objection. Plaintiffs object to this Interrogatory because it seeks information that is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to this Interrogatory as vague, overly broad and calls for speculation. Without waiving these objections, Plaintiffs respond as follows:

To the best of Plaintiffs' knowledge, Decedent was never denied or cancelled on any health or life insurance policy.

**INTERROGATORY NO. 12**

Please state whether you have filed a claim for personal injury, compensation benefits, workers' compensation, unemployment, VA pension or disability benefits (provided by any federal or state law), and if so, state the venue in which the claim was made, date of claim, injury or disease for which claim was made and whether suit was filed as a result of the claim.  If suit was filed, please identify the civil action number or cause number of any such claim, the court and state in which any claim is or was pending, the nature of the injury, terms of any judgment, type of disability, if any, and name of attorney representing you.

7

**RESPONSE TO INTERROGATORY NO. 12**

Objection. Plaintiffs object to this Interrogatory in that it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to this Interrogatory as vague, overly broad and unduly burdensome. Without waiving these objections, Plaintiffs respond as follows:

Upon information and belief, Decedent received Social Security Benefits as well as Veteran's Disability. Plaintiffs will supplement and/or amend this response if and when additional responsive information becomes available.

**INTERROGATORY NO. 13**

Have you at any time been determined to be disabled by any local, state or federal agency? If so, please state the date, nature and cause of disability; date of determination of disability; nature of benefits, which you are receiving or have received; the source of those benefits; the name of the physician who has rendered this diagnosis and the date upon which it was made.

**RESPONSE TO INTERROGATORY NO. 13**

Objection. The term "disabled" is unclear and ambiguous and any response will depend on the standard used to determine disability or partial disability. Without waiver of this objection, Plaintiffs will supplement and/or amend this response if and when additional responsive information becomes available.

**INTERROGATORY NO. 14**

Please give the full name, current address, telephone number of each doctor or other health care provider who has examined, tested, screened, consulted or treated you within the last 10 – 25 years for anything, including but not limited to any condition for which you claim damages in this suit, and for each said health care provider please state:

      a.     The date (or inclusive dates) of each examination or treatment;

      b.     The medical reason for each examination or treatment;

      c.     The type of examination and the type of treatment that each doctor provided to you; and

      b.     The full name, current address and telephone number of any person to whom a report of any such examination or treatment was sent, the date of each such report and a summary of the contents or in lieu thereof, please attach a copy of each report.

**RESPONSE TO INTERROGATORY NO. 14**

(a-d) Objection. Plaintiffs object to those portions of this Interrogatory which seek information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Interrogatory to the extent that it seeks privileged information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Also, Plaintiffs object to this Interrogatory as vague, overly broad and unduly burdensome. Plaintiffs cannot identify all of Decedent's medical providers for any medical reason during the last 10 – 25 years "for anything". Without waiving these objections, Plaintiffs respond as follows:

Tulane Medical Center1415
Tulane Avenue
New Orleans, LA 70112

Southeast Louisiana Veterans
Health Care
2400 Canal St.
New Orleans, LA 70119

The Joint Pathology Center
606 Stephen Sitter Avenue
Silver Spring, MD 20910-1290

AmeraCare Home Hopsice
303 West 21st Ave.
Covington, LA 70433

Dr. Kendra Harris
1415 Tulane Avenue
Attn HC-11
New Orleans, LA 70112

Discovery is ongoing and Plaintiffs reserve the right to supplement this response. Should Defendants wish to obtain Decedent's medical records independently, Plaintiffs will review any completed HIPAA-compliant authorizations that are medical provider specific sent to them (through counsel) by Defendants. If acceptable under applicable state and federal laws, Plaintiffs(s) will sign the completed authorizations and remit for Defendant's use.

**INTERROGATORY NO. 15**

Please give the full name, current address and telephone number of each hospital, medical facility, or other health care institution at which you have ever been treated, examined, tested, screened, confined or admitted within the last 10-25 years for anything, including but not limited to any condition for which you claim damages in this suit, and for each please state:

      a.      The date or inclusive dates including admission and discharge of each such treatment or examination;

      b.      The medical reason for and the nature of each treatment or examination; and

      c.      The name and address of your attending physician.

**RESPONSE TO INTERROGATORY NO. 15**

(a-d) Objection. Plaintiffs object to those portions of this Interrogatory which seek information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Interrogatory to the extent that it seeks privileged information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Also, Plaintiffs object to this Interrogatory as vague, overly broad and unduly burdensome. Plaintiffs cannot possibly identify all of Decedent's medical providers for any medical reason during the last $10 - 25$ years "for anything". Without waiving these objections, Plaintiffs respond as follows:

Tulane Medical Center1415
Tulane Avenue
New Orleans, LA 70112

Southeast Louisiana Veterans
Health Care
2400 Canal St.
New Orleans, LA 70119

The Joint Pathology Center
606 Stephen Sitter Avenue
Silver Spring, MD 20910-1290

AmeraCare Home Hopsice
303 West 21st Ave.
Covington, LA 70433

Discovery is ongoing and Plaintiffs reserve the right to supplement this response. Should Defendants wish to obtain Decedent's medical records independently, Plaintiffs will review any completed HIPAA-compliant authorizations that are medical provider specific sent to them (through counsel) by Defendants. If acceptable under applicable state and federal laws, Plaintiffs(s) will sign the completed authorizations and remit for Defendant's use.

**INTERROGATORY NO. 16**

Itemize the medical expenses which you seek to recover as an element of damages in this suit, and state:

     a.    Who provided the care;

     b.    When the care was provided; and

     c.    The amount of the expense.

**RESPONSE TO INTERROGATORY NO. 16**

(a-c) Objection. Plaintiffs object to this Interrogatory as vague and unduly burdensome. Without waiving these objections, Plaintiffs respond as follows: Plaintiffs do not have all of the requested information. Plaintiffs are awaiting receipt of all medical records to determine the medical expenses incurred. Furthermore, please see answers to Interrogatory No. 14 and 15, and any expert medical reports, if available. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 17**

Have you ever smoked/used any kind of cigarette, cigar, pipe or other tobacco product?  If so, please state:

     a.    The type and brand of product smoked/used; if cigarettes were smoked, state whether the particular brand was filtered or unfiltered;

     b.    The approximate date or age begun;

     c.    The number of cigars, cigarettes or pipe bowls smoked per day;

     d.    The date of cessation; if applicable;

     e.    The reason for stopping; and

     f.    Whether any physician or medical personnel ever advised you to stop smoking.  If so, when?

**RESPONSE TO INTERROGATORY NO. 17**

Objection. Plaintiffs object to this Interrogatory in its entirety because it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Subject to said objection and without waiving same:  Plaintiffs state that the information sought is currently unknown.  Plaintiffs will supplement if and when additional information becomes available.

**INTERROGATORY NO. 18**

Has any person who has lived with you ever smoked cigarettes?  If so, please state:

    a.    Name of person and relationship to you;

    b.    The type and brand of product smoked/used; if cigarettes were smoked, state whether the particular brand was filtered or unfiltered;

    c.    Dates when you lived with said person; and

    d.    Number of cigarettes per day.

**RESPONSE TO INTERROGATORY NO. 18**

(a-d)   Objection. Plaintiffs object to this Interrogatory in its entirety because it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Further, Plaintiffs object to this Interrogatory as overbroad. Subject to said objection and without waiving same:

To the best of Plaintiffs' knowledge, nobody in the decedent's household smoked cigarettes.

**INTERROGATORY NO. 19**

For every chest x-ray or CT scan that you have undergone, please give the following:

    a.    The place of the exam;

    b.    The date;

    c.    The reason why the x-ray or CT scan was taken;

    d.    The interpretive or diagnostic results, conclusions or possibilities derived from each such examination; and

    e.    The name and address of the physician who recommended or ordered the chest x-ray or CT scan.

**RESPONSE TO INTERROGATORY NO. 19**

(a-e) Objection. Plaintiffs object to this Interrogatory as overbroad and not properly limited in time or scope. Further Plaintiffs object to this Interrogatory to the extent that it seeks attorney-client and/or attorney work product privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Plaintiffs cannot possibly recall all of the requested information. Subject to said objection and without waiving same, please see answers to Interrogatory No. 14 and 15.  Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 20**

Have you ever been treated by radiation and/or chemotherapy for any disease or

condition? If so, please state:

    a.  The types of treatment(s);

    b.  When and where the treatment(s) were received;

    c.  The condition(s) for which the treatment(s) were given;

    d.  The name and address of the physician who recommended or ordered this treatment; and

    e.  Have you ever been vaccinated against polio? By whom, when, and where?

**RESPONSE TO INTERROGATORY NO. 20**

(a-d) Please see answers to Interrogatory No. 14 and 15. Plaintiffs believe that the Decedent received a polio vaccine, but are unable to recall the details of by whom, when, or where. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 21**

For every pulmonary function test that you have undergone, please give the following:

    a.  The place of the exam;

    b.  The date;

    c.  The reason why the test was taken;

    d.  The technician's impression who performed the test;

    e.  The interpretive or diagnostic results, conclusions or possibilities derived from each such examination; and

    f.  The name and address of the physician who recommended or ordered the test.

**RESPONSE TO INTERROGATORY NO. 21**

(a-f)  Objection. Plaintiffs object to this Interrogatory as overbroad and not properly limited in time or scope. Further Plaintiffs object to this Interrogatory to the extent that is seeks attorney-client and/or attorney work product privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Plaintiffs cannot possibly recall all of the requested information. Subject to said objections and without waiving same, please see answers to Interrogatory No. 14 and 15. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 22**

Separately list with respect to your claim of injury or illness for which you seek damages:

    a.  Every ill health effect caused or contributed to by asbestos exposure;

    b.  Date and time of diagnosis of said ill health effect(s);

    c.  The identity of the diagnosing physician and any physician who either concurred in the diagnosis or reviewed any radiographs, radiographic reports or other diagnostic tests concerning the diagnosis;

    d.  The method and information upon which such diagnosis was based;

e.   The identity of each and every health care provider, hospital, medical institution, laboratory and physician involved in any part of such diagnosis;

f.   The identity of each and every person, including relatives of yours, employers, or anyone acting in the Plaintiffs' behalf, to whom such diagnosis was made known, including the date, time and place of such disclosure, and the name, address and phone number of anyone witnessing said disclosure;

g.   Describe in detail the specific course(s) of treatment or therapy, including any medication prescribed as a result of each such diagnosis, and the name, address and telephone number of each prescribing physician;

h.   The identity of your employer at the time of the diagnosis; and

i.   If said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, life-style, or working habits or conditions and state:

1.   Nature, extent and exact content of such prescription or recommendation;

2.   Your response to same and reasons for such response, particularly stating any reasons for failure to comply fully with such prescription or recommendations.

## RESPONSE TO INTERROGATORY NO. 22

(a-f)   Objection. Plaintiffs object to this Interrogatory as vague, overly broad and unduly burdensome as worded. Plaintiffs further object to this Interrogatory to the extent that is seeks attorney-client and/or attorney work product privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Additionally, Plaintiffs object to portion (f) of this Interrogatory because much of the information sought is not relevant, or reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs cannot possibly recall all of the requested information. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Decedent was diagnosed with asbestos-related lung cancer in April 2016. Additionally, please see answers to Interrogatories No. 14 and 15. For further information, please see Plaintiffs' expert medical report(s), attached hereto if available, in which the relevant, non-privileged information sought is being provided to all Defendants, and all amendments and supplements thereto.  Also, see the Certificate of Death attached hereto. Plaintiffs reserve the right to supplement and/or amend this response.

## INTERROGATORY NO. 23

Upon what date did you first see a physician regarding treatment of any symptoms or conditions described in the preceding Interrogatory? Give the name and address of the first physician the Plaintiffs saw and all subsequent physicians that they have seen or consulted in connection with their diagnosis.

## RESPONSE TO INTERROGATORY NO. 23

Objection. Plaintiffs object to this Interrogatory as vague and ambiguous. Plaintiffs further object to this Interrogatory to the extent that it seeks privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Plaintiffs cannot possibly recall all of the requested information. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Please see answers to Interrogatories No. 14 and 15. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 24**

Upon what date were you advised by a physician that the symptoms or conditions described in Answer to Interrogatory No. 22 resulted from your alleged exposure to asbestos, asbestos-containing products, and/or any other harmful substances which caused or may have caused the condition(s) or symptom(s)? Please provide the name and address of the physician making the diagnosis described above.

**RESPONSE TO INTERROGATORY NO. 24**

See answers to Interrogatory No.14, 15, 22 and 23. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 25**

Has the physician(s) identified in answer to Interrogatory No. 22 been paid for the services which resulted in the discovery of Plaintiff's symptoms? If so, when and by whom? If not, please state whether payment of the physician's fees is contingent upon the Plaintiff's recovery in this litigation.

**RESPONSE TO INTERROGATORY NO. 25**

Objection. Plaintiffs object to this Interrogatory as vague, overbroad, it is a violation of the collateral source rule, and seeks information which is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Interrogatory to the extent it can be construed to seek privileged information regarding Plaintiffs' retained experts. Subject to said objection and without waiving same:

No payments for medical treatment for physicians were contingent upon the outcome of this lawsuit. Plaintiffs reserve the right to supplement and/or amend this Answer.

**INTERROGATORY NO. 26**

Has the physician(s) identified in answer to Interrogatory No. 22 (including his partnerships or professional corporations) entered into any contract, written or otherwise, pursuant to the terms of which you were examined? If so, describe in detail the terms and conditions of such contract, including the date of the contract, the terms of the contract and identify the parties of the contract.

**RESPONSE TO INTERROGATORY NO. 26**

Objection. Plaintiffs object to this Interrogatory as vague, overbroad, it is a violation of the collateral source rule, and seeks information which is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Interrogatory to the extent it can be construed to seek privileged information regarding Plaintiffs' retained experts. Subject to said objection and without waiving same: no.

**INTERROGATORY NO. 27**

Please state all medication(s) prescribed to Plaintiff as a result of the diagnosis with the injury alleged in this suit, and any other medication, which Plaintiffs have used during the past ten years in connection with any injury, complaint or illness. In response to this Interrogatory, pleas state with regard to each type of medication:

    a.      The doctor who prescribed this medication;

    b.      The condition for which it was prescribed;

    c.      The inclusive dates for which it was taken/prescribed;

d.    The dose amount for each medication.

**RESPONSE TO INTERROGATORY NO. 27**

(a-d) Objection. Plaintiffs object to this Interrogatory as overbroad, unduly burdensome and to the extent it seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Plaintiffs cannot possibly recall all of the requested information. Please see answers to Interrogatories No. 14 and 15. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 28**

Do you or did you suffer from any pulmonary disease, including but not limited to bronchitis, pneumonia, polio, COPD, chest trauma, asthma, tuberculosis, emphysema or allergies? If so, please state:

a.   Date and time of such diagnosis;

b.   Identity of the diagnosing and any concurring physician;

c.   The method and information upon which such diagnosis was based;

d.   The identity of each and every hospital, medical institution, laboratory, physician, nurse or laboratory technician involved in any part of such diagnosis;

e.   The identity of each and every person, including relatives of the Plaintiffs, employers or any acting on the Plaintiffs' behalf, to whom such diagnosis was made known, including the date, time and place of such disclosure, and the name, address and phone number of anyone witnessing said disclosure;

f.   Description in detail of the specific course(s) of treatment or therapy, including any medication prescribed as a result of such diagnosis, and the name, address, and telephone number of each prescribing physician;

g.   The identity of your employer at the time of the diagnosis; and

h.   If the said diagnosis resulted in any prescribed or recommended change in your occupation, behavior, lifestyle, or working habits or conditions and state:

1.   Nature, extent and exact content of such prescription or recommendation;

2.   Plaintiff's response to same and reasons for such response; particularly stating any reasons for failure to comply fully with such prescriptions or recommendations.

**RESPONSE TO INTERROGATORY NO. 28**

(a-h) Objection. Plaintiffs object to this Interrogatory as overbroad, unduly burdensome, harassing and oppressive. Additionally, Plaintiffs object to portions of this Interrogatory as it seeks information which is not relevant, or reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to this Interrogatory to the extent it seeks privileged information regarding consulting experts or attorney-work product. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Plaintiffs cannot possibly recall all of the requested information. In an effort to reasonably respond, please see answers to Interrogatory No. 14 and 15. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 29**

Has an immediate family member, including mother, father, grandparents, spouse or sibling of Plaintiffs ever been diagnosed with any cancer, carcinoma, sarcoma, mesothelioma, malignancy or any pulmonary disease? If yes, please identify the person and the disease(s).

**RESPONSE TO INTERROGATORY NO. 29**

Objection. Plaintiffs object to this Interrogatory as overbroad and because the information sought is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs do not have the requested information. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 30**

If Plaintiffs ever had a biopsy or autopsy performed, or had a tissue sample taken, please identify the following information for each procedure performed:

    a.    The name and address of the office or hospital where such procedures were performed;

    b.    Reasons as to why such procedures were performed;

    c.    The date(s) on which such procedures were performed;

    d.    The information reported to Plaintiffs from medical practitioners as a result of such procedures;

    e.    The person(s) who performed such procedure and the person(s) who made such findings;

    f.    The location of any tissue sample or any other physical evidence obtained in the performance of such procedures; and

    g.    The location and custodian of any reports or written findings of any such procedures.

**RESPONSE TO INTERROGATORY NO. 30**

(a-g) Objection. Plaintiffs object to this Interrogatory as overbroad and because the information sought is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this request to the extent it seeks privileged non-discoverable information regarding experts. Subject to said objection and without waiving same: please see answers to Interrogatory No. 14 and 15.  Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 31**

If you are claiming in this action lost wages, future lost wages or future loss of earnings by impairment of earning capacity, please state the amount of such loss of earnings and the detailed basis upon which you computed that amount.

**RESPONSE TO INTERROGATORY NO. 31**

Not applicable. Plaintiffs reserve the right to amend and/or supplement this response.

**INTERROGATORY NO. 32**

If any of your immediate family members, including mother, father, grandparents, spouse, or siblings have ever been employed by any of the Defendants in this action, please identify and describe the date, location, all supervisors and the duties for each person's employment.

**RESPONSE TO INTERROGATORY NO. 32**

      To the best of Plaintiffs' present knowledge, not applicable. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 33**

      Did your job duties ever involve tearing out insulation or other materials which allegedly contained asbestos? If so, please state for each such employment:

      a.      Name, address, telephone number of employer;

      b.      Name and location of job site(s);

      c.      Dates of such employment period(s);

      d.      Detailed job description and description of work methods and techniques; and

      e.      The manufacturer(s) of the insulation product(s) you removed.

**RESPONSE TO INTERROGATORY NO. 33**

      (a-e) Objection. Plaintiffs object to those portions of this Interrogatory which seek information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to this Interrogatory as vague, overly broad and unduly burdensome. Without waiving these objections, Plaintiffs respond as follows:

      Please see Plaintiffs' petition for damages. Plaintiffs will exchange witness and exhibit lists pursuant to the Court's Scheduling Order. Please see Answer to Interrogatory No. 4 and see any testimony to be given by Plaintiffs and/or Decedent's co-workers in this case, via deposition or otherwise. Please also see Decedent's Social Security Earnings Statement which is attached. Plaintiffs reserve the right to supplement this response.

**INTERROGATORY NO. 34**

      Did you ever work as a sandblaster, sandblaster's helper, welder or welder's helper? If so, please state where and when said activity took place.

**RESPONSE TO INTERROGATORY NO. 34**

      Please see Answer to Interrogatory No. 33.

**INTERROGATORY NO. 35**

      State whether any respiratory protective equipment, respirators, dust masks and/or hoods were made available to you for use during any job that you ever performed. If any such equipment was made available, state:

      a.      The name of each facility at which such equipment was available;

      b.      Describe in detail the type of equipment (including model number and manufacturer) used or available, and where such equipment was located and/or stored;

      c.      Whether you were given instructions for the use of such equipment, and if so, the name and rank of the person giving such instructions;

      d.      The date the work was performed and when such equipment was available;

      e.      The nature and extent of the work performed when such equipment was

*17*

available;

f.      Your duties in connection with each such job; and

g.      Whether you used and/or wore the available respiratory protective equipment, and if not, why.

**RESPONSE TO INTERROGATORY NO. 35**

(a-g) Objection. Plaintiffs object to this Interrogatory as unreasonably vague. Without waiving this objection, Plaintiffs respond as follows:

To the best of Plaintiffs' knowledge, Decedent was not provided respiratory protection for the purpose of preventing exposure to asbestos products. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 36**

Please state the full name, address and telephone number of each such witness upon whom you rely to make the contention that you used respiratory equipment manufactured and/or distributed by each manufacturer.

**RESPONSE TO INTERROGATORY NO. 36**

Objection. Plaintiffs object to this Interrogatory as unreasonably vague. Without waiving these objections, Plaintiffs respond as follows:

Please see Answer to Interrogatory No. 35.  Discovery is continuing. Plaintiffs will identify their witnesses at such time the Court requires and/or pursuant to the Court Scheduling Order to be entered in this case.  Plaintiffs reserve the right to supplement this response.

**INTERROGATORY NO. 37**

Please state the name, address and telephone number of any and all persons whom you have reason to believe possess expertise in the field of respiratory protection and with whom you have discussed the case and whom you may call at the trial.

**RESPONSE TO INTERROGATORY NO. 37**

Objection. This Interrogatory is premature, vague, and speculative. Discovery is ongoing.  Additionally, at this stage of the proceedings, Plaintiffs have not determined which witnesses will be called to testify; Plaintiffs will identify their witnesses at such time the Court requires and/or pursuant to the Court Scheduling Order.  Plaintiffs reserve the right to supplement this response.

**INTERROGATORY NO. 38**

Please describe in detail all documentation by manufacturer and product, including but not limited to, purchase orders, invoices, sales literature, etc., you or your attorney have reviewed and upon which you or your attorney rely in order to make the connection regarding your use, if any, of respiratory protective equipment manufactured by any Defendant herein.

**RESPONSE TO INTERROGATORY NO. 38**

Objection. Plaintiffs object to this Interrogatory as overbroad, vague, and speculative. In an effort to reasonably respond, to the best of Plaintiffs' knowledge, Decedent was never provided respiratory protection for the purpose of preventing exposure to asbestos products. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 39**

Please identify any instructions given to you by your employer(s) or premises owners concerning the operation, use and/or maintenance of any respiratory protective equipment, abrasive blasting equipment, asbestos, asbestos-containing products, silica, silica-containing products and/or sand blast hoods and identify the full names and addresses of all person(s) who provided such instructions.

**RESPONSE TO INTERROGATORY NO. 39**

Objection. Plaintiffs object to this Interrogatory as overbroad, vague and speculative. Without waiving these objections, Plaintiffs respond as follows:

Please see Answer to Interrogatory Nos. 3 and 35, and see the testimony given or to be given by Plaintiffs and/or Decedent's coworkers in this case, via deposition or otherwise. Further, discovery is continuing and Plaintiffs reserve the right to supplement this response.

**INTERROGATORY NO. 40**

For each product and equipment that you contend was defective and/or otherwise harmful and/or each manner in which you contend that a Defendant failed to properly warn, please identify the alleged defect/failure to warn by specific manufacturer and product, explain how the alleged defect/failure to warn exposed you to injurious or harmful substances, and identify any individual(s) who has information concerning the alleged defect/failure to warn.

**RESPONSE TO INTERROGATORY NO. 40**

Objection. Plaintiffs object to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this Interrogatory as premature; discovery is not yet completed. Subject to and without waiving these objections:

Please see Plaintiffs' Petition for Damages. Please also see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refer Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or otherwise, in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

**INTERROGATORY NO. 41**

If you allege that any Defendant violated any regulatory requirements, certification standards, or safety codes, as an element of negligence or a causally related to any and all claims made by you, for each such violations set forth:

a.    Full and complete description of each code along with each and every applicable section or provision of each code which you claim was violated and by which manufacturer for which product;

b.    Describe the manner in which each such section or provision involved in each violation; and

c.    Identify the name and address of the persons allegedly involved in each violation; and

e.    Set forth a date and location for each such alleged violation.

**RESPONSE TO INTERROGATORY NO. 41**

Objection. Plaintiffs object to this Interrogatory because it calls for a legal conclusion. Further, Plaintiffs object to this Interrogatory as vague, ambiguous, overbroad and unduly

burdensome. Plaintiffs also object to this Interrogatory as premature; discovery is not yet completed. Subject to and without waiving these objections:

In Louisiana, a statutory duty is imposed on every employer to furnish a reasonably safe employment. *See* LA. REV. STAT. ANN. § 23:13 (2014); *see also Becknell v. Northrop Grumman Ship Systems, Inc.,* No. 2009-C-982, 2009 WL 5667696, *2 (La. App. 4 Cir. 2009).

In addition, see Plaintiffs' <u>Petition for Damages</u>. Please also see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refer Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or otherwise, in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

## INTERROGATORY NO. 42

If you contend that the proximate cause of the alleged injuries and damages arose out of the breach by any Defendant, of any oral or written expressed warranties with respect to the allegedly defective products referred to in your Petition or in your responses to these Interrogatories, as to each such alleged breach set forth:

    a.  The nature of the alleged breach of expressed warranties by manufacturer and product;

    b.  The name, address and job title of any person allegedly furnishing an oral warranty;

    c.  The substance, in detail, of each such alleged warranty; and

    d.  The name and address of each person present when any oral warranty was furnished.

## RESPONSE TO INTERROGATORY NO. 42

Objection. Plaintiffs object to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this Interrogatory as premature; discovery is not yet completed. Subject to and without waiving these objections:

In Louisiana, a statutory duty is imposed on every employer to furnish a reasonably safe employment. *See* LA. REV. STAT. ANN. § 23:13 (2014); *see also Becnel v. Northrop Grumman Ship Systems, Inc.,* No. 2009-C-982, 2009 WL 5667696, *2 (La. App. 4 Cir. 2009).

Please see Plaintiffs' <u>Petition for Damages</u>. Please also see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refer Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or otherwise, in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

## INTERROGATORY NO. 43

If you, or anyone acting on your behalf, have caused any products and/or respirator, mask, hood or other respiratory device and/or abrasive blasting protection device used by you, or of a type used by you to be tested, inspected or evaluated, please state for each such test, inspection or evaluation:

    a.  The date it was made;

    b.  The name of the manufacturer of each such product and/or device;

    c.  The model number and name of each such product and/or device;

d.    A description of the test;

e.    The name, address, job title and employer of each person participating in and/or conducting such tests;

f.    The results of the tests; and

g.    The name, address, job title and employer of each and every person known to have a copy of any report setting forth the results of the test.

**RESPONSE TO INTERROGATORY NO. 43**

(a-g) Objection. Plaintiffs objects to this Interrogatory to the extent that it seeks attorney-client and/or attorney work product privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461and 1465. Additionally, Plaintiffs object to this Interrogatory as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Please see Plaintiffs' <u>Petition for Damages</u>. Please also see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refer Defendant to the testimony given or to be given by Plaintiffs and/ or Decedent's co-workers, via deposition or otherwise, in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

**INTERROGATORY NO. 44**

With respect to each manufacturer and/or supplier of each harmful substance or product to which you claim to have been exposed which caused or potentially contributed to any injury or illness for which you seek compensation in this suit, please identify by name, address and telephone number all witnesses capable of identifying each such product, specifying each witness by product, manufacturer and/or supplier.

**RESPONSE TO INTERROGATORY NO. 44**

Objection. Plaintiffs object to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this Interrogatory as premature; discovery is not yet completed. Subject to and without waiving these objections:

Please see Plaintiffs' <u>Petition for Damages</u>. Please also see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refer Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or otherwise, in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

**INTERROGATORY NO. 45**

For each of the manufacturers and/or suppliers identified in the previous two Interrogatories, please further specify the insulation type and brand name, as well as the identity of every facility/plant where the witness has knowledge that the Plaintiffs was exposed.

**RESPONSE TO INTERROGATORY NO. 45**

Objection. Plaintiffs object to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this Interrogatory as premature; discovery is not yet completed. Subject to and without waiving these objections:

Please see Plaintiffs' <u>Petition for Damages</u>. Please also see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided

at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refer Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or otherwise, in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

**INTERROGATORY NO. 46**

Please provide the basis for your contention that the Plaintiffs were exposed to asbestos-containing products manufactured by the manufacturers and/or suppliers listed in Plaintiffs' Petition(s), and for each manufacturer and/or supplier, describe the evidence which supports your basis.

**RESPONSE TO INTERROGATORY NO. 46**

Objection. Plaintiffs object to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this Interrogatory as premature; discovery is not yet completed. Subject to and without waiving these objections:

The asbestos-containing product manufacturers listed as Defendants in the Petition for Damages supplied asbestos-containing products to Decedent's place of work at the Port of New Orleans.

Please see Plaintiffs' Petition for Damages. Please also see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refer Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or otherwise, in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

**INTERROGATORY NO. 47**

If in your pleadings you allege that certain premises Defendant(s) are liable to you for failure to exercise reasonable care to protect you from the foreseeable dangers associated with exposure to asbestos or other harmful substances and/or to keep the premises safe for its invitees and/or that premises Defendant knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos or other harmful substances but failed to protect you from said risk of harm, please describe each and every failure on each premises Defendant's part; the date each such failure occurred; the danger or harm involved; the specific harmful substance involved and state in detail the measures which you, your experts or witnesses contend each premises Defendant should have taken and the technology it should have used to make the premises safe for Plaintiffs(s); and the name, address, telephone number and occupation of any witness upon which you may rely to support your allegations.

**RESPONSE TO INTERROGATORY NO. 47**

Objection. Plaintiffs object to this Interrogatory as vague, ambiguous, harassing, overbroad, speculative and unduly burdensome. Further, Plaintiffs object to this Interrogatory to the extent that is seeks attorney-client and/or attorney work product privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Plaintiffs also object to this Interrogatory as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this Interrogatory as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Please see Plaintiffs' Petition, Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refers Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or

otherwise, in this case. Please also see all of Plaintiffs' discovery and supplemental discovery responses in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

## INTERROGATORY NO. 48

Identify by full name, current or last known address and telephone number every individual known to you or your counsel not already identified in response to any of the preceding Interrogatories who can give any testimony whatsoever relevant to your claims against each place of employment or worksite where you had known of potential exposure to asbestos or other harmful substances or any executive officer or insurer of that employer or worksite, including but not limited to any testimony which is relevant to working conditions at that employer or worksite and he basis for the alleged liability of any executive officer, employee or insurer of that employer or worksite; whether or not said individual will be called at the trial of this matter as a witness.

## RESPONSE TO INTERROGATORY NO. 48

Objection. Plaintiffs object to this Interrogatory as vague, overbroad and unduly burdensome. Further, Plaintiffs object to this Interrogatory to the extent that is seeks attorney-client and/or attorney work product privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Plaintiffs also object to this Interrogatory as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this Interrogatory as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Please see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refers Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or otherwise, in this case. Please also see all of Plaintiffs' discovery and supplemental discovery responses in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

## INTERROGATORY NO. 49

Please identify all testimony, including opinion testimony that you reasonably expect to elicit at trial. In doing so, please identify the witness giving the testimony, the subject matter on which the witness is expected to testify and the substance of the facts to which the witness is expected to testify.

## RESPONSE TO INTERROGATORY NO. 49

Objection. Plaintiffs object to this Interrogatory as vague, overbroad and unduly burdensome. Further, Plaintiffs object to this Interrogatory to the extent that is seeks attorney-client and/or attorney work product privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Plaintiffs also object to this Interrogatory as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this Interrogatory as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Please see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refers Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or

otherwise, in this case. Please also see all of Plaintiffs' discovery and supplemental discovery responses in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

**INTERROGATORY NO. 50**

Identify every expert you and/or your counsel have consulted and/or retained in connection with this case, whether or not such expert will be used as a witness at the trial, including all pathologists who have examined you or reviewed any of your pathology or autopsy specimens. For each such expert (a) state the date on which each such expert was first consulted and/or retained; (b) the general subjects on which the expert was consulted; (c) whether each such expert has or will conduct any tests on any pathology specimens or on any asbestos; and (d) for all tests conducted state the results of said tests.

**RESPONSE TO INTERROGATORY NO. 50**

Objection. Plaintiffs object to this Interrogatory as vague, overbroad and unduly burdensome. Further, Plaintiffs object to this Interrogatory to the extent that is seeks attorney-client and/or attorney work product privileged information and/or non-discoverable information regarding experts which is protected from disclosure under Louisiana Civil Code of Procedure 1422, 1425, 1461 and 1465. Plaintiffs also object to this Interrogatory as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs personal knowledge and obtained by Plaintiffs' attorneys through litigation. Additionally, Plaintiffs object to this Interrogatory as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Please see Plaintiffs' Witness List, and any supplements and/or amendments thereto, in which the information sought will be provided at such time the Court requires and/or in accordance with the Scheduling Order to be entered in this case. Plaintiffs refers Defendant to the testimony given or to be given by Plaintiffs and /or Decedent's coworkers, via deposition or otherwise, in this case. Please also see all of Plaintiffs' discovery and supplemental discovery responses in this case. Plaintiffs reserve the right to supplement this response to this Interrogatory.

**INTERROGATORY NO. 51**

State whether you, either directly or through counsel, have at any time settled, made an agreement to settle or reached any understanding (either tentative or final) with any Defendant in the above-captioned matter, or with any non-party, regarding either the ultimate outcome of our claims against such Defendant or non-party, including all settlement agreements and/or claims submissions with any claims resolution organization of any bankrupt entities. Your answer specifically should include agreements or understandings in which you agree to waive claims against any participating Defendant or non-Defendant (for example a claim for punitive damages) or in which any participating Defendant or non-Defendant agrees not to raise one or more defenses or not to contest certain elements of alleged liability, or in which the participating parties agree to minimum and maximum amounts of compensatory liability, or in which the participating parties agree not to disclose the terms of such agreements or understandings.

**RESPONSE TO INTERROGATORY NO. 51**

Objection. Plaintiffs object to the wholesale disclosure of settlement agreements as irrelevant. Plaintiffs further object to this Interrogatory to the extent it seeks attorney work-product privileged and confidential information. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Plaintiffs state that as of the date of filing these discovery responses, they have not made any agreement(s) described in this Interrogatory.  Plaintiffs reserve the right to supplement and amend this Answer.

**INTERROGATORY NO. 52**

If your answer to the preceding Interrogatory is anything other than an unqualified

negative, then separately for each such agreement or understanding:

    a.      Identify all parties released;

    b.      Identify all parties granting the release;

    c.      State the date or approximate date on which the agreement was made of the understanding reached;

    d.      Identify all signatories to the agreement;

    e.      Identify all claims covered by the release;

    f.      Identify all persons who knew of the agreement or understanding prior to the date of your answers to these Interrogatories;

    g.      State each and every term or provision of the agreement or understanding, including (without limitation) the amount to be paid and received; if the amount is contingent, each factor which is applicable to fixing the amount; the maximum amount ultimately to be paid and received; the minimum amount ultimately to be paid and received; each and every claim waived; each and every defense waived; each and every agreement or understanding or understanding regarding disclosure or nondisclosure of the underlying agreement or understanding; and

    h.      Identify each document that constitutes evidences, contains, incorporates, refers to, describes, discusses, or otherwise relates to the agreement or understanding.

**RESPONSE TO INTERROGATORY NO. 52**

(a-h) Objection. Plaintiffs object to the wholesale disclosure of settlement agreements as irrelevant. Plaintiffs further object to this Interrogatory to the extent it seeks attorney work-product privileged and confidential information. Subject to said objections and without waiving same, Plaintiffs respond as follows:

See Response to Interrogatory No. 51. Plaintiffs reserve the right to supplement and/or amend the response to this Interrogatory.

**INTERROGATORY NO. 53**

Please state whether you have ever given deposition testimony as a Plaintiff, Defendant, or witness in connection with any lawsuit. If so, please identify which case number and jurisdiction you gave deposition testimony as well as the date of said testimony.

**RESPONSE TO INTERROGATORY NO. 53**

Objection. This Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Subject to said objection and without waiving same, Plaintiffs respond as follows:

Plaintiffs are not in possession of the information at this time. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 54**

Please identify and acknowledge the first date on which you were put on notice that asbestos-containing products might be harmful to your health, and identify the source of such notice.

**RESPONSE TO INTERROGATORY NO. 54**

Objection. Vague, ambiguous, and calls for legal conclusion. Subject to said objection and without waiving same, Defendants never told, cautioned, or warned Decedent in any manner about the dangerous and deadly effects of inhaling visible and invisible asbestos dust. Plaintiffs reserve the right to supplement and/or amend this response.

**INTERROGATORY NO. 55**

Pursuant to Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 (MMSEA), please provide the following information:

    a.    Decedent's full name (as it appears on his Social Security card);

    b.    Decedent's Health Insurance Claim Number (HICN), if applicable;

    c.    State whether Decedent received Social Security Disability benefits. If so, please identify the dates that Decedent received Social Security Disability benefits;

    d.    State whether Decedent was diagnosed with End Stage Renal failure;

    e.    State whether Decedent was diagnosed with Lou Gehrig's disease;

    f.    State whether Decedent was eligible to receive, was receiving, or ever received benefits under Medicare, Medicaid, SCHIP or any similar program, and if so, the date on which Decedent first became eligible to receive such benefits.

**RESPONSE TO INTERROGATORY NO. 55**

Objection. Plaintiffs object to this Interrogatory as overbroad and because the information sought is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence, is premature and violates the collateral source rule. Subject to said objection and without waiving same, Plaintiffs submit the following known information:

    a.    John Brindell (deceased).

    b.    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-A.

    c.    Yes, will supplement.

    d.    No.

    e.    No.

    f.    Unknown.  Will supplement.

**INTERROGATORY NO. 56**

Pursuant to Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 (MMSEA), please provide the following information for each Plaintiffs ("claimant"), who has filed suit on behalf of Decedent:

    a.    Full name and date of birth for each claimant;

    b.    Relationship of each claimant to Decedent;

    c.    Social Security number for each Plaintiff;

    d.    Date of birth for each claimant;

    e.    Address and Phone number for each claimant;

f.      HICN for each Medicare eligible claimant; and

g.      The tax identification number for claimants' representative (attorney).

h.      State whether Plaintiffs is eligible to receive, is receiving, or has received benefits under Medicare, Medicaid, SCHIP or ay similar program, and if so, the date on which Plaintiffs first became eligible to receive such benefits.

i.      The identity of any claimant that presently receives, has applied for, or has been denied Social Security Disability Insurance;

j.      For each claimant presently receiving Social Security Disability Insurance, please identify the date when the claimant first began receiving such benefits.

k.      The identity of any claimant that has been diagnosed with End Stage Renal Disease;

l.      The identity of any claimant that has been diagnosed with Lou Gehrig's disease;

m.      The identity of any claimant that is ***both*** maintaining a claim for loss of consortium and is Medicare eligible.

**ANSWER TO INTERROGATORY NO. 56**

Objection. Plaintiffs object to this Interrogatory as overbroad and because the information sought is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence, is premature and violates the collateral source rule. Subject to said objection and without waiving same, Plaintiffs submits the following known information:

a-f.    Refer to answer to Interrogatory No. 1.
g.      20-0410905
h-l.    Not applicable.
m.      None.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1

Please produce any and all medical reports, records, notes, charts, written documentation, chest or pulmonary x-rays, films, CT scans or test results concerning any examination, screening testing and/or treatment for any injury, illness or disease in the possession of you or your counsel.

### RESPONSE TO REQUEST NO. 1

Objection. Plaintiffs object to this Request for Production as overbroad, vague and unduly burdensome and in violation of La. Code of Civil Procedure Articles 1422 and 1428. Plaintiffs object to this request to the extent that it seeks privileged information regarding retained experts protected from disclosure. Without waiving these objections, Plaintiffs respond as follows:

Please see attached medical records.  Should Defendants wish to obtain Decedent's medical records independently, Plaintiffs will review any completed HIPAA-compliant authorizations that are medical provider specific sent to them (through counsel) by Defendants. If acceptable under applicable state and federal laws, Plaintiff(s) will sign the authorizations and remit for Defendant's use.

### REQUEST FOR PRODUCTION NO. 2

Please produce copies of all federal and state income tax returns and all attachments filed thereto by you either jointly or separately, for the last ten (10) years.

### RESPONSE TO REQUEST NO. 2

Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Plaintiffs respond as follows:  Plaintiffs will supplement.

### REQUEST FOR PRODUCTION NO. 3

Please produce copies of all records regarding your service in the military or other branch of the armed forces.

### RESPONSE TO REQUEST NO. 3

Objection. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Plaintiffs respond as follows: Plaintiffs reserve the right to supplement this response.

### REQUEST FOR PRODUCTION NO. 4

Please produce copies of all documents related to workers' compensation benefits or disability benefits which you may have received.

### RESPONSE TO REQUEST NO. 4

Plaintiffs object to this Request for Production as overbroad. Plaintiffs object to this Request for Production to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Plaintiffs respond as follows:  Unknown, Plaintiffs reserve the right to supplement this response.

**REQUEST FOR PRODUCTION NO. 5**

Please produce copies of all cards or documents reflecting your membership in unions or other trade, skill or professional organizations.

**RESPONSE TO REQUEST NO. 5**

Not applicable. From Plaintiffs understanding decedent did not belong to any labor unions.

**REQUEST FOR PRODUCTION NO. 6**

Please produce a copy of all children's birth certificates and any marriage license(s).

**RESPONSE TO REQUEST NO. 6**

Objection. Plaintiffs object to this request to the extent it seeks information which is not relevant, nor reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 7**

In the case of deceased Plaintiffs, please produce a copy of the Plaintiffs' death certificate and all autopsy reports, if any.

**RESPONSE TO REQUEST NO. 7**

Please see Death Certificate, attached as Exhibit 2.

**REQUEST FOR PRODUCTION NO. 8**

Please produce copies of all settlement agreements, receipt and release agreements, or similar agreements, entered into by or on behalf of any Plaintiffs(s) (and the Plaintiffs' if there are survival and/or wrongful death claims asserted herein) and any person or entity (whether or not such person or entity was ever a Defendant in this or any other suit) which concerns any occupational injury, illness or disease.

**RESPONSE TO REQUEST NO. 8**

Objection. Plaintiffs object to the wholesale disclosure of settlement agreements as confidential, inadmissible, irrelevant and privileged.

**REQUEST FOR PRODUCTION NO. 9**

Please produce a copy of all claims for payment of any type submitted to any claims processing entity, trust, bankruptcy trust or claim facility (including but not limited to the Claims Resolution Management Corporation) with respect to any occupational injury, illness or disease.

**RESPONSE TO REQUEST NO. 9**

Objection. Privileged and attorney work product. Subject to said objection and without waiving same, to the best of Plaintiffs' present recollection, no claims for payment have been submitted.

**NO. 10**

Please produce a copy of all fact sheets, correspondence, or other documents provided by you or your attorney to any witness, treating physician or expert which in any way concerns the Decedent's alleged work history, exposure history or medical history.

**RESPONSE TO REQUEST NO. 10**

Objection. Plaintiffs object to this Request for Production as overbroad, vague and unduly burdensome and in violation of La. Code of Civil Procedure Articles 1422 and 1428.

Plaintiffs object to this request to the extent that it seeks privileged information regarding retained experts protected from disclosure. Without waiving these objections, Plaintiffs respond as follows:

Please see Response to Request No. 3 and the authorizations attached hereto.

## REQUEST FOR PRODUCTION NO. 11

Please produce all photographs of (a) Decedent taken at any time while working for each such place of employment where you had known or potential exposure to asbestos, silica or other harmful substance and (b) any location(s) where Decedent worked, whether or not he is included in the photograph.

## RESPONSE TO REQUEST NO. 11

Plaintiffs are not in possession of any such photographs at this time.

## REQUEST FOR PRODUCTION NO. 12

Please produce copies of all transcripts of depositions or other sworn testimony (trial, etc.) or sworn statements in the possession of you or your counsel, ever given by any employee, executive officer, corporate officer, official or other representative of each place of employment where you had known of potential exposure to asbestos or other representative of each place of employment where you had known or potential exposure to asbestos, silica or other harmful substance (including individuals appointed as corporate witnesses for each place of employment).

## RESPONSE TO REQUEST NO. 12

Objection. Plaintiffs object to this request as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this request as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this request as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Discovery is ongoing at this time and therefore these depositions have not been taken. Plaintiffs will identify their expert and fact witnesses at such time as the Court requires and/or in accordance with the Scheduling Order adopted in this case.

## REQUEST FOR PRODUCTION NO. 13

Please identify any documentary evidence which you may or will use at the trial of this lawsuit, and with regard to each such document, please state:

    a.    The nature of the document;

    b.    The name and address of the person having possession of the original and/or any copies thereof;

    c.    The substance of the facts which you intend to establish with the introduction of that document; and

    d.    The name and address of the person you intend to have identify the document at the time of trial.

## RESPONSE TO REQUEST NO. 13

Objection. Plaintiffs object to this request as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this request as seeking attorney work product

to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this request as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Discovery is ongoing at this time and therefore, these depositions have not been taken. Plaintiffs will identify their expert and fact witnesses at such time as the Court requires and/or in accordance with the Scheduling Order adopted in this case.

**REQUEST FOR PRODUCTION NO. 14**

Please produce any physical evidence, documents or exhibits you intend to introduce at trial for which you intend to use in an opening statement or closing argument.

**RESPONSE TO REQUEST NO. 14**

Objection. Plaintiffs object to this request as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this request as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this request as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Discovery is ongoing at this time and therefore, exhibits have not yet been identified. Plaintiffs will identify their exhibits at such time as the Court requires and/or in accordance with the Scheduling Order adopted in this case.

**REQUEST FOR PRODUCTION NO. 15**

Please produce any and all photographs, videotapes or recordings taken in connection with this litigation. Please give a description of each, identify who has possession of same, and identify by whom said was taken.

**RESPONSE TO REQUEST NO. 15**

Objection. Plaintiffs object to this request as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this request as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this request as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Discovery is ongoing at this time and therefore, exhibits have not yet been identified. Plaintiffs will identify exhibits at such time as the Court requires and/or in accordance with the Scheduling Order adopted in this case.

**REQUEST FOR PRODUCTION NO. 16**

Please produce copies of any and all personal diaries, work logs, or documents (including employment related documents) that Decedent may have kept in connection with employment at any site where he had or could have had asbestos exposure. (This request includes but is not limited to any personal diaries or work logs that Decedent may have personally kept but does not request any documentation prepared by the Plaintiffs and their attorney in preparation for this litigation.)

**RESPONSE TO REQUEST NO. 16**

Objection. Plaintiffs object to this request as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this request as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this

request as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Discovery is ongoing at this time and therefore, exhibits have not yet been identified. Plaintiffs will identify exhibits at such time as the Court requires and/or in accordance with the Scheduling Order adopted in this case.

**REQUEST FOR PRODUCTION NO. 17**

If you allege that any Defendant concealed or suppressed the truth about the dangerous nature of the products, please produce all documents and evidence which would establish the allegations in your Petition that Defendants had knowledge of the falsity and concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy products.

**RESPONSE TO REQUEST NO. 17**

Objection. Plaintiffs object to this request as vague, ambiguous, overbroad and unduly burdensome. Plaintiffs also object to this request as seeking attorney work product to the extent it seeks information outside the scope of Plaintiffs' personal knowledge and obtained by Plaintiffs attorneys through litigation. Additionally, Plaintiffs object to this request as premature. Subject to said objections and without waiving same, Plaintiffs respond as follows:

Discovery is ongoing at this time and therefore, exhibits have not yet been identified. Plaintiffs will identify exhibits at such time as the Court requires and/or in accordance with the Scheduling Order adopted in this case.

**REQUEST FOR PRODUCTION NO. 18**

Please produce any and all expert reports prepared by any expert retained by you and who will testify in this litigation.

**RESPONSE TO REQUEST NO. 18**

Objection.  This request is premature and unduly burdensome.  Plaintiff will comply with the scheduling order entered by the Court in this case and the deadlines therein.

**REQUEST FOR PRODUCTION NO. 19**

Please produce a copy of the Medicare Card for each Medicare eligible Decedent, if applicable.

**RESPONSE TO REQUEST NO. 19**

To be supplemented.

Dated: December 20, 2019                         Respectfully submitted,

                                                 THE CHEEK LAW FIRM

                                                 _____
                                                 LINDSEY A. CHEEK, LA Bar No. 34484
                                                 650 Poydras St., Suite 2310
                                                 New Orleans, LA 70130

Telephone: (504) 304-4333
Facsimile: (504) 324-0629
LCheek@thecheeklawfirm.com

-And-

Melissa Schopfer, IL Bar No. 6285982
*PHV Pending*
 Michael Hibey, IL Bar No. 6286401
*PHV Pending*
Jean Michel Lecointre, IL Bar NO. 6307953
*PHV Pending*
One Court Street
Alton, IL 62002
Tel: (618) 259-2222
Facsimile: (618) 259-2251
mschopfer@simmonsfirm.com
mhibey@simmonsfirm.com
jelcointre@simmonsfirm.com

**ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has been served upon all known counsel of record via one or more of the following methods, in accordance with the Louisiana Code of Civil Procedure: by depositing same in the U.S. Mail, properly addressed and postage prepaid; by Certified Mail; electronic mail; and/or facsimile transmission this the ___20th___ day of ___December___, 2019.

LINDSEY CHEEK

## PLAINTIFFS' EXHIBITS

1. Decedent John Brindell's Social Security Records; and
2. Decedent John Brindell's Death Certificate; and
3. Miscellaneous authorizations

# STATE OF LOUISIANA
## CERTIFICATION OF VITAL RECORD
### CERTIFICATION OF DEATH

BIRTH NUMBER:    STATE FILE NUMBER: 2019-022-00252

6958677

**DECEDENT**

| Field | Value |
|---|---|
| DECEDENT'S NAME | BRINDELL JR , JOHN CHLOROUS |
| DATE OF BIRTH | 07/18/1947 |
| DATE OF DEATH | 07/06/2018 |
| TIME OF DEATH | 09:00 AM |
| PLACE OF BIRTH | NEW ORLEANS, LA UNITED STATES |
| SEX | MALE |
| AGE | 71 YEARS |

**PERSONAL**

RESIDENCE OF DECEDENT: 59168 TRANSMITTER RD. , LACOMBE, LA 70445 UNITED STATES
WITHIN CITY LIMITS? NO   PARISH/COUNTY: ST. TAMMANY
EVER IN U.S. ARMED FORCES? YES
OCCUPATION: SUPERVISOR   INDUSTRY OF OCCUPATION: MARINE
MARITAL STATUS: MARRIED
NAME OF SURVIVING SPOUSE: PELAYO, CAROLYN
FATHER/PARENT NAME: BRINDELL SR , JOHN CHLOROUS   PLACE OF BIRTH: NEW ORLEANS, LA UNITED STATES
MOTHER/PARENT NAME:   PLACE OF BIRTH: NEW ORLEANS, LA UNITED STATES
INFORMANT'S NAME: BRINDELL, CAROLYN PELAYO   RELATIONSHIP: WIFE   ADDRESS: 59168 TRANSMITTER RD. , LACOMBE, LA 70445 UNITED STATES
EDUCATION: HIGH SCHOOL GRADUATE, OR GED COMPLETED
OF HISPANIC ORIGIN? NO, NOT SPANISH/HISPANIC/LATINO
RACE: WHITE

**DEATH INFO**

PLACE OF DEATH: DECEDENT'S HOME
FACILITY ADDRESS: 59168 TRANSMITTER RD. , LACOMBE, LA 70445 UNITED STATES   PARISH/COUNTY: ST. TAMMANY

**DISPOSITION**

METHOD OF DISPOSITION: BURIAL
PLACE OF DISPOSITION: SOUTHEAST LOUISIANA VETERANS CEMETERY
PLACE OF DISPOSITION: SLIDELL, LA UNITED STATES   DATE OF DISPOSITION: 07/10/2019

**FUNERAL FACILITY**

FUNERAL FACILITY NAME: HONAKER FUNERAL HOME   ADDRESS: 1751 GAUSE BLVD W. , SLIDELL, LA 70460 UNITED STATES
NAME OF FUNERAL DIRECTOR: GUILLORY, FOSTER   LICENSE NUMBER: F1598   CORONER NOTIFIED? Y
SIGNATURE OF FUNERAL DIRECTOR: "e-sign"   DATE: 7/11/2019

**MEDICAL INFO**

MANNER OF DEATH: NATURAL
IF FEMALE? NOT APPLICABLE
DID TOBACCO USAGE CONTRIBUTE TO DEATH? UNKNOWN

**CAUSE OF DEATH**

PART I: IMMEDIATE CAUSE: a. MALIGNANT CANCER OF THE CONNECTIVE AND SOFT TISSUES   APPROXIMATE INTERVAL: UNK
WAS AN AUTOPSY PERFORMED? NO
FINDINGS USED IN DETERMINING CAUSE? NOT APPLICABLE

**CERTIFIER**

I CERTIFY THAT I ATTENDED THE DECEDENT FROM 5/25/2019 TO 7/6/2019 AND THAT DEATH OCCURED ON THE DATE AND HOUR STATED AND DUE TO THE CAUSE(S) AND MANNER STATED.
SIGNATURE OF CERTIFIER: "e-sign"   DATE: 7/10/2019
CERTIFIER NAME: DURANTE, LAURENCE J
CERTIFIER TITLE: CERTIFYING PHYSICIAN
CERTIFIER ADDRESS: 3621 RIDGELAKE DR. , METAIRIE, LA 70002 UNITED STATES
BURIAL TRANSIT PERMIT: 319753   PARISH OF ISSUE: ORLEANS   DATE OF ISSUE: 07/08/2019   DATE FILED WITH REGISTRAR: 7/11/2019

**REGISTRAR**

SIGNATURE OF REGISTRAR: DEVIN GEORGE "e-sign"
ISSUED BY: Crochet, Kathleen   Issued on: 8/26/2019 4:00:49 PM



006958677

I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF A CERTIFICATE OR DOCUMENT REGISTERED WITH THE VITAL RECORDS REGISTRY OF THE STATE OF LOUISIANA, PURSUANT TO LSA - R.S.40:32, ET SEQ.


DEVIN GEORGE
STATE REGISTRAR



A REPRODUCTION OF THIS DOCUMENT IS VOID AND INVALID. DO NOT ACCEPT.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

AmeriTech, Incorporated

# EXHIBIT 1

```
SSA-1826                ITEMIZED STATEMENT OF EARNINGS

                        SOCIAL SECURITY ADMINISTRATION
                        OFFICE OF CENTRAL OPERATIONS
                        6100 WABASH AVENUE
                        BALTIMORE MARYLAND   21215

                                        Date: 09/12/2019

POHLMAN
120 NORTH MAIN STREET SUITE 3
EDWARDSVILLE IL 62025




We are sending the statement of earnings requested for:

   Number Holder's Name: JOHN    BRINDELL
  Social Security Number: XXX-XX-6973

        Years Requested: 1963 THRU 2018




Control Number: 19219114006
SERS Order Number: 00000681673

Enclosure(s):
    Earnings Statement
```

SSA-000001



## SOCIAL SECURITY ADMINISTRATION
Baltimore, Maryland 21290-0300

## CERTIFICATION OF EXTRACT FROM RECORDS

Pursuant to the provisions of Title 42, United States Code, Section 3505, and the authority vested in me by 45 F. R. 47245-46. I hereby certify that I have legal custody of certain records, documents, and other information established and maintained by the Social Security Administration, pursuant to Title 42, United States Code, Section 405, and that the annexed is a true extract from such records in my custody as aforesaid.

I certify that all signatures of Social Security Administration officials on the annexed document(s) are genuine and made pursuant to the signers' official capacity.

I further certify that these records may not show all the earnings reported for the periods ending after December 31, 2017 because of the time required to receive and process reports.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Social Security Administration to be affixed this _____ day of _____, 2019

Monica De Los Reyes
Director
Division of Earnings and Business Services
Office of Central Operations

Form **SSA-473** (09/13)
Destroy Prior Edition

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
                   * * *    FOR SSN XXX-XX-6973     * * *


FROM:  SOCIAL SECURITY ADMINISTRATION
       OFFICE OF CENTRAL OPERATIONS
       6100 WABASH AVENUE
       BALTIMORE  MARYLAND  21215


NUMBER HOLDER NAME: JOHN    BRINDELL
   YEARS REQUESTED: 1963 THRU 2018


POHLMAN
120 NORTH MAIN STREET SUITE 3
EDWARDSVILLE IL 62025
```

```
EMPLOYER NUMBER:  72-0592622
AIRLINE BOWLING CENTER INC
7401 AIRLINE DR
METAIRIE  LA 70003-6225
```

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1964 |         |         | 110.00  | 218.00  | $328.00 |
| 1965 | 25.00   |         | 100.00  |         | $125.00 |

```
EMPLOYER NUMBER:  34-9990000
DEFENSE FINANCE & ACCOUNTING SVC
% CENTRALIZED DISBURSING CODE 1907
1240 E 9TH ST RM 1907
CLEVELAND  OH 44199-9904
```

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1965 | 208.00  | 256.36  | 269.10  | 333.30  | $1,066.76 |
| 1966 | 353.70  | 353.70  | 365.40  | 365.40  | $1,438.20 |
| 1967 | 494.20  | 510.30  | 510.30  | 539.10  | $2,053.90 |
| 1968 | 572.70  | 684.90  | 25.17   |         | $1,282.77 |

```
EMPLOYER NUMBER:  72-0643433
BAR EQUIPMENT INC
1055 BARONNE ST
NEW ORLEANS  LA 70113-1104
```

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1968 |         |         | 624.00  |         | $624.00 |

PAGE   1

SSA-000003

```
SSA-1826            ITEMIZED STATEMENT OF EARNINGS
                 * * *    FOR SSN XXX-XX-6973    * * *
```

EMPLOYER NUMBER:  72-0632816
G T MICHELLI CO INC
130 BROOKHOLLOW
HARAHAN  LA 70123-0000

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1968 |         |         |         | 616.50  | $616.50 |
| 1969 | 948.00  | 160.00  |         |         | $1,108.00 |

EMPLOYER NUMBER:  72-0449298
ELMS ROCHE & LAGARDE
TAC AMUSEMENT COMPANY
5350 SAINT BERNARD AVE
NEW ORLEANS  LA 70122-1252

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1969 |         | 462.25  | 1240.50 | 1135.75 | $2,838.50 |
| 1970 | 1054.00 | 1178.47 | 1273.01 | 1408.09 | $4,913.57 |
| 1971 | 1484.45 | 1399.51 | 1491.88 | 2024.92 | $6,400.76 |
| 1972 | 272.25  |         |         |         | $272.25 |

EMPLOYER NUMBER:  36-2649106
WURLITZER DISTRIBUTING CORPORATION
105 W ADAMS ST
CHICAGO  IL 60603-4109

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1972 | 1321.31 | 1766.81 | 1952.75 | 2007.51 | $7,048.38 |
| 1973 | 2088.51 | 1887.70 | 2142.27 | 2284.19 | $8,402.67 |
| 1974 | 2079.91 | 2463.30 |         |         | $4,543.21 |

EMPLOYER NUMBER:  22-1839096
RIH INC
1547 GODFREY AVE SW
WYOMING  MI 49509-1067

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1974 |         |         | 1269.99 | 2869.89 | $4,139.88 |
| 1975 | 2320.32 | 2761.68 | 2360.53 | 2204.72 | $9,647.25 |

EMPLOYER NUMBER:  66-0326459
PUERTO RICO MARINE MANAGEMENT INC
PO BOX 3170
EDISON  NJ 08818-0000

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1976 | 3913.00 | 4444.16 | 4666.18 | 2276.66 | $15,300.00 |
| 1977 | 4974.46 | 5547.29 | 5978.25 |         | $16,500.00 |

SSA-000004

```
SSA-1826                ITEMIZED STATEMENT OF EARNINGS
                  * * *     FOR SSN XXX-XX-6973      * * *
```

```
        1978                                              $17,700.00
        1979                                              $22,900.00
        1980                                              $25,900.00
        1981                                              $19,738.93
```

EMPLOYER NUMBER:  13-1985646
FLEXI-VAN LEASING INC
% TAX DEPARTMENT
251 MONROE AVE
KENILWORTH  NJ 07033-1106

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1981 |         |         |         |         | $6,000.02 |
| 1982 |         |         |         |         | $24,590.92 |
| 1983 |         |         |         |         | $26,400.40 |
| 1984 |         |         |         |         | $27,381.14 |
| 1985 |         |         |         |         | $29,701.44 |
| 1986 |         |         |         |         | $30,487.48 |
| 1987 |         |         |         |         | $20,329.65 |

EMPLOYER NUMBER:  72-0944062
FRENCHMEN TRUCK & TRAILER INC
424 GREFER AVE
HARVEY LA 70058-4138

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1987 |         |         |         |         | $8,435.40 |
| 1988 |         |         |         |         | $18,357.00 |

EMPLOYER NUMBER:  62-1294533
CSX SERVICES INC
% CSX SHARED SERVICES INC
301 W BAY ST
JACKSONVILLE  FL 32202-5184

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1988 |         |         |         |         | $3,458.20 |
| 1989 |         |         |         |         | $28,854.20 |
| 1990 |         |         |         |         | $18,020.25 |

EMPLOYER NUMBER:  72-1014462
WADLEIGH OFFSHORE INC
PO BOX 188
SLIDELL  LA 70459-0188

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1990 |         |         |         |         | $1,062.00 |
| 1991 |         |         |         |         | $5,575.50 |

SSA-000005

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
                  * * *    FOR SSN XXX-XX-6973    * * *
```

EMPLOYER NUMBER:  72-0883580
CARONNAS SEAFOOD INC
123 N LESTER AVE
METAIRIE  LA 70003-6121

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1991 | | | | | $2,260.67 |
| 1992 | | | | | $6,922.13 |
| 1993 | | | | | $4,115.52 |
| 1994 | | | | | $6,859.20 |

EMPLOYER NUMBER:  72-0856025
SLIDELL EQUIPMENT COMPANY INC
CHARLES FRED OBERKIRCH JR
1111 RUE CALAIS
SLIDELL  LA 70458-2214

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 1995 | | | | | $11,866.61 |
| 1996 | | | | | $21,598.92 |
| 1997 | | | | | $21,342.50 |
| 1998 | | | | | $22,405.66 |
| 1999 | | | | | $22,590.89 |
| 2000 | | | | | $2,521.75 |
| 2001 | | | | | $24,983.48 |
| 2002 | | | | | $22,600.09 |

EMPLOYER NUMBER:  72-1193517
PAVALOR MERCHANDISING INC
% LEO KERN
4223 WILLIAMS BLVD
KENNER  LA 70065-2204

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 2000 | | | | | $10,501.19 |
| 2001 | | | | | $588.60 |

EMPLOYER NUMBER:  72-1331769
NEW ORLEANS DEPOT SERVICES INC
% KIRK S WILLIAMS
5690 CHEF MENTEUR HWY
NEW ORLEANS  LA 70126-5038

| YEAR | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR | TOTAL |
|------|---------|---------|---------|---------|-------|
| 2002 | | | | | $2,112.00 |
| 2003 | | | | | $7,898.00 |

SSA-000006

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
                 * * *     FOR SSN XXX-XX-6973     * * *

EMPLOYER NUMBER:  52-2158506
VENTURE LOGISTICS INC
401 MURRAY RD
CINCINNATI  OH 45217-1012

YEAR    1ST QTR    2ND QTR    3RD QTR    4TH QTR         TOTAL
2003                                                $8,833.13
2004                                               $25,358.08
2005                                               $32,409.18


EMPLOYER NUMBER:  04-2801160
EXEL INC
570 POLARIS PKWY
WESTERVILLE  OH 43082-7900

YEAR    1ST QTR    2ND QTR    3RD QTR    4TH QTR         TOTAL
2006                                               $28,379.07
2007                                               $24,249.28
2008                                               $17,642.42
2009                                               $32,983.94
2010                                               $13,949.63


EMPLOYER NUMBER:  22-1211670
PRUDENTIAL INSURANCE CO OF AMERICA
 & CONS SUBS
% JOEL GREENBAUM
100 MULBERRY ST FL GC3-4TH
NEWARK  NJ 07102-4056

YEAR    1ST QTR    2ND QTR    3RD QTR    4TH QTR         TOTAL
2008                                                $2,682.60
2009                                                  $491.81


******************************************************************
*********   THERE ARE NO OTHER EARNINGS RECORDED UNDER THIS  *********
*********   SOCIAL SECURITY NUMBER FOR YEAR(S) REQUESTED     *********
******************************************************************

                         PAGE   5
```

EXHIBIT 2

## AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS AND PATHOLOGY SPECIMENS, SLIDES, BLOCKS, ETC

TO:

RE:  _____      _____

      DOS:_____      DOB:_____

      DOD:_____      Social Security No:_____

I authorize the above-named individual or organization to disclose the above-named patient's health information, as described below, to the following recipients: _____, for the purpose of the above-named individuals asbestos personal injury claim.

The information to be used and or disclosed is as follows:

1.  All records, reports, test results or other documents concerning the medical care, treatment, and examination of the aforementioned person;

2.  All pathology, original tissue blocks, original tissue slides, records, self histories, histochemical and immunochemical reports, autopsy reports, test results or other documents concerning the medical care, treatment, and examination of the aforementioned person;

3.  Copies of all correspondence concerning the medical care, treatment, examination, or physical condition of the aforementioned person;

4.  Copies of bills or statements of services rendered for such services;

5.  X-ray films, MRI films, CT films and all other imaging films.

I understand that the information in the patient's health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV), Tuberculosis, and genetic testing. It may also include information about behavioral or mental health services, or treatment for alcohol or drug abuse.

I understand that authorizing the disclosure of this health care information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assure treatment. I understand that I may inspect or copy the information to be used or disclosed, as provided in 45 CFR 164.524. I understand that any disclosure of information carries with it the potential for an unauthorized re-disclosure of the patient's health information by the recipient, resulting in the health information no longer being protected by federal confidentiality rules.

A copy of the consent and a notation as to any action taken thereon is to be entered in the patient's record. I understand that I have the right to revoke this authorization at any time. I understand that if I revoke this authorization I must do so in writing by sending or presenting my written revocation to the Privacy Contact of the health care provider named above. I understand that the revocation of this authorization will not apply to the extent that the health care provider has taken action in reliance thereon. I understand that if the authorization was obtained as a condition of obtaining insurance coverage, other law provides the insurer with the right to contest a claim under the policy or the policy itself.

A photostatic copy of this Authorization shall be considered as effective and valid as the original. In the absence of an express revocation, the authority granted under this authorization shall remain in effect for one year from the date set forth below. **This authorization does <u>not</u> waive my doctor/patient privilege.**

The covered entity may not withhold/condition treatment, payment, enrollment or eligibility for benefits on obtaining the authorization or if the patient refuses to sign this authorization. The undersigned has the right to receive a copy of this authorization.

I hereby authorize attorneys of _____ to speak to my healthcare professionals privately or to take testimony at deposition or trial as may be requested.

*The information requested by this authorization falls within ¹164.512 of the Health Insurance Portability and Accountability Act of 1996.*

The undersigned further agrees to waive any time limitations required by the above provider with respect to their receipt of this authorization and the date on which the authorization for records was signed.

      DATED this_____ day of _____, 20_____.

                                    X _____
                                                  Signature of patient

                                **OR**

_____
(Signature) as Special Administrator for the Estate of                  (relationship to patient)

_____

Standard Form 180 (Rev. 11/2015) (Page 1)
Prescribed by NARA (36 CFR 1233.18 (d))

Authorized for local reproduction
Previous edition unusable

OMB No. 3095-0029 Expires 04/30/2021

# REQUEST PERTAINING TO MILITARY RECORDS

Requests from veterans or deceased veteran's next-of-kin may be submitted online by using eVetRecs at http://www.archives.gov/veterans/military-service-records/
To ensure the best possible service, please thoroughly review the accompanying instructions before filling out this form.  PLEASE PRINT LEGIBLY OR TYPE BELOW.

## SECTION I - INFORMATION NEEDED TO LOCATE RECORDS *(Furnish as much information as possible.)*

| 1. NAME USED DURING SERVICE (last, first, full middle) | 2. SOCIAL SECURITY # | 3. DATE OF BIRTH | 4. PLACE OF BIRTH |
|---|---|---|---|
| Brindell, John | 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 | 07/16/1947 | New Orleans, LA |

5. SERVICE, PAST AND PRESENT *(For an effective records search, it is important that ALL service be shown below.)*

| | BRANCH OF SERVICE | DATE ENTERED | DATE RELEASED | OFFICER | ENLISTED | SERVICE NUMBER (If unknown, write "unknown") |
|---|---|---|---|---|---|---|
| a. ACTIVE | United States Navy | | | ☐ | ☐ | |
| b. RESERVE | - | | | ☐ | ☐ | |
| c. STATE NATIONAL GUARD | - | | | ☐ | ☐ | |

6. IS THIS PERSON DECEASED? ☐ NO  ☐ YES - *MUST provide Date of Death if veteran is deceased:* _____

7. DID THIS PERSON RETIRE FROM MILITARY SERVICE? ☐ NO  ☐ YES

## SECTION II – INFORMATION AND/OR DOCUMENTS REQUESTED

1. CHECK THE ITEM(S) YOU ARE REQUESTING:

☐ **DD Form 214 or equivalent.** Year(s) in which form(s) issued to veteran: _____
This form contains information normally needed to verify military service. A copy may be sent to the veteran, the deceased veteran's next-of-kin, or other persons or organizations, if authorized in Section III, below.  An UNDELETED DD214 is ordinarily required to determine eligibility for benefits.  If you request a DELETED copy, the following items will be blacked out:  authority for separation, reason for separation, reenlistment eligibility code, separation (SPD/SPN) code, and, for separations after June 30, 1979, character of separation and dates of time lost.
*An UNDELETED copy will be sent UNLESS YOU SPECIFY A DELETED COPY by checking this box:* ☐ I want a DELETED copy.

☐ **Medical Records** Includes Service Treatment Records, Health (outpatient) and Dental Records.  *IF HOSPITALIZED (inpatient) the FACILITY NAME and DATE (month and year) for EACH admission MUST be provided:* _____

☐ **Other (Specify):** _____

2. PURPOSE:  (Providing information about the purpose of the request is **strictly voluntary**; however, it may help to provide the best possible response and may result in a faster reply.  Information provided will in no way be used to make a decision to deny the request.)

☐ Benefits (explain)  ☐ Employment  ☐ VA Loan Programs  ☐ Medical  ☐ Genealogy  ☐ Correction  ☐ Personal  ☐ Other (explain)

Explain here: _____

## SECTION III - RETURN ADDRESS AND SIGNATURE

1. REQUESTER NAME: _____

2. ☐ I am the MILITARY SERVICE MEMBER OR VETERAN identified in Section I, above.

☐ I am the DECEASED VETERAN'S NEXT-OF-KIN *(MUST submit Proof of Death. See item 2a on instruction sheet.)*

_____
*(Relationship to deceased veteran)*

☐ I am the VETERAN'S LEGAL GUARDIAN *(MUST submit copy of Court Appointment)* or AUTHORIZED REPRESENTATIVE *(MUST submit copy of Authorization Letter or Power of Attorney)*

☐ OTHER _____
*(Specify type of Other)*

3. SEND INFORMATION/DOCUMENTS TO:
*(Please print or type.  See item 4 on accompanying instructions.)*

Name _____

Street _____ Apt. _____

City _____ State _____ Zip Code _____

* This form is available at *http://www.archives.gov/veterans/military-service-records/standard-form-180.html* on the National Archives and Records Administration (NARA) web site. *

4. AUTHORIZATION SIGNATURE: I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the information in this Section III is true and correct and that I authorize the release of the requested information. *(See items 2a or 3a on accompanying instruction sheet. Without the Authorization Signature of the veteran, next-of-kin of deceased veteran, veteran's legal guardian, authorized government agent, or other authorized representative, only limited information can be released unless the request is archival. No signature is required if the request is for archival records.)*

X _____
Signature Required - Do not print            Date _____

Daytime phone _____ Fax Number _____

Email address _____

# REQUEST FOR SOCIAL SECURITY EARNING INFORMATION

1. Provide your name as it appears on your most recent Social Security card or the name of the individual whose earnings you are requesting.

First Name:  | J | O | H | N | | | | | | | | |      Middle Initial: [ ]

Last Name:  | B | R | I | N | D | E | L | L | | | | |

Social Security Number (SSN) | 4 | 3 | 9 | | 7 | 2 | | 6 | 9 | 7 | 3 |      One SSN per request

Date of Birth: 07/16/1947                Date of Death: 04/17/2019

Other Name(s) Used
Maiden Name)

2. What kind of earnings information do you need? (Choose **ONE** of the following types of earnings or SSA must return this request.)

[ ] **Itemized Statement of Earnings $91.00**
(Includes the names and addresses of employers)
If you check this box, tell us why you need this information below.

Year(s) Requested: [ ][ ][ ][ ] to [ ][ ][ ][ ]
Year(s) Requested: [ ][ ][ ][ ] to [ ][ ][ ][ ]

[ ] Check this box if you want the earnings information **CERTIFIED** for an additional $34.00 fee.

[ ] **Certified Yearly Totals of Earnings $34.00**
(Does not include the names and addresses of employers) Yearly earnings totals are FREE to the public if you do not require certification. To obtain FREE yearly totals of earnings, visit our website at www.ssa.gov/myaccount.

Year(s) Requested: [ ][ ][ ][ ] to [ ][ ][ ][ ]
Year(s) Requested: [ ][ ][ ][ ] to [ ][ ][ ][ ]

3. If you would like this information **sent to someone else**, please fill in the information below.

I authorize the Social Security Administration to release the earnings information to:

Name

Address                                                                      State

City                                                            ZIP Code

4. I am the individual to whom the record pertains (or a person authorized to sign on behalf of that individual). I understand that any false representation to knowingly and willfully obtain information from Social Security records is punishable by a fine of not more than $5,000 or one year in prison.

X | Signature AND Printed Name of Individual or Legal Guardian | *SSA must receive this form within 120 days from the date signed*

*John G. Brindell*        *John Brindell*        Date

Relationship (if applicable, you must attach proof)                Daytime Phone:

Address                                                                      State

City                                                            ZIP Code

Witnesses must sign this form ONLY if the above signature is by marked (X). If signed by mark (X), two witnesses to the signing who know the signee must sign below and provide their full addresses. Please print the signee's name next to the mark (X) on the signature line above.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address *(Number and Street, City, State and ZIP Code)* | Address *(Number and Street, City, State and ZIP Code)* |

# **AUTHORIZATION FOR RELEASE OF UNION RECORDS**

**TO:**

**RE:**     _____

         _____

         _____

**Date of Birth:** _____

**Social Security No.:** _____

         You are hereby authorized and directed to release and provide to_____ _____or its representatives, the following documents, including but not limited to all electronically or computer stored or generated records:

1.    Application for membership;
2.    Yearly income including number of hours/days worked per year;
3.    Names and addresses of any and all employers, locations of worksites including any job and/or work logs;
4.    All pension related information including documents showing pension contributions by employers;
5.    Documentation of any training participation and information regarding training materials or trade literature received;
6.    Records of any grievances filed or claims made for work-related injuries;
7.    Records of all claims for health, accident, pension or disability benefits;
8.    All records pertaining to any claim for injuries allegedly due to exposure to asbestos or other materials in the course of his/her employment;
9.    All medical reports and records, infirmary records, return to work slips, medical excuses and accident reports; and
10.   Reports pertaining in any manner to any health screening or educational sessions in which the aforementioned person participated regarding his/her claimed exposure to asbestos or other materials or conditions during the course of his/her employment.

         Copies of the above-referenced materials should be numbered. A photostatic copy of this Authorization shall be considered as effective and valid as the original.

DATED this _____ day of _____, 20_____.

                                                                    X_____
                                                                        Signature of patient

_____ **OR**     _____
(Signature) as Special Administrator for the Estate of             (relationship to patient)

_____

# Brent C. Staggs, M.D.

Diplomat, American Board of Pathology

1 Lile Court, Suite 101

Little Rock, Arkansas 72205

Phone (501) 831-0161

Fax (501) 202-1420

brentstaggs@comcast.net

August 26, 2019

RE: Brindell, John (DOB July 16, 1947)

Dear Sirs,

You have asked for my opinion regarding the diagnosis of Mr. Brindell's disease.

PATHOLOGY REPORTS:

Report from the Southeastern Louisiana VA MC (SPNO – 19 – 1888, April 17, 2019) diagnosed a right pleura needle biopsy as "keratin positive sarcomatoid neoplasm". Clinical information reported incidentally identified pleural-based masses on the right. The case was reviewed by the Joint Pathology Center who performed immunohistochemical stains. They reported atypical spindle cells admixed with collagen and necrosis. Tumor cells reportedly sustained positive for pancytokeratin and CK 8/18 with focal positive staining for D2 40 and trace staining with SMA. Tumor cells were reported negative for EMA, TTF1, STAT 6, CD34, calretinin, CK 5/6, WT1, S100, SOX 10 and desmin. BAP 1 staining was reportedly retained. The differential diagnosis reportedly included sarcomatoid carcinoma and sarcomatoid/desmoplastic malignant mesothelioma.

1

PATHOLOGY MATERIALS:

I received a USB Drive containing numerous photographs at autopsy. Photographs of the external examination were generally unremarkable. Photographs of the internal examination demonstrated a plaque – like tumor of the anterior right chest wall with extension of tumor along the visceral pleural surface of the right lung on both the right lower and upper lobes. The left visceral pleura was unremarkable. Photographs of the chest wall showed numerous hyalinized pleural plaques.

I received lungs after autopsy along with sections of other organs, all previously fixed in formalin. Dissection of lung tissue demonstrated the right chest wall pleura and right visceral pleura extensively involved by thick pleural rind/tumor. Cut surfaces were dense and white with some areas of necrotic appearance. Tumor formed plaques on the chest wall and visceral pleura with some invasion into underlying lung parenchyma. No distant parenchymal lesions were detected on the right. A single 1 cm parenchymal nodule was detected in the left lung. Alveolar lung parenchyma was spongy and red bilaterally. Sections of other organs were grossly unremarkable. I submitted sections for processing as follows: 1 – 7 right lung and pleura, 8 – 14 left lung and pleura, 15 heart, 16 kidney, 17 spleen, 18 liver, 19 pancreas, 20 thyroid.

After processing, embedding and sectioning I created 20 H&E stained glass slides corresponding to the tissue sections mentioned above. Microscopic examination demonstrated a malignant spindle cell neoplasm extensively involving the right pleura and chest wall. Tumor cells were sharply spindled with elongated and tapered nuclei showing irregular chromatin and mitotic figures. Tumor cells showed thin, elongated and tapered cytoplasm. Tumor cells were arranged haphazardly in diffuse sheets but showed areas of nesting and extensive dense, hyalinized collagen entrapping individual tumor cells. Tumor showed destructive invasion into chest wall and lung parenchyma. A single metastatic tumor nodule was detected in the left lung as mentioned above, measuring 1 cm. Alveolar lung parenchyma bilaterally showed patchy areas of acute bronchopneumonia with some areas of lobar pneumonia. Alveolar lung parenchyma generally showed thin and delicate alveolar septae without significant fibrosis or emphysema. Sections of the heart showed mild myocyte hypertrophy.  Sections of kidney showed mild hypertensive changes. Sections of the spleen were unremarkable. Sections of the liver showed mild steatosis without

2

significant inflammation or fibrosis. No metastatic lesions were detected. Sections of the pancreas showed postmortem autolysis. Sections of the thyroid gland showed focal proliferation of atypical spindle cells suspicious for metastatic disease.

I performed immunohistochemistry on sections of pleural tumor. Tumor cells showed diffuse positive staining for CAM 5.2, patchy positive staining for calretinin, nuclear positive staining for GATA3, patchy positive staining for mesothelin, patchy positive staining for and D2 40. Tumor cells appeared negative for WT1, TTF1, B72.3, PAX 8, HBME1, CK 5/6, MOC 31, CEA, BerEp4 and pancytokeratin.



Image 1 (H&E)                    Image 2 (CAM5.2)

3

 

Image 3 (calretinin)                Image 4 (GATA3)

 

Image 5 (Mesothelin)               Image 6 (D240)

4

Based on my review of records and tissues, my diagnosis is as follows:

Lungs and pleura after autopsy:

- **Primary Pleural Malignant Mesothelioma, sarcomatoid/desmoplastic type.**
- **Hyalinized pleural plaques, bilateral.**
- **Acute lobar pneumonia.**

I will supplement or amend this report as appropriate, if additional information becomes available.

Sincerely,

Brent C. Staggs, M.D.

5

Brindell.J-STA01-000005

# Brent C. Staggs, M.D.

Diplomat, American Board of Pathology

1 Lile Court, Suite 101

Little Rock, Arkansas 72205

Phone (501) 831-0161

Fax (501) 202-1420

brentstaggs@comcast.net

Original report: August 26, 2019 (autopsy materials)

Supplemental report: October 29, 2019 (review materials S19-1888, supplemental report)

RE: Brindell, John (DOB July 16, 1947)


Dear Sirs,

You have asked for my opinion regarding the diagnosis of Mr. Brindell's disease.


PATHOLOGY REPORTS:

Report from the Southeastern Louisiana VA MC (SPNO – 19 – 1888, April 17, 2019) diagnosed a right pleura needle biopsy as "keratin positive sarcomatoid neoplasm". Clinical information reported incidentally identified pleural-based masses on the right. The case was reviewed by the Joint Pathology Center who performed immunohistochemical stains. They reported atypical spindle cells admixed with collagen and necrosis. Tumor cells reportedly sustained positive for pancytokeratin and CK 8/18 with focal positive staining for D2 40 and trace staining with SMA. Tumor cells were reported negative for EMA, TTF1, STAT 6, CD34, calretinin, CK 5/6, WT1, S100, SOX 10 and desmin. BAP 1 staining was reportedly retained. The differential diagnosis reportedly included sarcomatoid carcinoma and sarcomatoid/desmoplastic malignant mesothelioma.

1

PATHOLOGY MATERIALS:

I received 34 glass slides all labeled "S 19 – 1888". Two slides were received previously stained with H&E while the remainders were unstained. Microscopic examination demonstrated core biopsy involved by malignant spindle cell neoplasm. Tumor cells were large with angulated and tapered nuclei showing moderate amounts of tapered eosinophilic cytoplasm. Tumor was associated with dense collagenous fibrosis and areas of necrosis.

I received a USB Drive containing numerous photographs at autopsy. Photographs of the external examination were generally unremarkable. Photographs of the internal examination demonstrated a plaque – like tumor of the anterior right chest wall with extension of tumor along the visceral pleural surface of the right lung on both the right lower and upper lobes. The left visceral pleura was unremarkable. Photographs of the chest wall showed numerous hyalinized pleural plaques.

I received lungs after autopsy along with sections of other organs, all previously fixed in formalin. Dissection of lung tissue demonstrated the right chest wall pleura and right visceral pleura extensively involved by thick pleural rind/tumor. Cut surfaces were dense and white with some areas of necrotic appearance. Tumor formed plaques on the chest wall and visceral pleura with some invasion into underlying lung parenchyma. No distant parenchymal lesions were detected on the right. A single 1 cm parenchymal nodule was detected in the left lung. Alveolar lung parenchyma was spongy and red bilaterally. Sections of other organs were grossly unremarkable. I submitted sections for processing as follows: 1 – 7 right lung and pleura, 8 – 14 left lung and pleura, 15 heart, 16 kidney, 17 spleen, 18 liver, 19 pancreas, 20 thyroid.

After processing, embedding and sectioning I created 20 H&E stained glass slides corresponding to the tissue sections mentioned above. Microscopic examination demonstrated a malignant spindle cell neoplasm extensively involving the right pleura and chest wall. Tumor cells were sharply spindled with elongated and tapered nuclei showing irregular chromatin and mitotic figures. Tumor cells showed thin, elongated and tapered cytoplasm. Tumor cells were arranged haphazardly in diffuse sheets but showed areas of nesting and extensive dense, hyalinized collagen entrapping individual tumor cells. Tumor showed destructive invasion into chest wall and lung parenchyma.

2

A single metastatic tumor nodule was detected in the left lung as mentioned above, measuring 1 cm. Alveolar lung parenchyma bilaterally showed patchy areas of acute bronchopneumonia with some areas of lobar pneumonia. Alveolar lung parenchyma generally showed thin and delicate alveolar septae without significant fibrosis or emphysema. Sections of the heart showed mild myocyte hypertrophy.  Sections of kidney showed mild hypertensive changes. Sections of the spleen were unremarkable. Sections of the liver showed mild steatosis without significant inflammation or fibrosis. No metastatic lesions were detected. Sections of the pancreas showed postmortem autolysis. Sections of the thyroid gland showed focal proliferation of atypical spindle cells suspicious for metastatic disease.

I performed immunohistochemistry on sections of pleural tumor. Tumor cells showed diffuse positive staining for CAM 5.2, patchy positive staining for calretinin, nuclear positive staining for GATA3, patchy positive staining for mesothelin, patchy positive staining for and D2 40. Tumor cells appeared negative for WT1, TTF1, B72.3, PAX 8, HBME1, CK 5/6, MOC 31, CEA, BerEp4 and pancytokeratin.



Image 1 (H&E)                    Image 2 (CAM5.2)

3



Image 3 (calretinin)        Image 4 (GATA3)

Image 5 (Mesothelin)        Image 6 (D240)

4

Brindell.J-STA02-000004

Based on my review of records and tissues, my diagnosis is as follows:

Pleura, right, biopsy (S 19 – 1888):

- **Primary Pleural Malignant Mesothelioma, sarcomatoid/desmoplastic type.**

Lungs and pleura after autopsy:

- **Primary Pleural Malignant Mesothelioma, sarcomatoid/desmoplastic type.**
- **Hyalinized pleural plaques, bilateral.**
- **Acute lobar pneumonia.**

I will supplement or amend this report as appropriate, if additional information becomes available.

Sincerely,

Brent C. Staggs, M.D.

5

Brindell.J-STA02-000005



# Deposition of
# **Raymond Kain**

**Date:** January 29, 2021

**Case:** Carolyn Brindell, et al. v. Carlisle Industrial Brake and Friction, Inc., et al.

**No.** 2019-9716

**Court Reporter:** Karen R. Shales, CCR, RPR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513
www.spreporting.com

**EXHIBIT U**

Page 1

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA


NO. 2019-9716                        DIVISION "N"


CAROLYN BRINDELL, ET AL.,

VERSUS

CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC.,
ET AL.,




REMOTE VIDEOTAPED DEPOSITION OF RAYMOND KAIN




Taken on behalf of Plaintiff
January 29, 2021



Karen R. Shales, CCR, RPR
Certified Shorthand Reporter
License No. 2017007




Paszkiewicz Court Reporting (618) 307-9320

Raymond Kain
January 29, 2021

---

**Page 2**

1    INDEX OF EXAMINATION
2
3                        Page   Line
4    EXAMINATION BY MR. HIBEY............ 9     3
     EXAMINATION BY MR. KINLER........... 36    15
5    EXAMINATION BY MS. SENTER........... 90    19
     EXAMINATION BY MR. HART............. 147   11
6    EXAMINATION BY MS. BAXTER........... 165   22
     EXAMINATION BY MS. DETO............. 170   22
7    EXAMINATION BY MR. HARRISON......... 185   12
     EXAMINATION BY MR. LASSUS........... 194   22
8    EXAMINATION BY MR. ZANOVEC.......... 197   12
     EXAMINATION BY MS. SENTER........... 210   11
9    EXAMINATION BY MS. BAXTER........... 238   19
     EXAMINATION BY MR. KINLER........... 242   13
10   EXAMINATION BY MS. BAXTER........... 245   8
11
12   INDEX OF EXHIBITS
13
14   Kain Exhibit    Notice of
     No. 1           Deposition......... 34    23
15   Kain Exhibit
     No. 2           Affidavit.......... 34    24
16
17
18
19
20
21
22
     (Exhibit No. 2 not attached to transcript at time
23    of production.)
24
25

---

**Page 3**

1    CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
2
          STATE OF LOUISIANA
3
4    NO. 2019-9716        DIVISION "N"
5
6    CAROLYN BRINDELL, ET AL.,
7              VERSUS
8    CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC.,
     ET AL.,
9
10
11        REMOTE VIDEOTAPED DEPOSITION OF
     RAYMOND KAIN, produced, sworn, and examined on
     behalf of Plaintiff, January 29, 2021, between
12   the hours of 9:09 a.m. Central Standard Time and
     2:08 p.m. Central Standard Time, of that day,
13   taken before Karen R. Shales, Certified Shorthand
     Reporter.
14
15
16        A P P E A R A N C E S
17        APPEARING TELEPHONICALLY:  The Plaintiffs
18   were represented by Mr. Michael Hibey, of the law
     firm of Simmons Hanly Conroy, One Court Street,
     Alton, Illinois 62002.
19
20        APPEARING TELEPHONICALLY:  The
     Plaintiffs were represented by Ms. Lindsey Cheek,
21   of the law firm of The Cheek Law Firm, 650
     Poydras Street, Suite 2310, New Orleans,
22   Louisiana 70130.
23
24
25

---

**Page 4**

1        APPEARING TELEPHONICALLY:  The
     Defendant, First State Insurance Company, was
2    represented by Mr. James Holmes, of the law firm
     of Christovich & Kearney, LLP, 601 Poydras
3    Street, Suite 2300, New Orleans, Louisiana 70130.
4
5        APPEARING TELEPHONICALLY:  The
     Defendant, Lufkin Industries, Inc., was
6    represented by Ms. Jamie Zanovec, of the law firm
     of Courington Kiefer Sommers Marullo & Matherne,
7    LLC, 616 Girod Street, New Orleans, Louisiana
     70130.
8
9        APPEARING TELEPHONICALLY:  The
     Defendant, Pneumo Abex, LLC, was represented by
10   Mr. William Harrison, of the law firm of Deutsch
     Kerrigan, LLP, 755 Magazine Street, New Orleans,
11   Louisiana 70130.
12        APPEARING TELEPHONICALLY:  The
13   Defendant, Strick Trailers, was represented by
     Ms. Kay Baxter, of the law firm of Foley &
14   Mansfield, 650 Poydras Street, Suite 2450, New
     Orleans, Louisiana 70130.
15
16        APPEARING TELEPHONICALLY:  The
     Defendant, Carlisle Industrial Brake and
17   Friction, Inc., was represented by Ms. Magali
     Puente, of the law firm of Frilot, LLC, 1100
18   Poydras Street, Suite 3700, New Orleans,
     Louisiana 70163.
19
20        APPEARING TELEPHONICALLY:  The
     Defendant, Taylor-Seidenbach, Inc., was
21   represented by Mr. Edward Lassus, of the law firm
     of Hailey McNamara Hall Larmann & Papale, LLP,
22   One Galleria Boulevard, Suite 1400, Metairie,
     Louisiana 70001.
23
24
25

---

**Page 5**

1        APPEARING TELEPHONICALLY:  The
     Defendant, CRA Trailers, Inc., f/k/a Racine
2    Trailers, Inc., was represented by Ms. Amanda
     Deto-Sloan, of the law firm of Manning Gross &
3    Massenburg, LLP, 365 Canal Street, Suite 3000,
     New Orleans, Louisiana 70130.
4
5        APPEARING TELEPHONICALLY:  The
     Defendant, Eaton Corporation, was represented by
6    Ms. Meghan Senter, of the law firm of Manning
     Gross & Massenburg, LLP, 365 Canal Street, Suite
7    3000, New Orleans, Louisiana 70130.
8
9        APPEARING TELEPHONICALLY:  The
     Defendant, Utility Trailer Manufacturing Co., was
10   represented by Mr. Joseph Hart, IV, of the law
     firm of Pugh Accardo, 1100 Poydras Street,
11   Suite 3300, New Orleans, Louisiana 70163.
12        APPEARING TELEPHONICALLY:  The
13   Defendant, Eagle, Inc., was represented by
     Mr. Douglas Kinler, of the law firm of Simon,
14   Peragine, Smith & Redfearn, LLP, 1100 Poydras
     Street, 30th Floor, New Orleans, Louisiana
15   70163.
16
17        Also Present:  Mr. Scott Sill, Videographer
18
19
20
21
22
23
24
25

---

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Raymond Kain
January 29, 2021

Page 6

1           IT IS HEREBY STIPULATED AND AGREED
2    by and between Counsel for the Plaintiff and
3    Counsel for the Defendants, that this deposition
4    may be taken in shorthand by KAREN R. SHALES, a
5    Certified Shorthand Reporter, and afterwards
6    transcribed into typewriting, and the signature
7    of the witness is not waived by agreement of
8    counsel and the witness.
9
10                    O-O-O
11
12           THE VIDEOGRAPHER:  This is the
13    videotaped deposition of Raymond Kain.  Today's
14    date is January 29, 2021.  The time is 9:09 a.m.
15    Central Standard Time.  We are now on the record.
16    All attorneys present will be indicated on the
17    stenographic record.
18           The court reporter will now swear in
19    the witness.
20           (Witness sworn.)
21           MS. BAXTER:  I have no volume.  I
22    cannot hear the witness.
23           MR. HIBEY:  Mr. Kain -- is he sworn
24    in?
25           THE COURT REPORTER:  Yes.

Page 7

1           MR. HIBEY:  All right.  I don't know
2    who's trying to state that they can't hear the
3    witness.  Can they hear nothing?  They can't hear
4    me.
5           MR. KINLER:  Mike, is this you, Mike
6    Hibey?
7           MR. HIBEY:  Yes.
8           MR. KINLER:  Hey, Mike.  Doug Kinler.
9    That's Kay Baxter.
10           MR. HIBEY:  All right.  I'm assuming
11    Kay cannot hear me right now either.
12           THE VIDEOGRAPHER:  No, but it sounds
13    like she's calling in, so give her a couple of
14    seconds.
15           MR. HIBEY:  Okay.  Mr. Kain, we're
16    just going to hold tight one minute here.  Sorry
17    about the delay.
18           MR. KINLER:  Mike, while we're
19    waiting -- this is Doug Kinler again.  While
20    we're waiting for Kay, can we make an agreement
21    that one -- objection by one is good for all, is
22    that good with you?
23           MR. HIBEY:  That is.
24           MR. KINLER:  And all objections are
25    reserved except to form of the question and

Page 8

1    responsiveness of the answer.  Is that okay?
2           MR. HIBEY:  Sure.
3           MR. KINLER:  Okay.  Thank you.
4           MR. HART:  Probably should put on the
5    record that everybody consents to the witness
6    being sworn remotely just to have that covered.
7           Does anybody object?
8           MR. HIBEY:  No.  Thank you.
9           Kay, are you back on line?
10           MS. BAXTER:  I dialed in from my
11    phone.  Can you hear me?
12           MR. HIBEY:  Yes, we can hear you.
13           MS. BAXTER:  Wonderful.
14           MR. HIBEY:  He said that your client
15    is solely responsible for everything while you
16    were gone.
17           MS. BAXTER:  Good luck.  I love a
18    sense of humor.
19           MR. HIBEY:  All right, guys.
20                    RAYMOND KAIN,
21    of lawful age, being produced, sworn and examined
22    on the part of the Plaintiffs, and after
23    responding "Yes" to the oath administered by the
24    court reporter, deposes and says:
25

Page 9

1              * * * * * * * * * * * *
2              [EXAMINATION]
3    QUESTIONS BY MR. HIBEY:
4           Q.  Mr. Kain, I think we're going to get
5    started now, so here's the deal.  I'm going to
6    ask you some questions and then some defense
7    attorneys are going to ask you some questions.
8    I'm going to try to be as quick as I can so I'll
9    get right to it.
10           I need you to first identify
11    yourself, tell us your name, address and date of
12    birth.
13           A.  My name is Raymond Michael Kain,
14    K-a-i-n.  My address is 59512 Transmitter Road,
15    Lacombe, Louisiana 70445 ZIP.  And my age is
16    August 2nd -- the 22nd, 1949.
17           Q.  Thank you.  Mr. Kain, we're here
18    today in a case arising out of the death of John
19    Brindell.
20           Did you know Mr. Brindell?
21           A.  I sure did.
22           Q.  Okay.  How is my reception?  Can you
23    hear and see me okay?
24           A.  Pretty much, but the hearing
25    sometimes kind of delayed and broke up a little

                                3  (Pages 6 to 9)

Raymond Kain
January 29, 2021

Page 10

1   bit.
2       Q.   Now, I'm having a little bit of a
3   delay when you speak as well, so if it gets too
4   bad to where you cannot understand me, please let
5   me know.
6       A.   Okay.
7       Q.   All right.  Did you work with
8   Mr. Brindell?
9       A.   Yes, I did.
10      Q.   Where did you work with Mr. Brindell?
11      A.   Puerto Rican Marine Management.
12      Q.   When did you work there at Puerto
13  Rico Marine Management?
14      A.   Oh, Lord.  I worked from November the
15  13th, 1971, and all the way until they closed
16  down and I don't remember the date of that.
17      Q.   Okay.  Did they close down sometime
18  in the '80s, '90s or later?
19      A.   Oh, I'd say it was in the -- oh, I
20  guess -- Lord, it might have been in the '90s.
21  Probably late '90s or maybe beginning of 2000.  I
22  don't know.
23      Q.   Okay.  Well --
24      A.   I don't know the exact close date.
25      Q.   The good news is it doesn't really

Page 11

1   matter because Mr. Brindell wasn't working there
2   then.
3           Mr. Brindell worked at Puerto Rico
4   Marine Management between 1976 and 1981, so that
5   is the time period that I want to focus on.
6   Okay?
7       A.   Fine with me.
8       Q.   All right.  During the time period
9   that Mr. Brindell worked at Puerto Rico Marine,
10  did you ever work with him?
11      A.   Yes.
12      Q.   Okay.  Can you describe for us during
13  that time period, 1976 to 1981, what was your
14  job, what were your duties and what were your
15  responsibilities?
16      A.   Well, I was a mechanic and we did bad
17  chassis, trailers and that's what we did.  We did
18  brake jobs, everything to a chassis.
19      Q.   All right.  And what did Mr. Brindell
20  do?
21      A.   He would work out there with us.
22      Q.   During that time period 1976 to 1981,
23  can you describe for all of us here today how you
24  performed a brake job on a trailer at Puerto Rico
25  Marine?

Page 12

1       A.   Well, we used to jack it up first and
2   then we'd pull all the tires off, all the wheels.
3   That's the hub and all.  And then we take the
4   brake shoes off.  And after that, we take a
5   blowoff tip with an air gun and we blow all the
6   dust and everything out and all out inside the
7   drum and the hub.  And then we would replace the
8   brake shoes and the parts that go with it.
9       Q.   When you used that air hose to blow
10  out the dust, what were you actually blowing?
11      A.   Dust, I guess, brake dust from when
12  the brakes went against the drum to stop, they
13  would wear down and it made dust.
14      Q.   When you used the air to blow the
15  dust, what were the work conditions like in the
16  environment where you were working?
17      A.   A dust storm.  All the dust started
18  coming out there and blowing all around.  In
19  fact, sometimes we'd have to even move out of the
20  way for the (indiscernible) --
21      Q.   Could you see brake dust in the air?
22      A.   Yeah.
23           DEFENSE COUNSEL:  Object to form.
24  BY THE WITNESS:
25      A.   Yeah.

Page 13

1   BY MR. HIBEY:
2       Q.   Did you breathe any of that brake
3   dust?
4       A.   Sure.  We had to.  I mean, it was
5   there.  You would breathe it.
6       Q.   And what about Mr. Brindell, was he
7   present when the brake dust was in the air?
8           DEFENSE COUNSEL:  Object to form.
9   BY THE WITNESS:
10      A.   Sure.
11  BY MR. HIBEY:
12      Q.   What was he doing in that
13  environment?
14      A.   He was helping us.
15      Q.   All right.  Between 1976 and 1981,
16  can you give us all a sense for the frequency or
17  infrequency with which you personally performed
18  brake jobs?
19      A.   Oh, Lord.  We did so many brake jobs,
20  I couldn't, you know, tell you how many.
21  That's -- that's what my -- our job was.
22      Q.   If we wanted to break it down and
23  just look at a typical day, could you give us a
24  sense for how many brake jobs you performed on
25  trailers at Puerto Rico Marine in one day between

4  (Pages 10 to 13)

Raymond Kain
January 29, 2021

Page 14

1  1976 and 1981, a typical day?
2      A.  Oh, probably one a day.  I mean, it
3  takes time to do that.  I mean, brake -- maybe
4  one complete and start another one.
5      Q.  All right.  And when you say one
6  complete, are we talking about multiple brakes
7  for a full like trailer chassis system?
8          DEFENSE COUNSEL:  Object to the form.
9  BY THE WITNESS:
10     A.  It was the brakes and the trailer
11 system, you mean -- what -- I didn't understand
12 that question.
13 BY MR. HIBEY:
14     Q.  Yeah, that's fine.  I'm sorry.
15         What I'm -- what I'm trying to
16 understand is when -- when you're saying you're
17 doing a brake job a day, that actually isn't just
18 one brake.  It's the full chassis or trailer?
19     A.  Four wheels.
20     Q.  Right.  And that would be then four
21 different brake assemblies?
22     A.  Right.
23         DEFENSE COUNSEL:  Object to form.
24 BY THE WITNESS:
25     A.  Two axles.

Page 15

1  BY MR. HIBEY:
2      Q.  All right.  And just diving in for a
3  second into the location of this work, this work
4  was taking place in some type of a mechanic's
5  shop, true?
6      A.  Correct.
7          DEFENSE COUNSEL:  Object to the form.
8  BY MR. HIBEY:
9      Q.  I'm sorry your answer was correct,
10 yes?
11     A.  Yes.
12     Q.  Okay.  So can you please describe for
13 us the shop where the brake work that you were
14 performing was taking place between 1976 and
15 1981?
16     A.  Well, it was a four-stall shop and
17 they had trailer work going on in all four stalls
18 or chassis work, brake jobs.
19     Q.  All right.  Thank you.
20         And so you were not the only person
21 during this time period performing brake jobs?
22     A.  No.
23         DEFENSE COUNSEL:  Object to form.
24 BY MR. HIBEY:
25     Q.  So now I just want to briefly touch

Page 16

1  on the particular brands or manufacturers of
2  brakes that you recall working with.  Okay?
3          So my first question is, you
4  mentioned that there was four brake assemblies
5  and two axles on these chassises and trailers
6  that you were working on?
7      A.  Right.
8      Q.  Do you recall who manufactured the
9  axles?
10     A.  Yes, I do.  Fruehauf, Eaton and
11 Rockwell.
12     Q.  All right.  And do you recall who
13 manufactured the brakes that were used on the
14 Fruehauf axles?
15     A.  Probably Fruehauf.
16         DEFENSE COUNSEL:  Object to the form.
17 BY MR. HIBEY:
18     Q.  Do you recall who manufactured the
19 brakes for the Eaton axles?
20         DEFENSE COUNSEL:  Object to form.
21         DEFENSE COUNSEL:  Object to form.
22         MR. HIBEY:  What's the form
23 objection?
24         DEFENSE COUNSEL:  Vague.
25         MR. HIBEY:  What's vague about it?

Page 17

1  He said that he worked with Eaton axles and I'm
2  asking him which brakes he used on the Eaton
3  axles.
4          DEFENSE COUNSEL:  What are you
5  referring to specifically when you say brake?
6          MR. HIBEY:  Okay.  I will ask him.
7  BY MR. HIBEY:
8      Q.  Going back to the Fruehauf axles,
9  were there brakes that were incorporated into the
10 Fruehauf axle system?
11     A.  Yes.
12     Q.  Okay.  And did you have to use brakes
13 on the Fruehauf axles?
14     A.  Yeah.
15     Q.  Okay.  What -- what did the brakes
16 look like on the Fruehauf axles?
17     A.  Well, it's a shoe-looking thing.
18 They call them brake shoes.  It's kind of rounded
19 like this, half rounded, and they got brake pads
20 that are stapled or riveted onto the top of the
21 metal shoes --
22     Q.  Okay.
23     A.  The shoes or attached to the axle.
24     Q.  Do you consider the brake shoes part
25 of an assembly system that would be incorporated

5 (Pages 14 to 17)

Raymond Kain
January 29, 2021

Page 18

1    and used with the axles?
2        A.   Yes.
3        Q.   And whose brake shoes did you use on
4    the Fruehauf axles?
5        A.   I guess Fruehauf shoes.
6        Q.   And whose brake shoes did you use on
7    the Eaton axles?
8        A.   Eaton.
9        Q.   And whose brake shoes did you use on
10   the Rockwell axles?
11       A.   Rockwell.
12           MR. HIBEY:  And for the record, he
13   said Rockwell.  Did that get picked up?
14           THE COURT REPORTER:  Yes.
15   BY MR. HIBEY:
16       Q.   Now, within these shoes there were
17   pads and linings, correct?
18           DEFENSE COUNSEL:  Object to form.
19   BY THE WITNESS:
20       A.   Well, the brake lining is the pad --
21   BY MR. HIBEY:
22       Q.   Okay.
23       A.   -- that goes on top of the shoe.
24       Q.   All right.  And the linings were --
25   how were the linings attached to the shoes, if at

Page 19

1    all?
2        A.   Rivets.
3        Q.   I'm sorry.  I couldn't hear you.
4        A.   Rivets.
5        Q.   All right.  You said rivets twice and
6    neither time did I hear it, I -- the full word, I
7    don't think, but is that correct you said rivets?
8        A.   Right.
9        Q.   All right.  Now, what was worn down
10   and releasing dust during the brake changing
11   process?
12           DEFENSE COUNSEL:  Object to form.
13           DEFENSE COUNSEL:  Objection --
14   BY THE WITNESS:
15       A.   It was the shoe.
16   BY MR. HIBEY:
17       Q.   Okay.
18       A.   The lining.
19       Q.   The lining attached to the shoe.
20   Okay.
21           And is that where the dust came from?
22       A.   Right.
23           DEFENSE COUNSEL:  Object to form.
24   BY MR. HIBEY:
25       Q.   All right.  Let me ask you this.

Page 20

1            If you could give us a sense for --
2    during the times when you removed Fruehauf brake
3    shoes, can you tell us a number of times that you
4    did remove Fruehauf brake shoes in a dusty
5    situation at Puerto Rico Marine between '76 and
6    '81?
7        A.   Oh, I couldn't tell you.
8            DEFENSE COUNSEL:  Object to the form.
9    BY THE WITNESS:
10       A.   I couldn't tell you.  We did so many.
11   BY MR. HIBEY:
12       Q.   All right.  What would --
13       A.   I did so many.
14       Q.   What would be your best estimate of
15   the times that you were in dusty conditions from
16   removing Fruehauf brake shoes at Puerto Rico
17   Marine?
18       A.   Oh, probably all day.
19       Q.   All right.  And in terms of a number
20   of times over the course of, say, 1976 to 1981,
21   can you estimate, was that -- just in terms of
22   number, how many times do you think that was?
23       A.   Plenty.  A whole bunch.
24       Q.   Okay.
25       A.   It was -- you know, there's no way I

Page 21

1    could explain that.  You know, there's no way I
2    could tell a number.
3        Q.   Okay.  And so some people will hear
4    that and they'll say well, he doesn't know the
5    number, and I want -- I want you to be as exact
6    as you can.
7            When you're saying I can't tell the
8    number, it's because it was too many times to
9    count; isn't that true?
10       A.   That's true.
11           DEFENSE COUNSEL:  Object to the form.
12           DEFENSE COUNSEL:  Object to form,
13   misstates testimony.
14           DEFENSE COUNSEL:  Totally leading.
15   BY MR. HIBEY:
16       Q.   All right.  And so in terms of a
17   number, if you had to put a number on it, would
18   it be more than 100 times?
19           DEFENSE COUNSEL:  Object to form,
20   asked and answered.
21   BY THE WITNESS:
22       A.   Yes, it would be.
23   BY MR. HIBEY:
24       Q.   Okay.  And where would you draw the
25   line?  Would it be more than several hundred

6 (Pages 18 to 21)

Raymond Kain
January 29, 2021

Page 22

1    times or would it be less than several hundred
2    times?
3             DEFENSE COUNSEL:  Object to form.
4    BY THE WITNESS:
5        **A.  It probably would be more.**
6             DEFENSE COUNSEL:  Form.
7    BY MR. HIBEY:
8        Q.  All right.  Same thing as it relates
9    to the Eaton axles in the Eaton shoes that you
10   were talking about, could you tell us, was it
11   more or less than a hundred times that you were
12   in dusty conditions from blowing out brake dust
13   from Eaton axles and Eaton shoes?
14       **A.  I'm sure it was.**
15            DEFENSE COUNSEL:  Objection, form.
16            DEFENSE COUNSEL:  Object to form.
17            MR. HIBEY:  Okay.  We only need one
18   objection and there is no form objection even
19   proper there.  So if you all can just do it one
20   at a time --
21            DEFENSE COUNSEL:  Form objection --
22            MR. HIBEY:  -- or you can have a
23   running form objection to the question.  I don't
24   care.
25            DEFENSE COUNSEL:  Mike, our agreement

Page 23

1    does not permit you to consistently ask leading
2    questions.  You need to ask --
3             MR. HIBEY:  That's not a leading
4    question.  It's not a leading question.  It has
5    two options, more or less.
6             DEFENSE COUNSEL:  Mike, I think part
7    of the problem -- I know that you're getting
8    frustrated with the multiple objections.  I think
9    part of the problem is the platform.  There's a
10   delay and we're trying to make sure our
11   objections are lodged.
12            If you would consider agreeing to
13   reserving all objections including as to form, we
14   might be able to forgo this.
15            MR. HIBEY:  I don't think you guys
16   are going to stop, so I'm not going to agree to
17   that.  But I'm going to agree to the fact that
18   when it's not a leading question, I don't need
19   five objections saying it is just because you
20   don't like the question.
21            DEFENSE COUNSEL:  Well, Mike, I can't
22   see who else is objecting.  Nobody can see who
23   else is objecting, so we're all going to keep
24   making objections.  It's not going to solve the
25   problem.

Page 24

1             MR. HIBEY:  Great.  Okay.
2             DEFENSE COUNSEL:  But by all means,
3    go ahead.
4    BY MR. HIBEY:
5        Q.  Mr. Kain, sorry about that
6    interruption.
7             If possible, can you tell us how many
8    times you believe you were in dusty conditions
9    from working with Eaton shoes at Puerto Rico
10   Marine between 1976 and 1981?
11            DEFENSE COUNSEL:  Object to form.
12            DEFENSE COUNSEL:  Object to the form.
13   BY THE WITNESS:
14       **A.  We had a whole -- worked a lot like**
15   **that.**
16   BY MR. HIBEY:
17       Q.  And if you had to put a number on it,
18   what would be the range of days between -- over
19   the course of five or six years?
20            DEFENSE COUNSEL:  Object to form.
21   BY THE WITNESS:
22       **A.  I can say -- I can't give you a**
23   **number.  I can just tell you it was a whole**
24   **bunch.**
25

Page 25

1    BY MR. HIBEY:
2        Q.  Okay.
3        **A.  A lot.**
4        Q.  And that leads to just one final
5    question.
6             When you say a whole bunch, a lot,
7    can you be a little more precise or exact what
8    you mean by that?
9             DEFENSE COUNSEL:  Object to form.
10   BY THE WITNESS:
11       **A.  I mean, it -- you know, it was -- you**
12   **know, we did it every day.**
13   BY MR. HIBEY:
14       Q.  Okay.  Thank you.
15            Lastly, with respect to the Rockwell
16   axles and the Rockwell shoes, can you please give
17   us a range of times, if at all, that you were
18   present and in dusty conditions from blowing out
19   brake dust from Rockwell shoes and axles?
20            DEFENSE COUNSEL:  Object to the form.
21   BY THE WITNESS:
22       **A.  We -- we did it -- we did them every**
23   **day.  They had four stalls there and dust was**
24   **blowing all around in there.**
25   BY MR. HIBEY:

7 (Pages 22 to 25)

Raymond Kain
January 29, 2021

Page 26

1      Q.   All right.  Now --
2          DEFENSE COUNSEL:  Object to the form.
3   BY MR. HIBEY:
4      Q.   -- how often was Mr. Brindell present
5   in those dusty conditions from work on Fruehauf
6   shoes?
7          DEFENSE COUNSEL:  Object to the form.
8   BY THE WITNESS:
9      A.   Pretty -- pretty -- pretty often.
10  BY MR. HIBEY:
11     Q.   What does that mean?
12     A.   A couple times a week anyway.
13     Q.   All right.  And would your answer --
14  would your answer be the same for the dusty
15  conditions created from working on Eaton shoes?
16         DEFENSE COUNSEL:  Object to form.
17         DEFENSE COUNSEL:  Object to form.
18  BY THE WITNESS:
19     A.   Same thing.
20  BY MR. HIBEY:
21     Q.   All right.  And what about -- what
22  about for the Rockwell shoes?
23     A.   Probably just as much.  I mean, he
24  was down there with us.
25     Q.   All right.  Thank you.

Page 27

1          Now, last piece I want to ask you
2   about as it relates to brake work in the mechanic
3   shop is we talked about the axles and the shoes.
4   The next area I want to cover is the chassis and
5   trailers themselves.
6          Do you recall the manufacturers or
7   the brand names of any of the trailers that you
8   guys worked on?
9      A.   Oh, we had Lufkin, Fruehauf, Great
10  Dane.  I can't remember them all right now, but
11  that's some of them that we worked on.
12     Q.   All right.  And I'm going to ask you
13  about a few others.
14         Did you work on any Wilson trailers?
15     A.   Yes.
16         DEFENSE COUNSEL:  Object to form.
17  BY MR. HIBEY:
18     Q.   Did you work on any Strick trailers?
19         DEFENSE COUNSEL:  Objection, form.
20  BY THE WITNESS:
21     A.   Strick, yeah.
22  BY MR. HIBEY:
23     Q.   And did you work on any Utility
24  trailers?
25         DEFENSE COUNSEL:  Object to form.

Page 28

1   BY THE WITNESS:
2      A.   Utility, yeah.
3   BY MR. HIBEY:
4      Q.   All right.  All of these various
5   brands of trailers, what type of brake work did
6   you perform on them?
7      A.   Brake jobs.
8      Q.   Did you perform brake jobs similarly
9   to what you discussed at the beginning of this
10  deposition?
11     A.   Yes.
12     Q.   Was it the same process wherein you
13  had to jack it up, take the wheels off, remove
14  the hub, remove the brake shoes, blow out the
15  dust and replace the brake shoes?
16     A.   Exactly.
17         DEFENSE COUNSEL:  Object to form.
18         DEFENSE COUNSEL:  Object to form.
19  BY MR. HIBEY:
20     Q.   All right.  And with respect to each
21  of those brands of trailers that you've
22  mentioned, which includes now Lufkin, Fruehauf,
23  Great Dane, Wilson, Strick and Utility, could you
24  tell us if any of those were trailers that you
25  worked on more frequently or less frequently or

Page 29

1   would there be a way for you to kind of organize
2   that for us in any manner?
3          DEFENSE COUNSEL:  Object to form.
4   BY THE WITNESS:
5      A.   Now, we just -- you know, we just
6   worked on them like when they was what we needed.
7   Now, I think we had more Fruehauf than we had
8   anything.
9   BY MR. HIBEY:
10     Q.   All right.  And then earlier we were
11  talking about three different brands of axles and
12  three different brands of shoes that you
13  associated with those axles.
14         Are you able to associate particular
15  axles with particular trailers?  So, for example,
16  could you tell us whether or not, say, the Lufkin
17  trailers had Eaton, Rockwell or Fruehauf axles?
18     A.   It would probably have --
19         DEFENSE COUNSEL:  Object to form.
20  BY THE WITNESS:
21     A.   It would probably have the Rockwell
22  axle.
23  BY MR. HIBEY:
24     Q.   Okay.  And what about -- I'm assuming
25  a Fruehauf trailer, what kind of axles did those

8 (Pages 26 to 29)

Raymond Kain
January 29, 2021

Page 30

1  have?
2      A.   Fruehauf, they had their own axles.
3      Q.   All right.  What about Great Dane
4  trailers, do you know what kind of axles they
5  had?
6      A.   It could be --
7          DEFENSE COUNSEL:  Object to form.
8  BY THE WITNESS:
9      A.   It could be either Rockwell or Eaton.
10  BY MR. HIBEY:
11      Q.   And what about Wilson trailers, do
12  you know whose axles were underneath the Wilson
13  trailers?
14      A.   Oh, Rockwell or Eaton because they --
15  they didn't make their own axles.  They bought
16  axles.
17      Q.   What about Strick trailers, do you
18  know whose axles were underneath the Strick
19  trailers?
20      A.   Probably, like I said, the same two,
21  either -- you know, the only one that had the
22  Fruehauf axle was the Fruehauf trailer because
23  they made their own axles and their own trailers
24  and everything.
25      Q.   Okay.  And lastly for Utility, would

Page 31

1  you agree they did not have -- you don't believe
2  they had Fruehauf axles?
3      A.   No.
4      Q.   And what axles do you think Utility
5  trailers had?
6          DEFENSE COUNSEL:  Object to form.
7  BY THE WITNESS:
8      A.   Like I said, either Eaton or
9  Rockwell.
10  BY MR. HIBEY:
11      Q.   Okay.  All right.  Mr. Kain, I may
12  come back and ask you some questions later on
13  about the axles, brakes and trailers, but I don't
14  want to overdo it, so I think that's all I'm
15  going to ask you on that stuff for right now and
16  I'll let these defense attorneys bother you about
17  some of that in a minute.  And if they don't
18  bother you too much, I'll come back at the end
19  and finish up.
20          There's one other area that I wanted
21  to cover with you and it relates to work outside
22  of the mechanic shop down there at Puerto Rico
23  Marine, okay, and we'll just briefly touch on
24  that.
25          You previously provided a signed

Page 32

1  affidavit that everyone in this case has had a
2  chance to take a look at.
3          Do you recall signing a document
4  in -- that was used, I guess, in this case, but
5  it was signed, I think, remotely back a couple
6  months ago arising out of a -- statements of your
7  work with Mr. Brindell.
8          Do you remember that document?
9      A.   I do.
10      Q.   Okay.  And it was an affidavit that
11  was actually -- it looks like it was signed on
12  the 29th of April 2020.
13          And have you had a chance to take a
14  look at that document again recently?
15      A.   Not really recently, but I read it.
16  I know what it said.
17      Q.   Okay.  Well, I'm going to go ahead
18  and --
19      A.   I got a copy of it.
20      Q.   All right.  Well, do you want -- I
21  can show you the document real quick.  We can
22  take a look at it together.
23          DEFENSE COUNSEL:  I've got to object.
24  He should not be shown this document before it's
25  being examined regarding his recollection of the

Page 33

1  document.  It can't be used to refresh his
2  recollection in the absence of being asked the
3  questions first.
4          MR. HIBEY:  It's not being used to
5  refresh his recollection.  It's being used for
6  him to identify it.
7          DEFENSE COUNSEL:  Okay.  Can I have
8  a --
9  BY MR. HIBEY:
10      Q.   Mr. Kain --
11          DEFENSE COUNSEL:  -- continuing
12  objection to all -- all questions regarding the
13  affidavit so that I can be quiet during your
14  examination?
15          MR. HIBEY:  No, you can't.
16          DEFENSE COUNSEL:  Okay.  Fine.
17  BY MR. HIBEY:
18      Q.   Mr. Kain, I'm showing you what is --
19  at the top here it says Affidavit.
20          Can you see that document?
21      A.   Yes, sir, I can.
22      Q.   All right.  And down here at the
23  bottom, I've scrolled down, that's your signature
24  notarized --
25      A.   That's my signature.

9  (Pages 30 to 33)

Raymond Kain
January 29, 2021

Page 34

1      Q.  All right.  Mr. Kain, have you had a
2  chance to take a look at this document since
3  you've signed it?
4      **A.  Oh, yeah.  Quite a few times.**
5      Q.  All right.  Is this document
6  accurate?
7          DEFENSE COUNSEL:  Object to the form.
8          DEFENSE COUNSEL:  Object to form.
9  BY THE WITNESS:
10     **A.  Yes, as far as I'm concerned.**
11 BY MR. HIBEY:
12     Q.  Okay.  And is this document based on
13 your personal knowledge and information?
14         DEFENSE COUNSEL:  Object to the form.
15 BY THE WITNESS:
16     **A.  Exactly.**
17         MR. HIBEY:  All right.  I'm going to
18 take this down.
19         We will mark the affidavit as
20 Exhibit 2 to this deposition.  We'll mark the
21 notice of deposition as Exhibit 1 to the
22 deposition.
23         (Kain Exhibit No. 1 marked.)
24         (Kain Exhibit No. 2 marked.)
25

Page 35

1  BY MR. HIBEY:
2      Q.  All right.  Hey, Mr. Kain, can you
3  see me again?
4      **A.  What's that?**
5      Q.  All right.  Can you see me again?
6      **A.  Yes, I can.**
7      Q.  All right.  So what I wanted to ask
8  you is, were there ever any occasions out at
9  Puerto Rico Marine between 1976 and 1981 when you
10 and Mr. Brindell had to perform container
11 maintenance work onboard ships at the Port of New
12 Orleans?
13     **A.  Yes.**
14     Q.  All right.  And when you performed
15 this work onboard ships at the Port of New
16 Orleans, do you ever recall seeing other
17 contractors performing maintenance work or
18 insulation work on those same ships?
19     **A.  Yes.**
20     Q.  All right.  And are you familiar with
21 the name Eagle or Taylor-Seidenbach?
22     **A.  Yes.**
23         DEFENSE COUNSEL:  Object to the form.
24 BY MR. HIBEY:
25     Q.  And do you recall seeing Eagle and/or

Page 36

1  Taylor-Seidenbach performing maintenance work
2  and/or insulation repair work onboard these same
3  ships at the Port of New Orleans?
4      **A.  Yes.**
5          DEFENSE COUNSEL:  Object to form.
6          DEFENSE COUNSEL:  Object to form.
7          MR. HIBEY:  All right.  Mr. Kain, I
8  do not have any other questions for you at this
9  time.  Thank you.
10         MR. KINLER:  This is Doug Kinler.  I
11 can go if everybody's good with that.
12         MR. HIBEY:  Go ahead, Doug.
13         MR. KINLER:  Thank you, Mike.
14         [EXAMINATION]
15 QUESTIONS BY MR. KINLER:
16     Q.  Mr. Kain, I'm turning on my camera.
17 Can you see me?  I'm waving.
18     **A.  Yes, I sure can.**
19     Q.  Okay.  I've never done a deposition
20 with this format, so I can't see anybody else
21 other than you.  But if for any reason you
22 don't --
23         MR. HIBEY:  Doug, we've done this
24 before, you and I.
25         MR. KINLER:  On this format?

Page 37

1          MR. HIBEY:  Yes, sir.  I wish I could
2  see you, but I can't.
3          MR. KINLER:  Okay.  Was that the
4  Deaville case?
5          MR. HIBEY:  Yes, it was.
6          MR. KINLER:  Okay.  I didn't realize
7  that.  All right.  Well, I guess with the world
8  we're living in now, my memory is kind of shot.
9          MR. HIBEY:  Quite a few months ago.
10 It was last year now.  It's crazy.
11         MR. KINLER:  Absolutely.  Time
12 doesn't mean anything anymore now, you know?
13 BY MR. KINLER:
14     Q.  Okay.  Mr. Kain.  Can you hear me
15 okay, sir?
16     **A.  Yes, I can.**
17     Q.  All right.  I'm going to ask you just
18 a few questions and I hope I don't take too much
19 of your time, but if you just don't mind bearing
20 with me.  Okay?
21     **A.  Sure.**
22     Q.  All right.  I want to first off start
23 with you said that you started at Puerto Rico
24 Marine.
25         Can I just -- if I call it Puerto

10 (Pages 34 to 37)

Raymond Kain
January 29, 2021

Page 38

1  Rico Marine, do you understand what I'm talking
2  about?
3      A.   Right.
4      Q.   Okay.  You started there in 1971; is
5  that right?
6      A.   Right.
7          MR. KINLER:  I tell you what,
8  everybody, if you don't mind, I'm hearing a lot
9  of coughing and things.  Can everybody possibly
10 mute their microphones because I don't know if
11 Mr. Kain is hearing me.
12         DEFENSE COUNSEL:  My apologies.
13         MR. KINLER:  No worries, thank you.
14 BY MR. KINLER:
15     Q.   Okay.  So -- I don't recall if you
16 answered the question, but you started at Puerto
17 Rico Marine in '71, correct?
18     A.   (Audio disruption.)
19     Q.   I'm not hearing you, Mr. Kain.
20     A.   Correct.
21     Q.   Okay.  You were born in 1949, so you
22 were about 22 years old when you started at
23 Puerto Rico Marine?
24     A.   Correct.
25     Q.   All right.  Can you tell me, where

Page 39

1  did you grow up?
2      A.   Metairie, Louisiana.
3      Q.   Okay.  Where did you go to high
4  school?
5      A.   East Jefferson.
6      Q.   What year did you graduate?
7      A.   Oh, I think it was around '69, '68,
8  something like that.
9      Q.   Well, if you were born in '49, do you
10 think you were around maybe 18 years old when you
11 graduated?
12     A.   No.  I was 20.
13     Q.   You were 20 when you graduated.
14 Okay.
15         Did you have any other education
16 beyond East Jefferson High School?
17     A.   No.
18     Q.   Okay.  What did you do after you
19 graduated from high school?  Did you start
20 working or did you go into the military or --
21     A.   No.  I started working.
22     Q.   Okay.  Can you tell me -- I don't
23 have any of your work records, so I want to try
24 to get some background on you, what you did
25 before you started at Puerto Rico Marine.

Page 40

1          So if you can tell me from the time
2  you graduated high school until you started at
3  Puerto Rico Marine, can you tell me what type of
4  jobs you had?
5      A.   Welding.
6      Q.   Okay.  And what -- what type of
7  locations were you doing welding?
8      A.   I worked for Avondale Shipyard --
9      Q.   Okay.
10     A.   -- for a while.
11     Q.   Okay.
12     A.   And then I went to work for -- I went
13 to work for Fruehauf trailers down a ways
14 Shrewsbury Road in Jefferson Parish.
15     Q.   Okay.
16     A.   And that's where I started doing
17 brake work and everything.
18     Q.   So Fruehauf had an office or
19 something in Jefferson Parish?
20     A.   Down a ways Shrewsbury Road they had
21 a shop.
22     Q.   Okay.  And, you know, I didn't tell
23 you this, Mr. Kain.  I represent Eagle, so I'm
24 eventually going to have some questions about
25 that.  Okay?  I should have told you that from

Page 41

1  the get-go.  Okay?
2      A.   All right.
3      Q.   All right.  So let me go back.
4          Avondale, can you tell me were you
5  working directly for Avondale?
6      A.   Yeah.
7      Q.   Was that your first job out of high
8  school?
9      A.   Right.
10     Q.   Okay.  And how long do you think you
11 worked at Avondale for?
12     A.   Not real long.  Maybe a month.
13     Q.   Okay.
14     A.   And then Fruehauf called me because I
15 had put in an application at Fruehauf.
16     Q.   Okay.  And how long did you work for
17 Fruehauf?
18     A.   Three and a half years.
19     Q.   Okay.  And is that how you learned
20 how to work on trailers and doing these brake
21 jobs and things like that that we've talked about
22 earlier today?
23     A.   Right.
24     Q.   It didn't pick up.  Can you say the
25 answer again, please?

11 (Pages 38 to 41)

Raymond Kain
January 29, 2021

Page 42

1      A.   That's how I learned how to work on
2   that.
3      Q.   Okay.  When you were in high school,
4   did you do any auto mechanic work or anything
5   like that, did you know about how to change
6   brakes or anything like that?
7      A.   No.
8      Q.   Okay.  All right.  So Fruehauf for
9   three and a half years and then what happened?
10  Did you start working at Puerto Rico or did you
11  have another job?
12     A.   Exactly.
13     Q.   And so it is correct you went from
14  Fruehauf to Puerto Rico?
15     A.   That's correct.
16     Q.   Okay.  And then you stayed at Puerto
17  Rico until it closed, you said, sometime in the
18  '90s or maybe a little later.
19     A.   Yes.
20     Q.   Did you retire after that or did you
21  do any additional work?
22     A.   No.  I went to work and -- in fact,
23  when they closed and everything, I went to work
24  with a friend of mine doing siding.
25     Q.   Okay.

Page 43

1      A.   And then I wound up going back -- I
2   don't remember when it was, but I wound up going
3   back to New Orleans Depot doing trailer and brake
4   work again.
5      Q.   Okay.  Are you retired today?
6      A.   Yes, I am.
7      Q.   When did you fully retire?
8      A.   I was 55 years old when I retired.
9   The union doctor said I couldn't do that kind of
10  work anymore.
11     Q.   And why is that?
12     A.   Well, my back --
13     Q.   Okay.
14     A.   -- my shoulders.
15     Q.   I'm just taking notes as you're
16  talking.  So -- all right.  Let me ask you this.
17          Are you represented by an attorney?
18  Do you have an attorney?
19     A.   No.
20     Q.   No, sir.  Very good.
21          Have you ever been diagnosed with an
22  asbestos-related disease?
23     A.   I've never been tested.
24     Q.   Okay.  All right.  Do you know a man
25  by the name of Jay Keith Polito or Polito?

Page 44

1      A.   Yes, I do.  He worked with us.
2      Q.   Okay.  Very good.
3          Are you aware that Mr. Polito gave a
4   deposition in Mr. Brindell's case?
5      A.   No.
6      Q.   Okay.  So you've never read that
7   deposition?
8      A.   (Audio disruption.)
9      Q.   I'm sorry.  It didn't pick up.  Can
10  you say it again?
11     A.   No, I haven't.  I haven't even talked
12  to Keith.
13     Q.   Okay.  You mentioned that -- well,
14  let me ask you this.
15          Is the first time that you met
16  Mr. Brindell is when he started working at Puerto
17  Rico Marine in '76?
18     A.   Oh, no.
19     Q.   Okay.  When did you meet him?
20     A.   I got Jack the job.
21     Q.   I'm sorry.  Say that again.
22     A.   I got Jack the job.
23     Q.   You got Mr. Brindell the job?
24     A.   Yes.
25     Q.   Okay.  How did you know Mr. Brindell?

Page 45

1   When is the first time you met him?
2      A.   When we was kids.
3      Q.   All right.  Did you all grow up
4   together?
5      A.   For a while and then they moved --
6   his parents moved to St. Louis.
7      Q.   Okay.  Did Mr. Brindell move to
8   St. Louis as well?
9      A.   Oh, yeah.  He was a kid.  He went
10  with his parents.
11     Q.   Okay.  Where did y'all -- when you
12  knew him as a child, where were y'all living?
13     A.   In Metairie.
14     Q.   Okay.  Do you know how long
15  Mr. Brindell was in St. Louis for?
16     A.   No, because when he came back, he
17  moved out in Kenner and I didn't talk to him for
18  a long time.  In fact, he went in the Navy and
19  when he came out of the Navy is when I came -- I
20  wound up talking to him again because he moved
21  back in Metairie close to where I was living.
22     Q.   Okay.  Do you recall were y'all
23  adults by that time, young adults?
24     A.   Yeah.
25     Q.   All right.  So you're aware that

12 (Pages 42 to 45)

Raymond Kain
January 29, 2021

Page 46

1    Mr. Brindell served in the Navy?
2        A.   Right.
3        Q.   Do you know anything about his naval
4    service at all?
5        A.   Not really, other than he went to
6    Vietnam.
7        Q.   Okay.  Do you know -- I have here
8    Mr. -- I'm looking at Mr. Brindell's Social
9    Security earnings statement.  It lists all of his
10   jobs that he had.  It lists his time in the Navy
11   and, of course, it lists his time for Puerto Rico
12   Marine.
13            Let me just ask you just about a
14   couple of these other employers to see if you
15   know anything about them, maybe Mr. Brindell told
16   you about these.  Okay?  Let me just --
17       A.   I know he worked for -- I knew he
18   worked for some kind of amusement company, like,
19   you know, working on pinball machines and stuff
20   like that.
21       Q.   Sure.  I see he worked for TAC
22   Amusement from '69 to '72.  That's where you
23   recall he worked on pinball machines and things?
24       A.   Yeah.
25       Q.   Did he tell you that?

Page 47

1        A.   Yeah.
2        Q.   Okay.  He also worked from '72 to '74
3    for Wurlitzer Distributing Corporation.
4            Do you know anything about that?
5        A.   Yeah.  He had said something, but
6    it -- what was -- that was a music place or
7    something too?
8            You know, I know Wurlitzer is a
9    manufacturer of like pianos and stuff.  I think
10   that's what they do.  So I don't know if that is
11   what it is.
12       A.   It might have been jukeboxes.
13       Q.   Okay.  Do you know what he did -- do
14   you know what he did for that company?
15       A.   What's that?
16       Q.   Do you know what he did for that
17   company?
18       A.   No.  We didn't get into talking about
19   jobs.
20       Q.   Okay.  Let me just give you a couple
21   more names.  He worked for a company called G.T.
22   Michelli, M-i-c-h-e-l-l-i, for a short time in
23   '68 and '69.
24            Have you ever heard of that company?
25       A.   Yes, I did.  That was what, scales or

Page 48

1    something?
2        Q.   I don't know.
3        A.   I don't know either.  I don't know.
4        Q.   All right.  The address is --
5        A.   Because I remember the name Michelli,
6    but I thought that was for scales or -- you know,
7    calibrating scales or something.
8        Q.   Okay.  The address for that company
9    is out of Harahan, Louisiana.
10            Does that help you at all trying --
11       A.   No.
12       Q.   Okay.  How about a company in '68
13   called Bar, B-a-r, Equipment, have you ever heard
14   of that?
15       A.   No.
16       Q.   Okay.  There's a company in '74 and
17   '75.  It looks like he worked for about a year
18   and a half.  I guess these are initials, RIH,
19   Incorporated.
20            Have you ever heard of that company?
21       A.   No.
22       Q.   Okay.  And then after he left Puerto
23   Rico Marine in '81, he worked for a large part of
24   the 1980s for a company called Flexi-Van Leasing.
25            Do you know anything about that?

Page 49

1        A.   I knew about that.
2        Q.   What did he do for that, do you know?
3        A.   I think he used to write up damage on
4    equipment.
5        Q.   Okay.  Was that -- was that a job in
6    the New Orleans area, do you know?
7        A.   Yeah.  I think that was by the
8    railroad yard or somewhere.
9        Q.   Okay.  In the late '80s he worked for
10   Frenchman Truck & Trailer.
11            Do you know anything about that?
12       A.   No.
13       Q.   Okay.  Late '80s and into 1990 he
14   worked for a company called CSX Services.
15            Do you know anything about that?
16       A.   Yes.  That's a railroad.  I guess he
17   wrote up equipment there too.
18       Q.   Did you ever talk to him about his
19   job for that company?
20       A.   No.
21       Q.   Okay.  And then it looks like he
22   worked in the early '90s for Wadleigh,
23   W-a-d-l-e-i-g-h, Offshore, Incorporated.
24            Do you know anything about that
25   company?

13 (Pages 46 to 49)

Raymond Kain
January 29, 2021

Page 50

1    A.   No.
2    Q.   Okay.  And then from '91 to '94 he
3  worked for Caronnas, C-a-r-o-n-n-a-s, Seafood?
4    A.   He owned it.
5    Q.   Okay.  Was that a restaurant?
6    A.   It was a seafood -- not a restaurant,
7  but they sold seafood.
8    Q.   Okay.  And then from '95 until 2002
9  he worked for a company Slidell Equipment
10  Company --
11    A.   Oh, yeah.  That was --
12    Q.   I'm sorry.  Go ahead.
13    A.   That was selling -- they would --
14  they would re -- he worked for the company, they
15  would go get -- like a restaurant was selling out
16  and they would go buy all the equipment and then
17  bring it back there and they'd redo it and get it
18  ready and resell it.
19    Q.   Okay.  Just a couple more.
20         Pavalor, P-a-v-a-l-o-r,
21  Merchandising, he worked for that company in 2000
22  and 2001.
23         Do you know anything about that
24  company?
25    A.   No, sir.

Page 51

1    Q.   Okay.  2002 and 2003, Mr. Brindell
2  worked for New Orleans Depot Services.
3         Do you know anything about that?
4    A.   Yes.
5    Q.   Can you tell me what that is?
6    A.   I was working there after I -- after
7  I left PRMMI, Puerto Rico Marine.
8    Q.   Did y'all work together at this
9  company?
10    A.   Yes.
11    Q.   Okay.  Well, tell me about that.
12  What did y'all do?
13    A.   Well, I was a mechanic.  Jack was
14  writing up the equipment coming in for damage.
15    Q.   Okay.  What type of equipment are you
16  talking about?
17    A.   Chassis.
18    Q.   Okay.  Do you recall about how long
19  Mr. Brindell worked for this company?
20    A.   Not really.  He didn't work that long
21  because he got laid off.
22    Q.   Okay.  The next employer is Venture,
23  V-e-n-t-u-r-e, Logistics from 2003 to 2005.
24         Do you know anything about that
25  company?

Page 52

1    A.   No.
2    Q.   All right.  And then the last -- two
3  more.  Excel, E-x-c-e-l, Incorporated, from 2006 to
4  2010.
5         Do you know anything about that?
6    A.   No.
7    Q.   All right.  And then from 2008 and
8  2009 he worked for Prudential Insurance Company
9  of America.
10         Do you know what he did for that
11  company?
12    A.   No.  I didn't know he worked for an
13  insurance company.
14    Q.   Okay.  All right.  So did you remain
15  personal friends with Mr. Brindell after your
16  employment at Puerto Rico Marine?
17    A.   Yeah.
18    Q.   Okay.  Did y'all get together and
19  socialize?
20    A.   Yeah.  We used to fish and all, hunt
21  together.
22    Q.   Okay.  Let me ask you -- let me ask
23  you about the affidavit.  Okay?
24         I understand that you signed this
25  affidavit on April 29th, 2020.

Page 53

1    A.   Correct.
2    Q.   My question for you is, when were you
3  first contacted about this case?
4    A.   Oh, man.  I don't know.
5    Q.   Do you -- using the date of your
6  affidavit as a reference point, can you tell me
7  how far back before you signed this affidavit
8  that you were contacted?
9    A.   Oh, I don't think -- I think it was
10  right in that time, within a week of that time.
11    Q.   Okay.  And who contacted you,
12  Mr. Kain?
13    A.   I think it was Mike.  Mike was the
14  one that contacted.
15    Q.   Mr. Hibey who just questioned you
16  earlier?
17    A.   Yes.
18    Q.   Okay.  And you understand that that's
19  Mr. Brindell and the family's lawyer, do you
20  understand that?
21    A.   I understand that now, yeah.
22    Q.   Yes, sir.  Okay.
23         So how did Mr. Hibey contact you?
24  Was it by phone?
25    A.   Yes.  But Jack's older son called me

14  (Pages 50 to 53)

Raymond Kain
January 29, 2021

Page 54

1  first and asked me if I would talk to this
2  lawyer.
3       Q.  Okay.
4       A.  And I said, yeah, because I -- you
5  know, that's his son, little Jack or John.
6       Q.  Do you recall about how much time
7  passed between your phone call with
8  Mr. Brindell's son and the time that you executed
9  this affidavit?  Was it just a matter of a week?
10      A.  It didn't -- about a week, yeah.  All
11  that went down at one time.
12      Q.  Okay.  So Mr. Hibey called you on the
13  phone?
14      A.  Right.
15      Q.  Okay.  Can you tell me how many
16  conversations you had with Mr. Hibey either by
17  phone or some other method?
18      A.  One.
19      Q.  And let me ask you this.  Let's do it
20  before you executed the affidavit, let's take
21  that time period, how many times did you speak to
22  Mr. Hibey?
23      A.  Let me say I talked to him when they
24  got me to do that and then when -- when he told
25  me we was going to do this today with this thing

Page 55

1  here.  Twice.
2       Q.  Two times.  Very good.
3           Did you speak to anyone else at
4  Mr. Hibey's law office?
5       A.  No.
6       Q.  So the only person you've spoken to
7  regarding this case as far as an attorney is
8  Mr. Hibey?
9       A.  Yes.
10      Q.  And y'all had two conversations?
11      A.  Right.
12      Q.  Okay.  I'm sorry.  Were you finished?
13      A.  Yeah, I'm finished.
14      Q.  Okay.  All right.  So let's talk
15  about the first time that y'all spoke and that
16  was before you executed this affidavit.  Okay?
17      A.  Uh-huh.
18      Q.  All right.  Can you tell me -- I want
19  to know about the conversation.  Can you tell me
20  what Mr. Hibey told you?
21      A.  He just asked me a few questions
22  about work and what happened.
23      Q.  Okay.
24      A.  He never -- he never told me
25  anything, you know, and then he asked me if I

Page 56

1  would sign that affidavit and I said, yeah.  He
2  explained -- kind of explained what was going on
3  and that was it.
4       Q.  Okay.  Did he ask you -- you have two
5  company names in this affidavit, Eagle and
6  Taylor-Seidenbach.
7           Did he ask you specifically about
8  those companies?
9       A.  Well, he asked me if they had
10  companies that did any kind of work on the ship
11  and I told him, yeah, they had another truck that
12  used to pull up -- it was a truck pull up and
13  sometimes it was pulling a welder machine and
14  sometimes it was pulling a big compressor.  But I
15  never got involved with all of that because that
16  wasn't my job.  But when I would go back there --
17  if I had to go on a ship or something, I go back
18  there and would see this pulled up by the
19  ship and they was working on it.
20      Q.  This compressor company you're
21  talking about?
22      A.  It was a repair.  They did all of
23  that on the ship, I guess.
24      Q.  Okay.
25      A.  They did welding.  They did, I guess,

Page 57

1  everything that had to be done on a ship.
2       Q.  All right.  And you don't know the
3  name of that company, you can't recall?
4       A.  The what?
5       Q.  You can't recall --
6       A.  The name --
7       Q.  You're talking about a company that
8  did compressor work and welding on ships.
9       A.  Sure.
10      Q.  Do you know the name of that company?
11      A.  Not really.
12      Q.  All right.  So what I want to ask you
13  then is did Mr. Hibey tell you about the names --
14  tell you the names Eagle and Taylor-Seidenbach?
15      A.  Well, that was a truck that was
16  pulled up on the road and I seen -- on the wharf
17  up there, but I'm pretty sure that was the name
18  that was on there.
19      Q.  Which name are you talking about?
20      A.  Eaton -- Eagle.
21      Q.  Okay.  So you said you saw a truck on
22  a wharf and you think it had the name Eagle on
23  it?
24      A.  Right.  I didn't -- I didn't really
25  pay a lot of attention to it.  I mean, that's --

15 (Pages 54 to 57)

Raymond Kain
January 29, 2021

Page 58

1    that's really -- that sounds familiar to me, you
2    know, with the Eagle and all like that.  But --
3    because I'm not -- yeah, I kind of remember
4    seeing it on the door.  It had an insignia or
5    something on the door.
6         Q.   Okay.  Do you know anything else
7    about that company other than that you think you
8    may have saw a truck with an insignia on a door?
9         A.   Yes.  They work on the -- they
10   work -- they work on the ship.
11        Q.   All right.  So I'm going to talk to
12   you about that in a second.  Let -- I'll get back
13   to that in one second.
14             Let me ask you, when Mr. Polito
15   was -- gave a deposition, and you know who
16   Mr. Polito is, correct?
17        A.   Right.
18        Q.   Okay.  He said that he worked at
19   Puerto Rico Marine from the latter part of '79
20   and then through the '80s.  And so my -- what he
21   was questioned about was during the time frame
22   that he worked with Mr. Brindell there, so that
23   would have been from '79 to '81.
24             Do you understand that?
25        A.   Yeah.

Page 59

1         Q.   Okay.  What Mr. Polito said was
2    during that time frame, that Mr. Brindell was a
3    supervisor at Puerto Rico Marine.
4              Do you recall that?
5         A.   Yes.
6         Q.   Okay.  When Mr. -- you said you
7    helped him get a job at Puerto Rico Marine.
8         A.   Right.
9         Q.   Did -- when Mr. -- when Mr. Brindell
10   was hired in '76, did -- was he hired on as a
11   supervisor?
12        A.   No.  He was hired on as a mechanic.
13        Q.   Okay.
14        A.   Worked his way up.
15        Q.   I'm sorry?
16        A.   He worked his way up.
17        Q.   Okay.  Tell me how long did he work
18   as a mechanic before he went into a supervisor
19   role, if you can recall?
20        A.   Oh, Lord.  Four or five years, I
21   guess.  But he was exposed to it after that
22   because like if we worked overtime, he had to be
23   there and he wasn't on the clock like we was.  He
24   had to be there while we was working.  So what he
25   would do is come down there and help us because

Page 60

1    he knew the work, he would help us so we could
2    get out of there and punch out and go home.
3         Q.   And you're talking about the mechanic
4    work?
5         A.   Right.
6         Q.   Okay.  Do you think -- you know,
7    Mr. Polito's recollection was that at least by
8    late '79, at that point Mr. Brindell was a
9    supervisor.
10             Do you agree with that or disagree
11   with that?
12        A.   I really couldn't answer that because
13   I don't know, you know, when he -- when he took
14   that job.
15        Q.   Okay.  Mr. Polito's recollection of
16   seeing Mr. Brindell -- when he saw Mr. Brindell
17   there, he said that Mr. Brindell wore a coat and
18   tie to work.
19             Do you recall that?
20        A.   Jack never wore a coat and tie unless
21   he had to go -- unless he had to go to a meeting.
22        Q.   Okay.  So when he was a supervisor,
23   you don't recall Mr. Brindell coming to work in a
24   coat and tie and walking around the area with a
25   tie, shirt and slacks?  You don't recall that?

Page 61

1         A.   No.  And, like I said, unless he was
2    going to a meeting.  Jack was half the time on
3    the floor with us.
4         Q.   Do you recall if he had an office
5    when he was a supervisor?
6         A.   Yes, he had an office.
7         Q.   Okay.
8         A.   He didn't stay there.
9         Q.   Mr. Polito gave a pretty good
10   geographic description of the Puerto Rico Marine
11   terminal, and I'm not going to run through that
12   with you again.  But what Mr. Polito said was
13   that from the water's edge -- well, let me
14   backtrack.
15             The terminal was located on the
16   Industrial Canal, correct?
17        A.   Right.
18        Q.   Okay.  So what Mr. Polito said was
19   that from the water's edge until you got
20   to the -- he called them the shops, it was about
21   2,000 yards.
22             Does that sound right to you?
23        A.   I want to say that was an 80-acre
24   tract of land.
25        Q.   80 acres?  Were there -- were there

16 (Pages 58 to 61)

Raymond Kain
January 29, 2021

Page 62

1    roads leading from the shop to the water?
2        A.   Well, they had asphalt -- the whole
3    yard back there was asphalt and it was striped
4    off for chassis -- I mean, for trailers that was
5    going to go on the ship.
6        Q.   Gotcha. Okay. How many --
7            MR. KINLER: I'm hearing some noise
8    here. I wonder if everybody can possibly mute
9    their phones. I'm getting a lot of noise.
10   BY MR. KINLER:
11       Q.   How many docks did Puerto Rico Marine
12   have? Was it just -- was it just one dock or was
13   it multiple?
14       A.   Oh, we only had one dock in New
15   Orleans.
16       Q.   Okay.
17       A.   On the Industrial Canal.
18       Q.   All right. And how many ships could
19   be moored to that dock at one time?
20       A.   Well, they only moored one at one
21   time because they could only unload one at one
22   time.
23       Q.   Gotcha. Okay. So at any given time,
24   the most -- the most ships that were there would
25   have been one if a ship was there?

Page 63

1        A.   One.
2        Q.   All right. Gotcha. Okay. I'm just
3    checking things off my notes, Mr. Kain.
4            And I'll tell you, Mr. Kain, if you
5    ever -- if you need to take a break or, you know,
6    stretch your legs, you just let me know. Okay?
7        A.   All right.
8        Q.   All right. Let's talk about the
9    ships themselves.
10           Who owned the ships that were sending
11   the trailers out to Puerto Rico and then back,
12   who owned those ships?
13       A.   The Puerto Rican government.
14       Q.   Okay. Can you tell me -- because I
15   don't know anything about this at all, Mr. Kain.
16   Can you tell me how large of a ship they were?
17   Were they different sizes or...
18       A.   No. They had three of them. They
19   were -- I think they had like a thousand
20   containers.
21       Q.   Okay. So they were dealing with
22   pretty much three different ships?
23       A.   Yeah, but only one at a time. We had
24   three large ships. It was Mayaguez, the Ponce
25   and -- let me think. I can't think of the

Page 64

1    other one now, but there was three of them all
2    the same size, all built the same way.
3        Q.   Okay. I guess these were large cargo
4    ships; is that right?
5        A.   Right.
6        Q.   Okay. And --
7        A.   Containerized. It's containerized
8    shipping.
9        Q.   Containerized shipping. Okay.
10           Do you know how old the ships were?
11       A.   Old.
12       Q.   Okay.
13       A.   They were old. I don't know how old,
14   but they was old.
15       Q.   So you said that -- and I may have
16   written this down wrong. One of the names of the
17   ship, you said Mae West, is that what you said?
18       A.   Oh, no.  Ponce --
19       Q.   Ponce?
20       A.   -- and Mayaguez.
21       Q.   Mayaguez. Do you know how to spell
22   that?
23       A.   No.
24       Q.   Okay. All right. So they were
25   containerized ships. Mr. Polito described that

Page 65

1    to get the trailers on, there were two methods.
2    Either they were driven on -- do you recall?
3        A.   Yes, but that's a different ship.
4    That's when they went RoRo. What I'm talk --
5    what we was talking about was LoLo. They pick it
6    up and put it on -- the container and put it on
7    the ship. They stack them. The RoRo boat, they
8    had two ramps and they drove the whole trailer up
9    on the ship.
10       Q.   Okay. Is that one of these three
11   ships that you talked about, one of those was --
12       A.   No. They -- whatever they --
13   whenever they changed that ship -- I mean, that
14   operation from LoLo to RoRo, they just kept the
15   names of the ships but a different ship because
16   you had to have a different vessel to drive the
17   trailer onto the ship.
18       Q.   All right. Let me ask you -- let me
19   kind of narrow it down. Let me ask you
20   specifically about the '76 to '81 time frame.
21   That's when Mr. Brindell worked there.
22           Do you recall the type of ships that
23   would have been either taking out cargo or
24   bringing it back onto that dock?
25       A.   It worked both ways anyway.

17 (Pages 62 to 65)

Raymond Kain
January 29, 2021

1    Q.   Say it again?
2    **A.   It went both ways anyway.  They**
3  **load -- when the ship came in, they took off**
4  **loads and they put loads on.  So it went both**
5  **ways.  It wasn't just empties coming in.  It**
6  **was -- well, it was empties, but they had loads**
7  **on the boat too.  But everything that went back**
8  **on that boat was loads.**
9    Q.   Sure.  And did they have -- between
10 '76 and '81, did Puerto Rico Marine also use the
11 type of ship, and I don't recall exactly what you
12 called it, but the type that you would drive on
13 the trailers?  Was that used between '76 and '81?
14   **A.   I'm not sure.  It might have been**
15 **close to the end because I don't remember when**
16 **they did that, really.**
17   Q.   Okay.  But they -- and on the ships
18 where the trailers were stacked, I guess I'm
19 assuming they were stacked with some type of
20 crane?
21         DEFENSE COUNSEL:  Object to the form.
22 BY THE WITNESS:
23   **A.   Yes, a big -- two big --**
24         DEFENSE COUNSEL:  His testimony is
25 these were containers, not trailers.

1  BY MR. KINLER:
2    Q.   I'm sorry.  Containers.
3    **A.   Containers, right.**
4    Q.   And were they stacked by a crane?
5    **A.   (Audio disruption.)**
6    Q.   You didn't come through, Mr. Kain.
7  I'm sorry.
8    **A.   Yes, they were stacked with a crane.**
9    Q.   All right.  Now, Mr. Polito recalled
10 when he was working for Puerto Rico Marine that
11 there would be one ship per week that came in.
12        Is that your recollection?
13   **A.   (Nonverbal response.)**
14   Q.   You have to say it out loud.  I'm
15 sorry.
16   **A.   Yes, that's one ship a week.**
17   Q.   One ship a week.  Okay.
18        And Mr. Polito testified that the
19 ships were loaded -- the ship was loaded and
20 unloaded on the weekends.
21        Is that your recollection?
22   **A.   Friday and Saturday, yes.**
23   Q.   Okay.
24   **A.   Sometimes Sunday.  It depended, you**
25 **know.  They run late sometimes.**

1    Q.   Okay.  I'm just checking things off
2  my notes, Mr. Kain, just if you don't mind
3  bearing with me.
4         Mr. Polito, when he was asked -- he
5  mentioned your name and he said that you were the
6  shop foreman when he worked there.
7         Does that make sense to you?
8    **A.   Lead mechanic.**
9    Q.   Lead mechanic.  Okay.
10        All right.  So let's talk about the
11 affidavit.  Okay?
12   **A.   Uh-huh.**
13   Q.   So you spoke to Mr. Hibey prior to
14 executing the affidavit.
15        Did you write this affidavit
16 yourself, meaning did you sit at a computer and
17 type this out?
18   **A.   Oh, no.**
19   Q.   Okay.  Who did that, do you know?
20   **A.   No, I really don't know because it**
21 **was -- well, it was done on a computer.  I'm**
22 **sorry.**
23   Q.   Okay.  Was it done on your computer,
24 you typed it yourself or did -- was it sent to
25 you?

1    **A.   No, no.  I don't even know how to use**
2  **a computer.**
3    Q.   Okay.  Do you own a computer?
4    **A.   My wife does.  I don't -- I don't use**
5  **it.**
6    Q.   Understood.  Do you know how the
7  affidavit got to your house?  Was it e-mailed to
8  you?  Was it mailed to you, do you recall?
9    **A.   No.  I think it was -- it was done on**
10 **one of these little laptop-looking things like**
11 **this.**
12   Q.   Okay.  So let's -- I'm going to ask
13 you a little bit about some of the -- there's
14 eight paragraphs in your affidavit.
15        You said you have it in front of you?
16   **A.   What's that?**
17   Q.   Do you have the affidavit with you
18 there, Mr. Kain?
19   **A.   No.  I can go get it.**
20   Q.   That's okay.  It's very short, so I
21 can read it to you.
22        So on paragraph 3 of the affidavit,
23 you said when John Brindell, the plaintiff,
24 started -- first started working at Puerto Rico,
25 you and Mr. Brindell performed container

18 (Pages 66 to 69)

Raymond Kain
January 29, 2021

1    maintenance work.
2         A.   Yes.
3         Q.   Okay.  And you said that involved
4    welding.
5         A.   Right.
6         Q.   What type of welding, can you tell
7    me, were you doing on containers?
8         A.   We had MIG guns.  For steel
9    containers we had MIG guns.  On aluminum
10   containers we -- we usually patched them or we
11   would replace the whole sheet or whatever it
12   needed.
13        Q.   Okay.  And was this because the
14   containers were damaged in some way, is that why
15   you were always doing welding?
16        A.   Exactly, because that's what we did
17   was patch chassis and containers and everything.
18        Q.   Okay.
19        A.   But the four front shop, the four
20   mechanics shop in the front was the chassis shop,
21   they called it.  And we did mostly chassis work
22   unless they got short of containers and they
23   needed some to go out on the road to be
24   dispatched.
25        Q.   Okay.  Now, you said in your

1    affidavit that at times you and Mr. Brindell did
2    this container maintenance work onboard a ship.
3         A.   No, we had a -- sometimes we had to
4    go in there and -- like if the ship broke
5    apart -- I mean, the container kind of broke
6    apart or something where they couldn't get it out
7    of the cell, you see they used to put them things
8    underneath in the hold down in the -- in the
9    ship.  And where something happened to it where
10   we couldn't -- you know, couldn't get it out,
11   we'd have to go down in there and see what we had
12   to do before the spreader bar could pull it out,
13   you know, on the crane, the crane, the thing that
14   picked it up.
15        Q.   Okay.  And this was -- this was done
16   in the holds of the ship?
17        A.   Yes.
18        Q.   Okay.  And that's where the
19   containers were stored?
20        A.   Well, they stored -- they stored them
21   under that and on top of that.  They put the
22   hatch covers on and stack them up there.
23        Q.   Okay.  So the containers were stored
24   in the hold as well as on the top deck?
25        A.   Exactly.

1         Q.   And that -- and those were the areas
2    where if you and Mr. Brindell had to go on a ship
3    to do welding work, that's where y'all would be
4    doing it?
5         A.   We would -- like we would go down in
6    there or something -- a lot of times we would
7    ride the spreader bar down in there into the
8    hold.  And then we'd get down there and get
9    the -- you know, the -- whatever we had to do to
10   get the box out of there and then we would come
11   back out.
12        Q.   Between 1976 and 1981, can you
13   estimate for me how many times you think you saw
14   Mr. Brindell actually going on a ship to do weld
15   or maintenance work -- I'm sorry, container
16   maintenance work?
17        A.   Four or five times, five or six times
18   maybe.
19        Q.   During that five-year period?
20        A.   Yeah.
21             DEFENSE COUNSEL:  Doug, at what site?
22             MR. KINLER:  I'm confused by your
23   question.
24             DEFENSE COUNSEL:  The Port of New
25   Orleans or Industrial Canal?

1    BY THE WITNESS:
2         A.   Oh, that was part -- was part of the
3    Port of New Orleans, but it was the Industrial
4    Canal.
5    BY MR. KINLER:
6         Q.   All of you --
7         A.   It's where the ship channel came
8    in -- the ship channel came into the Industrial
9    Canal.
10        Q.   And all of your work for Puerto Rico
11   Marine and Mr. Brindell's work for Puerto Rico
12   Marine was on the Industrial Canal, correct?
13        A.   Right.
14        Q.   All right.  And that's in New
15   Orleans, right?  That's in New Orleans, correct?
16        A.   Right.
17        Q.   Okay.
18             DEFENSE COUNSEL:  Thank you, Doug.
19             MR. KINLER:  Sure.
20   BY MR. KINLER:
21        Q.   So between '76 and '81 just to
22   confirm, you said you think you saw Mr. Brindell
23   go on a ship to do weld or maintenance work maybe
24   five or six times, correct?
25        A.   Correct.  Well --

19 (Pages 70 to 73)

Raymond Kain
January 29, 2021

Page 74

1    Q.   Okay.
2    A.   **You know, he would go in there and**
3  **see what was going on, you know.  I don't know --**
4  **you know, it depends on if you have to do**
5  **maintenance on them down in there.  But you'd**
6  **have to go down there and shore them up or**
7  **something to get them out.**
8    Q.   Okay.  And that's either in the holds
9  of the ship or on the top deck, correct?
10   A.   **No.  Mostly in the hold.**
11   Q.   Mostly in the holds.  Fine.  Okay.
12       All right.  Paragraph 4 in your
13  affidavit you said, in addition, beyond container
14  maintenance work, at times and for various
15  reasons John and I -- John being Mr. Brindell --
16  were onboard ships on the Port of New Orleans.
17       What reason would you guys have to be
18  onboard a ship at Puerto Rico Marine other than
19  doing container maintenance work?
20   A.   **Well, we went down in there and**
21  **checked on containers and everything there.**
22  **Sometimes we had to go down there and find a**
23  **container that was on the boat.**
24   Q.   Okay.  Give me an idea, how long
25  would it take to do that?

Page 75

1    A.   **It's hard to say.  Maybe an hour.**
2    Q.   So y'all were going into the holds to
3  check on containers?
4    A.   **Right.**
5    Q.   All right.  Between '76 and '81, can
6  you estimate for me how many times you saw
7  Mr. Brindell going on a ship to check a -- into
8  the hold of a ship to check on a container?
9    A.   **I'm not -- I'm not sure because I was**
10  **in the shop.  He'd just jump in the pickup truck**
11  **and go to the back.**
12   Q.   Okay.
13   A.   **So I -- I really can't say how many**
14  **times I really seen him go in there.**
15   Q.   All right.  Did you ever personally
16  go with him, Mr. Brindell, on a ship --
17   A.   **Yes.**
18   Q.   -- to check a container?
19   A.   **Yes.**
20   Q.   All right.  Can you tell me how many
21  times you think you did that between '76 and '81?
22   A.   **About six, seven times.**
23   Q.   Okay.  And generally each one of
24  those times would maybe last about an hour?
25   A.   **I'd say roughly.**

Page 76

1    Q.   Okay.  All right.  So other than
2  doing welding maintenance work on containers on
3  the ships, you know, either in the holds or on
4  the deck as well as going on a ship to check on
5  containers in the hold, do you recall any other
6  instance where Mr. Brindell went on a ship?
7    A.   **I can't remember what type of ship it**
8  **was.  It was -- I think it was a LoLo ship.  But**
9  **I can remember that when they had a work stoppage**
10  **with the longshoremen with a -- with a strike,**
11  **they shut the ship down.  And Jack being a**
12  **supervisor had to go down in there every day and**
13  **check the engine room and all of that kind of**
14  **stuff to make sure because they shut it down.**
15       **The only thing they kept was just a**
16  **little bit of power to where the screw would keep**
17  **turning because they said if they shut it -- they**
18  **shut it down, the packing around -- you know, the**
19  **screw is the propeller -- I mean, the shaft.  If**
20  **they shut it down, the packing, it would start**
21  **leaking when they started it up again.**
22       **So he went down there in the engine**
23  **room and walked all around there, checked**
24  **everything out because they had -- they had shore**
25  **power on it then.  They had electricity off the**

Page 77

1  **dock and they had lights down there and he'd have**
2  **to go check the engine room and all like that,**
3  **check the bilge in the ship, everything like**
4  **that.**
5    Q.   Okay.  And so if I understand you
6  correctly, this was during a work stoppage, so
7  were the ships empty?
8    A.   **No.  They might have had -- they**
9  **might have had containers -- the only thing that**
10  **they would have had to take off even in a work**
11  **stoppage is if they had refrigerated containers**
12  **on there which are perishable, and then they had**
13  **to take it off.  And then after that, all other**
14  **cargo had to stay on the boat.**
15   Q.   Okay.  And so during this work
16  stoppage -- how long was the work stoppage, do
17  you know?
18   A.   **Oh, Lord.  I guess about -- sometimes**
19  **a month, sometimes six weeks.**
20   Q.   Were there more than one?
21   A.   **No, that I remember.**
22   Q.   Okay.  And you're fairly certain that
23  this work stoppage occurred while Mr. Brindell
24  was working there sometime between '76 and '81?
25   A.   **Yeah.  I know I remember him going**

20  (Pages 74 to 77)

Raymond Kain
January 29, 2021

Page 78

1    down in the hold of the ship to check all that.
2        Q.   Okay.  Did you go with him?
3        A.   One time.
4        Q.   One time you did?
5        A.   Yeah.
6        Q.   Okay.  All right.  And so if there
7    were containers on the ship during this work
8    stoppage, he was just going down there to check
9    on them and make sure everything was okay?
10       A.   Well, yeah.  He checked mostly the
11   engine room and all that.
12       Q.   Okay.  And like you said --
13       A.   All that kind of stuff.
14       Q.   All right.  And I take it with the
15   boat sitting there, there's nobody else working
16   on the boat.  The boat was empty other than
17   containers?
18       A.   Right.  They didn't have anybody on
19   the boat and nobody was working.
20       Q.   All right.  Okay.  Any other
21   instances that you can recall that Mr. Brindell
22   worked -- or went onboard a ship other than what
23   we talked about?
24       A.   Not really.
25       Q.   All right.  Very good.  Okay.

Page 79

1        So we talked about -- let me see.
2    Let me look at your affidavit.  Okay.
3        You talked about additional
4    maintenance work being performed on the ships.
5    That's in paragraph 5.  I want you to tell me
6    about that.
7        What are you referencing when you
8    said you saw maintenance work happening on a
9    ship?
10       A.   Well, that's when that truck would
11   come around there pulling either a weld machine
12   or a compressor, and they would go on -- they
13   would -- they would pull their welding leads up
14   on the boat and all, and like if a railing was
15   broke, they would fix that or I've seen them down
16   here -- I know they went down there doing them
17   already.
18       Q.   Okay.
19       A.   And I don't know what they was doing
20   down there, but on the outside I could see like
21   they was welding up -- welding up a railing that
22   might have been broke, hit by, you know, a
23   container when they was taking it off.  You know,
24   I could see them doing that.
25       But as far as when they went down in

Page 80

1    the hold or if they went down into the engine
2    room, I don't know what they was doing down in
3    there.  I do know one time they came and fixed
4    the boiler.
5        Q.   Okay.  So this sounds like some type
6    of mechanical contractor, correct?
7        A.   It wasn't with our company.  I know
8    that.
9        Q.   Okay.
10       A.   And I'm sure that was that truck
11   Eagle or whatever it was.
12       Q.   Okay.  Do you know what kind of
13   company Eagle is?
14       A.   No, other than maybe they -- they do
15   the work on a -- on a -- you know, like on a ship
16   and everything.
17       Q.   I'm going to tell you that Eagle
18   didn't do any mechanical work.
19       Do you have any reason to dispute
20   that?
21       A.   I would say it was maybe -- maybe
22   they was doing boiler work.
23       Q.   Okay.
24       A.   But they had a -- like I said, they
25   had one truck that used to come around and they

Page 81

1    would do like welding and stuff, and another
2    truck, they would come around with a compressor
3    on it.  And sometimes these guys was wearing
4    white suits.
5        Q.   Okay.
6        A.   So that's the best I can, you know,
7    figure out.  I figure the trucks was all the
8    same, same company.  I didn't -- you know.
9        Q.   Okay.
10       A.   I didn't really pay attention to them
11   people.
12       Q.   Okay.  And you said that you saw
13   maybe this company doing rail -- working on the
14   rails, repairing the rails on the ship?
15       A.   Yes.
16       Q.   Okay.
17       A.   Welding on the rails.
18       Q.   As far as -- I'm sorry.  Go ahead.
19       A.   Or it's like something else on a ship
20   needed welding.
21       Q.   Okay.  And as far as if this company
22   did work in the engine rooms, you didn't see what
23   they were doing, correct, because you never were
24   down there, correct?
25       A.   No.

21 (Pages 78 to 81)

Raymond Kain
January 29, 2021

Page 82

1    Q.   All right.  Very good.
2    A.   Well, like I said, they did come
3  wearing white suits and all, jumpsuits and all
4  like that over their regular clothes when they
5  went on the ship.
6    Q.   Okay.  This company that you're
7  talking about, can you tell me between 1976 and
8  1981 how many times you think you saw this
9  company on a ship?
10   A.   Three or four times.
11   Q.   Okay.  Did you ever see this company,
12 this mechanical company you're talking about
13 doing work in the holds of the ship?
14   A.   Yeah.
15   Q.   And they were doing welding work
16 according to you; is that right?
17   A.   Well, I'm not even sure about that
18 now.
19   Q.   Okay.
20   A.   Because they -- there might have been
21 two companies that had them trucks out there.  I
22 don't know.
23   Q.   All right.
24   A.   But I know some did -- some did
25 welding.  Some did with the air compressor,

Page 83

1  whatever they did.
2    Q.   Okay.  You say in your affidavit that
3  you saw airborne asbestos dust from the work of
4  Eagle and Taylor-Seidenbach.
5         My question to you is, you don't have
6  any personal knowledge regarding asbestos, do
7  you, and what did or didn't contain asbestos?
8    A.   No.  I don't even know what asbestos
9  was.
10   Q.   Very good.
11   A.   I didn't know what that was.
12   Q.   So when you're saying in this
13 affidavit you saw asbestos dust, you can't attest
14 to that, you can't swear to that, can you?
15   A.   Well, I can tell you this.  It was
16 dust.
17   Q.   Okay.
18   A.   I'm not sure about if it was asbestos
19 or what, but it was dust.  And I don't know where
20 all that dust would come from.  Maybe
21 that's because -- maybe that's when they had that
22 compressor.  I don't know.
23   Q.   All right.  So you don't know the
24 source of the dust, correct, that you saw?
25   A.   No, not really.

Page 84

1    Q.   And you can't tell me -- swear under
2  oath to a jury that that dust contained asbestos,
3  can you?
4    A.   No.
5    Q.   Okay.  Did you ever see this company
6  you're talking about doing any insulation work on
7  the ships -- on the ship, rather?
8    A.   No, I never did see it, but I know
9  they put masks on and all when they was working
10 on it.
11   Q.   So when you said in your affidavit
12 that Eagle and Taylor-Seidenbach were doing
13 insulation repair work, you don't know that, do
14 you?
15   A.   No, not really.  But they -- they
16 used to go on the ship with stuff and all and I
17 don't know.
18   Q.   Okay.  And would you recall --
19   A.   I know one thing, that all of the --
20 all of the steam lines on that boat had to be
21 checked and wrapped with insulation.
22   Q.   Okay.
23   A.   Because Jack Brindell told me --
24        DEFENSE COUNSEL:  Object to the
25 nonresponsive portion.

Page 85

1  BY THE WITNESS:
2    A.   -- that's the only reason he used to
3  go on the ship to check the steam lines.
4  BY MR. KINLER:
5    Q.   And that's when the ships were empty,
6  right?
7    A.   Pretty much.
8    Q.   Yeah, Okay.
9    A.   Not completely empty because they
10 never did empty -- completely empty them boats.
11   Q.   I'm sorry.  Empty meaning that there
12 were no -- there was no work taking place when he
13 was on the ship to check --
14   A.   Right, right.
15   Q.   -- during the work stoppage, correct?
16   A.   Right.  He'd go down in there to
17 check.
18   Q.   All right.  So what you saw these
19 outside contractors doing was welding work and
20 some type of work with compressors; is that
21 right?
22   A.   That's complete right.
23   Q.   All right.  And you can't say these
24 companies were doing insulation work, can you?
25   A.   I never -- I didn't see it.  I can't

22 (Pages 82 to 85)

Raymond Kain
January 29, 2021

1    say they wasn't doing it.  I just said I never
2    seen it.
3        Q.   Never saw it happen?
4        A.   I know Jack went down in there to
5    check all that stuff.
6        Q.   That was during the work stoppage,
7    correct?
8        A.   No.  That -- even when they was
9    working the boat, they would go down in the
10   engine room and all that.
11       Q.   Why would Mr. Brindell ever have to
12   go into an engine room?
13       A.   Why what?
14       Q.   Why would Mr. Brindell ever have to
15   go into an engine room other than you told us
16   about during the work stoppage to check on
17   things?
18       A.   I think he checked them steam lines,
19   especially after them people were working on
20   them, the boiler and all that.
21       Q.   During the work stoppage?
22       A.   No.  Whenever that ship come in and
23   had some kind of problem, if they had a problem
24   with the engine room or something like that, they
25   would -- if they needed it, they would bring

1    people in.
2        Q.   Okay.  And why would Mr. Brindell
3    ever go into an engine room?  He was a mechanic
4    like you were.  Why would he do that?
5        A.   He might have been a supervisor then.
6        Q.   Okay.
7        A.   I know he went down there when he was
8    a supervisor because the office made him go in
9    there.  The terminal manager made him go down
10   there and check it after them people worked in
11   there.
12       Q.   Okay.  Just checking my notes,
13   Mr. Kain.
14            So you don't have any personal
15   knowledge that either one of these companies that
16   you've listed on this affidavit ever handled
17   asbestos materials at Puerto Rico Marine, do you?
18            MR. HIBEY:  Objection, form.
19   BY THE WITNESS:
20       A.   Not really.
21   BY MR. KINLER:
22       Q.   Very good.
23            Do you know when asbestos was taken
24   out of thermal insulation?  Do you have that kind
25   of knowledge?

1        A.   I don't know what you're talking
2    about, no.
3        Q.   Okay.  That's fine.
4            And when you were working at Puerto
5    Rico Marine, did you ever -- did you know
6    anything about asbestos at all?
7        A.   No.
8        Q.   All right.  So in paragraph 7 when
9    you said John, meaning Mr. Brindell, and I,
10   yourself, saw airborne asbestos dust from the
11   work of Eagle and Taylor-Seidenbach, that's not
12   true, is it?  You can't attest to that, can you?
13            MR. HIBEY:  Objection, form.
14   BY THE WITNESS:
15       A.   I can say that it was dust flying.
16   Now, I don't know what the dust was, but that's
17   all I can say.  I don't...
18   BY MR. KINLER:
19       Q.   Very good.
20            And you never saw either one of these
21   companies doing any insulation work on the ships,
22   correct?  It was welding work and compressor
23   work?
24       A.   That's the only thing I seen that was
25   on the deck.  I don't know what went on under the

1    deck of the ship or in the engine room or
2    whatever.  But I know one of them companies used
3    to go in the engine room pretty often.
4        Q.   But you can't tell me which one?
5        A.   No.
6        Q.   And you were never around that?
7        A.   I worked in the shop in the front.
8        Q.   Yes, sir.  Let me check my notes,
9    Mr. Kain.  I think I'm almost done.
10            Do you need to take a break?
11       A.   No.  I'm good.
12       Q.   Okay.  Let me check my notes to see
13   if I'm just about done.
14            MR. KINLER:  I tell you what.  Just
15   to save time, Mr. Kain, I'll let somebody else
16   ask you some questions and I'll review my notes.
17   And if I have a few additional questions after,
18   I'll follow up with you just briefly before we
19   conclude.  Okay?
20            THE WITNESS:  All right.
21            MR. KINLER:  Thank you for your time.
22            THE WITNESS:  Okay.
23            MR. KINLER:  I don't know if y'all
24   want to take a break or a quick bathroom break or
25   anything?

23 (Pages 86 to 89)

Raymond Kain
January 29, 2021

Page 90

1    MS. SENTER: Hey, this is Meghan
2 Senter. I'm going to have some questions. But
3 we've been going a little over an hour and a
4 half. I could use a comfort break if that's all
5 right.
6    THE WITNESS: Fine with me.
7    MR. KINLER: Y'all want to take
8 ten minutes?
9    MS. SENTER: Yeah, let's take ten
10 minutes and we'll come right back. Okay?
11    THE VIDEOGRAPHER: The time is
12 10:38 a.m. Central Standard Time. We are now off
13 the record.
14    (Break taken.)
15    THE VIDEOGRAPHER: The time is
16 10:48 a.m. Central Standard Time. We are now
17 back on the record.
18    [EXAMINATION]
19 QUESTIONS BY MS. SENTER:
20    Q.   Hi, Mr. Kain. My name is Meghan. We
21 met just a moment ago.
22    A.   How you doing?
23    Q.   Are you ready to continue?
24    A.   I'm ready.
25    Q.   Okay. I'm going to go over just a

Page 91

1 couple of ground rules. All right?
2    A.   All right.
3    Q.   Okay. The first -- the first ground
4 rule is that -- hold on just one moment. I'm so
5 sorry. That would be one of the work from home
6 challenges. I apologize. Thank you for the
7 small break.
8    A.   That's okay. I have a five-year-old
9 granddaughter running around here.
10    Q.   The first thing is I know with
11 technology it can be difficult. So if you don't
12 hear my question or if you don't understand it,
13 please let me know. Okay?
14    A.   Sure.
15    Q.   If you let me know that you don't
16 understand it, I'll try and ask it a different
17 way or restate it so you do. All right?
18    A.   All right.
19    Q.   If I do ask a question and you answer
20 it, I'm going to go ahead and assume that you did
21 understand my question. Is that fair?
22    A.   That's fair.
23    Q.   Okay. And you're doing a really good
24 job right now, but just to make sure for
25 Ms. Karen who's taking everything down, let's

Page 92

1 just make sure all of our answers are out loud.
2 All right?
3    A.   All right.
4    Q.   Okay. And then I'm going to try and
5 do my very best to not interrupt you because
6 there's a small delay. Okay?
7    A.   All right.
8    Q.   Okay. And if at any point -- I know
9 we just took a break, but if at any point you
10 need another break, let me know. Okay?
11    A.   Sure.
12    Q.   Okay. So I wanted to back up a
13 little bit. We covered a lot of ground earlier
14 with Mr. Mike and Mr. Doug.
15    When you first hired on at Puerto
16 Rico Marine, what was your actual job title?
17    A.   Mechanic.
18    Q.   Mechanic?
19    A.   Yes.
20    Q.   How many other mechanics were there?
21    A.   At that time, five.
22    Q.   Do you remember their names?
23    A.   Yeah. Lester Busch, he's deceased
24 now. And there was Willy Hutcherson and they had
25 George Schremp (phonetic), he's deceased, and

Page 93

1 Marshall Elsie.
2    Q.   And you were the fifth?
3    A.   Right.
4    Q.   Mr. Hutcherson that you mentioned, is
5 he still living?
6    A.   I have no clue. I haven't seen him
7 in years. And I think -- no. And Marshall Elsie
8 died.
9    Q.   Who was your supervisor when you
10 first hired on at Puerto Rico Marine?
11    A.   Let me think. Donald Highbrook
12 (phonetic). He's dead.
13    Q.   Can you spell -- can you spell his
14 last name for me?
15    A.   I don't know how they spelled his
16 last name. But he -- he died just a few months
17 ago.
18    Q.   When Mr. Brindell hired on with you
19 in 1976, how many mechanics were there?
20    A.   Oh, man. There was like 43. Let me
21 explain something to you for a minute. When I
22 first hired on, it was called Gulf Puerto Rican
23 Lines and we was on Jordan Road on the Industrial
24 Canal. And then as time went on, we moved from
25 Jordan Road to France Road where our terminal was

24 (Pages 90 to 93)

Raymond Kain
January 29, 2021

Page 94

1   at then, and they got bigger ships.
2       The first ships that they had was
3   self-loading ships.  They had their own cranes on
4   the ship that go out, come in, and that's what --
5   why there was only a few mechanics in the
6   beginning.  We had smaller ships and everything.
7       And then when we moved to the
8   other -- the other terminal, then it was bigger
9   and then they started adding mechanics.  We got
10  bigger ships.
11      Q.   Okay.  So I'm not going to ask you
12  the name of all 43 mechanics that were there in
13  1976.  I think we'd be here for a little while.
14  But do you keep in touch with any of the
15  mechanics that were there in 1976?
16      A.   No, not really.  Jack was the only
17  one.  We used to hunt and fish together.
18          (Technical disruption.)
19          MS. SENTER:  Can y'all hear me again?
20  BY MS. SENTER:
21      Q.   Okay.  So I had asked just to confirm
22  that when you say Jack, you're talking about John
23  Brindell, right?
24      A.   Right.
25      Q.   He went by Jack?

Page 95

1       A.   Yeah.
2       Q.   Okay.  And I just want to be clear
3   because you just explained something to us that
4   there was kind of an upscale in the number of
5   employees at Puerto Rico Marine by the time
6   Mr. Brindell had gotten there because y'all were
7   working on some bigger ships?
8       A.   Working off of bigger ships.  Bigger
9   ships came in and unloaded more equipment.
10      Q.   All right.
11      A.   And that was our job to take care of
12  the equipment.
13      Q.   Right.
14      A.   Which our concern was about the
15  containers.
16      Q.   The containers?
17      A.   And the chassis because they had to
18  have the chassis to put the containers on.
19      Q.   Okay.
20      A.   That was their wheels.
21      Q.   Right.  Okay.  So you kind of took me
22  in nicely to what I wanted to ask you.  We talked
23  a little bit about some of the work that you've
24  done and you talked about doing repair work on
25  the containers and then some of the work that you

Page 96

1   did on the chassis earlier.
2       And I wanted to ask you what other type
3   of work did you do between 1976 and 1981 when you
4   were at Puerto Rico Marine?
5       A.   No other work.
6       Q.   Well, for instance -- I'm sorry.
7       You talked about repair work on the
8   containers and I wanted to ask you specifically
9   what type of repair work did you do?
10      A.   On the chassis?  Brake jobs.
11      Q.   On the containers when you were
12  talking about --
13      A.   The shop was a chassis shop.
14      Q.   Okay.
15      A.   The back shop was a container shop.
16  We worked on the chassis.  The only time we
17  worked on containers when was they needed
18  equipment to go out and we -- they would make us
19  start working on a few containers.
20      Q.   How --
21      A.   But most of the time it was chassis.
22      Q.   Okay.  How often did you have to do
23  any of the work on the containers?
24      A.   Not real often.
25      Q.   Would you be able to estimate how

Page 97

1   many times in a month?
2       A.   Maybe three times, but we'd only do
3   it like in the afternoon like when we worked
4   overtime.  They wouldn't cut us off the chassis.
5   They would make us work overtime to repair
6   containers.
7       Q.   And when you say repair the
8   containers, what specifically did you have to do?
9       A.   Oh, they could have a hole in them,
10  roof leaking, we had to seal a roof, patch a hole
11  in the side, stuff like that.  Hole in the floor,
12  fix a hole in the floor.
13      Q.   How would you go about fixing a hole
14  in a container?
15      A.   Well, you -- we put a patch on it
16  with a rivet.  Rivet it on.  Or if it was a metal
17  one, we would weld it.
18      Q.   And is that when you were talking
19  about using the MIG guns earlier?
20      A.   Exactly.
21      Q.   Did you use welding rods associated
22  with those MIG guns?
23      A.   No, it was a wire.  Now, we --
24  sometimes I did use a stick with an electrode,
25  you know, a rod or a rod with a -- that you weld

25 (Pages 94 to 97)

Raymond Kain
January 29, 2021

Page 98

1    with, regular welder.
2        Q.  Do you know who made the welding rods
3    that you used sometimes?
4        A.  The kind of rods?
5        Q.  Yeah.  Do you know who made them?
6        A.  Not really.
7        Q.  Did Mr. Brindell ever have to do any
8    of the welding on the containers?
9        A.  Well, he did with the MIG gun because
10   the MIG gun is kind of easy to use.
11       Q.  When you were doing the welding, did
12   you use any sort of protective equipment like
13   gloves or blankets?
14       A.  Well, I had gloves and I had a
15   welding shield, which I bought.
16       Q.  How about Mr. Brindell, did he use
17   gloves and a shield?
18       A.  Oh, yeah.
19       Q.  Do you know who made the gloves that
20   Mr. Brindell used when he was welding?
21       A.  No.
22       Q.  And just so we're clear, a lot of the
23   questions that I'm going to ask are going to be
24   very specific and you might not know and I don't
25   know is a fine answer.  Don't feel bad.  It's

Page 99

1    testing your memory a little bit here.  Okay?
2        A.  All right.
3        Q.  Now, we had talked about a little bit
4    the increase in work, right, the bigger ships
5    that started coming in.
6        A.  Right.
7        Q.  And I know you told Mr. Kinler
8    earlier and I just -- I don't know if it was just
9    me, if I couldn't hear it.  What were the names
10   of the ships that would come in between 1976 and
11   1981?
12       A.  The Mayaguez, the Ponce and
13   Aguadilla.
14       Q.  Okay.  The Mayaguez, the Ponce and
15   the Aguadilla?
16       A.  It's all names of Puerto Rican
17   cities.
18       Q.  And you said that -- who owned those
19   ships?
20       A.  The Puerto Rican government.
21       Q.  And I think you said that the ships
22   held over a thousand containers; was that right?
23       A.  Right.
24       Q.  Each of them held over a thousand
25   containers?

Page 100

1        A.  They were all sister ships.
2        Q.  Okay.  And I believe you said that
3    one ship docked a week; was that right?
4        A.  Exactly.
5        Q.  Were they on like a rotating
6    schedule?
7        A.  Right.  They would have to go from
8    New Orleans to maybe Jacksonville -- well, when
9    they left New Orleans, they went to Puerto Rico.
10   Then it would leave Puerto Rico and go to
11   Jacksonville.  And then it'd go back to Puerto
12   Rico and then it would go back to Charleston.
13   And, meanwhile, them other ships was going
14   around.
15       Q.  Okay.
16       A.  That way we had one ship a week.
17       Q.  How longs -- how long were the ships
18   in port for you?
19       A.  About 24 hours.  That's what it would
20   take to work a boat.
21       Q.  Were you ever responsible for
22   unloading the cargo out of the containers?
23       A.  No, no.  We just repaired them, the
24   chassis and the containers.
25       Q.  Okay.  And so I just wanted to be

Page 101

1    clear.  I'm looking at my notes to try to make
2    sure I don't go over a whole bunch of stuff that
3    you already did.
4        But when those ships were docked and
5    when Mr. Brindell was a supervisor, you said he
6    had to go in and check on various parts of the
7    ship, right?
8        A.  Only --
9        DEFENSE COUNSEL:  Object to the form.
10   BY THE WITNESS:
11       A.  Only if they had a problem.  If it
12   was just a normal ship come in, no.  If they had
13   to work on a ship, yes.
14   BY MS. SENTER:
15       Q.  How often when a ship docked would
16   there be a problem that would cause Mr. Brindell
17   to have to go onto it to check something?
18       MR. KINLER:  Objection, form.
19       MR. HIBEY:  Objection, asked and
20   answered.
21   BY THE WITNESS:
22       A.  Once or twice a month.
23   BY MS. SENTER:
24       Q.  I'm sorry?
25       A.  Once or twice a month.

26 (Pages 98 to 101)

Raymond Kain
January 29, 2021

Page 102

1      Q.   And I understood your testimony
2  earlier that you -- you personally went with him
3  at least six or seven times to check on things,
4  but --
5      A.   Yes.
6      Q.   -- your -- your recollection is that
7  once or twice a month when a ship was in dock
8  while Mr. Brindell was a supervisor, he'd have to
9  go on and check on something?
10     A.   Right.
11          DEFENSE COUNSEL:  Object to form.
12  BY MS. SENTER:
13     Q.   Okay.  And I'm going to ask a
14  clarifying question and this might be just be me
15  not knowing, but did you say a LoLo ship earlier?
16     A.   Well, that's what the containerized
17  ship is, LoLo.  That's they pick it up and put it
18  on.
19     Q.   Okay.  And then you distinguished
20  that between a RoRo ship?
21     A.   RoRo is when they drive the trailer
22  and everything on there.  They put ramps -- hook
23  the ramps up on the ship and run it up.  But you
24  can't use -- you can't use a LoLo ship and a RoRo
25  ship together.  They got to be one -- one's got

Page 103

1  to be a RoRo and one's got to be a LoLo.
2      Q.   Okay.  Now, when you got Mr. Brindell
3  his job at Puerto Rico Marine, do you recall what
4  his job title was specifically?
5      A.   Mechanic.
6      Q.   Just mechanic?
7      A.   Mechanic.
8      Q.   Okay.  And I know you eventually
9  became lead mechanic, right?
10     A.   Right.
11     Q.   When --
12     A.   Well, then I was lead mechanic
13  already.
14     Q.   Okay.  And that was going to be my
15  question.
16          How long after you started at Puerto
17  Rico Marine did you become lead mechanic?
18     A.   About five years.
19     Q.   Other than mechanic and lead
20  mechanic, did you ever hold any other job titles
21  with Puerto Rico Marine?
22     A.   No, no.
23     Q.   And Mr. Brindell, he was hired on as
24  a mechanic.  And I know Mr. Kinler asked you if
25  you could recall how long it took him to become a

Page 104

1  supervisor.
2          Other than his job as a supervisor
3  and as a mechanic, do you recall Mr. Brindell
4  ever holding any other job with Puerto Rico
5  Marine?
6      A.   Yes.
7      Q.   What else did he do?
8      A.   He was a parts man, to give us all
9  the brake shoes.
10     Q.   Other than a mechanic, a parts man
11  and a supervisor, did Mr. Brindell hold any other
12  positions?
13     A.   No.
14     Q.   When was Mr. Brindell the parts man
15  at Puerto Rico Marine?
16     A.   Well, he started as a mechanic.  He
17  worked with us as a mechanic and then they had
18  a -- because of his past, he had worked in some
19  part rooms, and they moved him into the parts
20  room to help this other guy.
21     Q.   Do you know where previously he had
22  worked as a parts man?
23     A.   I want to say it was at that
24  Wurlitzer or something.  They -- he did -- he did
25  like mechanic work there or whatever they did on

Page 105

1  them -- whatever them -- jukebox or whatever.
2  But he also had to do parts and all because they
3  used to sell parts for them things and all too.
4  I do know that much.
5      Q.   You said that they had moved him into
6  the parts room to help the guy who was there.
7      A.   Yeah, to give him a break because he
8  was the only parts man.
9      Q.   What was his name?
10     A.   A ship -- ma'am?
11     Q.   What was the other parts man's name?
12     A.   Tommy Smith.
13     Q.   Is Mr. Smith still living?
14     A.   Oh, I don't know.  I haven't seen him
15  in years.
16     Q.   Where did Mr. Smith live?
17     A.   I think he lived in New Orleans
18  somewhere.
19     Q.   And you haven't kept in touch with
20  him?
21     A.   No, I don't -- I don't -- I don't see
22  them guys anymore.
23     Q.   When's the last time --
24     A.   I live on the north side of the lake
25  now.

27 (Pages 102 to 105)

Raymond Kain
January 29, 2021

Page 106

1    Q.   I'm sorry?
2    A.   I live on the north side of the lake.
3  I'm about 50 miles away from him.
4    Q.   Right.  When's the last time that
5  you've spoken with anybody from Puerto Rico
6  Marine?
7    A.   Jack was the last person.
8    Q.   And when did you last speak with
9  Jack?
10   A.   Before he died.  A year ago.
11   Q.   Okay.  So we talked about
12 Mr. Brindell had moved from a mechanic to a parts
13 man.  Do you recall when that change happened?
14   A.   Not really because we still
15 considered him as a mechanic.  He'd come out
16 there and do work.  But like if the other guys --
17 if the other man was sick or something that day,
18 he would work the parts room.  But -- and if we
19 needed anything in the shop, he would go get it
20 and bring it out to us.
21   Q.   Okay.  So I want to talk a little bit
22 more about the work that y'all did as mechanics,
23 but I want to just make sure I have kind of a
24 clear time line.
25            When Mr. Brindell hired on, he was a

Page 107

1  mechanic, then he became a parts man, and then he
2  became a supervisor, correct?
3    A.   Right.
4    Q.   Okay.  Are you able to say between
5  1976 and 1981 how long Mr. Brindell spent as a
6  mechanic, with the job title mechanic?
7    A.   All the way until he went to
8  supervisor.  And even after supervisor he'd come
9  there and work with us.
10   Q.   What were his -- what was the
11 difference in job duties between mechanic and
12 supervisor?
13   A.   What was the difference in the job?
14   Q.   Yes.
15   A.   He had more authority.  He could --
16 he was under the maintenance department, but he
17 had more -- he had more authority.  He could do
18 -- he could tell a mechanic what they needed to
19 do.
20   Q.   Did he have to go to meetings?
21   A.   Sometimes he did.
22   Q.   Did he have to keep up with any sort
23 of office work?
24   A.   Some upstairs.  Some upstairs.  He
25 had an office.  Well, he had a desk, you know, in

Page 108

1  a big office.
2    Q.   Did he have to like work out the
3  schedule on who was going to work on any given
4  day?
5    A.   No, no, because we all worked -- we
6  all worked pretty much the same.  And when it
7  came, we was human.  When it came to overtime on
8  the ship -- because they used to use different
9  people on the ship like that, you know, because
10 we worked for 24 hours.  So we had to take and
11 rotate the crew.  And that was left up to the
12 shop steward because he was the one that made the
13 rotation on that overtime because unless
14 everybody was working, they would put a rotation
15 and he made the rotation up.  Jack had nothing to
16 do with that.
17   Q.   The shop steward made the rotation?
18   A.   Right.
19   Q.   Who was your shop steward?
20   A.   Oh, we used to call him Choo Choo.
21 His real name was Ronnie -- Ronnie Gillian,
22 Gillant, Gillent.
23   Q.   And you said y'all were union.  Which
24 union were you a member of?
25   A.   ILA and that's International and we

Page 109

1  was -- our local was 2036, the mechanic's union.
2  We weren't longshoremen, but we was all in the
3  same International, ILA.
4    Q.   Was Mr. Brindell a part of that union
5  as well?
6    A.   I want to say if he was -- when he
7  was a mechanic, he had to be.  But after he got
8  to be -- after he got to management, he
9  couldn't be in it no more because supervisors
10 can't.
11   Q.   Okay.  So when Mr. -- when
12 Mr. Brindell hired on as a mechanic, you said he
13 had to be in the mechanic's union?
14   A.   Right.  Well, after 30 days
15 probation -- you know, probation because they --
16 you know, before they could join the union.
17   Q.   Uh-huh.  Did you go to union
18 meetings?
19   A.   Ma'am?
20   Q.   Did you go to union meetings?
21   A.   Yes, ma'am, I did.
22   Q.   Did Mr. Brindell go with you?
23   A.   Yes, I'm sure he would -- well, he
24 would be there.  I'll tell you that.
25   Q.   How often did you go to meetings?

28  (Pages 106 to 109)

Raymond Kain
January 29, 2021

Page 110

1    A.   They was only once a month.  But I
2  didn't make them all now.  Sometimes I had to
3  work.
4    Q.   Did you get any sort of newsletters
5  or mail from the union?
6    A.   Never got it directly.  They would
7  put something on a bulletin board at work.
8    Q.   What sort of things did they post on
9  the bulletin board at work?
10    A.   When the next meeting was, what they
11  was going to discuss and stuff like that.
12    Q.   Now, when you hired on in 1971, do
13  you recall there ever being any discussion at
14  Puerto Rico Marine about OSHA?
15    A.   Oh, I've heard about them, yeah.
16    Q.   When you first hired on in 1971, what
17  do you recall being discussed at Puerto Rico
18  Marine about OSHA?
19    A.   Oh, that they -- they had
20  restrictions and stuff that they had to do.  We
21  didn't get much about that.
22    Q.   Do you recall whether between 1971
23  when you first hired on and 1976 when
24  Mr. Brindell hired on there being any change in
25  your work practices at Puerto Rico Marine?

Page 111

1    A.   No.
2    Q.   Did anybody from Puerto Rico Marine
3  ever teach you how to perform your job as a
4  mechanic?
5    A.   No.
6    Q.   Did you have safety meetings at
7  Puerto Rico Marine?
8    A.   What's that?
9    Q.   I said did you have safety meetings
10  at Puerto Rico Marine?
11    A.   No, no.
12    Q.   You laugh.  Why are you laughing at
13  that question?
14    A.   Just -- no safety meetings.
15    Q.   Was there anybody in charge of safety
16  at Puerto Rico Marine?
17    A.   No.
18    Q.   When you first hired on at Puerto
19  Rico Marine, did you already know how to do the
20  job that you were hired to do?
21    A.   Yes, I did.
22    Q.   And when Mr. Brindell hired on in
23  1976, do you recall who taught him how to do his
24  job?
25    A.   Me.

Page 112

1    Q.   You did?
2    A.   Yes.  I was the lead mechanic.
3    Q.   How many people would you say that
4  you trained how to do their job?
5    A.   Oh, wow.  I guess about -- about ten.
6    Q.   Do you know why Mr. Brindell decided
7  to move from being a mechanic to being a
8  supervisor?
9    A.   No, ma'am.  I never could figure that
10  out myself.  I mean, that was a cut in pay
11  because you went from -- it was a cut in pay for
12  him.  You went from the mechanic's pay, you know,
13  hourly pay to a salary.  I never could -- but
14  they had other guys that did the same thing too
15  and I couldn't figure that.
16    Q.   Were the hours better?
17    A.   No.  They got to work overtime and
18  didn't get paid.  That's why when we was doing
19  brake jobs downstairs on overtime, Jack would
20  come down and work with us just to get us out of
21  there quicker because he wanted to go home.
22    Q.   All right.  So you talked a little
23  bit earlier about -- with Mr. Hibey about the
24  work that you would do on the chassis on the
25  containers, correct?

Page 113

1    A.   Right.
2    Q.   I want -- I want to ask just some
3  kind of basic background questions.  Okay?
4    A.   All right.
5    Q.   The containers that you were working
6  on, the chassis, who owned those?
7    A.   Who owned them?
8    Q.   Yes.
9    A.   The company.
10    Q.   Which company?
11    A.   Puerto Rico Marine, Puerto Rican
12  government.
13    Q.   When they would come in to you to be
14  worked on, did they have any sort of maintenance
15  log that came with them?
16    A.   No, no.  When they -- in the shop
17  they worked off of a computer sheet and it was
18  deadline equipment, which means out of service.
19  And we would take them and pick them off of there
20  and work on that.
21        Now, that's the containers only.  The
22  chassis, we had a chassis pit on the side of my
23  shop where we worked because that was the
24  deadline chassis and we'd just go out there and
25  try and fix the easiest ones first, you know.

29 (Pages 110 to 113)

Raymond Kain
January 29, 2021

1    Q.   All right.  I'm going to have to ask
2 you to explain that a bit more for me.
3         When you say that you were working on
4 deadline chassis, what does that mean?
5    **A.   That means they putting out of**
6 **service.  They can't be used until we fix it,**
7 **brake jobs and no telling what else.  Most of**
8 **that -- them old chassis, the brakes was locking**
9 **up on them.  It was '66 model Fruehauf chassis,**
10 **most of them, 1966.**
11   Q.   Okay.  And you said those deadline
12 chassis were over in the chassis pit on the side?
13   **A.   On the side we had -- on the side of**
14 **the shop we had a parking lot over there --**
15   Q.   Okay.
16   **A.   -- with all of them.**
17   Q.   And you said you tried to work on the
18 deadline chassis first?
19   **A.   Well, that's the only ones you worked**
20 **on.  We tried to work on the easiest ones first**
21 **to get them off the deadline.**
22   Q.   Okay.  So you were only ever working
23 chassis that were taken out of service because
24 they couldn't be used; is that --
25   **A.   Right, they couldn't use them to go**

1 on the road.
2    Q.   Okay.  And you tried to work on the
3 easiest ones first to get them back on the road?
4    **A.   Right.  Some of them just had a**
5 **leaking seal and you had to pull the wheel off**
6 **and clean it all up, blow it all down with the**
7 **thing and all and put a new seal in it and put it**
8 **back on and then put more oil in the wheels.**
9    Q.   Okay.  And I know that you
10 mentioned -- you mentioned working on brakes
11 earlier, but you also just told me that sometimes
12 you might need to repair a seal or put more oil
13 on there.
14        What were other things that you might
15 need to do to a chassis to put it back into
16 service?
17   **A.   It could have had a -- oh, man.  It**
18 **could have been anything.  It could have been**
19 **missing a twist lock.  It could be the relay**
20 **valve on it.  That goes with the brakes.  It**
21 **could be the lights, could have problem with**
22 **lights.**
23   Q.   Anything else that you can recall?
24   **A.   Oh, man, everything -- all kind of**
25 **stuff.  Could have cracks in the frame that have**

1 to be welded.
2    Q.   Okay.  So we talked about -- you
3 talked about working on brakes earlier, but you
4 said they also could have needed seals replaced,
5 they could have needed more oil in the wheels,
6 they could have been missing --
7    **A.   No, no.  When you replace the seal,**
8 **you got to put oil back in the wheel.**
9    Q.   Okay.  So if you replaced the seal,
10 you would have had to put oil in there too.
11   **A.   Right.**
12   Q.   They could have been missing a twist
13 lock?
14   **A.   Right.**
15   Q.   Could have had to change a relay
16 valve.  You could have had to fix some lights.
17 You could have had to repair a cracked frame --
18   **A.   Right.**
19   Q.   -- by welding it.
20   **A.   Correct.**
21   Q.   Any other thing sitting here today
22 that you can think of that you've done to repair
23 those chassis while you were at Puerto Rico
24 Marine?
25   **A.   We put rear -- rear bolsters on them**

1 **because the other bolsters were bent down.  We**
2 **put goosenecks on them.  That's where you hook it**
3 **up to the tractor, support legs that holds it up.**
4    Q.   So there were a lot of reasons --
5 from what I'm hearing from you, there were a lot
6 of reasons that one of those chassis could be out
7 of service; is that right?
8    **A.   Right.**
9    Q.   And your job was -- as mechanics was
10 to fix whatever it was that was broken, right?
11   **A.   Right.  Well, when we put that**
12 **chassis in the shop, we went completely through**
13 **it, fixed everything.  Lights, everything.  When**
14 **it went out of there, it was ready for the road.**
15   Q.   All right.  So walk me through if you
16 would go out to the chassis pit, you'd pick out
17 one of those deadline chassis that you needed to
18 repair and bring it to the shop.  What was the
19 standard practice once that chassis got into the
20 shop?
21   **A.   Well, the first thing was you checked**
22 **out the brake system.  If the shoes were frozen**
23 **and if they had a frozen shoe or something, we**
24 **pull it out and did a complete brake job.  Or if**
25 **the brake shoe pads was down -- worn down too**

30 (Pages 114 to 117)

Raymond Kain
January 29, 2021

Page 118

1   much, we took them off, changed them.  And then
2   we had to check the equalizers for the springs
3   and all like that.
4        And then after we did all of the big
5   stuff like that, the main stuff, then we would go
6   back and fix the lights and all like that and
7   then grease it and get it all ready for the road.
8        Let me remind you now we got -- some
9   of these chassis were Fruehauf chassis in 1966
10  now.  Most of them brake shoes were locked up.
11  They was -- you couldn't hardly move them.  We
12  would have to go out there and get underneath
13  there with a chisel and a maul and pry the brake
14  shoe up before we could get it in the shop.  We
15  didn't have no new equipment.  Everything they
16  bought was old.  It was used.  It was all old
17  Seatrain equipment.
18       Q.   Before you ever got to any one of
19  these deadline chassis that you were repairing,
20  would there be any way for you to know what work
21  had been done on them before you put hands on
22  them?
23       A.   No, no.  Believe me, I don't think
24  there was any work done to them.
25       Q.   Now, the chassis that you were

Page 119

1   repairing, I know you've mentioned Fruehauf a few
2   times.
3        Do you really only recall Fruehauf
4   chassis in that deadline chassis pit?
5        A.   Oh, no.
6        Q.   All right.  I'm going to ask you a
7   very specific question.  Okay?
8        A.   All right.
9        Q.   How many times when you were working
10  on a chassis at Puerto Rico Marine was
11  Mr. Brindell working side by side with you?
12       A.   Pretty much.  Pretty much.  When he
13  was a mechanic, he was down there all the time
14  and he -- you know, he liked doing the work.
15       Q.   I'm sorry?
16       A.   He liked doing that kind of work.
17       Q.   Right.  And I'm asking you kind of a
18  very specific question.  I understand that there
19  was the shop, right, where there were about 43
20  different mechanics, working, right?
21       A.   No, not all in that shop.
22       Q.   Okay.
23       A.   It was all over.
24       Q.   How many were in --
25       A.   We had the front shop, a back shop,

Page 120

1   we had an inspection lane, we had a mechanic shop
2   and we had refrigeration men working in the yard
3   on refrigerated units.
4        Q.   Okay.  And how many of those
5   mechanics were in the front shop with you?
6        A.   Eight because we had four stalls, two
7   mechanics to a stall.
8        Q.   How many times was Mr. Brindell
9   working in your stall?
10       A.   Pretty much every time.  Like I said,
11  me and Jack was friends, so he would want to come
12  help me out.
13       Q.   Is there anybody else that you
14  remember working with in your stall other than
15  Mr. Brindell?
16       A.   Oh, yeah.  They had Charlie Brown.
17       Q.   So sometimes you worked with Charlie
18  Brown?
19       A.   Or he worked with me.
20       Q.   Do you recall Mr. Brindell working in
21  anybody else's stall, working with anybody else
22  in a different stall other than you?
23       A.   Oh, yeah.
24       Q.   Who else did he work with?
25       A.   He would go work with Keith Polito

Page 121

1   and DJ.
2        Q.   How -- and I know you're saying
3   that -- that pretty much every time Mr. Brindell
4   was working with you, but you're also telling me
5   that you worked with Charlie Brown and
6   Mr. Brindell worked with two other mechanics.
7        So are you able to break down how
8   much of the time Mr. Brindell was with you?
9        A.   Most of the time he'd be with me.
10  But like if Charlie Brown was in my stall, he'd
11  go work with somebody else.  It didn't mean it
12  had to be with just me.  There was three other
13  stalls you could go get, anybody that needed
14  help.
15       Q.   Right.  Okay.  Now, when you're
16  working on a stall or you're working in your
17  stall on one chassis; is that right?
18       A.   That's what?
19       Q.   If you're working in a stall, you're
20  only working on one chassis, right?
21       A.   Right.  It fits only one chassis to a
22  stall.
23       Q.   Okay.  And so while you're working on
24  your chassis, somebody else is doing other work
25  in the other stalls, right?

31 (Pages 118 to 121)

Raymond Kain
January 29, 2021

Page 122

1      A.   The next stall, yes, and the next
2  stall and the next stall.
3      Q.   Right.
4      A.   There was always something going on
5  in them four stalls.
6      Q.   Okay.  My point being, you're doing
7  the work in your stall, right?
8      A.   Right.
9      Q.   And so you weren't -- you weren't
10 fussing with what the people were doing in the
11 other stalls?
12     A.   Well, I was the lead mechanic.  I had
13 to go check and make sure people was doing stuff,
14 you know --
15     Q.   Okay.
16     A.   -- and doing it right.
17     Q.   Okay.  So you would float around as
18 the lead mechanic to check on other people's
19 work?
20     A.   Not all the time, but I did.  But
21 most of the time I was -- I was working on --
22 with the chassis.  I had a good crew.  They
23 hardly ever -- they hardly ever had -- you know,
24 wasn't working.  The thing was sometimes they
25 would have a problem making a decision and I

Page 123

1  would go over there and help them make a decision
2  or something, a repair or whatever.  It could
3  have been anything.
4      Q.   Mr. Kain, just because we're on video
5  and we just saw -- who else is -- who else is in
6  your house with you today?
7      A.   Nobody.  Just my wife and the dog.
8  They was in the other room.  She come through
9  here to get something.  I'm in the kitchen.
10     Q.   Okay.
11     A.   And she just got -- and she got me a
12 Coke.
13     Q.   Okay.  So you talked a little bit
14 about -- I think what kind of stuck out in your
15 mind about some of the deadline chassis that you
16 had to repair, right, with the freezing up
17 brakes?
18     A.   Right.
19     Q.   And you were specifically associating
20 those with the 1966 chassis?
21     A.   Right.
22     Q.   I'm going to ask --
23     A.   They were the first chassis we had to
24 work with.
25     Q.   I'm going to specifically ask you

Page 124

1  about one type of axle right now.  Okay?
2           You mentioned earlier Eaton axles.
3      A.   Right.
4      Q.   Okay.  Out of the three axles that
5  you identified, can you tell me what percentage
6  of the time you personally worked on Eaton axles?
7      A.   No, I really can't tell you, but I
8  know it was a good many of them.  You know, I
9  couldn't give you a percentage on that because,
10 you know, too much.
11     Q.   And I want to ask a similar question
12 about Mr. Brindell.
13          Are you able to say how often as a
14 mechanic Mr. Brindell would have worked on an
15 Eaton axle?
16     A.   Pretty much.  Plenty.
17     Q.   I'm sorry.  Like Mr. Kinler, I'm also
18 taking notes so I don't -- I don't or I try not
19 to repeat myself.
20          You said -- I understand you're
21 saying plenty and I just want to make sure, you
22 identified three different axles, right?
23     A.   Right.
24     Q.   So it wasn't as though Mr. Brindell
25 was working on Eaton axles all the time, right?

Page 125

1      A.   No.  We just -- we -- whatever that
2  chassis had when we pulled it in that needed a
3  brake job, that's what we did to it.
4      Q.   How did you know that any of the
5  axles that you were working on or that
6  Mr. Brindell worked on, more specifically, were
7  Eaton axles?
8      A.   They had a tag on it --
9      Q.   Can you describe that for me?
10     A.   On the axle itself, it had a tag.
11     Q.   Can you describe the tag for me?
12     A.   Just a tag.  Some of them were
13 square.  Some of them was oblong, you know, like
14 that.
15     Q.   Do you recall what color they were?
16     A.   Them old chassis, they wasn't silver
17 after that.  It wasn't even writing on it.  It
18 was stamped.  A lot of it was stamped with the
19 serial numbers and all.  But you could still read
20 the names on them.
21     Q.   Do you know what color the tag would
22 have been initially?
23     A.   No.
24     Q.   Did you ever --
25     A.   Might have been silver because they

32 (Pages 122 to 125)

Raymond Kain
January 29, 2021

Page 126

1  was mostly like a silver color and -- but
2  sometimes they even -- when they sprayed axles,
3  they sprayed over the tag, but you could always
4  read it, take a wire brush and clean it up.
5      Q.   You said you could read the writing
6  that was stamped on there.
7      What did the writing say?
8      A.   It said the name and then they would
9  have, I guess, like a serial number or something
10 on them.  I never really paid that much attention
11 to it, just mainly the name of the axle.
12     Q.   Why would you pay attention to the
13 name of the axle?
14     A.   Because to get the brake shoes that
15 go with the axle and the parts because you had
16 other parts that went on there.
17     Q.   You said the name was on there.  Can
18 you spell the name for me?
19     A.   What you talking about, Eaton?
20     Q.   Yeah.
21     A.   E-a-t-h-e-o-n.
22     Q.   Do you remember what kind of
23 lettering it was written in, what the letters
24 looked like?
25     A.   It was kind of -- I don't know, kind

Page 127

1  of -- the E was kind a little fancy than the rest
2  of it was.
3      Q.   Now, you described for us that it was
4  difficult to see what was on the chassis because
5  they were old and they were worn down, they might
6  have been sprayed over.
7      Did you ever see an original Eaton
8  axle or were they all on the old chassis?
9      A.   Oh, they was -- we did work on some
10 newer stuff, but the -- you know, the main thing
11 was, you know, if we did a brake job, we brought
12 it in.  If it needed work on it, we brought it
13 in.  So we --
14     Q.   Right.  And --
15     A.   But I never paid that much attention
16 to the tags on them or anything.  All we looked
17 to see what kind of axle it was and we go get --
18 tell the parts man and he would get the parts.
19     Q.   All right.  And so just to I'm clear,
20 the work that y'all were doing, that you
21 described doing with Mr. Brindell with Mr. Hibey,
22 that was all on the old deadline chassis, right?
23     A.   No.  We did all chassis.  They did
24 have newer ones in there that was deadlined.  But
25 anything that was deadlined we put in the stack

Page 128

1  over on the other side.
2      In fact, when the longshoremen was
3  working the ship, if they run across one that had
4  problems, they'd bring it to the front shop if
5  they couldn't take a container.
6      Q.   When you needed to get parts for an
7  Eaton axle, right, what would you say?  What
8  would you tell the parts guy?
9      A.   I told him I needed parts for this
10 trailer -- this chassis and he'd ask me what it
11 was and I'd tell him.
12     Q.   What information other than the name
13 of the axle did the parts man need?
14     A.   That's it, because he matched -- he
15 matched it up with the parts we bought.  You
16 know, you don't -- you go get parts for your car,
17 you're going to get it for your car, the right
18 car, not another car.
19     Q.   Did you ever have to give him a
20 serial number?
21     A.   No.
22     Q.   Did you ever have to give him a year?
23     A.   No.  He'd come and look.
24 Sometimes -- break time, if he had a problem
25 getting the parts, he'd go -- he would come and

Page 129

1  look at the thing.  I didn't -- you know, the
2  chassis.  I never told him -- you know, we didn't
3  discuss it, no.  He'd go get what he needed for
4  us to do it.  He was the parts man.
5      Q.   Did you ever order parts yourself for
6  Puerto Rico Marine?
7      A.   No.
8      Q.   Do you know where any of the parts
9  that Puerto Rico Marine got for you to use, do
10 you know where they came from?
11     A.   No.
12     Q.   On an Eaton axle, can you describe
13 for me what the brake assembly looked like?
14     A.   Yeah.  It pretty much looks the same
15 as all of them.  They got the brake shoe on the
16 top and on the bottom.  They got a camshaft comes
17 in here, they got a spring that holds the two
18 shoes together on the camshaft and it turns.
19 That's what opens it up and closes it.
20     On this side you got two anchor pins
21 that go in a spider on the thing that hold them
22 back here.  To take them off, you got to take the
23 clips off and then you got to knock the drive --
24 drive the anchor pins out and then you can pull
25 the shoes off.  But plenty of times them brake

33 (Pages 126 to 129)

Raymond Kain
January 29, 2021

Page 130

1  shoes are -- them anchor pins will be frozen up
2  and you got -- you know, you've got to drive them
3  out.
4      Q.  When you were removing or changing
5  the brakes on an Eaton axle, was there any
6  writing on -- on the brake shoes themselves?
7      A.  Yeah, they had writing on brake
8  shoes.
9      Q.  Where?
10     A.  Well, sometimes they had like a paper
11  tag that stuck on the side of the shoe -- not the
12  outer shoe, the metal part, the part that went
13  around on the thing or to the -- you know, the
14  eyes and the camshaft.
15     Q.  A paper tag?
16     A.  Yeah.
17     Q.  What did the paper tag say?
18     A.  What kind of axles it -- what kind of
19  tag -- I mean, shoes and stuff it was.
20     Q.  Now, you mentioned earlier with
21  Mr. Hibey that you might have to change -- you
22  might have to put on new linings.
23       Do you remember that?
24     A.  No, you don't put on new linings.
25  You have to get the whole brake shoe.  I didn't

Page 131

1  put no linings on.  You put the whole brake shoe
2  on.  The brake shoe comes with the lining.
3      Q.  Okay.  So when you were taking off
4  the brake shoe from an Eaton axle, were you ever
5  able to read the writing on the paper tag on --
6  for the brake shoe that you were removing?
7      A.  Yeah, yeah.
8      Q.  Okay.  The brake shoe that you were
9  removing, do you recall what that tag said?
10     A.  What kind of -- what kind of shoe it
11  was.
12     Q.  And I'm asking specifically what did
13  it say?
14     A.  Eaton.
15     Q.  And these are on the brake shoes that
16  you were removing?
17     A.  Yeah.
18     Q.  How about on the ones that you were
19  installing, do you recall --
20     A.  Yeah.
21     Q.  What did they say?
22     A.  Eaton.
23     Q.  Where's -- I'm just trying to
24  visualize on the brake shoe itself, where was the
25  paper tag located?

Page 132

1      A.  All right.  A shoe is made with a top
2  part and underneath that holds the metal on
3  there, they got a thing that comes down, one on
4  each side that the roller goes in by the
5  equalizer that turns it, and then there's -- on
6  the other side where the anchor pins goes
7  through.  So right on the side there, it was
8  about that wide that they would put a tag on it,
9  one side or the other.
10     Q.  So the paper tag that you're talking
11  about on the shoes that you removed, that was on
12  the metal part, not the liner, right?
13     A.  Right.  They wouldn't put it on the
14  liner.
15     Q.  Right.  So could you ever see any
16  words on the liner on the brake shoe that you
17  removed from an Eaton axle?
18     A.  The liner itself?
19     Q.  Yeah.
20     A.  Sometimes they had -- on the side
21  they would have some numbers or something.  But
22  I -- we never -- we never paid all that attention
23  to it, you know what I mean?  We put them on.
24  The parts man was the one that had to do that.
25  He had -- he was supposed to match it up with

Page 133

1  what we need.
2      Q.  How about on the new liners when you
3  were installing new brakes, do you recall ever
4  seeing any names on the liners on the new brakes?
5      A.  Yes, they had.
6      Q.  What were those names?
7      A.  It would be Eaton if that's what we
8  was working on.
9      Q.  You specifically recall the liner on
10  a brake that you were installing on an Eaton axle
11  said Eaton?
12     A.  Yeah.
13     Q.  How many times do you remember
14  Mr. Brindell helping you with a brake job on an
15  Eaton axle?
16     A.  Oh, pretty often.  Plenty.
17     Q.  When you guys were working together,
18  repairing any of the chassis, how did you divide
19  up the work?
20     A.  We didn't divide it up.  We just one
21  get on one side and one get on the other side.
22     Q.  Would you be working on opposite
23  sides of the chassis?
24     A.  Sometimes.  Sometimes we work
25  together.  Sometimes you could have a hard time

34 (Pages 130 to 133)

Raymond Kain
January 29, 2021

Page 134

1  pulling a wheel off and, you know, we would get
2  together to pull the wheel off.  But the chassis
3  would be jacked up on jack stands so we could
4  pull all wheels -- all four wheels off at one
5  time and clean it all up.
6      Q.   I think you told me earlier, I just
7  want to make sure.
8          How many anchor pins were on the
9  Eaton brakes that you were changing?  Did you say
10  it was two anchor pins?
11     A.   Right.  You're saying on each --
12  that's only on one side, one axle.  You got a top
13  brake shoe, a bottom brake shoe.  You got two
14  anchor pins, one on the top and one on the bottom
15  here.  And on the front you got rollers, one
16  roller, two rollers altogether.
17     Q.   Do you remember the linings on the
18  Eaton -- the linings that you associate with the
19  Eaton brakes, were they tapered?
20     A.   Right.  You got a taper to one side
21  and a taper to the other side and your high is in
22  the middle at the top.
23     Q.   So you recall the Eaton brakes being
24  tapered?
25     A.   Tapered, right.

Page 135

1      Q.   Do you recall how any of the brake
2  shoes that you associate with Eaton came
3  packaged?
4      A.   Oh, I didn't get to see all that.
5  All they gave us was brake shoes out of the parts
6  room.  I never seen -- I didn't know how they
7  come in the parts room.  They might have came in
8  a great big crate.  I have no idea.  We had a
9  window to go to to get parts.
10     Q.   Do you know any of the years of
11  manufacture of any of the Eaton axles that you
12  would have worked on?
13     A.   Yeah.  They -- I imagine -- you know,
14  I mean, we looked at them and all like that, you
15  know, but we never really paid that much
16  attention to it.  But I know there was no '66.
17  They could have been, you know, '70s or something
18  like that.
19     Q.   Right.  And so my question was just
20  more specific.
21         The Eaton axles that you and
22  Mr. Brindell worked on, do you know the exact
23  year of manufacture of any of those axles?
24     A.   No.  I never did pay attention to
25  that.

Page 136

1      Q.   I'm pretty sure I know the answer,
2  but I'm going to ask it just to be sure.
3          Do you recall any of the serial
4  numbers associated with any of the Eaton axles?
5      A.   I probably wouldn't even remember if
6  I -- if I looked at them.
7      Q.   That's fair.
8      A.   That's a long time ago.
9      Q.   I want to make sure I ask this
10  correctly, okay, so it's a really specific
11  question.
12     A.   All right.
13     Q.   Can you say -- or were you ever
14  present for a time when Mr. Brindell would have
15  done a first time brake job on an Eaton axle?
16  And what I mean by that is he was the very first
17  mechanic to ever change the brakes on an Eaton
18  axle.
19     A.   Oh, I'm sure I was present when he
20  did it because I was working with him, teaching
21  him.
22     Q.   Right.  And no, no, no.  My point
23  being that the brakes were the first ones -- the
24  first change on that specific axle.
25     A.   Yes.

Page 137

1      Q.   When do you think that happened?
2      A.   When do I think it happened?
3      Q.   Uh-huh.
4      A.   In the beginning when he first
5  started.
6      Q.   I think we might be having a
7  disconnect.
8          Are you saying you think you were
9  there the first time Mr. Brindell ever changed a
10  brake on an Eaton axle generally --
11     A.   No.
12     Q.   -- his first brake job?
13     A.   No.
14     Q.   Okay.  What makes you think that
15  Mr. Brindell was the first mechanic to change a
16  brake on a specific Eaton axle?
17     A.   What makes me think that?  Because --
18     Q.   Yes.
19     A.   -- he worked with me and I know we
20  didn't pick out just certain jobs.  We just
21  worked on what we had coming in.
22     Q.   Okay.  Help me to understand which
23  axles you think that you and Mr. Brindell worked
24  on that you were the very first mechanic to ever
25  change those brakes.

Raymond Kain
January 29, 2021

Page 138

1      A.   I don't understand the question.
2      Q.   Okay.  Let me see if I can run it
3  through this way.
4          If you get a car, right, you buy a
5  car new?
6      A.   Yeah.
7      Q.   You own that car, you're the one
8  doing all the maintenance on it, right?
9      A.   Right.
10     Q.   You know the service history, right?
11     A.   Right.
12     Q.   So the first time you change the
13  brakes on your car that you bought and you
14  maintain the service history, you know you're the
15  first mechanic to have ever changed those brakes,
16  right?
17     A.   Right.
18     Q.   Okay.  The axles that were at Puerto
19  Rico Marine, you said you didn't know the service
20  history of any of the axles that you worked on,
21  right?
22     A.   Right, we didn't know.
23     Q.   Right.  So the axles that you worked
24  on, since you didn't know the service history and
25  they came to you damaged, they were old, they

Page 139

1  were out of service, are you able to say that
2  nobody had ever changed the brakes on those axles
3  before?
4      A.   Yeah.
5      Q.   How?
6      A.   When they worn down and they froze
7  up.
8      Q.   Is that an assumption that you're
9  making based on the condition of the brakes?
10     A.   What I'm telling you is when you get
11  them -- I know there's nobody because they never
12  had no mechanics like we did.  All that stuff
13  come -- some of that stuff comes from overseas.
14     Q.   Do you know the condition it was in
15  when it was purchased?
16     A.   It was brand new probably.
17     Q.   You say probably.  Did you purchase
18  it?
19     A.   We bought all -- Puerto Rico Marine
20  management bought all of that stuff.
21     Q.   Okay.  So what I'm asking
22  specifically, did you personally order any of the
23  chassis brand new?
24     A.   No.
25     Q.   And you personally don't know any of

Page 140

1  the service histories of any of the chassis that
2  you worked on, correct?
3      A.   No, because they never kept records
4  on chassis, containers or anything.
5      Q.   Okay.  So because you don't know the
6  condition that they were purchased personally and
7  because you don't know the service history of any
8  of the chassis that you worked on, are you making
9  an assumption that you were the first person to
10  change any brakes?
11     A.   Oh, no.  I wouldn't say that I was
12  the first person that ever did that.
13     Q.   Okay.  And that's --
14     A.   I more than likely was.  We -- some
15  of this stuff, I'm telling you.
16     Q.   Right.  And so what I'm trying to
17  get, sir, is your -- the best knowledge that you
18  have with your personal knowledge.  So let me ask
19  it again to make sure that you and I are on the
20  same page.
21          The Eaton axles that you worked on
22  with Mr. Brindell, you don't know the service
23  history of any of those Eaton axles before you
24  put hands on them, right?
25     A.   Right.

Page 141

1      Q.   Okay.  And you don't know the
2  condition of any of the chassis when they were
3  first purchased, correct?
4      A.   No.
5      Q.   That's not correct?
6      A.   No.  I said that's correct.
7      Q.   Okay.  So sitting here today with
8  that understanding, are you able to say that you
9  and Mr. Brindell were the first mechanics to ever
10  change brakes on any of those Eaton axles?
11     A.   Yes, yes.
12     Q.   How?
13     A.   By the condition of the brakes and
14  everything under there.
15     Q.   I'm sorry.  I couldn't hear you.
16     A.   By the condition of the brakes and
17  everything under there.
18     Q.   Again --
19     A.   I get under one and look at it, all
20  rusted and you could tell if them things aren't
21  serviced.
22     Q.   Okay.  And so again, this is where
23  we're coming back to.  You're making an
24  assumption that you were the first person --
25          MR. HIBEY:  At this point -- at this

Raymond Kain
January 29, 2021

Page 142

1    point I'm going to object and we're going to move
2    along.  You've asked the question for
3    ten minutes.  You've asked it three or four
4    times.  It's beyond repetitive and it's crossed
5    over into harassment.
6              So do you have another topic area or
7    should we move along to another attorney?
8              MS. SENTER:  Well, Mike, the proper
9    objection in Louisiana is as to form.  So you can
10   make an objection and I'll continue to ask my
11   questions --
12             MR. HIBEY:  I made my objection.
13             MS. SENTER:  Okay.
14             MR. HIBEY:  And I'm instructing the
15   witness not to answer any further repetitive and
16   harassing questions.
17             So at this point do you have another
18   topic area?
19             MS. SENTER:  No.  I have --
20             MR. HIBEY:  You can go ahead and say
21   whatever you need to say for the record, but
22   we're moving along.
23             MS. SENTER:  We're going to go on a
24   break, Mr. Kain.  Why don't you go ahead and you
25   can -- we can go off the record -- we can go off

Page 143

1    the video record and, Mr. Kain, you can step out
2    of the room.
3              THE VIDEOGRAPHER:  Mike, are you
4    wanting to go off record?
5              MR. HIBEY:  No, we're not going off
6    the record.  He's here to answer questions.
7              MS. SENTER:  Well --
8              MR. HIBEY:  So continue or -- or we
9    can just suspend the deposition if that's what
10   you feel like you need to do, but we'll do it as
11   to your defendant only and continue along.
12             MS. SENTER:  I'm going to call the
13   judge because it is my right right now to ask the
14   questions that I would like to ask.  I understand
15   that you disagree, but it is my time for my
16   client to ask questions.  So if you'd like --
17             MR. HIBEY:  No, it's not.  You've
18   been going for over an hour.  You've asked the
19   same question now for over ten minutes.  It's
20   repetitive and it's harassing.  He's been here
21   for now almost three hours.  I asked questions
22   for 30 minutes.  I turned it over to you all and
23   it was an hour with one defendant and now over an
24   hour with you.  This is ridiculous.
25             So you can go ahead and call the

Page 144

1    judge, but he is here to answer questions and you
2    do not control the deposition for everyone else.
3              So as I said before, the deposition
4    is now suspended as to you and we will continue
5    with another defendant.
6              MS. SENTER:  For the record,
7    plaintiff's counsel is not allowed to
8    unilaterally suspend the deposition to a specific
9    defendant.  So we'll go ahead and call the judge.
10   If somebody else would like to pick up
11   questioning, but I'm reserving my right to come
12   back and ask any questions that I choose to.
13             MR. HIBEY:  Sounds good.
14             We will continue with the counsel for
15   Fruehauf.
16             Does anyone on the phone have
17   questions for Fruehauf?
18             MR. HART:  I don't think they're a
19   defendant.
20             MR. HIBEY:  They are represented by
21   Kelsey-Hayes and that entity, whoever is in the
22   case for them.
23             MS. PUENTE:  Well, does counsel for
24   Fruehauf want to take the same break because I
25   think -- I'm not sure that we all -- we can

Page 145

1    dictate who goes next.
2              MR. HIBEY:  Who is on the phone --
3              DEFENSE COUNSEL:  I agree.
4              MR. HIBEY:  -- for Kelsey-Hayes?
5              MR. HARRISON:  This is William
6    Harrison.  I'm on the phone.  You don't dictate
7    the order of the questioning.  I will go when I
8    choose.
9              MR. HIBEY:  Okay.  At this time
10   Fruehauf is being offered the opportunity to
11   question Mr. Kain.  I do not know how much time
12   Mr. Kain has today or in the future.  This is
13   your opportunity, Mr. Harrison, if you represent
14   them.  It is my understanding that you do not
15   represent them in this case.  Am I wrong?
16             MR. HARRISON:  My firm does and I'm
17   on the letterhead, yes.
18             MR. HART:  Hey, if we're going to do
19   this, I want this on the record.  This is
20   all improper.
21             MR. HIBEY:  This is -- this is all on
22   the record, Jody.
23             MR. HART:  Good.
24             MR. HIBEY:  I want it on the record.
25   This is not improper.  I'm trying to move this

37 (Pages 142 to 145)

Raymond Kain
January 29, 2021

1  along.  I'm asking for an attorney to ask
2  questions because I don't know how much longer
3  time we have here today.
4         MR. HART:  Mike, I'll ask questions.
5         MR. HIBEY:  And I'm not moving to you
6  at this time.  I'm asking --
7         MR. HART:  It's not your right to
8  determine who we move to.  I am going to ask
9  questions now.
10        MR. HIBEY:  No.  Jody, I'm going to
11 continue my conversation with Mr. Harrison and
12 then you can ask your questions.
13        Mr. Harrison, I'm confused because I
14 was specifically told yesterday or earlier this
15 week that you do not represent Fruehauf in this
16 case.  Am I wrong?
17        MR. HARRISON:  I'm on the letterhead.
18 I'm on the signature block.
19        MR. HIBEY:  Okay.  So it is your role
20 here to ask questions on behalf of any defendant
21 who may hold the liabilities for Fruehauf?
22        MR. HARRISON:  You do not dictate the
23 order of the questioning.
24        MR. HIBEY:  I'm not trying to dictate
25 it.  I'm just trying to confirm that you are

1  speaking for that entity today.
2         MR. HARRISON:  Me or one of my
3  partners do, yes.  And at this time --
4         MR. HIBEY:  Excuse me?
5         MR. HARRISON:  -- I'm passing the
6  witness.
7         MR. HIBEY:  Okay.  Thank you.
8  Jody, go ahead.
9         MR. HART:  Thank you, sir.
10        [EXAMINATION]
11 QUESTIONS BY MR. HART:
12    Q.   Mr. Kain, my name is Jody Hart.  Can
13 you see me and hear me okay?
14    A.   Yes, I can.
15    Q.   Thank you, sir.  Let's see where I
16 would like to start.
17        You just mentioned these pins that
18 hold the brakes in on one side, correct?
19    A.   Yes.
20    Q.   And you mentioned that they would get
21 rusty and stuck in there, correct?
22    A.   Right.
23    Q.   So -- and would -- that rust would
24 get in the brake drum, correct?
25    A.   Well, it really wasn't that much rust

1  that was in there.  It was just more like it was
2  frozen in.  I wouldn't say it was -- it all
3  depends.  It was a little rusty, but no, it
4  wasn't enough to make that much dust.
5     Q.   Okay.  But it would make some dust,
6  right?
7     A.   Very little, believe me, compared to
8  what we used to get.
9     Q.   Were there any other parts that would
10 rust within the brake drums?
11    A.   No, not really.
12    Q.   Did the chassis used at Puerto Rico
13 Marine, were they all the same weight rating to
14 your knowledge?
15    A.   Pretty much because to put a
16 chassis -- you know, to put the container on.  I
17 think it was -- the weight was like 6900 pounds.
18 Now, don't hold to me that, but I think --
19    Q.   I won't hold you to that.
20    A.   -- that's what I seen on it.
21    Q.   Okay.  But you think they were
22 consistent from chassis to chassis what they
23 could carry?
24    A.   Right.  That's what it was because
25 they want -- you know, they want to unload that

1  thing and put it on there and they didn't want it
2  to be overweight.
3     Q.   Okay.  When we spoke with Mr. Polito,
4  he testified that there would be occasions -- and
5  I don't know if I'm using the right term, you
6  tell me, where the bogies on trailers would be
7  replaced.
8         Does that word "bogey" have any
9  meaning to you?
10    A.   Bogies?
11    Q.   If it doesn't, that's fine.
12        Would the axles on the trailers
13 sometimes be -- chassis and trailers sometimes be
14 replaced?
15    A.   The axles and all?
16    Q.   Yes.
17    A.   Sure.  If it's missing a bearing or
18 something, you've got to replace the axle.
19    Q.   Okay.  And those axles would come
20 complete with brake assemblies on them?
21    A.   Most -- most of the time we'd get it
22 where all you had to do was put the drums and all
23 back on.
24    Q.   Okay.  Would these be -- would you
25 necessarily put the same brand of axle back on a

38 (Pages 146 to 149)

Raymond Kain
January 29, 2021

Page 150

1　trailer or chassis that --
2　　A.　Yes.
3　　Q.　-- had come originally with it?
4　　A.　That's what you put back on.
5　　Q.　Okay.  And I recall that Fruehauf was
6　the only one you testified to having the same
7　brand axle, Fruehauf trailers and chassis --
8　　A.　Yes, they make their own axles.
9　　Q.　-- had the Fruehauf axles.  And --
10　　A.　I worked for Fruehauf so I knew.
11　　Q.　Okay.  And you said that -- you've
12　mentioned the '66 model Fruehauf trailers --
13　　A.　Right.
14　　Q.　-- at Puerto Rico Marine.  When you
15　first got there, were all -- well, I keep saying
16　trailer.
17　　　　Were the Fruehaufs trailers and
18　chassis or just chassis?
19　　A.　We had some Fruehauf containers, but
20　they had -- they had bought out a company, so
21　when they bought them out, we got all the
22　containers --
23　　Q.　Okay.  Was --
24　　A.　-- and trailers.
25　　Q.　Was that Sealand that you've

Page 151

1　referenced earlier?
2　　A.　No, Seatrain.
3　　Q.　Seatrain, I'm sorry.  Okay.
4　　　　And so while you were with Puerto
5　Rico Marine or let's just say up to 1981, did
6　Puerto Rico Marine ever purchase any brand new
7　chassis or trailers to your knowledge?
8　　A.　No.
9　　Q.　They would --
10　　A.　Not that I know of.
11　　Q.　Okay.  And do you have any feel for
12　when these trailers from Seatrain, trailers
13　and/or chassis were purchased?
14　　A.　No.
15　　Q.　Okay.  Am I correct in my
16　understanding that when you first started at
17　Puerto Rico Marine, that there were no actual
18　trailers, everything was a chassis that a
19　container could fit on?
20　　A.　Oh, well, they didn't have any
21　trailers, but -- in fact, probably never did own
22　no trailers.  When they went RoRo, everything was
23　brought in that way.  You know, they -- anybody
24　that wanted to ship something that had a trailer,
25　they brought it and they drove the thing on

Page 152

1　there.
2　　Q.　Okay.  If they didn't own the
3　trailers, did y'all work on trailers or only on
4　chassis?
5　　A.　No, we worked on the trailer because
6　if it was damaged on a ship -- see, I'll repeat
7　this.  We were union and in the union contract,
8　anybody -- anything damaged by the ILA or the
9　longshoreman and everything had to be fixed in
10　the shop before it could leave.
11　　Q.　Was there an expectation at this
12　point in time when y'all were using the
13　roll-on/roll-offs that the owners of the trailer
14　would bring them to Puerto Rico Marine for
15　shipping in a workable condition such that the
16　presumption was that you wouldn't have to work on
17　them?
18　　A.　Well, if it came in in a workable --
19　workable condition and it got damaged on the
20　ship, we worked on them.
21　　Q.　Okay.  And you don't know how long or
22　when you went from LoLos to RoRos?
23　　A.　No, I don't remember that.
24　　Q.　Okay.  And before you went to the
25　RoRos and y'all were using just chassis, were all

Page 153

1　the chassis the 1966 Fruehauf model that you
2　discussed earlier?
3　　A.　No, no.  I wouldn't say all of them
4　because they leased chassis too.
5　　Q.　Uh-huh.
6　　A.　Different -- different -- like
7　different types of chassis.
8　　Q.　Okay.  At the beginning of the
9　deposition when Mr. Hibey was asking you
10　questions, he asked you about the brands of the
11　trailers and you gave him a couple, and then he
12　named a couple of additional brands and asked you
13　if they were there.
14　　　　My question for you is had he not
15　named those other brands of trailers, you
16　wouldn't have been able to have named them, would
17　you?
18　　A.　No.
19　　Q.　Okay.  Did y'all ever replace drums
20　during brake jobs, brake drums?
21　　A.　Drums?
22　　Q.　Yes.
23　　A.　Yeah.  If the drum's cracked, we
24　always had to take it off.
25　　Q.　Okay.  And would it also be -- would

39 (Pages 150 to 153)

Raymond Kain
January 29, 2021

Page 154

1 they crack because they got thin from when they
2 were new, compared to when they were new?
3      A.   Oh, yeah.  Yeah, they cracked from
4 that, but they also cracked from heat cracks from
5 getting too hot.
6      Q.   Gotcha.  But you all would --
7 sometimes they wouldn't be cracked and you would
8 measure the thickness of the drum and it would be
9 too thin and you'd have to replace it, correct?
10      A.   Right.
11      Q.   Okay.  And that's because the metal
12 wore away during the use of the brake, right?
13      A.   Right.
14      Q.   Okay.  And so --
15      A.   But the brake shoe wears more than
16 the drum.
17      Q.   No doubt about it.
18      A.   It's made like that.
19      Q.   I'm not arguing with you.  I agree.
20      My question is would you at least
21 agree with me that some of that break dust would
22 have been composed of metal from the wear down of
23 the drums?
24      A.   No, it wouldn't be that much --
25      Q.   But some?

Page 155

1      A.   -- compared to brake shoes.
2      Q.   Okay.  Compared, but some?
3      A.   It's always possible a little bit,
4 but it wasn't nothing like the brake dust --
5 brake shoes.
6      Q.   And did I understand from your
7 testimony earlier that the brake shoes when y'all
8 were replacing them and you'd go and request them
9 from parts, they were specific to the axle?
10      A.   Right.
11      Q.   Which bay -- if I'm facing your all's
12 garage where the doors are because there's -- is
13 there a door for each bay?
14      A.   Right.
15      Q.   So if I'm facing in that direction
16 looking at the doors, which bay was yours going
17 from left to right or right to left, whichever
18 you prefer?
19      A.   Well, it was the first one by the
20 parts room.
21      Q.   Was that on the left?
22      A.   Looking at it, it would have been --
23 well, if you're looking at it from this way from
24 the front, it would be the right.  If you're
25 looking it at the back, it would be left.

Page 156

1      Q.   I gotcha.  And then am I correct that
2 Mr. Polito's bay was on the opposite side, he was
3 the one against --
4      A.   All the way over.
5      Q.   -- the opposite wall?  Yeah, okay.
6 That's what I thought.
7      The chassis pit that you described,
8 did I understand correctly that that was outside
9 and was not a part of one of these four bays?
10      A.   Oh, no, no.
11      Q.   No what?
12      A.   That was outside.
13      Q.   That was outside.
14      What percentage of your work was done
15 at the chassis pit as opposed to inside one of
16 the four bays?
17      A.   Never.
18      Q.   Never?
19      A.   We brought it in.
20      Q.   Okay.  What was done --
21      A.   We brought it in.
22      Q.   What was done at the chassis pit
23 then?  I didn't understand that.
24      A.   That was just -- the chassis pit was
25 just where we put the deadline equipment, stuff

Page 157

1 that couldn't be used.
2      Q.   Oh, okay.  It was like a dump?
3      A.   Exactly.
4      Q.   Okay.  I was picturing something like
5 at an oil change facility where you get down
6 under the truck and roll over.  I'm sorry.
7      A.   No.
8      Q.   I was very confused there.
9      Now, when Mr. Brindell first started
10 at Puerto Rico Marine, am I correct that you were
11 his boss because you were lead mechanic and he
12 was a mechanic?
13      A.   Yes.
14      Q.   And at some point in time he became
15 your boss when you stayed lead mechanic and he
16 became supervisor?
17      A.   Right.
18      Q.   We're losing your sound.
19      Madam Court Reporter, can you hear?
20 I can tell what he's saying, but I can't hear it.
21      A.   Yeah, that was right.
22      Q.   Okay.  When you were Mr. Brindell's
23 boss, did you ever stop him from doing anything
24 that you considered to be unsafe?
25      A.   No.

40 (Pages 154 to 157)

Raymond Kain
January 29, 2021

Page 158

1       Q.   When he was your boss, did he ever
2   stop you from doing anything unsafe?
3       A.   No.
4       Q.   If you had seen Mr. Brindell do
5   something that you considered unsafe, would you
6   have stopped him?
7       A.   I would of.
8       Q.   Pardon me?
9       A.   Yes, I would of.
10      Q.   And if he had seen you doing
11  something unsafe, would you have expected him to
12  stop you?
13      A.   Yes.
14      Q.   Because y'all wanted to take care of
15  one another.  I mean, everybody had
16  responsibility towards one another, correct?
17      A.   Right.  We would have did that for
18  anybody in the shop.
19      Q.   Sure.  Okay.  The -- switching
20  subjects because I'm bouncing around so if I
21  confuse you, let me know.
22          The three names of the ships, am I
23  correct that one was Aguadilla, which was
24  A-g-u-a-d-i-l-l-a?
25      A.   I guess it was, yeah.  I don't

Page 159

1   have -- I don't know.
2       Q.   The one that I really had a hard time
3   understanding was the one that started with an M.
4   Was that Mur --
5       A.   Mayaguez.
6       Q.   Do you have any -- how do you best
7   spell it?
8       A.   I don't know.  That's one of the --
9   that three ships was named after cities in Puerto
10  Rico.
11      Q.   Uh-huh.
12      A.   Ponce, you had the Mayaguez, and you
13  had Aguadilla.
14      Q.   Okay.  When I looked up cities in
15  Puerto Rico after you testified to that, the M
16  name that I found was Moravis, M-o-r-a-v-i-s.  Is
17  that not right?
18      A.   Never heard of it.
19      Q.   Okay.  Fair enough.  Fair enough.
20          Did you ever work on -- did you and
21  Mr. -- did Mr. Brindell ever work on any
22  refrigerated containers?
23      A.   No.
24      Q.   Not even for sidewall repairs or
25  anything like that?

Page 160

1       A.   No, no, nothing like that.  That was
2   all insulated containers.
3       Q.   Uh-huh.  What percentage do you think
4   of the containers that y'all -- that were handled
5   at Puerto Rico Marine were insulated refrigerated
6   versus regular old dry containers?
7       A.   The majority was the dry.  I guess
8   they had maybe 200 of the refrigerated trailers.
9       Q.   Okay.  When you first got to Puerto
10  Rico Marine and you've already told us they had
11  '66 model Fruehaufs, were there any other brands
12  of trailers that you can specifically recall that
13  were present when you started?
14      A.   They had brands of chassis, I'm sure,
15  but Gindy, I think they had some Gindy chassis.
16      Q.   Uh-huh.  Any others?
17      A.   No, not that I really remember.
18      Q.   So you think the chassis were all
19  Fruehaufs and Gindys?
20      A.   Most, yeah.
21      Q.   Okay.  And whenever the trailers
22  started, whenever you went to the RoRo ships,
23  what were the first trailers that you recall
24  having worked on while you were at Puerto Rico
25  Marine?

Page 161

1       A.   Oh, man.  We worked on all of them.
2   I mean, anything that came through there, we
3   worked on them.  I mean, that was our job.
4       Q.   Was there a predominant manufacturer
5   of trailers amongst the trailers as opposed to
6   the chassis once y'all went to the RoRo ships?
7       A.   Well, the RoRo ships, like I said,
8   they could take any kind of chassis.  You know,
9   we even shipped -- we even shipped a zoo over
10  there one time --
11      Q.   Wow.
12      A.   -- with animals and everything in it.
13  I mean, we didn't look at them kind of, you know,
14  trailers.
15      Q.   So you can't tell me what brands
16  would have been the first RoRo -- or trailers
17  that you worked on when you went to RoRo ships?
18      A.   No.
19      Q.   No?
20      A.   No.
21      Q.   Okay.  Did Mr. Brindell -- you had
22  mentioned that you understood from some of his
23  other jobs, including the one that y'all worked
24  on together at New Orleans Depot Services, that
25  part of his job there was to write up damage

41 (Pages 158 to 161)

Raymond Kain
January 29, 2021

1  reports.
2      Did I understand that correctly?
3      **A.   Yes.  That's what he did.  He wrote**
4  **up damage reports.**
5      Q.   Did he have a responsibility for
6  writing up damage reports with Puerto Rico
7  Marine?
8      **A.   No.**
9      Q.   Was there somebody who did?
10     **A.   Yeah, we had the inspection lane.**
11     Q.   Oh.  Gotcha.
12     **A.   We had to inspect the trailer coming**
13  **in and inspect one going out.**
14     Q.   When y'all would change brakes on a
15  chassis or a trailer and you used the compressed
16  air to blow out the dust, how many seconds would
17  it take to blow out a wheel?
18     **A.   Oh.  A minute.**
19     Q.   One minute?
20     **A.   And then you had to blow the axles,**
21  **blow the dust all off the axles and everything**
22  **like that.**
23     Q.   Would that all be during that
24  one minute?
25     **A.   No.  It would be a little longer.**

1  **Sometimes --**
2      Q.   Another 30 seconds?
3      **A.   Say a minute and a half to do a**
4  **wheel.**
5      Q.   Okay.  That's fair.  I might be done.
6  Give me one second.
7      Were you ever offered the job of
8  supervisor at Puerto Rico Marine?
9      **A.   Yes, I was.**
10     Q.   And you turned it down?
11     **A.   Right.**
12     Q.   Was that at the same time or before
13  or after Mr. Brindell was offered that job?
14     **A.   Right after.  I mean right before.**
15  **They offered it to me and then they offered it to**
16  **Jack.**
17     Q.   Okay.  And this might be my last
18  question.  I want to make sure we're using the
19  same terminology because you know more about this
20  stuff than I do.
21     When you say chassis during the
22  course of this deposition, what you're referring
23  to is something that a container is placed onto,
24  correct?
25     **A.   Right.**

1      Q.   You are not referring to what we
2  would traditionally refer to as a semi-trailer
3  that's an enclosed box of some sort?
4      **A.   No.  This is -- a chassis is what the**
5  **container goes on, the wheels -- and it can come**
6  **off after it's loaded.**
7      MR. HART:  Gotcha.  Sir, I really
8  appreciate your time.  I may have some follow-ups
9  later, but I think that's all I have, and thank
10  you again.
11     THE WITNESS:  Thank you.
12     MR. HIBEY:  All right.  Let's keep
13  going unless you want to take a break, Mr. Kain.
14  Would you like to take a break?
15     THE WITNESS:  No, I'm ready unless
16  y'all want to take a break.
17     MR. HIBEY:  All right.  Mr. Harrison,
18  are you ready to ask questions for Kelsey-Hayes
19  at this time?
20     MR. HARRISON:  No.
21     MR. HIBEY:  All right.  Is there
22  someone else who would like to ask questions at
23  this time?
24     MS. DETO:  Yes.  This is Amanda Deto.
25  I would like to, but I'd ask that we take a

1  ten-minute comfort break.
2      MR. HIBEY:  Mr. Kain, would you like
3  to take a ten-minute comfort break?
4      THE WITNESS:  It doesn't matter to
5  me.
6      MR. HIBEY:  All right.  I guess we'll
7  take a ten-minute comfort break.  Who is that on
8  the line who's ready to go when we return?
9      MS. DETO:  Yes.  This is Amanda Deto.
10  Thanks.
11     MR. HIBEY:  All right.  We'll be back
12  in ten minutes, Mr. Kain.  Sorry about the delay.
13     THE WITNESS:  All righty.
14     THE VIDEOGRAPHER:  The time is
15  12:23 p.m. Central Standard Time.  We're going
16  off the record.
17     (Break taken.)
18     THE VIDEOGRAPHER:  The time is
19  12:30 p.m. Central Standard Time.  We are now
20  back on the record.
21     [EXAMINATION]
22  QUESTIONS BY MS. BAXTER:
23     Q.   Good afternoon, Mr. Kain.  My name is
24  Kay Baxter.  Can you hear me all right?
25     **A.   Yes, ma'am.  Good afternoon.**

42 (Pages 162 to 165)

Raymond Kain
January 29, 2021

Page 166

1    Q.   Okay.  Very good.
2        First of all, I'd love to say that I
3    absolutely love your crab plate back there in the
4    background.  Love it, love it, love it.
5        All right.  I'm going to be jumping
6    around with some of my questions --
7    A.   All right.
8    Q.   -- and the first is when you and --
9    -- and let me ask this.  Do you pronounce his
10   name Brindell or Brindell?
11   A.   Brindell.
12   Q.   Okay, Brindell.  Thank you so much.
13       When you and Mr. Brindell were on any
14   of these Puerto Rican owned vessels, were you
15   ever working around stevedores?
16   A.   Yes, yeah.
17   Q.   Okay.  And do you know who -- who
18   employed those stevedores?
19   A.   Who what?  What's that?  Who did
20   what?
21   Q.   Who employed them?
22   A.   I don't understand the question.
23   Q.   Okay.  Do you know who employed the
24   stevedores that you and Mr. Brindell worked
25   around?

Page 167

1    A.   Oh, yeah.  It was -- well, it was ILA
2    employees, but it was -- I can't think of the
3    name of it now.  They was -- oh, man.  But they
4    was Local 3000.  I'll tell you that.
5    Q.   Okay.
6    A.   And they -- PRMMI just hired -- well,
7    Puerto Rico Marine, PRMMI is all the same thing.
8    They hired them out of the hall.
9    Q.   Okay.
10   A.   And they came with -- they came with
11   their, you know, supervisors and all that, you
12   know, their bosses and all.
13   Q.   Okay.  They were other union people,
14   but they weren't employees of Puerto Rico Marine;
15   is that true?
16   A.   That's true.
17   Q.   Okay.  Do you know the age of any of
18   the Puerto Rican Marine ships, those three ships?
19   A.   No, no.
20   Q.   Did you and Mr. Brindell ever have to
21   work on any ships that were not owned by Puerto
22   Rican Marine?
23   A.   No, we never worked on a ship and
24   Puerto Rico Marine -- the only ship that was in
25   there was one that belonged to Puerto Rican

Page 168

1    government.
2    Q.   Okay.  And those answers are taking
3    care of a bunch of my questions, so that's very
4    good.  All right.  Let me look here at my other
5    notes for half a second.  Checking them off.
6    Some of these were already asked, so it's making
7    my questions go a lot faster.
8        Would you agree with me that all of
9    your work and all of Mr. Brindell's work was
10   directed by Puerto Rico Marine?
11   A.   Yes.
12   Q.   All right.  I want to talk to you
13   about trailers for just a second.  I know you
14   said you changed brakes on trailers?
15   A.   Right.
16   Q.   What -- what other type of work had
17   to be done on trailers?
18   A.   You talking about a trailer or a
19   chassis?
20   Q.   What's the difference?
21   A.   A chassis has got the wheels and a
22   trailer has got a container like on it.
23   Q.   Okay.  So what kind of work did you
24   have to do on a trailer?
25   A.   Well, we fixed holes in the side and

Page 169

1    stuff like that.
2    Q.   I'm sorry, but you've got to tell me
3    what stuff like that means.
4    A.   Repairing it, you know, whatever --
5    leaks, roof leaking or something like that or a
6    door might need to be greased or something so we
7    could open and close it.
8    Q.   Okay.  So that's just metal work,
9    right?
10   A.   Right.
11   Q.   Okay.  Now, I represent Strick
12   Trailer.
13   A.   All right.
14   Q.   So is that just a metal container?
15   A.   No.
16   Q.   Okay.
17   A.   No, we got Strick chassis too.
18   Q.   All right.  Now, tell me what a
19   Strick chassis is.
20   A.   That's a chassis that they put the
21   containers on that come off the ship.
22   Q.   Okay.  So then that takes care of
23   more of my questions.  I've got that because
24   you've already told us what can go wrong on a
25   chassis, so I've got that.

43 (Pages 166 to 169)

Raymond Kain
January 29, 2021

Page 170

1      Do you know if Puerto Rican Marine
2  ever used refurbished brakes on the chassis?
3      A.  No.
4      Q.  Okay.
5      A.  No, because I wasn't in the parts
6  room.
7      MS. BAXTER:  Okay.  Mr. Kain, I
8  believe that's all my questions for right now,
9  but I'm going to reserve my right to come back
10 and talk to you a little bit more if I need to.
11 But I really appreciate your time today.
12     THE WITNESS:  Okay.
13     MS. BAXTER:  Thank you, sir.
14     THE WITNESS:  Thank you.
15     MS DETO:  Good afternoon.  I can jump
16 in unless anybody has any preference?
17     MR. HIBEY:  Is this Amanda?  Are you
18 ready to go?
19     MS. DETO:  Yeah.  Yep.
20     MR. HIBEY:  Go ahead.  Thanks.
21     [EXAMINATION]
22 QUESTIONS BY MS. DETO:
23     Q.  Good afternoon, Mr. Kain.  Thanks for
24 your time.  I'm hopeful to not take too much of
25 it.  My name is Amanda Deto.  I've been listening

Page 171

1  along this morning trying to follow my notes, so
2  I should be able to streamline a bunch of this.
3      If at any point you can't understand
4  me, can you please let me know?
5      A.  Sure.
6      Q.  And I do tend to talk a little quick.
7  I am conscious of it, so I'll try to slow down.
8  But if you do answer any of my questions, it's --
9  I'm going to assume that you understood them; is
10 that fair?
11     A.  Yes.
12     Q.  Okay.  Now, earlier in the deposition
13 when you were speaking with Mike, you mentioned
14 Great Dane trailers --
15     A.  Yes.
16     Q.  -- correct?
17     A.  Yes.
18     Q.  When is -- when is the first time you
19 recall seeing a Great Dane trailer at Puerto Rico
20 Marine?
21     A.  When they started the RoRo vessel.
22     Q.  Okay.  And can you remind me what
23 year that was again or your best estimate?
24     A.  Man, I couldn't really remember that.
25 I couldn't tell you if it was in the summer or

Page 172

1  the fall.
2      Q.  Any -- any type of year estimate or
3  just don't know?
4      A.  No, I just don't know.
5      Q.  Okay.  And when is the last time you
6  recall seeing a Great Dane trailer?
7      A.  Whenever they stopped the RoRo vessel
8  and went back to LoLo.
9      Q.  And do you have any time estimate of
10 that?
11     A.  No, that was -- I would say the RoRo
12 vessel was only on for maybe eight years.
13     Q.  Eight years.  Okay.
14     Now, can you tell me what work you
15 did on a Great Dane trailer?
16     A.  Whatever needed to have done.
17     Q.  Okay.  And can you describe that for
18 me?
19     A.  Well, if it had brake problems, we
20 did brake problems.  If it had light problems, we
21 did light problems.  If it had damage to the
22 trailer, we did the -- fixed the damage.
23     Q.  Okay.  I'm maybe a little confused.
24 I thought you had said earlier that you did not
25 do brake jobs on trailers.

Page 173

1      A.  We did brake jobs on everything.
2      MR. HIBEY:  Yeah, I'm going to
3  object.  That completely misstates testimony.  If
4  that was said or came across at some point,
5  that's crazy.  That's what this deposition is
6  about is brake jobs on trailers.
7      MS. DETO:  Okay.  Mike, you can
8  object to form, but -- okay.  Thank you.
9      MS. BAXTER:  I join the objection.
10 BY MS. DETO:
11     Q.  Do you recall ever reviewing -- oh,
12 sorry.  Is someone trying to speak?
13     MS. BAXTER:  This is Kay.  I just
14 wanted to clarify that I'm joining your objection
15 to his speaking objection.
16     MS. DETO:  Thanks, Kay.
17 BY MS. DETO:
18     Q.  Mr. Kain, did you ever review any
19 manuals from any trailer manufacturer --
20     A.  No.
21     Q.  Did you say no?
22     A.  No.
23     Q.  I'm sorry.  I'm having some
24 difficulty hearing.  Okay.
25     And did you ever see any paperwork or

44 (Pages 170 to 173)

Raymond Kain
January 29, 2021

Page 174

1   anything about the ownership or -- the ownership
2   of any of the trailers?
3       A.   No.
4       Q.   Okay.  You don't know who owned any
5   of the Great Dane trailers, correct?
6       A.   No, we -- that wasn't our -- you
7   know, our business or anything.
8       Q.   Okay.  I'm so sorry.  I had -- could
9   you repeat your answer?
10      A.   We didn't -- we didn't have no
11  business looking at who owned it.  They didn't
12  show us that.  We knew it was a Great Dane
13  trailer by the name on the side of it or the tag
14  they had on it.
15      Q.   Sure.  And can you describe that for
16  me --
17      A.   What, the tag?
18      Q.   -- how you knew it was a Great Dane
19  trailer?
20      A.   You want to know the tag?
21      Q.   Sure.  Let's start there.
22      A.   It was -- in fact, they was metal
23  tags.  I'd say they was about 18 inches long and
24  they was -- they was riveted to the side of the
25  trailer.

Page 175

1       Q.   Okay.  And where would that be
2   riveted?
3       A.   Mostly in the front.  Some of them
4   was in the rear.  Sometimes they even had a
5   sticker on the back door.
6       Q.   Okay.  And can you describe for me
7   the tag?  Was there any writing on the tag?
8       A.   Yeah, it said the name of the
9   trailer, yeah.
10      Q.   Okay.  And what did it say
11  specifically?
12      A.   What did it say?  I mean, it said the
13  name of the trailer, who made the trailer and --
14      Q.   Sure.  Maybe I should -- oh, go
15  ahead, sir.  Sorry.  I didn't mean to cut you off
16  there.
17      A.   All right.
18      Q.   Maybe we're kind of speaking around
19  each other.
20           In regards to specifically the Great
21  Dane -- any Great Dane trailer, what would the
22  tag say?
23      A.   Well, it would say Great Dane and
24  mostly that was the name what they said.  And if
25  you looked around, you'd find a tag on it that

Page 176

1   would say Great Dane and it would have a serial
2   number and all of that kind of stuff on it,
3   manufacture date and everything.  But I never
4   paid attention to none of that.
5       Q.   Okay.  So you can't recall of -- I'm
6   sure I know the answer to this -- any of the
7   serial numbers?
8       A.   No.
9       Q.   Okay.  Or any of the -- you think you
10  just mentioned the manufacturer date?
11      A.   Yes, but I never did check all that.
12  Only the parts man would check that because if we
13  needed a part for it like a nose rail or
14  something like that, he would come out and write
15  all that down and then he would order it from
16  Great Dane.
17      Q.   He would order what from Great Dane?
18      A.   Whatever -- any part we needed.  Like
19  a nose rail or something like that, like it was
20  damaged where the nose rail went in or a piece of
21  top rail, something like that, he would -- then
22  he would come get all of that.  We didn't fool
23  with that.
24      Q.   Okay.  So a nose rail or a top rail.
25           Okay.  You don't know if any of the

Page 177

1   Great Dane trailers were leased, correct?
2       A.   Leased, no.
3       Q.   Leased?
4       A.   No.
5       Q.   And you don't have any information
6   about where any Great Dane trailer came from
7   originally?
8       A.   No, because like I said, any shipper
9   could get a Great -- would get a Great Dane
10  trailer or whatever and they would ship their
11  cargo through us.  And like I said before, any --
12  they inspected coming in and any trailer that
13  came off the ship, if it was damaged in the port,
14  it had to be repaired by us.
15      Q.   Okay.  Now, can you estimate for me
16  the size of a Great Dane trailer?
17      A.   They had 40-foot.  They had 45-foot.
18      Q.   40-foot, 45-foot.  Okay.
19           And I believe just looking at my
20  notes you mentioned a sticker.  Can you describe
21  for me any stickers you recall?
22      A.   Just there was like a Great Dane
23  sticker on the back door, just stating that, you
24  know, Great Dane trailer.
25      Q.   Okay.  Just to clarify, the sticker

45 (Pages 174 to 177)

Raymond Kain
January 29, 2021

Page 178

1    said Great Dane Trailers?
2        A.   Right.  Or Great Dane anyway.
3        Q.   Okay.  Do you remember the size of
4    the sticker?
5        A.   It was -- it was I guess about a foot
6    long, something like that, about maybe
7    three inches wide.
8        Q.   Sure.  And you said it was located on
9    the rear?
10       A.   On the rear door.  They'd stick it on
11   the door.
12       Q.   Okay.  Do you recall the license
13   plates of any Great Dane trailers?
14       A.   No, I sure don't.
15       Q.   I know.  I'm sorry.  Some of these
16   questions may seem a little silly.  We just have
17   to ask.  I'm sorry.
18            So that's no?
19       A.   No, I never did look at it.
20       Q.   Okay.  And you don't know how many
21   miles were on any Great Dane trailers?
22       A.   No.  There's no way in the world I
23   would know that.
24       Q.   And I believe I know the answer to
25   this, but you don't know the maintenance history

Page 179

1    for any trailers including Great Dane that you
2    had worked on, correct?
3        A.   Exactly.  I knew -- we didn't know
4    anything about it.
5        Q.   Okay.  And you don't know -- I
6    believe you told us about the parts man.  You
7    don't know if any of the parts on any Great Dane
8    trailer would have been original to the trailer,
9    correct?
10       A.   Oh, yes, it would have to be.
11       Q.   And can you clarify what you mean by
12   that?
13       A.   Yes, it would have to be original
14   parts.  That's why the parts man would come get
15   the serial number and everything, model number
16   and everything and order parts.
17       Q.   And what parts are you describing,
18   sir, just so we're clear?
19       A.   I didn't understand that.
20       Q.   Sorry about that.
21            I said what parts?  Are we talking
22   about the same -- the nose rails or the top
23   rails?
24       A.   What parts am I talking about?
25       Q.   Yes.

Page 180

1        A.   That's -- the nose rail is at the
2    front and the top and the side -- side rail is
3    the ones that go down each side from the front to
4    the back.
5        Q.   Okay.  Now, did you do any welding on
6    any Great Dane trailers?
7        A.   No.  They mostly was all aluminum
8    boxes, you know, aluminum trailers.
9        Q.   Okay.  Did you change any lights on
10   any Great Dane trailers?
11       A.   Sure.
12       Q.   How many times would you estimate
13   doing that?
14       A.   How many times?
15       Q.   Yes.
16       A.   I have no clue really.  I couldn't
17   really tell you.  I couldn't tell you how many
18   lights I used.  I mean, we didn't write all that
19   down or anything.
20       Q.   Okay.  And did you also do any wiring
21   work on any Great Dane trailer?
22       A.   Well, if a wire was missing, we might
23   put some wire in it to make -- you know, to
24   work -- to get the light to work.
25       Q.   Okay.  And do you have any estimate

Page 181

1    of how frequently you would have done that?
2        A.   What's that?
3        Q.   I'm sorry about that.  Can you hear
4    me okay?
5        A.   I can hear you all right.
6        Q.   Okay.  Do you have any estimate of
7    how frequently you would have done any of that
8    wiring work on a Great Dane trailer?
9        A.   No, ma'am.  I can't tell you how many
10   times we did that because -- you know, put it
11   this way.  How many times I did it?  I don't know
12   because we had four other bays there.  You know,
13   if they had problems, they didn't come tell me
14   they got wiring problems.  They fixed it.
15       Q.   Sure.  And did you ever do any work
16   on landing gears on a Great Dane trailer?
17       A.   I'm sure -- I'm sure we did.
18       Q.   All right.  Now, I'm going to ask you
19   a specific question here.
20            Do you have a specific recollection
21   of Mr. Brindell ever doing work on a Great Dane
22   trailer?
23       A.   Yeah, sure he did.
24       Q.   Okay.  When?
25       A.   Whenever -- whenever they came in, we

46 (Pages 178 to 181)

Raymond Kain
January 29, 2021

Page 182

1  had to do it. I couldn't tell you a date or
2  anything.
3      Q.    Okay. So you couldn't tell me the
4  first time you recall?
5      A.    I couldn't tell you the first time I
6  did it.
7      Q.    Sure.
8      A.    But I know I did.
9      Q.    And what do you specifically recall?
10     A.    What Mr. Brindell did?
11     Q.    Yes.
12     A.    Probably with the brakes.
13     Q.    Probably with the brakes?
14     A.    Yes.
15     Q.    And why do you say that?
16     A.    Because he was always with me when we
17  went in when they had a problem. And, you know,
18  if -- you know, because me and him kind of worked
19  together a lot.
20     Q.    Okay. So because you guys worked
21  together a lot, that is why you would recall
22  that?
23     A.    We -- you know, if we had brake
24  problems, we jumped on it.
25     Q.    Okay. So you had a general knowledge

Page 183

1  about Mr. Brindell, but can you give me or
2  specify any particular memory?
3      A.    Yes, I guess. Yeah.
4      MS. DETO: I'm sorry. I'm getting
5  some feedback. Could everybody mute their lines?
6  BY MS. DETO:
7      Q.    Sorry about that, Mr. Kain. I'm
8  sorry. The feedback is still there. Okay. I'll
9  go ahead.
10     You can't specifically recall any
11  instance of Mr. Brindell working on a Great Dane
12  trailer, correct?
13     MR. HIBEY: Objection, form.
14  BY THE WITNESS:
15     A.    I can't give you a time and a date,
16  but I know he worked on them.
17  BY MS. DETO:
18     Q.    Okay. And would you do any brake
19  jobs on any Great Dane trailer in the same way
20  that you've already spoken about to the other
21  lawyers earlier?
22     A.    Yes. If it come off the ship and had
23  brake problems, we had to fix it before it can go
24  on the road, whether it was a brake job or
25  whatever.

Page 184

1      Q.    Okay. Now, you wouldn't know the
2  manufacturer of any of the old brake parts that
3  you were removing from a Great Dane trailer,
4  correct?
5      A.    No, I didn't pay attention to that.
6      Q.    Okay. So one moment. Let me look
7  over -- oh, I'm sorry. Did I cut you off?
8      A.    No.
9      Q.    Okay. One moment. Let me look over
10  my notes here. Okay. I think I can streamline
11  this.
12     You don't know where any of the
13  replacement parts, including the brake pads or
14  brake linings, would have come from that you
15  installed or removed on a Great Dane trailer,
16  correct?
17     A.    Yeah, the parts room. We got it from
18  the parts room. The parts man come out there and
19  he would match up the parts to the axle.
20     Q.    Okay. One moment. Sorry. One
21  second here. I'm just looking through my notes.
22     MS. DETO: I'm going to -- I don't
23  want to waste any time. I'm going to look
24  through my notes here and I may have a few
25  follow-up questions, but I don't want to waste

Page 185

1  any time for anyone on the phone.
2      So thank you for your time and I'll
3  look through my notes.
4      MR. HIBEY: All right. Is there
5  someone else ready to ask questions?
6      MR. HARRISON: Yeah. If no one else
7  is ready, this is Bill Harrison.
8      MR. HIBEY: Thanks, Bill.
9      MR. HARRISON: Thank you. Thank you,
10  Mike.
11     [EXAMINATION]
12  QUESTIONS BY MR. HARRISON:
13     Q.    Mr. Kain?
14     A.    Yes.
15     Q.    Can you explain to me the fleet, the
16  fleet of the trailers and chassis that were at
17  Puerto Rico Marine? And by that what I need
18  clarification on is did Puerto Rican Marine have
19  its own fleet or were these -- or were these
20  trailers and chassis that came in from different
21  trucking companies that were bringing in the
22  containers? Can you explain to me how that
23  worked?
24     A.    We had our own fleet over there. We
25  had our own chassis and our own containers.

47 (Pages 182 to 185)

Raymond Kain
January 29, 2021

Page 186

1    Q.   All right.  Did you work on any --
2  did you work on any -- did you work on any
3  tractors or trailers or chassis that were not
4  owned by Puerto Rican Marine?
5    A.   Yes, we did.  Not the trucks, just
6  the chassis and the containers, the cabinets.
7    Q.   Can you tell me under what
8  circumstances you would work on the non-Puerto
9  Rican Marine chassis?
10   A.   Well, like I explained before, ILA
11  had had a contract with the company that anything
12  that came off that ship that was damaged by the
13  ILA and all had to be repaired by the ILA before
14  they went out, and that's why.
15   Q.   Do you know the -- do you know the
16  makeup of the brands of the tractors and trailers
17  that consisted of the non-Puerto Rican Marine
18  fleet?
19   A.   Oh, it was -- oh, heck.  They had all
20  kind of tractors -- I mean all kind of trailers.
21  Not the tractor, the trailers.
22        So they had Avondale.  Just -- it
23  could be anybody's trailer.  It doesn't have to
24  even be a company --
25   Q.   Okay.

Page 187

1    A.   -- you know, like a big company.
2    Q.   Right.  It could have been a local
3  company?
4    A.   Right.
5    Q.   Yeah.  Or just any company that would
6  have been bringing in containers?
7    A.   Well, that would bring -- yeah, it
8  would bring it in and go on a ship.
9    Q.   Okay.
10   A.   They used what they call time share
11  with -- with different people that could come in
12  and buy a slot on that ship to go out.
13   Q.   Okay.  Did you go to TH Harris?
14   A.   No.
15   Q.   Okay.  You talked earlier about
16  putting Fruehauf brakes on a Fruehauf axle.
17   A.   Right.
18   Q.   Did you -- whatever you're describing
19  as a Fruehauf brake, did that go on to any other
20  axles?
21   A.   We didn't do it that way.  I don't
22  know if it did, but that ain't the way we did it,
23  you know.
24   Q.   Okay.  So your recollection --
25   A.   Fruehauf made their own brake shoes

Page 188

1  for their axles.  So when they came, they came as
2  a unit.  If we bought -- you know, if we -- we
3  bought it.  You know --
4    Q.   Okay.  I --
5    A.   If we had parts, they were on it.
6    Q.   Okay.
7    A.   You know, like I said before, you
8  wouldn't put another type of brake shoe on
9  another type of chassis.  For one thing, they
10  might not -- it probably wouldn't even fit.
11   Q.   Okay.  Well, that's what my question
12  was aimed at or was going towards, and that is
13  Brand A went on Brand A axles, Brand B went on
14  Brand B axles, correct?
15   A.   That's the way we did it.
16   Q.   Okay.  Thank you.
17        All right.  Now, when you went to get
18  the Fruehauf brake that went on the Fruehauf
19  axle, my understanding is you went to the parts
20  department or the parts window and you told them
21  the axle you were working on and they would give
22  you the appropriate or correct brake to go on
23  that axle; is that correct?
24   A.   Right, right.
25   Q.   Okay.  And when they handed you the

Page 189

1  brake through the window, it was out of the
2  packaging; is that correct?
3    A.   Oh, yeah.  There was nothing -- it
4  wasn't in a package.  It was straight brake
5  shoes, okay.  Put them by the job and then they
6  give you the boxes of the anchor pins and rollers
7  and all that, springs, everything that went with
8  the brake job.
9    Q.   So the pins and those kind of things
10  were in a box that went with the metal shoes?
11   A.   Right.
12   Q.   Is that correct?
13   A.   Just a plain yellow box.
14   Q.   Okay.  Well, that's what I was going
15  to ask you.
16        For the different brands that you
17  described, is there any way to differentiate or
18  to distinguish one brand's box from another
19  brand's box, anything jump out at you?
20   A.   They probably have parts -- they had
21  the parts numbers on the box.
22   Q.   Aside from parts numbers, did one
23  brand use a color that was specific to that
24  brand?
25   A.   No.

48 (Pages 186 to 189)

Raymond Kain
January 29, 2021

Page 190

1    Q.   Nothing like that?  No kind of
2  animal --
3      A.   No, not that I remember.
4      Q.   Okay.  But no kind of pictorials like
5  animal pictures or geometric shapes?
6      A.   Uh-uh.
7      Q.   Well, for example, there was a brake
8  made by a company that the brake was known as
9  Grizzly and it had a bear on it, you know.
10     A.   No.
11     Q.   You don't remember seeing anything
12  like that?
13     A.   No.
14     Q.   Okay.  So when you get --
15     A.   I don't remember anything like that.
16     Q.   Okay.  So when you get the brake
17  and -- well, do you first have to identify the
18  axle before you go and tell the window -- the
19  parts window what you need?
20     A.   No.  We take it apart.
21     Q.   Okay.
22     A.   We pull it all down and then go to
23  the parts window.  They -- they carried most all
24  the parts we needed.
25     Q.   Okay.  And they stocked them there?

Page 191

1      A.   Yeah.
2      Q.   Okay.  Now, once you identified the
3  axle and once you identified the parts you needed
4  for the axle to do the job you were doing, how
5  did you communicate that to the parts department?
6  Was there a slip of paper or was there a
7  requisition or anything like that?
8      A.   No.
9      Q.   Nothing.  You just went --
10     A.   No.
11     Q.   You just went to the window and
12  verbally told them what you needed?
13     A.   Right.  And they would go to the back
14  and I'm sure they had a chart or something or if
15  they problems, they'd look it up on the computer,
16  and then they'd come back and give us what we
17  needed.
18     Q.   Okay.  Now, when they handed you the
19  brake shoe, and let's say -- how could you tell
20  on the shoe itself, the metal shoe when they
21  handed it to you, how could you tell that was a
22  Fruehauf shoe versus an Eaton shoe or some other
23  shoe?
24     A.   It would have a name on it.
25     Q.   All right.  Where was the name on the

Page 192

1  shoe?
2      A.   On the side of it.
3      Q.   On the side of it, are you talking
4  about the side of the metal?
5      A.   No, the pad.  And they might --
6  sometimes they had it on the shoe too.  They had
7  a little paper thing that would -- was on the
8  side of the shoe itself.
9      Q.   How was the paper thing affixed to
10  the shoe?
11     A.   Glued.
12     Q.   And how big was this piece of paper?
13     A.   Oh, I guess about two-inches long by
14  an inch wide.
15     Q.   And what was on the paper that made
16  the identification for you?
17     A.   Mostly was the name of the axle that
18  it came off of, what kind of axle.
19     Q.   Okay.  Now, are you making the
20  assumption that because you got a metal shoe that
21  had a paper tag that said it was Brand A, are you
22  assuming that the lining was also Brand A or do
23  you have any personal knowledge that the
24  lining --
25     A.   No, I had no knowledge of -- you

Page 193

1  know, of that.  If we put it on and it didn't
2  fit, then we knew something was wrong.
3      Q.   Okay.  But do you know who made the
4  lining on any given brake shoe?
5          MR. HIBEY:  Asked and answered.
6  BY THE WITNESS:
7      A.   The manufacturer or the people, the
8  people that made the axles.
9  BY MR. HARRISON:
10     Q.   Okay.  Is that an assumption on your
11  part or do you have personal knowledge on that?
12     A.   Well, some of them are marked, like I
13  say, with names on it.
14     Q.   On what?
15     A.   The liners.
16     Q.   Okay.  So the name was on the liner
17  as well as on the metal shoe?
18     A.   Right.
19     Q.   On the paper?
20     A.   Right.
21     Q.   All right.  So the name would be on
22  both?
23     A.   Not on all of them, but most of the
24  time.
25     Q.   Okay.  Now when you --

49 (Pages 190 to 193)

Raymond Kain
January 29, 2021

Page 194

1      A.   You could tell if it wasn't the right
2   pad that went on that shoe.
3      Q.   Because it wouldn't fit when you put
4   it into the drum; is that correct?
5      A.   Right.
6      Q.   Okay.  Now, when -- and I believe
7   you've answered this, but do you know where the
8   parts person ordered the Fruehauf -- what you
9   have identified as the Fruehauf brake shoes?
10      A.   No, sir.  I didn't do any ordering so
11   I have no idea.
12      MR. HARRISON:  All righty.  Thank
13   you, Mr. Kain.  I appreciate your time and your
14   courtesy.
15      THE WITNESS:  Thank you.
16      MR. HARRISON:  And I'll reserve any
17   questions if something else comes up.
18      Thank you, Mike.
19      MR. HIBEY:  All right.  We're rolling
20   now.  Who's next?  Anyone?
21      [EXAMINATION]
22   QUESTIONS BY MR. LASSUS:
23      Q.   Hello.  This Ed Lassus.  Can you hear
24   me?
25      A.   Yes, I can.

Page 195

1      Q.   Great.
2      Sir, you're 71 years old?
3      A.   Yes.  I'll be 72 next month.
4      Q.   Are you in -- are you in good general
5   health?
6      A.   What's that?
7      Q.   Are you in good general health?
8      A.   Oh, I wouldn't say that.
9      Q.   Is there any reason --
10      A.   I wouldn't say I was in good health.
11      Q.   You don't plan on leaving the state
12   of Louisiana any time soon, moving out of the
13   state?
14      A.   No.
15      Q.   Okay.  Is there any reason that you
16   wouldn't be available to testify at the trial on
17   the merits of this matter?
18      A.   Where?  What did you say, sir?
19      Q.   You don't have any reason why you
20   would be unavailable to testify at the trial of
21   this case?
22      A.   No, I'd be there.
23      Q.   Okay.  Sir, am I correct in
24   understanding that all of the work that you
25   described here today in your deposition for

Page 196

1   Puerto Rican Marine, that work took place at the
2   Puerto Rican Marine facility located off the
3   Industrial Canal and off France Road --
4      A.   Right.
5      Q.   -- in New Orleans?
6      A.   Exactly.
7      Q.   Okay.  And your affidavit, which was
8   marked for identification as Exhibit 2, do you
9   know the document I'm referring to?
10      A.   Yes.
11      Q.   When that affidavit mentions the Port
12   of New Orleans, that is a reference to the Puerto
13   Rican Marine facility located off the Industrial
14   Canal and France Road in New Orleans, correct?
15      A.   Correct.
16      Q.   Did you answer the question, sir?
17   Because I didn't hear it.
18      A.   Yes, it's correct.
19      Q.   Thank you.  I'm sorry.  I didn't hear
20   your response.
21      And the work you described here today
22   for Puerto Rican Marine in your deposition, none
23   of that work took place at any Port of New
24   Orleans facility located on the bank of the
25   Mississippi River?

Page 197

1      A.   No.  All on France Road on the
2   Industrial Canal.
3      MR. LASSUS:  Thank you, sir.  I have
4   no further questions.  You have a good day.
5      THE WITNESS:  You too.
6      MR. HIBEY:  Who else we got?
7   Anybody?
8      MS. ZANOVEC:  Yes.  This is Jamie
9   Zanovec.  I have some questions.
10      MR. HIBEY:  Go ahead, please.
11      [EXAMINATION]
12   QUESTIONS BY MS. ZANOVEC:
13      Q.   Sir, can you hear me okay?
14      A.   Yes.
15      Q.   I'm trying to see if I can get the
16   camera on.  I'm sorry.  Let me see.  Let me see
17   if that works.  If not, I will just ask -- okay.
18   Can you see me okay?
19      A.   Yes.
20      Q.   Okay.  I know it's been a long day.
21   So I appreciate your patience.  I don't
22   anticipate this to be very long.
23      All of these trailers you were
24   working on, they were all older trailers with a
25   lot of miles on them, correct?

50 (Pages 194 to 197)

Raymond Kain
January 29, 2021

Page 198

1      A.   No, not all of them, no, no.
2      Q.   Do you have a specific recollection
3  of working on any brand new trailers?
4      A.   You broke up just now, ma'am.
5      Q.   I know.  I'm --
6           MR. HIBEY:  Hey, I'm having a lot of
7  issues with your reception.
8           Mr. Kain, is everything okay on your
9  end?
10          THE WITNESS:  Yeah, I just keep --
11  but it's breaking up here -- I mean, like with
12  the --
13          MS. ZANOVEC:  Yeah, me as well.  I
14  can barely here anything.  Is it better if I pick
15  it up?
16          THE WITNESS:  Well, I hear you better
17  now.
18          MS. ZANOVEC:  Okay.  My computer
19  audio is messed up so I have to have you on video
20  and also my phone.
21          MR. HIBEY:  Yeah, I'm not sure if
22  it's just that, though, because I was having --
23  everything's getting a little pixilated.  But
24  let's keep trying.
25          MS. ZANOVEC:  Should I -- I'm trying

Page 199

1  to think if I should just disconnect the video
2  and just do phone because sometimes there's a
3  crossover.
4  BY MS. ZANOVEC:
5      Q.   Can you hear me okay, Mr. Kain?
6      A.   I can hear you.
7      Q.   Okay.  Do you recall the first time
8  between the 1976 to 1981 that you were out at
9  Puerto Rico Marine with Mr. Brindell, do you
10  remember the first time you worked on a Lufkin
11  trailer?
12      A.   Yeah.
13      Q.   You do?
14      A.   I couldn't tell you a date or nothing
15  like that, but I can remember working on them.
16      Q.   Okay.  And I'm taking notes just so I
17  can not repeat myself.
18           And I guess you also don't recall the
19  last time you worked on a Lufkin trailer?
20      A.   No.
21      Q.   Okay.  We talked to Mr. Polito
22  previously, Keith, I think, Polito?
23      A.   Yes.
24      Q.   And he talked about a lot of other
25  work that you guys did on trailers, and I think

Page 200

1  you've talked about that some too, like changing
2  lights, welding the landing gear, welding repairs
3  to the damage of the trailer in addition to brake
4  work?
5      A.   Right.  We changed axles, everything.
6      Q.   Okay.  What type of work do you
7  recall doing on a Lufkin trailer?
8      A.   Oh, fixing it.  That's all I can
9  remember.  I couldn't tell you exactly what the
10  damage was, not now.
11      Q.   Do you recall doing some electrical
12  work for a Lufkin trailer?
13      A.   No, ma'am.  I can't tell you.  We
14  probably did it.  If it needed it, we did it.
15  Any kind of work it needed, we did.  Look, this
16  is a long time ago for me.
17      Q.   I understand.  And truly I don't
18  remember what I did last week.  So thank you for
19  being patient with me.  I just have to ask these
20  questions.
21           Do you remember performing a brake
22  job on a Lufkin trailer?
23      A.   Yes.
24      Q.   Do you remember about how many you
25  would have done?

Page 201

1      A.   Oh, no.  I don't -- probably a lot --
2      Q.   Let's say --
3      A.   -- because if we --
4      Q.   I'm sorry.  That's a bad question.
5  Let me just say do you know about how many you
6  would have done in one month?
7      A.   Oh, no.  It depends -- you know, it
8  would depend on -- you know, we -- like I said, I
9  don't write all that down and I don't remember
10  all that as much now.  You know, years ago I
11  could have probably told you that.
12      Q.   Okay.  I understand.  Let me see if
13  we can come at it a different way.
14           Can you describe in detail the
15  sticker or logo on Lufkin trailers?
16      A.   Oh, Lord.  Not really.  Oh, yeah.  It
17  was a little -- I think a little oblong looking
18  thing and it said Lufkin.
19      Q.   Okay.  And do you know what color?
20      A.   I think it was white with black
21  letters.
22      Q.   Okay.  You never saw any paperwork
23  concerning the ownership or lease of any Lufkin
24  trailers, did you?
25      A.   No.

51 (Pages 198 to 201)

Raymond Kain
January 29, 2021

Page 202

1      Q.   Okay.  And you never reviewed any
2  manual from Lufkin, correct?
3      **A.   Correct.**
4      Q.   Okay.  Do you believe there was
5  asbestos anywhere on a Lufkin trailer?
6      **A.   It was -- yes.**
7      Q.   Where do you think the asbestos was?
8      **A.   Oh.  In the brake drum -- brake**
9  **shoes.**
10      Q.   Okay.  In the brake shoes.  But that
11  would be the only place, correct?
12      **A.   Right.**
13      Q.   And you never performed work on a
14  brand new Lufkin trailer, correct?
15      **A.   No.**
16      Q.   No, you did not?
17      **A.   I did not.**
18      Q.   Okay.  Thank you.
19          Do you know the manufacturer of any
20  of the old brake pads you removed from the Lufkin
21  trailer?
22      **A.   Did I ever do what now?**
23      Q.   Do you know the manufacturer of any
24  of the old brake pads you removed from a Lufkin
25  trailer?

Page 203

1      **A.   No, not really.  I don't know what --**
2      Q.   And my understand -- okay.  Thank
3  you.
4          And my understanding from your
5  conversations with Ms. Deto and Mr. Harrison is
6  that when you needed new brakes, you would just
7  go to the parts room and he would match the axle
8  and that's how you would get the brakes and the
9  axle to install new, correct?
10      **A.   Right.  If there was any question,**
11  **the parts man would come out and find the tag and**
12  **he would do it.**
13      Q.   Okay.  So you're not able to identify
14  the manufacturer of any of the new brakes you
15  installed on a Lufkin trailer either?
16      **A.   No.**
17      Q.   Do you need to take a break?
18      **A.   No, I don't -- I thought I had**
19  **unplugged that phone.  No, it's not unplugged.**
20  **That's my home phone.**
21      Q.   Okay.  It's no problem.  If you need
22  a break, just let me know.
23      **A.   All right.  I'm ready.**
24      Q.   Okay.  Do you know the manufacturer
25  of the axles on the Lufkin trailers?  I think you

Page 204

1  said they would have been Rockwell or Eaton?
2      **A.   I think so.**
3      Q.   Do you have any specific recollection
4  of which or you just know it would have been one
5  of the two?
6      **A.   It would have been one of them**
7  **because Fruehauf only put Fruehauf axles on their**
8  **own axle -- on their own trailers.  I hardly -- I**
9  **don't think I've ever seen a Fruehauf axle on any**
10  **other trailer unless it was made by Fruehauf now.**
11  **But Lufkin made their own trailers.**
12      Q.   Right.  Okay.  And Lufkin made the
13  trailer, but they did not make brake pads,
14  correct?
15      **A.   No.  Whoever -- whoever made the axle**
16  **probably did that.**
17      Q.   Okay.  Thank you.  Hold on one
18  second.  Let me just look over my notes.
19          Okay.  And did you ever see anything
20  published or produced by Lufkin that required the
21  use of asbestos brake pads?
22      **A.   No.**
23      Q.   Okay.  And, Mr. Kain, you never
24  performed a first time brake job on a Lufkin
25  trailer, did you?

Page 205

1      **A.   First time, probably so.**
2      Q.   Is that a guess or do you know for
3  certain?
4      **A.   Well, I'm going to tell you that --**
5  **I'd say it was probably the first time.  I mean,**
6  **I can't be sure of that, but I can, you know --**
7      Q.   And you can't -- sorry, go ahead.
8      **A.   I mean, who knows.**
9      Q.   Okay.  And that's what I'm getting
10  at.  You don't know the service history of the
11  Lufkin trailer, correct?
12      **A.   No.**
13      Q.   You never saw any written records
14  about what mechanical work was performed on a
15  trailer before it came to you, correct?
16      **A.   No.**
17      Q.   So you can -- you can sort of make a
18  guess, but you don't know for certain that you
19  ever performed a first time brake job on a Lufkin
20  trailer, correct?
21      **A.   I can make a guess, but that -- I can**
22  **pretty much tell when you bring them in and they**
23  **all -- the shoes wore down metal to metal, nobody**
24  **did that in a long time.**
25      Q.   In a long time, but you can't be

52 (Pages 202 to 205)

Raymond Kain
January 29, 2021

Page 206

1    certain it's the first time, correct?
2      A.   Correct.
3      Q.   Okay.  Thank you.
4           So we're talking about your work on a
5    Lufkin trailer, but we're here about Mr. Brindell
6    -- Brindell, I believe you said, specifically.
7      A.   Right.
8      Q.   So what I would like to know is if
9    you have a specific recollection of seeing
10   Mr. Brindell perform brake work on a Lufkin
11   trailer?
12     A.   Yes.
13     Q.   Okay.  When would that have been?
14     A.   I misunderstood you.
15     Q.   Okay.  I'm sorry.  Can you tell me
16   about that job?
17     A.   When did what?
18     Q.   When did you see Mr. Brindell --
19     A.   When did he do it?
20     Q.   Yes, sir.
21     A.   Well, he did it when he was working
22   there because -- I don't know what to tell you
23   because I didn't write nothing down to tell you
24   the day or the date, the year or none -- anything
25   like that.  I mean, you asking me questions I

Page 207

1    can't answer.
2      Q.   Okay.  I understand.  So you're able
3    to generally recall Lufkin and performing brake
4    work, but you can't get any more specific with me
5    about the number of times that you think he would
6    have performed that work?
7      A.   I wouldn't --
8           MR. HIBEY:  Objection.
9    BY THE WITNESS:
10     A.   I wouldn't be able to tell you.
11          MR. HIBEY:  Objection, form,
12   misstates testimony.
13   BY MS. ZANOVEC:
14     Q.   If you just give me one second to
15   look over my notes, Mr. Kain, I think I'm almost
16   finished.
17          Mr. Kain, you said that you and
18   Mr. Brindell went fishing and hunting outside of
19   work.  I was just curious, did you guys ever
20   perform work on any of your personal vehicles
21   together?
22     A.   No.
23          MS. ZANOVEC:  Okay.  That's all I
24   have for you for now.  I'm going to let someone
25   else go and look over my notes so we can try to

Page 208

1    get you out of here.  Thank you.
2           THE WITNESS:  All right.
3           MR. HIBEY:  All right.  We're almost
4    there, Mr. Kain.
5           Is there someone on the phone who has
6    not asked questions yet that needs to ask
7    questions?
8           MS. SENTER:  This is Meghan Senter.
9    I haven't finishing my questioning and I'm still
10   waiting on a conference with the judge, but I'm
11   more than willing to pick back up.
12          MR. HIBEY:  Sure.  Before we do that,
13   I just wanted to confirm on the record here, is
14   there anyone on the phone who represents or has
15   liability for the Wilson trailers?
16          Okay.  And so there is no one else on
17   the phone at this time that has questions besides
18   our good friend Meghan with Eaton; is that
19   correct?
20          MS. DETO:  I believe I have a few
21   follow-ups.  This is Amanda.
22          MS. BAXTER:  And this is Kay.  I have
23   some follow-ups.
24          MR. HIBEY:  Okay, guys.  Well,
25   Meghan, why don't we give it another shot and see

Page 209

1    if we can try to get through your questioning.
2           What I've said previously is that you
3    had repeatedly asked the same line of questions
4    and if you have found a new way to maybe approach
5    it, I will allow that.  But we're not going to
6    stay on that topic for another ten minutes.
7           And then beyond that, I would hope
8    that you're near the end of your questioning.
9    Otherwise, I will again cut you off and I will
10   happily speak with the judge about what has
11   happened.  But please go ahead now.
12          MS. SENTER:  And for the record, this
13   is --
14          MR. HIBEY:  Go ahead.  Let's hear it.
15          MS. SENTER:  Oh, actually, let's just
16   take a minute because the court is calling me.
17   Hold on.
18          MR. HIBEY:  Wonderful.
19          All right.  While we're waiting on
20   Meghan, Mr. Kain, I apologize for the delay here.
21   And if she doesn't come back in a minute or two,
22   we'll just continue without her.
23          MS. SENTER:  Everyone, the judge's
24   clerk just called me and asked for our case
25   number.  She's getting ready to call me back.  We

53 (Pages 206 to 209)

Raymond Kain
January 29, 2021

Page 210

1    can take a break and wait for the judge or I can
2    start asking my questions and we'll have to stop
3    as soon as the judge calls.
4            MR. HIBEY: I think you should ask
5    your questions considering there's currently
6    nothing to put in front of the judge.
7            MS. SENTER: All right. In that I
8    don't believe it's proper to continue to argue in
9    front of the witness, I will ask some questions.
10           [FURTHER EXAMINATION]
11   QUESTIONS BY MS. SENTER:
12       Q.   Mr. Kain?
13       A.   Yes.
14       Q.   Are you able to see my video right
15   now?
16       A.   No.
17       Q.   No?  All right.  Well, we'll go ahead
18   anyway.  You're okay to continue?
19       A.   I'm okay.
20       Q.   Okay.  I would like to ask you to
21   understand for myself, you testified earlier when
22   we were -- when we were talking that you believed
23   that Mr. -- that you and Mr. Brindell would have
24   been the first mechanics to change a brake from
25   an Eaton axle, and I would like for you to tell

Page 211

1    me why you think that.
2        A.   I'm looking at --
3            MR. HIBEY: I'll reiterate my
4    objection that this has been asked and answered
5    at least three times, if not more.
6            But go ahead, Mr. Kain, and answer
7    the question again.
8    BY THE WITNESS:
9        A.   By looking at the condition of the
10   axle, the brake shoes -- I mean the drum and the
11   brake shoe, the grooves of the drum, brake shoes,
12   metal to metal, that would have to be a first
13   time.  I don't know who would let a piece of
14   equipment on the highway that long.
15   BY MS. SENTER:
16       Q.   Okay.  And so you're saying that
17   because of the condition of the drum and the
18   lining, you think it was the first time it got
19   changed, right, from what you observed of the
20   condition of the brake?
21       A.   Right.
22       Q.   Okay.  Do you know on the -- are you
23   picturing a specific time in your mind or is this
24   general knowledge?
25       A.   Well, I would say it's -- you know,

Page 212

1    it's -- when you look at something like that, you
2    know it's been a -- it never been done.
3        Q.   Okay.  Right.  And so I guess what
4    I'm trying to understand is you didn't know the
5    year on any of those Eaton axles, correct?
6        A.   No, we don't -- we didn't check
7    the -- you know, the year on all that.
8        Q.   Right.
9        A.   We never -- why check it?  I mean, we
10   checked -- we just match the parts with it.
11       Q.   Right.  And so my -- what I'm trying
12   to understand is when you're looking at something
13   and you think it's deteriorated or you think that
14   it's -- you know, it looks like it needs a new
15   brake job, right, it looked like it needed to be
16   changed to you, right?
17       A.   Right.
18       Q.   How long had passed between when that
19   brake was originally put on and when you were
20   changing it?
21       A.   How long?
22       Q.   Yeah.
23       A.   There's no telling.  I have no clue.
24   That brake pad could last ten years if it was
25   never run anywhere.

Page 213

1        Q.   And would it also be possibly that
2    somebody had changed it before you and a long
3    time had passed before you got there to change it
4    again?
5        A.   No, no.  That's not -- somebody
6    would -- it would have to be a long, long time.
7        Q.   When did you -- you started at Puerto
8    Rican Marine in 1971, right?
9        A.   Yes.
10       Q.   That was a yes?
11       A.   Yes.
12       Q.   Okay.  Were you the first employee
13   ever at Puerto Rico Marine?
14       A.   No.
15       Q.   How long had that company been in
16   business before you started there?
17       A.   I have no clue because like I
18   explained before, when they started out it was
19   Gulf Puerto Rican Lines and we belonged to the
20   Puerto Rican government and they started out
21   small and then they got bigger and they went to
22   France Road.
23           Now, I was the first mechanic hired,
24   but they had other people working.  But they was
25   more or less people that worked on the special

54 (Pages 210 to 213)

Raymond Kain
January 29, 2021

Page 214

1  **lane, locking trailers down and all the**
2  **containers down that go on the road.**
3      Q.  Okay.
4      **A.  I was the first -- first one there to**
5  **start repairing that stuff.**
6      Q.  And before you got there and before
7  you got there to start repairing stuff, you don't
8  know what the service history was on any of the
9  chassis, trailers or axles that came through
10 Puerto Rican Marine; is that right?
11     **A.  No, we didn't know it because they**
12 **never did keep records for that.**
13     Q.  How did you know it?
14     **A.  How did I know what?**
15     Q.  Well, I just asked if you knew the
16 service history -- I said before you started, you
17 didn't know the service history of any of those
18 pieces of equipment and you said yes, you did.
19 Was that right?
20     **A.  No, I said no.**
21     Q.  Okay.
22     **A.  Because they never kept any records**
23 **on anything.**
24     Q.  Right.  Okay.  I'd like to ask you
25 some additional questions about your affidavit.

Page 215

1      **A.  Go ahead.**
2      Q.  Now, I heard -- I heard earlier that
3  you believe the first time that you talked to
4  Mr. Hibey was around the time of this affidavit;
5  is that right?
6      **A.  Right.**
7      Q.  Okay.  And that's in April 2020?
8      **A.  I would say that time, around a week**
9  **in there, somewhere about a week.**
10     Q.  Okay.  Did you tell Mr. Hibey at the
11 time that you spoke with him about this affidavit
12 that you also -- anything about the brake jobs or
13 the trailers that you're telling us today?
14     **A.  Did I talk to him yesterday, no.**
15     Q.  No.  I'm sorry.  I asked -- I asked
16 when you were talking to Mr. Hibey about this
17 affidavit, the stuff that's in your affidavit
18 about the welding work and the maintenance work
19 on the containers, did you also tell him about
20 the work on the chassis that you've talked about
21 today?
22     **A.  Yeah.  Some kind of way it come up.**
23 **I don't know if he asked me or if I asked him,**
24 **but it came up.**
25     Q.  Do you know why if you talked about

Page 216

1  that back in April, your affidavit didn't contain
2  any of that information?
3      **A.  I have no clue.**
4      Q.  And I think earlier somebody had
5  asked you, you know, how you got this affidavit
6  and you said it came over on the computer.
7      Do you remember that?
8      **A.  Well, that's where I gave the**
9  **affidavit and then they -- and it came through**
10 **the copy machine.**
11     Q.  Okay.  So if you could just kind of
12 walk me through the process, when you got -- when
13 you got a copy of this affidavit, you said it
14 came through the copy machine?
15     **A.  Right.**
16     Q.  Is that at your house?
17     **A.  No.  It was my daughter's.**
18     Q.  At your daughter's house?
19     **A.  Yes.**
20     Q.  So it went to your daughter's house
21 and she brought it over to you?
22     **A.  Yes.**
23     MS. SENTER:  Okay.  Hold on just a
24 moment.  The court's calling me.  Let's take a
25 pause here.

Page 217

1      (Pause in proceedings.)
2      MS. SENTER:  All right.  The judge is
3  still on the bench.  We're going to keep going.
4  BY MS. SENTER:
5      Q.  So when your daughter brought the
6  copy of the affidavit over to you, did you read
7  it through all the way?
8      **A.  Yes.**
9      Q.  And then after you read it, what did
10 you do next?
11     **A.  Well, then I was on one of these**
12 **funny looking things right here and they watched**
13 **me sign it.**
14     Q.  Who watched you sign it?
15     **A.  Whoever -- whoever stamped it, excuse**
16 **me.  Because I got another copy later that was**
17 **the -- you know, where they stamped it.**
18     Q.  Did you ever give anybody a copy of
19 your driver's license?
20     **A.  Driver's license, no.**
21     MS. CHEEK:  This is Lindsey Cheek.
22 This is ridiculous, honestly.  Can we go off the
23 record?  This is Lindsey Cheek.
24     MS. SENTER:  No.
25     MR. HART:  No, let's stay on the

55 (Pages 214 to 217)

Raymond Kain
January 29, 2021

Page 218

1  record because there's nothing ridiculous about
2  this.  It's at the heart of something --
3          MR. HIBEY:  Lindsey -- Lindsey and
4  Jody and everyone, let's just finish this, okay?
5  We're fine.  The questions have been asked,
6  though.  That's the ridiculous part.  So it's
7  been asked, it's been presented in various forms.
8          And, Meghan, if you're not aware of
9  that, this isn't his job to explain the whole
10 case to you.  But go ahead and continue to ask
11 your questions.
12         And Jody, you know the answer to this
13 stuff.  You were the one that was asking about
14 it.
15         MS. SENTER:  Everybody done making
16 objections?
17 BY MS. SENTER:
18     Q.   All right.  So my question was did
19 you ever show anybody a copy of your driver's
20 license?
21     **A.   The doctor's office maybe.**
22     Q.   I mean -- I'm sorry.  I mean in
23 connection with the affidavit when you were
24 signing the affidavit.
25         MR. HIBEY:  Here.  I am going to

Page 219

1  object because the answer to this question is a
2  known question.  It was provided to you.  It's a
3  notarized document where he had to show his
4  identification and the video clip was presented
5  to you or to your firm through the filing of the
6  affidavit.  So I don't know why you're asking
7  him.  He can tell you he doesn't know.  He can
8  tell you he doesn't remember.  It really doesn't
9  matter.  It was a notarized document.
10         MS. SENTER:  Was your objection to
11 form?  Did you have another objection?
12         MR. HIBEY:  My objection is to the
13 harassment.  Please move on and ask a question
14 that's relevant to this case and hasn't already
15 been disclosed.
16 BY MS. SENTER:
17     Q.   When you read through this affidavit,
18 Mr. Kain, did you see anything in there that you
19 disagreed with?
20         DEFENSE COUNSEL:  Object to form.
21 BY THE WITNESS:
22     **A.   No.**
23 BY MS. SENTER:
24     Q.   No.  So when we were talking earlier,
25 you -- and I think you were talking to

Page 220

1  Mr. Kinler, you said that you were talking
2  specifically about one of the paragraphs where it
3  said you saw --
4          MR. HIBEY:  Meghan, if the question
5  has already been asked, why are you repeating it?
6  So I will object that the question is asked and
7  answered, and when you didn't get the answer that
8  you liked, now you're going to ask it a third
9  time.  Is that your plan?
10         MS. SENTER:  Mike, the proper
11 objection is to form.  And I have not asked
12 questions about the affidavit yet.  So if you --
13         MR. HIBEY:  You just did.
14         MS. SENTER:  -- would like to
15 continue to make improper objections under the
16 Rules of Procedure in Louisiana, you can and I
17 will move for sanctions later.  But right now is
18 my opportunity to ask questions about this
19 affidavit.  Mr. Kinler and I are not the same
20 attorney.
21         MR. HIBEY:  And the question was
22 asked, it was answered.
23         MS. SENTER:  I haven't even finished
24 a question so I don't know what your objection
25 is.  But if you would like to continue, go for

Page 221

1  it.  You can make your objection and I'll ask my
2  question.  You're making it harder.
3          MR. HIBEY:  I'm making my objection.
4  I did.  I don't know why you're asking me to make
5  it again, but I will.
6          Mr. Kinler asked the question about
7  the affidavit.  Then you followed up and asked
8  the same question asking him whether he disagreed
9  with anything in his affidavit.  He said no.
10         Previously when he was talking to
11 Mr. Kinler, there was some things that came up
12 that were not all square and that has already
13 been discussed.  So when you asked it, you were
14 asking a second time.  Now you're about to ask a
15 third time.
16         That is the objection.  I don't know
17 why I have to explain it to you.  I thought it
18 was very obvious.
19         MS. SENTER:  You didn't -- I didn't
20 ask you to explain it.  You're the one who's
21 choosing to --
22         MR. HIBEY:  You did.
23         MS. SENTER:  You can just object to
24 form, which is the proper procedure in Louisiana.
25         MR. HIBEY:  And I did.

56 (Pages 218 to 221)

Raymond Kain
January 29, 2021

Page 222

1  BY MS. SENTER:
2      Q.  Mr. Kain, we were talking about your
3  affidavit and when you were speaking earlier, you
4  told Mr. Kinler that you were unsure as to
5  whether any of the dust actually contained
6  asbestos.
7          Do you recall that?
8          MR. HIBEY:  Objection, form, asked
9  and answered.
10         DEFENSE COUNSEL: Objection, form,
11 asked and answered.
12 BY THE WITNESS:
13     **A.  I wasn't sure what?**
14 BY MS. SENTER:
15     Q.  You were asked about one of the
16 paragraphs that discussed asbestos dust and
17 you recall -- you told Mr. Kinler that you didn't
18 know whether the dust actually contained
19 asbestos.
20         Do you remember that?
21         DEFENSE COUNSEL:  Same objection.
22         MR. HIBEY:  Objection, form, asked
23 and answered.
24         This is now getting repetitive for
25 the second time with you, Meghan.  I will again

Page 223

1  point out that this is not just asked and
2  answered.  This is objectionable because it is
3  repetitive and harassing.  You can continue.
4          MS. SENTER:  Madam Court Reporter,
5  will you read back my question, please?
6  BY THE WITNESS:
7      **A.  To my opinion as far as I can figure,**
8  **that's the only thing I can figure that was, you**
9  **know, asbestos.  That's what I figured it was.**
10 **It could have been anything, I guess, but I'm**
11 **almost sure it was asbestos to the best of my**
12 **knowledge anyway.**
13 BY MS. SENTER:
14     Q.  And my question is if you think that
15 it is asbestos, although you say it could have
16 been anything?
17     **A.  I really couldn't tell you if it**
18 **really was asbestos, but to the best of my**
19 **opinion and knowledge it was.**
20     Q.  Okay.  And so when you signed this
21 affidavit that said true and correct under
22 penalty of perjury, you were giving your opinion.
23         Is that what I'm understanding?
24     **A.  I was giving the best of my**
25 **knowledge.**

Page 224

1      Q.  Okay.  Did you ever express to
2  Mr. Hibey that you weren't actually sure that any
3  of the dust was asbestos?
4      **A.  No, I never, you know, said -- you**
5  **know, talked to anybody else about it.**
6      Q.  Did you specifically tell Mr. Hibey
7  that the dust you saw was asbestos?
8          DEFENSE COUNSEL:  Object to form.
9  BY THE WITNESS:
10     **A.  Yeah, I said to me, that's asbestos**
11 **dust.**
12 BY MS. SENTER:
13     Q.  And why did you think that the dust
14 onboard the ships was asbestos?
15         DEFENSE COUNSEL:  Object to form.
16 BY THE WITNESS:
17     **A.  Because the guys with the suits on**
18 **went down in there and -- you know, they blow**
19 **stuff out and all, the dust and all like that.**
20 **They had white suits on, they had masks.  They**
21 **went down there with a compressor and they went**
22 **to the engine room.  And I know all of those**
23 **steam lines on that ship were wrapped with**
24 **asbestos.  Now I know it.  I didn't know it then.**
25

Page 225

1  BY MS. SENTER:
2      Q.  How do you know it now?
3          MS. CHEEK:  Meghan, move on.  He has
4  answered these questions repeatedly.  Move on.
5          MS. SENTER:  Lindsey, nobody's asked
6  him that, first of all.  And second of all, I
7  thought Mr. Hibey was appearing for plaintiff's
8  counsel.  One person is supposed to appear per
9  party, so I don't think that's proper.
10         But nobody has asked him now how he
11 knows.  I'm trying to find out the basis of his
12 knowledge.  He's sworn to this in an affidavit.
13         MR. HIBEY:  Hey, Meghan, I don't want
14 to argue with you here, but it has been asked and
15 answered, so you can keep going.
16         MR. KINLER:  Doug Kinler, I'll join
17 that objection.
18         MR. HIBEY:  Yeah, because you asked
19 it, Doug.
20 BY MS. SENTER:
21     Q.  Mr. Kain, I'm getting close here.
22 I'm trying to move through.
23         You told us earlier you spoke to
24 Mr. Hibey about the affidavit and another time
25 about this deposition, right?

57 (Pages 222 to 225)

Raymond Kain
January 29, 2021

Page 226

1     A.   Right.
2     Q.   When did you speak about the
3   deposition?
4     A.   About this?
5     Q.   Yes.
6     A.   Oh, when they brought me this little
7   thing here to put up so we could have this
8   conference.
9     Q.   So you could do the video?
10     A.   Right, because I don't know how to
11   work this --
12     Q.   And when you --
13     A.   Huh?
14     Q.   Go ahead.  I didn't mean to cut you
15   off.
16     A.   And he showed me how this works.
17     Q.   And did y'all have any conversations
18   about the deposition?
19     A.   No, other than he said there was
20   going to be people asking me questions because I
21   said I didn't know -- I didn't know what this was
22   over this thing.
23     Q.   Did you talk about what any of the
24   questions were likely to be?
25     A.   No.

Page 227

1     Q.   Did he ask you about any of the --
2   any of the testimony that you might give about
3   Mr. Brindell's time at Puerto Rico Marine?
4     A.   Yeah.
5     Q.   And what did -- I'm sorry.  What did
6   Mr. Hibey specifically ask you?
7     A.   Well, what he -- it was how long I
8   worked there and who I worked with and what kind
9   of work we did and all like that.
10     Q.   Did you make any notes about --
11     A.   Did I make --
12     Q.   Did you make any notes during the
13   meeting?
14     A.   No.  I knew it all.  The only thing I
15   can say, everything I tell you here and
16   everything that's the paper I signed, it's all to
17   the best of my ability and I'm not going to lie
18   about nothing like that.
19     Q.   Did you at any point after anybody
20   got in touch with you about this case about
21   Mr. Brindell, did you go back to try and look
22   anything up --
23     A.   No.
24     Q.   -- about the work you had done?
25     A.   No.

Page 228

1     Q.   No.  Have you ever done any research
2   about asbestos?
3     A.   No.  I never knew about asbestos
4   until they start putting TV commercials on.
5     Q.   When you say you never knew anything
6   about asbestos --
7     A.   No, I didn't.
8     Q.   -- do you mean -- okay.
9         What do you think that you've learned
10   about asbestos since you started seeing
11   commercials?
12     A.   That it's awful.
13     Q.   You mentioned earlier that you and
14   Mr. Brindell were in the union and you used to
15   post bulletins on the board.
16     A.   Right.
17     Q.   Did your union ever warn you about
18   asbestos?
19     A.   No.
20     Q.   Did you ever have any training to
21   recognize asbestos?
22     A.   No.
23     Q.   Do you have any knowledge about what
24   types of products contained asbestos during any
25   given time frame?

Page 229

1     A.   No.
2     Q.   Do you know if Mr. Brindell ever had
3   any training or education from the union about
4   asbestos?
5     A.   No, he never had anything.  None of
6   us did.  It would have had to go through me first
7   as the lead mechanic.
8     Q.   As a lead mechanic, you were in
9   charge of kind of setting how work went?
10     A.   Right.
11     Q.   You mentioned a bit about the process
12   for changing brakes on a chassis earlier in the
13   day and you told us that you could do about --
14   you could -- you could finish working on one
15   chassis.
16     A.   There's some kind of noise in the
17   background.  I can't understand what you're
18   saying.
19     Q.   All right.  I think whoever was
20   moving around stopped.
21         We were talking earlier about how
22   many brake jobs or how many chassis you could
23   work on in a day, and I think you said you could
24   finish up working on one chassis in a day and
25   maybe start another?

58 (Pages 226 to 229)

Raymond Kain
January 29, 2021

Page 230

1    A.   Right.
2    Q.   And my question is when you and I
3  talked earlier, you talked about a whole slew of
4  things that you would do on a chassis to make
5  sure that it was road ready.  Do you remember?
6        So that one day of working on a
7  chassis, that was the whole -- the whole process,
8  right, to make sure it was road ready?
9    A.   Right, right.
10   Q.   Okay.
11   A.   But -- but not all of them had other
12  than brake jobs.  I'm not saying every chassis we
13  had to do everything, but it only takes a minute
14  to plug a light tester in and see if the lights
15  come on.
16   Q.   Right.
17   A.   And -- I mean, the brake job was the
18  longest.
19   Q.   I understand.  I just -- I wanted to
20  make sure that I understood that when you say it
21  took a day to do a chassis, that included
22  everything that we talked about, right?
23   A.   I said it takes a day to do a brake
24  job.
25   Q.   Okay.

Page 231

1    A.   And get the chassis -- where you pull
2  the chassis out because like I said, we already
3  pull the chassis and you had to do a brake job on
4  it and get it out of there.  There wasn't nothing
5  else wrong with it.
6    Q.   You told us all about the steps so I
7  won't go back through each and every step, but I
8  would like to know about -- I'm going to start
9  out just one wheel, okay, because I understand
10  that it's multiple wheels on multiple axles,
11  right?
12   A.   Right.
13   Q.   Okay.  So for one wheel, how long did
14  it take you to get the wheel off?
15   A.   About an hour.
16   Q.   Okay.
17   A.   Not just to get the wheel off.  It
18  might have took 30 minutes to get the wheel off.
19   Q.   Okay.  So, yeah, I'm going to --
20   A.   You got to drain the oil out of the
21  hub.  You got to let the oil drain out.  Take the
22  hubcap off, you let the oil drain out and you
23  catch it and it keep it from going all over the
24  shop and everything else.
25   Q.   Okay.  So I'm going to ask very

Page 232

1  specific questions just to help my time line,
2  okay, to understand.
3        So taking the wheel off, on just one
4  wheel taking it off would have taken about
5  30 minutes?
6    A.   Just to take it off.  That ain't
7  changing brake shoes and all.
8    Q.   Right, right.  Just to take it off.
9  Okay.
10   A.   Right.
11   Q.   And then after you've gotten the
12  wheel off and you were going on, what was the
13  next step?
14   A.   You had to knock the seal out, the
15  old seal because you can't use the same seal when
16  you go back.
17   Q.   All right.  So when you knocked the
18  seal out, how long did that take?
19   A.   Not long, but then you got to get the
20  bearings and inspect the bearings, clean them up
21  and inspect the bearings, and then you take and
22  go into the brake shoes.  You'd have to blow it
23  all down with the air hose and everything to get
24  everything off so you could see, blow the inside
25  of the drum out and all the hub around it and

Page 233

1  then you had to start pulling off the brake
2  shoes.
3    Q.   Right, okay.  So I'm trying -- I'm
4  trying to pars it down and just be a little bit
5  quicker here.
6        You said you had to inspect the
7  bearings.  How long did it take you to inspect
8  the bearings?
9    A.   Well, you had to clean them up first
10  and then get the oil and everything off so you
11  could see them and then you -- I guess another
12  30 minutes.
13   Q.   Okay.  So another 30 minutes for the
14  bearings.
15        And then after that you said you
16  would have to start taking off the brakes shoes,
17  right?
18   A.   Right.
19   Q.   How long did it take you to break
20  off -- to take off the brake shoes on one wheel?
21   A.   I couldn't give you a time on there
22  because if the anchor pins are frozen in there,
23  you had to use a hammer and a bar to knock them
24  out.  You might have even had to heat them.  Some
25  of them popped right out, some of them don't.

59 (Pages 230 to 233)

Raymond Kain
January 29, 2021

Page 234

1    Q.   Okay.  After --
2    **A.   You can't put a time limit on that.**
3    Q.   Okay.  That one is variable.  It
4    depended on the condition?
5    **A.   Right.**
6    Q.   Okay.  After you had the brake shoes
7    off and you were cleaning up the drums, how long
8    did that take you?
9    **A.   Well, I'd say the whole thing took**
10   **close to two hours.**
11   Q.   Okay.  So the whole --
12   **A.   You had to put the brake shoes back**
13   **on.**
14   Q.   Okay.  So from start to finish on one
15   wheel took you about two hours?
16   **A.   Yeah.**
17   Q.   All right.
18   **A.   Depending -- you know, like I said,**
19   **depending on them anchor pins.**
20   Q.   Right.
21   **A.   If the anchor pins come out easy,**
22   **it's faster.  If you've got to beat them out,**
23   **sometimes it takes longer.**
24   Q.   Okay.  And then when you're
25   putting -- putting the new shoes back on, that's

Page 235

1    pretty quick, right?  After you've gotten
2    everything off and cleaned up, putting them on is
3    pretty quick as long as they fit, right --
4    **A.   Right.**
5    Q.   -- they were the right ones?
6    **A.   Right.  And then you put it back on**
7    **and then you got to go under there and adjust the**
8    **brake shoes to the axle just like you do in a car**
9    **and all that, and then it takes time, you got to**
10   **fill the oil back up.**
11   Q.   Right.
12   **A.   So you got an oil can with a pump on**
13   **it and they got a level line on a sight glass on**
14   **the front of what is the hubcap, and you pump it**
15   **until you see it's at the sight line and then you**
16   **got enough in it.  But it takes -- because the**
17   **oil has to -- excuse me.  The oil has to run down,**
18   **seek level, and it's thick.  It's 90 weight oil.**
19   Q.   Right.  Okay.  So start to finish
20   changing the brakes on one wheel on an axle took
21   you about two hours, right?
22   **A.   Right.**
23   Q.   And you were working two mechanics to
24   a bay?
25   **A.   Correct.**

Page 236

1    Q.   And --
2    **A.   And if -- if one mechanic was**
3    **changing the wheel or the bearing or the brake**
4    **shoes, the other could go around and check the**
5    **chassis for any other damage --**
6    Q.   Okay.
7    **A.   -- like the lights and everything.**
8    Q.   Okay.  So like if you were changing
9    the brakes on a chassis in your bay and
10   Mr. Brindell was with you, while you were
11   changing the brakes, he was checking the rest of
12   the chassis for other damage?
13   **A.   Not necessarily, because he would be**
14   **helping me get that wheel ready first, but like**
15   **when we come to a time when you're putting the**
16   **oil back in the wheel, it only takes one man to**
17   **pump oil in there.  Now the other man can go**
18   **check whatever -- can go check whatever, you**
19   **know, needed to be checked.**
20   Q.   All right.  And then the last part I
21   don't think you answered, and I apologize if you
22   did and I didn't hear the estimate, but do you
23   know about how long it took you to clean out the
24   drum?
25   **A.   Oh, about 15 minutes maybe to get the**

Page 237

1    oil out of the drum.
2    Q.   How did you get the oil out of the
3    drum?
4    **A.   With a rag.**
5    Q.   You talked about those anchor pins
6    freezing up.  Did you ever use any sort of like
7    lubricant or like the no seize or whatever to
8    spray on it to get them out?
9    **A.   Yeah, but that don't work.  Like I'm**
10   **telling you, we used to have to sometimes heat**
11   **them up with a torch so you could break them out**
12   **of there.**
13   Q.   I'm scrolling through my notes.  I'm
14   sorry for the pause.
15   MS. SENTER:  I'm going to finish
16   reviewing my notes, but in the interest of
17   expediency, why doesn't somebody else jump in.
18   MR. HIBEY:  Mr. Kain, this is Mike.
19   I do think that we've got a few people with some
20   brief follow-up, and so we're going to go ahead
21   and try to let them do that and finish up here in
22   the next 30 minutes or so tops.  That's the hope.
23   THE WITNESS:  Okay.
24   MR. HIBEY:  I know Kay, Amanda, I
25   think each of you spoke up and said you might

60 (Pages 234 to 237)

Raymond Kain
January 29, 2021

Page 238

1    have some follow-up.  I'm not sure if you still
2    do.
3                MR. KINLER:  Hey, Mike --
4                MR. HIBEY:  I'll open it up to anyone
5    other than you, Doug, for now.  Just one second
6    and let's see if anybody else has any questions.
7                MS. BAXTER:  Yes, this is Kay.
8                MR. HIBEY:  Oh, Kay.  We didn't hear
9    you again.  Were you trying to speak earlier?
10               MS. BAXTER:  It takes a minute for me
11   to find out how to unmute this thing.
12               MR. HIBEY:  Probably because you're
13   doing something else while you're doing this.
14               MS. BAXTER:  No, I'm talking notes.
15               MR. HIBEY:  I'm joking.  All right,
16   Kay.  You're up.
17               MS. BAXTER:  Thank you so much.
18               [FURTHER EXAMINATION]
19   QUESTIONS BY MS. BAXTER:
20        Q.   Mr. Kain, hello again.
21        **A.   Hello.**
22        Q.    When the attorney for Lufkin was
23   asking you questions, she asked you if you could
24   tell how long brakes had been on the Lufkin
25   trailer, and you said you could not.

Page 239

1            Would that be true for all of the
2    equipment, you couldn't tell us how long any of
3    the brakes had been on any of the equipment there
4    at Puerto Rican Marine?
5         **A.   Give you a time limit, no.**
6         Q.   Okay.  Thank you.
7              And my next question is was there
8    ever a job when Mr. Brindell was assisting you or
9    another mechanic there at Puerto Rico Marine that
10   he got called off of that job, he had to stop
11   helping you because he got called to do his own
12   job?  Do you understand my question?
13        **A.   I understand what you're talking**
14   **about, but when he was a mechanic, he didn't get**
15   **called off a job.**
16        Q.   Right.  But when -- after he wasn't a
17   mechanic, I thought you said he would sometimes
18   help you guys if you needed help --
19        **A.   That was mostly --**
20        Q.   -- when he wasn't a mechanic?
21        **A.   Yes, but they didn't call him -- they**
22   **didn't call him off.  I've never had that**
23   **problem.**
24        Q.   Okay.  Well, I was just thinking
25   maybe if he was, you know, helping one of you

Page 240

1    guys and then he said oh, I've got to go take
2    care of this, he stopped helping you to go take
3    care of his own work.
4         **A.   No.**
5         Q.   I think this is going to became my
6    last maybe, hopefully fingers crossed.
7              I told you before I represent Strick,
8    and can you describe for me what a Strick trailer
9    or I think maybe you called it chassis looks
10   like?
11        **A.   Yes.  It's got a name on it.**
12        Q.   Okay.  And can you tell me what the
13   name looks like?
14        **A.   It's -- it's a thing on the side and**
15   **it's got Strick and I think it's black around it**
16   **and Strick is in light or vice-versa.**
17        Q.   Okay.  And this will sound equally
18   silly to you, but do you know the serial number
19   of any Strick trailer that you ever saw there at
20   Puerto Rican Marine?
21        **A.   No.**
22        Q.   Okay.
23        **A.   No, I -- I wouldn't even remember it**
24   **if I did.**
25        Q.   I know, but we just have to ask.

Page 241

1            Do you know the model of any Strick
2    chassis/trailer that you saw at Puerto Rican
3    Marine?
4         **A.   Oh, man.  There was so many chassis**
5    **that went through, thousands.  It could have been**
6    **anything.**
7         Q.   Okay.  And when you say there were so
8    many chassis, you're talking about in general,
9    not just Strick, right?
10        **A.   Yes, in general.  But, you know --**
11        Q.   And --
12        **A.   But, you know, it was -- but, you**
13   **know, like trying to remember one type of chassis**
14   **was -- you know, it's almost impossible.**
15        Q.   Right.  Sort of just runs together at
16   this point, right?
17        **A.   Yeah.**
18        Q.   Do you remember the year that any of
19   the Strick trailers were made that you saw at
20   Puerto Rico Marine?
21        **A.   No, I don't remember.**
22        Q.   Okay.
23        **A.   They were older chassis.  They wasn't**
24   **new.**
25               MS. BAXTER:  Right.  Okay.  Mr. Kain,

61 (Pages 238 to 241)

Raymond Kain
January 29, 2021

Page 242

1  for now that's all my questions. Again, I really
2  appreciate your time today. Thank you so much,
3  sir.
4          THE WITNESS:  Thank you.
5          MR. HIBEY:  All right.  Was there
6  anybody else that had follow-up?
7          I know, Doug, you've got some
8  questions you want to ask?
9          MR. KINLER:  I have less than a
10  minute, Mike.  I think I have two questions.
11         MR. HIBEY:  Go for it.
12         [FURTHER EXAMINATION]
13  QUESTIONS BY MR. KINLER:
14     Q.   I put my camera back on, Mr. Kain.
15  Can you see me okay?
16     A.   Yes.
17     Q.   Okay.  I'm not going to re-ask
18  anything I asked you when we spoke a few hours
19  ago.  I just want to ask you this generally.
20         Do you remember you and I spoke about
21  the affidavit.  We went through all the
22  paragraphs and I asked you about --
23     A.   Right.
24     Q.   -- and I asked you about your
25  knowledge of asbestos.

Page 243

1          Do you remember that?
2      A.   Right.
3      Q.   And you were truthful when you
4  answered my questions, weren't you?
5      A.   Yes.
6      Q.   I'm sorry?
7      A.   Yes.
8      Q.   Okay.  And we also talked about the
9  number of times that you saw Mr. Brindell going
10  on ships.  Do you remember we talked about all of
11  that, and you were truthful when you answered my
12  questions about that, weren't you?
13     A.   Yes, to the best of my ability.
14         MR. KINLER:  Yes, sir.  Okay.  That's
15  all I have.  Thank you, sir.
16         MR. HIBEY:  All right.  Is there
17  anybody else that has any follow-up questions?
18         MS. DETO:  Yes, sir.  I'm trying to
19  go off mute.  Can you hear me?
20         THE WITNESS:  Yes.
21         MS. DETO:  Okay, great.  This is
22  Amanda just quickly.  I'm looking over my notes
23  here.
24         Can I just have one second to look
25  through my notes, Mike, if you don't mind, 20

Page 244

1  seconds?
2          MR. HIBEY:  Sure.  You can look
3  through your notes.  I will kill some time.
4          Mr. Kain, how are you doing?
5          THE WITNESS:  Back hurts from sitting
6  so long.
7          MR. HIBEY:  Yeah.
8          THE WITNESS:  I have a bad back.
9          MR. HIBEY:  Mine too.
10         MS. BAXTER:  Hey, I can tell you I
11  have one more question.
12         MR. HIBEY:  Kay --
13         MS. BAXTER:  I can ask questions for
14  one more time if you want.
15         MR. HIBEY:  Well, I guess we can do
16  that.  I don't see why not.  Is it your practice
17  to always like leave trails of questions behind
18  so you can just keep coming back again and again
19  and again?
20         MS. BAXTER:  I love it, yeah.
21         MR. HIBEY:  You've done this now
22  multiple times.  The model number and series
23  number questions that you asked on your follow-up
24  is not really a follow-up of any kind, is it?
25         MS. BAXTER:  Mr. Kain, are you taking

Page 245

1  a break?
2          THE WITNESS:  No, I've got to stand
3  up.  My back is going out.
4          MS. BAXTER:  You do you what --
5          MR. HIBEY:  All right.  Let's finish
6  this up.
7          [FURTHER EXAMINATION]
8  QUESTIONS BY MS. BAXTER:
9      Q.   My one question is this.  Do you know
10  the mileage of any Strick chassis or trailer you
11  worked on?
12     A.   No, ma'am.
13         MS. BAXTER:  That's it.  Thank you.
14         MR. HIBEY:  All right.  Mr. Kain, I'm
15  going to forego any follow-up.  I think that
16  you've answered plenty of questions today and
17  I'll leave you alone.
18         Amanda, do you have anything at this
19  time?
20         All right.  That concludes the
21  deposition, everyone.
22         Mr. Kain, you will have the
23  opportunity to read and review the transcript of
24  this deposition.  So we have a court reporter
25  who's been typing everything up today and due to

62 (Pages 242 to 245)

Raymond Kain
January 29, 2021

Page 246

1  the fact that it's been remote and at times some
2  of your words may not have been transcribed, I'm
3  going to recommend that you do take the
4  opportunity to receive a copy of this transcript
5  and take a quick look just to be sure that
6  everything is transcribed correctly.
7         So that is your option.  If you
8  choose to waive it you can, but I would recommend
9  you take a look at it.  What do you think?
10        THE WITNESS:  I'll take a look at it.
11        MR. HIBEY:  Sounds good.  The
12 deposition is over.  Thank you all.
13        THE VIDEOGRAPHER:  The time is 2:08
14 p.m. Central Standard Time.  We are off the
15 record.
16        (Whereupon signature was not waived
17 and the witness was excused.)
18
19
20
21
22
23
24
25

Page 247

1         COMES NOW THE WITNESS, RAYMOND KAIN, and
2  having read the foregoing transcript of the
3  deposition taken on January 29, 2021,
4  acknowledges by signature hereto that it is a
5  true and accurate transcript of the testimony
6  given on the date hereinabove mentioned.
7
8
9         _____
10         RAYMOND KAIN
11
12
13        Subscribed to before me this _____
14 day of _____, 2021.
15
16
17
18        _____
19         [Notary Public]
20
21 Case:  Brindell vs. Carlisle, et al.
22 Date Taken:  January 29, 2021
23 Reporter:  Karen Shales, CCR, RPR
24
25

Page 248

1      REPORTER CERTIFICATE
2
3      I, KAREN SHALES, Certified Shorthand
   Reporter, do hereby certify that there came
   before remotely,
4
         RAYMOND KAIN,
5
   who was by me first duly sworn; that the witness
6  was carefully examined, that said examination was
   reported by myself; translated and proofread
7  using computer-aided transcription, and the above
   transcript of proceedings is a true and accurate
8  transcript of my notes as taken at the time of
   the examination of this witness.
9
         I further certify that I am neither
10 attorney nor counsel for nor related nor employed
   by any of the parties to the action in which this
11 examination is taken; further, that I am not a
   relative or employee of any attorney or counsel
12 employed by the parties hereto or financially
   interested in this action.
13
         Dated this 2nd day of February, 2021.
14
15
16
17        _____
         KAREN SHALES, CCR, RPR
18
19
20
21
22
23
24
25

63 (Pages 246 to 248)

**STATE OF LOUISIANA**        )
                                   )

**PARISH OF ORLEANS**        )

<div align="center">

**<u>AFFIDAVIT</u>**

</div>

I, Raymond Kain, declare that the following is true and correct under penalty of perjury under the laws of the United States of America:

1) My name is Raymond Kain. My date of birth is February 22, 1949.

2) I worked at Puerto Rico Marine Management, Inc. with John Brindell between 1976 and 1981.

3) When John Brindell first started working at Puerto Rico Marine Management, Inc., John and I performed some container maintenance work. Container maintenance work involved welding. At times, John Brindell and I performed container maintenance work on board ships at the Port of New Orleans.

4) In addition, beyond container maintenance work, at times and for various reasons, John and I were on board ships at the Port of New Orleans.

5) While John Brindell and I were on board ships at the Port of New Orleans, performing container maintenance work or otherwise on the ships, additional maintenance work was performed on the same ships and in our work areas.

6) John and I were present and exposed to asbestos from the maintenance work and insulation repair work performed by a variety of contractors, including, but not limited to, Eagle and Taylor Seidenbach.

7) John and I saw airborne asbestos dust from the work of Eagle and Taylor Seidenbach at the Port of New Orleans.

8) I was able to identify these maintenance and insulation workers by their trucks, uniforms, and equipment.

Affiant says nothing further.

_Raymond Kain_
Raymond Kain

Sworn to and subscribed before me on this _29th_ day of __April____, 2020, by Raymond Kain.

JEANNE LOUISE ST. ROMAIN
NOTARY PUBLIC ID NO. 139815, BAR NO. 36035
PARISH OF ORLEANS
STATE OF LOUISIANA
MY COMMISSION IS FOR LIFE.

_____
**NOTARY PUBLIC**

**EXHIBIT V**

**Chena Burciaga**

---

| | |
|---|---|
| **From:** | Meghan B. Senter |
| **Sent:** | Tuesday, February 2, 2021 3:22 PM |
| **To:** | Chena Burciaga |
| **Cc:** | Tonni A. Keeler; Jeanette Riggins; Amanda L. Deto-Sloan |
| **Subject:** | FW: Brindell v. Carlisle 2019-09716 |
| **Attachments:** | Carlisle Subpeona.pdf; Eaton - Brindell, Carolyn PLTFF SDT_RFP.pdf; Eaton - Brindell, Carolyn PLTFF 1st ROG.pdf; Eaton Letter.pdf; Eaton Subpeona.pdf; Great Dane - Brindell Carolyn PLTFF SDT_RFP.pdf; Great Dane - Brindell, Carolyn PLTFF 1st ROG.pdf; Great Dane Letter.pdf; Great Dane Subpeona.pdf; Kelsey Hayes - Brindell Carolyn PLTFF SDT_RFP.pdf; Kelsey Hayes - Brindell, Carolyn PLTFF 1st ROG.pdf; Kelsey Hayes Letter.pdf; Kelsey Hayes Subpeona.pdf; Lufkin - Brindell Carolyn PLTFF SDT_RFP.pdf; Lufkin - Brindell, Carolyn PLTFF 1st ROG.pdf; Lufkin Letter.pdf; Lufkin Subpeona.pdf; Utility - Brindell Carolyn PLTFF SDT_RFP.pdf; Utility - Brindell, Carolyn PLTFF 1st ROG.pdf; Utility Letter.pdf; Utility Subpeona.pdf; Wilson - Brindell Carolyn PLTFF SDT_RFP.pdf; Wilson - Brindell, Carolyn PLTFF 1st ROG.pdf; Wilson Subpeona.pdf; Wilson Trailer Co. Letter.pdf; Abex - Brindell Carolyn PLTFF SDT_RFP.pdf; Abex - Brindell, Carolyn PLTFF 1st ROG.pdf; Abex Letter.pdf; Abex Suppeona.pdf; Carlisle - Brindell Carolyn PLTFF SDT_RFP.pdf; Carlisle - Brindell, Carolyn PLTFF 1st ROG.pdf; Carlisle Letter.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

**From:** Tia Krueger <tkrueger@simmonsfirm.com>
**Sent:** Thursday, December 24, 2020 12:27 PM
**To:** jadams@deutschkerrigan.com; wharrison@deutschkerrigan.com; bormsby@deutschkerrigan.com; jhainkel@frilot.com; abowlin@frilot.com; Brown, James H. <JBrown@frilot.com>; mpuentee@frilot.com; keagan@frilot.com; klong@frilot.com; lmccoy@frilot.com; rhainkel@frilot.com; Jeanette Riggins <JRiggins@mgmlaw.com>; Chris Massenburg <CMassenburg@mgmlaw.com>; Adam Hays <AHays@mgmlaw.com>; Meghan B. Senter <msenter@mgmlaw.com>; Vikram S. Bhatia <VBhatia@mgmlaw.com>; Amanda L. Deto-Sloan <ADeto-Sloan@mgmlaw.com>; 'd marullo' <dmarullo@courington-law.com>; Jeffrey M. Burg <jburg@courington-law.com>; Troy N. Bell <tbell@courington-law.com>; Joseph Hart <jhart@pugh-law.com>; tporteous@pugh-law.com; doser@pugh-law.com
**Cc:** Melissa Schopfer <mschopfer@simmonsfirm.com>; JM Lecointre <jlecointre@simmonsfirm.com>; Mike Hibey <mhibey@simmonsfirm.com>; Lindsey A. Cheek <lcheek@thecheeklawfirm.com>; Jeanne St. Romain <JStromain@thecheeklawfirm.com>; kcheek <kcheek@thecheeklawfirm.com>; Asbestos <Asbestos@thecheeklawfirm.com>; Don Blydenburgh <dblydenburgh@simmonsfirm.com>; Tia Krueger <tkrueger@simmonsfirm.com>; Kelley Hotz <khotz@simmonsfirm.com>
**Subject:** Brindell v. Carlisle 2019-09716

Counselors:

Please see attached regarding the above referenced case.

Thank you,

**EXHIBIT W**


**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                     SECTION: 8                     DIVISION N

**CAROLYN BRINDELL, ET AL.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED: _____          DEPUTY CLERK: _____

**PLAINTIFF'S FIRST INTERROGATORIES**
**TO DEFENDANT PNEUMO ABEX, LLC**

TO DEFENDANT:  PNEUMO ABEX, LLC

BY AND THROUGH ITS COUNSEL OF RECORD:
      William Harrison, Jennifer Adams, Barbara Ormsby
      DEUTSCH KERRIGAN, LLP
      755 Magazine Street
      New Orleans, LA 70130
      jadams@deutschkerrigan.com
      wharrison@deutschkerrigan.com
      bormsby@deutschkerrigan.com

      Plaintiff, by and through his undersigned counsel and pursuant to articles 1422, 1457 and

1458 of the Louisiana Code of Civil Procedure and other applicable rules and law, demands that

within thirty (30) days, Defendant shall answer the attached requests separately and fully in writing

under oath.

Dated:  December 24, 2020                     Respectfully Submitted,


By: _____
**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Michael K. Hibey, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com


    -AND-


**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484

- 1 -

Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**


### <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this <u>24 December 2020</u> I served a copy of the foregoing pleading on counsel for all parties to this proceeding by facsimile, by electronic mail, by hand delivery or by mailing the same by United States mail, properly addressed and first class postage prepaid.

_____

## GENERAL INSTRUCTIONS

With respect to all questions, all information is to be divulged which is within the knowledge, possession or control of the corporation or company to whom these requests are addressed, as well as the corporation or company's attorneys, investigators, agents, employees or other representatives.  If you cannot answer the following requests in full after exercising due diligence to secure the full information to do so, then state and answer to the fullest extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to acquire the information.

A.      Please produce all documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories or numbered requests in this set of discovery.

B.      If any information or material is being withheld under any claim of privilege, protection, or immunity, please state with specificity the particular privilege, protection, or immunity asserted.

C.      If Defendant cannot produce requested information or material because it is not in Defendant's possession, custody, or control, please identify the information or material, the reason the information or material is not in Defendant's possession, custody, or control, and the entity currently having possession, custody, or control over the information or material.

D.      When providing a date, please provide the exact day, month, and year.  If the exact date is not known, please provide the best approximation of the date and clearly note that the date is an approximation.

E.      If responsive material is in electronic, magnetic, or digital form, Plaintiff specifically requests production of such material. Plaintiff requests such material be provided on CD-ROM.

F.      In the event a proper and timely objection is filed as to any requested material, please nevertheless respond to all portions of the request which do not fall within the scope of the objection.  For example, if a request is objected to on the grounds that it is too broad insofar as it seeks documents covering years Defendant believes are not relevant to this litigation, please nevertheless produce documents for all years which Defendant concedes are relevant.

## GENERAL DEFINITIONS

A.      "Defendant," as used herein, means the entity answering these discovery requests and any of its merged, consolidated, or acquired predecessors, divisions, joint ventures, subsidiaries, foreign subsidiaries, foreign subsidiaries of predecessors, parent companies, sister companies.  This definition includes present and former officers, directors, agents, employees, and all other persons acting or purporting to act on behalf of Defendant, its predecessors, subsidiaries, and/or affiliates.

      i.      "Predecessors" further means any entity, whether or not incorporated, which had all or some of its assets purchased by Defendant or came to be acquired by Defendant whether by merger, consolidation, or other means.

      ii.     "Subsidiaries" further means any entity, whether or not incorporated, which is or was in any way owned or controlled, in whole or in part by Defendant or its predecessors.

B.      "Related company" as used herein means any entity in which the named defendant has or had an interest and which does or has specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered asbestos-containing material.

C.      "Asbestos-containing material" and/or "asbestos-containing product" as used herein means raw or processed asbestos and any product which included any form of asbestos as any part of its composition or ingredients *including but not limited to* **friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers**; and/or, equipment or machinery in or on which an asbestos-containing material as defined above was incorporated, added, utilized or applied prior to being sold, distributed or installed by defendant. This term shall also refer to equipment that was originally sold with asbestos-containing material, and / or has specifications that require asbestos or an asbestos-containing material and equipment whose manufacturer anticipates or should anticipate the use of asbestos or an asbestos-containing material in its practical, foreseeable, and/or proper use.

D.      "Documents", as used herein, include, without limitation, books, records, notes, letters, correspondence, memoranda, writings, invoices, purchase orders, contracts, sales ledgers, recordings, journals or books of account, in possession or control of Defendant or Defendant's attorneys, investigators, agents, or employees.  Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any means. "Documents" also includes the content of any applicable computer database.

E.      Where used with respect to documents, "identify" means to give the date, title, origin, author and addressee of the document and the name, address, position or title of the person who has custody of the document.  Whenever identification is requested and Defendant is willing to produce the documents voluntarily, Defendant may respond by attaching a copy of the responsive document to the answers to these requests.

F.      Where used with respect to a person, "identify" means to give the person's name, employer, title or position with that employer, and business address and last known home address if the person is no longer so employed.  If the person identified is, or has been, an employee, officer, director or agent of Defendant, also state the period of time during which he/she has been employed by Defendant, and all positions, titles or jobs that person has held with the Defendant and the years each position was held.

G.      The terms, "trade organization" and "trade association," mean any organization or association of business, industrial, or governmental entities that were associated and/or met for the purpose of achieving common goals, exchanging or disseminating information related to common needs or interests, and/or learning information or facts of interest to the various members of the organization or association.

H.      The terms, "plant" and "facility," mean any location where materials are refined, converted, chemically altered, changed, assembled, manufactured, constructed, or fabricated as well as locations where products are fabricated, assembled, or manufactured or prepared for further fabrication or assembly.  This definition also includes office spaces, storage spaces, control rooms, undeveloped land, and similar areas within the larger plant or facility.

I.      The term, "manufacture," means to fabricate, construct, assemble, prepare for fabrication or assembly, or take any other action prior to completion of a product or material.

J.      The terms, "medical department," "safety department," and "industrial hygiene department," mean an individual or a group of individuals working for Defendant, either directly or in a contractual capacity, whose purpose was or is to provide guidance, assistance, or advice concerning any aspect of medical health including, but not limited to, the safety of Defendant's workers and the safety of individuals using or exposed to asbestos or asbestos-containing products.

K.      The term, "hazards of asbestos," means any potential or actual asbestos-related injury, effect, damage, scarring, wound, impairment, or disability of any part of human or non-human anatomy including, but not limited to, the lungs and associated tissue.

L.      The term, "test," includes, but is not limited to, studies of atmospheric dust samples, studies of the concentration of asbestos in airborne test samples, studies of the lung conditions of workers (by x-ray or other means), pulmonary function studies of workers, animal studies, pathological studies, industrial hygiene studies, risk assessment studies, cost-benefit analyses, and any other studies concerning health and safety.

M.      The term, "communication," means any transmission or exchange of information, whether oral or written, and whether face to face, by telephone, mail, fax, personal delivery, electronic means, or otherwise.

N.      "Premises," means:

i.      Real property, as well as any structures or other improvements located on the property; and,

ii.     A ship or other floating vehicle, vessel, or structure.

O.      As used herein, "locations and recipients at issue" if and where specifically used means:

i.      Port of New Orleans;
ii.     Puerto Rico Marine Management;
iii.    Great Dane;
iv.     Kelsey Hayes;
v.      Lufkin;
vi.     Strick;
vii.    Utility Trailer; and / or,
viii.   Wilson Trailer.

P.      The terms, "abate" and "abatement," mean any removal and/or cleanup of asbestos-containing products on a premises.

Q.      The term, "utilize," when referring to asbestos-containing products and/or asbestos job site(s) means to install, inspect, apply, maintain, repair, replace, or remove.

R.      The definitions stated above shall also apply to other grammatical forms of the word defined, such as singular and plural, masculine and feminine, and various verb tenses.

## FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**      Identify all sources of information relied upon in formulating defendant's responses to these interrogatories (providing a privilege log if necessary), including records or documents reviewed, records or documents determined to have been destroyed, document retention policies, persons providing information and/or overseeing the process, and the person verifying the answers.

**ANSWER:**

**INTERROGATORY NO. 2:**          Please identify each and every product and/or material—regardless of whether Defendant knows it contained asbestos—Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982.

          **ANSWER:**

**INTERROGATORY NO. 3:**          For each product and / or material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982, please state whether Defendant knows or has reason to believe said product and / or material contained asbestos. If so, for each asbestos-containing material, please identify:

a.     The trade name or brand name of the same;

b.     The type, brand name and percentage of asbestos contained in the material, including any changes over time (and/or the elimination of asbestos in the material);

c.     Each and every source (including manufacturers and distributors) from which Defendant and/or any predecessor/related entity obtained each such material;

d.     The date said product / material was placed on the market, and the inclusive dates of its manufacture, sale, and distribution;

e.     A detailed description of said product / material, including a description of how and why it involved the use of asbestos or asbestos-containing products;

f.     The date Defendant stopped manufacturing, marketing, selling, and/or distributing said product / material;

g.     If applicable, the date said product / material was removed from the market and no longer sold or distributed and the reasons therefore;

h.     The date, if ever, Defendant asbestos no longer utilized asbestos or asbestos-containing material in said product / material, and the reasons for no longer doing so;

i.     Whether Defendant ever conducted any testing on asbestos-containing material to determine whether it posed any potential asbestos-related hazard to human or non-human health;

j.     The plants or facilities where asbestos and /or asbestos-containing materials were manufactured, fabricated, and / or processed by Defendant;

k.     Those likely to encounter said asbestos and / or asbestos-containing materials (such as mechanics); and,

l.     A description of any hazard communications Defendant placed on asbestos-containing materials or its packaging, operating manuals, brochures, catalogs, or other related printed material.  This description should include the precise language

of any such hazard communication, the size of the hazard communication, the location on the asbestos-containing material or its packaging where the hazard communication was printed, and when the hazard communication was first placed on said asbestos-containing material.

**ANSWER:**

**INTERROGATORY NO. 4:**       Please identify any and all prior claim(s) alleging lung diseases or death from lung disease, whether directly or indirectly attributed to asbestosis, mesothelioma, lung cancer, or exposure to asbestos-containing material as defined above, alleging exposure to asbestos-containing materials allegedly manufactured, sold, distributed, specified, applied, and / or installed in whole or part by Defendant and / or any predecessor / related entity, specifically including but not limited to those Defendant and/or any predecessor/related entity applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above).

**ANSWER:**

**INTERROGATORY NO. 5:**       Please identify each and every policy, procedure, step, hazard communication, purported warning, and/or program undertaken, implemented, discussed and/or contemplated by Defendant and/or any predecessor/related entity intended to protect any person or persons (including, but not limited to, employees, product end-users and/or by-standers) in any way from exposure to asbestos, asbestos-containing materials and / or dust therefrom.

**ANSWER:**

**INTERROGATORY NO. 6:**       Please identify any and all tests of any kind (e.g., air sampling, laboratory experiments, industrial hygiene surveys, fiber release studies, etc.) concerning possible or potential health hazards involved in the use or manipulation of, or exposure to, asbestos-containing materials or ingredients contained therein (including contaminants such as, for example, tremolite or chrysotile asbestos in talc) conducted b Defendant, any predecessor or related company, or any person or entity acting on behalf thereof including but not limited to any insurance company.

**ANSWER:**

**INTERROGATORY NO. 7:**       Please identify any and all persons or entities that provided industrial hygiene or similar services or information to, or for the benefit of, Defendant, at any time from 1925 to date, including, but not limited to, employees of, or anyone retained by, any predecessor or related company.

**ANSWER:**

**INTERROGATORY NO. 8:**        Please describe Defendant's medical, safety, and industrial hygiene programs from the Defendant's inception through the current time, specifically including but not limited to the date when said department / program was first established and identifying persons associated with the department (including but not limited to directors, managers, physicians, nurses, medical personnel, safety engineers, industrial hygienists, and safety personnel).

       **ANSWER:**

**INTERROGATORY NO. 9:**        Please describe when (approximating if necessary) any officer, director, and / or employee of Defendant, any predecessor(s) or related company first had knowledge, information, or belief that exposure to asbestos could have a detrimental effect on health and how such person obtained such knowledge, information or belief.

       **ANSWER:**

**INTERROGATORY NO. 10:**        Please identify any and all trade organizations, associations, or other entities to which Defendant, any predecessor or any related company (including any officers, agents and/or employees thereof) has belonged or in which the same has participated since 1925, including dates of membership and/or participation and a description of each such officer, agent and/or employee's involvement with each such organization (e.g., general member, officer or official of the organization, member of a committee or subcommittee, chair of any committee or subcommittee, etc.).

       **ANSWER:**

**INTERROGATORY NO. 11:**        Identify any and all periodicals—including but not limited to scientific, medical and trade periodicals, and corporate newsletters/publications, bulletins, and notices—that Defendant and/or any predecessor/related entity, employee or agent thereof subscribed to, received, published, authored, or distributed from 1925 to the present and for each periodical state the dates of such subscriptions, receipt, publication, authorship, or distribution.

       **ANSWER:**

**INTERROGATORY NO. 12:**        Please identify each of Defendant's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or nonhuman exposure to asbestos, populations at risk, etc.).  For each such person

identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Defendant's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

**ANSWER:**

**INTERROGATORY NO. 13:**        Please describe Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

**ANSWER:**

**INTERROGATORY NO. 14:**        Please identify any and all communications, including but not limited to investigations and / or citations, between defendant and OSHA or any other local, state, or federal governmental agency for any matter related to asbestos and / or asbestos exposure.

**ANSWER:**

**INTERROGATORY NO. 15:**        If Defendant has asserted any affirmative defenses, avoidances, theories of alternate causation (including but not limited to sole proximate cause), and / or exceptions in this case, please provide a short and plain statement of the facts Defendant contends support each such defense, avoidance, theory of alternate causation and / or exception.

**ANSWER:**

**INTERROGATORY NO. 16:**        Please identify by case name, docket number, court and date filed any proceeding(s) of any nature whatsoever (specifically including but not limited to civil, adjudicatory, or arbitration) filed by you against your insurer(s) for reimbursement and/or coverage dispute of any legal fees, costs, expenses and/or judgment(s) related to and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

**ANSWER:**

**INTERROGATORY NO. 17:**        Please identify any and all policies of insurance which may provide coverage for this Defendant, its executive officers, any predecessor or related companies, against the claims asserted in Plaintiff's complaint, specifically including but not limited to Commercial General Liability ("CGL") policies, Workers' Compensation / Employers' Liability ("WC/EL") policies, Excess policies, and Umbrella policies.

**ANSWER:**

**INTERROGATORY NO. 18:**     Please state all facts in support of defendant's contention, if it so contends, that it was not foreseeable that asbestos-containing material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above) would be removed, replaced, and / or otherwise disturbed.

       **ANSWER:**

**INTERROGATORY NO. 19:**     Please identify defendant's employees and executive officers with responsibility for the selection / specification of asbestos-containing materials in friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered by Defendant, any predecessor and/or related entity at any point in time prior to the end of the year 1982.

       **ANSWER:**

Dated: <u>December 24, 2020</u>           Respectfully Submitted,

                                *Michael K. Hibey*

By: _____
         **SIMMONS HANLY CONROY LLC**
         Melissa Schopfer, admitted *pro hac vice*
         Jean-Michel Lecointre, admitted *pro hac vice*
         Michael K. Hibey, admitted *pro hac vice*
         One Court Street
         Alton, IL 62002
         Telephone: 618-259-2222
         Fax: 618-259-2251
         mschopfer@simmonsfirm.com
         jlecointre@simmonsfirm.com
         mhibey@simmonsfirm.com

            -AND-

         **THE CHEEK LAW FIRM LLC**
         LINDSEY A. CHEEK, Bar No. 34484
         Jeanne L. St. Romain, Bar No. 36035
         650 Poydras Street, Suite 2310
         New Orleans, LA 70130
         Telephone:  504-304-4333
         Fax:  504-324-0629
         LCheek@thecheeklawfirm.com
         JStromain@thecheeklawfirm.com
         asbestos@thecheeklawfirm.com
         **COUNSEL FOR PLAINTIFF**

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                          **SECTION: 8**                          DIVISION N

**CAROLYN BRINDELL, ET AL.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED: _____          DEPUTY CLERK: _____

**PLAINTIFF'S FIRST INTERROGATORIES**
**TO DEFENDANT CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC.**

TO DEFENDANT:  CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC.

BY AND THROUGH ITS COUNSEL OF RECORD:

John Hainkel, III, Angela Bowlin, James Brown, Jr., Magali Puente Martin, Kelsey
Eagan, Kelly Long, Lacey McCoy, Roth Hainkel
FRILOT LLC
1100 Poydras Street, Suite 3700
New Orleans, LA 70163
jhainkel@frilot.com
abowlin@frilot.com
jbrown@frilot.com
mpuentee@frilot.com
keagan@frilot.com
klong@frilot.com
lmccoy@frilot.com
rhainkel@frilot.com

Plaintiff, by and through his undersigned counsel and pursuant to articles 1422, 1457 and

1458 of the Louisiana Code of Civil Procedure and other applicable rules and law, demands that

within thirty (30) days, Defendant shall answer the attached requests separately and fully in writing

under oath.

Dated: _December 24, 2020___                          Respectfully Submitted,

By: _____
**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Michael K. Hibey, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

-AND-

**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I do hereby certify that on this <u>24 December 2020</u> I served a copy of the foregoing pleading on counsel for all parties to this proceeding by facsimile, by electronic mail, by hand delivery or by mailing the same by United States mail, properly addressed and first class postage prepaid.


_Michael K. Hibey_
_____


## GENERAL INSTRUCTIONS

With respect to all questions, all information is to be divulged which is within the knowledge, possession or control of the corporation or company to whom these requests are addressed, as well as the corporation or company's attorneys, investigators, agents, employees or other representatives.  If you cannot answer the following requests in full after exercising due diligence to secure the full information to do so, then state and answer to the fullest extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to acquire the information.

A.      Please produce all documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories or numbered requests in this set of discovery.

B.      If any information or material is being withheld under any claim of privilege, protection, or immunity, please state with specificity the particular privilege, protection, or

immunity asserted.

C.      If Defendant cannot produce requested information or material because it is not in Defendant's possession, custody, or control, please identify the information or material, the reason the information or material is not in Defendant's possession, custody, or control, and the entity currently having possession, custody, or control over the information or material.

D.      When providing a date, please provide the exact day, month, and year.  If the exact date is not known, please provide the best approximation of the date and clearly note that the date is an approximation.

E.      If responsive material is in electronic, magnetic, or digital form, Plaintiff specifically requests production of such material. Plaintiff requests such material be provided on CD-ROM.

F.      In the event a proper and timely objection is filed as to any requested material, please nevertheless respond to all portions of the request which do not fall within the scope of the objection.  For example, if a request is objected to on the grounds that it is too broad insofar as it seeks documents covering years Defendant believes are not relevant to this litigation, please nevertheless produce documents for all years which Defendant concedes are relevant.

## GENERAL DEFINITIONS

A.      "Defendant," as used herein, means the entity answering these discovery requests and any of its merged, consolidated, or acquired predecessors, divisions, joint ventures, subsidiaries, foreign subsidiaries, foreign subsidiaries of predecessors, parent companies, sister companies.  This definition includes present and former officers, directors, agents, employees, and all other persons acting or purporting to act on behalf of Defendant, its predecessors, subsidiaries, and/or affiliates.

> i.      "Predecessors" further means any entity, whether or not incorporated, which had all or some of its assets purchased by Defendant or came to be acquired by Defendant whether by merger, consolidation, or other means.
>
> ii.     "Subsidiaries" further means any entity, whether or not incorporated, which is or was in any way owned or controlled, in whole or in part by Defendant or its predecessors.

B.      "Related company" as used herein means any entity in which the named defendant has or had an interest and which does or has specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered asbestos-containing material.

- 3 -

C.     "Asbestos-containing material" and/or "asbestos-containing product" as used herein means raw or processed asbestos and any product which included any form of asbestos as any part of its composition or ingredients *including but not limited to* **friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers**; and/or, equipment or machinery in or on which an asbestos-containing material as defined above was incorporated, added, utilized or applied prior to being sold, distributed or installed by defendant. This term shall also refer to equipment that was originally sold with asbestos-containing material, and / or has specifications that require asbestos or an asbestos-containing material and equipment whose manufacturer anticipates or should anticipate the use of asbestos or an asbestos-containing material in its practical, foreseeable, and/or proper use.

D.     "Documents", as used herein, include, without limitation, books, records, notes, letters, correspondence, memoranda, writings, invoices, purchase orders, contracts, sales ledgers, recordings, journals or books of account, in possession or control of Defendant or Defendant's attorneys, investigators, agents, or employees. Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any means. "Documents" also includes the content of any applicable computer database.

E.     Where used with respect to documents, "identify" means to give the date, title, origin, author and addressee of the document and the name, address, position or title of the person who has custody of the document. Whenever identification is requested and Defendant is willing to produce the documents voluntarily, Defendant may respond by attaching a copy of the responsive document to the answers to these requests.

F.     Where used with respect to a person, "identify" means to give the person's name, employer, title or position with that employer, and business address and last known home address if the person is no longer so employed. If the person identified is, or has been, an employee, officer, director or agent of Defendant, also state the period of time during which he/she has been employed by Defendant, and all positions, titles or jobs that person has held with the Defendant and the years each position was held.

G.     The terms, "trade organization" and "trade association," mean any organization or association of business, industrial, or governmental entities that were associated and/or met for the purpose of achieving common goals, exchanging or disseminating information related to common

needs or interests, and/or learning information or facts of interest to the various members of the organization or association.

H.    The terms, "plant" and "facility," mean any location where materials are refined, converted, chemically altered, changed, assembled, manufactured, constructed, or fabricated as well as locations where products are fabricated, assembled, or manufactured or prepared for further fabrication or assembly.  This definition also includes office spaces, storage spaces, control rooms, undeveloped land, and similar areas within the larger plant or facility.

I.    The term, "manufacture," means to fabricate, construct, assemble, prepare for fabrication or assembly, or take any other action prior to completion of a product or material.

J.    The terms, "medical department," "safety department," and "industrial hygiene department," mean an individual or a group of individuals working for Defendant, either directly or in a contractual capacity, whose purpose was or is to provide guidance, assistance, or advice concerning any aspect of medical health including, but not limited to, the safety of Defendant's workers and the safety of individuals using or exposed to asbestos or asbestos-containing products.

K.    The term, "hazards of asbestos," means any potential or actual asbestos-related injury, effect, damage, scarring, wound, impairment, or disability of any part of human or non-human anatomy including, but not limited to, the lungs and associated tissue.

L.    The term, "test," includes, but is not limited to, studies of atmospheric dust samples, studies of the concentration of asbestos in airborne test samples, studies of the lung conditions of workers (by x-ray or other means), pulmonary function studies of workers, animal studies, pathological studies, industrial hygiene studies, risk assessment studies, cost-benefit analyses, and any other studies concerning health and safety.

M.    The term, "communication," means any transmission or exchange of information, whether oral or written, and whether face to face, by telephone, mail, fax, personal delivery, electronic means, or otherwise.

N.    "Premises," means:

   i.    Real property, as well as any structures or other improvements located on the property; and,

   ii.    A ship or other floating vehicle, vessel, or structure.

O.    As used herein, "locations and recipients at issue" if and where specifically used means:

   i.    Port of New Orleans;

      ii.     Puerto Rico Marine Management;
      iii.    Great Dane;
      iv.    Kelsey Hayes;
      v.     Lufkin;
      vi.    Strick;
      vii.   Utility Trailer; and / or,
      viii.  Wilson Trailer.

P.     The terms, "abate" and "abatement," mean any removal and/or cleanup of asbestos-containing products on a premises.

Q.     The term, "utilize," when referring to asbestos-containing products and/or asbestos job site(s) means to install, inspect, apply, maintain, repair, replace, or remove.

R.     The definitions stated above shall also apply to other grammatical forms of the word defined, such as singular and plural, masculine and feminine, and various verb tenses.

## FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**     Identify all sources of information relied upon in formulating defendant's responses to these interrogatories (providing a privilege log if necessary), including records or documents reviewed, records or documents determined to have been destroyed, document retention policies, persons providing information and/or overseeing the process, and the person verifying the answers.

**ANSWER:**

**INTERROGATORY NO. 2:**     Please identify each and every product and/or material—regardless of whether Defendant knows it contained asbestos—Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982.

**ANSWER:**

**INTERROGATORY NO. 3:**     For each product and / or material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982, please state whether Defendant knows or has reason to believe said product and / or material contained asbestos. If so, for each asbestos-containing material, please identify:

a.     The trade name or brand name of the same;

b.     The type, brand name and percentage of asbestos contained in the material, including any changes over time (and/or the elimination of asbestos in the material);

c.     Each and every source (including manufacturers and distributors) from which Defendant and/or any predecessor/related entity obtained each such material;

d.     The date said product / material was placed on the market, and the inclusive dates of its manufacture, sale, and distribution;

e.     A detailed description of said product / material, including a description of how and why it involved the use of asbestos or asbestos-containing products;

f.     The date Defendant stopped manufacturing, marketing, selling, and/or distributing said product / material;

g.     If applicable, the date said product / material was removed from the market and no longer sold or distributed and the reasons therefore;

h.     The date, if ever, Defendant asbestos no longer utilized asbestos or asbestos-containing material in said product / material, and the reasons for no longer doing so;

i.     Whether Defendant ever conducted any testing on asbestos-containing material to determine whether it posed any potential asbestos-related hazard to human or non-human health;

j.     The plants or facilities where asbestos and /or asbestos-containing materials were manufactured, fabricated, and / or processed by Defendant;

k.     Those likely to encounter said asbestos and / or asbestos-containing materials (such as mechanics); and,

l.     A description of any hazard communications Defendant placed on asbestos-containing materials or its packaging, operating manuals, brochures, catalogs, or other related printed material.  This description should include the precise language of any such hazard communication, the size of the hazard communication, the location on the asbestos-containing material or its packaging where the hazard communication was printed, and when the hazard communication was first placed on said asbestos-containing material.

**ANSWER:**

**INTERROGATORY NO. 4:**          Please identify any and all prior claim(s) alleging lung diseases or death from lung disease, whether directly or indirectly attributed to asbestosis, mesothelioma, lung cancer, or exposure to asbestos-containing material as defined above, alleging exposure to asbestos-containing materials allegedly manufactured, sold, distributed, specified, applied, and / or installed in whole or part by Defendant and / or any predecessor / related entity, specifically including but not limited to those Defendant and/or any predecessor/related entity applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above).

**ANSWER:**

**INTERROGATORY NO. 5:**          Please identify each and every policy, procedure, step, hazard communication, purported warning, and/or program undertaken, implemented, discussed

and/or contemplated by Defendant and/or any predecessor/related entity intended to protect any person or persons (including, but not limited to, employees, product end-users and/or by-standers) in any way from exposure to asbestos, asbestos-containing materials and / or dust therefrom.

      **ANSWER:**

**INTERROGATORY NO. 6:**      Please identify any and all tests of any kind (e.g., air sampling, laboratory experiments, industrial hygiene surveys, fiber release studies, etc.) concerning possible or potential health hazards involved in the use or manipulation of, or exposure to, asbestos-containing materials or ingredients contained therein (including contaminants such as, for example, tremolite or chrysotile asbestos in talc) conducted b Defendant, any predecessor or related company, or any person or entity acting on behalf thereof including but not limited to any insurance company.

      **ANSWER:**

**INTERROGATORY NO. 7:**      Please identify any and all persons or entities that provided industrial hygiene or similar services or information to, or for the benefit of, Defendant, at any time from 1925 to date, including, but not limited to, employees of, or anyone retained by, any predecessor or related company.

      **ANSWER:**

**INTERROGATORY NO. 8:**      Please describe Defendant's medical, safety, and industrial hygiene programs from the Defendant's inception through the current time, specifically including but not limited to the date when said department / program was first established and identifying persons associated with the department (including but not limited to directors, managers, physicians, nurses, medical personnel, safety engineers, industrial hygienists, and safety personnel).

      **ANSWER:**

**INTERROGATORY NO. 9:**      Please describe when (approximating if necessary) any officer, director, and / or employee of Defendant, any predecessor(s) or related company first had knowledge, information, or belief that exposure to asbestos could have a detrimental effect on health and how such person obtained such knowledge, information or belief.

      **ANSWER:**

**INTERROGATORY NO. 10:**      Please identify any and all trade organizations, associations, or other entities to which Defendant, any predecessor or any related company (including any

officers, agents and/or employees thereof) has belonged or in which the same has participated since 1925, including dates of membership and/or participation and a description of each such officer, agent and/or employee's involvement with each such organization (e.g., general member, officer or official of the organization, member of a committee or subcommittee, chair of any committee or subcommittee, etc.).

**ANSWER:**

**INTERROGATORY NO. 11:**        Identify any and all periodicals—including but not limited to scientific, medical and trade periodicals, and corporate newsletters/publications, bulletins, and notices—that Defendant and/or any predecessor/related entity, employee or agent thereof subscribed to, received, published, authored, or distributed from 1925 to the present and for each periodical state the dates of such subscriptions, receipt, publication, authorship, or distribution.

**ANSWER:**

**INTERROGATORY NO. 12:**        Please identify each of Defendant's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or nonhuman exposure to asbestos, populations at risk, etc.).  For each such person identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Defendant's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

**ANSWER:**

**INTERROGATORY NO. 13:**        Please describe Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

**ANSWER:**

**INTERROGATORY NO. 14:**        Please identify any and all communications, including but not limited to investigations and / or citations, between defendant and OSHA or any other local, state, or federal governmental agency for any matter related to asbestos and / or asbestos exposure.

**ANSWER:**

**INTERROGATORY NO. 15:**     If Defendant has asserted any affirmative defenses, avoidances, theories of alternate causation (including but not limited to sole proximate cause), and / or exceptions in this case, please provide a short and plain statement of the facts Defendant contends support each such defense, avoidance, theory of alternate causation and / or exception.

**ANSWER:**

**INTERROGATORY NO. 16:**     Please identify by case name, docket number, court and date filed any proceeding(s) of any nature whatsoever (specifically including but not limited to civil, adjudicatory, or arbitration) filed by you against your insurer(s) for reimbursement and/or coverage dispute of any legal fees, costs, expenses and/or judgment(s) related to and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

**ANSWER:**

**INTERROGATORY NO. 17:**     Please identify any and all policies of insurance which may provide coverage for this Defendant, its executive officers, any predecessor or related companies, against the claims asserted in Plaintiff's complaint, specifically including but not limited to Commercial General Liability ("CGL") policies, Workers' Compensation / Employers' Liability ("WC/EL") policies, Excess policies, and Umbrella policies.

**ANSWER:**

**INTERROGATORY NO. 18:**     Please state all facts in support of defendant's contention, if it so contends, that it was not foreseeable that asbestos-containing material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above) would be removed, replaced, and / or otherwise disturbed.

**ANSWER:**

**INTERROGATORY NO. 19:**     Please identify defendant's employees and executive officers with responsibility for the selection / specification of asbestos-containing materials in friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered by Defendant, any predecessor and/or related entity at any point in time prior to the end of the year 1982.

**ANSWER:**

Dated: <u>December 24, 2020</u>        Respectfully Submitted,

By: _____

**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Michael K. Hibey, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

-AND-

**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                    **SECTION: 8**                    **DIVISION N**

**CAROLYN BRINDELL, ET AL.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED: _____          DEPUTY CLERK: _____

**PLAINTIFF'S FIRST INTERROGATORIES**
**<u>TO DEFENDANT EATON CORPORATION</u>**

TO DEFENDANT:  EATON CORPORATION

BY AND THROUGH ITS COUNSEL OF RECORD:
      Jeanette Riggins, Christopher Massenburg, B. Adam Hays, Meghan Senter, Vikram
      Bhatia, Amanda Deto
      MG+M Law Firm
      One Canal Place
      365 Canal Street, Suite 3000
      New Orleans, LA 70130
      jriggins@mgmlaw.com
      cmassenburg@mgmlaw.com
      ahays@mgmlaw.com,
      msenter@mgmlaw.com,
      vbhatia@mgmlaw.com,
      adeto@mgmlaw.com

      Plaintiff, by and through his undersigned counsel and pursuant to articles 1422, 1457 and

1458 of the Louisiana Code of Civil Procedure and other applicable rules and law, demands that

within thirty (30) days, Defendant shall answer the attached requests separately and fully in writing

under oath.

Dated: <u>December 24, 2020</u>                    Respectfully Submitted,


By: _____
    **SIMMONS HANLY CONROY LLC**
    Melissa Schopfer, admitted *pro hac vice*
    Jean-Michel Lecointre, admitted *pro hac vice*
    Michael K. Hibey, admitted *pro hac vice*
    One Court Street
    Alton, IL 62002
    Telephone: 618-259-2222
    Fax: 618-259-2251
    mschopfer@simmonsfirm.com
    jlecointre@simmonsfirm.com
    mhibey@simmonsfirm.com

-AND-

**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

## GENERAL INSTRUCTIONS

With respect to all questions, all information is to be divulged which is within the knowledge, possession or control of the corporation or company to whom these requests are addressed, as well as the corporation or company's attorneys, investigators, agents, employees or other representatives.  If you cannot answer the following requests in full after exercising due diligence to secure the full information to do so, then state and answer to the fullest extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to acquire the information.

A.    Please produce all documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories or numbered requests in this set of discovery.

B.    If any information or material is being withheld under any claim of privilege, protection, or immunity, please state with specificity the particular privilege, protection, or immunity asserted.

C.    If Defendant cannot produce requested information or material because it is not in Defendant's possession, custody, or control, please identify the information or material, the reason the information or material is not in Defendant's possession, custody, or control, and the entity currently having possession, custody, or control over the information or material.

D.    When providing a date, please provide the exact day, month, and year.  If the exact date is not known, please provide the best approximation of the date and clearly note that the date is an approximation.

E.    If responsive material is in electronic, magnetic, or digital form, Plaintiff

specifically requests production of such material. Plaintiff requests such material be provided on CD-ROM.

F.    In the event a proper and timely objection is filed as to any requested material, please nevertheless respond to all portions of the request which do not fall within the scope of the objection.  For example, if a request is objected to on the grounds that it is too broad insofar as it seeks documents covering years Defendant believes are not relevant to this litigation, please nevertheless produce documents for all years which Defendant concedes are relevant.

## GENERAL DEFINITIONS

A.    "Defendant," as used herein, means the entity answering these discovery requests and any of its merged, consolidated, or acquired predecessors, divisions, joint ventures, subsidiaries, foreign subsidiaries, foreign subsidiaries of predecessors, parent companies, sister companies.  This definition includes present and former officers, directors, agents, employees, and all other persons acting or purporting to act on behalf of Defendant, its predecessors, subsidiaries, and/or affiliates.

>    i.    "Predecessors" further means any entity, whether or not incorporated, which had all or some of its assets purchased by Defendant or came to be acquired by Defendant whether by merger, consolidation, or other means.
>
>    ii.    "Subsidiaries" further means any entity, whether or not incorporated, which is or was in any way owned or controlled, in whole or in part by Defendant or its predecessors.

B.    "Related company" as used herein means any entity in which the named defendant has or had an interest and which does or has specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered asbestos-containing material.

C.    "Asbestos-containing material" and/or "asbestos-containing product" as used herein means raw or processed asbestos and any product which included any form of asbestos as any part of its composition or ingredients *including but not limited to* **friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers**; and/or, equipment or machinery in or on which an asbestos-containing material as defined above was incorporated, added, utilized or applied prior to being sold, distributed or installed by defendant. This term shall also refer to equipment that was originally sold with asbestos-containing material, and / or has specifications that require asbestos or an asbestos-containing material and equipment

whose manufacturer anticipates or should anticipate the use of asbestos or an asbestos-containing material in its practical, foreseeable, and/or proper use.

D.      "Documents", as used herein, include, without limitation, books, records, notes, letters, correspondence, memoranda, writings, invoices, purchase orders, contracts, sales ledgers, recordings, journals or books of account, in possession or control of Defendant or Defendant's attorneys, investigators, agents, or employees.  Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any means. "Documents" also includes the content of any applicable computer database.

E.      Where used with respect to documents, "identify" means to give the date, title, origin, author and addressee of the document and the name, address, position or title of the person who has custody of the document.  Whenever identification is requested and Defendant is willing to produce the documents voluntarily, Defendant may respond by attaching a copy of the responsive document to the answers to these requests.

F.      Where used with respect to a person, "identify" means to give the person's name, employer, title or position with that employer, and business address and last known home address if the person is no longer so employed.  If the person identified is, or has been, an employee, officer, director or agent of Defendant, also state the period of time during which he/she has been employed by Defendant, and all positions, titles or jobs that person has held with the Defendant and the years each position was held.

G.      The terms, "trade organization" and "trade association," mean any organization or association of business, industrial, or governmental entities that were associated and/or met for the purpose of achieving common goals, exchanging or disseminating information related to common needs or interests, and/or learning information or facts of interest to the various members of the organization or association.

H.      The terms, "plant" and "facility," mean any location where materials are refined, converted, chemically altered, changed, assembled, manufactured, constructed, or fabricated as well as locations where products are fabricated, assembled, or manufactured or prepared for further fabrication or assembly.  This definition also includes office spaces, storage spaces, control rooms, undeveloped land, and similar areas within the larger plant or facility.

I.      The term, "manufacture," means to fabricate, construct, assemble, prepare for fabrication or assembly, or take any other action prior to completion of a product or material.

- 4 -

J.      The terms, "medical department," "safety department," and "industrial hygiene department," mean an individual or a group of individuals working for Defendant, either directly or in a contractual capacity, whose purpose was or is to provide guidance, assistance, or advice concerning any aspect of medical health including, but not limited to, the safety of Defendant's workers and the safety of individuals using or exposed to asbestos or asbestos-containing products.

K.      The term, "hazards of asbestos," means any potential or actual asbestos-related injury, effect, damage, scarring, wound, impairment, or disability of any part of human or non-human anatomy including, but not limited to, the lungs and associated tissue.

L.      The term, "test," includes, but is not limited to, studies of atmospheric dust samples, studies of the concentration of asbestos in airborne test samples, studies of the lung conditions of workers (by x-ray or other means), pulmonary function studies of workers, animal studies, pathological studies, industrial hygiene studies, risk assessment studies, cost-benefit analyses, and any other studies concerning health and safety.

M.      The term, "communication," means any transmission or exchange of information, whether oral or written, and whether face to face, by telephone, mail, fax, personal delivery, electronic means, or otherwise.

N.      "Premises," means:

    i.      Real property, as well as any structures or other improvements located on the property; and,

    ii.      A ship or other floating vehicle, vessel, or structure.

O.      As used herein, "locations and recipients at issue" if and where specifically used means:

    i.      Port of New Orleans;
    ii.      Puerto Rico Marine Management;
    iii.      Great Dane;
    iv.      Kelsey Hayes;
    v.      Lufkin;
    vi.      Strick;
    vii.      Utility Trailer; and / or,
    viii.      Wilson Trailer.

P.      The terms, "abate" and "abatement," mean any removal and/or cleanup of asbestos-containing products on a premises.

Q.      The term, "utilize," when referring to asbestos-containing products and/or asbestos job site(s) means to install, inspect, apply, maintain, repair, replace, or remove.

R.    The definitions stated above shall also apply to other grammatical forms of the word defined, such as singular and plural, masculine and feminine, and various verb tenses.

## FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**    Identify all sources of information relied upon in formulating defendant's responses to these interrogatories (providing a privilege log if necessary), including records or documents reviewed, records or documents determined to have been destroyed, document retention policies, persons providing information and/or overseeing the process, and the person verifying the answers.

**ANSWER:**

**INTERROGATORY NO. 2:**    Please identify each and every product and/or material—regardless of whether Defendant knows it contained asbestos—Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982.

**ANSWER:**

**INTERROGATORY NO. 3:**    For each product and / or material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982, please state whether Defendant knows or has reason to believe said product and / or material contained asbestos. If so, for each asbestos-containing material, please identify:

    a.    The trade name or brand name of the same;

    b.    The type, brand name and percentage of asbestos contained in the material, including any changes over time (and/or the elimination of asbestos in the material);

    c.    Each and every source (including manufacturers and distributors) from which Defendant and/or any predecessor/related entity obtained each such material;

    d.    The date said product / material was placed on the market, and the inclusive dates of its manufacture, sale, and distribution;

    e.    A detailed description of said product / material, including a description of how and why it involved the use of asbestos or asbestos-containing products;

    f.    The date Defendant stopped manufacturing, marketing, selling, and/or distributing said product / material;

    g.    If applicable, the date said product / material was removed from the market and no longer sold or distributed and the reasons therefore;

- 6 -

h.    The date, if ever, Defendant asbestos no longer utilized asbestos or asbestos-containing material in said product / material, and the reasons for no longer doing so;

i.    Whether Defendant ever conducted any testing on asbestos-containing material to determine whether it posed any potential asbestos-related hazard to human or non-human health;

j.    The plants or facilities where asbestos and /or asbestos-containing materials were manufactured, fabricated, and / or processed by Defendant;

k.    Those likely to encounter said asbestos and / or asbestos-containing materials (such as mechanics); and,

l.    A description of any hazard communications Defendant placed on asbestos-containing materials or its packaging, operating manuals, brochures, catalogs, or other related printed material.  This description should include the precise language of any such hazard communication, the size of the hazard communication, the location on the asbestos-containing material or its packaging where the hazard communication was printed, and when the hazard communication was first placed on said asbestos-containing material.

**ANSWER:**

**INTERROGATORY NO. 4:**        Please identify any and all prior claim(s) alleging lung diseases or death from lung disease, whether directly or indirectly attributed to asbestosis, mesothelioma, lung cancer, or exposure to asbestos-containing material as defined above, alleging exposure to asbestos-containing materials allegedly manufactured, sold, distributed, specified, applied, and / or installed in whole or part by Defendant and / or any predecessor / related entity, specifically including but not limited to those Defendant and/or any predecessor/related entity applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above).

**ANSWER:**

**INTERROGATORY NO. 5:**        Please identify each and every policy, procedure, step, hazard communication, purported warning, and/or program undertaken, implemented, discussed and/or contemplated by Defendant and/or any predecessor/related entity intended to protect any person or persons (including, but not limited to, employees, product end-users and/or by-standers) in any way from exposure to asbestos, asbestos-containing materials and / or dust therefrom.

**ANSWER:**

**INTERROGATORY NO. 6:**        Please identify any and all tests of any kind (e.g., air sampling, laboratory experiments, industrial hygiene surveys, fiber release studies, etc.) concerning possible or potential health hazards involved in the use or manipulation of, or exposure to, asbestos-containing materials or ingredients contained therein (including contaminants such as,

for example, tremolite or chrysotile asbestos in talc) conducted b Defendant, any predecessor or related company, or any person or entity acting on behalf thereof including but not limited to any insurance company.

**ANSWER:**

**INTERROGATORY NO. 7:** Please identify any and all persons or entities that provided industrial hygiene or similar services or information to, or for the benefit of, Defendant, at any time from 1925 to date, including, but not limited to, employees of, or anyone retained by, any predecessor or related company.

**ANSWER:**

**INTERROGATORY NO. 8:** Please describe Defendant's medical, safety, and industrial hygiene programs from the Defendant's inception through the current time, specifically including but not limited to the date when said department / program was first established and identifying persons associated with the department (including but not limited to directors, managers, physicians, nurses, medical personnel, safety engineers, industrial hygienists, and safety personnel).

**ANSWER:**

**INTERROGATORY NO. 9:** Please describe when (approximating if necessary) any officer, director, and / or employee of Defendant, any predecessor(s) or related company first had knowledge, information, or belief that exposure to asbestos could have a detrimental effect on health and how such person obtained such knowledge, information or belief.

**ANSWER:**

**INTERROGATORY NO. 10:** Please identify any and all trade organizations, associations, or other entities to which Defendant, any predecessor or any related company (including any officers, agents and/or employees thereof) has belonged or in which the same has participated since 1925, including dates of membership and/or participation and a description of each such officer, agent and/or employee's involvement with each such organization (e.g., general member, officer or official of the organization, member of a committee or subcommittee, chair of any committee or subcommittee, etc.).

**ANSWER:**

**INTERROGATORY NO. 11:** Identify any and all periodicals—including but not limited to scientific, medical and trade periodicals, and corporate newsletters/publications, bulletins, and

notices—that Defendant and/or any predecessor/related entity, employee or agent thereof subscribed to, received, published, authored, or distributed from 1925 to the present and for each periodical state the dates of such subscriptions, receipt, publication, authorship, or distribution.

**ANSWER:**

**INTERROGATORY NO. 12:**      Please identify each of Defendant's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or nonhuman exposure to asbestos, populations at risk, etc.).  For each such person identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Defendant's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

**ANSWER:**

**INTERROGATORY NO. 13:**      Please describe Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

**ANSWER:**

**INTERROGATORY NO. 14:**      Please identify any and all communications, including but not limited to investigations and / or citations, between defendant and OSHA or any other local, state, or federal governmental agency for any matter related to asbestos and / or asbestos exposure.

**ANSWER:**

**INTERROGATORY NO. 15:**      If Defendant has asserted any affirmative defenses, avoidances, theories of alternate causation (including but not limited to sole proximate cause), and / or exceptions in this case, please provide a short and plain statement of the facts Defendant contends support each such defense, avoidance, theory of alternate causation and / or exception.

**ANSWER:**

**INTERROGATORY NO. 16:**      Please identify by case name, docket number, court and date filed any proceeding(s) of any nature whatsoever (specifically including but not limited to civil, adjudicatory, or arbitration) filed by you against your insurer(s) for reimbursement and/or coverage

dispute of any legal fees, costs, expenses and/or judgment(s) related to and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

  **ANSWER:**

**INTERROGATORY NO. 17:**  Please identify any and all policies of insurance which may provide coverage for this Defendant, its executive officers, any predecessor or related companies, against the claims asserted in Plaintiff's complaint, specifically including but not limited to Commercial General Liability ("CGL") policies, Workers' Compensation / Employers' Liability ("WC/EL") policies, Excess policies, and Umbrella policies.

  **ANSWER:**

**INTERROGATORY NO. 18:**  Please state all facts in support of defendant's contention, if it so contends, that it was not foreseeable that asbestos-containing material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above) would be removed, replaced, and / or otherwise disturbed.

  **ANSWER:**

**INTERROGATORY NO. 19:**  Please identify defendant's employees and executive officers with responsibility for the selection / specification of asbestos-containing materials in friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered by Defendant, any predecessor and/or related entity at any point in time prior to the end of the year 1982.

  **ANSWER:**

Dated: <u>December 24, 2020 </u>   Respectfully Submitted,


           *Michael K. Hibey*

By: _____
   **SIMMONS HANLY CONROY LLC**
   Melissa Schopfer, admitted *pro hac vice*
   Jean-Michel Lecointre, admitted *pro hac vice*
   Michael K. Hibey, admitted *pro hac vice*
   One Court Street
   Alton, IL 62002
   Telephone: 618-259-2222

Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

-AND-

**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                     **SECTION: 8**                     **DIVISION N**

**CAROLYN BRINDELL, ET AL.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED: _____          DEPUTY CLERK: _____

**PLAINTIFF'S FIRST INTERROGATORIES**
**TO DEFENDANT CRA TRAILERS, INC. F/K/A GREAT DANE TRAILERS, INC.**

TO DEFENDANT:  CRA TRAILERS, INC. F/K/A GREAT DANE TRAILERS, INC.

BY AND THROUGH ITS COUNSEL OF RECORD:
　　　　Christopher Massenburg, Jeanette Riggins, B. Adam Hays, Meghan Senter, Amanda Deto
　　　　MG+M Law Firm
　　　　One Canal Place
　　　　365 Canal Street, Suite 3000
　　　　New Orleans, LA 70130
　　　　cmassenburg@mgmlaw.com,
　　　　jriggins@mgmlaw.com
　　　　ahays@mgmlaw.com
　　　　msenter@mgmlaw.com
　　　　adeto@mgmlaw.com

　　　　Plaintiff, by and through his undersigned counsel and pursuant to articles 1422, 1457 and 1458 of the Louisiana Code of Civil Procedure and other applicable rules and law, demands that within thirty (30) days, Defendant shall answer the attached requests separately and fully in writing under oath.

Dated:  <u>December 24, 2020</u>                     Respectfully Submitted,


By: _____
**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Michael K. Hibey, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

　　　　-AND-

**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I do hereby certify that on this 24 December 2020 I served a copy of the foregoing pleading

on counsel for all parties to this proceeding by facsimile, by electronic mail, by hand delivery or

by mailing the same by United States mail, properly addressed and first class postage prepaid.

_____

## GENERAL INSTRUCTIONS

With respect to all questions, all information is to be divulged which is within the knowledge, possession or control of the corporation or company to whom these requests are addressed, as well as the corporation or company's attorneys, investigators, agents, employees or other representatives.  If you cannot answer the following requests in full after exercising due diligence to secure the full information to do so, then state and answer to the fullest extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to acquire the information.

A.      Please produce all documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories or numbered requests in this set of discovery.

B.      If any information or material is being withheld under any claim of privilege, protection, or immunity, please state with specificity the particular privilege, protection, or immunity asserted.

C.      If Defendant cannot produce requested information or material because it is not in Defendant's possession, custody, or control, please identify the information or material, the reason the information or material is not in Defendant's possession, custody, or control, and the entity currently having possession, custody, or control over the information or material.

D.      When providing a date, please provide the exact day, month, and year.  If the exact date is not known, please provide the best approximation of the date and clearly note that the date is an approximation.

E.      If responsive material is in electronic, magnetic, or digital form, Plaintiff specifically requests production of such material. Plaintiff requests such material be provided on CD-ROM.

F.      In the event a proper and timely objection is filed as to any requested material, please nevertheless respond to all portions of the request which do not fall within the scope of the objection.  For example, if a request is objected to on the grounds that it is too broad insofar as it seeks documents covering years Defendant believes are not relevant to this litigation, please nevertheless produce documents for all years which Defendant concedes are relevant.

## **GENERAL DEFINITIONS**

A.      "Defendant," as used herein, means the entity answering these discovery requests and any of its merged, consolidated, or acquired predecessors, divisions, joint ventures, subsidiaries, foreign subsidiaries, foreign subsidiaries of predecessors, parent companies, sister companies.  This definition includes present and former officers, directors, agents, employees, and all other persons acting or purporting to act on behalf of Defendant, its predecessors, subsidiaries, and/or affiliates.

        i.      "Predecessors" further means any entity, whether or not incorporated, which had all or some of its assets purchased by Defendant or came to be acquired by Defendant whether by merger, consolidation, or other means.

        ii.     "Subsidiaries" further means any entity, whether or not incorporated, which is or was in any way owned or controlled, in whole or in part by Defendant or its predecessors.

B.      "Related company" as used herein means any entity in which the named defendant has or had an interest and which does or has specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered asbestos-containing material.

C.      "Asbestos-containing material" and/or "asbestos-containing product" as used herein means raw or processed asbestos and any product which included any form of asbestos as any part of its composition or ingredients *including but not limited to* **friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers**; and/or, equipment or machinery in or on which an asbestos-containing material as defined above was incorporated, added, utilized or applied prior to being sold, distributed or installed by defendant. This term shall also refer to equipment that was originally sold with asbestos-containing material, and / or has specifications that require asbestos or an asbestos-containing material and equipment whose manufacturer anticipates or should anticipate the use of asbestos or an asbestos-containing material in its practical, foreseeable, and/or proper use.

D.      "Documents", as used herein, include, without limitation, books, records, notes, letters, correspondence, memoranda, writings, invoices, purchase orders, contracts, sales ledgers, recordings, journals or books of account, in possession or control of Defendant or Defendant's attorneys, investigators, agents, or employees.  Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any means. "Documents" also includes the content of any applicable computer database.

E.      Where used with respect to documents, "identify" means to give the date, title, origin, author and addressee of the document and the name, address, position or title of the person who has custody of the document.  Whenever identification is requested and Defendant is willing to produce the documents voluntarily, Defendant may respond by attaching a copy of the responsive document to the answers to these requests.

F.      Where used with respect to a person, "identify" means to give the person's name, employer, title or position with that employer, and business address and last known home address if the person is no longer so employed.  If the person identified is, or has been, an employee, officer, director or agent of Defendant, also state the period of time during which he/she has been employed by Defendant, and all positions, titles or jobs that person has held with the Defendant and the years each position was held.

G.      The terms, "trade organization" and "trade association," mean any organization or association of business, industrial, or governmental entities that were associated and/or met for the purpose of achieving common goals, exchanging or disseminating information related to common needs or interests, and/or learning information or facts of interest to the various members of the organization or association.

H.      The terms, "plant" and "facility," mean any location where materials are refined, converted, chemically altered, changed, assembled, manufactured, constructed, or fabricated as well as locations where products are fabricated, assembled, or manufactured or prepared for further fabrication or assembly.  This definition also includes office spaces, storage spaces, control rooms, undeveloped land, and similar areas within the larger plant or facility.

I.      The term, "manufacture," means to fabricate, construct, assemble, prepare for fabrication or assembly, or take any other action prior to completion of a product or material.

J.      The terms, "medical department," "safety department," and "industrial hygiene department," mean an individual or a group of individuals working for Defendant, either directly or in a contractual capacity, whose purpose was or is to provide guidance, assistance, or advice concerning any aspect of medical health including, but not limited to, the safety of Defendant's workers and the safety of individuals using or exposed to asbestos or asbestos-containing products.

K.      The term, "hazards of asbestos," means any potential or actual asbestos-related injury, effect, damage, scarring, wound, impairment, or disability of any part of human or non-human anatomy including, but not limited to, the lungs and associated tissue.

L.      The term, "test," includes, but is not limited to, studies of atmospheric dust samples, studies of the concentration of asbestos in airborne test samples, studies of the lung conditions of workers (by x-ray or other means), pulmonary function studies of workers, animal studies, pathological studies, industrial hygiene studies, risk assessment studies, cost-benefit analyses, and any other studies concerning health and safety.

M.      The term, "communication," means any transmission or exchange of information, whether oral or written, and whether face to face, by telephone, mail, fax, personal delivery, electronic means, or otherwise.

N.      "Premises," means:

     i.      Real property, as well as any structures or other improvements located on the property; and,

     ii.     A ship or other floating vehicle, vessel, or structure.

O.      As used herein, "locations and recipients at issue" if and where specifically used means:

     i.      Port of New Orleans;
     ii.     Puerto Rico Marine Management;
     iii.    Great Dane;
     iv.     Kelsey Hayes;
     v.      Lufkin;
     vi.     Strick;
     vii.    Utility Trailer; and / or,
     viii.   Wilson Trailer.

P.      The terms, "abate" and "abatement," mean any removal and/or cleanup of asbestos-containing products on a premises.

Q.      The term, "utilize," when referring to asbestos-containing products and/or asbestos job site(s) means to install, inspect, apply, maintain, repair, replace, or remove.

R.      The definitions stated above shall also apply to other grammatical forms of the word defined, such as singular and plural, masculine and feminine, and various verb tenses.

### FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**      Identify all sources of information relied upon in formulating defendant's responses to these interrogatories (providing a privilege log if necessary), including records or documents reviewed, records or documents determined to have been destroyed, document retention policies, persons providing information and/or overseeing the process, and the person verifying the answers.

**ANSWER:**

**INTERROGATORY NO. 2:**        Please identify each and every product and/or material—regardless of whether Defendant knows it contained asbestos—Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982.

   **ANSWER:**

**INTERROGATORY NO. 3:**        For each product and / or material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982, please state whether Defendant knows or has reason to believe said product and / or material contained asbestos. If so, for each asbestos-containing material, please identify:

  a.  The trade name or brand name of the same;

  b.  The type, brand name and percentage of asbestos contained in the material, including any changes over time (and/or the elimination of asbestos in the material);

  c.  Each and every source (including manufacturers and distributors) from which Defendant and/or any predecessor/related entity obtained each such material;

  d.  The date said product / material was placed on the market, and the inclusive dates of its manufacture, sale, and distribution;

  e.  A detailed description of said product / material, including a description of how and why it involved the use of asbestos or asbestos-containing products;

  f.  The date Defendant stopped manufacturing, marketing, selling, and/or distributing said product / material;

  g.  If applicable, the date said product / material was removed from the market and no longer sold or distributed and the reasons therefore;

  h.  The date, if ever, Defendant asbestos no longer utilized asbestos or asbestos-containing material in said product / material, and the reasons for no longer doing so;

  i.  Whether Defendant ever conducted any testing on asbestos-containing material to determine whether it posed any potential asbestos-related hazard to human or non-human health;

  j.  The plants or facilities where asbestos and /or asbestos-containing materials were manufactured, fabricated, and / or processed by Defendant;

  k.  Those likely to encounter said asbestos and / or asbestos-containing materials (such as mechanics); and,

  l.  A description of any hazard communications Defendant placed on asbestos-containing materials or its packaging, operating manuals, brochures, catalogs, or other related printed material.  This description should include the precise language

of any such hazard communication, the size of the hazard communication, the location on the asbestos-containing material or its packaging where the hazard communication was printed, and when the hazard communication was first placed on said asbestos-containing material.

**ANSWER:**

**INTERROGATORY NO. 4:**      Please identify any and all prior claim(s) alleging lung diseases or death from lung disease, whether directly or indirectly attributed to asbestosis, mesothelioma, lung cancer, or exposure to asbestos-containing material as defined above, alleging exposure to asbestos-containing materials allegedly manufactured, sold, distributed, specified, applied, and / or installed in whole or part by Defendant and / or any predecessor / related entity, specifically including but not limited to those Defendant and/or any predecessor/related entity applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above).

**ANSWER:**

**INTERROGATORY NO. 5:**      Please identify each and every policy, procedure, step, hazard communication, purported warning, and/or program undertaken, implemented, discussed and/or contemplated by Defendant and/or any predecessor/related entity intended to protect any person or persons (including, but not limited to, employees, product end-users and/or by-standers) in any way from exposure to asbestos, asbestos-containing materials and / or dust therefrom.

**ANSWER:**

**INTERROGATORY NO. 6:**      Please identify any and all tests of any kind (e.g., air sampling, laboratory experiments, industrial hygiene surveys, fiber release studies, etc.) concerning possible or potential health hazards involved in the use or manipulation of, or exposure to, asbestos-containing materials or ingredients contained therein (including contaminants such as, for example, tremolite or chrysotile asbestos in talc) conducted b Defendant, any predecessor or related company, or any person or entity acting on behalf thereof including but not limited to any insurance company.

**ANSWER:**

**INTERROGATORY NO. 7:**      Please identify any and all persons or entities that provided industrial hygiene or similar services or information to, or for the benefit of, Defendant, at any time from 1925 to date, including, but not limited to, employees of, or anyone retained by, any predecessor or related company.

**ANSWER:**

**INTERROGATORY NO. 8:**        Please describe Defendant's medical, safety, and industrial hygiene programs from the Defendant's inception through the current time, specifically including but not limited to the date when said department / program was first established and identifying persons associated with the department (including but not limited to directors, managers, physicians, nurses, medical personnel, safety engineers, industrial hygienists, and safety personnel).

      **ANSWER:**

**INTERROGATORY NO. 9:**        Please describe when (approximating if necessary) any officer, director, and / or employee of Defendant, any predecessor(s) or related company first had knowledge, information, or belief that exposure to asbestos could have a detrimental effect on health and how such person obtained such knowledge, information or belief.

      **ANSWER:**

**INTERROGATORY NO. 10:**        Please identify any and all trade organizations, associations, or other entities to which Defendant, any predecessor or any related company (including any officers, agents and/or employees thereof) has belonged or in which the same has participated since 1925, including dates of membership and/or participation and a description of each such officer, agent and/or employee's involvement with each such organization (e.g., general member, officer or official of the organization, member of a committee or subcommittee, chair of any committee or subcommittee, etc.).

      **ANSWER:**

**INTERROGATORY NO. 11:**        Identify any and all periodicals—including but not limited to scientific, medical and trade periodicals, and corporate newsletters/publications, bulletins, and notices—that Defendant and/or any predecessor/related entity, employee or agent thereof subscribed to, received, published, authored, or distributed from 1925 to the present and for each periodical state the dates of such subscriptions, receipt, publication, authorship, or distribution.

      **ANSWER:**

**INTERROGATORY NO. 12:**        Please identify each of Defendant's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or nonhuman exposure to asbestos, populations at risk, etc.).  For each such person

identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Defendant's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

**ANSWER:**

**INTERROGATORY NO. 13:**        Please describe Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

**ANSWER:**

**INTERROGATORY NO. 14:**        Please identify any and all communications, including but not limited to investigations and / or citations, between defendant and OSHA or any other local, state, or federal governmental agency for any matter related to asbestos and / or asbestos exposure.

**ANSWER:**

**INTERROGATORY NO. 15:**        If Defendant has asserted any affirmative defenses, avoidances, theories of alternate causation (including but not limited to sole proximate cause), and / or exceptions in this case, please provide a short and plain statement of the facts Defendant contends support each such defense, avoidance, theory of alternate causation and / or exception.

**ANSWER:**

**INTERROGATORY NO. 16:**        Please identify by case name, docket number, court and date filed any proceeding(s) of any nature whatsoever (specifically including but not limited to civil, adjudicatory, or arbitration) filed by you against your insurer(s) for reimbursement and/or coverage dispute of any legal fees, costs, expenses and/or judgment(s) related to and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

**ANSWER:**

**INTERROGATORY NO. 17:**        Please identify any and all policies of insurance which may provide coverage for this Defendant, its executive officers, any predecessor or related companies, against the claims asserted in Plaintiff's complaint, specifically including but not limited to Commercial General Liability ("CGL") policies, Workers' Compensation / Employers' Liability ("WC/EL") policies, Excess policies, and Umbrella policies.

**ANSWER:**

**INTERROGATORY NO. 18:**      Please state all facts in support of defendant's contention, if it so contends, that it was not foreseeable that asbestos-containing material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above) would be removed, replaced, and / or otherwise disturbed.

        **ANSWER:**

**INTERROGATORY NO. 19:**      Please identify defendant's employees and executive officers with responsibility for the selection / specification of asbestos-containing materials in friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered by Defendant, any predecessor and/or related entity at any point in time prior to the end of the year 1982.

        **ANSWER:**

Dated:  <u>December 24, 2020</u>                    Respectfully Submitted,       .

By:  _____
Melissa C. Schopfer, *pro hac vice*
Jean-Michel Lecointre, *pro had vice*
Michael K. Hibey, *pro hac vice*
Simmons Hanly Conroy LLC
1 Court Street
Alton, IL 62002
Tel:    (618) 259-2222
Fax:    (618) 259-2251
Email:  mschopfer@simmonsfirm.com
Email:  jlecointre@simmonsfirm.com
Email:  mhibey@simmonsfirm.com

-and-

**THE CHEEK LAW FIRM**
<u>/s/  Lindsey A. Cheek</u>
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com

**COUNSEL FOR PLAINTIFF**

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                    **SECTION: 8**                    **DIVISION N**

**CAROLYN BRINDELL, ET AL.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED: _____          DEPUTY CLERK: _____

**PLAINTIFF'S FIRST INTERROGATORIES**
**TO DEFENDANT ZF ACTIVE SAFETY US INC. F/K/A KELSEY-HAYES COMPANY**

TO DEFENDANT:  SAFETY US INC. F/K/A KELSEY-HAYES COMPANY

BY AND THROUGH ITS COUNSEL OF RECORD:
      William Harrison, Jennifer Adams, Barbara Ormsby
      DEUTSCH KERRIGAN LLP
      755 Magazine Street
      New Orleans, LA  70130
      jadams@deutschkerrigan.com
      wharrison@deutschkerrigan.com
      bormsby@deutschkerrigan.com

      Plaintiff, by and through his undersigned counsel and pursuant to articles 1422, 1457 and

1458 of the Louisiana Code of Civil Procedure and other applicable rules and law, demands that

within thirty (30) days, Defendant shall answer the attached requests separately and fully in writing

under oath.

Dated:  <u>December 24, 2020   </u>                    Respectfully Submitted,

                          *Michael K. Hibey*

By: _____
      **SIMMONS HANLY CONROY LLC**
      Melissa Schopfer, admitted *pro hac vice*
      Jean-Michel Lecointre, admitted *pro hac vice*
      Michael K. Hibey, admitted *pro hac vice*
      One Court Street
      Alton, IL 62002
      Telephone: 618-259-2222
      Fax: 618-259-2251
      mschopfer@simmonsfirm.com
      jlecointre@simmonsfirm.com
      mhibey@simmonsfirm.com

       -AND-

      **THE CHEEK LAW FIRM LLC**
      LINDSEY A. CHEEK, Bar No. 34484

Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I do hereby certify that on this <u>24 December 2020</u> I served a copy of the foregoing pleading on counsel for all parties to this proceeding by facsimile, by electronic mail, by hand delivery or by mailing the same by United States mail, properly addressed and first class postage prepaid.

_Michael K. Hibey_

_____

## GENERAL INSTRUCTIONS

With respect to all questions, all information is to be divulged which is within the knowledge, possession or control of the corporation or company to whom these requests are addressed, as well as the corporation or company's attorneys, investigators, agents, employees or other representatives.  If you cannot answer the following requests in full after exercising due diligence to secure the full information to do so, then state and answer to the fullest extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to acquire the information.

A.      Please produce all documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories or numbered requests in this set of discovery.

B.      If any information or material is being withheld under any claim of privilege, protection, or immunity, please state with specificity the particular privilege, protection, or immunity asserted.

C.      If Defendant cannot produce requested information or material because it is not in Defendant's possession, custody, or control, please identify the information or material, the reason

the information or material is not in Defendant's possession, custody, or control, and the entity currently having possession, custody, or control over the information or material.

     D.     When providing a date, please provide the exact day, month, and year.  If the exact date is not known, please provide the best approximation of the date and clearly note that the date is an approximation.

     E.     If responsive material is in electronic, magnetic, or digital form, Plaintiff specifically requests production of such material. Plaintiff requests such material be provided on CD-ROM.

     F.     In the event a proper and timely objection is filed as to any requested material, please nevertheless respond to all portions of the request which do not fall within the scope of the objection.  For example, if a request is objected to on the grounds that it is too broad insofar as it seeks documents covering years Defendant believes are not relevant to this litigation, please nevertheless produce documents for all years which Defendant concedes are relevant.

## GENERAL DEFINITIONS

     A.     "Defendant," as used herein, means the entity answering these discovery requests and any of its merged, consolidated, or acquired predecessors, divisions, joint ventures, subsidiaries, foreign subsidiaries, foreign subsidiaries of predecessors, parent companies, sister companies.  This definition includes present and former officers, directors, agents, employees, and all other persons acting or purporting to act on behalf of Defendant, its predecessors, subsidiaries, and/or affiliates.

         i.     "Predecessors" further means any entity, whether or not incorporated, which had all or some of its assets purchased by Defendant or came to be acquired by Defendant whether by merger, consolidation, or other means.

         ii.     "Subsidiaries" further means any entity, whether or not incorporated, which is or was in any way owned or controlled, in whole or in part by Defendant or its predecessors.

     B.     "Related company" as used herein means any entity in which the named defendant has or had an interest and which does or has specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered asbestos-containing material.

     C.     "Asbestos-containing material" and/or "asbestos-containing product" as used herein means raw or processed asbestos and any product which included any form of asbestos as any part of its composition or ingredients *including but not limited to* **friction material, brake**

**pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers**; and/or, equipment or machinery in or on which an asbestos-containing material as defined above was incorporated, added, utilized or applied prior to being sold, distributed or installed by defendant. This term shall also refer to equipment that was originally sold with asbestos-containing material, and / or has specifications that require asbestos or an asbestos-containing material and equipment whose manufacturer anticipates or should anticipate the use of asbestos or an asbestos-containing material in its practical, foreseeable, and/or proper use.

D.      "Documents", as used herein, include, without limitation, books, records, notes, letters, correspondence, memoranda, writings, invoices, purchase orders, contracts, sales ledgers, recordings, journals or books of account, in possession or control of Defendant or Defendant's attorneys, investigators, agents, or employees.  Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any means. "Documents" also includes the content of any applicable computer database.

E.      Where used with respect to documents, "identify" means to give the date, title, origin, author and addressee of the document and the name, address, position or title of the person who has custody of the document.  Whenever identification is requested and Defendant is willing to produce the documents voluntarily, Defendant may respond by attaching a copy of the responsive document to the answers to these requests.

F.      Where used with respect to a person, "identify" means to give the person's name, employer, title or position with that employer, and business address and last known home address if the person is no longer so employed.  If the person identified is, or has been, an employee, officer, director or agent of Defendant, also state the period of time during which he/she has been employed by Defendant, and all positions, titles or jobs that person has held with the Defendant and the years each position was held.

G.      The terms, "trade organization" and "trade association," mean any organization or association of business, industrial, or governmental entities that were associated and/or met for the purpose of achieving common goals, exchanging or disseminating information related to common needs or interests, and/or learning information or facts of interest to the various members of the organization or association.

H.      The terms, "plant" and "facility," mean any location where materials are refined,

- 4 -

converted, chemically altered, changed, assembled, manufactured, constructed, or fabricated as well as locations where products are fabricated, assembled, or manufactured or prepared for further fabrication or assembly.  This definition also includes office spaces, storage spaces, control rooms, undeveloped land, and similar areas within the larger plant or facility.

   I.  The term, "manufacture," means to fabricate, construct, assemble, prepare for fabrication or assembly, or take any other action prior to completion of a product or material.

   J.  The terms, "medical department," "safety department," and "industrial hygiene department," mean an individual or a group of individuals working for Defendant, either directly or in a contractual capacity, whose purpose was or is to provide guidance, assistance, or advice concerning any aspect of medical health including, but not limited to, the safety of Defendant's workers and the safety of individuals using or exposed to asbestos or asbestos-containing products.

   K.  The term, "hazards of asbestos," means any potential or actual asbestos-related injury, effect, damage, scarring, wound, impairment, or disability of any part of human or non-human anatomy including, but not limited to, the lungs and associated tissue.

   L.  The term, "test," includes, but is not limited to, studies of atmospheric dust samples, studies of the concentration of asbestos in airborne test samples, studies of the lung conditions of workers (by x-ray or other means), pulmonary function studies of workers, animal studies, pathological studies, industrial hygiene studies, risk assessment studies, cost-benefit analyses, and any other studies concerning health and safety.

   M.  The term, "communication," means any transmission or exchange of information, whether oral or written, and whether face to face, by telephone, mail, fax, personal delivery, electronic means, or otherwise.

   N.  "Premises," means:

      i.  Real property, as well as any structures or other improvements located on the property; and,

      ii.  A ship or other floating vehicle, vessel, or structure.

   O.  As used herein, "locations and recipients at issue" if and where specifically used means:

      i.  Port of New Orleans;
      ii.  Puerto Rico Marine Management;
      iii.  Great Dane;
      iv.  Kelsey Hayes;
      v.  Lufkin;
      vi.  Strick;
      vii.  Utility Trailer; and / or,

viii.     Wilson Trailer.

P.        The terms, "abate" and "abatement," mean any removal and/or cleanup of asbestos-containing products on a premises.

Q.        The term, "utilize," when referring to asbestos-containing products and/or asbestos job site(s) means to install, inspect, apply, maintain, repair, replace, or remove.

R.        The definitions stated above shall also apply to other grammatical forms of the word defined, such as singular and plural, masculine and feminine, and various verb tenses.

## FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**        Identify all sources of information relied upon in formulating defendant's responses to these interrogatories (providing a privilege log if necessary), including records or documents reviewed, records or documents determined to have been destroyed, document retention policies, persons providing information and/or overseeing the process, and the person verifying the answers.

        **ANSWER:**

**INTERROGATORY NO. 2:**        Please identify each and every product and/or material—regardless of whether Defendant knows it contained asbestos—Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982.

        **ANSWER:**

**INTERROGATORY NO. 3:**        For each product and / or material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982, please state whether Defendant knows or has reason to believe said product and / or material contained asbestos. If so, for each asbestos-containing material, please identify:

        a.     The trade name or brand name of the same;

        b.     The type, brand name and percentage of asbestos contained in the material, including any changes over time (and/or the elimination of asbestos in the material);

        c.     Each and every source (including manufacturers and distributors) from which Defendant and/or any predecessor/related entity obtained each such material;

        d.     The date said product / material was placed on the market, and the inclusive dates of its manufacture, sale, and distribution;

e.  A detailed description of said product / material, including a description of how and why it involved the use of asbestos or asbestos-containing products;

f.  The date Defendant stopped manufacturing, marketing, selling, and/or distributing said product / material;

g.  If applicable, the date said product / material was removed from the market and no longer sold or distributed and the reasons therefore;

h.  The date, if ever, Defendant asbestos no longer utilized asbestos or asbestos-containing material in said product / material, and the reasons for no longer doing so;

i.  Whether Defendant ever conducted any testing on asbestos-containing material to determine whether it posed any potential asbestos-related hazard to human or non-human health;

j.  The plants or facilities where asbestos and /or asbestos-containing materials were manufactured, fabricated, and / or processed by Defendant;

k.  Those likely to encounter said asbestos and / or asbestos-containing materials (such as mechanics); and,

l.  A description of any hazard communications Defendant placed on asbestos-containing materials or its packaging, operating manuals, brochures, catalogs, or other related printed material.  This description should include the precise language of any such hazard communication, the size of the hazard communication, the location on the asbestos-containing material or its packaging where the hazard communication was printed, and when the hazard communication was first placed on said asbestos-containing material.

**ANSWER:**

**INTERROGATORY NO. 4:**     Please identify any and all prior claim(s) alleging lung diseases or death from lung disease, whether directly or indirectly attributed to asbestosis, mesothelioma, lung cancer, or exposure to asbestos-containing material as defined above, alleging exposure to asbestos-containing materials allegedly manufactured, sold, distributed, specified, applied, and / or installed in whole or part by Defendant and / or any predecessor / related entity, specifically including but not limited to those Defendant and/or any predecessor/related entity applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above).

**ANSWER:**

**INTERROGATORY NO. 5:**     Please identify each and every policy, procedure, step, hazard communication, purported warning, and/or program undertaken, implemented, discussed and/or contemplated by Defendant and/or any predecessor/related entity intended to protect any person or persons (including, but not limited to, employees, product end-users and/or by-standers) in any way from exposure to asbestos, asbestos-containing materials and / or dust therefrom.

**ANSWER:**

**INTERROGATORY NO. 6:**        Please identify any and all tests of any kind (e.g., air sampling, laboratory experiments, industrial hygiene surveys, fiber release studies, etc.) concerning possible or potential health hazards involved in the use or manipulation of, or exposure to, asbestos-containing materials or ingredients contained therein (including contaminants such as, for example, tremolite or chrysotile asbestos in talc) conducted b Defendant, any predecessor or related company, or any person or entity acting on behalf thereof including but not limited to any insurance company.

**ANSWER:**

**INTERROGATORY NO. 7:**        Please identify any and all persons or entities that provided industrial hygiene or similar services or information to, or for the benefit of, Defendant, at any time from 1925 to date, including, but not limited to, employees of, or anyone retained by, any predecessor or related company.

**ANSWER:**

**INTERROGATORY NO. 8:**        Please describe Defendant's medical, safety, and industrial hygiene programs from the Defendant's inception through the current time, specifically including but not limited to the date when said department / program was first established and identifying persons associated with the department (including but not limited to directors, managers, physicians, nurses, medical personnel, safety engineers, industrial hygienists, and safety personnel).

**ANSWER:**

**INTERROGATORY NO. 9:**        Please describe when (approximating if necessary) any officer, director, and / or employee of Defendant, any predecessor(s) or related company first had knowledge, information, or belief that exposure to asbestos could have a detrimental effect on health and how such person obtained such knowledge, information or belief.

**ANSWER:**

**INTERROGATORY NO. 10:**        Please identify any and all trade organizations, associations, or other entities to which Defendant, any predecessor or any related company (including any officers, agents and/or employees thereof) has belonged or in which the same has participated since 1925, including dates of membership and/or participation and a description of each such officer, agent and/or employee's involvement with each such organization (e.g., general member, officer

or official of the organization, member of a committee or subcommittee, chair of any committee or subcommittee, etc.).

   **ANSWER:**

**INTERROGATORY NO. 11:**        Identify any and all periodicals—including but not limited to scientific, medical and trade periodicals, and corporate newsletters/publications, bulletins, and notices—that Defendant and/or any predecessor/related entity, employee or agent thereof subscribed to, received, published, authored, or distributed from 1925 to the present and for each periodical state the dates of such subscriptions, receipt, publication, authorship, or distribution.

   **ANSWER:**

**INTERROGATORY NO. 12:**        Please identify each of Defendant's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or nonhuman exposure to asbestos, populations at risk, etc.).  For each such person identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Defendant's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

   **ANSWER:**

**INTERROGATORY NO. 13:**        Please describe Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

   **ANSWER:**

**INTERROGATORY NO. 14:**        Please identify any and all communications, including but not limited to investigations and / or citations, between defendant and OSHA or any other local, state, or federal governmental agency for any matter related to asbestos and / or asbestos exposure.

   **ANSWER:**

**INTERROGATORY NO. 15:**        If Defendant has asserted any affirmative defenses, avoidances, theories of alternate causation (including but not limited to sole proximate cause), and / or exceptions in this case, please provide a short and plain statement of the facts Defendant

contends support each such defense, avoidance, theory of alternate causation and / or exception.

**ANSWER:**

**INTERROGATORY NO. 16:**        Please identify by case name, docket number, court and date filed any proceeding(s) of any nature whatsoever (specifically including but not limited to civil, adjudicatory, or arbitration) filed by you against your insurer(s) for reimbursement and/or coverage dispute of any legal fees, costs, expenses and/or judgment(s) related to and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

**ANSWER:**

**INTERROGATORY NO. 17:**        Please identify any and all policies of insurance which may provide coverage for this Defendant, its executive officers, any predecessor or related companies, against the claims asserted in Plaintiff's complaint, specifically including but not limited to Commercial General Liability ("CGL") policies, Workers' Compensation / Employers' Liability ("WC/EL") policies, Excess policies, and Umbrella policies.

**ANSWER:**

**INTERROGATORY NO. 18:**        Please state all facts in support of defendant's contention, if it so contends, that it was not foreseeable that asbestos-containing material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above) would be removed, replaced, and / or otherwise disturbed.

**ANSWER:**

**INTERROGATORY NO. 19:**        Please identify defendant's employees and executive officers with responsibility for the selection / specification of asbestos-containing materials in friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered by Defendant, any predecessor and/or related entity at any point in time prior to the end of the year 1982.

**ANSWER:**

Dated: <u>December 24, 2020</u>                    Respectfully Submitted,

By: _____

**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Michael K. Hibey, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

     -AND-

**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                    **SECTION: 8**                    DIVISION N

**CAROLYN BRINDELL, ET AL.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED: _____          DEPUTY CLERK: _____

**PLAINTIFF'S FIRST INTERROGATORIES**
**TO DEFENDANT LUFKIN INDUSTRIES, LLC**

TO DEFENDANT:  LUFKIN INDUSTRIES, LLC

BY AND THROUGH ITS COUNSEL OF RECORD:
> Kaye Courington, Jamie Zanovec, Dawn Marullo, Jeffery Burg, Troy Bell
> COURINGTON, KIEFER, SOMMERS, MARULLO, AND MATHERNE, LLC.
> 616 Girod Street, Suite 2105
> New Orleans, LA 70130
> kcourington@courington-law.com
> jzanovec@courington-law.com
> dmarullo@courington-law.com
> jburg@courington-law.com
> tbell@courington-law.com

Plaintiff, by and through his undersigned counsel and pursuant to articles 1422, 1457 and

1458 of the Louisiana Code of Civil Procedure and other applicable rules and law, demands that

within thirty (30) days, Defendant shall answer the attached requests separately and fully in writing

under oath.

Dated:  December 24, 2020                    Respectfully Submitted,

By: _____
**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Michael K. Hibey, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

-AND-

**THE CHEEK LAW FIRM LLC**

LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I do hereby certify that on this <u>24 December 2020</u> I served a copy of the foregoing pleading on counsel for all parties to this proceeding by facsimile, by electronic mail, by hand delivery or by mailing the same by United States mail, properly addressed and first class postage prepaid.

_Michael K. Hikey_
_____

## GENERAL INSTRUCTIONS

With respect to all questions, all information is to be divulged which is within the knowledge, possession or control of the corporation or company to whom these requests are addressed, as well as the corporation or company's attorneys, investigators, agents, employees or other representatives.  If you cannot answer the following requests in full after exercising due diligence to secure the full information to do so, then state and answer to the fullest extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to acquire the information.

A.      Please produce all documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories or numbered requests in this set of discovery.

B.      If any information or material is being withheld under any claim of privilege, protection, or immunity, please state with specificity the particular privilege, protection, or immunity asserted.

C.      If Defendant cannot produce requested information or material because it is not in

Defendant's possession, custody, or control, please identify the information or material, the reason the information or material is not in Defendant's possession, custody, or control, and the entity currently having possession, custody, or control over the information or material.

D.      When providing a date, please provide the exact day, month, and year.  If the exact date is not known, please provide the best approximation of the date and clearly note that the date is an approximation.

E.      If responsive material is in electronic, magnetic, or digital form, Plaintiff specifically requests production of such material. Plaintiff requests such material be provided on CD-ROM.

F.      In the event a proper and timely objection is filed as to any requested material, please nevertheless respond to all portions of the request which do not fall within the scope of the objection.  For example, if a request is objected to on the grounds that it is too broad insofar as it seeks documents covering years Defendant believes are not relevant to this litigation, please nevertheless produce documents for all years which Defendant concedes are relevant.

## GENERAL DEFINITIONS

A.      "Defendant," as used herein, means the entity answering these discovery requests and any of its merged, consolidated, or acquired predecessors, divisions, joint ventures, subsidiaries, foreign subsidiaries, foreign subsidiaries of predecessors, parent companies, sister companies.  This definition includes present and former officers, directors, agents, employees, and all other persons acting or purporting to act on behalf of Defendant, its predecessors, subsidiaries, and/or affiliates.

      i.      "Predecessors" further means any entity, whether or not incorporated, which had all or some of its assets purchased by Defendant or came to be acquired by Defendant whether by merger, consolidation, or other means.

      ii.      "Subsidiaries" further means any entity, whether or not incorporated, which is or was in any way owned or controlled, in whole or in part by Defendant or its predecessors.

B.      "Related company" as used herein means any entity in which the named defendant has or had an interest and which does or has specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered asbestos-containing material.

C.      "Asbestos-containing material" and/or "asbestos-containing product" as used herein means raw or processed asbestos and any product which included any form of asbestos as

any part of its composition or ingredients *including but not limited to* **friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers**; and/or, equipment or machinery in or on which an asbestos-containing material as defined above was incorporated, added, utilized or applied prior to being sold, distributed or installed by defendant. This term shall also refer to equipment that was originally sold with asbestos-containing material, and / or has specifications that require asbestos or an asbestos-containing material and equipment whose manufacturer anticipates or should anticipate the use of asbestos or an asbestos-containing material in its practical, foreseeable, and/or proper use.

      D.      "Documents", as used herein, include, without limitation, books, records, notes, letters, correspondence, memoranda, writings, invoices, purchase orders, contracts, sales ledgers, recordings, journals or books of account, in possession or control of Defendant or Defendant's attorneys, investigators, agents, or employees.  Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any means. "Documents" also includes the content of any applicable computer database.

      E.      Where used with respect to documents, "identify" means to give the date, title, origin, author and addressee of the document and the name, address, position or title of the person who has custody of the document.  Whenever identification is requested and Defendant is willing to produce the documents voluntarily, Defendant may respond by attaching a copy of the responsive document to the answers to these requests.

      F.      Where used with respect to a person, "identify" means to give the person's name, employer, title or position with that employer, and business address and last known home address if the person is no longer so employed.  If the person identified is, or has been, an employee, officer, director or agent of Defendant, also state the period of time during which he/she has been employed by Defendant, and all positions, titles or jobs that person has held with the Defendant and the years each position was held.

      G.      The terms, "trade organization" and "trade association," mean any organization or association of business, industrial, or governmental entities that were associated and/or met for the purpose of achieving common goals, exchanging or disseminating information related to common needs or interests, and/or learning information or facts of interest to the various members of the organization or association.

H.      The terms, "plant" and "facility," mean any location where materials are refined, converted, chemically altered, changed, assembled, manufactured, constructed, or fabricated as well as locations where products are fabricated, assembled, or manufactured or prepared for further fabrication or assembly.  This definition also includes office spaces, storage spaces, control rooms, undeveloped land, and similar areas within the larger plant or facility.

I.      The term, "manufacture," means to fabricate, construct, assemble, prepare for fabrication or assembly, or take any other action prior to completion of a product or material.

J.      The terms, "medical department," "safety department," and "industrial hygiene department," mean an individual or a group of individuals working for Defendant, either directly or in a contractual capacity, whose purpose was or is to provide guidance, assistance, or advice concerning any aspect of medical health including, but not limited to, the safety of Defendant's workers and the safety of individuals using or exposed to asbestos or asbestos-containing products.

K.      The term, "hazards of asbestos," means any potential or actual asbestos-related injury, effect, damage, scarring, wound, impairment, or disability of any part of human or non-human anatomy including, but not limited to, the lungs and associated tissue.

L.      The term, "test," includes, but is not limited to, studies of atmospheric dust samples, studies of the concentration of asbestos in airborne test samples, studies of the lung conditions of workers (by x-ray or other means), pulmonary function studies of workers, animal studies, pathological studies, industrial hygiene studies, risk assessment studies, cost-benefit analyses, and any other studies concerning health and safety.

M.      The term, "communication," means any transmission or exchange of information, whether oral or written, and whether face to face, by telephone, mail, fax, personal delivery, electronic means, or otherwise.

N.      "Premises," means:

   i.      Real property, as well as any structures or other improvements located on the property; and,

   ii.      A ship or other floating vehicle, vessel, or structure.

O.      As used herein, "locations and recipients at issue" if and where specifically used means:

   i.      Port of New Orleans;
   ii.      Puerto Rico Marine Management;
   iii.      Great Dane;
   iv.      Kelsey Hayes;
   v.      Lufkin;

      vi.     Strick;

      vii.    Utility Trailer; and / or,

      viii.   Wilson Trailer.

P.     The terms, "abate" and "abatement," mean any removal and/or cleanup of asbestos-containing products on a premises.

Q.     The term, "utilize," when referring to asbestos-containing products and/or asbestos job site(s) means to install, inspect, apply, maintain, repair, replace, or remove.

R.     The definitions stated above shall also apply to other grammatical forms of the word defined, such as singular and plural, masculine and feminine, and various verb tenses.

## FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**     Identify all sources of information relied upon in formulating defendant's responses to these interrogatories (providing a privilege log if necessary), including records or documents reviewed, records or documents determined to have been destroyed, document retention policies, persons providing information and/or overseeing the process, and the person verifying the answers.

     **ANSWER:**

**INTERROGATORY NO. 2:**     Please identify each and every product and/or material—regardless of whether Defendant knows it contained asbestos—Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982.

     **ANSWER:**

**INTERROGATORY NO. 3:**     For each product and / or material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982, please state whether Defendant knows or has reason to believe said product and / or material contained asbestos. If so, for each asbestos-containing material, please identify:

     a.     The trade name or brand name of the same;

     b.     The type, brand name and percentage of asbestos contained in the material, including any changes over time (and/or the elimination of asbestos in the material);

     c.     Each and every source (including manufacturers and distributors) from which Defendant and/or any predecessor/related entity obtained each such material;

d.      The date said product / material was placed on the market, and the inclusive dates of its manufacture, sale, and distribution;

e.      A detailed description of said product / material, including a description of how and why it involved the use of asbestos or asbestos-containing products;

f.      The date Defendant stopped manufacturing, marketing, selling, and/or distributing said product / material;

g.      If applicable, the date said product / material was removed from the market and no longer sold or distributed and the reasons therefore;

h.      The date, if ever, Defendant asbestos no longer utilized asbestos or asbestos-containing material in said product / material, and the reasons for no longer doing so;

i.      Whether Defendant ever conducted any testing on asbestos-containing material to determine whether it posed any potential asbestos-related hazard to human or non-human health;

j.      The plants or facilities where asbestos and /or asbestos-containing materials were manufactured, fabricated, and / or processed by Defendant;

k.      Those likely to encounter said asbestos and / or asbestos-containing materials (such as mechanics); and,

l.      A description of any hazard communications Defendant placed on asbestos-containing materials or its packaging, operating manuals, brochures, catalogs, or other related printed material.  This description should include the precise language of any such hazard communication, the size of the hazard communication, the location on the asbestos-containing material or its packaging where the hazard communication was printed, and when the hazard communication was first placed on said asbestos-containing material.

**ANSWER:**

**INTERROGATORY NO. 4:**    Please identify any and all prior claim(s) alleging lung diseases or death from lung disease, whether directly or indirectly attributed to asbestosis, mesothelioma, lung cancer, or exposure to asbestos-containing material as defined above, alleging exposure to asbestos-containing materials allegedly manufactured, sold, distributed, specified, applied, and / or installed in whole or part by Defendant and / or any predecessor / related entity, specifically including but not limited to those Defendant and/or any predecessor/related entity applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above).

**ANSWER:**

**INTERROGATORY NO. 5:**    Please identify each and every policy, procedure, step, hazard communication, purported warning, and/or program undertaken, implemented, discussed and/or contemplated by Defendant and/or any predecessor/related entity intended to protect any person or persons (including, but not limited to, employees, product end-users and/or by-standers)

in any way from exposure to asbestos, asbestos-containing materials and / or dust therefrom.

> **ANSWER:**

**INTERROGATORY NO. 6:**      Please identify any and all tests of any kind (e.g., air sampling, laboratory experiments, industrial hygiene surveys, fiber release studies, etc.) concerning possible or potential health hazards involved in the use or manipulation of, or exposure to, asbestos-containing materials or ingredients contained therein (including contaminants such as, for example, tremolite or chrysotile asbestos in talc) conducted b Defendant, any predecessor or related company, or any person or entity acting on behalf thereof including but not limited to any insurance company.

> **ANSWER:**

**INTERROGATORY NO. 7:**      Please identify any and all persons or entities that provided industrial hygiene or similar services or information to, or for the benefit of, Defendant, at any time from 1925 to date, including, but not limited to, employees of, or anyone retained by, any predecessor or related company.

> **ANSWER:**

**INTERROGATORY NO. 8:**      Please describe Defendant's medical, safety, and industrial hygiene programs from the Defendant's inception through the current time, specifically including but not limited to the date when said department / program was first established and identifying persons associated with the department (including but not limited to directors, managers, physicians, nurses, medical personnel, safety engineers, industrial hygienists, and safety personnel).

> **ANSWER:**

**INTERROGATORY NO. 9:**      Please describe when (approximating if necessary) any officer, director, and / or employee of Defendant, any predecessor(s) or related company first had knowledge, information, or belief that exposure to asbestos could have a detrimental effect on health and how such person obtained such knowledge, information or belief.

> **ANSWER:**

**INTERROGATORY NO. 10:**      Please identify any and all trade organizations, associations, or other entities to which Defendant, any predecessor or any related company (including any officers, agents and/or employees thereof) has belonged or in which the same has participated since 1925, including dates of membership and/or participation and a description of each such officer,

agent and/or employee's involvement with each such organization (e.g., general member, officer or official of the organization, member of a committee or subcommittee, chair of any committee or subcommittee, etc.).

**ANSWER:**

**INTERROGATORY NO. 11:**    Identify any and all periodicals—including but not limited to scientific, medical and trade periodicals, and corporate newsletters/publications, bulletins, and notices—that Defendant and/or any predecessor/related entity, employee or agent thereof subscribed to, received, published, authored, or distributed from 1925 to the present and for each periodical state the dates of such subscriptions, receipt, publication, authorship, or distribution.

**ANSWER:**

**INTERROGATORY NO. 12:**    Please identify each of Defendant's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or nonhuman exposure to asbestos, populations at risk, etc.).  For each such person identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Defendant's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

**ANSWER:**

**INTERROGATORY NO. 13:**    Please describe Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

**ANSWER:**

**INTERROGATORY NO. 14:**    Please identify any and all communications, including but not limited to investigations and / or citations, between defendant and OSHA or any other local, state, or federal governmental agency for any matter related to asbestos and / or asbestos exposure.

**ANSWER:**

**INTERROGATORY NO. 15:**    If Defendant has asserted any affirmative defenses, avoidances, theories of alternate causation (including but not limited to sole proximate cause), and

/ or exceptions in this case, please provide a short and plain statement of the facts Defendant contends support each such defense, avoidance, theory of alternate causation and / or exception.

**ANSWER:**

**INTERROGATORY NO. 16:**      Please identify by case name, docket number, court and date filed any proceeding(s) of any nature whatsoever (specifically including but not limited to civil, adjudicatory, or arbitration) filed by you against your insurer(s) for reimbursement and/or coverage dispute of any legal fees, costs, expenses and/or judgment(s) related to and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

**ANSWER:**

**INTERROGATORY NO. 17:**      Please identify any and all policies of insurance which may provide coverage for this Defendant, its executive officers, any predecessor or related companies, against the claims asserted in Plaintiff's complaint, specifically including but not limited to Commercial General Liability ("CGL") policies, Workers' Compensation / Employers' Liability ("WC/EL") policies, Excess policies, and Umbrella policies.

**ANSWER:**

**INTERROGATORY NO. 18:**      Please state all facts in support of defendant's contention, if it so contends, that it was not foreseeable that asbestos-containing material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above) would be removed, replaced, and / or otherwise disturbed.

**ANSWER:**

**INTERROGATORY NO. 19:**      Please identify defendant's employees and executive officers with responsibility for the selection / specification of asbestos-containing materials in friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered by Defendant, any predecessor and/or related entity at any point in time prior to the end of the year 1982.

**ANSWER:**

Dated:  December 24, 2020                    Respectfully Submitted,

By: _____

**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Michael K. Hibey, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

-AND-

**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                    **SECTION: 8**                    **DIVISION N**

**CAROLYN BRINDELL, ET AL.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED: _____          DEPUTY CLERK: _____

**PLAINTIFF'S FIRST INTERROGATORIES**
**TO DEFENDANT UTILITY TRAILER MANUFACTURING COMPANY**

TO DEFENDANT:  UTILITY TRAILER MANUFACTURING COMPANY

BY AND THROUGH ITS COUNSEL OF RECORD:
      Joseph Hart, IV, Thomas Porteous, Daniel Oser
      PUGH, ACCARDO, HAAS, RADECKER & CAREY, LLC
      1100 Poydras Street, Suite 3300
      New Orleans, LA 70163
      jhart@pugh-law.com
      tporteous@pugh-law.com
      doser@pugh-law.com

      Plaintiff, by and through his undersigned counsel and pursuant to articles 1422, 1457 and

1458 of the Louisiana Code of Civil Procedure and other applicable rules and law, demands that

within thirty (30) days, Defendant shall answer the attached requests separately and fully in writing

under oath.

Dated:  <u>December 24, 2020</u>                    Respectfully Submitted,

                                 *Michael K. Hibey*

By: _____
     **SIMMONS HANLY CONROY LLC**
     Melissa Schopfer, admitted *pro hac vice*
     Jean-Michel Lecointre, admitted *pro hac vice*
     Michael K. Hibey, admitted *pro hac vice*
     One Court Street
     Alton, IL 62002
     Telephone: 618-259-2222
     Fax: 618-259-2251
     mschopfer@simmonsfirm.com
     jlecointre@simmonsfirm.com
     mhibey@simmonsfirm.com

       -AND-

     **THE CHEEK LAW FIRM LLC**
     LINDSEY A. CHEEK, Bar No. 34484

Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I do hereby certify that on this <u>24 December 2020</u> I served a copy of the foregoing pleading on counsel for all parties to this proceeding by facsimile, by electronic mail, by hand delivery or by mailing the same by United States mail, properly addressed and first class postage prepaid.

_____

## GENERAL INSTRUCTIONS

With respect to all questions, all information is to be divulged which is within the knowledge, possession or control of the corporation or company to whom these requests are addressed, as well as the corporation or company's attorneys, investigators, agents, employees or other representatives.  If you cannot answer the following requests in full after exercising due diligence to secure the full information to do so, then state and answer to the fullest extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to acquire the information.

A.     Please produce all documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories or numbered requests in this set of discovery.

B.     If any information or material is being withheld under any claim of privilege, protection, or immunity, please state with specificity the particular privilege, protection, or immunity asserted.

C.     If Defendant cannot produce requested information or material because it is not in Defendant's possession, custody, or control, please identify the information or material, the reason

the information or material is not in Defendant's possession, custody, or control, and the entity currently having possession, custody, or control over the information or material.

D.     When providing a date, please provide the exact day, month, and year.  If the exact date is not known, please provide the best approximation of the date and clearly note that the date is an approximation.

E.     If responsive material is in electronic, magnetic, or digital form, Plaintiff specifically requests production of such material. Plaintiff requests such material be provided on CD-ROM.

F.     In the event a proper and timely objection is filed as to any requested material, please nevertheless respond to all portions of the request which do not fall within the scope of the objection.  For example, if a request is objected to on the grounds that it is too broad insofar as it seeks documents covering years Defendant believes are not relevant to this litigation, please nevertheless produce documents for all years which Defendant concedes are relevant.

## GENERAL DEFINITIONS

A.     "Defendant," as used herein, means the entity answering these discovery requests and any of its merged, consolidated, or acquired predecessors, divisions, joint ventures, subsidiaries, foreign subsidiaries, foreign subsidiaries of predecessors, parent companies, sister companies.  This definition includes present and former officers, directors, agents, employees, and all other persons acting or purporting to act on behalf of Defendant, its predecessors, subsidiaries, and/or affiliates.

      i.     "Predecessors" further means any entity, whether or not incorporated, which had all or some of its assets purchased by Defendant or came to be acquired by Defendant whether by merger, consolidation, or other means.

     ii.     "Subsidiaries" further means any entity, whether or not incorporated, which is or was in any way owned or controlled, in whole or in part by Defendant or its predecessors.

B.     "Related company" as used herein means any entity in which the named defendant has or had an interest and which does or has specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered asbestos-containing material.

C.     "Asbestos-containing material" and/or "asbestos-containing product" as used herein means raw or processed asbestos and any product which included any form of asbestos as any part of its composition or ingredients *including but not limited to* **friction material, brake**

**pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers**; and/or, equipment or machinery in or on which an asbestos-containing material as defined above was incorporated, added, utilized or applied prior to being sold, distributed or installed by defendant. This term shall also refer to equipment that was originally sold with asbestos-containing material, and / or has specifications that require asbestos or an asbestos-containing material and equipment whose manufacturer anticipates or should anticipate the use of asbestos or an asbestos-containing material in its practical, foreseeable, and/or proper use.

D.    "Documents", as used herein, include, without limitation, books, records, notes, letters, correspondence, memoranda, writings, invoices, purchase orders, contracts, sales ledgers, recordings, journals or books of account, in possession or control of Defendant or Defendant's attorneys, investigators, agents, or employees.  Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any means. "Documents" also includes the content of any applicable computer database.

E.    Where used with respect to documents, "identify" means to give the date, title, origin, author and addressee of the document and the name, address, position or title of the person who has custody of the document.  Whenever identification is requested and Defendant is willing to produce the documents voluntarily, Defendant may respond by attaching a copy of the responsive document to the answers to these requests.

F.    Where used with respect to a person, "identify" means to give the person's name, employer, title or position with that employer, and business address and last known home address if the person is no longer so employed.  If the person identified is, or has been, an employee, officer, director or agent of Defendant, also state the period of time during which he/she has been employed by Defendant, and all positions, titles or jobs that person has held with the Defendant and the years each position was held.

G.    The terms, "trade organization" and "trade association," mean any organization or association of business, industrial, or governmental entities that were associated and/or met for the purpose of achieving common goals, exchanging or disseminating information related to common needs or interests, and/or learning information or facts of interest to the various members of the organization or association.

H.    The terms, "plant" and "facility," mean any location where materials are refined,

converted, chemically altered, changed, assembled, manufactured, constructed, or fabricated as well as locations where products are fabricated, assembled, or manufactured or prepared for further fabrication or assembly.  This definition also includes office spaces, storage spaces, control rooms, undeveloped land, and similar areas within the larger plant or facility.

I.      The term, "manufacture," means to fabricate, construct, assemble, prepare for fabrication or assembly, or take any other action prior to completion of a product or material.

J.      The terms, "medical department," "safety department," and "industrial hygiene department," mean an individual or a group of individuals working for Defendant, either directly or in a contractual capacity, whose purpose was or is to provide guidance, assistance, or advice concerning any aspect of medical health including, but not limited to, the safety of Defendant's workers and the safety of individuals using or exposed to asbestos or asbestos-containing products.

K.      The term, "hazards of asbestos," means any potential or actual asbestos-related injury, effect, damage, scarring, wound, impairment, or disability of any part of human or non-human anatomy including, but not limited to, the lungs and associated tissue.

L.      The term, "test," includes, but is not limited to, studies of atmospheric dust samples, studies of the concentration of asbestos in airborne test samples, studies of the lung conditions of workers (by x-ray or other means), pulmonary function studies of workers, animal studies, pathological studies, industrial hygiene studies, risk assessment studies, cost-benefit analyses, and any other studies concerning health and safety.

M.      The term, "communication," means any transmission or exchange of information, whether oral or written, and whether face to face, by telephone, mail, fax, personal delivery, electronic means, or otherwise.

N.      "Premises," means:

i.      Real property, as well as any structures or other improvements located on the property; and,

ii.      A ship or other floating vehicle, vessel, or structure.

O.      As used herein, "locations and recipients at issue" if and where specifically used means:

i.      Port of New Orleans;
ii.      Puerto Rico Marine Management;
iii.      Great Dane;
iv.      Kelsey Hayes;
v.      Lufkin;
vi.      Strick;
vii.      Utility Trailer; and / or,

viii.    Wilson Trailer.

P.    The terms, "abate" and "abatement," mean any removal and/or cleanup of asbestos-containing products on a premises.

Q.    The term, "utilize," when referring to asbestos-containing products and/or asbestos job site(s) means to install, inspect, apply, maintain, repair, replace, or remove.

R.    The definitions stated above shall also apply to other grammatical forms of the word defined, such as singular and plural, masculine and feminine, and various verb tenses.

## FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**    Identify all sources of information relied upon in formulating defendant's responses to these interrogatories (providing a privilege log if necessary), including records or documents reviewed, records or documents determined to have been destroyed, document retention policies, persons providing information and/or overseeing the process, and the person verifying the answers.

**ANSWER:**

**INTERROGATORY NO. 2:**    Please identify each and every product and/or material—regardless of whether Defendant knows it contained asbestos—Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982.

**ANSWER:**

**INTERROGATORY NO. 3:**    For each product and / or material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982, please state whether Defendant knows or has reason to believe said product and / or material contained asbestos. If so, for each asbestos-containing material, please identify:

    a.    The trade name or brand name of the same;

    b.    The type, brand name and percentage of asbestos contained in the material, including any changes over time (and/or the elimination of asbestos in the material);

    c.    Each and every source (including manufacturers and distributors) from which Defendant and/or any predecessor/related entity obtained each such material;

    d.    The date said product / material was placed on the market, and the inclusive dates of its manufacture, sale, and distribution;

- 6 -

e.      A detailed description of said product / material, including a description of how and why it involved the use of asbestos or asbestos-containing products;

f.      The date Defendant stopped manufacturing, marketing, selling, and/or distributing said product / material;

g.      If applicable, the date said product / material was removed from the market and no longer sold or distributed and the reasons therefore;

h.      The date, if ever, Defendant asbestos no longer utilized asbestos or asbestos-containing material in said product / material, and the reasons for no longer doing so;

i.      Whether Defendant ever conducted any testing on asbestos-containing material to determine whether it posed any potential asbestos-related hazard to human or non-human health;

j.      The plants or facilities where asbestos and /or asbestos-containing materials were manufactured, fabricated, and / or processed by Defendant;

k.      Those likely to encounter said asbestos and / or asbestos-containing materials (such as mechanics); and,

l.      A description of any hazard communications Defendant placed on asbestos-containing materials or its packaging, operating manuals, brochures, catalogs, or other related printed material.  This description should include the precise language of any such hazard communication, the size of the hazard communication, the location on the asbestos-containing material or its packaging where the hazard communication was printed, and when the hazard communication was first placed on said asbestos-containing material.

**ANSWER:**

**INTERROGATORY NO. 4:**      Please identify any and all prior claim(s) alleging lung diseases or death from lung disease, whether directly or indirectly attributed to asbestosis, mesothelioma, lung cancer, or exposure to asbestos-containing material as defined above, alleging exposure to asbestos-containing materials allegedly manufactured, sold, distributed, specified, applied, and / or installed in whole or part by Defendant and / or any predecessor / related entity, specifically including but not limited to those Defendant and/or any predecessor/related entity applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above).

**ANSWER:**

**INTERROGATORY NO. 5:**      Please identify each and every policy, procedure, step, hazard communication, purported warning, and/or program undertaken, implemented, discussed and/or contemplated by Defendant and/or any predecessor/related entity intended to protect any person or persons (including, but not limited to, employees, product end-users and/or by-standers) in any way from exposure to asbestos, asbestos-containing materials and / or dust therefrom.

**ANSWER:**

**INTERROGATORY NO. 6:**     Please identify any and all tests of any kind (e.g., air sampling, laboratory experiments, industrial hygiene surveys, fiber release studies, etc.) concerning possible or potential health hazards involved in the use or manipulation of, or exposure to, asbestos-containing materials or ingredients contained therein (including contaminants such as, for example, tremolite or chrysotile asbestos in talc) conducted b Defendant, any predecessor or related company, or any person or entity acting on behalf thereof including but not limited to any insurance company.

**ANSWER:**

**INTERROGATORY NO. 7:**     Please identify any and all persons or entities that provided industrial hygiene or similar services or information to, or for the benefit of, Defendant, at any time from 1925 to date, including, but not limited to, employees of, or anyone retained by, any predecessor or related company.

**ANSWER:**

**INTERROGATORY NO. 8:**     Please describe Defendant's medical, safety, and industrial hygiene programs from the Defendant's inception through the current time, specifically including but not limited to the date when said department / program was first established and identifying persons associated with the department (including but not limited to directors, managers, physicians, nurses, medical personnel, safety engineers, industrial hygienists, and safety personnel).

**ANSWER:**

**INTERROGATORY NO. 9:**     Please describe when (approximating if necessary) any officer, director, and / or employee of Defendant, any predecessor(s) or related company first had knowledge, information, or belief that exposure to asbestos could have a detrimental effect on health and how such person obtained such knowledge, information or belief.

**ANSWER:**

**INTERROGATORY NO. 10:**     Please identify any and all trade organizations, associations, or other entities to which Defendant, any predecessor or any related company (including any officers, agents and/or employees thereof) has belonged or in which the same has participated since 1925, including dates of membership and/or participation and a description of each such officer, agent and/or employee's involvement with each such organization (e.g., general member, officer

or official of the organization, member of a committee or subcommittee, chair of any committee or subcommittee, etc.).

**ANSWER:**

**INTERROGATORY NO. 11:**       Identify any and all periodicals—including but not limited to scientific, medical and trade periodicals, and corporate newsletters/publications, bulletins, and notices—that Defendant and/or any predecessor/related entity, employee or agent thereof subscribed to, received, published, authored, or distributed from 1925 to the present and for each periodical state the dates of such subscriptions, receipt, publication, authorship, or distribution.

**ANSWER:**

**INTERROGATORY NO. 12:**       Please identify each of Defendant's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or nonhuman exposure to asbestos, populations at risk, etc.).  For each such person identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Defendant's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

**ANSWER:**

**INTERROGATORY NO. 13:**       Please describe Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

**ANSWER:**

**INTERROGATORY NO. 14:**       Please identify any and all communications, including but not limited to investigations and / or citations, between defendant and OSHA or any other local, state, or federal governmental agency for any matter related to asbestos and / or asbestos exposure.

**ANSWER:**

**INTERROGATORY NO. 15:**       If Defendant has asserted any affirmative defenses, avoidances, theories of alternate causation (including but not limited to sole proximate cause), and / or exceptions in this case, please provide a short and plain statement of the facts Defendant

contends support each such defense, avoidance, theory of alternate causation and / or exception.

**ANSWER:**

**INTERROGATORY NO. 16:**     Please identify by case name, docket number, court and date filed any proceeding(s) of any nature whatsoever (specifically including but not limited to civil, adjudicatory, or arbitration) filed by you against your insurer(s) for reimbursement and/or coverage dispute of any legal fees, costs, expenses and/or judgment(s) related to and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

**ANSWER:**

**INTERROGATORY NO. 17:**     Please identify any and all policies of insurance which may provide coverage for this Defendant, its executive officers, any predecessor or related companies, against the claims asserted in Plaintiff's complaint, specifically including but not limited to Commercial General Liability ("CGL") policies, Workers' Compensation / Employers' Liability ("WC/EL") policies, Excess policies, and Umbrella policies.

**ANSWER:**

**INTERROGATORY NO. 18:**     Please state all facts in support of defendant's contention, if it so contends, that it was not foreseeable that asbestos-containing material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above) would be removed, replaced, and / or otherwise disturbed.

**ANSWER:**

**INTERROGATORY NO. 19:**     Please identify defendant's employees and executive officers with responsibility for the selection / specification of asbestos-containing materials in friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered by Defendant, any predecessor and/or related entity at any point in time prior to the end of the year 1982.

**ANSWER:**

Dated:  December 24, 2020                     Respectfully Submitted,

By: _____

**SIMMONS HANLY CONROY LLC**
Melissa Schopfer, admitted *pro hac vice*
Jean-Michel Lecointre, admitted *pro hac vice*
Michael K. Hibey, admitted *pro hac vice*
One Court Street
Alton, IL 62002
Telephone: 618-259-2222
Fax: 618-259-2251
mschopfer@simmonsfirm.com
jlecointre@simmonsfirm.com
mhibey@simmonsfirm.com

   -AND-

**THE CHEEK LAW FIRM LLC**
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com
**COUNSEL FOR PLAINTIFF**

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2019-09716                    **SECTION: 8**                    **DIVISION N**

**CAROLYN BRINDELL, ET AL.**

**VERSUS**

**CARLISLE INDUSTRIAL BRAKE AND FRICTION, INC., ET AL.**

FILED: _____        DEPUTY CLERK: _____

**PLAINTIFF'S FIRST INTERROGATORIES**
**TO DEFENDANT WILSON TRAILER COMPANY**

TO DEFENDANT:  WILSON TRAILER COMPANY

BY AND THROUGH ITS COUNSEL OF RECORD:
    William Harrison, Jennifer Adams, Barbara Ormsby
    DEUTSCH KERRIGAN LLP
    755 Magazine Street
    New Orleans, LA  70130
    jadams@deutschkerrigan.com
    wharrison@deutschkerrigan.com
    bormsby@deutschkerrigan.com

    Plaintiff, by and through his undersigned counsel and pursuant to articles 1422, 1457 and

1458 of the Louisiana Code of Civil Procedure and other applicable rules and law, demands that

within thirty (30) days, Defendant shall answer the attached requests separately and fully in writing

under oath.

Dated:  <u>December 24, 2020</u>                    Respectfully Submitted,          .

                                        By: _____
                                        Melissa C. Schopfer, *pro hac vice*
                                        Jean-Michel Lecointre, *pro had vice*
                                        Michael K. Hibey, *pro hac vice*
                                        Simmons Hanly Conroy LLC
                                        1 Court Street
                                        Alton, IL 62002
                                        Tel:    (618) 259-2222
                                        Fax:    (618) 259-2251
                                        Email: mschopfer@simmonsfirm.com
                                        Email: jlecointre@simmonsfirm.com
                                        Email: mhibey@simmonsfirm.com

                                        -and-

                                        THE CHEEK LAW FIRM

/s/  Lindsey A. Cheek
LINDSEY A. CHEEK, Bar No. 34484
Jeanne L. St. Romain, Bar No. 36035
650 Poydras Street, Suite 2310
New Orleans, LA 70130
Telephone:  504-304-4333
Fax:  504-324-0629
LCheek@thecheeklawfirm.com
JStromain@thecheeklawfirm.com
asbestos@thecheeklawfirm.com

## CERTIFICATE OF SERVICE

I do hereby certify that on this <u>24 December 2020</u> I served a copy of the foregoing pleading

on counsel for all parties to this proceeding by facsimile, by electronic mail, by hand delivery or

by mailing the same by United States mail, properly addressed and first class postage prepaid.


_____
Jean-Michel Lecointre

## GENERAL INSTRUCTIONS

With respect to all questions, all information is to be divulged which is within the knowledge, possession or control of the corporation or company to whom these requests are addressed, as well as the corporation or company's attorneys, investigators, agents, employees or other representatives.  If you cannot answer the following requests in full after exercising due diligence to secure the full information to do so, then state and answer to the fullest extent possible, specifying your inability to answer the remainder, stating whatever information or knowledge you have concerning the unanswered portion and detailing what you did in attempting to acquire the information.

A.      Please produce all documents and tangible things as they are kept in the usual course of business or organize and label them to correspond with the categories or numbered requests in this set of discovery.

B.      If any information or material is being withheld under any claim of privilege, protection, or immunity, please state with specificity the particular privilege, protection, or immunity asserted.

C.      If Defendant cannot produce requested information or material because it is not in Defendant's possession, custody, or control, please identify the information or material, the reason the information or material is not in Defendant's possession, custody, or control, and the entity currently having possession, custody, or control over the information or material.

D.      When providing a date, please provide the exact day, month, and year.  If the exact date is not known, please provide the best approximation of the date and clearly note that the date is an approximation.

E.      If responsive material is in electronic, magnetic, or digital form, Plaintiff specifically requests production of such material. Plaintiff requests such material be provided on CD-ROM.

F.      In the event a proper and timely objection is filed as to any requested material, please nevertheless respond to all portions of the request which do not fall within the scope of the objection.  For example, if a request is objected to on the grounds that it is too broad insofar as it seeks documents covering years Defendant believes are not relevant to this litigation, please nevertheless produce documents for all years which Defendant concedes are relevant.

## GENERAL DEFINITIONS

A.      "Defendant," as used herein, means the entity answering these discovery requests and any of its merged, consolidated, or acquired predecessors, divisions, joint ventures, subsidiaries, foreign subsidiaries, foreign subsidiaries of predecessors, parent companies, sister companies.  This definition includes present and former officers, directors, agents, employees, and all other persons acting or purporting to act on behalf of Defendant, its predecessors, subsidiaries, and/or affiliates.

        i.      "Predecessors" further means any entity, whether or not incorporated, which had all or some of its assets purchased by Defendant or came to be acquired by Defendant whether by merger, consolidation, or other means.

        ii.     "Subsidiaries" further means any entity, whether or not incorporated, which is or was in any way owned or controlled, in whole or in part by Defendant or its predecessors.

B.      "Related company" as used herein means any entity in which the named defendant has or had an interest and which does or has specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered asbestos-containing material.

C.      "Asbestos-containing material" and/or "asbestos-containing product" as used herein means raw or processed asbestos and any product which included any form of asbestos as any part of its composition or ingredients *including but not limited to* **friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers**; and/or, equipment or machinery in or on which an asbestos-containing material as defined above was incorporated, added, utilized or applied prior to being sold, distributed or installed by defendant. This term shall also refer to equipment that was originally sold with asbestos-containing material, and / or has specifications that require asbestos or an asbestos-containing material and equipment whose manufacturer anticipates or should anticipate the use of asbestos or an asbestos-containing material in its practical, foreseeable, and/or proper use.

D.      "Documents", as used herein, include, without limitation, books, records, notes, letters, correspondence, memoranda, writings, invoices, purchase orders, contracts, sales ledgers, recordings, journals or books of account, in possession or control of Defendant or Defendant's attorneys, investigators, agents, or employees.  Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any means. "Documents" also includes the content of any applicable computer database.

E.      Where used with respect to documents, "identify" means to give the date, title, origin, author and addressee of the document and the name, address, position or title of the person who has custody of the document.  Whenever identification is requested and Defendant is willing to produce the documents voluntarily, Defendant may respond by attaching a copy of the responsive document to the answers to these requests.

F.      Where used with respect to a person, "identify" means to give the person's name, employer, title or position with that employer, and business address and last known home address if the person is no longer so employed.  If the person identified is, or has been, an employee, officer, director or agent of Defendant, also state the period of time during which he/she has been employed by Defendant, and all positions, titles or jobs that person has held with the Defendant and the years each position was held.

G.      The terms, "trade organization" and "trade association," mean any organization or association of business, industrial, or governmental entities that were associated and/or met for the purpose of achieving common goals, exchanging or disseminating information related to common needs or interests, and/or learning information or facts of interest to the various members of the organization or association.

H.      The terms, "plant" and "facility," mean any location where materials are refined, converted, chemically altered, changed, assembled, manufactured, constructed, or fabricated as well as locations where products are fabricated, assembled, or manufactured or prepared for further fabrication or assembly.  This definition also includes office spaces, storage spaces, control rooms, undeveloped land, and similar areas within the larger plant or facility.

I.      The term, "manufacture," means to fabricate, construct, assemble, prepare for fabrication or assembly, or take any other action prior to completion of a product or material.

J.      The terms, "medical department," "safety department," and "industrial hygiene department," mean an individual or a group of individuals working for Defendant, either directly or in a contractual capacity, whose purpose was or is to provide guidance, assistance, or advice concerning any aspect of medical health including, but not limited to, the safety of Defendant's workers and the safety of individuals using or exposed to asbestos or asbestos-containing products.

K.      The term, "hazards of asbestos," means any potential or actual asbestos-related injury, effect, damage, scarring, wound, impairment, or disability of any part of human or non-human anatomy including, but not limited to, the lungs and associated tissue.

L.      The term, "test," includes, but is not limited to, studies of atmospheric dust samples, studies of the concentration of asbestos in airborne test samples, studies of the lung conditions of workers (by x-ray or other means), pulmonary function studies of workers, animal studies, pathological studies, industrial hygiene studies, risk assessment studies, cost-benefit analyses, and any other studies concerning health and safety.

M.      The term, "communication," means any transmission or exchange of information, whether oral or written, and whether face to face, by telephone, mail, fax, personal delivery, electronic means, or otherwise.

N.      "Premises," means:

      i.      Real property, as well as any structures or other improvements located on the property; and,

      ii.      A ship or other floating vehicle, vessel, or structure.

O.      As used herein, "locations and recipients at issue" if and where specifically used means:

      i.      Port of New Orleans;
      ii.      Puerto Rico Marine Management;
      iii.      Great Dane;
      iv.      Kelsey Hayes;
      v.      Lufkin;
      vi.      Strick;
      vii.      Utility Trailer; and / or,
      viii.      Wilson Trailer.

P.      The terms, "abate" and "abatement," mean any removal and/or cleanup of asbestos-containing products on a premises.

Q.      The term, "utilize," when referring to asbestos-containing products and/or asbestos job site(s) means to install, inspect, apply, maintain, repair, replace, or remove.

R.      The definitions stated above shall also apply to other grammatical forms of the word defined, such as singular and plural, masculine and feminine, and various verb tenses.

## FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**      Identify all sources of information relied upon in formulating defendant's responses to these interrogatories (providing a privilege log if necessary), including records or documents reviewed, records or documents determined to have been destroyed, document retention policies, persons providing information and/or overseeing the process, and the person verifying the answers.

      **ANSWER:**

**INTERROGATORY NO. 2:**        Please identify each and every product and/or material—regardless of whether Defendant knows it contained asbestos—Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982.

      **ANSWER:**

**INTERROGATORY NO. 3:**        For each product and / or material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and entities at issue (as defined above), at any point in time prior to the end of the year 1982, please state whether Defendant knows or has reason to believe said product and / or material contained asbestos. If so, for each asbestos-containing material, please identify:

    a.    The trade name or brand name of the same;

    b.    The type, brand name and percentage of asbestos contained in the material, including any changes over time (and/or the elimination of asbestos in the material);

    c.    Each and every source (including manufacturers and distributors) from which Defendant and/or any predecessor/related entity obtained each such material;

    d.    The date said product / material was placed on the market, and the inclusive dates of its manufacture, sale, and distribution;

    e.    A detailed description of said product / material, including a description of how and why it involved the use of asbestos or asbestos-containing products;

    f.    The date Defendant stopped manufacturing, marketing, selling, and/or distributing said product / material;

    g.    If applicable, the date said product / material was removed from the market and no longer sold or distributed and the reasons therefore;

    h.    The date, if ever, Defendant asbestos no longer utilized asbestos or asbestos-containing material in said product / material, and the reasons for no longer doing so;

    i.    Whether Defendant ever conducted any testing on asbestos-containing material to determine whether it posed any potential asbestos-related hazard to human or non-human health;

    j.    The plants or facilities where asbestos and /or asbestos-containing materials were manufactured, fabricated, and / or processed by Defendant;

    k.    Those likely to encounter said asbestos and / or asbestos-containing materials (such as mechanics); and,

    l.    A description of any hazard communications Defendant placed on asbestos-containing materials or its packaging, operating manuals, brochures, catalogs, or other related printed material.  This description should include the precise language

of any such hazard communication, the size of the hazard communication, the location on the asbestos-containing material or its packaging where the hazard communication was printed, and when the hazard communication was first placed on said asbestos-containing material.

**ANSWER:**

**INTERROGATORY NO. 4:**        Please identify any and all prior claim(s) alleging lung diseases or death from lung disease, whether directly or indirectly attributed to asbestosis, mesothelioma, lung cancer, or exposure to asbestos-containing material as defined above, alleging exposure to asbestos-containing materials allegedly manufactured, sold, distributed, specified, applied, and / or installed in whole or part by Defendant and / or any predecessor / related entity, specifically including but not limited to those Defendant and/or any predecessor/related entity applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above).

**ANSWER:**

**INTERROGATORY NO. 5:**        Please identify each and every policy, procedure, step, hazard communication, purported warning, and/or program undertaken, implemented, discussed and/or contemplated by Defendant and/or any predecessor/related entity intended to protect any person or persons (including, but not limited to, employees, product end-users and/or by-standers) in any way from exposure to asbestos, asbestos-containing materials and / or dust therefrom.

**ANSWER:**

**INTERROGATORY NO. 6:**        Please identify any and all tests of any kind (e.g., air sampling, laboratory experiments, industrial hygiene surveys, fiber release studies, etc.) concerning possible or potential health hazards involved in the use or manipulation of, or exposure to, asbestos-containing materials or ingredients contained therein (including contaminants such as, for example, tremolite or chrysotile asbestos in talc) conducted b Defendant, any predecessor or related company, or any person or entity acting on behalf thereof including but not limited to any insurance company.

**ANSWER:**

**INTERROGATORY NO. 7:**        Please identify any and all persons or entities that provided industrial hygiene or similar services or information to, or for the benefit of, Defendant, at any time from 1925 to date, including, but not limited to, employees of, or anyone retained by, any predecessor or related company.

**ANSWER:**

**INTERROGATORY NO. 8:**        Please describe Defendant's medical, safety, and industrial hygiene programs from the Defendant's inception through the current time, specifically including but not limited to the date when said department / program was first established and identifying persons associated with the department (including but not limited to directors, managers, physicians, nurses, medical personnel, safety engineers, industrial hygienists, and safety personnel).

       **ANSWER:**

**INTERROGATORY NO. 9:**        Please describe when (approximating if necessary) any officer, director, and / or employee of Defendant, any predecessor(s) or related company first had knowledge, information, or belief that exposure to asbestos could have a detrimental effect on health and how such person obtained such knowledge, information or belief.

       **ANSWER:**

**INTERROGATORY NO. 10:**        Please identify any and all trade organizations, associations, or other entities to which Defendant, any predecessor or any related company (including any officers, agents and/or employees thereof) has belonged or in which the same has participated since 1925, including dates of membership and/or participation and a description of each such officer, agent and/or employee's involvement with each such organization (e.g., general member, officer or official of the organization, member of a committee or subcommittee, chair of any committee or subcommittee, etc.).

       **ANSWER:**

**INTERROGATORY NO. 11:**        Identify any and all periodicals—including but not limited to scientific, medical and trade periodicals, and corporate newsletters/publications, bulletins, and notices—that Defendant and/or any predecessor/related entity, employee or agent thereof subscribed to, received, published, authored, or distributed from 1925 to the present and for each periodical state the dates of such subscriptions, receipt, publication, authorship, or distribution.

       **ANSWER:**

**INTERROGATORY NO. 12:**        Please identify each of Defendant's employees, former employees, or representatives who attended any proceeding, symposium, or conference of a scientific, medical, or technical nature during which information relating to the hazards of asbestos or nuisance dust in general was discussed, disseminated, or in any way published (e.g., the effects of human or nonhuman exposure to asbestos, populations at risk, etc.).  For each such person

identified in the response to this Interrogatory, please also list the proceeding, symposium, or conference the person attended; provide the date and location of the proceeding, symposium, or conference; provide the identity of the person within Defendant's organization who received or was designated to receive the attending person's report of the information gathered at such proceeding, symposium, or conference; and describe the manner in which such reports were made.

**ANSWER:**

**INTERROGATORY NO. 13:**        Please describe Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

**ANSWER:**

**INTERROGATORY NO. 14:**        Please identify any and all communications, including but not limited to investigations and / or citations, between defendant and OSHA or any other local, state, or federal governmental agency for any matter related to asbestos and / or asbestos exposure.

**ANSWER:**

**INTERROGATORY NO. 15:**        If Defendant has asserted any affirmative defenses, avoidances, theories of alternate causation (including but not limited to sole proximate cause), and / or exceptions in this case, please provide a short and plain statement of the facts Defendant contends support each such defense, avoidance, theory of alternate causation and / or exception.

**ANSWER:**

**INTERROGATORY NO. 16:**        Please identify by case name, docket number, court and date filed any proceeding(s) of any nature whatsoever (specifically including but not limited to civil, adjudicatory, or arbitration) filed by you against your insurer(s) for reimbursement and/or coverage dispute of any legal fees, costs, expenses and/or judgment(s) related to and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

**ANSWER:**

**INTERROGATORY NO. 17:**        Please identify any and all policies of insurance which may provide coverage for this Defendant, its executive officers, any predecessor or related companies, against the claims asserted in Plaintiff's complaint, specifically including but not limited to Commercial General Liability ("CGL") policies, Workers' Compensation / Employers' Liability ("WC/EL") policies, Excess policies, and Umbrella policies.

**ANSWER:**

**INTERROGATORY NO. 18:**        Please state all facts in support of defendant's contention, if it so contends, that it was not foreseeable that asbestos-containing material Defendant and/or any predecessor/related entity manufactured, sold, distributed, specified, applied, installed, removed and / or replaced in whole or part to/for/at any of the locations and recipients at issue (as defined above) would be removed, replaced, and / or otherwise disturbed.

        **ANSWER:**

**INTERROGATORY NO. 19:**        Please identify defendant's employees and executive officers with responsibility for the selection / specification of asbestos-containing materials in friction material, brake pads, brake blocks, brake shoes, brake drums, brake discs, clutches and/or clutch components, gaskets, gasket material, engines, axles, tractors, and/or trailers specified, assembled, manufactured, sold, distributed, installed, removed, repaired, and/or brokered by Defendant, any predecessor and/or related entity at any point in time prior to the end of the year 1982.

        **ANSWER:**

        Dated:  <u>December 24, 2020</u>                    Respectfully Submitted,        .


        By:  _____
             Melissa C. Schopfer, *pro hac vice*
             Jean-Michel Lecointre, *pro had vice*
             Michael K. Hibey, *pro hac vice*
             Simmons Hanly Conroy LLC
             1 Court Street
             Alton, IL 62002
             Tel:    (618) 259-2222
             Fax:    (618) 259-2251
             Email:  mschopfer@simmonsfirm.com
             Email:  jlecointre@simmonsfirm.com
             Email:  mhibey@simmonsfirm.com

             -and-

             **THE CHEEK LAW FIRM**
             <u>/s/  Lindsey A. Cheek</u>
             LINDSEY A. CHEEK, Bar No. 34484
             Jeanne L. St. Romain, Bar No. 36035
             650 Poydras Street, Suite 2310
             New Orleans, LA 70130
             Telephone:  504-304-4333
             Fax:  504-324-0629
             LCheek@thecheeklawfirm.com
             JStromain@thecheeklawfirm.com
             asbestos@thecheeklawfirm.com

             **COUNSEL FOR PLAINTIFF**

**Expert  Report of James R. Millette, Ph.D., D-IBFES**

In the matter Carolyn Brindell (John Brindell, dec.), et al. v. Carlisle Industrial
Brake and Friction, Inc., et al., In Civil District court for the Parish of Orleans,
Louisiana. No. 2019-09716, Section 8, Division "N"

## A.  Introduction

1.  I was asked by the Law Offices of Simmons, Hanly, Conroy to prepare an
    expert report concerning my opinions about asbestos fiber release from
    work with friction products in the above listed case involving John Brindell.

## B.  Qualifications and Foundation

2.  I am an environmental scientist and Board certified in forensic engineering
    sciences specializing in environmental / industrial hygiene exposure /
    particle and material science since 1972, primarily using electron
    microscopy techniques.   Material science is used to analyze and
    determine the properties of different materials.

3.  I am currently a Senior Scientist at Millette Technical Consulting in Lilburn,
    GA.  I hold a B.S. in Physics from the University of Dayton in Dayton, Ohio
    (1973); an M.En. in Environmental Science from Miami University in
    Oxford, Ohio (1975); and a Ph.D. in Environmental Science from the
    University of Cincinnati, School of Engineering in Cincinnati, Ohio (1983).

4.  My research includes 11 years as a research scientist at the U.S.
    Environmental Protection Agency Research Center in Cincinnati, Ohio, as
    well as 5 years at McCrone Environmental Services performing and
    supervising analysis of particulates and product constituent analysis by
    microscopic techniques.  More than 60 of my publications have appeared
    in a number of journals including Scanning Electron Microscopy, Journal of
    the American Water Works Association, Environmental Health
    Perspectives, Archives of Environmental Contamination and Toxicology,
    Science of the Total Environment, Journal of Analytical Toxicology,
    Electron Microscopy, and The Microscope.  I have written chapters and
    books on the subject of asbestos analysis[1-3].  Additionally, reports of my
    scientific work have been presented at numerous national and
    international meetings. My resume which includes a list of my publications
    is attached in Appendix A.

5.  I have testified in a number of court cases, both by deposition and at trial,
    concerning the matters of environmental science, microscopy of asbestos
    fibers, asbestos fiber release from asbestos-containing products and
    exposure to people from those releases. A list of the cases in which I have
    testified, either by deposition or at trial within the last four years, is

1

**EXHIBIT X**

attached as Appendix B.  My compensation rates are given in Appendix C.

**6.** I have conducted extensive research and testing on asbestos content of products including but not limited to friction products.

**7.** I have also conducted extensive research and testing on the potential for fiber release from the ordinary and intended uses and manipulation of asbestos products including but not limited to friction products.  I have also reviewed some corporate documents, as well as various government reports, which discuss the fiber release from products including friction products.

## C.  Materials Reviewed

**8.** I have reviewed the following case specific material and have relied upon this in formulating my opinions in this case:

    a.  Transcript of the deposition of Keith J. Poleto Vol. 1 – February 19, 2020
    b.  Transcript of the deposition of Keith J. Poleto Vol. 2 – February 20, 2019
    c.  Plaintiff's Responses to Master Interrogatories – December 20, 2019
    d.  John Brindell Exposure History (2 page summary)
    e.  Affidavit of Raymond Kain, April 19, 2020

**9.** I also reviewed reports of studies done by MVA Scientific Consultants and the relevant published scientific literature concerning asbestos friction products.  A list of materials that I have reviewed concerning asbestos-containing friction products can be found under the heading: Articles, Reports, Corporate Memos, etc. Copies of the asbestos-containing friction related documents can be supplied upon request.

## D.  John Brindell's Exposure to Asbestos from Asbestos-Containing Friction Products

**10.** According to the information received, Mr. John Brindell worked for Puerto Rico Marine Management Inc.(PRMMI) in the Port of New Orleans between approximately 1976 and 1981. As described in the deposition of Keith Poleto, a co-worker of John Brindell's, John was the supervisor for Mr. Poleto, who started in 1979 as a mechanic doing maintenance for 18 wheel trailers. Mr. Brindell did some teaching of Poleto on how to perform maintenance work on the semi-trailers. Poleto remembered that Mr. Brindell did help the mechanics when they were in a bind, but not too often.

**11.** Trucks came into the terminal in New Orleans, and containers were transferred to ships that went directly to Puerto Rico. The terminal held about 3,000 trucks with trailers. There was a Front shop and a rear shop

and a mechanic shop for the yard trucks. Mr. Poleto's best estimate was that 1,000 trailers had brake work done each year at Puerto Rico Marine.

12. The Front maintenance shop where Mr. Poleto worked contained 4 bays and each bay had 2 mechanics. Poleto did brake inspections and brake jobs on the tandem axle on the trailers. After brake inspection, 40-50% of the time you had to change the drum. There were 4 brake shoes per each axle.

13. Poleto and other mechanics did brake jobs approximately 70-75% of their work. They all followed essentially the same procedures that included blowing brake systems off with an air hose. Mr. Poleto testified that it took 30 seconds to a minute to blow out a single drum. The dust went on the ground, in air, all over. He also blew off new brakes before reassembling. Often, a couple of times a day, he would have to bevel the edges of the brake linings at 45 degrees with a grinder to get the pads to fit. Some days they would do 4 brake jobs in each bay, each a complete brake job, all 4 wheels, both axles, 8 shoes. To do one complete axle took about an hour. The mechanics were responsible for cleaning up themselves. Mostly that involved sweeping.

14. Because it was a closed in work area, Poleto said he believed everybody in that shop got 'mega' exposed to brake dust, including Mr. Brindell, who was always in and out of the shop supervising. Poleto said, "Because not only what I'm doing, what the guy next to me is doing and the guy next to that and the guy next to that, so you was constantly in that dust."

15. According to the Poleto deposition, Mr. Brindell was often 4-5 feet away from Poleto while Poleto performed brake work including blowing off drums with 120 psi compressed air. Mr. Poleto also blew himself off with compressed air. Mr. Poleto had a fan in the bay that he positioned to blow on himself and sometimes tried to get it to blow the dust away from himself. Sometimes it blew away from Brindell; sometimes toward Brindell.

16. Poleto recalled that he worked on Carlisle brake materials (most common) as well as Abex and Bendix. The brake linings that he worked with were as wide as a book – 8, 10 inches. They were about 4 times bigger than a car brake. The liner (pad) was ¾ to 1 inch thick. (According to Mr. Poleto, some people say pad, some people say liner. Same thing.)

17. He recalled working on Eaton axles and some Rockwell, and Dayton axles. There were a lot of Fruehauf trailers, as well as some Strick, Great Dane, Utility, Wilson, Trailmobile, and Lufkin trailers that he recalled working on. Poleto said that removing brake shoes from Eaton axles (and those of other brands) was done the same way as brake jobs in general. Mr. Poleto said, "A brake job is a brake job no matter whose equipment

3

you are using. They are all the same." He used the same tools and methods regardless of brand name.

18. Brindell spent about 50% of time in his office. The majority of the other time was spent in the Front shop where Poleto worked. Although Puerto Rico Marine Management provided uniforms to shop employees, Mr. Brindell did not wear a uniform. He generally wore a white shirt, slacks and a tie when he was in the working bay areas. Brindell used to complain because Poleto and other mechanics used to get his white shirt dirty.  He never wore a mask.

### E.  Friction Products

19. Friction materials such as brake linings and clutches often contained chrysotile asbestos as a component in the past.  Using acid/base digestion procedures[4-6], small amounts of amphibole asbestos (primarily tremolite) have also been found in brake products and a clutch (Table 1).

### F.  Encapsulation and Releasable Fibers in Brakes and Clutches

20. The question of whether or not all asbestos fibers are completely bound or encapsulated in friction material is one that I have studied by microscopy. A close examination of the surfaces of unused brakes and clutches showed that although most of the asbestos is indeed bound within a binder, uncoated asbestos fibers were present on the surface and on the edges that would be released as free fibers with mild abrasion.  Additional work examining friction products from a number of manufacturers including Abex, Bendix and Fruehauf showed similar results.   On the surface, asbestos fibers are uncoated and protruding from the friction product surface (For examples see Figures 2 and 5).  The asbestos fibers are available to be released into the air upon rubbing or abrasion.

21. It is well established that asbestos fibers released during brake servicing including blow-outs with compressed air, sanding, filing and grinding can cause high exposures[7-23]. Studies I conducted at MVA Scientific Consultants have shown that asbestos fibers are released into the breathing zone of the worker while sanding and filing brakes (Tables 2a, 2b, and 2c).  Sweeping up of brake dust also exposes the worker to asbestos fibers (Table 2b and 2c). Indirect exposure (in the proximity to others performing work) can result in asbestos exposures to the person who observes the work (bystander).  In the absence of measured values at specific distances, the rule of thumb determined by Donovan, 2011[24], is useful for approximating exposures; namely: for bystanders in the range of 1-5 feet from the person performing the work (source), airborne asbestos concentrations can be roughly approximated at 50% of the source

4

concentration; 35% at >5-10 feet, 10% for >10-30 feet, and less than 1% at distances greater than 30 feet.

22. There is evidence that handling of boxes in which friction parts are shipped can expose a worker to asbestos fibers because the handling and shipping of new brakes can release asbestos fibers into the shipping boxes. I have personally tested the dust within a box containing brake components and found it to contain approximately 21 million asbestos fibers[F-2].

23. A letter from Rockwell International, Highway Brake Div., of October 26, 1977 to Abex Corp[25] complained about shipments of Abex brake linings from a Salisbury plant having excessive asbestos dust. The letter stated: "Our people indicated each box on this shipment contained approximately one cup of dust."

24. In an internal Ford memo (1 October 1984)  from P.A. Brogan to Mr. E.C. Koops, Manager, Sterling Plant concerning an "Industrial Hygiene Survey of Asbestos Fiber Exposure at Conveyor Loading of Brake Assembly"[26], it was stated that asbestos fibers were present on the cardboard packing separators when the brake shoes contain asbestos. Laboratory analysis of one sample of the box dust from another plant showed a level of 23% chrysotile asbestos. The memo concluded that, in light of present knowledge, the best control of asbestos is its eventual complete removal or absolute containment. The memo also recommended that all cardboard separators be returned to the supplier as soon as possible to prevent their reuse within the plant because now the cardboard is used for other purposes after the assemblies have been removed. The memo concluded that this practice potentially exposes others to asbestos fibers.

25. Handling and shipping of new friction products can release asbestos fibers into the shipping boxes, and handling the boxes can expose a worker to asbestos fibers.  Ford Company inter-office memos from the 1970s and 1980s show concern for exposure to asbestos dust from clutches while they were handled. One 1978 analysis[27] of the dust in prefabricated clutch assembly boxes found a level of asbestos of less than or equal to 1% while dust associated with clutches in another Ford facility (also 1978) showed a level of 3-5% chrysotile asbestos[28]. In 1979, an analysis of dust[29-31] from clutch plates (discs) showed a level of 14-15% chrysotile asbestos.

26. A 1978 study[32] of an employee during clutch disc unpacking at a Ford facility revealed an exposure to the employee of a time-weighted average (TWA) level of 0.14 F/cc – in excess of then current corporate guidelines requiring medical monitoring. A 1979 Ford study[33] showed breathing zone samples of one employee involved with clutch assembly to be at levels of 0.04 - 0.5 F/cc with time-weighted averages (TWA) of 0.03 – 0.45 F/cc.

5

Another 1979 study[34] at a different Ford facility showed that an employee who unpacked pressure plates and opened clutch plate boxes had exposure levels 0.05 - 0.3 F/cc with a time-weighted average (TWA) of 0.14 F/cc. The same study found that a person who disposed of clutch boxes had a level of 0.18 F/cc.

27. A Ford Inter-office Memo of October 24, 1983[35] reported that "It has been our experience that excess asbestos fibers can be present in air if clutches are carelessly packed at the supplier causing fiber shedding during transit, and employees throw the shipping boxes while unloading the clutches. This problem can be handled by insisting the supplier carefully package the clutches in clean boxes with a flypaper type lining of the box and between clutches." A Ford Inter-office memo from 1982[36] reported that Raybestos was at that time supplying clutch plates wrapped in sticky paper to cut down on dust. The same memo of March 18, 1982[36] also stated that "This is Company policy when dealing with asbestos, a known carcinogen, in which no safe limit or threshold exposure is known and an employe (sic) exposure exceeds 0.1 f/cc… that the employee receives annual medical exams."

28. While it is theoretically possible, there is simply no conclusive scientific evidence that chrysotile converts to forsterite in brake wear to any great degree[37-46]. This is consistent with the 2005 statement of OSHA by Dan Crane[39]: "Contrary to many reports, the braking process does not 'convert' fibers to forsterite. This misconception is based on some unfounded speculation in several early reports which did not actually identify forsterite as a decomposition product in the brake shoe dust." The concentration of asbestos in brake wear dust, in terms of asbestos fibers, has been reported to be as high as in the trillions of fibers per gram and is certainly in the millions or billions of asbestos fibers per gram[F-50,47,48,49]. In addition to the asbestos fibers in the brake wear dust, asbestos fibers protruding from the surfaces of brake linings contribute to the airborne concentration when the brake area is blown out with compressed air. These fibers may not have had any direct contact with the braking process. Although thermal degradation reduces some chrysotile asbestos to particles that are no longer fibers and some amorphous fibers may be produced, the airborne population of fibers are primarily chrysotile fibers without substantial alteration in morphology, chemical composition, or crystal structure.

## G. Re-suspension of Settled Asbestos Fibers

29. It is my opinion that asbestos fibers are released into the air from handling asbestos-containing friction products and their boxes. Some of the fibers settle out on surfaces, including clothing. The asbestos fibers settling on clothing may be re-suspended into the air during handling and cleaning

activities, including blowing with compressed air, blowing with a fan, and sweeping.

30. The US Environmental Protection Agency considers the resuspension of asbestos fibers to be one of the main sources of potential exposure. A discussion of the topic of resuspension of settled dust containing asbestos and data from the scientific literature on the subject can be found in a book I co-authored in 1994[50]. I have personally studied the question of asbestos fiber release from contaminated clothing. In two MVA studies, I found that airborne asbestos fibers are released from asbestos-contaminated clothing while being handled and put into a container like a washing machine[F-39,F-40,GP-1,GP-2]. The amount put into the air can be significantly above background.  In the MVA studies, I found levels in the air between 0.3 and 2 F/cc. A 1977 study[51] of handling asbestos-contaminated clothing and putting them in a washing machine by Dr. Sawyer of Yale University showed a level of 0.4 F/cc, within the range that I found. A 1970 UK study[52] showed that asbestos fibers could be released from a contaminated laboratory coat (0.5 – 2.4 F/cc). The study also showed that asbestos fibers were being resuspended during sweeping and brushing of settled dust containing asbestos (7 – 53 F/cc). Using a test chamber similar to what I used, a 1972 NIOSH study, in which asbestos-contaminated burlap bags were shaken, found significantly high levels of asbestos (over 100 F/cc) were released into the air[53].

## H. Opinions about Mr. John Brindell's Exposure to Asbestos from Friction Products

31. Based upon my education, training and experience, as well as my review of the materials listed above, it is my expert opinion to a reasonable degree of scientific certainty that Mr. John Brindell's work with and being in the presence of others working with asbestos-containing brakes involving handling, beveling or grinding, blowing with compressed air and clean-up activities while at Puerto Rico Marine Management Inc., more likely than not exposed him to respirable asbestos fibers at levels significantly above ambient levels. He was also exposed to asbestos from the resuspension of dust that accumulated on his clothing and in the boxes in which the friction products were received.  It is my opinion that Mr. John Brindell, when he was around others while they worked with asbestos friction products, was exposed to varying levels of asbestos fibers in his breathing zone during his work.  These exposures varied from day to day at about 35% of the ranges described in Tables 2a, 2b, and 2c, depending on the specific activities which he was around while others performed their work.

## I. Basis of Opinions

32. My opinions are based on my education and experience as well as the research reports by MVA Scientific Consultants and other documents listed in this expert report and its Appendixes. All of my opinions are to a reasonable degree of scientific certainty unless otherwise stated. I reserve the right to supplement or amend my opinions if additional information is provided about this case.

33. My opinions are all given to a reasonable degree of scientific certainty. They are all based on my education and experience as well as the research reports by MVA Scientific Consultants and other documents listed in this expert report. I reserve the right to supplement or amend my opinions if additional information is provided about this case.

James R. Millette, Ph.D., D-IBFES

Millette Technical Consultants
220 Cricket Walk SW
Lilburn, GA 30047
(MTC Project 101)
11 January, 2021

**Information Cited and/or Considered**
(Copies can be provided upon request)

**MVA Reports related to Friction**
F-1. MVA 1810 Fiber Release Ford, Bendix 01/29/97
F-2. MVA 5744 Fiber Release Friction Product Box 11/03/03
F-3. MVA 7040 Fiber Release During the Sanding of Brakes (Bendix), 09/26/08
F-4. MVA 7040 Ford&Delco Bulk 10/10/08
F-5. MVA 7040 Used Brake Bulk 10/09/08
F-6. MVA 7275 Honda Bulk 12/10/07
F-7. MVA 7293 Wizard Bulk 12/14/07
F-8. MVA 7293 Supplemental Wizard Bulk 02/19/08
F-9. MVA 7380 Ford Bulk 02/19/08
F-10. MVA 7380 Chrysler Bulk 02/19/08
F-11. MVA 7380 GM Bulk 02/19/08
F-12. MVA 7385 Western Auto for VW Bulk 02/06/08
F-13. MVA 7585 Mercedes Bulk 09/03/08
F-14. MVA 7620 Girling Bulk 11/19/08
F-15. MVA 7621 Bendix Bulk 09/16/09
F-16. MVA 7651 Girling Bulk 12/15/08
F-17. MVA 7746 Abex Bulk 02/11/09
F-18. MVA 7811 CraneClutch Bulk 03/30/09
F-19. MVA 7921 Release Beveling Carlisle Truck Brakes (Rev) 09/03/09
F-20. MVA 8041 Wizard Bulk 11/13/09
F-21. MVA 8219 Grizzly Bulk 10/22/10
F-22. MVA 8219 Release Grizzly Brake Shoes 11/09/10
F-23. MVA 8219 Bendix Bulk 10/22/10
F-24. MVA 8219 Report including Borg Warner "Borg & Beck" Clutch Plate Bulk 10/01/10
F-25. MVA 8219 Borg Warner Clutch Bulk 07/20/12
F-26. MVA 8322 Rayloc Bulk 04/13/10
F-27. MVA 8322 Carlisle Bulk 04/13/10
F-28. MVA 8348 Ford Truck Brake Bulk 06/29/10
F-29. MVA 8473 Release Caterpillar Brake Band 07/30/10
F-30. MVA 8473 Caterpillar Bulk 08/18/10
F-31. MVA 8680 GrandPro Brakes Bulk 01/26/11
F-32. MVA 8680 VW Bulk 01/26/11
F-33. MVA 8706 Dodge Truck Brakes Bulk 02/27/11
F-34. MVA 8706 Pronto Brakes Bulk 03/04/11
F-35. MVA 8706 Wagner Brakes 03/01/11 Rev1 Bulk 03/04/11
F-36. MVA 8706 Unknown Brake shoe Bulk 03/01/11
F-37. MVA 8746 Clark forklift brake Bulk 03/15/11

F-38. MVA 8768 Toyota Truck Bulk 03/23/11
F-39. MVA 8872 Release Sanding Paver Brake and Resusp Washing 06/03/11
F-40. MVA 8872 Release Sanding Paver Brake & Resusp Wash Supplement 06/27/11
F-41. MVA 8979 VW Bulk 09/16/11
F-42. MVA 8979 VW Set 2 Bulk 11/03/11
F-43. MVA 9224 Bendix Bulk 05/11/12
F-44. MVA 9238 Tru Star Bulk 05/15/12
F-45. MVA 9314 CarQuest Bulk 09/06/12
F-46. MVA 9615 Ford Bendix Delco Bulk 03/22/13
F-47. MVA 9615 Delco Supplemental Bulk 04/04/13
F-48. MVA 9827 Release Brake Removal (1975 Toyota) 07/05/13
F-49. MVA 9827 Release  Chamfering a Toyota Brake 07/05/13
F-50. MVA 9827 Release Brake Removal (1975 Toyota) Supplemental 08/16/2013
F-51. MVA 9867 Toyota 1  Bulk 12/10/13
F-52. MVA 9867 Toyota 2  Bulk 12/19/13
F-53. MVA10494 Release Sanding Ford (BX) Brakes 07/31/14
F-54. MVA 10494 Ford Brake Linings BX-PM-FE and BX-RY-RE Bulk 08/08/14.
F-55. MVA  10720 Truck Brake AIMCO Canada Bulk 02/13/15
F-56. MVA  11845 Mighty Brakes Bulk 07/07/17
F-57.MVA 10529 Examination of Fruehauf Heavy Duty Brake Linings for Asbestos 07/31/14
F-58.MVA 10529 Examination of Fruehauf Heavy Duty Brake Linings for Asbestos 08/15/14 (includes additional TEM data)
F-59. MVA 10653 Asbestos Analysis of Rayloc Disc Brakes10/28/14


**MVA Reports Related to Resuspension and Wash**
F-39. MVA 8872 Release Sanding Paver Brake and Resusp Washing 06/03/11
F-40. MVA 8872 Release Sanding Paver Brake & Resusp Wash Supplement 06/27/11
GP-1. MVA 6553 Glovebox Release Contaminated Clothing Piece 03/24/06.
GP-2. MVA 6553 Chamber Release Contaminated Clothing. 03/31/06.


**Articles, Reports, Corporate Memos, etc.**


1.      Millette, J.R., "Asbestos Analysis Methods", Chapter 2. In: Asbestos: Risk Assessment, Epidemiology, and Health Effects, R.F. Dodson and S.P. Hammar, Eds., CRC, Taylor & Francis, Boca Raton, Fl. pp:9-38, 2006.

2.      Millette, J.R., "Asbestos Analysis Methods", Chapter 2. In: Asbestos: Risk Assessment, Epidemiology, and Health Effects, R.F. Dodson and S.P. Hammar, Eds., 2nd Edition, CRC, Taylor & Francis, Boca Raton, Fl. pp:23-48, 2011.

3.      Millette, J.R. and Hays, S.M., Settled Asbestos Dust: Sampling and Analysis. Lewis Publishers, Boca Raton, 1994.

4.       J. Addison and L.S.T. Davies. "Analysis of Amphibole Asbestos in Chrysotile and Other Minerals"  Ann. Occup. Hyg. Vol. 34. No. 2. pp. 159-175, 1990.

5.      Millette J.R., A. Harmon, P. Few, W.L. Turner, Jr., and W.R. Boltin. Analysis of amphibole asbestos in chrysotile-containing ores and a manufactured asbestos product. Microscope, 57(1):19-22, 2009.

6.      ISO 22262-2

7.      USEPA. Guidance for Preventing Asbestos Disease Among Auto Mechanics. EPA-560-OPTS-86-002 June1986.

8.      USEPA. Controlling Brake Dust to Protect Your Health…What Every Auto Mechanic Should Know. EPA-560-OPTS-86-003 September 1986.

9.      Rohl, A. et al., Asbestos Exposure during brake lining maintenance and repair. Environ. Res. 12, 110-128 (1976).

10.     Rohl, Mount Sinai Medical Center Report to Robert Magdelain of Nilfisk of America, 1979

11.     Lorimer, Asbestos Exposure of Brake Repair Workers in the United States, 1976

12.     Kauppinen and Korhonen. Exposure to asbestos during brake maintenance of automotive vehicles by different methods. Am. Ind. Hyg. Assoc. J. 48(5):499-504 (1987).

13.     Moore. Asbestos exposure associated with automotive brake repair in Pennsylvania. Am. Ind. Hyg. Assoc. J 49:A-12, 1988.

14.     Sheehy, et al, Ind. Hyg. 4(12):313-319. 1989.

15.     Paustenbach, etal. An evaluation of the historical exposures of mechanics to asbestos in brake dust. Appl. Occup. And Env. Hyg. 18:786-804, 2003.

16.     Lemen Asbestos in Brake: Exposure and Risk of Disease. Am. J. Ind. Med. 45:229-237. 2004.

17.     Hickish, D.E.; Knight, K.L. Exposure to Asbestos during Brake Maintenance. *Ann. Occup. Hyg.* 1970**,** *13*, 17-21.

18.     Johnson, P.; Zumwalde, R.D.; Roberts, D. Industrial Hygiene Assessment of Seven Brake Servicing Facilities. National Institute for Occupational Safety and Health; Division of Surveillance, Hazard Evaluations, and Field Studies: Cincinnati, OH, 1979.

19.     Plato, N.; Tornling, G.; Hogstedt, C.; Krantz, S. An Index of Past Asbestos Exposure as Applied to Car and Bus Mechanics. *Ann. Occup. Hyg.* 1995**,** *39*, 441-454.

20. Rödelsperger, K.; Jahn, H.; Brückel, B.; Manke, J.; Paur, R.; Woltowitz, H.J. Asbestos Dust Exposure during Brake Repair. *Am. J. of Ind. Med.* 1986, *10*, 63-72.

21. Yeung, P.; Patience, K.; Apthorpe, L.; Willcocks, D. An Australian Study to Evaluate Worker Exposure to Chrysotile in the Automotive Service Industry. *App. Occup. and Environ. Hyg.* 1999, *14*, 449-458.

22. PEI Associates, Asbestos Dust Control in Brake Maintenance, 1985

23. Abex Corporation. U.S.P.H.S. Survey at Abex Corporation, American Brakeblock Division, Winchester, Virginia. United States Department of Commerce, National Technical Information Service: Springfield, VA, 1972.

24. Donovan EP, Donovan BL, Sahmel J, Scott PK, Paustenbach DJ. Evaluation of bystander exposures to asbestos in occupational settings: a review of the literature and application of a simple eddy diffusion model. Crit Rev Toxicol. 2011 Jan. 41(1):52-74.

25. Letter (October 26, 1977) from Rockwell International, Highway Brake Div., to Dennis Conlon of Abex Corp. [KHALL03156]

26. Inter-office Ford Memo, 1 October 1984.  From: PA Brogan to Mr. E.C. Koops, Manager, Sterling Plant. "Industrial Hygiene Survey of Asbestos Fiber Exposure at Conveyor Loading of Brake Assembly". [Marking on Document: Exh. 29]

27. Ford Inter-office Memo Apr 6, 1978 From: James Sproat, IH to CJ Augey, Manager, Cleveland Engine Plant [FAFD0012570]

28. Ford Inter-office Memo Oct 9, 1978 From: Keith Lee, IH to JE Senterfitt, Ind. Rel. Manager, Cleveland Engine Plant 2 [FAFD0013358]

29. Ford Inter-office Memo July 12, 1979 From: David Carruthers, IH to R.J. Mudloff, Safety Engineer, Tractor Operations. FAFD0013355]

30. Report of Clayton (J Singh, Ph.D.) to David Carruthers, Ford Motor Co. – June 18, 1979. [FAFD0013356]

31. Ford Inter-office Memo July 9, 1980 From: Mark Francis, IH to AS Tobiassen, Envir & Safety Manager, Troy Tractor [FAFD0015700]

32. Ford Inter-office Memo Nov 8, 1978 From: Keith Lee, IH to RM McCaffrey, Manager, Fairfax Transmission Plant  [FAFD0013531]

33. Ford Inter-office Memo May 17, 1979 From: James Sproat, IH to C. Roth, Manager, Dept 74 KY truck plant. Industrial Hygiene Study of Asbestos Exposure, Dept 74 KY truck plant. [FD 5650]

34. Ford Inter-office Memo May 14, 1979 From: Mark Francis, IH to CJ Augey, Manager, Cleveland Engine Plant No. 2 [FD 5649]

35. Ford Inter-office Memo Oct 24 1983 From: HB Lick, IH to FE MaGaw, Safety Engineer, Lima Engine Plant  [FAFD0012631]

36. Ford Inter-office Memo Mar 18, 1982 From: AR Amberg, IH to JD Whyte, Manager, KY Truck Plant FAFD0016136]

37. Alste, J., D. Watson, and J. Bagg., 1976. Airborne Asbestos in the Vicinity of a Freeway. Atmospheric Environment. Vol. 10. pp. 583-589.

38.  Cha, S., P. Carter, R.L. Bradow. Simulation of Automobile Brake Wear Dynamics and Estimation of Emissions.  SAE Technical Paper Series, 831036. 1983

39.  Crane, D. Letter from OSHA, 2005

40.  Hatch, D. Possible Alternatives to Asbestos as a Friction Material. Ann. Occup. Hyg. 13:25-29. 1970

41.  Jacko, M.G. and R.T. DuCharme.  Brake Emissions: Emission Measurements from brake and clutch linings from selected mobile sources. Bendix Research Laboratories, Bendix Center.  Report 68-04-0020. 1973 (p21)

42.  Langer, AM, Wolff, M.S.. Rohl. AN., Selikoff. IJ.. 1978. Variation of properties of chrysotile asbestos subjected to milling. J. Toxicol. Environ. Health 4.173-188.

43.  Lynch, J.R. "Brake Lining Decomposition Products," J. Air Pollut. Control Assoc. , 18(12): 824 (1968).

44.  Muhlbaier, J.L. and R.L. Williams. Characterization of Asbestos Emissions from Brakes. General Motors Research Laboratories, Research Publication. 1980

45.  Rohl. A.N.. Langer, A.M., Klimentidis, R., Wolff, M.S., Selikoff, I.J. Asbestos Content of Dust Encountered in Brake Maintenance and Repair. Proc. Roy. Soc. Med. 70:32-37  1977

46.  Williams RL, Muhlbaier JL, 1982. Asbestos brake emissions. Environ. Res. 29:70-82

47.  Lemen, R.A., Asbestos in Brakes: Exposure and Risk of Disease. Amer. J. of Indust. Med. 45:229-237 (2004).

48.  Lemen, R.A., Letter to the Editor. Re: Reply to Jay Turim, PhD Letter of July 9, 2007 to the Editor Concerning 'Asbestos in Brakes'. 2008

49.  Turim, J. Letter to Editor. Correction to R. Lemen's Review Article, 'Asbestos in Brakes: Exposure and Risk of Disease'. Amer. J. Indust. Med 51:475. 2008,

50.  Millette, J.R. and Hays, S.M., Settled Asbestos Dust: Sampling and Analysis. Lewis Publishers, Boca Raton, 1994.

51.  Sawyer, R.N., "Asbestos Exposure in a Yale Building". Environmental Research 13:146-169, 1977

52.  Carter, R.F., "The Measurement of Asbestos Dust Levels in a Workshop Environment". AWRE Report No. O28/70, United Kingdom Atomic Energy Authority, July, 1970.

53.  Fleming, R.M., "Asbestos-Burlap Bags", Environmental Investigations Branch, National Institute for Occupational Safety and Health (NIOSH), Cincinnati, OH, January 14, 1972.

54.  "Don't Blow It" Video. Produced September, 1986  American Lung Association of Maryland, US EPA.

  
**Table 1.   Full Asbestos Content Results – Friction Products**

| MVA# | Sample Information | PLM Analysis Results % Chrysotile | TEM Analysis Results % Amphibole | TEM Amphibole Fibers per gram |
|---|---|---|---|---|
| | | | | |
| (7040)-1810-G0922 | Ford Brake  SEC BX-DU-GF | 50% | 0.019% | 240 million |
| (7040)-4792-L1472 | Delco Brake Drum  DELCO 233 FE | 50% | 0.0004% | 18 million |
| 7040-S0552 | Bendix Brake Pads BDX 16, | 50% | 0.003% | 12 million |
| 7040-S0565AD | Bendix Brake Pads, BDX 16 | 50% | 0.004% | 21 million |
| 7040-S0565EF | Unknown Brake Pads used | 40-60% | 0.0009% | 15 million |
| 7380-T0192 | GM Brake Shoes | 25% | 0.04% | 330 million |
| 7380-T0193a | Ford Brake Shoes Set 1 | 45% | 0.01% | 28 million |
| 7380-T0193b | Ford Brake Shoes Set 2 | 40% | 0.04% | 730 million |
| 7380- T0194 | Chrysler Brake Shoes | 45% | 0.004% | 31 million |
| 7621-T3145A | Bendix Brake | 30% | 0.003% | 17 million |
| 7621-T3145B | Bendix Brake | 30% | 0.009% | 31 million |
| 7746-U0030A | Abex  Brake | 20% | 0.00005% | 540,000 |
| 7746-U0030B | Abex  Brake | 20% | 0.00015% | 1 million |
| 7921-U0912 | Carlisle Brake lining | 20-40% | 0.0007% | 10 million |
| 8219-V1758 | Bendix Brakes 175-71-8 | 30-50% | 0.01% | 239 million |
| 8322-V0490 | Carlisle Brake lining | 30-40% | 0.04% | 480 million |
| 8348-V0582A | Ford Truck Brake Lining, Tan ME C3TA-2021-B | 40-50% | 0.001% | 29 million |
| 8348-V0582B | Ford Truck Brake Lining, Dark Gray ME C3TA-2022-A MVA8348 Rpt 06/29/10 | 45-55% | 0.003% | 21 million |
| 9615- Y0094 | 3" Brake, "Ford" label on top of lining (Exh TT18) | 25-45% | 0.002% | 23 million |
| 9615-Y0095 | 3" Brake, "Ford" label on top of lining, "Bendix-DO-ED" on side (Exh TT19) | 25-45% | 0.003% | 16 million |
| 9615- Y0097 | 2 in Brake "NG-38-FE-PR1_MD" on side of lining, "Delco Moraine Made in USA" stamped on shoe | 40-60% | 0.03% | 380 million |
| 10494-Z1339B | Ford Brake Lining BX-PM-FE | 25-35% | 0.0005% | 2 million |
| 10494- Z1339C | Ford Brake Lining BX-RY-RE | 25-35% | 0.0006% | 5 million |
| 10529-Z1541-A | Fruehauf brake | 20-40% | 0.06% | 340 million |
| 10529-Z1541-E | Fruehauf brake | 20-40% | 0.04% | 160 million |

*PLM - Percent by volume, TEM – Percent by weight.  Amphibole primarily tremolite

14

**Table 2a.  Results of Friction Product Fiber Release Studies**

| Friction Activity | PCM* (F/cc) |
|---|---|
| Unboxing/Handling (Glovebag)[F-2] | 1.8 |
| Dry Brush Cleaning[14] | 0.45 |
| Dry Brush Cleaning[8] | 0.1 |
| Dry Brush Cleaning[5] | 1.3-3.6 |
| Dry Brush Cleaning (with exhaust)[16] | 0.09 |
| Dry Brush/Rag Cleaning[18] | 0.61-0.81 |
| Damp Brush/Rag Cleaning[18] | 0.67-2.62 |
| Water (Squirt Bottle) Cleaning[18] | 0.54 |
| Compressed Air[F-48,F-49,F-50] | 0.41 |
| Compressed Air (Bystander)[F-48,F-49,F-50] | 0.1 |
| Compressed Air[13] | 0.21-1.12 (0.68 TWA) |
| Compressed Air (By car/dust cloud)[13] | 1.12-3.62 (1.25-2.55 TWA) |
| Compressed Air[14] | 14.54 |
| Compressed Air[8] | <0.1-8.2 |
| Compressed Air (with exhaust)[8] | <0.1-0.2 |
| Compressed Air (with exhaust)[16] | 0.10 |
| Compressed Air[5] | 6.6-29.8 |
| Compressed Air (5-10 ft)[5] | 2.0-4.2 |
| Compressed Air (10-20 ft)[5] | 0.4-4.8 |
| Compressed Air[18] | 0.14-15.00 |
| Brake Cleaner/Compressed Air[18] | 0.25-0.68 |
| Vacuuming, wiping, brushing, and/or compressed air[14] | 0.03-0.18 TWA |
| Assembling of Brakes[8] | <0.1-0.4 |
| Dry Brushing[8] | 0.1-4.5 |
| Dry Brushing (with exhaust)[16] | 0.15 |
| Damp Cloth[8] | 1.1-3.3 |
| Compressed Air (with exhaust)[8] | 0.2-3.0 |
| Compressed Air (with exhaust)[16] | 0.05 |
| Compressed Air[8] | 0.2-3.0 |
| Vacuuming, wiping, brushing, and/or compressed air[14] | 0.05-1.68 TWA |
| Loosening Rivets from Brake Linings[8] | <0.1-1.6 |

*PCM (phase contrast microscopy) is a light microscope technique that counts only the longer and thicker asbestos fibers (longer than 5 um and thicker than 0.25 um).  PCM provides an index of asbestos exposure. Transmission electron microscopy (TEM) can count all the asbestos fibers greater than 0.5 um in length.  Typically there are 5 to 100 times as many asbestos fibers counted by TEM as by PCM.

**Table 2b.  Additional Results of Friction Product Fiber Release Studies**

| Friction Activity | PCM* (F/cc) |
|---|---|
| Hand Sanding[F-1] | 2.2 |
| Hand Sanding[F-3] | 0.6-0.8 |
| Hand Sanding[F-53] | 0.8 |
| Power Sanding[F-3] | 0.9-1.0 |
| Power Sanding[16] | 0.13-0.29 |
| Hand Filing[F-1] | 0.3 |
| Hand Grinding (with exhaust)[16] | 0.12 |
| Machine Grinding (with exhaust)[16] | 0.06 |
| Grinding Brake Drums[8] | 0.5 |
| Grinding Brake Disks[8] | <0.1-0.2 |
| Hand Power Grinding[F-1] | 8.5 |
| | |
| Hand Filing (Chamfering Leading/Trailing Edges)[13] | <0.25 |
| Rivet Operator[14] | 3.41-4.47 TWA |
| Riveting[16] | 0.10 |
| Punch Operator[14] | 0.68-7.52 TWA |
| Punching Rivets into Brake Linings[8] | 0.1-3.5 |
| Punching Rivets into Brake Linings[5] | 1.9-2.0 |
| Rivet Removal with Hammer and Punch[F-29] | 0.17 |
| Drilling Brake Lining[F-29] | 0.24 |
| Power Sanding with Compressed Air Cleanup[F-39,F-40] | 2.5-3.7 |
| Grinding[5] | 1.7-7.0 |
| Machine Grinding (Bench Grinder chamfer)[F-22] | 25 |
| Machine Grinding (with exhaust)[16] | 0.39 |
| Power Grinding (with exhaust)[8] | 0.1-5.9 |
| Power Grinding (Beveling)[F-19] | 69-241 |
| Power Grinding (Cutting)[F-29] | 35-62 |
| Power Grinding[8] | 0.3-125 |
| File Beveling[8] | 0.1-0.9 |
| Beveling (grinding wheel or arcing machine)[5] | 23.7-72.0 |
| | |
| Broom sweeping of area after sanding[F-1] | 1.7 |
| Broom sweeping of area after sanding[F-53] | 2 |
| Sweeping after grinding[F-19] | 165 |
| Sweeping floor of garage[8] | <0.1-1.7 |
| Sweeping floor around grinder[5] | 3.6 |
| Compressed Air after Hand Filing[F-48] | <1.35-2.88 |
| Compressed Air after Hand Filing (Bystander)[F-49] | 6.98 (area) |
| Compressed Air after Rivet Removal and Drilling[F-29] | 2.8-3.3 |
| Clothes Handling for Laundering after Power Sanding[F-39,F-40] | 0.3 (area) |

*PCM (phase contrast microscopy) is a light microscope technique that counts only the longer and thicker asbestos fibers (longer than 5 um and thicker than 0.25 um).  PCM provides an index of asbestos exposure. Transmission electron microscopy (TEM) can count all the asbestos fibers greater than 0.5 um in length.  Typically there are 5 to 100 times as many asbestos fibers counted by TEM as by PCM.

**Table 2c.  Results of MVA Friction Product Fiber Release Studies**

| Activity | Sample Time | PCM* | TEM |
|---|---|---|---|
| Hand Grinding Brake   [F-1] | 2 min | 8.5 F/cc | 230 str/cc |
| Beveling of Carlisle Brake [F-19] | 3 Min | 69-81 F/cc | Over 1000 str/cc |
| Sweeping of Brake Dust [F-1] | 5 Min | 1.7 F/cc | 28 str/cc |
| Sweeping Brake Beveling Dust [F-19] | 5 Min | 165 F/cc | Over 1000 str/cc |
| Sweeping of Brake Dust [F-54] | 3 Min | 2 F/cc | |
| Bystander (5 ft) Brake work including Compressed Air, Sweeping [F-54] | 19 Min | 0.5 F/cc | |

*PCM (phase contrast microscopy) is a light microscope technique that counts only the longer and thicker asbestos fibers (longer than 5 um and thicker than 0.25 um).  PCM provides an index of asbestos exposure. Transmission electron microscopy (TEM) can count all the asbestos fibers greater than 0.5 um in length.  Typically there are 5 to 100 times as many asbestos fibers counted by TEM as by PCM. (MVA 1810 Report 01/29/97 [F-1], MVA 7040 Report 09/26/08 [F-3], MVA 10494 Report 07/31/14 [F-54])



**Figure 1.**  Ford (Bendix) Brake Surface.



**Figure 2.** Close-up of a Ford (Bendix) Brake surface showing asbestos fibers
protruding.



**Figure 3.** Bendix brakes showing Bendix edge code (BX).









**Figure 4.** Carlisle Brake Linings including close-up of asbestos fibers protruding from a Carlisle lining.



**Figure 5.** Fruehauf Brake.



**Figure 6.** Fruehauf Brake surface showing asbestos fibers protruding.



**Figure 7** . Blowing out Brake Assembly From "Don't Blow It" Video[41]. Produced
September, 1986  American Lung Association of Maryland, US EPA.



**Figure 8.** Blowing out Brake Assembly From "Don't Blow It" Video[41]. Produced
September, 1986  American Lung Association of Maryland, US EPA.


**Figure 9.** Hand Sanding of Brake (MVA 1810).


**Figure 10.** Hand Sanding of Brake (MVA 10494).

**Appendix A**
**Resume**

**Millette Technical Consulting, LLC**

**JAMES R. MILLETTE, Ph.D., D-IBFES**

**Summary of Credentials**

---

**EDUCATION:**

B.S., Physics, University of Dayton, Dayton, Ohio, 1973
M.En., Miami University, Oxford, Ohio, 1975
Ph.D., University of Cincinnati, Ohio, 1983

**WORK EXPERIENCE:**

• Involved in environmental/occupational/forensic/particle and materials studies since 1972
• Present position:  Senior Scientist, Millette Technical Consulting, Lilburn, GA.
• Previous work included 24 years with MVA Scientific Consultants, Duluth, GA, 11 years as a research scientist at the U.S. Environmental Protection Agency Research Center in Cincinnati, Ohio and 5 years at McCrone Environmental Services performing and  supervising analysis of particles and products by microscopic techniques.

**PUBLICATIONS:**

Over 140 publications have appeared in a number of peer-reviewed journals dealing with microscopy, environmental and occupational particulate exposures, and analytical technique. Two books and several book chapters have been published in the scientific literature.

**PRESENTATIONS:**

Since 1973 results of scientific work have been presented at over 100 national and international meetings.

**OTHER:**

• Served as chairman or co-chairman of technical sessions at numerous national meetings
• Chairman, Electron Microscope Facility at the USEPA Research Center, 1980-1985.
• Fellow of ASTM-International. Former Chair for ASTM Committee D22.07 Asbestos.  Current Vice-Chair for D22-Air Quality. Co-Chair Johnson & ME Beard Conferences.
• Fellow of the American Academy of Forensic Scientists - Andrew H. Payne, Jr., Special Achievement Award. Feb 20, 2008.Chair: Engineering Sciences Section 2013
• Diplomate of the International Board of Forensic Engineering Sciences (D-IBFES) since 2014
• George W. Luciw Award of Excellence presented by ASTM International for exemplary organization, leadership and pursuit of technical excellence since 1986 in the organization of what has become a premier international scientific conference, The Johnson Conference. October, 2018
• Lifetime Achievement Award presented by ASTM International for many years of leadership as Chair and Vice-chair of Subcommittee D22.07 and as Technical Vice Chair of D22. October, 2018
• Engineering Sciences Section Founders Award presented by the American Academy of Forensic Sciences in Recognition of Outstanding Service, February, 2019

**Millette Technical Consulting, LLC**
**220 Cricket Walk SW**
**Lilburn, Georgia 30047**
**(404) 375-0979**

**JAMES R. MILLETTE, Ph.D., D-IBFES**

_____

A. Education Background

B.S., Physics, University of Dayton, Dayton, Ohio, 1973
M.En., Environmental Science, Miami University, Oxford, Ohio, 1975
Ph.D., Environmental Science, School of Engineering, University of Cincinnati, Cincinnati, Ohio, 1983

B. Work Experience

Consultant, Millette Technical Consulting, Lilburn, GA. Oct 2014 - Present

Executive Director, MVA Scientific Consultants, Duluth, GA.  June 1990 – Oct 2014.

Vice President and General Manager, McCrone Environmental Services, Inc., Norcross, GA.  December 1987 - June 1990.

Manager, Laboratory Operations and Electron Optics Group, McCrone Environmental Services, Inc., Norcross, GA.  July 1985 - December 1987.

Physical Scientist, Health Effects Research Laboratory, U.S. Environmental Protection Agency, Cincinnati, Ohio.  July 1974 - July 1985.

Graduate Teaching Assistant, Physics Department, Miami University, Oxford, Ohio.  1973 – 1974.

Student Researcher, NSF-SOS (Student Originated Studies) Grant, Hiram College, Hiram, Ohio, entitled "Pollution Studies of Cuyahoga, Chagrin, and Grand Rivers Using Non-Dispersive X-Ray Fluorescence Spectroscopy", Summer 1973.

Student Research Assistant, University of Dayton, Dayton, Ohio.  U.S. Department of Interior Contract "Determination of Trace Metal Pollutants in Water Resources and Stream Sediments by X-Ray Fluorescence", 1972-1973, including summer 1972.

Student Teaching Assistant, Physics Department, University of Dayton, Dayton, Ohio, 1971.

C. Publications

Cothern, R. and Millette, J. R.,  Efficiency Calibration of an Energy Dispersive X-ray Fluorescence System for Trace Metal Analysis.  Bull. Amer. Physical Soc. 18:888 (1973) (Abstr.).

January 2021

James R. Millette, Ph.D.
Page 2

Millette, J. R., McFarren, E. F., and Poth, J. E.,  Analysis of Asbestos Fibers in Water by Electron Microscopy.  Bull. Amer. Physical Soc. 20:890 (1975) (Abstr.).

Millette, J. R.,  Analyzing for Asbestos in Drinking Water.  News of the Environmental Research in Cincinnati, January 16, 1976.

Millette, J. R.,  Monitoring Drinking Water for Asbestos by Transmission Electron Microscopy.  In:  Proc. of Symp. on Electron Microscopy of MicroFibers, HEW Pub. #FDA-77-1033, USGPA Stock #017-012-00244-7, p. 85-92 (1976).

Millette, J. R. and McFarren, E. F.,  EDS of Waterborne Asbestos Fibers in TEM, SEM, and STEM.  Scanning Electron Microscopy/1976, 3:451-459 (1976).

Craun, G. G., Millette, J. R., Woodhull, R. S., and Laiuppa, R.,  Exposure to Asbestos Fibers in Water Distribution Systems.  In:  Proc. of the 97th AWWA Conf. May 1977, Denver, CO, (1977).  Paper 704 13 pp.

Millette, J. R., Clark, P. J. and Pansing, M. F., Sizing of Particulates for Environmental Health Studies. Scanning Electron Microscopy I: 253-258 (1978).

Millette, J. R., Clark, P. J. and Pansing, M. F., Exposure to Asbestos from Drinking Water in the United States, ORD-USEPA Environmental Health Effects Research Report USEPA-600/1-79-028, (1979) 87 pp.

Millette, J. R., Twyman, J. D., Hansen, E. C., Clark, P. J. and Pansing M. F., Chrysotile, Palygorskite, and Halloysite in Drinking Water, Scanning Electron Microscopy I:  579-586 (1979).

Millette, J. R., Clark, P. J., Pansing, M. F. and Twyman, J. D., Concentration and Size of Asbestos in Water Supplies.  Environ. Health Perspectives 34:13-25 (1980).

Millette, J. R., Boone, R. L. and Rosenthal, M.,  Asbestos in Cistern Water.  EPA Environ. Research Brief.  USEPA-ORD, February 1980 4pp.

Buelow, R. W., Millette, J. R., McFarren, E. F. and Symons, J. M., The Behavior of Asbestos-Cement Pipe Under Various Water Quality Conditions:  A Progress Report.  JAWWA 5 75(2)91-102 (1980).

Millette, J. R., Hammonds, A. F., Hansen, E. C. and Pansing, M. F.,  Aggressive Water and Water Utilities from Representative Areas of the U.S.  JAWWA 72:262-266 (1980).

Patel-Mandlik, K. J., Hallenbeck, W. H. and Millette, J. R.,  Asbestos Fibers; 1. A Modified Preparation of Tissue Samples for Analysis by Electron Microscopy. 2.  Presence of Fibers in Tissues of Baboon Fed Chrysotile Asbestos.  J. Environ. Path. Toxic.  2:  1385-1395 (1979).

McCabe, L. J. and Millette, J. R., Health Effects and Prevalence of Asbestos Fibers in Drinking Water.  In:  Proceedings of AWWA, San Francisco, California. (2):1079-1093 (1979).

Meigs, J. W., Walter, S. D., Millette, J. R., Craun, G. F., Heston, J. F., Woodhull, R. S. and Flannery, J. R.,  Asbestos Cement Pipe and Cancer in Connecticut, 1955-1974.  J. Environ. Health 42(4) 187-191 (1980).

Reiss, B., Millette, J. R. and Williams, G. M.,  The Activity of Environmental Samples in a Cell Culture Test for Asbestos Toxicity.  Enviro. Res. 22:315-321 (1980).

Clark, P. J., Millette, J. R. and Boone, R. L.,  Asbestos-Cement Products in Contact with Drinking Water:  SEM Observations.  SEM (1980) I:341-346 (1980).

Patel-Mandlik, K. J. and Millette, J. R.,  Evidence of Migration of Ingested Asbestos into Various Baboon Organs.  SEM/1980/I:347-354 (1980).

Millette, J. R., Rosenthal, M. T. and Feldman, R. S.,  Asbestos Analytical Technique.  In:  Proc. Tech. Conf. AWWA December 7-10, 1980 p. 173-188 (1981).

Logsdon, G. S. and Millette, J. R.,  Monitoring for Corrosion of A/C Pipe.  In: Proc. Techn. Conf. AWWA December 6, 1981.

Millette, J. R., Boone, R. L., Rosenthal, M. T. and McCabe, L. J.,  The Need to Control Asbestos Fibers in Potable Water Supply Systems.  Sci. Tot. Envir. 18:91-102 (1981).

Millette, J. R.,  Use of Asbestos Cement Pipe, Letter to the Editor, J. Occup. Med. 23(4):226 (1981).

Millette, J. R., Pansing, M. F. and Boone, R. L.,  Asbestos-Cement Materials Used in Water Supply.  WATER/Engineering and Management 48, 51, 60, 97 (March 1981).

Inoue, K., Grupp, I., Schwartz, A., Ashraf, M., Millette, J. et al.,  X-Ray Microanalysis of Rabbit Heart Papillary Muscles Treated with Calcium Containing Solutions Before and After Treatment with Diltiazern.  Jap. Pharm. and Exper. Therapeutics, 10(2):117-129 (1982) (In Japanese).

Patel-Mandlik, K. and Millette, J. R.,  Chrysotile Asbestos in Kidney Cortex of Chronically Gavaged Rats.  Arch. Environ. Contam. Toxicol. 2:247-255 (1983).

Millette, J., Clark, P. J., Stober, J. and Rosenthal, M. T.,  Asbestos in Water Supplies of the United States.  Environmental Health Perspectives, 53:45-48 (1983).

Millette, J. R., Craun, G. F., Stober, J. A., Kraemer, D. F., Tousignant, H. G., Hildago, E., Duboise, R. L. and Benedict, J.,  An Epidemiology Study of the Use of Asbestos-Cement Pipe for the Distribution of Drinking Water in Escambia County, Florida.  Environmental Health Perspectives, 53:91-98 (1983).

Boatman, E. S., Merrill, T., O'Neill, A., Polissar, L. and Millette, J. R.,  The Use of Quantitative Analysis of Urine to Assess Exposure to Asbestos Fibers in Drinking Water in the Puget Sound Region.  Environmental Health Perspectives, 53:131-142 (1983).

Patel-Mandlik, K. and Millette, J.,  Accumulation of Ingested Asbestos Fibers in Rat Tissues Over Time.  Environmental Health Perspectives, 53:197-200 (1983).

James R. Millette, Ph.D.
Page 4

Millette, J.,  Summary of Discussion Sessions:  Workshop on Ingested Asbestos. Environmental Health Perspectives, 53:197-200 (1983).

Millette, J. R., McCauley, P. T., Clark, P. J., Allenspach, A. L. and Washington, I. S.,  X-Ray Microanalysis of Mitochondrial Calcium Levels in Frozen Liver Tissue from Rats Exposed to Carbon Tetrachloride.  The Toxicologist 4(1):185 (1984).

Millette, J. R. and Kinman, R. N.,  Iron-Containing Coatings on Asbestos-Cement Pipes Exposed to Aggressive Water.  In:  Proc. of the 1983 Tech. Conf. Proc., AWWA, Norfolk, VA 11-184 (1984).

Millette, J. R., Logsdon, G. S., Clark, P. J. and Kinman, R. N.,  Evaluating the Condition of Asbestos-Cement.  Mat. Perform. 23(12):14-19 (1984).

Millette, J. R., Allenspach, A. L., Clark, P. J., Washington, I. and McCauley, P. T., Measurement of Calcium Level Changes in Tissue in Response to Injury by Environmental Agents.  Fed. Proc. 43(3):495 (1984).

Millette, J. R., Allenspach, A. L., Clark, P. J. and Washington, I. S.,  X-Ray Microanalysis of Calcium, Potassium, and Phosphorus in Liver Mitochondria Stressed by Carbon Tetrachloride.  J. Analy. Tox. 9:145-151 (1985).

Millette, J. R.,  Asbestos in Water, Microscope, 34:371-374, 1986.

Krewer, J.A. and Millette, J.R., Comparison of Sodium Hypochlorite Digestion and Low-Temperature Ashing Preparation Techniques for Lung Tissue Analysis by TEM, Microbeam Analysis 1986, Proc. 21st Conf. Microbeam Analysis Society, Aug. 1986, Albuquerque, NM,  San Francisco Press, Inc.

Basu, B. and Millette, J. R. (editors), Electron Microscopy in Forensic, Occupational and Environmental Health Sciences, Plenum Press, New York pp. 285, 1986.

Millette, J. R., Allenspach, A. L., Clark, P. J., Stober, J. A., Mills, T., Weiler, C. and Black, D.,  Measurement of Subcellular Ions by X-ray Microanalysis for Evidence of Hepatotoxicity.  In:  Electron Microscopy in Forensic, Occupational, and Environmental Health Sciences, Plenum Press, New York, pp. 253-260, 1986.

Millette, J. R., Clark, P. J., Bonne, R. L. and Rosenthal, M. T.,  Occurrence and Biological Activity Testing of Particulates in Drinking Water.  Bull Environmental Contamin. Toxicol. 38:1-8, 1987.

Millette, J. R., The Proposed TEM Clearance Testing of an Asbestos Abatement Area:  A Brief Summary, NAC Journal 5(2); 33-33, 1987.

Smith, J. J. and Millette, J. R.,  Calibration of the Electron Diffraction Camera Constant, Microscope, 35:107-117, 1987.

Millette, J. R.,  Electron Diffraction of Asbestos, Microscope, 35:207-215, 1987.

James R. Millette, Ph.D.
Page 5

Millette, J. R. and Krewer, J. A.,   A Reference List of Microscopical Methods for the Measurement of Asbestos, <u>Microscope</u>, 35:311-318, 1987.

Millette, J. R. and Burris, S. B.,  Counting Rules for TEM Analysis of Clearance Samples, <u>Microscope</u>, 36:273-280, 1988.

Working Group for the DHHS Committee to Coordinate Environmental and Related Programs, Millette, J. R.; one of fourteen participants, Report on Cancer Risks Associated with the Ingestion of Asbestos, <u>Environmental Health Perspectives</u>, Vol. 72, pp. 253-265, 1987.

Millette, J. R. and Mount, M. D.,  Many Non-School Projects Adopting AHERA Guidelines, <u>Council Currents</u>, Vol. 1, No. 4, p. 3, 1988.

Millette, J. R., Kremer, T., and Wheeles, R. K., Settled Dust Analysis Used in Assessment of Buildings Containing Asbestos, <u>Microscope</u>, Vol. 38, pp. 215-219, 1990.

Hays, S. M. and  Millette, J. R., "Decon:  A Case Study in Technology", <u>Asbestos Issues</u>, February 1990, 42-46.

Millette, J. R., Ewing, W., Brown, R. S., "A Close Examination of Asbestos-Containing Debris", <u>NAC Journal</u> 8 (3); 38-40, 1990.

Millette, J. R., Ewing, W., Brown, R. S., "Stepping on Asbestos Debris", <u>Microscope</u>, 38:321-326, 1990.

Krewer, J. A., Millette, J. R., "Asbestos Analysis by Transmission Electron Microscopy In-House Training", <u>Microscope</u>, Vol. 38, pp. 97-108, 1990.

Millette, J. R., Boltin, W. R., Crankshaw, O.S., "Searching for Asbestos, Identifying the Matrix", <u>Microscope</u>, Vol. 39, pp. 131-134, 1991.

Kremer, T. and Millette, J. R., "A Standard TEM Procedure for Identification and Quantification of Asbestiform Minerals in Talc", <u>Microscope</u>, Vol. 38, pp. 457-468, 1990.

Keyes, D. L., Chesson, J., Ewing, W. M., Faas, J. C., Hatfield, R. L., Hays, S. M., Longo, W. E., and Millette, J. R., "Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above a Suspended Ceiling", <u>Am. Ind. Hyg. Assoc. J.</u>, Vol. 52 (11), pp. 479-484, 1991.

Wilmoth, Roger C., Powers, Thomas J., U.S. Environmental Protection Agency and Millette, J.R., "Observations on Studies Useful to Asbestos O&M Activities", <u>Microscope</u>, Vol. 39, pp. 299-312, 1991.

Millette, J. R., Brown, R. S., Barnett, J., and Mount, M. D., "Scanning Electron Microscopy of Post-it™ Notes Used for Environmental Sampling", <u>NAC Journal</u>, pp. 32-35, Spring 1991.

Millette, J.R., Brown, R.S., "A Close Examination of the Surfaces of Asbestos Gasket Materials", <u>Microscope</u>, pp. 131-136, 1992.

James R. Millette, Ph.D.
Page 6

Hays, S. M. and Millette, J.R.,  Use of Observational Data and Experimental Studies in Developing Better Operations and Maintenance Plans.  Environmental Management, April 1992.

Keyes, D.L., Chesson, J., Hays, S.M., Hatfield, R.L., Ewing, W.M., Longo, W.E. and Millette, J.R., Re-entrainment of Asbestos From Dust in a Building With Acoustical Plaster,  Environ. Choices Tech. Supplement, pp. 6-11, July/August 1992.

Bracket, K.A., Clark, P.J. and Millette, J.R., "Method for the Analysis of Asbestos Fibers in Water Using MCE Filters", Microscope, Vol. 40, pp. 159-163, 1992.

Millette, J.R., Longo, W.E. and Hubbard, J.L., "Demonstration of the Capability of Asbestos Analysis by Transmission Electron Microscopy in the 1960s", Microscope, Vol. 41, pp.15-18, 1993.

Wilmoth, R.C., Clark, P.J., Hollett, B.R., Powers, J. and Millette, J.R., "Asbestos Release During Building Demolition", Environ. Choices Tech. Supplement, pp. 5-11, (1) No. 2, 1993.

Ewing, W.M., Chesson, J., Dawson, T.A., Ewing, E.M., Hatfield, R.L., Hays, S.M., Keyes, D.L., Longo, W.E., Millette, J.R. and Spain, W.H., "Asbestos Exposure During and Following Cable Installation", Environ. Choices Tech. Supplement, pp. 12-20, (1) No. 2, 1993.

Millette, J.R., Clark, P.J., Brackett, K.A. and Wheeles, R.K., "Methods for the Analysis of Carpet Samples for Asbestos", Environ. Choices Tech. Supplement, pp. 21-24, (1) No. 2, 1993.

Millette, J.R., and Brown, R.S., "Scanning Electron Microscopy of Asbestos-Containing Material where the Asbestos Fibers are Considered Locked in a Binder", Proceedings, 51st Annual Meeting, Mic. Soc. of America, August 1993.

Millette, J.R., and Mount, M.D., "A Study Determining Asbestos Fiber Release During the Removal of Valve Packing", Appl. Occup. Environ. Hyg., Vol. 8 (9), pp. 790-793, September 1993.

Millette, J.R., Hopen, T.J. and Bradley, J.P., "Titanium Dioxide:  Anatase or Rutile?", Microscope, Vol. 41, pp. 147-153, 1993.

Millette, J.R., Hopen, T.J., and Brown, R.S., Investigating the Particulate Component In Indoor Air Quality Concerns.  Environ. Choices 3(2):14-16, 1994.

Millette, J.R. and Hays, S.M., Settled Asbestos Dust: Sampling and Analysis. Lewis Publishers, Boca Raton, 1994.

Kelman, B. J.,  Millette, J.R., and Bell, J.U., Resuspension of Asbestos in Settled Dust in an Apartment Cleaning Situation, Appl. Occup. Environ. Hyg. 9(11):878-878, 1994.
Millette, J.R., and Boltin, W.R., Effectiveness of Asbestos Operations and Maintenance: Measurement Issues.,  Appl. Occup. Environ. Hyg. 9(11):785-790, 1994.

Keyes, D.L.,  Ewing, W.M., Hays, S.M., Longo, W.E., and Millette, J.R., Baseline Studies of Asbestos Exposure During Operations and Maintenance Activities. Appl. Occup. Environ. Hyg. 9(11):853-860, 1994.

Brown, R.S., Millette, J.R., and Mount M.D., Application of Scanning Electron Microscopy for Pollution Particle Source Determination in Residential Dust and Soil. Scanning 17(5):302-305, 1995.

Millette, J.R., Mount, M.D., Hays, S.M., Releasability of Asbestos Fibers from Asbestos-containing Gaskets.  EIA Technical Journal 3(2):10-15, 1995.

Millette, J.R., Brown, R.S., and Mount M.D., Lead Arsenate. Microscope 43(4):187-191, 1995.

Hopen, T. J. and Millette, J. R., "Microscopical Characterization of IAQ Dust Particles", in Proceedings of Engineering Solutions to Indoor Air Quality Problems, VIP.51, Air & Waste Management Association, pp. 437-444, 1995.

Millette, J.R., Mount, M.D., Hays, S.M., Asbestos-containing Sheet Gaskets and Packing. Chapter 6. In: Sourcebook on Asbestos Diseases, Vol. 12. Asbestos Health Risks. G.A. Peters and B.J. Peters, Eds.,  Michie, Charlottesville, VA. p153-188. 1996.

Few, P. and Millette, J.R., A Combination Calibration Grid for Transmission Electron Microscopes. Microscope, 44(4):175-179,  1996.

Beard, M.E., Millette, J.R., Montaque, N., Longo, W.E., and Hatfield,R.L. Comment on "Effect of Indirect Sample Preparation Procedures on the Apparent Concentration of Asbestos in Settled Dusts".  Environ, Science & Tech. 30(4):1404-1405, 1996.

Millette, J.R., Reference Methods for Asbestos Analysis. Microscope, 45(2):57-59, 1997.

Millette, J.R., IAQ Air Sampling Filters. Microscope, 45(2): 60, 1997.

Millette, J. R.,  Comparison of Commercial Microvacuum Sampling Cassettes for Settled Dust Analysis. Microscopy Today, 6:98, August 1998.

Millette, J.R. and Ewing, E., Case Study: Drilling of Floor Tile During Residential Insect Control.  EIA Technical Monograph Series Vol 4., 6 pp. 1998.

Millette, J.R. and Few, P., Electron Microscopy of Air-O-Cell Air Samples. Microscope, 46(3): 155-159, 1998.

Millette, J.R. and Few, P., Indoor Carbon Soot Particles. Microscope, 46(4): 201-206, 1998.

Kelman, B.J., Swenson, L.J., Uppala, L.V., Cohen, J. M., Millette, J.R. and

Mueller, W.F.,  1999.  Chemical Components of Shredded Paper Insulation: A Preliminary Study. <u>Applied Occupational and Environmental Hygiene</u> 14:192-197.

Millette, J.R., Microscopical Studies of the Asbestos Fiber Releasability of Dryer Felt Textiles. <u>Microscope</u>, 47(2): 93-100, 1999.

Millette, J.R. and Mount, M.D., Microscopical Studies of the Asbestos Fiber Release During Cutting and Stripping of Wire Cables. <u>Microscope</u>, 47(3): 159-161, 1999.

Hopen, T.J., Millette, J.R., Boltin, W.R. and Brown, R.S., A Dictionary of Terms Related to Additives Found in Asbestos Building Products. <u>Microscope</u>, 47(3): 163-171, 1999.

Millette, J.R., Boltin, W. R., Clark, P.J., and Brackett, K. A.,  "Proposed ASTM Method  for the Determination of Asbestos in Air by TEM and Information on Interfering Fibers," Advances in Environmental Measurement Methods for Asbestos, <u>ASTM STP 1342</u>, M.E. Beard and H.L. Rook, Eds., American Society for Testing and Materials, 2000. (Note: The "Proposed" Method is now ASTM Standard Method 6281).

Millette, J.R., Few, P., and Krewer,  J.A., " Asbestos in Water Methods: EPA's 100.1 & 100.2 and AWWA's Standard Method 2570," Advances in Environmental Measurement Methods for Asbestos, <u>ASTM STP 1342</u>, M.E. Beard and H.L. Rook, Eds., American Society for Testing and Materials, 2000.

Millette, J.R. and Mount, M.D., "Applications of the ASTM Asbestos in Dust Method D5755," Advances in Environmental Measurement Methods for Asbestos, <u>ASTM STP 1342</u>, M.E. Beard and H.L. Rook, Eds., American Society for Testing and Materials, 2000.

Hopen, T.J. and Millette, J.R.,  "Characterizing Household Dirt: 1928-2001". Proc. of the Second NSF International Conf. on Indoor Air Health. Jan. 29-31, 2001, Miami Beach, FL. pp 174-183.

Millette, J.R. and Few, P.,  "Sample Collection Procedures for Microscopical Examination of Particulate Surface Contaminants", <u>Microscope</u>, 49(1): 21-27, 2001.

Millette, J.R., "Early Studies Characterizing Household Dirt", <u>Microscope</u>, 49(4): 201-208, 2001.

Millette, J.R. and Brown, R.S., "Examining the Fine Particle Component of Grout Dust by Automated SEM", <u>Microscope</u>, 50(1): 1-3, 2002.

Millette, J.R., Boltin, R., Few, P. and Turner, Jr., W., Microscopical Studies of World Trade Center Disaster Dust Particles", <u>Microscope</u>, 50(1): 29-35, 2002.

James R. Millette, Ph.D.
Page 9

Lioy, P.J, Weisel, C.P., Millette, J.R., Eisenreich, S., Vallero, D., Offenberg, J., Buckley, B., Turpin, B., Zhong, M., Cohen, M.D., Prophete, C., Yang, I., Stiles, R., Chee, G., Johnson, W., Porcja, R., Alimokhtari, S., Hale, R.C., Weschler, C. and Chen, L.C., "Characterization of the Dust/Smoke Aerosol that Settled East of the World Trade Center (WTC) in Lower Manhattan after the Collapse of the WTC 11 September 2001", <u>Environmental Health Perspectives</u>, Vol. 110, No. 7, 703-714, July 2002.

Lioy, P.J, Freeman, N.C.G. and Millette, J.R., "Dust: A Metric for Use in Residential and Building Exposure Assessment and Source Characterization", <u>Environmental Health Perspectives</u>, Vol. 110, No. 1, 969-983,  2002.

Millette, J.R., Brown, R.S., Ewing, W.M., and Dawson, T.A., "Examination of Asbestos Floor Tile by White Light Interference Microscopy and Scanning Electron Microscopy", <u>Microscope</u>, 50(4): 173-177, 2002.

Millette, J.R., Lioy, P.J., Wietfeldt, J., Hopen, T.J., Gipp, M., Padden, T., Singsank, C., and Lepow, J., "A Microscopical Study of the General Composition of Household Dirt", <u>Microscope</u>, 51(4): 201-207, 2003.

Millette, J.R. and Brown, R.S., "The Analysis of Darkening Agents in Indoor Environments", Proceedings of the American Academy of Forensic Sciences, Annual Meeting,  Feb. 16-21, 2004.

Beard, M. E., Millette, J. R. and Webber, J. S., "Developing ASTM Standards, Monitoring Asbestos", <u>Standardization News</u>, American Society for Testing and Materials, 32(4):26-29, April 2004.

Ghazi, A.M. and Millette, J.R., "Environmental Forensic Application of Lead Isotope Ratio Determination: A Case Study Using Laser Ablation, Sector ICP-MS", <u>Environmental Forensics</u>, 5(2):97-108, 2004.

Yiin, L-M, Millette, J.R., Vette, A., Ilacqua, V., Quan, C., Gorczynski, J., Kendall, M., Chen, L.C., Weisel, C.P., Buckley, B., Yang, I. and Lioy, P.J., "Comparisons of the Dust/Smoke Particulate that Settled Inside the Surrounding Buildings and Outside on the Streets of Southern New York City after the Collapse of the World Trade Center, September 11, 2001", <u>Journal of the Air & Waste Management Association</u>, 54:515-528, 2004.

Millette, J.R., Brown, R., Turner, W. Jr., and Few, P.  "Zinc Whiskers in Computer Facility Dust", <u>Microscope</u>, 52(2): 59-62, 2004.

Millette, J.R. and R. S. Brown, "Dust Particulate From the World Trade Center Disaster of September 11, 2001" *Proceedings of the American Academy of Forensic Sciences*, Annual Meeting,  Feb. 21-26, 2005.

Millette, J.R. and B. R. Bandli, "Asbestos Identification Using Available Standard Methods", <u>Microscope</u> 53(4):179-185 (2005).

Turner, W.L., J.R. Millette, W.R. Boltin, and T.J. Hopen, A Standard Approach to the Characterization of Common Indoor Dust Constituents. <u>Microscope</u> 53(4):169-177. 2005.

James R. Millette, Ph.D.
Page 10

Millette, J.R., "Asbestos Analysis Methods", Chapter 2. In: Asbestos: Risk Assessment, Epidemiology, and Health Effects, R.F. Dodson and S.P. Hammar, Eds., CRC, Taylor&Francis, Boca Roton, Fl. pp:9-38, 2006.

Millette, J.R. and R. S. Brown, "Microscopical Analysis of Dust from Disasters: Natural and Man-Made",  *Proceedings of the American Academy of Forensic Sciences*, Annual Meeting,  Feb. 20-24, 2006.

Ghazi, A. M. and J.R. Millette, "Lead" Chapter 4. In: Environmental Forensics. R.D. Morrison and B.L. Murphy, Eds., Elsevier, New York, NY. pp 55-80, 2006.

Millette, J.R., P. Few, W. Hill, and M. Ritorto. Sizing Nano-Range Primary Particles in Aciniform Carbon Aggregates Using ImageJ. Microscope 54(2):51-59. 2006.

Millette, J.R. and R.S. Brown. Environmental Forensic Microscopy. Chapter 13 In: Introduction to Environmental Forensics, 2nd Ed., B. L. Murphy and R. D. Morrison, Eds., Academic Press, Elsevier, Amsterdam. pp:611-635. 2007.

Millette, J.R., W. Turner, W.B. Hill, P. Few, and J.P. Kyle. Microscopic Investigation of Outdoor "Sooty" Surface Problems. *Environmental Forensics*, 8:37-51, 2007.

Millette, J.R., Gerber, M., Turner, W., and Hill, W.B., Investigation of Ghosting, a Darkening Agent on the Ceiling. Microscope, 55(1):3-7, 2007.

Brown, R.S., W.R. Boltin, B.R. Bandli, and J.R. Millette. Light and Electron Microscopy of Mineral Wool Fibers. Microscope, 55(1):37-44, 2007.

Millette JR, Brown RS, Hill WB. Using Environmental Forensic Microscopy in Exposure Science. *Journal of Exposure Science and Environmental Epidemiology*/ (2008) 18, 20–30. advance online publication, 7 November 2007 (DOI 10.1038/sj.jes.7500613).

Few, P. and J.R. Millette. Filter Preparation for Particle Analysis by Transmission Electron Microscopy. Microscope, 56(1):3-11, 2008.

Webster TF, Harrad S, Millette JR, Holbrook RD, Davis JM, Stapleton HM, Allen JG, McClean, Michael MD, Ibarra C, Abdallah M, Covaci A. Identifying transfer mechanisms and sources of decabromodiphenyl ether (BDE 209) in indoor environments using environmental forensic microscopy. *Environ Sci Technol* 2009; 43(9): 3067–3072.

Millette JR, A. Harmon, P. Few, W.L. Turner, Jr., and W.R. Boltin. Analysis of amphibole asbestos in chrysotile-containing ores and a manufactured asbestos product. *Microscope*, 57(1):19-22, 2009.

Millette, JR, RS Brown, JP Kyle, , WL Turner, Jr., WB Hill and WR Boltin. Distinguishing coal, coke and other black particles. *Microscope*, 57(2):51-57, 2009.

Millette, JR, WB Hill, WL Turner, Jr., and SM Hays. Analysis of carbon nanotubes in air. *Microscope*, 57(3):127-132, 2009.

Millette, JR, "Characterization of Coal Fly Ash" *Proceedings of the American Academy of Forensic Sciences*, Annual Meeting, Seattle, WA 2010.

Ewing, W. M., S.M. Hays, R.Hatfield, W.E. Longo, and J.R. Millette. Zonolite Attic Insulation Exposure Studies. *Int J. Occup. Environ Health*, 16:279-290, 2010.

Millette, JR, B. Epstien, and E. Horner. Analysis of Microscopic Contaminants in Sick Building Investigations. Chapt. 8. In: Sick Building Syndrome and Related Illness, Prevention and Remediation of Mold Contamination. W.E. Goldstein (Ed). CRC Press – Taylor & Francis Group, Boca Raton, FL. 256 pages. 2010.

J.R. Millette and W.L. Turner, Jr. Visual Estimation in the Analysis of Surface Particulate by Microscopy. *Microscope*, Vol 58(2):65-68, 2010.

Millette, J.R., "Using D6602-03b to Investigate Dark Environmental Particles", The Carbon Aggregate, ASTM-International, Vol 11(1):1-3, 2011

Millette, J.R., "Asbestos Analysis Methods", Chapter 2. In: Asbestos: Risk Assessment, Epidemiology, and Health Effects, R.F. Dodson and S.P. Hammar, Eds., 2nd Edition, CRC, Taylor&Francis, Boca Raton, Fl. pp:23-48, 2011.

Kominsky J., Millette J.  Evaluation of Asbestos in Dust on Surfaces by Micro-Vacuum and Wipe Sampling. *J. ASTM International*, 8(5):1-8. On-line:JAI 103477 May 2011 Also published in ASTM STP 1533, pp 165-176, Eds: M. Brisson and K. Ashley. 2011

Millette, J.R. Use of the ASTM Inter-Laboratory Studies (ILS) Program in Developing Precision Data for ASTM D5755 – Asbestos in Dust by Microvacuum Sampling. *J. ASTM International*, 8(8):1-5. On-line: JAI 103509. July 2011. Also published in ASTM STP 1533, pp 177-186, Eds: M. Brisson and K. Ashley. 2011

Millette, J.R., Rook, H.L., and Compton, S. Application of ASTM Standard Practice D6602 in the Investigation of Outdoor Environmental Surface Particulate Including Darkening Agents. *J. ASTM International*, 8(9):1-14. On-line: JAI103523. August 2011. Also published in ASTM STP 1533, pp 249-269, Eds: M. Brisson and K. Ashley. 2011

Chepaitis, P.S., Millette, JR, VanderWood, T.B., A Novel coal Fly Ash Sphere Reveals a Complete Understanding of Plerosphere Formation.  *Microscope* 59(4):175-180. 2011

Millette, J.R., S. Compton, W.L. Turner, Jr., S.M. Hays, S. Kenoyer, W.B. Hill, and P.S. Chempaitis. Characterization of Coal Ash Including Fly Ash Particles. *Microscope*. 60(2): 73-84, 2012

James R. Millette, Ph.D.
Page 12

Compton, S.P. and J.R. Millette. Airborne Asbestos Exposure from Gooch Fiber Use. *Microscope*. 60(4): 165-170, 2012

Gordon, R.E., S. Fitzgerald, and JR Millette. Asbestos In Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women. *International Journal of Occupational and Environmental Health*, 20(4):318-332. 2014.

Millette, J.R. and R.S. Brown. Environmental Forensic Microscopy. Chapter 13 In: Introduction to Environmental Forensics, 3rd Ed., B. L. Murphy and R. D. Morrison, Eds., Academic Press, Elsevier, Amsterdam. pp:487-511. 2015. Published on-line Sept, 2014.

Cannan, K., Cavness, B., et al., Managing Asbestos in Buildings: A Guide for Owners and Managers. A revision of the USEPA's 1985 Guidance for Controlling Asbestos-Containing Materials in Buildings, EPA 560/5-85-024 (Purple Book). The Environmental Information Association, Chevy Chase, MD. 2015

Millette, J.R. Procedure for the Analysis of Talc for Asbestos. The Microscope, 63(1): 11-20, 2015

Millette, J.R. and S. Compton. Analysis of Vermiculite for Asbestos and Screening for Vermiculite from Libby, Montana. The Microscope 63(2):55-70, 2015

Millette, J.R., R.S. Brown, W.R. Boltin, and T.J. Hopen. Origins of Asbestos Product Identification. The Microscope 64(2):79-87, 2016

Millette, JR., S. Compton, C. DePasquale, Microscopical Analyses of Asbestos-Cement Pipe and Board. The Microscope, 66(1):2-20. 2018

Millette, JR., WM. Ewing, C. DePasquale, S. Compton,  Asbestos-containing Materials Associated with Steam Locomotives and Railroad Equipment. The Microscope, 66(4):147-156. 2018

Millette, J. R.,  S. Compton, C. DePasquale. Microscopical Analyses of Asbestos-containing Dental Tape. The Microscope, 67(3):99-109. 2019


D.   Awards

Elected to Sigma Pi Sigma, Physics Honorary, 1972
Elected to Society of Sigma Xi, Research Society, 1975
Outstanding Performance Rating Civil Service, 1978, 1982,1983
Publication nominated by Laboratory Director for USEPA-ORD's
  Scientific and Technological Achievement Award, 1979,1980,1981
American Water Works Association Distribution Division Award
  for best published paper 1980
Publication Award National Asbestos Council Journal 1991-1992
STAR Publication Award, Risk Reduction Engineering Laboratory, USEPA, 1994
Award of Excellence, The Environmental Information Association, Georgia

January 2021

Chapter, 1995
ASTM Award of Appreciation from Committee D-22 on Sampling and Analysis of
  Atmospheres for outstanding service to Subcommittee D22.07. October 2000
American Academy of Forensic Scientists (AAFS) Engineering Sciences
  Section's Andrew H. Payne, Jr., Special Achievement Award. Feb 20, 2008
Georgia Microscopical Society, Honorary Achievement Award for Dedication to
  the Education and Advancement of Microscopy. January 14, 2009
ASTM-International Award of Appreciation from Committee D-22 on Sampling
  and Analysis of Atmospheres for exceptional effort in organizing a sucessful
  inaugural Michael Beard Conference. October 2010
American Chemical Society Certificate of Appreciation for valuable contribution
  and dedicated service in the peer review of manuscripts submitted to ACS
  journals. December 2011
ASTM-International Award of Merit and Honorary Title of Fellow, 2011
American Academy of Forensic Sciences Award of Academy Fellow, 2012
ASTM-International Award of Appreciation from Committee D-22 on Sampling
  and Analysis of Atmospheres for exceptional effort in organizing a sucessful
  Johnson Asbestos Conference. April 2012
EIA – Snider Lifetime Achievement Award from Environmental Information
  Association, March 2013
Board Certified as a Forensic Engineer by the International Board of Forensic
  Engineering Sciences, Feb. 2014.
ASTM-Moyer D. Thomas Award for outstanding contributions to the science of air
  pollution measurement technology. 2014
ASTM-George W. Luciw Award of Excellence for exemplary organization,
  leadership and pursuit of technical excellence since 1986 in the organization of
  what has become a premier international scientific conference, The Johnson
  Conference. October, 2018
ASTM-Lifetime Achievement Award for many years of leadership as Chair and
  Vice-chair of Subcommittee D22.07 and as Technical Vice Chair of D22.
  October, 2018
American Academy of Forensic Sciences-Chosen as the recipient of the
Founders Award for the Engineering Section. 2019


E.    Selected Technical Presentations

"Efficiency Calibration of an Energy Dispersive X-Ray Fluorescence System for
Trace Metal Analysis", presented at the spring meeting of the Ohio Section of the
American Physical Society, Wittenberg University, April 7, 1973.  Abstract
published in the Bulletin of the American Physical Society, 18:888, 1973.


"Analysis of Asbestos Fibers in Water by Electron Microscopy", co-authors J. E.
Poth and E. F. McFarren, presented at the spring meeting of the Ohio Section of
the American Physical Society, Kent State University, May 10, 1975.  Abstract
published in the Bulletin of the American Physical Society, 20:890, 1975.

"EDS of Waterborne Asbestos Fibers in TEM, SEM, AND STEM", co-author E. F.
McFarren, presented at the Scanning Electron Microscopy Symposium
Workshop on Technique for Particulate Matter Studies, IIT Research Institute,
Toronto, Canada, April 1976.

James R. Millette, Ph.D.
Page 14

"Monitoring Drinking Water for Asbestos by Electron Microscopy", presented at the Symposium on Electron Microscopy of Micro-Fibers, U. S. Food and Drug Administration.  Pennsylvania State University, August 25, 1976.

"Effects of Water on Asbestos-Cement Materials in Drinking Water Supplies", presented at the Scanning Electron Microscopy Symposium, SEM Inc., Chicago, IL, April 1979.

"Concentration and Size of Asbestos in Water Supplies", at the Asbestos Workshop, NIEHS, DHEW, Washington, D.C., June 7-8, 1979.

"Occurrence and Health Effects of Eroded Asbestos Fibers", at the Seminar for Corrosion Control in Water Distribution Systems, USEPA, Cincinnati, OH, May 20-22, 1980.

"Fate of Ingested Particles", presented at the Workshop on the Substitutes for Asbestos, Consumer Product Safety Commission, Washington, D.C., July 14-16, 1980.

"The Need to Control Asbestos Fibers in Potable Water Supply Systems", presented at the International Water Supply Conference, Noordivijkerhout, The Netherlands, August 30-September 1, 1980.

"Particulates in Water Supplies", presented at the Clay and Clay Minerals Society Conference, Waco, TX, October 8-9, 1980.

"Some Investigations of X-Ray Microanalysis for Biological Tissue", at the Electron Microscopy Society Meeting, Louisville, KY, February 6, 1982.

"X-Ray Microanalysis of Mitochondrial Calcium Levels in Frozen Liver Tissue from Rats Exposed to Carbon Tetrachloride", poster presented at the 23rd Society of Toxicology Conference, March 12-16, 1984.

"Evaluating the Conditions of Asbestos-Cement Pipe", paper number 152 presented at Corrosion 84, an International Corrosion Forum sponsored by the National Association of Corrosion Engineers, New Orleans, LA, April 1984.

"Measurement of Calcium Level Changes in Tissue in Response to Injury by Environmental Agents", at the Fed. of Amer. Soc. for Exp. Biology Meeting, St. Louis, MO, April 1984.

"X-Ray Analysis of Freeze-Dried Sections" invited lecture at Cryo-Techniques in Electron Microscopy Symposium and Workshop, University of Iowa, Iowa City, IA, April 8-10, 1985.

"Subcellular Ions by X-ray Microanalysis for Evidence of Hepatotoxicity", Electron Microscopy Society of America and Microbeam Analysis Society Joint Annual Meeting, Louisville, KY, August 5-9, 1985.

"Use of TEM Analysis for Ambient and Clearance Sampling", University of Kentucky Symposium on Managing Asbestos in Buildings, Lexington, KY, October 23-25, 1985.

"Laboratory Analysis", Asbestos Abatement in the Federal Government 1985 Annual Symposium, Kansas City, MO, November 19-21, 1985.

James R. Millette, Ph.D.
Page 15

"X-ray Microanalysis of Animal Cells", Miami University Zoology Department, Oxford, OH, November 29, 1985.

"Analyzing for Asbestos in Environmental Samples", Department of Geology, Emory University, Atlanta, GA, February 6, 1986.

"Transmission Electron Microscopy", National Asbestos Council, Baltimore, MD, February 20, 1986.

"Laboratory Analysis", Western States Asbestos Abatement Conference and Exposition, Los Angeles, CA, March 7, 1986.

"Electron Microscopy, Interpretation of Results", Asbestos Abatement Project Monitoring Course, Georgia Tech Research Institute, Atlanta, GA, March 26, 1986.

"Asbestos Fibers in Water", Symposium on Innovative Techniques and Recent Developments in the Asbestos Abatement Industry, Georgia Tech Research Institute, Atlanta, GA, March 28, 1986.

"Diagnostic Electron Microscopy in Environmental Sciences", Minnesota Electron Microscope Society Spring Symposium, St. Paul, MN, May 16, 1986.

"An Overview of Asbestos Analytical Methods", American Industrial Hygiene Conference, Dallas, TX, May 23, 1986.

"Experiences with Direct and Indirect Sample Preparation for TEM Analysis of Asbestos", 1986 ASTM Johnson Conference on Measurement Challenges of the 80's:  Indoor Air, Acid Rain and Asbestos, Johnson, VT, July 13-14, 1986.

"Analysis of Asbestos in Environmental Samples by TEM" presented at the INTER/MICRO-86, International Microscopy Society, Chicago, IL, July 21-24, 1986.

"Comparison of Sodium Hypochlorite Digestion and Low-Temperature Ashing Preparation Techniques for Lung Tissue Analysis by TEM" co-authored and presented at the Electron Microscope Society of America/Microbeam Analysis Society Annual Meeting; Albuquerque, NM, August 11-15, 1986.

"Electron Microscopy Sampling, Analysis, and Interpretation" and "Field Applications of the EPA Guidelines for Post Abatement Air Monitoring" presented at the National Asbestos Council Meeting, New Orleans, LA, September 22-25, 1986.

"Laboratory Analysis, Bulk and Air Monitoring" presented at the Asbestos Abatement in the Federal Government, Kansas City, MO, November 19, 1986.

"Overview of Asbestos Analytical Methods" presented at the Connecticut River Valley Section of American Industrial Hygiene Association, Hartford, CT, March 4, 1987.

"Air Sample Analysis II:  Electron Microscopy", Asbestos Abatement Air Monitoring Course, Georgia Institute of Technology, Atlanta, GA, March 25, 1987.

"Analytical Tools for Identification of Asbestos Materials in Buildings", Co-authored with Richard L. Hatfield, presented at the American Society of Civil Engineers National Spring Convention, Atlantic City, NJ, April 27, 1987.

"Analyzing Asbestos Brake Dust", Asbestos Brake Maintenance Conference, Georgia Institute of Technology, Atlanta, GA, August 5, 1987.

"Overview of AHERA Requirements", Advanced TEM Asbestos Analysis Course, Georgia Institute of Technology, Atlanta, GA, February 15, 1988.

"Counting and Sizing Procedures", Advanced TEM Asbestos Analysis Course, Georgia Institute of Technology, Atlanta, GA, February 15, 1988.

"Microscopy and AHERA", Northeastern Society of Electron Microscopy, JEOL, Inc., Peabody, MA, February 17, 1988.

"Microscopy and the Asbestos Hazard Emergency Response Act", Inter/Micro, McCrone Research Institute, Chicago, IL, June 28, 1988.

"Asbestos Fiber Counting Rules", ASTM Johnson Conference, Johnson, VT, July 12, 1988.

"Transmission Electron Microscopy Asbestos Analysis Course", Georgia Institute of Technology, Atlanta, GA, June 6-17, 1988.

"Polarized Light Microscopy Analysis of Tremolite/Actinolite in Vermiculite", National Asbestos Council Technical Conference, Boston, MA, September 21, 1988.

"Some Comments on Settled Dust Sample Analysis by Transmission Electron Microscopy", National Asbestos Council Technical Conference, Boston, MA, September 22, 1988.

"Practical Considerations in Designing a TEM Asbestos Laboratory", JEOL, Peabody, MA, September 23, 1988.

TUTORIAL:  "Analysis of Asbestos in Water and Other Liquids", Scanning Microscopy International, Salt Lake City, Utah, May 1, 1989.

TUTORIAL:  "Analysis of Asbestos in Air", Scanning Microscopy International, Salt Lake City, Utah, May 1, 1989.

"TEM Asbestos Accreditation Seminar", Georgia Institute of Technology, Atlanta, GA, August 1-2, 1989.

"Asbestos in Drinking Water", Water Quality Technical Conference, American Water Works Association, Philadelphia, PA, November 14, 1989.

Professional Development Seminar on TEM X-Ray analysis, NAC Conference, San Antonio, TX, February 18, 1990.

"Current Aspects of Surface Dust Collection and Analysis", NAC Conference, San Antonio, TX, February 19, 1990.

"Recent Research on Fiber Release and Re-Entrainment of Asbestos Dust", NAC Conference, San Antonio, TX, February 29, 1990.

"The Dust Dilemma", NAC Conference, Phoenix, AZ, September 11, 1990.

James R. Millette, Ph.D.
Page 17

"How Clean is Clean, The Laboratory Analyst's Point of View of Abatement Clearance", NAC Conference, Phoenix, AZ, September 11, 1990.

"Sizes of Asbestos Fibers in Buildings", NAC Conference, New Orleans, LA, February 21, 1991.

"Analytical Techniques for the Analysis of Lead in Buildings", The Envir. Inst., Marietta, GA, April 22, 1991.

"Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing", co-authored with W. M. Ewing, E. M. Clay, W. H. Spain, T. A. Dawson, J. Chesson, R. L. Hatfield, S. M. Hays, D. L. Keyes and W. E. Longo. Amer. Indust. Hygiene Conf., Salt Lake City, UT, May 22, 1991.

"Settled Dust Collection Methods" and "Interpretation of Results", as Co-director of the Course, Settled Dust Sampling: Asbestos and Other Particulates, Georgia Institute of Technology, Atlanta, GA, August 12, 1991.

"Can You Identify This Material?", Inter-Micro, Chicago, IL, August 22, 1991. Co-authored with E.J. Chatfield and R.J. Lee.

"Overview of Techniques for Detecting Asbestos Fibers in Indoor Air and Settled Dust", American Public Health Association (APHA) Conference, Atlanta, GA, November 13, 1991.

"Analysis of Low-Level Asbestos-Containing Bulk Building Materials by Polarized Light Microscopy and Transmission Electron Microscopy", Professional Development Seminar coordinated  by J.A. Krewer, Environmental Management '92, April 6, 1992, Pittsburgh, PA.

"Removal of Asbestos-Containing Roofing:  Effects of Work Practices on Airborne Asbestos Levels", M.D. Cameron, D.L. Keyes, J.R. Millette, Environmental Management '92, April 7, 1992, Pittsburgh, PA.

"Use of Observational Data and Experimental Studies in Developing Better Asbestos Operations and Maintenance Plans", S.M. Hays, J.R. Millette, Environmental Management '92, April 8, 1992, Pittsburgh, PA.

An Overview of Monitoring Techniques for Asbestos in Settled Dust, ASTM Johnson Conference, July 15, 1992, Johnson, VT.

"Asbestos in Settled Dust", A Professional Development Course, EM '94, Envir. Inform. Assoc. Conf., March 13, 1994, San Diego, CA.

"Lead Source Determination and Research Activities".  J.R. Millette, R.S. Brown, J.P. Bradley, EM '94, Envir. Inform. Assoc. Conf., March 15, 1994, San Diego, CA.

"Dust Sampling and Analysis", ASTM Standards for Asbestos Control, October 27-28, 1994, Atlanta, GA.

"Contamination from Asbestos Dust", Professional Development Seminar, The Environmental Information Association, November 17, 1994, Las Vegas, Nevada.

ASTM Standards for Asbestos Control, American Society for Testing and Materials Course, Nov. 9-10, 1995, Atlanta, Georgia.

James R. Millette, Ph.D.
Page 18

"Asbestos Dust Contamination", Seminars, California Environmental Information Association, Nov. 16-17, 1995, Oakland and Long Beach, California.

"Microscopical Examination of Indoor Dusts", Microscopy & Microanalysis '98, Microscopy Society of America, July 15, 1998.

"Use of Electron Microscopy in the Study of Indoor Air Quality (IAQ) Samples", INTER/MICRO-98, Chicago, IL, August 13, 1998.

"Environmental Forensic Microscopy", with R. S. Brown, American Academy of Forensic Sciences, Chicago, IL Feb 20, 2003.

"Characterization of Coal Ash", InterMicro, Chicago, July 12, 2010.

Additional presentations at InterMicro, ASTM Symposia and EIA each year to present.


F.   Professional Societies

American Industrial Hygiene Association
ASTM-International (American Society for Testing and Materials)
Environmental Information Association
American Academy of Forensic Scientists
International Board of Forensic Engineering Sciences


G.   Participation in Scientific Conferences, Technical Committees

"Sampling and Analysis of Asbestos in Settled Dusts" Workshop - USEPA, Risk Reduction Engineering Laboratory, Cincinnati, Ohio, July 11-14, 1989.

Chairman of the Cincinnati EPA Environmental Research Center Electron Microscope Facility Committee.

Member of the Sampling and Analytical Committee, National Asbestos Council.

Member of the American Society for Testing and Materials (ASTM) D22.07, Sampling and Analysis of Atmospheres:Asbestos. Co-chair of the ASTM Michael E. Beard Asbestos Conference – San Antonio, January 2010.

Member of the American Water Works Association Water Quality Division Ad Hoc Committee on Asbestos in Drinking Water and the Technical and Professional Council Committee on Particles in Water and Health Implications.

Served as technical reviewer of papers submitted to a number of journals, including Scanning Electron Microscopy, Science, American Water Works Association, American Industrial Hygiene Association, NAC Journal.

Member of the USEPA Asbestos Methodology Subcommittee.

Member of Ambient Water Quality Criteria Document Review Panel for Asbestos, 1980.

Co-chairman for the October 2, 1982 and June 2, 1984 meetings of the Electron Microscopy Society of the Ohio River Valley held at Miami University and USEPA.

Chairman and Organizer--Workshop on Ingested Asbestos--USEPA, Cincinnati, Ohio, October 13-14, 1982.  Editor for Proceedings Published in Vol. 53 of Environmental Health Perspectives, 1983.

Member ASTM Committee D-22 on Sampling and Analysis of Atmospheres.

Chairman, American Water Works Association Standard Methods Joint Task Group #200Z on Asbestos in Water.

Chairman, Asbestos Session, Inter/Micro - 88, Chicago, IL, June, 1988.

Member EPA Asbestos Hazard Emergency Response Act (AHERA) Technical Panel developing TEM clearance procedure.

H.  Consultant Activities

Testified as an expert witness in the Connecticut State Capitol at a hearing of the State of Connecticut Department of Health Services concerning the development of regulations governing the use of asbestos-cement pipe, September 16, 1980.

Technical input into the USEPA Asbestos Methodology subcommittee as part of a team effort which resulted in the development of the USEPA Interim Procedure for Fibrous Asbestos, Transmission Electron Microscopy Method, the first step toward a standard USEPA method for analyzing asbestos in water.

Technical assistance to the USEPA regions in the form of asbestos analyses has helped determine the extent of potential asbestos exposure to populations through their drinking water.

Interviewed by "Maclean's" Canada's Weekly News magazine, July 21, 1986: "Health:  A Battle to Rehabilitate Asbestos" pp. 39-41.

Member Technical Working Group on Asbestos in Public and Commercial Buildings for the U.S. EPA Policy Dialogue Group, Washington, D.C., September 12, 1989.

Instructor for the Electron Microscopy Course on Asbestos given at the JEOL Training Center, Peabody, MA, August 17-21, 1987, May 2-6, 1988, July, 1989.

Instructor for Georgia Tech "Asbestos Analysis by Electron Microscopy" course, 1987-1988.

 Instructor for TEM Asbestos Analysis Course, McCrone Research Institute, 1988-1989, 1999.

Instructor for TEM Asbestos Analysis Course, MVA Scientific Consultants, 1999-Present.

Panel Member on the U.S. Environmental Protection Agency Workshop on Vermiculite Attic Insulation, February 17-18, 2004, Alexandria, VA.

Expert Panel Member – US House of Representatives, Committee on Energy and Commerce, Subcommittee on Environment and Hazardous Materials,

James R. Millette, Ph.D.
Page 20

Legislative Hearing on S.742 and Draft Legislation to Ban Asbestos in Products. 2322 Rayburn House Office Building, February 28, 2008.

Member of the organizing committee of the  NIOSH sponsored workshop on EMPs organized by the National Academies of Science, Engineering, and Medicine scheduled for January 25 and 26, 2018, Washington, DC – postponed.

I.      Other Information

Completed Contracts, Grants, and Interagency Agreements Course for EPA Project Officers given in cooperation with the Ohio State University, 1976, and a similar course given in 1983.

Completed Course on Introduction to Supervision, U.S. Civil Service, 1979; Analytical Electron Microscopy, JEOL, Boston, 1979; Selection of Tests for Assessment of Hepatotoxicity, SOT, Atlanta, 1984.  Sampling and Evaluating Airborne Asbestos Dust, NIOSH, Cincinnati, 1977.

Board certified by the International Board of Forensic Engineering Sciences (IBFES), February 18, 2014. The IBFES is accredited by FSAB (Forensic Specialties Accreditation Board), an independent board which is sponsored by the NIJ (National Institute of Justice, U.S. Department of Justice).

Peer-Reviewer for scientific journals such as Environmental Health Perspectives, Science, American Journal of Industrial Medicine, Journal of Occupational and Environmental Hygiene.

Testified as an expert witness for the CT State Depart. of Health 1980 & US House of Representatives Subcommittee on Environment & Hazardous Materials – Feb 28, 2008.
• Adjunct Professor, Department of Zoology, Miami University, Oxford, Ohio, 1984-1985.
• President, Electron Microscope Society of the Ohio River Valley, 1984-1985.
• President, Georgia Microscopical Society, 1994-1996.
• Testified as an Expert Witness on matters relating to microscopical analyses in court.
• Co-Course Director, "Settled Dust Analysis," Georgia Tech Research Institute, 1991-1992.
• Lecturer for ASTM Technical & Professional Training Courses.

January 2021

**Appendix B**
**List of Testimony**

**Testimony of James R. Millette, Ph.D, D-IBFES**
**In trial and at deposition   last 5 years**

| | |
|---|---|
| Martha Dickerson (John Dickerson, dec) v. Georgia Pacific, LLC, et al. in State Court Dekalb Co., Georgia. File No. 14A50080-1 | 01/19/16 |
| Betty Garcia (Jorge Garcia, dec.) v. Automoco Corp., et al., Circuit Court Miami-Dade Co., FL, Case No.: 08-40561 CA09 | 03/03/16 |
| Billy Parrott v. Arvinmeritor, Inc., et al., Superior Court California, Co. of Los Angeles, Case No. BC544152 | 03/24/16 |
| Dorothy Keisker (Robert Keisker dec.) v. A.W Chesterton Co. et al., Circuit Court of St. Louis City, MO, Case No. 1422-CC09759 | 03/25/16 |
| Alicia Azzolini (Pedro Azzolini, dec.)  v. Basco Drywall & Painting  Co., etal., Superior Court, County of Alameda, CA  Case: RG1471980 | 03/28/16 |
| T. George Coulbourn et al. v. Air and Liquid Systems Corp., etal., US District Court Arizona. Case 3:13-CV-08141-DGC | 04/08/16 |
| Willard Entwisle, etal v. ACandS, Inc., etal., Circuit Court for Baltimore City, MD Case No. 24X15000104 | 04/15/16 |
| Billy Parrott v. Arvinmeritor, Inc., et al., Superior Court California, Co. of Los Angeles, Case No. BC544152 [Continuation of 03/24/16] | 04/27/16 |
| Ralph Vitale (part of Entwisle etal v. ACandS, Inc., etal., Circuit Court for Baltimore City, MD Consol. Case No. 24X15000104) Vitale Case No. 24X14000545 | 05/20/16 |
| William C. Bell v. Foster Wheeler Energy Corp., et al. US District court of the Eastern District of Louisiana. No. 2:15-cv-06394 | 07/07/16 |
| David Coletti (Nicole M. Theriault Coletti), etal. v. Advance Stores Co., Inc (Advance Auto Parts, Inc.), etal., Superior Court Commonwealth of Massachusetts, Middlesex. Civil Action No. 13-4487 | 08/26/16 |
| Christopher Coates, et al., v. ACandS, Inc., et al.,Circuit Court for Baltimore City, Consolidated Case No. 24X16000052 Christopher Coates Case No. 24X15000559 | 09/15/16 |
| Nola H. Bristol v. Arvinmeritor, Inc., et., In the Circuit Court, 22nd Circuit (St. Louis City), MO Case No. 1522-CC10413 | 09/22/16 |
| William Mathieu (No. 15 L 755) and James Cucchiara (No. 15 L 1205) v. A.W. Chesterton Company, et al., In the 3rd Judicial Circuit Court Madison Co., IL | 10/14/16 |
| T. Nola H. Bristol v. Arvinmeritor, Inc., et., In the Circuit Court, 22nd Circuit (St. Louis City), MO Case No. 1522-CC10413 | 11/1-2/16 |
| Richard Arthur Hawk v. BNSF Railway in District Court of Harris Co., TX, 11th Judicial Dist. Cause No. 2014-52886 | 11/3/16 |
| T. Christopher Coates, et al., v. ACandS, Inc., et al.,Circuit Court for Baltimore City, Consolidated Case No. 24X16000052 Christopher Coates Case No. 24X15000559 | 11/17/16 |
| Jessica Blackford-Cleeton etal v.AK Steel Corp., et al. In 2nd Judicial Circuit Court, Richland Co. IL. Case No. 15-L-17 | 12/06/16 |

| | |
|---|---|
| Jesse Frank Sheppard v. Mosaic Global Holdings, Inc., et al. In US District Court, Eastern District of Louisiana. Civil Action No. 2:16-cv-02401 | 12/20/16 |
| Barbara Wallace (No. 24X16000121) and Donald Watson (No. 24X16000108) v. ACandS, Inc., et al., In the Circuit Court for Baltimore City, Consolidation Trial Grp No. 24X16000249 | 02/02/17 |
| T. Richard Arthur Hawk v. BNSF Railway in District Court of Harris Co., TX, 11th Judicial Dist. Cause No. 2014-52886 | 03/03/17 |
| T. Kenneth W. Anderson et al.. V. AVCO Corp. et al.., Campbell Circuit Court, Div. 2, KY Case No. 12-CI-184 | 03/09/17 |
| Ronald Kindred v. ACandS., et al., Case No 24X16000258 in Circuit Court for Baltimore, MD. Part of Consolidated case Aubrey Baber, etal.,No. 24X16000355 | 03/14/17 |
| Linda Granere and Deborah Mains vs. 84 Lumber Co., et al., 17 Judicial Circuit, Broward Co., FL Case No. CACE-14-006459 | 04/25/17 |
| Edgar Albright and Marcia Albright v. 3 M Co., et al., 17th Circuit Court, Broward, Co. FL. Case CACE 16-015574 | 08/11/17 |
| John Dunn and Charis Dunn v. American Honda Motor Co., Inc., et al., 11th Circuit Court for Miami-Dade Co, FL Case No: 16-031773 | 08/17/17 |
| Katherine Uyeno v. The Old OAHU Tug Service, Inc., et al., in the First Circuit Court, State of Hawaii, Case CV CIVIL NO. 16-1-2006-10 (RAN). | 09/01/17 |
| Clayton Russell, Jr. et.al,. v. ACandS, Inc., et al.,  Circuit Court for Baltimore City, Maryland, No. 24-X17-000015. In Consolidated Trial Group No 24-X-16-000498 (David Cartwright, et al.) | 09/07/17 |
| William C. Blosser and Marcia Blosser v. Ashcroft, Inc., et al., US District Court, Western District of Washington at Tacoma. Case No. 3:17-CV-05243-BHS | 10/23/17 |
| Brian Keeney etal (Harley Keeney – dec.) v. A.W. Chesterton, Co., etal, Circuit Court 22nd Judicial Circuit, Missouri (City of St Louis) Case No. 1522-CC1100  and Leonard Mayo and Margaret Mayo v. A.W. Chesterton, Co., etal, Same Judicial Circuit Court Case No. 1622-CC10835 | 11/09/17 |
| Maria O'Neill (Eugene O'Neill, dec.) v. Vanderbilt Minerals, LLC et al., In the Circuit Court of 11th Judicial Circuit, Miami-Dade Co., FL Case No 2016-017101-CA-01 | 11/28/17 |
| Maria Rosenfield (Max Rosenfield, dec.) v. A.W. Chesterton Co., et al, In the Third Judicial Circuit Court, Madison Co., Illinois | 12/06/17 |
| T. Jack Esvelt (Estate of Jane Esvelt, Deceased) vs CertainTeed Corporation, et al. Superior Court, State Of Washington, County Of King. No. 16-2-15978-8 SEA | 01/10/18 |
| T. Steven Redfearn Stewart v. Albany International, Corp., etal. Court of Common Pleas, County of York, South Carolina. Case No. 2013-CP-46-00368 - Case changed to Stephen Edwards (Mr. Stewart's son) after Stewart's death. | 01/31/18 |
| Nelcome Joseph Courville, Jr. v. Lamorak Insurance Co., et al., Civil District Court, Parish of Orleans, LA. No 2017-1117, Div. "J" | 02/27/18 |

| | |
|---|---|
| Gary Iben (Jill Iben Dec.) v. A.W. Chesterton Co. et al., 3rd Judicial Circuit, Madison Co. IL. No.: 15 L 843 | 03/08/18 |
| Tricia Davis and Andrew Berry (Patrick Berry, dec.) v. Gulf Coast Chemical Corp., Vanderbilt Minerals, LLC in Circuit Court of 17th Judicial Circuit, Broward Co., FL. Case No. 15-005737 | 03/22/18 |
| Joseph F. Brazan v. Lamorak Ins. Co. et.al., Civil District Court, Parish of Orleans, LA. No 2017-9390, Div. "M" | 04/05/18 |
| Ronald Blake, et al., v. ACandS, Inc. et. al.,  In Circuit Court for Baltimore City, MD. July 2018 Trial Group. Consolidated No. 24-17-000372 Blake Case No. 24-X-17-000244 | 04/18/18 |
| Gardner (Patricia Corbin) v. American International Industries, Inc., et al., in Superior Court of New Jersey, Div. Middlesex Co. Docket No.:MID-L-5203-11(AS) | 05/30/18 |
| Callen L. Dempster v. Lamorak Ins. Co., et.al. in Civil District Court, Parish of Orleans, Louisiana No. 2018-2513, Div "C", Section "10" | 06/08/18 |
| James Fiebiger and Bonnie Fiebiger v. A.W. Chesterton Co. et.al., In the 22nd Judicial Circuit Court of the City of St. Louis, MO Cause No.: 1722-CC10983 Div. 1 | 06/15/18 |
| Allen Cain (Mary Cain, dec.) v. A.W. Chesterton Co., et.al.,  Cause No. 1622-CC10750 and Jimmy Hasty (Barbara Hasty, dec.) v. A.W. Chesterton Co., et.al., Cause No. 1722-CC00403. both cases in 22nd Judicial Circuit Court of the City of St. Louis, MO. | 06/25/18 |
| Sandra Plummer (Seth Brown, Dec.) v. Whip-Mix Corp. et al., in Superior Court, J.D. of Fairfeild at Bridgeport, CT.  No. FBT-CV-16-6060487-S | 07/17/18 |
| John O'Daniel and Barbara O'Daniel v. Air & Liquid Systems Corp., et al. in the 3rd Judicial Circuit Court of Madison Co., Illinois. Case No. 16-L-1782 | 07/24/18 |
| John Dugger, Jr. et al., v. Union Carbide Corp. et al., In U.S. District Court, District of Maryland, Civil Action No. 16-cv-03912-CCB | 07/31/18 |
| Joseph M. Chiacchieri, Sr. v. BorgWarner Morse Tec LLC, etal.,  In Circuit Court for Prince George's Co., MD Case No. CAL17-20905 | 08/27/18 |
| Hazel Mertz (Clarence Mertz, dec.) vs. BWDAC Inc. (BWD Automotive Corp) et al., Superior court King Co. Washington No. 12-2-12415-0 SEA | 09/10/18 |
| Michael Reed and Deborah Reed v. A.O. Smith Corporation, et.al., In 22nd Judicial Circuit Court, State of Missouri (City of St. Louis). Cause No. 1722-CC11161 | 09/11/18 |
| Silverio (and Faye) Onorato v. Borg Warner Morse Tec Inc., et.al. In 11th Judicial Circuit Court, Miami-Dade Co., FL Case No. 17-013703-CA (42) | 10/10/18 |
| Lakhota Harker v. A.W. Chesterton, Inc., et.al. (incl vs. Brake Parts Inc. LLC a/k/a Brake Parts LLC f/k/a Brakes Parts Inc.) in 3rd Judicial Circuit Court, Madison Co., IL Case No. 17-L-965 | 11/15/18 |
| Roy Knight and Milva Knight v. Scapa Dryer Fabrics, Inc.,In the Superior Court of Ware Co., Georgia, Civil Action No. 09-V-0799 | 12/21/18 |
| T. Christopher Coates, et al., v. ACandS, Inc., et al.,Circuit Court for Baltimore City, Consolidated Case No. 24X16000052 | 02/06/19 |

| | |
|---|---|
| Christopher Coates Case No. 24X15000559 | |
| Jeffrey Miller and Kim Miller v. 3M Company, et al., in the 3rd Judicial Circuit, Madison Co., IL. Case No. 18-L-0420 | 02/28/19 |
| Albert Manring and I. Juanita Manring v. 3M Company et al., in the 3rd Judicial Circuit, Madison Co., IL. Case No. 17-L-1686 | 03/06/19 |
| Charles R. Steib v. Lamorak Ins Co., et al., in District Court for the Parish of Orleans, LA. Div "L-6". Case No.2018-4189 | 03/14/19 |
| Michael Charles Bell et. al. v. BorgWarner Tec, Inc. et al., Baltimore City Circuit Court. Case No. 24X18000127 | 06/06/19 |
| Charles Dale and Lana Dale vs. A.O. Smith Corp, et al., in the 3rd Judicial Circuit, Madison Co., IL. Case No.18-L-1085 | 06/14/19 |
| Arthur Putt, et al. v. A.O. CBS Corporation, et al. JCCP 4674 [Los Angeles Superior Court Case No. 18STCV06912] | 07/16/19 |
| Nelcome Joseph Courville, Jr. v. Lamorak Insurance Co., et al., Civil District Court, Parish of Orleans, LA. No 2017-1117, Div. "J" Supplemental to 02/27/18 | 08/12/19 |
| T. Arthur Putt, et al. v. A.O. CBS Corporation, et al. JCCP 4674 [Los Angeles Superior Court Case No. 18STCV06912] | 08/14/19 |
| Diane Shoemaker French (Bobby Shoemaker, dec) v. Bostik Inc, et al., In 17 Circuit Court, Broward Co., FL Case No. 17-017041 (27) | 08/19/19 |
| Margaret J. Jones (William Jones, dec) v. AW Chesterton Co., et al., in Circuit Court of Crawford, Co., Arkansas, Case No. 17Civ-2017-527 | 08/20/19 |
| Robert G. Clark and Alana Clark v Borg Warner Corp., et al. In the 11th Judicial Circuit, Miami-Dade Co., FL Case No. 14-027985 | 08/23/19 |
| Sandra Brown (Seth Brown, dec.) v State of Connecticut/University of Connecticut Health Center in the 8th Dist. St of Connecticut Worker's Compensation Commission WCC file No. 601082427 | 08/26/19 |
| Janet Finch (William M. Finch, dec.) v. BorgWarner Morse Tec LLC, et al., in Circuit Court for Baltimore Co., MD. Case No: 24X18000279 | 09/12/19 |
| Michael Charles Bell et. al. v. BorgWarner Tec, Inc. et al., Baltimore City Circuit Court. Case No. 24X18000127 (video for trial) | 09/17/19 |
| Donald Coker and Marie Coker v. Union Carbide Corp., et al. In St. Lawrence Co., New York Index No.: 153254 (video for trial) | 09/26/19 |
| Gerald W. Wilson, et al. vs. ABB, Inc., et al. Los Angeles Superior Court Case Nos. JCCP 4674/19STCV00653 | 10/18/19 |
| Daniel J. Boullion v. Lamorak Ins. Co., et al., Civil Dist. Court, Parish of Orleans, Louisiana, Div. "M", Section "13". Case No. 2018-12993 | 10/30/19 |
| Johnny Pinkston and Sherry Pinkston v. Air & Liquid Systems Corp., et al., 17th Judicial Circuit, Broward Co., FL. Case No. 19-012541 CA 27 | 01/09/20 |
| Robert King and Queida King v. ABB, Inc. as successor in interest to Detroit Electric Furnace, et al., In 13th Circuit Court, Hillsborough Co., Florida Case No.: | 02/06/20 |

| | |
|---|---|
| CA-19002884 | |
| Reyna Carranza (Alberto dec.) v. 3M Co., et al., Los Angeles Superior Court No. 18STCV04130 | 02/11/20 |
| Barbara Ingram (Samuel Ingram, dec.) v. American Honda Motor Co., Inc., et al., in Marion County, Indiana, Superior Court 12, Mass Tort Litigation Cause No. 49D12-1703-MI-010155 | 03/12/20 |
| Ronald Greth and Lyn Greth v. ABS, Inc., et al., 17th Judicial Circuit, Broward Co., FL. Case No. 19-023152 | 05/18/20 |
| James Rankin and Nanette Rankin v. A.W. Chesterton Co., et al., 22nd Judicial Circuit Court for the City of St. Louis, MO | 05/19/20 |
| Michael and Cheryl Levand v. ABB, Inc., et al., in  Los Angeles Superior Court Case No.19STCV30594  (LAOSD ASBESTOS CASES  JCCP Case No. 4674) | 06/09/20 |
| Victor B. Robinson, Sr. v. Bird, Inc., et al., in Circuit Court of Cook Co., IL No. 19 L 007058 | 06/30/20 |
| L. Joseph Derouen v. Anco Insulations Inc., et al. in 19th District Court, Parish of East Baton Rouge, Louisiana No. C-695843 | 09/14/20 |
| Martin Jones v. Neo Fabrics, Inc. et al., Civil District Court for the Parish of Orleans, Louisiana.  Div/Sec: "J-15", No.: 2019-11716 | 10/21/20 |
| Carolyn Wassinger, etal v. Air & Liquid Systems Corp, et al. JCCP Case No. 4674, LASC 19STCV1081 | 10/30/20 |
| Charles Toney, Jr. and Patricia Toney v #M Company, et al.,  In the 17th Judicial Circuit, Boward Co., FL Case No.: CACE-20-001331 (27) | 11/18/20 |
| Joseph A. Glos, et al.,  v. Akebono Brake Corporation, et al.,  in the Circuit Court for Baltimore City, Case No. 24-x-20-000013 | 12/22/20 |
| Dale M. Spurlin etal., v. Alfa Laval, etal., US District Court, Southern District of California. Case No.: 3:19-CV-2049-BEN-AHG | 01/06/21 |

**Appendix C**
**Compensation**

Compensation for James R. Millette is paid to Millette Technical Consulting, LLC at the rate of $500 per hour for testimony either by deposition or at trial. The same rate is charged for research and consulting.

Report:   CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA
NO.: 2019-09716 SECTION 8 DIVISION "N"
CAROLYN BRINDELL, et., al,
VERSUS
CARLISLE INDUSTRIAL BRAKE AND FRICTION INC., *et., al.*

# December 21, 2020

## Marty Kanarek, Ph.D. M.P.H.
### Professor
University of Wisconsin-Madison,
School of Medicine and Public Health
And the Nelson Institute for Environmental Studies
610 N. Walnut Street, Madison WI 53726

**Mailing Address: 456 Virginia Terrace, Madison, WI 53726**

<u>**Training, Background and Experience**</u>

I am Professor of Epidemiology in the Department of Population Health Sciences in the School of Medicine and Public Health and in the Nelson Institute for Environmental Studies at the University of Wisconsin-Madison. I received my Ph.D. in Epidemiology from the University of California Berkeley, my M.P.H. in Environmental Health from the University of Minnesota and my B.A. in Biology from Grinnell College. I worked at the U.S. Environmental Protection Agency from 1972-78 before coming to the University of Wisconsin-Madison as an Assistant Professor in 1978. I subsequently was promoted to Associate Professor in 1984 and Professor in 2000.

I have served as Director of the Graduate Program in Population Health and the Graduate Program in Epidemiology and Vice Chair of the Department of Population Health Sciences in the School of Medicine and Public Health for 7 years, and Chair of the Gaylord Nelson Institute for Environmental Studies Major and Certificate for undergraduates for over 30 years. I have taught introduction to epidemiology, advanced epidemiology, non-infectious disease epidemiology, environmental health, and air pollution and human health and other courses to thousands of junior and senior undergraduate students, graduate students, medical students and physicians, and have mentored many Master's degree and Doctoral students.

1 |

**EXHIBIT Y**

My research has included many aspects of environmental epidemiology, including childhood lead poisoning prevention and subtle neurological and learning effects of lead at low and moderate lead exposure levels, indoor and outdoor air pollution (including nitrogen dioxide, formaldehyde and radon), PCB, dioxin and mercury contaminants from consumption of contaminated fish, drinking water and cancer, environmental tracking and other studies of the human health effects of pollution. I am well known in the field of environmental epidemiology for my seminal studies in indoor air pollution, chlorination byproducts in drinking water and cancer, and asbestos in drinking water and cancer.

I have been a consultant in epidemiology on the environmental and occupational disease effects of asbestos, lead and other contaminants for the United States Environmental Protection Agency (EPA), the International Agency for Research on Cancer (IARC), the Agency for Toxic Substances and Disease Registry (ATSDR), and the National Institute for Environmental Health Sciences (NIEHS).

I have authored four major publications on asbestos and mesothelioma:

Kanarek, M.S. *Mesothelioma from chrysotile asbestos: update.* Annals of Epidemiology 21:688-697 (2011); Erratum: Annals of Epidemiology 22:377 (2012). (**attached**)

Kanarek, M.S. and Mandich MK.  *Peritoneal mesothelioma and asbestos: clarifying the relationship by epidemiology.*  Epidemiology Open Access. 6:2 (2016). http://dx.doi.org/10.4172/2161-1165.1000233 (**attached**)

Kanarek, M.S. and Anderson, HA. *Mesothelioma from asbestos exposure in brake mechanics: epidemiology in context.*  Epidemiology Open Access, 8:2 (2018).  http://dx.doi.org/10.4172/2161-1165.1000340 (**attached**)

Kanarek, MS, O'Brien Liegel, JC. Asbestos in talc and mesothelioma: review of the causality using epidemiology. Medical Research Archives 8: issue 5, https://journals.ke-i.org/mra/article/view/2097 2020. (**attached**)

**My opinions on mesothelioma and asbestos rely on these four publications and all the references in these publications in addition to the references in this report.**

My Curriculum Vitae (C.V.) is **attached**.

My Testimony History is **attached**.

## Materials on Mr. Brindell Reviewed

    a.  Deposition of J. Keith Poleto Vol 1 +II, + Exhibits A, B, C, D
    b.  Affidavit of Raymond Kain
    c.  Brindell- Social Security Records
    d.  Brindell Exposure History
    e.  Responses to Master Interrogatories and Requests for Production of Documents
    f.  Pathology Report April 17, 2019 SE Louisiana Veterans HCS
    g.  Surgical Pathology Report Tulane Transplant Institute 5/20/2019

## Summary of Mr. Brindell's Potential Exposure to Asbestos

Mr. John Brindell was diagnosed with pleural mesothelioma on May 15, 2019.  He died on July 6, 2019.

Mr. Brindell  worked as a supervisor responsible for a trailer mechanic shop 1976-1981.  In the trailer mechanic shop, mechanics constantly changed brakes on trailers in addition to other trailer maintenance.  Keith Poleto testified that Mr. Brindell was exposed to asbestos from brake work almost every single day that they worked together 1979-1981. Mr. Brindell was regularly, substantially and consistently exposed to asbestos from brake work 1976-1981. Mr. Brindell was present when mechanics did brake work on the trailers where he was exposed to the dust from their work.

Brake work exposed Mr. Brindell to airborne asbestos dust substantially, frequently, consistently, regularly, and hundreds to thousands of times with each brand of brake, axle, or trailer, all from the asbestos dust created by removing and installing the brakes equipment. Regardless of brand of brake, axle, or trailer being maintained, asbestos dust was released during brake removals because worn asbestos lining materials that had accumulated inside the brake drums were blown out into the air with an air hose. Asbestos dust was also released during brake installations because asbestos lining materials were beveled and ground prior to installation, creating visible dust in the air. Trailer brake pads are at least four times larger than car brakes pads.  Mr. Brindell did not wear a mask when in the mechanic shop and he was often standing within feet of these dusty work practices. Mr. Poleto saw Mr. Brindell exposed to asbestos dust from brakes hundreds of times and from axles hundreds of times.   Mr. Brindell as the supervisor was exposed while supervising the mechanics.

Mr. Brindell at times, was required to perform additional duties, including but not limited to container maintenance work, on board ships at the Port of New Orleans. While on board ships, Mr. Brindell was present and exposed to asbestos from maintenance work and insulation repair work performed on the ships.

## Summary of the Epidemiology of Mesothelioma

It has been recognized that asbestos caused asbestosis as early as 1930. *Merewether 1930.*  The seminal publication associating mesothelioma of the pleura and peritoneum to exposure to asbestos was written by Dr. J.C. Wagner in 1960.  *Wagner 1960.*  Over 50 years later, there is overwhelming evidence that asbestos is responsible for this fatal cancer.  Mesothelioma from asbestos is the most definitive example of an environmental cause-effect cancer, involving a quickly fatal disease that has a very long latent period.  Due to the extensive occupational, community and para-occupational exposures to asbestos, a worldwide epidemic of mesothelioma has been reported.  *CDC 2009, Park 2011, Stayner 2013, Bang 2014.*

Kanarek Brindell Report Dec 21, 2020

There are numerous epidemiological studies that have clearly linked all types of asbestos, including crocidolite, amosite and chrysotile, to pleural and peritoneal mesothelioma. *Kanarek 2011, Kanarek 2016, Kanarek 2018.* The global magnitude of mesothelioma is estimated to be 38,900 in a group of 33 countries that report the disease. The actual number of cases is probably much greater as one mesothelioma is missed in every four or five reported cases because of the difficulty in establishing a pathologic diagnosis. *Park 2011.*

There is a long history of asbestos fibers being found in mesothelioma tissue. *Kohyama 1991, Heller 1999.* It is the consensus of the medical and scientific community that there is no known threshold of exposure below which mesothelioma will not occur. *Hillerdal 1999, BTS statement 2001, Welch 2007.* Multiple studies have shown that all levels of exposure to asbestos increase the risk of mesothelioma. *WHO 1998, ATSDR 2001, IARC 2012.* Since there is no known threshold, current regulatory levels for asbestos are capable of causing mesothelioma. *Iwatsubo 1998.* Indeed, brief or low exposures to asbestos are capable of causing mesothelioma. *Rodelsperger 2001, Singhal 2014.* In fact, *Lacourt (2014)* found a four-fold increased risk of mesothelioma at cumulative exposure levels less than 0.1 f/cc. Mesothelioma incidence is proportional to cumulative asbestos exposure. *Pinto 2013, Magnani 2013, Collegium Ramazzini 2016* Intensity and duration of asbestos exposure are determinant of mesothelioma risk. *Magnani 2015, Ferrante 2020*

The mainstream scientific community has concluded that there is no "safe' level of exposure to asbestos of any type and that "…an occupational history of brief or low-level exposure should be considered sufficient for mesothelioma to be designated occupationally related" to asbestos. *Tossavianen  1997, Markowitz 2015, NTP 2016*

## Spontaneous mesothelioma and idiopathic mesothelioma

The concept of spontaneous disease causation without a cause is not been a valid concept in modern medicine for over two thousand years and stems from antiquated lack of medical knowledge in the era of 300 B.C  Idiopathic means relating to or denoting any disease with unknown cause. *Mark 1991* in Massachusetts General Hospital and *Strauchen 2011* at Mt. Sinai examined autopsy specimens from 1883-1910 (*Strauchen 2011*) and 1896-1946 (*Mark 1991*) and found no mesotheliomas concluding that mesothelioma was not a disease entity until asbestos started to be used commercially and no cases occurred "idiopathically" or "spontaneously" before there was an asbestos industry.  *LaCourt 2014* estimates the attributable risk (attributable risk = how much of the disease rate is caused by a certain factor) of occupational asbestos exposure and pleural mesothelioma for men as 83.1% and 41.7% for women.  The non-occupational attributable risk for asbestos and mesothelioma was 20.0% in men and 38.7% in women.  When considering all kinds of asbestos exposure, the attributable risk of asbestos in causing mesothelioma was 87.3% in men and 64.8% in women *LaCourt 2014.  Spirtas 1994, Rake 2009, Price 2009, Offermans 2014 and Marinaccio 2012* all document very similar estimates, 85-88% in men and 23% to 65% in women.  It is assumed by all these authors that non-occupational asbestos exposure accounts for a large percentage of the risk in females.

There are small numbers of mesotheliomas that are attributed to erionite in Turkey, fluor-edentite in Sicily and rare cases after radiation for cancer therapy.

Considerable biological progress is being made on the biological mechanisms of mesothelioma development in the last 20 years.

Sage 2018 gives a good summary:

> "As asbestos exposure is a primary cause of mesothelioma development, analysis of the molecular aberrations induced by these fibers is pertinent to the study of mesothelioma biology. The primary mechanism of asbestos-related carcinogenesis is chronic inflammation and ongoing generation of highly reactive oxygen species (ROS) that collide with cellular components, promote DNA mutation, and trigger transformation . Asbestos fibers also contain iron (II) ions (Fe2+) and can induce hemolysis to sequester Fe(II) from hemoglobin [24]; this is particularly important as, via the Fenton reaction, free Fe(II) disproportionatesH2O2 into hydroxyl radicals ( OH) that oxidize DNA, free nucleicacids, proteins, and lipids. This process is exacerbated by the release of cytokines, including tumornecrosis factor-_ (TNF-_) from macrophages and high mobility group box 1 (HMGB1) proteins from necrotic cells, amplifying the inflammatory response and increasing the number of cells under going oxidative damage. Oxidative DNA damage, if not properly repaired, is highly mutagenic and can trigger genomic instability, a primary enabling characteristic of cancer formation that is detectable by high-throughput techniques…" (Sage et al. 2018)

*Attanoos 2018* tries to make a case that there are substantial numbers of cases of mesothelioma that are "idiopathic" or in other words, are not caused by asbestos. There is no legitimate biologic mechanism of mesothelioma carcinogenesis that describes it as spontaneous. "Genome-sequencing data exclude the possibility of spontaneous tumors: a normal adult cell cannot suddenly transform into a cancer cell." *Vogelstein 2015* Any mesothelioma where the specific exposure to asbestos is not documented is sometimes called idiopathic, but modern science makes it clear that the sentinel cause, asbestos, occurred some place in the person's history, but is not documented.  In the Brindell case, asbestos exposures are clear, so the concepts of spontaneous and idiopathic mesothelioma are irrelevant.

### *BAP1*

*BAP1* is one of many possible genetic factors that help explain why certain asbestos exposed individuals develop mesotheliomas and others do not develop the disease. *Betti 2017.*  There is some evidence that patients with mesothelioma with mutations in the BAP1 repair gene may have increased survival time after chemotherapy treatment.  *Baumann 2015, Hassan 2019.*   While *BAP1* gene status may play a role in susceptibility to mesothelioma in certain individuals, is definitely not the cause of mesothelioma.  *Xu 2014* ("our findings provide experimental support for the idea that *BAP1*mutation carriers may be highly susceptible to malignant mesothelioma even at modest levels of asbestos exposure that would be considerably less tumorigenic in the general population"); *Napolitano 2016* ("Our findings suggest that minimal exposure to carcinogenic fibers may significantly increase the risk of malignant mesothelioma in genetically predisposed individuals carrying germline *BAP1* mutations, possible via alterations of the inflammatory response."); *Ohar 2016* ("the significantly higher incidence of *BAP1* mutations observed in MM [malignant mesothelioma] cases versus controls suggests that asbestos and genetic factors cooperate

to enhance the onset of MM."); *Cheung 2017* ("These unbiased genetic findings in an experimental model suggest that humans carrying a germline *BAP1* mutation may likewise be predisposed to the carcinogenic effects of asbestos fibers."); *Hassan 2019* ("An interaction between genotype and asbestos exposure on mesothelioma risk has been demonstrated in mouse models and is consistent with the reported experience of our patients."); *Gaudino 2020* ("The presence of inherited mutations affecting DNA repair and other genes may further contribute to the process of carcinogenesis by increasing the susceptibility to environmental carcinogens."). The BAP1 mutation merely weakens the body's defenses against asbestos. The BAP1 gene is a "tumor suppressor," normally fighting against any tumor initiation and promotion caused by a carcinogen like asbestos. But when that gene is mutated, its tumor-suppression function is compromised, rendering the person exposed to such a carcinogen more susceptible to developing disease.

With very little support, *Attanoos 2018* claims that in "substantially less than 1% of patients with mesothelioma (when there is no external agent exposure), the mesothelioma will be induced by a specific inherited genetic mutation; scientific evidence presently favors the role of *BAP1*." There is no science behind the idea of mesothelioma being caused by BAP1 without exposure to asbestos. As summarized by *Betti 2019* "genetic factors alone (without any exposure to asbestos or other mineral fibers) have never been shown to induce MM."

## All types of asbestos can cause mesothelioma.

Asbestos has two main types, the serpentines (of which chrysotile is the most common) and the amphiboles, which include crocidolite, amosite, tremolite, anthophyllite and actinolite. Chrysotile asbestos has comprised 95% of world asbestos production, largely in the past from Canada, but also from mines in several other countries around the world. *IARC 2012, Becklake 2007*. There is general agreement among scientists and health agencies that exposure to any type of asbestos (chrysotile or amphibole) can increase the likelihood of lung cancer, mesothelioma, and nonmalignant lung and pleural disorders. *Collegium Ramazzini 2010, Linton 2012, Stayner 2013, Pira 2017, Loomis 2019.*

In 2004, Dr. Richard Lemen published a careful analysis using the widely accepted Hill "Causation Model" to demonstrate that exposure to chrysotile asbestos is a cause of mesothelioma. *Lemen 2004a*. In 2011, I examined the studies from all over the world where exposure to chrysotile asbestos caused mesothelioma. *Kanarek 2011*. Since my publication, the *National Toxicology Program on Carcinogens, 12th edition (2011)* reiterated its' previous conclusions from earlier editions that all forms of asbestos, including chrysotile are associated with an increased risk of mesothelioma in humans.

In addition, in 2012, the International Agency on Research on Cancer published a new Monograph on the Evaluation of Carcinogenic Risks to Humans, where they reached the firm conclusion that all types of asbestos including chrysotile are causative for malignant mesothelioma. *IARC 2012*. Also in 2012, nine major epidemiology professional organizations issued a joint policy statement that described the science and the public health consequences of exposure to all types of asbestos, including chrysotile, as being causative for malignant mesothelioma. *JPC-SE Position Statement on Asbestos 2012*. In 2014 the World Health Organization (WHO) published a new summary document on chrysotile asbestos concluding that it is a cause of mesothelioma around the world. *WHO 2014.*

Kanarek Brindell Report Dec 21, 2020

**Epidemiology Research Methods in the Study of Asbestos Occupational Exposure and Mesothelioma**

There are a variety of different epidemiologic research study designs that have been utilized to address the causation of occupational cancers:

1.      **Case Reports/Case Series**:  Medical case reports of rare diseases or causes of death historically have often alerted the occupational research community to investigate possible causal factors.  According to *Checkoway 2004*, "[case series reports are particularly informative in situations where there are identified occurrences of very rare conditions for which there are few, if any, established causal factors . . ."  In those instances, even a small number of cases "can sometimes be invoked as prima facie evidence of exposure to the putative causal agent."  Mesothelioma is one of the two diseases *Checkoway 2004* uses as an example of this principle.  In fact, *Wagner 1960*, a case series from South Africa, has been widely regarded as sufficient to causally tie asbestos to mesothelioma since mesothelioma had previously been such a rarely reported disease and exposure to asbestos was present in every case.  Ever since *Wagner 1960*, mesothelioma has been considered a "sentinel" for asbestos exposure.

2.      **Registries**:  Many countries have established registries to gather information about the incidence of mesothelioma.  Like a case series, these registries collect cases of mesothelioma as well as some limited information regarding the occupation.  Also like a case series, no comparison is made to a control group.

3.      **Proportionate Mortality Studies**:  Data on deaths collected by various government entities on mortality in registries can be used to detect possible elevations in a specific cause of death as compared to all causes of death in that group.  A Proportionate Mortality Ratio (PMR) is often calculated to compare the proportion of the deaths from one cause to all other causes of death.   A PMR measures only the relative frequency of a particular cause among all causes of death and does not measure the risk of death from that specific cause.  PMR studies are usually an early attempt to explore an association epidemiologically because they can be completed much more rapidly and with considerably less expenditure of resources than other analytic epidemiologic studies.

Since a PMR is typically calculated using information on death certificates, there are two significant limitations in interpreting its impact.  First, the occupational information is limited to that listed on the death certificate which is often the last occupation of the deceased.  The important occupational exposure to asbestos, on the other hand, may have occurred in an earlier occupation in the person's lifetime.  Second, since the cause of death is based solely on that listed on the death certificate; there are concerns about the completeness of the ascertainment of death and the accuracy of the coding of the cause of death.  PMR studies are considered surveillance studies by epidemiologists.

7 |

4.      **Cohort Studies**:  This is the most rigorous of the epidemiologic study designs in occupational epidemiology.   A population of workers with documented exposure is enumerated and followed for disease and mortality as compared to another occupational group, without the exposure of interest, or the general population.  These studies can either be done prospectively in real-time or historically.  Both prospective and historical cohort studies select workers based on exposure and follow them through time for disease occurrence or death.  A relative risk is calculated by comparing the rate of disease in the exposed cohort to a non-exposed group or, in the case of historical cohort studies, the general population.

Prospective cohort studies usually require considerable time and money and are rare in an occupational setting.  Such studies of asbestos exposed cohorts present a particular problem because of the long latency of asbestos diseases.  To capture the true occurrence of asbestos diseases, a cohort with occupational exposure to asbestos would have to be followed for decades. The studies of pipe fitters, insulators and spray insulators by researchers at Mount Sinai are well known examples of a prospective cohort study in occupational epidemiology.  *Selikoff 1964, Selikoff 1979, Ribak 1988, Selikoff 1991*

5.      **Case-Control Studies**:  Lacking the ability to follow exposure groups in a cohort study, epidemiologists often rely on estimating relative risk by comparing reconstructed past exposure histories of persons with the disease or cause of death of interest (cases) to persons free of that disease or cause of death (controls).  These retrospective case-control studies are not designed with the intent of determining the risk of disease for any specific occupation.  Instead, the researchers work backwards from a collection of cases with the disease with the intent of uncovering occupations or exposures that appear more frequently in the case group than the comparison control group.  Since all the data is gathered retrospectively, relative risk cannot be directly calculated in case-control studies, but is estimated by a biostatistical measure called the odds ratio.

These types of epidemiologic studies can be useful but often are prone to the possibility of exposure misclassification, *i.e.*, the exposure data is inaccurate for the cases, controls or both.  In the case of mesothelioma, exposure misclassification is likely because the exposure data is reconstructed from the distant past.  Given the short life expectancy of an individual diagnosed with mesothelioma, the cases are often deceased at the time of the study and researchers have to rely upon the memory of relatives or friends to reconstruct the deceased worker's exposure. Relying upon relatives and friends of mesothelioma victims for an occupational exposure history as compared to interviews with live controls can lead to a differential bias in exposure information (differential exposure misclassification).  *Pearce 2007*.  Non-differential exposure misclassification can occur if both cases and controls lack precise ways of collecting information about past exposures.  *Blair 2007*.  Both differential and non-differential exposure misclassification can lead to finding false negative results in case-control studies of mesothelioma and occupation.

**Potency Comparisons for Different Asbestos Fiber Types in Mesothelioma Causation**

There have been many efforts at estimating relative asbestos fiber type potency for mesothelioma using published occupational studies (*Garabrant 2018, Berman 2008, Hodgson 2000, Hodgson 2010).*  I was a consultant epidemiologist to the EPA effort towards that same goal in 2007-2008.  As summarized by *Silverstein 2009*, the exercise of using statistical models to estimate relative cancer potencies for different asbestos fiber types cannot overcome the limitations of the exposure data in the published occupational studies.  Of the roughly 30 occupational studies that might be used in a potency comparison exposure estimation had problems including (*Silverstein 2009)*:

1. Microscopy (use of phase contrast microscopy- PCM) which undercounts smaller, thinner fibers; Differing microscopes in each study likely varied in fiber sizing and counting;
2. Workers were exposed to a distribution of fiber sizes that is not captured in the historical exposure data;
3. Lack of standard methods for the analysis of asbestos in various media resulting in not comparable measurements between studies;
4. Use of area samples to estimate personal exposure to fibers likely resulted in underestimates or overestimates of the true exposures;
5. Different time frames for measurements between studies—some measured real-time shifts, some used historical estimates of past conditions;
6. Work histories were often imprecise or misclassified.

No amount of statistical modeling can overcome these deficiencies in the underlying exposure data.  Consequently the EPA abandoned the effort to calculate relative potencies for different asbestos fiber types.

*Wong 2020* analyzed the mesothelioma risk from different mixes of fiber types and sizes in a U.S. case-control study.  All fiber type mixes, including both amphiboles and chrysotile, and chrysotile alone, and all sizes of fibers had significantly elevated odds ratios for mesothelioma.


**Asbestos Exposure in Brake Mechanics**

Chrysotile asbestos has been the predominant type used in brakes since the 1940's in the United States, Canada, Europe and Australia.  *Hickish - July 1968, Lemen 2004b*.  Typically, drum and disc brakes contained between 35 to 60% asbestos.  *Lemen 2004b*.  Brake repair workers are potentially exposed to asbestos during a number of procedures utilized during the removal of the existing brakes and the installation of new brakes.

During the removal of the existing brakes, a common practice was the use of compressed air to "blowout" the dust that had accumulated in the wheel well overtime during the braking process. The major component of this brake dust is a particulate substance known as forsterite, a non-fibrous magnesium silicate that is created by the transformation of chrysotile asbestos during the heat and pressure of braking. *Rohl 1976.*  Not all of the chrysotile asbestos, however, is transformed.  Researchers from General Motors Corporation, reported finding 90,000 unaltered

chrysotile asbestos fibers in a nanogram of brake dust, the small fibers (less than 5 microns in length) outnumbering the longer fibers (5 microns and greater) at a rate of 300 to 1.  For every gram of brake dust, this translates to the equivalent of 90 trillion short asbestos fibers and 300 billion long asbestos fibers.  *Lemen 2004b.*

During the installation of the new brakes, brake repair workers would often manipulate the surface through beveling, sanding and/or grinding to insure a proper fit.  The manipulation of the new brakes using these techniques does not result in the transformation of the chrysotile asbestos into forsterite but rather liberates free floating chrysotile fibers into the worker's environment. *Lemen 2004b.*

The first published studies documenting the amount of asbestos generated from the repair and replacement of brakes did not occur until 1970.  *Hickish 1970.*  Since that time, repeated measurements of the dust generated from removing old b*rake* linings and manipulating the new brake linings prior to installation have confirmed the presence of significant levels of asbestos fibers in the workplace.  For example, *Rohl (1976)* measured fibers in dust samples from car brake drums and found chrysotile in all samples.  In addition, measurable concentrations of asbestos were found up to 75 feet from where the compressed air was being used during the blowout of this brake dust.  Concentrations in the brake dust averaged 16 fibers/ml of air.  *Lorimer (1976)* measured mean fiber concentrations of 3.8 fibers/ml among New York City brake repair workers.

In Finland, researchers found that the use of an air hose to clean out the brake dust before the brakes were removed could create a cloud of visible dust leading to airborne concentrations of 8.2 f/cm$^3$ in the immediate vicinity of where the work was being performed.  They further found that the grinding of brake linings prior to installation led to asbestos fiber counts as high as 125 fibers/ cm$^3$.  *Kauppinen 1987.*

*Gustavsson (1990)* conducted personal monitoring for asbestos during brake repair and reconstruction modeling of previous exposures from working in bus garages as part of a study of Swedish bus garage workers.   The cumulative mean exposure was approximately 2.2 fibers per milliliter and the maximum was 6.0 fibers per milliliter.  These exposures are in the millions of fibers per day in the bus garage workplace air.

*Atkinson (2004)* conducted an experiment to evaluate the potential of asbestos to be released from the manipulation of brake components.  Samples were collected from each brake component by gently rinsing the exposed surface with water from a squeeze bottle.  The wash was then analyzed by analytical transmission electron microscopy (TEM) for chrysotile asbestos fibrils, bundles, clusters and matrices. X-ray energy dispersive analysis and selected area diffraction was used to confirm the presence of chrysotile asbestos.  The samples contained from 44.7% to 76.1% chrysotile asbestos particulates with the mean length of fibrils being less than 4 microns, a size that can be taken deep into the respiratory system and thus pose a respiratory hazard.  Since the manipulation in this study was simple rinsing, and not the usual more aggressive procedures used to prepare the brakes for installation, like beveling, grinding, and sanding, the authors concluded that brake installation and repair would lead to release of large numbers of chrysotile asbestos that posed a respiratory hazard to brake workers.

*Cely-Garcia (2012)* conducted personal monitoring for asbestos in three brake repair shops in Bogota Columbia. Standardized NIOSH methods were used to measure full shift (8-hour TWA) and short term (30 min) exposures. Personal asbestos concentrations based on transmission electron microscopy counts were "extremely high, ranging from 0.006 to 3.493 f cm-3 for 8-h TWA and from 0.015 to 8.835 f cm-3 for 30 minute samples." All asbestos fibers detected were chrysotile. Cleaning and grinding facilities showed the highest counts.

**Brake Debris: Are the Chrysotile Fibers Contaminated with Tremolite?**

There are numerous articles debating the significance of finding non-commercial amphibole tremolite asbestos fibers sometimes found among the chrysotile asbestos fibers in brake debris and in the tissues of brake workers. *Poland 2019, Liu 2018, Finkelstein 2015, Finkelstein 2012, Marsh 2011, Marsh 2012, Egilman 2012, Egilman 2012b, Kakooei 2009, Paustenbach 2003, Butnor 2003* Some articles claim that the tremolite must come from some source outside the brakes (*Roggli 2002b* showed that talc could be a source of tremolite) or must come from the worker's other occupational exposures other than brake work. Other authors from the above articles claim that even though the asbestos in brakes was chrysotile, it was contaminated with tremolite or other amphiboles from the brake material. Given the large body of evidence that some chrysotile mines are contaminated with tremolite, (*Mossman 1990, Langer 1997, McDonald 1997, Roggli 1993, Churg 1986* ) it is logical that brake chrysotile can also be contaminated with tremolite, since the source chrysotile asbestos can be contaminated with tremolite. A debate about whether chrysotile asbestos from brake work, or chrysotile asbestos contaminated with tremolite causes mesothelioma in brake workers, is irrelevant given that both asbestos types can be found in brake debris and brake workers and both cause mesothelioma.

**Fiber Size and Shape**

A significant portion of the chrysotile asbestos fibers generated during gasket and packing and brake replacement are shorter than 5 microns, which at one time were considered to be asbestos fibers not worth regulating. Regulations from the past were based on a minimum fiber length of 5 microns and a ratio of length to width of greater or equal to 3 were based on the microscope limitations of using phase contrast microscopy (PCM) before the modern availability of electron microscopy. *Stayner 2008* A review by *Dodson (2003)* describing the work of Dr. Frederick Pott, Dr. Frank and others makes it clear that these small chrysotile small fibers are capable of carcinogenicity. Moreover, it has been shown that these small chrysotile fibers migrate to the pleura from the lung and that they can contribute to the development of mesothelioma. *Davis 1988, Suzuki 2001, Suzuki 2005*. A comprehensive review of the literature on asbestos fiber size and toxicity concluded that "…the toxicity of short asbestos fibers cannot be dismissed." *Boulanger 2014  Hamra 2014* and *Hamra 2017* conducted statistical modeling of the epidemiological toxicity of differing sizes and shapes of chrysotile fibers and concluded that small fibers and thick chrysotile fibers can be carcinogenic. As discussed in the potency section above, *Wong 2020* analyzed the mesothelioma risk from different mixes of fiber types and sizes in a U.S. case-control study. All fiber mixes including both amphiboles, and chrysotile and chrysotile alone, and fibers longer and shorter than 4 microns had significantly elevated odds ratios for mesothelioma.

## Epidemiology Research Methods in the Study of Brake Mechanics and Mesothelioma

It is universally accepted that it takes a greater exposure to asbestos to cause asbestosis than the amount needed to cause mesothelioma.  *Hillderdal 1999.*  Brake repair and clutch lining workers have been diagnosed with both pleural plaques, *Marcus (1987)*, *Ameille (2012)*, and asbestosis, *McVittie (1965)*, *Lorimer 1976*, *Coggon 1995*, indications that their exposures to asbestos were significant.  Where there has been excess respiratory impairment, workers have definitely been exposed to asbestos levels high enough to cause mesothelioma.  *Erdinc 2003.*  As a result of the documented exposures to asbestos from friction materials in auto repair, *Huncharek (1990)* reported a forecast of 20,000 deaths from asbestos-related cancers among auto mechanics during the next 40 years in the United States.

Not all studies have reported excess mesotheliomas in auto mechanics or brake workers.  Epidemiologic research methods, however, have not been adequately applied to the question of whether brake workers are at an increased risk of mesothelioma.  In many of the studies cited for the proposition that exposure to asbestos from brakes cannot cause mesothelioma, there are issues of inadequate study design, methodological flaws, small study size, lack of accurate work histories, using occupation as surrogate for exposure, difficulty of mesothelioma diagnosis and other weaknesses.  *Egilman 2005, Welch 2007, Teschke 2016, Vermuelen 2016*   While there have been review articles, re-analyses of previous studies and meta-analyses that conclude there is no hazard of mesothelioma from working with brakes, they have all been financed by the automobile manufacturers and do not accurately reflect the scientific and medical literature.  *Wong 2001, Goodman 2004, Laden 2004, Hessel 2004, Kelsh 2007, Garabrant 2016.*

There are a variety of different epidemiologic research study designs that have been utilized to address the causation of occupational cancers:

1.    **Case Reports/Case Series**:

There have been a number of published case reports and case series concerning mesothelioma in brake repair workers, their family members and even their pets:

*Newhouse (1965)* studied a series of 83 patients from the London Hospital with a diagnosis of confirmed mesothelioma.  One male case worked in the manufacturing of brake linings.

*Godwin (1968)* describe a peritoneal mesothelioma in a 43 year old woman who had spent three years weaving brake linings made of chrysotile asbestos.

*Greenberg (1974)* report mesothelioma in a motor mechanic.

In a study of 52 mesothelioma cases of females from New York State, *Vianna (1978)* found two women whose husbands had exposure to brake linings, and another who was a textile worker and whose husband was a brake lining worker.  In a nested case-control study which included these three women, the authors found that this pattern of exposure yielded an estimated relative risk of 10 with a 95% CI of 1.42 to 37.40.

*Langer (1982)* described the case of the case of a diffuse pleural mesothelioma in a brake repair worker, a 55 year old male who had worked in the car, tire and car repair business since the age

Kanarek Brindell Report Dec 21, 2020

of 19.  He routinely had done replacement of brake linings, and he had no other known source of asbestos exposure history.  The authors report their analysis of lung tissue showed the presence of chrysotile fibers and no amphibole fibers by electron diffraction.

*Cutler (1982)* describes the case of a mesothelioma in a 12-year-old child who was exposed to brake drum dust from work his father ("a heavy goods vehicle mechanic") brought home.

In eighteen dogs with mesothelioma identified from veterinary hospital records, *Glickman (1983)* identified two German shepherds whose owners were automobile mechanics, another German shepherd who accompanied his owner to his auto body and used parts supply business, and a mixed breed whose owner was involved in auto body repair.

*Huncharek (1989)* found a pleural mesothelioma in a 47 male whose only known exposure to asbestos was a brake mechanic from age 30-41.  That would be a latent period of 17 years.

*Muscat (1991)* described a case of mesothelioma is a woman married to an automobile mechanic.

*Rees (1999)* identified a motor vehicle mechanic among 123 mesothelioma cases in South Africa.

*Maltoni (1999)* describes "a case of pleural mesothelioma arising in the wife of a garage mechanic professionally exposed to asbestos present in brakes and clutch discs."

*Burdorf (2003)* describe the occupational background of mesothelioma cases collected by two law firms.  5 of the cases are listed as car mechanic.

*Okura (2009)* reports on a 61-year-old man with mesothelioma who had worked "at a car repair shop dealing with brakes and clutches from 1963 to 1970."

*Ruiz-Tirado (2011)* describes an 88-year-old woman with peritoneal mesothelioma whose husband worked in the automotive industry as a brake specialist.

2.   **Registries**:  There have been registry studies from all over the world showing automotive workers with mesotheliomas.

*Malker (1985)* conducted a systematic assessment of pleural mesothelioma occurrence in Sweden from national population-based registries linking cancer incidence from 1961 to 1979 with 1960 census data.  Based on finding of 16 cases of mesothelioma in the category of mechanics and repairmen, the authors calculated a standard incidence ratio (SIR) of 2.4, more than double the expected incidence.  The authors, however, did not specify how many of those cases occurred in automotive mechanics.

*Neumann (2001)* found 48 mesotheliomas in the German mesothelioma register 1987-1999 (1605 total mesotheliomas) that worked in the "automobile sector".  The mean age of these 48 cases was 57.8, with a mean latent period of 35.7 years.

*Leigh (2002)* studied the 6329 mesothelioma cases on the Australian National Mesothelioma Registry 1945-2000.  77 of the cases had documented exposures to brake lining as an occupation,

with 58 having brake lining work as their only occupational exposure to asbestos.  Using this data from the Australian mesothelioma registry, Dr. Douglas Henderson, an appointed expert for the World Trade Organization, calculated that brake mechanics have approximately a 10-fold increased risk of contracting mesothelioma as compared to the general population.  *Henderson 2001*.

*Roggli (2002)* report on exposure histories of 1445 cases of mesothelioma obtained from litigation files.  51 of these cases were listed in the category "automotive industry" which included  "auto mechanic, brake repair worker, brake line worker."  24 of the 51 cases had this as their sole occupation.

*Goldberg (2005)* studied the industry and occupation in the French National Mesothelioma Surveillance Program (PNSM).  6.66% were in the "transportation and communication" economic sector.  In 2009, the PNSM listed 29 motor vehicle mechanics in the registry.  *PNSM 2007*.

*Pan (2005)* studied mesothelioma cases from the California Cancer Registry.  46 of the cases were classified occupationally as mechanics.  There is no indication of how many, if any, of these mechanics were involved in automotive repair.

*Pukkala (2009)* studied 45 (1961-2005) years of cancer incidence in the Nordic countries of Denmark, Finland, Iceland, Norway       Sweden.  There were 6017 pleura/peritoneal mesotheliomas recorded in total.  By occupational category, 85 were listed as transport workers, and 851 as mechanics.  Again, the authors did not indicate how many of the transport workers or mechanics were involved with repairing automobiles or trucks.

*Rolland (2010)* conducted a case-control study of 462 pleural mesothelioma cases as compared to 897 controls.  17 mesotheliomas occurred among motor vehicle mechanics as compared to 22 in the controls for an Odds Ratio of 1.50 (95% CI 0.76-2.95).  In the category of repair of motor vehicles and motorcycles, 19 mesotheliomas were found as compared to 29 in the controls for an Odds Ratio of 1.20 (95% CI 0.65-2.24).  While neither finding is statistically significant, they are still suggestive of an association given the limitations of probable under-diagnosis of mesothelioma and the high probability of exposure misclassification in both cases and the controls, especially in relation to the lack of inclusion of multiple occupations.

3**.    Proportionate Mortality Studies**:

In a proportionate mortality study the proportionate mortality ratio (PMR) is calculated using information on death certificates, there are two significant limitations in interpreting its impact.  First, the occupational information is limited to that listed on the death certificate which is often the last occupation of the deceased.  The important occupational exposure to asbestos, on the other hand, may have occurred in an earlier occupation in the person's lifetime.  Second, since the cause of death is based solely on that listed on the death certificate; there are concerns about the completeness of the ascertainment of death and the accuracy of the coding of the cause of death.  For these reasons, Goodman (2004) declined to include the data from any of these types of studies in their meta-analysis, as they were deemed "unreliable." According to the authors, they were cited solely for the sake of completeness.

Kanarek Brindell Report Dec 21, 2020

The British Health Safety Executive cautioned, "a PMR of 100 does not represent the 'background' risk for mesothelioma (the level that would be expected in the absence of all asbestos exposure)." *HSE 2001*. Rather, according to the HSE, a hypothetical group of men with no asbestos exposure would likely record a PMR of approximately 6. Since the HSE calculated a PMR of 48.4 for automobile mechanics based upon 60 mesothelioma deaths, multiple times higher than the hypothetically non-exposed group, the HSE's data should not be interpreted as providing evidence that automobile mechanics are not at risk of developing mesothelioma.

*Coggon (1995)* conducted a proportionate mortality analysis of occupation of deaths age 20-74 in England and Wales during 1979-1980 and 1982-90. 12 deaths were recorded for pleural cancer (PMR 46) and 3 for peritoneal deaths (PMR 88) in motor mechanics. Interestingly, 2 deaths in motor mechanics from asbestosis were also recorded (PMR 80).

*Hodgson (1997)* utilizing data from the HSE's mesothelioma register, reports that motor mechanics have a PMR less than 100 without specifying the exact calculated PMR or the number of cases included in that calculation.

*Milham (2001)* conducted a proportionate mortality analysis of deaths in Washington State. Among automobile mechanic and repair workers, they found 7 pleural mesotheliomas (PMR 75) and 2 peritoneal cases (PMR 53).

*Roelofs (2013)* coded occupations mesothelioma cases on the Massachusetts Cancer Registry from 1988-2003. For comparison, 80,184 cancer cases were also coded for occupation and industry and standard morbidity odds ratios (SMORs) were computed. Based on 10 mesothelioma cases, automobile mechanics had an SMOR of 2.1 (95% CI 1.1-4.0). In addition, based on 11 mesothelioma cases, automotive repair and related services industry was assigned a SMOR of 2.2 (95% CI 1.2-3.9).

Based upon their inherent limitations, it would not be reasonable to rely upon PMR studies like *Coggon (1995)*, *Hodgson (1997)*, *Milham (2001)*, and *HSE (2001)* to conclude that automobile mechanics are not at risk for developing mesothelioma.

4.    **Cohort Studies**: A cohort study of a large workforce of auto workers such as Ford or General Motor's workers in the U.S. has not been done. Unlike the unionized insulation workers studied by Selikoff, however, brake repair workers in gas stations and garages are not a workforce amenable to systematic study because of the lack of a sufficient number of such workers in a central location or union, and because of the intermittent and transient nature of the occupation. As aptly described in *Welch (2007)*:

> There have not been definitive epidemiology studies of brake mechanics because of the nature of the workforce. It is generally non-unionized, and spread out in car repair shops all over the world. Well-defined asbestos worker studies of insulators and asbestos textile manufacture have been in factories or highly unionized workforces where exposure is clearly documentable by the nature of their job or job title or industry. Exposure to asbestos from brakes can occur to automobile or truck mechanics anywhere in a vehicle repair shop and the workers

15 |

are highly transient and not documented. In fact, thousands if not millions of non-occupational amateur car repair-persons have been exposed while changing their brakes outside in alleys or on the street or in their own home garages.

In fact, there has not been any adequate prospective cohort studies conducted on a group of brake repair workers.

There have been, however, been a number of historical cohort studies of workers in plants manufacturing friction materials such as brakes and clutches:

*Robinson (1975)* reported the mortality patterns in a friction materials manufacturing plant of 3276 workers followed for mortality 1940-1975. 99% of the asbestos in the plant, which had been operating since the early 1900's was chrysotile with some small amounts of amosite and crocidolite being used during the years of WWII. Mesotheliomas accounted for 4.3% of the deaths. Table 7 lists 17 cases of mesothelioma, 5 pleural, 6 peritoneal, and 6 with site unstated.

*Newhouse (1982)* reported a mortality study of workers in a factory producing friction materials. 11 deaths were due to pleural mesothelioma. Even though the factory only used chrysotile except during two well-defined periods (1929-33 and 1939-44) in well-defined areas of the factory when crocidolite was used, the authors attributed none of the mesotheliomas to chrysotile exposure. *Newhouse (1989)* extended this study by seven more years and found 3 additional mesotheliomas for a total of 13. Of the three new cases, one was a grinder who was only exposed to chrysotile asbestos. Another of the three worked at the factory when only chrysotile was being used and died of a malignant right pleural effusion but a diagnosis of mesothelioma could not be confirmed.

*Finkelstein (1989)* conducted a mortality study of 1657 employees at two Ontario automotive parts factories that manufactured friction materials containing chrysotile asbestos. Elevations were found for laryngeal and lung cancer. Two of the lung cancer cases were suspected to actually be cases of pleural mesothelioma. The diagnosis of mesothelioma, however, could not be confirmed in one of the cases because tissue specimens were lost and a definitive pathologic diagnosis had not been render in the other although the pathology consultant to the Worker's Compensation Board reported that "the morphologic features of the specimen and the distribution of the tumor at the time of surgery were fully consistent with mesothelioma."

There have also been a handful of historical cohort studies of workers engaged in brake repair work:

*Rushton (1983)* studied 8490 London bus transport maintenance workers, 2313 of which were mechanics. Under the category of "Cancer of the lung and pleura," there were 102 deaths but no breakdown as to the number, if any, of pleural cancers. The authors emphasize that their study inadequate to determine mortality patterns because both the number of men included and the years of follow-up, a mean of 5.9 years, were inadequate.

*Jarvholm (1988)* reported one pleural mesothelioma in a cohort of 21,905 Swedish men who had and occupational title of "mechanic" or an industry code of "car repair" as listed in the 1960 Swedish census. Without explanation, the authors state that the data indicates no increased risk

of mesothelioma in car mechanics even though they were unable to calculate a risk ratio because of the lack of information regarding the expected incidence of mesothelioma in the general population.

*Hansen (1989)* conducted a study of 21,800 auto mechanics in Denmark and observed a case of mesothelioma. Because no cases of mesothelioma were expected based upon the death rates of the comparison population, the standardized mortality ratio (SMR) was essentially infinite leading the author to conclude the population was at an increased risk of contracting the disease. The author states "[a]sbestos exposure is known to occur during the replacement of brake linings, and the single case of pleural mesothelioma is an indication that this exposure has not been negligible." Significantly, the population of auto mechanics studied was quite young with nearly 93% of the man age 54 or younger at the end of the study's ten-year follow-up. Given the long latency period associated with mesothelioma, it is likely that this study underestimated the risk in this population.

*Gustavsson (1990)* found two mesotheliomas among 696 workers in bus garages in Stockholm Sweden. The authors speculated, however, that both might have been exposed to asbestos during previous employments. The authors cautioned that no conclusions could be drawn regarding risk estimates for any of the disease due to the limited size of the study group.

*Merlo (2010)* conducted an historical mortality study among bus drivers and bus maintenance workers in Genoa, Italy. The authors observed 26 cases of pleural mesothelioma. When compared to the entire Italian male population death statistics with an expected rate of mesothelioma death of 7.08, the standardized mortality ratio (SMR) was 3.67 (95% CI of 2.50-5.39). When, however, compared to the local Ligurian male expected mesothelioma death rate of 25.6, no increased risk was detected.

5.      **Case-Control Studies**:

Exposure misclassification plagues most of the case-control studies cited for the proposition that brake mechanics are not at risk for mesothelioma:

*McDonald (1980)* conducted a matched case-control study in North America and found 11 mesothelioma cases in the category of garage workers as compared to 12 in the control group. Since, however, the category of garage workers is not limited to only those workers who replaced brakes, there is a strong probability of non-differential exposure misclassification which tends to underestimate any risk of producing a "false negative" finding. *Blair 2007.* A prior McDonald study utilizing the more specific occupational category of "installation of brake linings," on the other hand, found an increased risk of mesothelioma. *McDonald 1970.*

*Teta (1983)* studied 201 cases of mesothelioma from the Connecticut Tumor Registry. For the category of "automobile repair and related service," the authors calculated a relative risk of 0.65 (95% CI 0.08 to 5.53). The extremely wide confidence interval is a consequence of the limited amount of cases in the study related to automobile repair - 6, a figure that included both cases and controls. The authors acknowledged that a major difficulty in their non-interview retrospective study relate to "the inadequacy of occupational histories" and the "potential for misclassification of exposure status." They further conceded that the "'true' magnitude of the RR [relative risk] . . . is likely to be higher than [their] findings indicate."

Kanarek Brindell Report Dec 21, 2020

*Spirtas (1985)*, in preliminary results from evaluating 259 cases of mesothelioma, listed a relative risk of 1.0 ( 95% CI 0.6 to 1.6) in the category of "brake lining installation or repair" based upon next-of-kin telephone interviews.  This "study," however, is simply an abstract and does not contain sufficient details to adequately evaluate its preliminary findings.

*Spirtas (1994)* was a published case-control study of malignant mesothelioma cases from the Los Angeles County Cancer Surveillance Program, the New York State Cancer Registry, and 39 large Veterans Administration hospitals that was based upon information from telephone interviews of next-of-kin.  These interviews yielded 33 mesothelioma cases that had a reported history of "Brake lining work or repair."  The authors did not calculate an odds ratio specific for this exposure.  Ten years later, *Hessel (2004)*, after eliminating 5 cases, ascertained that all but one of the remaining 28 mesothelioma cases with brake lining exposure had a history of asbestos exposure as insulators or in shipbuilding.

*Woitowitz (1994)* reported on 16 mesothelioma cases that were classified as either "motor vehicle mechanics" or "motor vehicle repair workers."  Without revealing any odds ratios, the authors concluded that there was no evidence that "car mechanics are exposed to an increased risk of mesothelioma even if they do brake repairs. . ."  The difficulty of classifying exposure in these types of studies is highlighted by the fact that only 6 of the 16 mesothelioma cases were "definitively engaged in brake service."

*Teschke (1997)* studied 51 mesothelioma cases as compared to 154 population-based controls for occupational histories and possible asbestos exposures. Vehicle mechanics had a relative risk of 0.8 (95% CI 0.2 to 2.3) based upon 6 cases and 20 controls.  Individuals engaged in brake lining installation or repair had an OR of 0.3 (95% CI 0 to 1.4) based upon 2 cases and 17 controls.  The authors, however, recognized that this was an extremely small study and that the grouping of occupations "was likely to result in non-differential misclassification."   In addition, since one-third of the case group was based on next-of-kin interviews and only one-seventh of the control, relative risk estimates for such exposures "would be expected to be biased downward whenever there was a smaller proportion of next-of-kin interviews among controls." *Teschke (2016)* describes the difficulties in conducting epidemiology case-control studies to elucidate a possible exposure-response relationship between asbestos from brakes as an auto mechanic by classifying cases and controls by occupation.  "Of course, it is impossible to study every occupation-disease relationship.  In addition, even where a job has been studied, the potential for variable exposures within a job to dilute the relationship is probable for many jobs, and would preclude a person with high exposures from having their occupational disease recognized, simply because others in the same job were not similarly exposed.  The question is whether the exposure caused the disease.  A job cannot cause disease, its exposure may…. In other words, the effects of chrysotile are not properly assessed via the surrogate measures of exposure 'vehicle mechanic' or "brake repair.'"

*Agudo (2000)* conducted a case-control study in Spain of mesothelioma.  In a footnote, the authors reveal that there were 3 cases of mesothelioma in the category of "Mechanics, motor vehicle" as compared to 14 controls.  The authors reported, however, that while all but one of the controls were interviewed, 44% of the cases were deceased and information regarding exposure came from the spouse, a son or daughter, another relative or a neighbor.  The authors conceded the possibility of "some degree of misclassification".

18 |

*Welch (2005)* conducted a case-control study of 40 cases of primary peritoneal mesothelioma cases compared to controls.  8 of the cases had engaged in brake lining work compared to only 6 controls resulting in an excess risk.

*Rake (2009)* conducted a case-control study of 622 mesothelioma patients and 1420 population controls.  The authors reported an OR of 0.4 (95% CI 0.1 to 1.7) for "vehicle maintenance involving work with brakes or gaskets without disclosing the number of cases or controls involved in the work activity.  *Peto (2009)*, using the same data as *Rake (2009)* disclosed 18 motor mechanics with mesothelioma as compared to 54 controls resulting in an OR of 3.8 (95% CI 1.9 to 7.8).  After removing any mesothelioma case that also had potential exposure elsewhere, the motor mechanic mesothelioma cases were reduced to 2 with 24 controls resulting in an OR of 0.7 (95% CI 0.2 to 3.5).

*Aguilar-Madrid (2010)* conducted a case-control study of 119 malignant pleural mesothelioma cases listed on the Mexican Institute of Social Security compared to 353 controls from the same system.  There were 8 mesothelioma cases in the economic activity of "Sale, maintenance and repair of motor vehicles and motorcycles; retail sale of automotive fuel" as compared to only 5 controls.  In the occupational category of "Mechanic, automobile," however, there was only 1 mesothelioma case versus 4 controls.  The authors recognized that the results of their study depended on a hygienist to estimate exposure and that the hygienist could have introduced nondifferential misclassification bias which always dilutes the strength of the association.

## Issues in the Epidemiology of Brake Workers

Interpreting the existing epidemiologic studies to determine whether there is a link between exposure from brake work and the subsequent development of mesothelioma is difficult for a variety of reasons.  First, for any study that relied upon disease information recorded on death certificates prior to 1999, there is a general under-ascertainment of mesothelioma as the underlying cause of death because of the lack of a specific International Classification of Disease (ICD) code for mesothelioma.  *Wojcik 2014.*

Second, proportionate mortality studies are not designed to answer the question of causation from a specific occupation.  Instead, these types of studies are, at best, a general surveillance tool.

Third, few cohort studies of brake workers exist and those that have been conducted do not have sufficient latency or population size to accurately assess the risk from a rare disease like mesothelioma.  No cohort studies of brake repair workers have been conducted in the United States because these workers are not a cohesive, or unionized group that can be followed either in real time or historically as has been done for asbestos insulators or textile manufacturing workers.

Fourth, case-control studies that include brake workers have been plagued with exposure misclassification in both the case and control groups which can lead to a bias toward a null result or even a seeming "protective" effect of working with asbestos dust from brakes.  In studies involving mesothelioma, the cases are often deceased and exposure

Kanarek Brindell Report Dec 21, 2020

histories depend on information from living relatives or friends, whereas the exposure histories are taken from living controls.  The live controls are more likely to accurately report brake work history, especially home garage or "shade tree" mechanic history as compared to information gathered from the relatives of deceased cases.   The issue of misclassification is further highlighted by the lack of uniformity in how the case-control studies categorize the occupation - *McDonald (1970)*, brake lining installation; *McDonald (1980)*, garage worker; *Teta (1983)*, automobile repair and related services; *Woitowitz (1994)*, motor vehicle mechanics/motor vehicle repair workers; *Teschke (1997)*, vehicle mechanics/brake lining installation and repair; *Agudo (2000)*, mechanics - motor vehicles; *Welch (2005)*, tire or brakelining work; *Rake (2009)*, vehicle maintenance involving work with brakes or gaskets; *Peto (2009)*, motor mechanics; and *Aguilar-Madrid (2010)*, automobile mechanics/sale, maintenance & repair of motor vehicles & motorcycles - retail sale of automotive fuel.  Using occupation as a surrogate for brake dust exposure tends to bias all these case-control studies toward the null. *Teschke 2016.*

Finally, because of the rarity of the disease being studied, there is an overarching issue applicable to all of these studies regarding the inadequate statistical power of these various studies to detect an increased risk if it exists.  The existing studies are all small and thus not likely to detect a risk that would be detected in a larger study.   *Freeman 2012.*

## Limits of Meta-Analysis in the Epidemiology of Mesothelioma from Asbestos in Brake Work

Meta-analysis was invented for clinical trials in medicine. *DerSimonian 1986.*  The motivation were instances of a series of identical clinical trials on a new treatment for a disease where the sample size was too small to achieve statistical significance (lack of statistical power). The small identical studies could be combined into a "meta" study to have enough study subjects to achieve adequate statistical power and thus the null hypothesis of no effect could be rejected and the new treatment could be adopted. *Cochran 1954.*

That meta-analysis has been adopted for observational epidemiology studies is controversial among epidemiologists, as it the techniques were not designed for studies that are dissimilar.  *Shapiro 1994 Greenland 1994*   As observed by *Blair 1995* "… meta-analysis may not be useful…when there is substantial confounding or other biases which cannot be adjusted for in the analysis."

There have been a series of meta-analyses that have sought to combine the epidemiology studies that had any mention of automobile mechanics to reach a conclusion about asbestos from brakes and mesothelioma. *Wong 2001, Goodman 2004, Laden 2004, Kelsh 2007, Garabrant 2016*   All of these suffer from the problem that they put the veneer (*Stroup 2000, Sheehan 2015)* of meta-analysis on a group of observational studies that were not designed to study the issue of brake mechanics and mesothelioma.

We will discuss the *Garabrant 2016* article as it is the culmination of the previous similar efforts by *Wong 2001, Goodman 2004, Laden 2004, Kelsh 2007*.   Garabrant's meta-analysis is flawed in that it takes 16 studies that were not designed to answer the question of asbestos brake exposures and mesothelioma and uses the jargon of meta-analysis to reach an unwarranted conclusion.   A cohort or historical cohort epidemiology study of brake workers could have been mounted by an auto company like Ford or other large automotive company, but was not done. The case-control studies used by *Garabrant 2016* are not bad science, but they were not designed to find the answer concerning mesothelioma and brake repair. *Garabrant 2016* included 16 studies and did a test of heterogeneity (p < .0001) which is an indicator that they are incompatible studies.  He then picked 5 "Tier one studies": all case-control studies by his own scoring system.  Each of these 5 were the wrong kind of epidemiology observational studies as it was impossible to correctly assess exposure to brake dust jobs in their case-control study design. Invariably, since mesothelioma is a quickly fatal disease, the information on jobs and exposure was gathered from surrogates from the case group as compared to the information on occupational exposures gathered from the live controls.  This is a systematic bias (error) in the setup of these studies for assessing occupational exposure that leads to a misclassification of exposure (controls will know about exposure more than the surrogates for the cases)**.** Unfortunately, in the existing case-control studies of brake workers, there is no measurement of exposure and the job titles cover a whole range of auto repair activities.  Job titles are all that is available and they are not necessarily accurate as to exposure.  *Vermuelen 2016*

*Boyle 1992* conducted a study of the quality of responses to questions about past exposures to occupation and other exposures in cases versus proxy respondents within a case-control study of six types of cancer.  Whereas for cigarettes and other exposures, proxies did well, whereas for occupational exposure proxy responses were poor.  *Lerchen 1986* compared exposure information gathered via surviving spouses of lung cancer cases as compared to the same information on exposure gathered from the cases before their deaths.  Exposures to cigarettes were accurate from the spouses, where the data gathered from the spouses on occupational exposures was poor.  Thus, case-control studies have been successful in epidemiology when the exposure history can be fairly obtained between the case and control groups.  Thus, for cigarettes *Doll 1950, Wynder 1950, Levin 1950*, and medical exposures *Herbst 1971* for instance, the case-control studies have been successful, as the measurement of past exposures is unbiased between the case and control groups.

There are methodological flaws in each of Garabrant's five Tier I studies studies:

1. *McDonald 1980*: the control group consisted of patients who had "pulmonary metastases were present from a non-pulmonary malignant tumore":---thus control group may have had members who had mesothelioma or other asbestos induced  malignancies, such as larynx cancer.  This would lead to a systematic bias toward the null.  In addition the occupational status used was the one 10 years prior to death---not the important exposure in mesothelioma where the latent period is 15 years and usually much longer.  All the above would lead to misclassification of exposure bias that would bias to null.  The results were that there were 11 garage workers in the cases, 12

controls were "garage workers".    This is a tiny flawed study if one is looking for brake work exposure.

2. *Teta 1983* Cases were from the Connecticut Tumor Registry.  Occupational histories were from death certificates and city directories.  This is a serious flaw in the study as the death certificate would have most often the last occupation of the deceased, not the most relevant occupation.  In addition, using City Directories to assess exposure is another huge flaw.  The results were 1 "exposed case, 5 "exposed' controls.   This is a tiny flawed study if one is looking for brake work exposure.

3. *Hessel 2004*:  This is not a study at all.  It is a reanalysis of *Spirtas 1994*, removing all the cases and who had possible exposures to asbestos in occupations other the brake work.  *Hessel 2004* reduced *Spirtas 1994* 33 cases and controls down to 1 case and 9 control "brake workers".

4. *Rake 2009* In this case control study of mesothelioma, the occupational history takers were not blinded as to case and control status of subjects and thus this study is entirely flawed as to any conclusions as to occupational exposures.

5. *Teschke 1997: Teschke 2016* herself gives exposure misclassification and bias toward null as reasons not to use her study to reach the conclusion *Garabrant 2016* did.

*Garabrant 2016* concludes:

"This meta-analysis of the epidemiologic studies provides evidence that motor vehicle mechanics, including workers who were engaged in brake repair, are not at an increased risk of mesothelioma."  This is a totally unwarranted conclusion as the studies were not designed to answer that question.

**Summary of Bystander and Household Mesothelioma**

There have been multiple studies and reports of mesotheliomas resulting from household and environmental exposure to asbestos (*Newhouse 1965 Vianna 1978, Wolf 1987, Huncharek 1989, Magnani 1993, Schneider 1996, Bourdes 2000, Bianchi 2004, Miller 2005, Ampleford 2007, Ferrante 2007, Marinaccio 2015,  D'Agostin 2018*).  The risk of mesothelioma is not confined to people working directly with asbestos. Exposures from living with someone who works with asbestos and brings it home on their clothes, doing the laundry of the work clothes increases the risk of mesothelioma.

*Bourdes 2000* conducted a meta-analysis of bystander exposure studies and mesothelioma.  "The relative risks (RRs) of pleural mesothelioma for household exposure ranged between 4.0 and 23.7, and the summary risk estimate was 8.1 (95% confidence interval [CI]: 5.3±12). For neighborhood exposure, RRs ranged between 5.1 and 9.3 (with a single RR of 0.2) and the summary estimate was 7.0 (95% CI: 4.7±11). " (abstract)

There is clear evidence from these and other studies that an individual does not have to be actually working with asbestos to be exposed to asbestos to cause mesothelioma.  Individuals can be exposed from a worksite via the air or via the clothes of the worker to be exposed at a level sufficient to cause mesothelioma.

## Truck Terminal and Garage Manager Mesothelioma

Directly relating to Mr. Brindell's mesothelioma and workplace environment, the *Huncharek 1992* report from the data of *Muscat 1991* reviews the occupations of 24 men and 19 women with mesothelioma, with no self-reported asbestos related exposures, included a truck terminal manager.  In addition, the British *Health and Safety Executive HSE (2001)* found mesothelioma in 6 garage managers and proprietors.
.


## Application of Hill Criteria

A widely accepted method for determining cause and effect for causation in epidemiology are the guidelines that were originally suggested by *Hill (1965)* for evaluating the studies on cigarette smoking and lung cancer and other diseases.  These guidelines are not limited to just formal epidemiological studies but rather incorporate and evaluate the totality of the science on a given issue including cell biology, animal studies, and mechanistic studies.  As Hill stated, "[n]one of [his] nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine quo non.*"

The most utilized modern list of viewpoints derived from Hill's work are contained in the textbook, Epidemiology, by Leon Gordis.  *Gordis 2009*.  They are:

a.      Temporal relationship
b.      Strength of the association
c.      Dose-response relationship
d.      Replication of the findings
e.      Biologic plausibility
f.      Consideration of alternate explanations
g.      Cessation of exposure
h.      Consistency with other knowledge
i.      Specificity of the association


a.      **Temporal Relationship**: This requires that the cause come before the effect.  This criterion is easily satisfied in the current context as the exposure to asbestos in brake dust occurs many years, usually decades, before the diagnosis of the disease, mesothelioma.

b.      **Strength of the Association**: In epidemiology, strength of association is most often measured by comparing the incidence of disease in the exposed divided by the non-exposed in a cohort study.  In the case of brake workers and mesothelioma, no adequate cohort studies have been done, so there has not been any actual calculation of the relative risk.  Likewise, most case-control studies are plagued with exposure misclassification that leads to incorrect calculations of the odds ratio estimate of relative risk.

c.      **Dose-Response Relationship**: There is clear evidence of asbestos dose-response in mesothelioma causation.  *Iwatsubo (1998)* did a rigorous assessment of occupational exposure to

asbestos in 405 mesothelioma cases and 387 controls. The authors found "a clear dose-response relation between cumulative asbestos exposure and pleural mesothelioma…" Examining data from the French mesothelioma registry, *Lacourt (2014)* also found a clear dose-response relationship between asbestos exposure and pleural mesothelioma. In fact, there are many studies cited in *IARC (2012)* that show that every additional exposure to asbestos leads to a greater risk of mesothelioma. Thus if a brake worker, was also exposed to asbestos from another source, the asbestos in brake work would put the brake worker at heightened risk of mesothelioma.

d.      **Replication of Findings**: The peer-reviewed published literature contains more than 400 mesothelioma cases that have occurred in workers, their families and their pets from exposure to asbestos from the replacement of brakes in locations all over the globe.

e.      **Biologic Plausibility**: While the exact biologic mechanism explaining how mesothelioma develops has not been definitively identified, there is abundant literature that conclusively establishes the exposure to any form of asbestos can result in the formation of mesothelioma. *IARC 2012*. There is also abundant literature that confirms that the process of removing and replacing brakes can liberate substantial amounts of asbestos in the worker's environment. Accordingly, it is biologically plausible that such exposure can cause mesothelioma.

f.      **Consideration of Alternate Explanations**: There are very few documented causes of mesothelioma other than exposure to asbestos. The scientific literature contains a handful of mesothelioma cases that were purportedly caused by the administration of therapeutic radiation. In addition, exposure to erionite, a mineral found in Turkey and fluor-edentite in Sicily have been linked with the development of mesothelioma. Neither of these would apply as an alternate explanation for mesothelioma in brake mechanics. While there have been reports of "idiopathic" or "spontaneous" mesotheliomas, this term has been reserved for those instances where there is no discernable history of exposure to asbestos. Given the strong relationship between mesothelioma and asbestos, it is likely that a significant portion of those cases that have been labeled "idiopathic" are not cases where the asbestos exposure has not occurred but rather simply could not be adequately documented. It is highly unlikely that the multitude of reported mesothelioma cases in the medical literature (over 400) that have occurred in workers and their family members from exposure to asbestos from brakes is due to chance alone.

g.      **Cessation of Exposure**: While many new and recent truck trailers were built with brakes that did not contain asbestos, it still may be present in both old and replacement brakes. *OSHA 2006* Given the potential for continued exposure to asbestos and because of the long latent period associated with mesothelioma, whether or not the incidence of mesothelioma in truck mechanics and supervisors will decrease will not be known for several decades.

h.      **Consistency with other Knowledge**: The published literature is replete with data demonstrating that workers exposed to chrysotile asbestos from products that are not friction products are at risk for developing mesothelioma. All asbestos types and exposures increase the risk of mesothelioma. Moreover, there are studies of brake mechanics that document asbestosis and/or pleural plaques that is also consistent with significant exposures to asbestos.

i.      **Specificity of the Association**: This is the one criteria derived from Hill that is not useful in environmental/occupational epidemiology.  For instance, cigarette smoke causes multiple diseases including lung cancer, emphysema, bladder cancer, heart disease and many other diseases.  Likewise asbestos causes malignant mesothelioma, lung cancer, other cancers, asbestosis and pleural plaques.

## Conclusion

There is sufficient evidence from the scientific literature, including epidemiology studies of workers exposed to asbestos in many trades, that those in those trades are at an elevated risk of death from malignant mesothelioma.   Mr. John Brindell's work history as a supervisor of mechanics changing brakes on truck trailers was one of frequent exposure to asbestos.   In addition Mr. Brindell was exposed to asbestos from insulation on ships.  All types of asbestos are known to cause mesothelioma and there is no known safe level of exposure and all doses are cumulative in increasing the risk of mesothelioma.   While we do not know the precise dose, the level of exposure to asbestos from Mr. Brindell's supervisory work with truck trailer mechanics would clearly cause substantial increased risk for mesothelioma.

## References

Agency for Toxic Substances and Disease Registry (ATSDR).  *Toxicological Profile of Asbestos,* United States Public Health Service (2001).

Agudo A, Gonzalez CA, Bleda MJ, Ramirez J, Hernandez S, Lopez F, Calleja A, Panades R, Turuguet D, Escolar A, Beltran M, Gonzalez-Moya J. et al.  *Occupation and risk of malignant pleural mesothelioma: a case-control study in Spain*.  Am J Ind Med 37:159-168 (2000).

Aguilar-Madrid G., Robles-Perez E, Juarez-Perez CA, Alvarado-Cabrero I, Rico-Mendez FG, Javier K-G.  *Case-control study of pleural mesothelioma in workers with social security in Mexico*. Am J Ind Med 53:241-251 (2010).

Ameille J, Rosenberg N, Matrat M, Descatha A, Mompoint D, Hamzi L, Atassi C, Vasile M, Garnier R, Pairon J-C.  *Asbestos-related diseases in automobile mechanics*.  Ann Occup Hyg 56(1):55-60 (2012).

Ampleford EJ, Ohar J.  *Mesothelioma: you do not have to work for it*.  Diagnostic Cytopathology 35:774-777 (2007).

Atkinson MAL, O'Sullivan M, Zuber S, Dodson RF.  *Evaluation of the size and type of free particulates collected from unused asbestos-containing brake components as related to potential for respirability*.  Am J Ind Med 46:545-553 (2004).

Kanarek Brindell Report Dec 21, 2020

Attanoos RL, Churg A, Galateau-Salle F, Gibbs A, Roggli VL. *Malignant mesothelioma and its non-asbestos causes.* Arch Pathol Lab Med 142:753-760 (2018).

Bang KM, Mazurek JM, Wood JM, Hendricks SA. *Diseases attributable to asbestos exposure: years of potential life lost, United States, 1999-2010.* Am J Ind Med 57:38-48 (2014).

Baumann, Francine, Erin Flores, Andrea Napolitano, Shreya Kanodia, Emanuela Taioli, Harvey Pass, Haining Yang and Michele Carbone. 2015. *Mesothelioma patients with germline BAP1 mutations have 7-fold improved long-term survival.* Carcinogenesis 36(1):76-81 (2015).

Becklake MR, Bagatin E, Neder JA. *Asbestos-related diseases of the lungs and pleura: uses, trends and management over the last century.* Int J Tuber Lung Dis 11:356-369 (2007).

Bégin, R., Gauthier, J. J., Desmeules, M., & Ostiguy, G. *Work-related mesothelioma Québec, 1967–1990.* American journal of industrial medicine, 22(4), 531-542. (1992)

Berman DW, Crump KS. *Update of potencuy factors or asbestos-related lung cancer and mesothelioma.* Crit Rev Toxicol 38 (S1)1-47 (2008).

Berry G, Newhouse ML. *Mortality of workers manufacturing friction materials using asbestos.* Brit J Ind Med 40:1-7 (1983).

Betti, Marta, Elisabetta Casalone, Daniela Ferrante, Anna Aspesi, Giulia Morleo, Alessandra Biasi, Marika Sculco, Giuseppe Mancuso, Simonetta Guarrera, and Luisella Righi. *Germline mutations in DNA repair genes predispose asbestos-exposed patients to malignant pleural mesothelioma.* Cancer Letters, 405: 38-45. (2017).

Betti, Marta, Anna Aspesi, Markia Sculco, Giuseppe Matullo, Corrado Magnani and Irma Dianzani. *Genetic predisposition for malignant mesothelioma: A concise review.* Mutation Research-Reviews in Mutation Research 781:1-10. (2019).

Bianchi C, Brollo A,, Ramani L, Bianchi T, Giarelli L. *Familial mesothelioma of the pleura.* Industrial Health  42:235-239 (2004).

Blair A, Burg J, Foran J et al. *Guidelines for application of meta-analysis in environmental epidemiology.* Regulatory Toxicology and Pharmacology 22:189-197 (1995).

Blair A, Stewart P, Lubin JH, Forastiere F. *Methodological issues regarding confounding and exposure misclassification in epidemiological studies of occupational studies.* Am J Ind Med 50:199-207 (2007).

Boulanger G, Andujar P, Pairon J-C, Billon-Galland MA, Dion C, Dumortier P,  Brochard P, Sobaszek A, Bartsch P, Paris C, Jaurand M-C.  *Quantification of short and long*

*asbestos fibers to assess asbestos exposure: a review of fiber size toxicity.*  Environ Health 13:59 (2014).

Bourdes, V., P. Bofetta, P. Pisani, *Environmental Exposure to Asbestos and Risk of Pleural Mesothelioma: Review and Meta-Analysis*, European J. of Epi., 16:411-417 (2000).

Boyle CA, Brann EA, Selected Cancers Cooperative Study Group.  *Proxy respondents and the validity of occupational and other exposure data.* Am J Epid 136(6):712-721 (1992).

BTS British Thoracic Society Standards of Care Committee.  *Statement on malignant mesothelioma in the United Kingdom.*  Thorax 56:250-265 (2001).

Butnor KJ, Sportn T, Roggli VL.  *Exposure to brake dust and malignant mesothelioma: a study of 10 cases with mineral fiber analysis.*  Ann Occup Hyg 47:325-330 (2003).

Burdorf A, Dahhan M, Swuste P.  *Occupational characteristics of cases with asbestos-related diseases in the Netherlands.*  Ann Occup Hyg 47(6):485-492 (2003).

CDC. *Malignant mesothelioma mortality-United States, 1999-2005.*  MMWR Morb Mortal Wkly Rep 58:393-396 (2009).

Cely-Garcia, MF, Sanchez M, Breysse PN and Ramos-Bonilla PR.  *Personal exposures to asbestos fibers during brake maintenance of passenger vehicles.* Ann Occup Hyg 56(9):985-999 (2012).

Checkoway H, Pearce N, Kriebel. Research Methods in Occupational Epidemiology. Oxford U Press, NY, 2004.

Cheung, Mitchell and Joseph R Testa.. *BAP1,  a tumor suppressor gene driving malignant mesothelioma'* Translational Lung Cancer Research, 6(3):270 (2017).

Churg A, Wiggs B.  *Fiber size and number in workers exposed to processed chrysotile asbestos, chrysotile miners and the general population*.  Am J Ind Hyg 9:143-152 (1986).

Cochran WG. *The combination of estimates from difference experiments.* Biometrics 10:101-129 (1954).

Coggon D, Inskip H, Winter P, Pannett B.  *Differences in occupational mortality from pleural cancer, peritoneal cancer and asbestosis.*  Occup Environ Med 52:775-777 (1995).

Collegium Ramazini.  *Asbestos is still with us.  Repeat call for a universal ban.* J Occup Environ Med 52:469-472 (2010).

Collegium Ramazini. *Comments on the causation of malignant mesothelioma: rebutting the false concept that recent exposures to asbestos do not contribute to causation of mesothelioma.* Eur J Oncol 21:49-50 (2016).

Cutler J. *Asbestos and the media*. Brit Med J 285:814 (1982).

D'Agositin F, Michieli PD, Negro C. *Mesothelioma from household asbestos exposure*. J Lung Health & Dis 1:27-30 (2018).

Davis JMG, Jones AD. *Comparison of the pathogenicity of long and short fibres of chrysotile asbestos in rats*. Brit J Exp Path 69:717-737 (1988).

DerSimonian R, Laird N., *Meta-analysis in clinical trials*. Controlled Clinical Trials 7:177-188, 1986.

Dodson RF, Atkinson MAL, Levin J. *Asbestos fiber length as related to potential pathogenicity: A critical review*. Am J Ind Med 44:291-297 (2003).

Doll R, Hill AB. *Smok*ing *and carcinoma of the lung*. Brit Med J 2:739-748 (1950).

Egilman DS, Billings MA. *Abuse of epidemiology: automobiles manufacturers manufacture a defense to asbestos liability*. Int J Occup Environ Health 11:360-371 (2005).

Egilman D. *Report of a recent "brake" through in the fiber burden-mesothelioma dialogue*. Inhalation Toxicology 24: 136-137 (2012).

Egilman D. (B) *Egilman's assessment regarding exposures of auto mechanics to amphiboles is correct*. Inhalation Toxicology 24:614-618 (2012b).

Erdinc, M, Erdinc E, Cok G, Polati M. *Respiratory impairment due to asbestos exposure in brake-lining workers*. Environ Res 91:151-156 (2003).

Ferrante D, Bertolitti M, Todesco A et al. *Cancer mortality and incidence of mesothelioma in a cohort of wives of asbestos workers in Casale monferrato, Italy*. Env Health Perspect 115: 1401-1405 (2007.

Ferrante D, Mirabelli D, Silvestri S et al. *Mortality and mesothelioma incidence among chrysotile asbestos miners in Balangero, Italy: a cohort study*. Am J Ind Med 63: 135-145 (2020).

Finkelstein MM. *Mortality rates among employees potentially exposed to chrysotile asbestos at two automotive parts factories*. CMAJ 141:125-130 (1989).

Finkelstein M. *Letter re Marsh et al*. Inhalation Toxicology 24:139-140 (2012).

Finkelstein MM. Asbestos fibres in the lungs of an American mechanic who drilled, riveted, and ground brake linings: a case report and discussion. Ann Occup Hyg 59:525-527 (2015).

Freeman MD, Kohles SS. *Review: Assessing specific causation of mesothelioma following exposure to chrysotile asbestos-containing brake dust*. Int J Occup Environ Health 18(4):329-336 (2012).

.

Kanarek Brindell Report Dec 21, 2020

Garabrant DH, Alexander DD, Miller PE, Fryzek JP, Boffetta P, Teta MJ, Hessel PA, Craven A, Kelsh MA, Goodman M. *Mesothelioma among motor vehicle mechanics: an updated review and meta-analysis.* Ann Occup Hyg 60:1-8 (2016).

Garabrant DH, Pastula ST. *A comparison of asbestos fiber potency and elongate mineral particle (EMP) potency for mesothelioma in humans.* Toxicology and Applied Pharmacology 361:127-136 (2018).

Gaudino, Giovanni, Jiaming Xue, and Haining Yang.. *How asbestos and other fibers cause mesothelioma*, Translational Lung Cancer Research, 9: S39. (2020).

Glickman LT, Domanski LM, Maguire TG, Dubielzig RR, Churg A. *Mesothelioma in pet dogs associated with exposure of their owners to asbestos.* Environ Res 32:305-313 (1983).

Godwin MC, Jagatic G. *Asbestos and mesothelioma.* JAMA 204:151 (1968).

Goldberg M, Imbernon E, Rolland P, Gilg Soit Ilg A, Saves M, de Quillacq A, Frenay C, Chamming's S, Arveux P, Boutin C, Launoy G, Pairon JC, Astoul P, Galateau-Salle F, Brochard P. *The French National Mesothelioma Surveillance Program.* Occup Environ Med 63:390-395 (2006).

Goodman M, Teta, MJ, Hessel P, Garabrant D, Craven V, Scrafford CG, Kelsh M. *Mesothelioma and lung cancer among motor vehicle mechanics: a meta-analysis.* Ann Occup Hyg 48:309-326 (2004).

Gordis, L. Epidemiology. Elsevier, Phil. PA. 4th ed. pp. 236-239 (2009).

Greenberg M, Davies TAL. *Mesothelioma register 1967-68.* Brit J Ind Med 31:91-104 (1974).

Greenland S. *Invited commentary:A critical look at some popular meta-analytic methods.* Am J Epid 140:290-296 (1994).

Gustavsson P, Plato N, Lidstrom E-B, Hogstedt C. *Lung cancer and exposure to diesel exhaust among bus garage workers.* Scand J Work Environ Health 16:348-54 (1990).

Hamra GB, Loomis D, Dement J. *Examining the association of lung cancer and highly correlated fibre size-specific asbestos exposures with a hierarchical Baysian model.* J Occup Environ Med 71: 353-357 (2014).

Hamra G, Richardson DB, Dement J, Loomis D. *Lung cancer risk associated with regulate and unregulated chrysotile asbestos fibers.* Epidemiology 28:275-280 (2017).

Hansen ES. *Mortality of auto mechanics: a ten year follow-up.* Scand J Work Environ Health 15:43-46 (1989).

Hassan, Raffit, Betsy Morrow, Anish Thomas, Tom Walsh, Ming K Lee, Suleyman Gulsuner, Meghana Gadiraju, Vasiliki Panou, Shaojian Gao, and Idrees Mian. *'Inherited predisposition to malignant mesothelioma and overall survival following platinum chemotherapy'*, Proceedings of the National Academy of Sciences, 116: 9008-13 (2019).

HSE Health and Safety Executive. *Mesothelioma Occupation Statistics: Male and Females Deaths Aged 16-74 in Great Britain: 1980-2000 (excluding 1981)*. National Statistics, Great Britain (2001).

Heller DS, Gordon RE, Clement PB, Turnnir R, Katz N. *Presence of asbestos in peritoneal malignant mesothelioma in women.* Int J Gynecol Cancer 9:452-455 (1999).

Henderson DW. *European communities measures affecting asbestos and asbestos-containing products.* WTO WT/DS135/AB/R, p. 303 at ¶ 5.253 (2001).

Herbst A, Ulfelder H, Poskanzer D. *Adenocarcinoma of the vagina: Association of maternal stibestrol therapy with tumour appearance in young women.* N Engl J Med 284:871-881 (1971).

Hessel PA. Teta MJ, Goodman M, Lau E. *Mesothelioma among brake mechanics: an expanded analysis of a case-control study.* Risk Analysis 24:547-552 (2004).

Hickish DE, *Report 41/68 Exposure to Asbestos during the Servicing of Brakes of Passenger Cars.* July 1968.

Hickish DE, *Report 52/68 Exposure to Asbestos Dust during Brake Maintenance Operations on Commercial Vehicles, Fleet Repair Garage, Dagenham.* October 1968

Hickish DE and Knight KL. *Exposure to asbestos during brake maintenance*. Ann Occup Hyg 13:17-21 (1970).

Hill AB. *The environment and disease: association or causation*? Proc R Soc Med 58:295-299 (1965).

Hillerdal G. *Mesothelioma: cases associated with non-occupational and low dose exposures.* Occup Environ Med 56:505-513 (2009).

Hodgson JT, Peto J, Jones JR, Matthews FE. *Mesothelioma mortality in Britain: patterns by birth cohort and occupation.* Ann Occup Hyg 41 (Suppl 1):129-133 (1997).

Hodgson JT, Darnton A. *The quantitative risks of mesothelioma and lung cancer in relation to asbestos exposure.* Ann Occup Hyg 14:565-601 (2000).

Hodgson JT, Darnton A. *Mesothelioma risk from chrysotile.* Occup Env Med 67:432 (2010).

Huncharek, M, Muscat J, Capotorto JV. *Pleural mesothelioma in a brake mechanic*. Brit J Ind Med 46:69-71 (1989).

Huncharek, M. *Brake mechanics, asbestos, and disease risk*. Am J Forensic Med and Path 11(3):236-240 (1990).

Huncharek M. *Changing risk groups for malignant mesothelioma.* Cancer 69:2704-2711 (1992).

Kanarek Brindell Report Dec 21, 2020

International Agency for Research on Cancer (IARC) *IARC Monograph on the Evaluation of Carcinogenic Risks to Humans*. Volume 100C 2012. Asbestos (Chrysotile, Amosite, Crocidolite, Tremolite, Actinolite and Anthophyllite). WHO, Lyon, France.

Iwatsubo Y, Pairon JC, Boutin C, Menard O, Massin N, Caillaurd D, Orlowski E, Galateau-Salle F, Bignon J and Brochard P. *Pleural Mesothelioma: Dose-Response Relation at Low Levels of Asbestos Exposure in a French Population-based Case-Control Study*. Am J Epid 148:133-142 (1998).

Jarvholm B, Brisman J.  *Asbestos associated tumours in car mechanics*.  Brit J Ind Med 45:645-646 (1988).

Joint Policy Committee of the Societies of Epidemiology (JPC-SE). *Position Statement on Asbestos*. http://www.jpc-se.org/documents/03.JPC-SE-Position_Statement_on_Asbestos-June_4_2012-Full_Statement_and_Appendix_A.pdf

Kakooei H, Marioryad.  *Evaluation of exposure to the airborne asbestos in an automobile brake and clutch manufacturing industry in Iran*.  Regulatory Toxicology and Pharmacology.  56:143-147 (2010).

Kanarek, M.S. *Mesothelioma from chrysotile asbestos: update.* Annals of Epidemiology 21:688-697 (2011); Erratum: Annals of Epidemiology 22:377 (2012).

Kanarek, M.S. and Mandich MK.  *Peritoneal mesothelioma and asbestos: clarifying the relationship by epidemiology.*  Epidemiology Open Access. 6:2 (2016).
http://dx.doi.org/10.4172/2161-1165.1000233

Kanarek, M.S. and Anderson, HA. *Mesothelioma from asbestos exposure in brake mechanics: epidemiology in context.*  Epidemiology Open Access, 8:2 (2018).  http://dx.doi.org/10.4172/2161-1165.1000340

Kanarek, MS, O'Brien Liegel, JC. *Asbestos in talc and mesothelioma: review of the causality using epidemiology*. Medical Research Archives 8: issue 5, https://journals.ke-i.org/mra/article/view/2097 (2020).

Kauppinen T and Korhonen K.  *Exposure to asbestos during brake maintenance of automotive vehicle by different methods*.  Am Ind Hyg Assoc J 48:499-504 (1987).

Kelsh M, Craven V, Teta MJ, Mowat F, Goodman M.  *Mesothelioma in vehicle mechanics: is the risk different for Australians?* Occup Med 57:581-589 (2007).

Kohyama N, Suzuki Y.  Analysis of asbestos fibers in lung parenchyma, pleural plaques, and mesothelioma tissues of North American insulation workers.  Annals NY Acad Sci 643:27- 51 (1991).

Lacourt A, Gramond C, Rolland P, Ducamp S, Audignon S, Astoul P, Chamming's S, Gilg Soit Ilg A, Rinaldo M, Raherison C, Galateau-Salle F, Imbernon E, Pairon JC, Goldberg M, Brochard P.  *Occupational and non-occupational attributable risk of asbestos exposure for malignant pleural mesothelioma*.  Thorax 69:532-539 (2014).

Laden F, Stampfer M, Walker A. *Lung cancer and mesothelioma among male automobile mechanics: A review.* Rev Environ Health 19(1):39-61 (2004).

Langer AM, McCaughey, WTE. *Mesothelioma in a brake repair worker.* Lancet 8307:1101-1103 (1982).

Langer AM, Nolan RP. The *amphibole hypothesis: neither gone nor forgotten.* Am J Public Health 87:688-689 (1997).

Leigh J, Davidson P, Hendry L, Berry D. *Malignant mesothelioma in Australia, 1945-2000.* Am J Ind Med 41:188-201 (2002).

Lemen RA. *Chrysotile asbestos as a cause of mesothelioma: application of the Hill causation model.* Int J Occup Environ Health 10:233-239 (2004a).

Lemen RA. *Asbestos in brakes: exposure and risk of disease.* Am J Ind Med 45:229-237 (2004b).

Lerchen ML, Samet JM. *An assessment of the validity of questionnaire reponses provided by a surviving spouse.* Am J Epid 123:481-489 (1986).

Levin ML, Goldstein H, Gerhardt PR. *Cancer and tobacco smoking.* JAMA 143:336-338 (1950).

Linton A, Vardy J, Clarke S and Zandwijk NV. *The ticking time-bomb of asbestos: Its insidious role in the development of malignant mesothelioma.* Critical Reviews in Oncology/Hematology 84:200-212 (2012).

Loomis  D, Richardson DB, Eliliot L. *Quantitative relationships of exposure to chrysotile asbestos and mesothelioma mortality.* Am J Ind Med 62:471-477 (2019).

Liu Yi; Marsh, G M.; Roggli, V. *Asbestos fiber concentrations in the lungs of brake repair workers. an updated analysis using several regression methods to handle nondetectable measurements.* Journal of Occupational and Environmental Medicine 60: 661-671 (2018).

Lorimer WV, Rohl AN, Miller A, Nicholson WJ, Selikoff IJ. *Asbestos Exposure of Brake Repair Workers in the United States.* Mt Sinai J Med 43:207-18 (1976).

Magnani C, Terracini B et al. *A cohort study on mortality among wives of workers in the asbestos cement industry in Casale Monferrato, Italy.* Brit J Ind Med 50:779-784 (1993).

Magnani C, Fubini B, Mirabelli D et al. *Pleural mesothelioma: epidemiological and public health issues. Report from the second Italian consensus conference on pleural mesothelioma.* Med Lab 104:191-202 (2013)

Magnani C, Bianchi C, Chellini E et al. *III Italian consensus conference on malignant mesothelioma of the pleura. Epidemiology, public health and occupational medicine related issues.* Med Lav 106:325-332 (2015)

Malker HSR, McLaughlin JK, Malker BK, Stone BJ, Weiner JA, Erickson JLE and Blot WJ.. *Occupational risks for pleural mesothelioma in Sweden*, 1961-1979. JNCI 1985; 74:61-66.

Maltoni C, Pinto C, Bisceglie. *Mesotelioma in moglie di meccanico di auto insorto in seguito ad esposizione familiare ad asbesto*. Eur J Oncol 4(2):159-162 (1999).

Marinaccio A, Binazzi A et al. *Pleural malignant mesothelioma epidemic: incidence, modalities of asbestos exposure and occupations involved from the Italian National Register*. Int J Cancer 130: 2146-2154 (2012).

Mark EJ, Yokoi T. *Absence of evidence for a significant background incidence of diffuse malignant mesothelioma apart from asbestos exposure.* Annals of the NY Acad Sci 643; 196-204 (1991).

Markowitz S. *Asbestos-related lung cancer and malignant mesothelioma of the pleura: selected current issues.* Semin Respir Crit Care Mede 36:334-346 (2015).

Markus K, Jarvholm BG and Larsson S. *Asbestos-associated lung effects in car mechanics.* Scand J Work Environ Health 13:252-254 (1987).

Marinaccio A, Binazzi A, Bonafede M et al. *Malignant mesothelioma dure to non-occupational asbestos exposure from the Italian national surveillance system (ReNaM): epidemiology and public health issues.* Occup Environ Med 72:648-655 (2015)

Marsh GM, Youk AO, Roggli VL. *Asbestos fiber concentrations in the lungs of brake repair workers: commercial amphiboles are predictive of chrysotile levels.* Inhalation Toxicology 23:681-688 (2011).

Marsh GM, Youk AO, Roggli VL. *Letter to the editor in response to Finkelstein et al (2012*). Inhalation Toxicolgy 24:141-142 (2012).

McCallum, R. W., Maceri, D. R., Jensen, D., & Berci, G. *Laparoscopic diagnosis of peritoneal mesothelioma*. Digestive Diseases and Sciences, 24(2), 170-174. (1979).

McDonald AD, Harper A, El Attar OA, McDonald JC. *Epidemiology of primary malignant mesothelioma tumors in Canada*. Cancer 26:914-919 (1970).

McDonald AD, McDonald JC. *Malignant mesothelioma in North America*. Cancer 46:1650-1656 (1980).

McDonald JC, McDonald AD. *Chrysotile, tremolite and carcinogenicity.* Ann Occup Hyg 41:699-705 (1997).

McElvenny DM, Darnton AJ, Price MJ, Hodgson JT. *Mesothelioma mortality in Great Britain from 1968 to 2001.* Occup Med 55:79-87 (2005).

McVittie JC. *Asbestosis in Great Britain.* Ann NY Acad Sci 132:128-138 (1965).

Kanarek Brindell Report Dec 21, 2020

Merewether ERA, Price CW. *Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry.* His Majesty's Stationery Office, London (1932).

Merlo DF, Stagi E, Fontana V, Consonni D, Gozza C, Garrone E, Bertazzi PA, Pesatori AC. *A historical mortality study among bus drivers and bus maintenance workers exposed to urban air pollutants in the city of Genoa, Italy.* Occup Environ Med 67:611-619 (2010).

Milham S, Ossiander E. *Occupational mortality in Washington State 1950-1999.* Washington State Department of Health (2001).

Miller A. *Mesothelioma in household members of asbestos-exposed worker: 32 United States cases since 1990.* Am J Ind Med \47:458-462 (2005).

Mossman BT, Bignon J, Corn M, Seaton A, Gee JBL. *Asbestos: scientific developments and implications for public policy.* Science 24:294-301 (1990).

Muscat J, Wynder E. *Cigarette Smoking, Asbestos Exposure, and Malignant Mesothelioma.* Cancer Res 51:2263-2267 (1991).

Napolitano, A, L Pellegrini, A Dey, D Larson, M Tanji, EG Flores, B Kendrick, D Lapd, A Powers, S Kanodia, S Pastorino, HI Pass, V Dixit, H Yang and M Carbone. *Minimal ssbestos exposure in germline BAP1 heterozygous mice is associated with deregulated inflammatory response and increased risk of mesothelioma.* Oncogene 35(15):1996-2002. (2016).

National Toxicology Program, Department of Health and Human Services. *Report on Carcinogens*, Twelfth Edition (2011). Asbestos. CAS No. 1332-21-4. pp. 53-56

National Toxicology Program (NTP). Report on carcinogens, 14th ed. Research Triangle Park, NC: US Department of Health and Human Services, Public Health Service. https://ntp.niehs.nih.gov/go/roc14/. (2016)

Neumann V, Gunther S, Muller KM, Fischer M. *Malignant mesothelioma—German mesothelioma register 1987-1999*. Int Arch Occup Environ Health 74:383-395 (2001).

Newhouse ML, Thompson H. *Mesothelioma of pleura and peritoneum following exposure to asbestos in the London area*. Brit J Ind Med 22:261-269 (1965).

Newhouse ML, Berry G, Skidmore JW. *A mortality study of workers manufacturing friction materials with chrysotile asbestos.* Ann Occup Hyg 26 (1-4):899-909 (1982).

Newhouse ML, Sullivan KR. *A mortality study of workers manufacturing friction materials: 1941-86.* Brit J Ind Med 46:176-179 (1989).

Nicholson WJ et al. Occupational exposure to asbestos: population at risk and projected mortality—1980-2030. Am J Ind Med 3:259-311 (1982).

Offermans NSM , Vermeulen R et al. *Occupational asbestos exposure and risk of pleural mesothelioma, lung cancer and laryngeal cancer in the prospective Netherlands cohort study.* JOEM 56:6-19 (2014).

Kanarek Brindell Report Dec 21, 2020

Ohar, Jill A, Mitchell Cheung, Jacqueline Talarchek, Suzanne E Howard, Timothy D Howard, Mary Hesdorffer, Hongzhuang Peng, Frank J Rauscher and Joseph R Testa. *Germline BAP1 mutational landscape of asbestos-exposed malignant mesothelioma patients with family history of cancer. Cancer Research* 76(2):206-215 (2016).

Okura H, Suga Y, Akiyama O, Kudo K, Tsutsumi S, Abe Y, Ysumoto Y, Ito M, Izumi H, Shiomi K. *Pleural malignant mesothelioma causing cord infiltration through the nerve root – case report.* Neurol Med Chir (Tokyo) 49:167-171 (2009).

Omenn, G. S., Goodman, G. E., Thornquist, M. D., Balmes, J., Cullen, M. R., Glass, A., . . . Williams Jr, J. H. *Risk factors for lung cancer and for intervention effects in CARET, the Beta-Carotene and Retinol Efficacy Trial.* JNCI: Journal of the National Cancer Institute, 88(21), 1550-1559 (1996).

OSHA. *Asbestos-Automotive Brake and Clutch Work.* Safety and Health Information Bulletin. SHIB 07-26-06 (2006).

Pan X-l, Day HW, Wang W, Beckett L, Schenker MB. *Residential proximity to naturally occurring asbestos and mesothelioma risk in California.* Am J Respir Crit Care Med 172:1019-1025 (2005).

Park E-K, Takahashi K, Hoshuyama T et al. *Global magnitude of reported and unreported mesothelioma.* Environ Health Perspectives 119:514-518 (2011).

Paustenbach DJ, Richter RO, Finley BL, Sheehan PJ. *An evaluation of the historical exposures of mechanics to asbestos in brake dust.* Applied and Environmental Hygiene 18:786-804 (2003).

Pearce N, Checkoway H, Kriebel D. *Bias in occupational studies.* Occup Environ Med 64:562-568 (2007).

Peto J, Rake C, Gilham C, Hatch J. *Occupational, domestic and environmental mesothelioma risks in Britain, a case-control study.* Health and Safety Executive: Norwich, UK (2009).

Pinto C, Novello S, Torri V et al. *Second Italian consensus conference on malignant pleural mesothelioma: state of the art and recommendations.* Cancer Treat Rev 39:328-339 (2013).

Pira E ,Romanp C , Donato F et al. *Mortality from cancer and other causes among Italian chrysotile asbestos miners.* Occupational and Environmental Medicine 74:558-563 (2017).

Plato, N., Martinsen, J. I., Sparén, P., Hillerdal, G., & Weiderpass, E. *Occupation and mesothelioma in Sweden: updated incidence in men and women in the 27 years after the asbestos ban.* Epidemiology and health, 38 (2016).

PNSM, The French National Program for Mesothelioma Surveillance, Principal results 1998-2006, www.invs.sante.fr/publications/2009/pnsm/pnsm_resultats_1998_2006_english.pdf

Poland CA, Duffin R. *The toxicology of chrysotile-containing brake debris: implications for mesothelioma*. Critical Reviews in Toxicology 49:11-35 (2019).

Price B. *Time trend of mesothelioma incidence in the United States and projection of future cases: an update based on SEER data for 1973 through 2005.* Critical Reviews in Toxicology 39: 576-588 (2009).

Pukkala E, Martinsen JI, Lynge E, Gunnarsdottir HK, Sparen P, Tryggvadottir L, Weiderpass E, Kjaerheim K. *Occupation and cancer- follow-up of 15 million people in five Nordic countries*. Acta Oncologica 48:646-790 (2009).

Rake C, Gilhma C, Hatch J, Darnton A, Hodgson J, Peto J. *Occupational, domestic and environmental mesothelioma risks in the British population: a case-control study*. Brit J Cancer 100:1175-1183 (2009).

Rees D, Goodman K, Fourie E, Chapman R, Blignaut C, Bachmann O, Myers J. *Asbestos exposure and mesothelioma in South Africa*. S Afr Med J 89:627-634 (1999).

Ribak, J, Lilis R, Suzuki Y, Penner, L, Selikoff IJ. *Malignant mesothelioma in a cohort of asbestos insulation workers: clinical presentation, diagnosis and causes of death.* Brit J Ind Med 45:182-187 (1988).

Robinson CF, Lemen RA, Wagoner JK. *Mortality patterns, 1940-1975 among workers employed in an asbestos textile friction and packing products manufacturing facilities.* Lemen RA, Dement JM editors. Dust and Disease. Park Forest, IL: Pathotox Publishers, 1975.

Rodelsperger K, Jahn B, Bruckel J, Manke J, Paur R and Woitowitz, H-J. *Asbestos dust exposure during brake repair.* Am J Ind Med 10:63-72 (1986).

Rodelsperger K, Jockel, K-H, Pohlabein H, Romer W and Woitowitz H-J. *Asbestos and man-made vitreous fibers as risk factors for diffuse malignant mesothelioma: results from a German hospital-based case-control study.* Am J Ind Med 39:262-275 (2001).

Roelofs CR, Kernan GJ, Davis LK, Clapp R, Hunt PR. *Mesothelioma and employment in Massachusetts: analysis of cancer registry data 1988-2003.* Am J Ind Med 56:985-992 (2013).

Roggli VL, Pratt PC, Brody AR. *Asbestos fiber type in malignant mesothelioma: an analytical scanning electron microscopic study of 94 cases.* Am J Ind Hyg 23:605-614 (1993).

Roggli VL, Sharma A, Butnor KJ, Sporn T, Volmer RT. *Malignant mesothelioma and occupational exposure to asbestos: A clinicopathological correlation of 1,445 cases.* Ultra Path 26:55-65 (2002).

Roggli VL, Volmer RT, Butnor KJ, Sporn T. *Tremolite and mesothelioma*. Ann Occup Hyg 46: 447-453 (2002b)

Rohl AN, Langer AM, Wolf MS, Weisman I. *Asbestos exposure during brakel lining maintenance and repair*. Environ Research 12:110-128 (1976).

Rolland P, Gramond C, Lacourt A, Astoul P, Chamming's S, Ducamp S, Frenay C, Galateau-Salle F, Gilg Soit Ilg, A, Imbernon E, Le Stang N, Pairon JC, Goldberg M, Brochard P. *Occupations and industries in France at high risk for pleural mesothelioma: a population-based case-control study (1998-2002)*.  Am J Ind Med 53:1207-1219 (2010).

Ruiz-Tirado ML, Olvera-Rodriguez A, Diaz-Barranco I, Ruiz-Romano A, Castillo-Ruiz N, Olvera-Quiroz SE.  *Mesotelioma peritoneal maligno.  Informe de un caso y revision de la literatura*.  Rev Med Inst Mex Seguro Soc 49(1):79-84 (2011).

Rushton L, Alderson MR, Nagarajah CR.  *Epidemiological survey of maintenance workers in London transport executive bus garages and Chiswick works*.  Brit J Ind Med 40:340-345 (1983).

Sage, Adam P, Victor D Martinez, Brenda C Minatel, Michelle E Pewarchuk, Erin A Marshall, Gavin M MacAulay, Roland Hubaux, Dustin D Pearson, Aaron A Goodarzi, and Graham Dellaire. 2018. *Genomics and epigenetics of malignant mesothelioma, High-throughput*, 7: 20:1-23.(2018).

Schneider J, Woitowitz H-J. *Tumours linked to para-occupational exposure to airborne asbestos*.  Indoor Built Environ 5:67-75 (1996).

Selikoff I, Churg J, Hammond EC.  *Asbestos exposure and neoplasia.*  JAMA 252(1):91-95 (1964).

Selikoff IJ, Hammond EC, Seidman H. *Mortality experience of insulation workers in the United States and Canada, 1943-1976*. Annals of the New York Academy of Sciences. Dec;330(1):91-116 (1979).

Selikoff, IJ, Seidman , H. *Asbestos-associated deaths among insulation workers in the United States and Canada, 1967-1987*. Annals of the New York Academy of Sciences 643:1-14 (1991).

Shapiro, S. *Meta-analysis of observational studies: Meta-analysis/Shmeta-analysis*. Am J Epid 140:771-778 (1994).

Sheenan  MC, Lam J.  *Use of systematic review and meta-analysis in environmental health epidemiology: a systematic review and comparison with guidelines*.  Curr Envir Health Rpt 2:272-283 (2015).

Silverstein MA, Welch LS, Lemen R.  *Developments in asbestos cancer risk assessment*.  Am J Ind Med 52:850-858 (2009).

Singhal B, Kohli S, Singhal A and Kumar V. *Malignant pleural and peritoneal mesothelioma consequential to brief indirect asbestos exposure.*  J Clin Imaging Sci 4: 35 (2014).

Spirtas R, Keehn R, Wright W, Stark A, Beebe G, Dickson E.  *Mesothelioma risk related to occupational or other asbestos exposure: preliminary results from a case-control study.* Society of Epidemiology Research: Abstracts, Am J Epi 122(3):519 (1985).

Spirtas R, Heineman EF, Bernstein L, Beebe GW, Keehn RJ, Stark A, Harlow BL, Benichou. *Malignant mesothelioma: Attributable risk of asbestos exposure.* Occup Environ Med 51:804-811 (1994).

Stayner L, Kuempel E, Gilbert S, Hein M, Dement J. *An epidemiological study of the role of chrysotile asbestos fibre dimensions in determining respiratory disease risk in exposed workers.* Occup Environ Med 65:613-619 (2008).

Stayner L, Welch LS and Lemen R. *The worldwide pandemic of asbestos-related diseases.* Ann Rev Public Health 34:205-216 (2013).

Strauchen JA. *Rarity of malignant mesothelioma prior to the widespread commercial introduction of asbestos: the Mount Sinai autopsy experience 1883-1910.* (2011).

Stroup DF et al. *Meta-analysis of observational studies in epidemiology: a proposal for reporting.* JAMA 283;2008-2012 (2000).

Suzuki Y and Yuen S. *Asbestos Tissue Burden Study on Human Malignant Mesothelioma.* Ind Health 39:150-10 (2001).

Suzuki Y, Yuen SR and Ashley R. *Short, thin fibers contribute to the development of human malignant mesothelioma: pathological evidence.* Int J Hyg Environ Health 208:201-210 (2005); Erratum. Int J Hyg Environ Health 208:439-444 (2005).

Teschke K, Morgan MS, Checkoway H, Franklin G., Spinelli JJ, van Belle G, Weiss N. *Mesothelioma surveillance to locate sources of exposure to asbestos.* Canada J Public Health 88:163-168 (1997).

Teschke K. *Thinking about occupation-response and exposure-response relationships: vehicle mechanics, chrysotile, and mesothelioma.* Letter to the editor. Ann Occup Hyg 60:528-530, (2016).

Teta MJ, Lewinsohn HC, Meigs W, Vidone RA, Mowad LZ, Flannery JT. *Mesothelioma in Connecticut 1995-1977.* J Occup Med 10:749-756 (1983).

Tossavianen A. *Consensus report: Asbestos, asbestosis, and cancer.* The Helsinki criteria for diagnosis and attribution. Scan J Work Environ Health 23:311-316 (1997).

Vermuelen R. When are the risk analyses on job titles informative. Ann Occup Hyg 60:913-915 (2016).

Vianna NJ, Polan AK. *Non-occupational exposure to asbestos and malignant mesothelioma in females.* Lancet 20:1061-1063 (1978).

Vogelstein, B, Kinzler KW. *The path to cancer—three strikes and you're out.* New Eng J Med 373:1895-1898 (2015).

Wagner JC, Sleggs CA, Marchand P. *Diffuse pleural mesothelioma and asbestos exposure in the northwestern Cape Province.* Br J Ind Med 17:260-271 (1960).

Welch LS, Acherman YIZ, Haile E, Sokas R, Sugarbaker PH. *Asbestos and peritoneal mesothelioma among college-educated men.* Int J Occup Environ Health 11:254-258 (2005).

Welch LS. *Asbestos exposure causes mesothelioma, but not this asbestos exposure: an amicus brief to the Michigan Supreme Court.* Int J Occup Environ Health 13:318-327 (2007).

WHO. *Environmental Health Criteria 203: Chrysotile Asbestos.* World Health Organization, Geneva (1998).

WHO. *Chrysotile Asbestos.* World Health Organization, Geneva (2014).

Whorton, M. D., Schulman, J., Larson, S. R., Stubbs, H. A., & Austin, D. *Feasibility of identifying high-risk occupations through tumor registries. Journal of occupational medicine.: official publication of the Industrial Medical Association, 25*(9), 657-660. (1983).

Woitowitz HJ, Rodelsperger K. *Mesothelioma among car mechanics?* Ann Occup Hyg 38:635-638 (1994).

Wojcik MS, Schnatter AR, Huebner WW. Mesothelioma in occupational cohort studies: methodlogical considerations. JOEM 56:47-51 (2014).

Wong, Jason YY, Carol Rice, Aaron Blair, Debra T Silverman. *Mesothelioma risk among those exposed to chrysotile asbestos only and mixtures that include amphibole: a case-control study in the USA, 1975-1980.* Occupational and Environmental Medicine, Online First (2020).

Wong O. *Malignant mesothelioma and asbestos exposure among auto mechanics appraisal of scientific evidence.* Regul Toxicol Pharmacol 34:170-177 (2001).

Wynder EL, Graham EA. *Tobacco smoking as a possible etiologic factor in bronchogenic carcinoma* JAMA 143:329-336 (1950).

Xu, Jinfei, Yuwaraj Kadariya, Mitchell Cheung, Jianming Pei, Jacqueline Talarchek, Eleonora Semetino, Yinfei Tan, Craig W Menges, Kathy Q Cai, Samuel Litwin, Hongzhuang Peng, Jayashree Karar, Frank J Rauscher and Joseph R Testa. *Germline Mutation of Bap1 Accelerates Development of Asbestos-Induced Malignant Mesothelioma.* Cancer Research 74(16):4388-97.(2014).

# John Brindell, Jr. Asbestos Exposure Report of

# Kenneth S. Garza, CIH, MS

# Carolyn Brindell, et al. vs. Carlisle Industrial Brake and Friction, Inc., et al.

Prepared for

Simmons Hanly Conroy
One Court Street
Alton, Illinois 62002

Prepared by

GHP, Inc.
401 East Sonterra Blvd, Suite 375
San Antonio, Texas 78258

GHP Project 12320.61
January 29, 2021

**EXHIBIT Z**

Table of Contents

1.   Introduction ................................................................................................................. 1

2.   Industrial Hygiene ........................................................................................................ 3

3.   Regulations and Recommendations ............................................................................ 9

4.   Airborne Asbestos Hazard .......................................................................................... 12

5.   Asbestos-containing Dust and Resuspension .............................................................. 19

6.   Bystander Exposure ..................................................................................................... 21

7.   Take Home Exposures .................................................................................................. 24

8.   Fiber Type and Fiber Size ............................................................................................. 28

9.   Asbestos-containing Friction Products ........................................................................ 31

10.   Conclusions ................................................................................................................. 43

APPENDIX A ....................................................................................................................... i

APPENDIX B ....................................................................................................................... ii

APPENDIX C ....................................................................................................................... iii

APPENDIX D ....................................................................................................................... iv

APPENDIX E ....................................................................................................................... v

John Brindell, Jr. Asbestos Exposure Report of Kenneth S. Garza, CIH, MS

Carolyn Brindell, et al. vs. Carlisle Industrial Brake and Friction, Inc., et al.

Civil District Court, Parish of Orleans, State of Louisiana

Case No. 2019-09716

## 1.  Introduction

This report is based on a review of the case-specific documentation, pertinent industrial hygiene literature, and my qualifications, experience, and professional judgement as a Certified Industrial Hygienist. My background education includes a B.S. Biology, minor Chemistry, an M.S. Environmental Science and Management. I am certified by the American Board of Industrial Hygiene as a Certified Industrial Hygienist (CIH). I am also a Texas Department of State Health Services (TDSHS) licensed asbestos consultant for asbestos issues related to air monitoring, management planning, inspection and abatement project design. I have conducted industrial hygiene related activities dealing with asbestos hazards for 18 years.

Selected industrial hygiene, scientific, regulatory, and other documents which I considered are cited in Appendix A. My curriculum vitae is in Appendix B. My expert testimony history is given in Appendix C. My compensation is given in Appendix D. Deposition summary is located in Appendix E. I also rely on my general knowledge in the topic areas, including our library of relevant publications. My opinions may be supplemented or changed if new evidence/information is presented to me.

I am an expert in the field of industrial hygiene, regarding asbestos. I hold a Master of Science in Environmental Science and Management and a Bachelor of Science in Biology with a Minor in Chemistry. I am a Certified Industrial Hygienist (CIH), certified by the American Board of Industrial Hygiene (ABIH). Examination and certification requirements include both formal education and professional industrial hygiene experience such as possession of at least a four-year bachelor's degree in a field of science, requiring at least 180 academic contact hours or 240 continuing education contact hours of industrial hygiene course work with at least half of those hours in the areas of Fundamentals of Industrial Hygiene, Toxicology, Measurements and Controls, and 2 hours of the ethics training or course work. Additionally, I was required to demonstrate at least four years of industrial hygiene practice and at least two years of the following occupational health stressors: chemical, physical, biological, ergonomics. As well as receive

approval from an active CIH. The written CIH exam tested my knowledge of, and competency in, several subject areas concerning workplace hazards. An industrial hygienist is a "professional qualified by education, training, and experience to anticipate, recognize, evaluate and develop controls for occupational health hazards … Certified Industrial Hygienist (CIH) means one certified in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene." (OSHA 1994). I am Licensed by the Texas Department of State Health Services (TDSHS) as an asbestos consultant allowing for the inspection, management planning, air-monitoring, and abatement of asbestos-containing materials. I am Licensed by the State of Florida Department of Business and Professional Regulation as an asbestos consultant allowing for the same asbestos-related consulting activities mentioned beforehand; Training within these licenses includes Environmental Protection Agency (EPA) accreditation for Inspector, Management Planner and Project [abatement] Design.

Regarding the hazards of asbestos as a consultant, or as an inspector prior to, I have: Conducted numerous field assessments/surveys, which may involve worker interview and input, and including the collection of thousands of environmental samples in the field, such as bulk samples, air samples, and surface dust samples, which involves sample strategy planning therein; Conducted third party owner-representative services for numerous asbestos management planning activities, including response actions, instructions, abatement design technical specifications, periodic surveillance recommendations for the control of asbestos, operations and maintenance (O&M) program policies, compliance with various asbestos regulations and standards, selected and fit tested for and trained on the appropriate use of personal protection equipment, and the development of engineering controls and work practices for asbestos-related activities; Reviewed published/unpublished literature, and worker depositions regarding asbestos exposure; Educated, trained, and experienced regarding the general development of standards and regulations applicable to asbestos and the development of industrial hygiene knowledge, procedures and technology over time; Educated, trained and experienced regarding with respect to fiber release of various asbestos-containing products and the relative fiber release capability and relative exposure to asbestos fibers.

I prepared a report based upon my review of the evidence in this case, as well as my education, training, knowledge, and experience in the field of Industrial Hygiene.  My report is a summary of my opinions to-date concerning this case.

The purpose of this report is to provide industrial hygiene opinions about 1) exposure and potential exposure to airborne asbestos, 2) as well as specific exposures from various asbestos-containing products (Section 9). My review of case specific information includes: Video Deposition of Jonathan Keith Poleto, Volume I, dated February 19, 2020; Video Deposition of Jonathan Keith Poleto, Volume II, dated February 20, 2020; and other case-specific information.

Based on my review of the case-specific information, this report will discuss the asbestos exposure of Mr. John Brindell, Jr., personally or as a bystander, during the repair and maintenance of asbestos-containing trailers, axles, and friction materials, including the use of compressed air and grinders.

"Asbestos has been used in cement products, plaster, fireproof textiles, vinyl floor tiles, thermal and acoustical insulation, and sprayed materials." (USEPA, 1979) "Asbestos fibers do not have any detectable odor or taste. They do not dissolve in water or evaporate and are resistant to heat, fire, chemical and biological degradation. … As a result of its low cost and desirable properties such as heat and fire resistance, wear and friction characteristics, tensile strength, heat, electrical and sound insulation, adsorption capacity, and resistance to chemical and biological attack, asbestos has been used in a very large number of applications and types of products." (ATSDR, 2001) According to Hueper, 1942, "The production of asbestos has risen enormously in recent years. It received this great impetus from its use in the automobile industry. … Occupational contact with asbestos is present in many industries using asbestos products. Asbestos is employed for a great variety of purposes, such as the manufacture of incombustible and insulating materials (fire resistant clothes, blankets, theater curtains, sheets, ropes, cords, twine, and threads), filter cloths, mill-board, wall board, shingles, tiles, mortar (together with cement and plaster of Paris for providing a fire-proof wall lining), clinkers, gaskets, packing material of pumps, insulating material of steam pipes, water pipes, boilers, and electric wires, brake lining, paper, mattresses, adsorbent dyes (for manufacture of fire proof and acid proof stains), ingredient of rubber products, and artificial wood." (Hueper, 1942)

## 2. Industrial Hygiene

When referencing more contemporaneous industrial hygiene literature concerning exposure assessment methodology, means, methods, and management; they are typically written in the idea of assessment for a current exposure to some work hazard, and provide guidance for moving forward with addressing real-

time hazard management (e.g., assessing a current benzene exposure in a factory setting for the purpose of managing that hazard going forward; or anticipating, recognizing, evaluating, and controlling). However, these concepts and guidance can be useful for an industrial hygienist when assessing exposure data in conjunction with work activities described, materials used, and work environmental settings that occurred in the past, rather than a cumulative dose reconstruction. This report is not a lifetime cumulative asbestos dose reconstruction (fiber-years/cc), but rather an asbestos exposure assessment, in which opinions of asbestos exposure significance and risk are made based on available data (quantitative and/or qualitative), professional judgement, experience and training.

Historic asbestos exposures were mostly measured using an impinger, which gave results in million particles per cubic foot of air (mppcf) or using phase contrast microscopy (PCM) to examine sampling filters, which is an optical microscopy technique that gave results in fibers per cubic centimeter of air ($f/cm^3$). It should be noted that units "f/cc" or "$f/cm^3$" (fibers per cubic centimeters) and "f/ml" (fibers per milliliter), have the same quantitative meaning. The PCM method measures only fibers equal to or longer than 5 micrometers, with an aspect ratio (length to width) of equal to or greater than 3 to 1. Short fibers are not counted, and thin fibers are not even seen by the analyst because the optical scope cannot resolve fiber widths less than 0.25 micrometers. The mppcf measurement gives no information about fiber size, large or small, since it only provides a total numerical count of dust particles present. With these historic data, and with contemporary PCM data, the total number of fibers present and the fiber size distribution are not known. Transmission electron microscopy (TEM) is another and more current method of analysis. This approach is appealing because it quantitatively measures only airborne asbestos fibers and reports them in structures per cubic centimeter (s/cc). This method can also distinguish between the different types of asbestos. Using historic data on average exposures or ranges of exposures in a given operation or job to estimate exposures for an individual or a group must be done with these limitations and/or capabilities in mind.

Asbestos exposures in any individual event are influenced by many variables which may be described qualitatively (e.g., dustiness) or quantitatively (e.g., units of measurement per volume, f/cc). These include, but are not limited to, the work being done, the particular method or work practice by which the work is done, ventilation (mechanical or natural), air flow patterns and characteristics, atmospheric conditions, types of asbestos-containing products, amount of asbestos in the product used or disturbed,

proximity to the work, duration of the work, duration of fiber settling times and time spent in an area after work, and proximity of other co-workers conducting the same or different asbestos-related activities. "Wide variations in concentration and receptor characteristic may exist, even within a single scenario." (DiNardi, 2003) Given these variables, it is logical that an individual's exposure profile for a certain work activity may have a broad range for any given time period or task, and certainly for a career. Indeed, the fact that the average exposure for a particular trade, job or task may be low does not mean that the exposure was low for every worker in that trade, job or task. Historic and contemporary asbestos exposure data confirm this variability.

Instantaneous, real time measurements specific to asbestos exposure were not, and are not, done. An asbestos air sample is an average of varying concentration over some period of time. This is true for short-term sampling as well as long-term sampling. Within a sampling period, there can be peak asbestos exposures which may not be observable in the overall average. For example, if an air sample is taken for 4 hours (240 minutes) and the reported result is 1.0 f/cm$^3$ that number could represent 30 minutes at 5.0 f/cm$^3$ (500% of the reported result) and 210 minutes at 0.4 f/cm$^3$ (40% of the reported result).

For industrial hygiene purposes, the ranges of exposure from multiple sampling data points, which can be represented through short-term or long-term sampling events, can be more useful in understanding the potential magnitude of exposure than just the average of multiple samples. The full range of exposures for a given workplace or task may not be known if both the highest and lowest concentrations were not measured or considered. Even if the extremes were measured or considered, the data may be subject to the limitations of the sampling methodology. Using the example above, the range would be 0.4 f/cm$^3$ to 5.0 f/cm$^3$ with an average of 2.7 f/cm$^3$ (n=2).

Industrial hygiene studies will report data as exposure levels during the course of the sampling event (short-term) or as a time–weighted average (TWA). These are generally described as occupational exposure levels (OEL's) and can be regulatory (OSHA) or authoritative (e.g., NIOSH, AIHA, ACGIH). Regulative and authoritative OEL's for asbestos have existed for many decades. "For NIOSH RELs, '**TWA**' indicates a time-weighted average concentration for up to a 10-hour workday during a 40-hour workweek. … TWA concentrations for OSHA **PEL**s [permissible exposure limits] must not be exceeded during any 8-hour workshift of a 40-hour workweek." (NIOSH, 2007) "To meet the requirements of

establishing the TWA concentrations, the sampling method and time periods should be chosen to average out fluctuations that commonly occur in a day's work. If there are wide fluctuations in concentration, the long-term samples should be supplemented by samples designed to catch the peaks separately." (Plog, 1996) For example, if a 30-minute sampling event per a task occurs and a concentration of 1.0 $f/cm^3$ is reported and this event only occurs once in a workday, then the 8-hour TWA is 0.0625 $f/cm^3$ (below the current PEL). If this event occurred twice in a workday, then the 8-hour TWA is 0.125 $f/cm^3$ (above the current PEL). If this event was consistent throughout an entire workday, then the 8-hour TWA is 1.0 $f/cm^3$ (above the current PEL and certainly the excursion limit). When comparing TWA-based data, a description of the activity, frequency and duration for a particular workday should be considered. When comparing short term exposures data, a description of the activity and duration should be considered.

Asbestos exposure assessment methodology is based on generally accepted, reliable, reproducible industrial hygiene practices (e.g., means, methods, measurements, etc.), and professional industrial hygiene judgement based on experience, training, and education. The variables in the workplace, to the degree that they are reported, and limitations in the sampling methodology and work practice methodology must be considered to prevent bias in interpretation of data from the industrial hygiene literature. For the purposes of exposure assessment, industrial hygiene literature data or information may be presented quantitatively, qualitatively, or both. Also, exposure data may be represented as short term data, long-term data, or both.

"Occupational Hygiene is the science and art 'dedicated to the anticipation, recognition, evaluation, and control of environmental factors arising in or from the workplace that may result in injury, illness, impairment, or affect the well-being of workers and members of the community'" (DiNardi, 2003). With regard to **anticipation**, it is the "…expectation of potential health hazards." For example, an Industrial Hygienist can anticipate levels of worker exposure to asbestos for an activity based on professional judgement and/or a review of previous relatable exposure levels for a given activity with a given asbestos-containing material; therefore recommending appropriate respiratory type with protection factor, without collecting one air sample. With regard to **recognition**, it is the "acknowledgment of health hazards in the work place", understanding where those hazards come from and who those hazards pertain to. For example, and industrial hygienist can recognize that certain cement pipe produced before

a certain time period, more likely than not, contains asbestos and further recognizes that the act of uncontrolled sawing, grinding, sanding, and the like, will most likely result in the release of asbestos fibers; again, based on his/her professional judgement and/or a review of previous relatable exposure. Regarding both anticipation and recognition, an industrial hygienist characterizes the nature of the hazard, in this case asbestos, by understanding: the materials that contain asbestos; what the asbestos-containing material was used for; the historic understanding of work practice(s) related to these asbestos-containing materials; the exposure(s) associated with asbestos-containing material work practices; and human health implications due to work activity, and the potential risks associated with asbestos exposure. Industrial hygiene literature includes information describing these aspects historically and currently. These aspects can then be compared to what an individual or individuals may describe about their work experience. (DiNardi, 2003)

With regard to **evaluation**, an industrial hygienist will characterize exposure concentrations and temporal variability based on asbestos material type and work activity, more specifically. "Evaluation is the process of examining an operation to determine the extent to which health hazards are present. Key skills necessary for evaluation are observation and judgment as well as technical knowledge in science and math. Both observation and judgment are developed and refined as a result of training and experience and therefore utilize 'art' as well as science. The application of the occupational hygienist's experience is used together with quantitative measurements, if available, to determine the magnitude of the stressors. … The stressor measurements/estimates are then analyzed and tested for significance (e.g., determining the importance and meaningfulness of the results). Judging significance can involve both subjective decisions based on the occupational hygienist's experience as well as objective decisions based on statistical analyses." (DiNardi, 2003) "There is a wealth of health and safety information that should be researched to help anticipate potential hazards in any work setting. Included in this search should be a review of the known hazards associated with industrial processes or job classifications. An inventory can then be made of previously identified hazards by category, and any relevant standards or guidelines can be referenced." (Plog, 1996) Quantitatively or qualitatively, when assessing an individual's exposure to asbestos, an industrial hygienist may rely on a worker's contemporaneous workplace asbestos exposure data, if this data exists; contemporaneous workplace asbestos exposure data for another worker or workers with a similar job or work activity; current or historic, published or unpublished industrial

hygiene literature describing similar work tasks or jobs (e.g., regulatory / recommendation publications, journal studies, industry IH field studies); published or unpublished laboratory studies or simulations studies. Again, this information is reviewed considering industrial hygiene methodology, general acceptance, reliability, reproducibility of practices (e.g., means, methods, measurements…), and professional industrial hygiene judgement based on experience, training, and education. Considering the above IH information gives an industrial hygienist a magnitude range of exposure that is similar to what may be described for an individual. Industrial hygienists use many techniques to assess exposure when little or no data exist for a given situation or worker. Conclusions may be drawn from data in the literature if conditions have sufficient similarity to the case of interest. Simulations can be reliable for estimating exposure. These data sources can be used to establish a likely range of exposures and probable average. For a given worker, however, the actual exposures at the extremes may be more or less than studies and literature indicate. Industrial hygiene literature reporting asbestos exposures orders of magnitude greater than background levels may describe these exposures as significant. General conclusions about exposures of a given worker population may not be accurate for an individual worker. (DiNardi, 2003) With regard to workplace **controls**, an industrial hygienist considers controls implemented, if any. Such as substitution, engineering controls, administrative controls and personal protective equipment (e.g., hierarchy of controls).

In general, an industrial hygienists' decision about workplace exposure "…is based on a combination of observations, interviews [information provided by workers], and measurement of … air contaminates arising from the process or work operation and the effectiveness of control measures use." (Plog, 1996) My asbestos exposure assessment methodology includes having an understanding of the: expectation and acknowledgement of the potential human health implications due to asbestos exposure as represented in the industrial hygiene literature; nature of its use historically and currently; characterization of asbestos hazard as reported in the industrial hygiene literature; understanding of industry accepted and sound methodologies employed in the IH literature; similar work practices in the IH literature involving asbestos-containing materials resulting in asbestos exposure; the comparison of similar work activity exposure in the IH literature to work activities described by an individual or individual(s); likely exposure ranges expected; and effects of in-place controls, if any.

In some cases, historical exposure data are limited in quantity and scope. It is unreasonable to assert that

such historical data, simulation data, etc. can only be reliable for estimating exposures that match in every detail the historical events, the simulations, etc. It is standard industrial hygiene practice to consider, with appropriate care, all data which may have bearing on a worker's exposure. If industrial hygiene were limited to estimating exposures only where historical data existed as an exact match for the situation under assessment, there would be no meaningful and practical way to predict average exposures and/or ranges of exposures for the boundless variety of work places, work practices, and products in commerce today and historically. Without exposure estimates (both retrospective and prospective), health effects could not be related to workplace conditions, adequate exposure limits could not be established, and epidemiology studies would have insufficient foundation related to environmental conditions. This situation would preclude adequate worker protection and make workers "canaries" like those birds used in coal mines in times past.

### 3.   Regulations and Recommendations

According to the Memorandum on the Industrial Diseases of Silicosis and Asbestosis, in 1935, the exposure to asbestos-containing dust from various material types and guidance control are discussed. The disease asbestosis was described as "a special type of fibrosis of the lung tissue. … Industries and processes in which asbestosis occurs – Processes involving exposure to asbestos dust which are known to give rise to asbestosis or in which the conditions are such as to be liable to produce disease, are the breaking, crushing, disintegrating, opening and grinding of asbestos and the mixing or sieving of asbestos or any admixture of asbestos, the manufacture of asbestos textiles, the making of insulating slabs or sections and the making or repairing of insulating mattresses composed wholly or partly of asbestos, and the sawing, grinding, and turning in the dry state of articles composed wholly or partly  of asbestos such as motor car brake, clutch linings, jointings, electric insulating materials and some types of electrodes." Regarding preventative asbestos dust exposure measures, the suppressions of dust is mentioned as the "chief means of preventing the disease [asbestosis]." "The adoption of wet methods, effective enclosure of dust-producing machines, adoption of enclosed mechanical methods instead of hand conveyance and dusty hand work generally, and application of exhaust draught at dust-producing points." (Great Britain Home Office, 1935)

According to Dreessen, "A characteristic of asbestosis is the finding of asbestosis bodies in the lungs and

in the sputum. … Above 5 million particles per cubic foot, numerous cases of well-marked asbestosis were found. It would seem that if the dust concentration in asbestos factories could be kept below 5 million particles (the engineering section of the report had shown how this may be accomplished), new cases of asbestosis probably would not appear." (Dreessen, 1938)

In 1943, The American Industrial Hygiene Association (AIHA) described "eight common types of disease and methods for their prevention," one of which was asbestosis, and the sources and jobs for potential asbestos exposure in the work environment. They further recommended controls for dealing with this hazard such as segregation of dusty work, special ventilation, respirators, and periodic medical examinations. (AIHA, 1943) In relation to occupation and the environment, Hueper describes asbestos as an observed cancer-causing agent.  "Asbestosis cancer of the lung is the most recent newcomer among the occupational cancers of this organ" (Hueper, 1943). Asbestos was "known or suspected to cause occupational cancer" in the work environment. (JAMA, 1944)

The American Conference of Governmental Industrial Hygienists (ACGIH) in 1946 published its recommended exposure standard for asbestos. The standard was called a maximum allowable concentration (MAC) and was set at 5 million particles per cubic foot (mppcf) as an 8-hr TWA. (ACGIH TLV, 1946-1991) The ACGIH standard, which is now called the threshold limit value (TLV), has been reduced many times since and is currently at 0.1 f/cc as an 8-hr TWA. This measurement is specific to fibers rather than all dust; however, the technique does not distinguish asbestos from non-asbestos fibers. The ACGIH definition of the TLV is "the time-weighted average concentration for a conventional 8-hour workday and a 40-hour work week, to which it is believed that ***nearly all*** workers may be repeatedly exposed, day after day, without adverse effect." {emphasis added} (ACGIH 2006) Of special note to the user of ACGIH's TLVs, "The values listed in this book are intended for use in the practice of industrial hygiene as guidelines or recommendations to assist in the control of potential workplace health hazards and for no other use. These values are *not* fine lines between safe and dangerous concentrations and *should not* be used by anyone untrained in the discipline of industrial hygiene." (ACGIH, 2009)

According to Stokinger, "There is still one group of substances for which some method should be devised for establishing safe air standards - the industrial cancerigens. … As a suggested method of approach, the following is offered: To the level judged safe for other types of systemic injury add a safety factor for

carcinogenicity. The magnitude of the safety factor is suggested to be from 100 to 500." (Stokinger, 1956).

The adequacy of the ACGIH MAC, which remained at 5 mppcf through 1973, was called into question in the literature in 1964 and 1965. (Marr, 1964) (Schall, 1965) In 1968, two published articles concluded that the MAC was too high. (Leathart, 1963) (Balzer, Environment, 1968) (Balzer, Industrial Hygiene, 1968) Selikoff also comments on the inadequacy of this standard, historically (Selikoff, 1971)

Pre-OSHA, some US states regulated asbestos in the work environment to varying degrees. In some cases, it was simply listed as a potential occupational disease, and in others, a defined threshold limit value assigned [5.0 mppcf] with recommended control practices for achievement in the work environment. (California, 1943) (Wisconsin, 1947) (West Virginia, 1951) (Louisiana, 1952) (Texas, 1957) (New Jersey, 1958) (Pennsylvania, 1969).

In 1971, the US Occupational Safety & Health Agency (OSHA) published its first asbestos regulation. "A 12 f/cc permissible exposure limit (PEL) was included in the initial promulgation on May 29, 1971. … In response to a petition by the Industrial Union Department of the AFL-CIO, OSHA issued an Emergency Temporary Standard on asbestos on December 7, 1971, OSHA, which established a PEL to 5.0 f/cc as an 8-hour time-weighted average (TWA) and peak exposure level of 10.0 f/cc. In June 1972, OSHA promulgated a new final standard that established an 8-hour TWA PEL of 5 f/cc and a ceiling limit of 10 f/cc. These limits were intended primarily to protect employees against asbestosis, and it was hoped that they would provide some incidental degree of protection against asbestos induced forms of cancer. Effective July 1976, OSHA's 8-hour TWA limit was reduced to 2 f/cc and this limit remained in effect up to the effective date of the revised 1986 standards. (OSHA FR, 1994) On June 20, 1986, OSHA reduced the PEL to 0.2 f/cc as an 8-hour TWA and an Action Level of 0.1 f/cc. On September 14, 1988, OSHA established an Excursion Limit of 1.0 f/cc for 30 minutes. Finally, on August 19, 1994, OHSA reduced the PEL again to its present level of 0.1 f/cc as an 8-hour TWA. (Martonik, 2001). Of note, Sawyer mentions the inadequacy of the 1971 and 1976 standards, "[t]hese standards are under critical review. The allowable levels were developed mainly for the prevention of asbestosis, not malignancy, and were based upon a single study limited in both numbers and duration of observations. … There is evidence that exposures estimated to be within the present standard may result in excess cancer deaths" (Sawyer,

1977) "Unfortunately, constraints and demurrers noted in recommendations of standard-setting organisations are often blurred or omitted during their application to occupational problems, and recommended threshold values for asbestos, considered for prevention of asbestosis, become 'threshold values for asbestos,' despite the absence of data which would suggest that neoplasms would also be prevented at such levels. The US Department of Labor standards promulgated in 1972 provide a level of 2 fibres/ml, to be reached after a delay of 4 years." (Selikoff, 1971) "These limits [PEL's and EL's] were intended primarily to protect employees against asbestosis, and it was hoped that they would provide some incidental degree of protection against asbestos induced forms of cancer." Even this current PEL is not considered by OSHA to be fully protective and is still considered "a significant risk." (OSHA FR, 1994)

In 1971, the US Environmental Protection Agency (USEPA) listed asbestos as a hazardous air pollutant. The EPA recognizes the concept of friability relative to the exposure risk associated with in-place asbestos-containing materials (ACMs). The agency's regulations for demolition and renovation require methods to control the release of fibers to the environment when ACMs to be disturbed are friable in-place and when ACMs which are not friable in-place will be rendered friable by the intended disturbance. ACM will release asbestos fibers into the air when it "has deteriorated or sustained physical injury such that the internal structure (cohesion) of the material is inadequate or, if applicable, which has delaminated such that its bond to the substrate (adhesion) is inadequate or which for any other reason lacks fiber cohesion or adhesion qualities. Such damage or deterioration may be illustrated by the separation of ACM into layers; separation of ACM from the substrate; flaking, blistering, or crumbling of the ACM surface; water damage; significant or repeated water stains, scrapes, gouges, mars or other signs of physical injury on the ACM." (USEPA, How to Manage, 1996) {ACBM= asbestos-containing building material}

A regulatory summary is presented by Georgia Tech asbestos training courses. (Georgia Tech, 1995) OSHA regulates all forms of asbestos minerals (chrysotile, amosite, etc.) in the same manner because all types are known to cause disease, and the EPA also regulates all asbestos types in the same way.

## 4.  Airborne Asbestos Hazard

The hazard of workplace dust, including asbestos, has been recognized since the 1930s, and engineering controls, proper exhaust ventilation, and respirator protection were recommended. National Safety

News, August 1933, The Mechanical Control of Occupational Diseases, David S. Beyer, states that "[w]hen the subject of dust is mentioned most of us probably think of visible particles. In fact, much of the dust removal work, even by companies specializing along this line in the past, has been directed at this form of dust. Medical research has shown us, however, that dust that is most dangerous, through its deep inhalation into the lungs, is so small that the individual particles are invisible and can only be seen by the naked eye if they are gathered in a dense cloud, which may have the appearance of a gray fog. … In general, the most reliable way to correct a dust hazard is to install exhaust equipment that will capture the dust at the point where it is generated." (Beyer, 1933)

TRANSACTIONS, 26th National Safety Congress, 1937: What Industrial Dusts Are Harmful? Why? Dr. R.R. Sayers, states that "Dust Control. Engineering and medical control are the two most important factors in combating the industrial dust hazard, and are to a large extent complementary. … Dust may be entrapped at its source by suction devices and thus removed and collected … Generally speaking, the exhaust ventilation method, where applicable, is to be preferred in controlling a dust hazard. … Sometimes a dusty process can be completely enclosed in a sealed room or compartment. … A great deal of attention has been given the subject of individual protection from dust, and there are many types of respiratory protective devices now available. These are generally of two types: those which provide fresh air from an uncontaminated source and those which rely upon a filtering medium for removing dust from the air breathed. Where the use of such a device is indicated, only one of the types approved by the U.S. Bureau of Mines should be used. As a rule, it may be said that masks, respirators, or other such protective device should be used only where exposure to the dust is intermittent and brief, or where some unusual conditions makes a more adequate dust control impracticable." (Sayers, 1937) Bonsib relays "[o]ne common-sense answer is that any atmosphere in which dust is visible to the naked eye is certainly too dusty to be breathed with safety by human beings, and the wise, farsighted, human employer will immediately start to decrease the dust content in any atmosphere when dust is visible. After he has eliminated visible dust, there may still be enough very small invisible dust to cause harm to the health of those who breath it, but in any event if he has exerted sufficient well-directed effort to remove the visible dust it is certain that much of the smaller invisible, and probably most harmful dust has also been removed." (Bonsib, 1937) These general principals of controls for dust hazards in the workplace are noted in other industrial hygiene literature. (Coburn, 1937)

According to Merewether, "The majority of the particles, however, which get into and stay in the lungs are much smaller in each case - up to 5 microns in the case of silica and up to about 50 microns in the case of asbestos. That is to say, that the dust particles which are invisible to the naked eye are the important ones; this leads us to the practical point that if a silica or an asbestos process produces visible dust in the air, then the invisible dust is certainly in dangerous concentrations." (Merewether, 1938)

According to Cook, "In the case of the asbestos dust conditions, our evaluation of the exposure should be based on the knowledge that the present toxic limit for asbestos is five million particles of dust per cubic foot of air. This is a very small concentration, so small in fact that the condition may look good even to the critical eye and still present an exposure greater than this low limit. … In the case of asbestos dust … the toxic limit is so low that the only safe procedure is to have recourse to actual dust determinations. This is especially important where the injurious condition is not immediately evident but requires years to develop as in the case of asbestosis. … In conclusion it may be stated that in the evaluation of occupational disease hazards in the field, much can be done in spotting conditions which are obviously severe on mere observation of the condition. Where the condition presents some question as to the severity of the exposure, then specialized methods should be utilized as a measure of the degree of the hazard. … Where it is found necessary to institute air analyses or similar technical measurements, the Divisions of Industrial Hygiene of most of the industrial states are available to manufacturers for study of their conditions." (Cook, 1942)

TRANSACTIONS, 32nd National Safety Congress, Volume II, 1943, The Control of Fumes in Shipyards, William E. Lawrence, states that "[t]he use of water repellent asbestos insulation has recently replaced some types of material formerly used in ship work. For protection against dust or possible asbestosis from such material, it is recommended that both on ships and in shops, or where the materials is prepared, it be dampened and that dust respirators be worn, also that special ventilation be provided. Periodic medical examination of those exposed to such hazards is also necessary." (Lawrence, 1943) The control of asbestos dust is additionally mentioned by the Industrial Hygiene Foundation - Industrial Hygiene Digest Literature and News. "The control of asbestosis must be an engineering control because there are no medical means to detect the disease until much harm has been done. Engineering control consists of the two important principles: (1) Adequate exhaust, (2) Good housekeeping." (Industrial Hygiene Foundation, 1943)

The 1951 Walsh-Healy Act implemented regulation for the control of workplace hazards, including asbestos dust, for U.S. Government-related projects. In Section H, Environmental Conditions and Personal Services, for gases, vapors, dusts, fumes and mists, details the following requirements: (a) guide for allowable concentrations, including 5.0 mppcf for asbestos dust, (b) control measures, (c) personal protective equipment, (d) respiratory protective devices, (e) and air cleaning equipment. (Walsh-Healey Act, 1951)

The hazards of exposure to asbestos-containing products have been well documented in the scientific literature. By the 1930s, asbestosis had been thoroughly documented in the industrial hygiene literature (Merewether, 1930). In 1955, the link between asbestos exposure and lung cancer had been firmly established in public health and industrial safety literature (Doll, 1955). In 1960, mesothelioma occurrence was discussed in previous studies and observed in individuals exposed to asbestos in relation to the mining industry. (Wagner, 1960) In 1965, the link between asbestos exposure and mesothelioma had been firmly established in public health and industrial safety literature (Newhouse, 1965). This was also conveyed by Hueper in 1965: "Since 1935 and increasing amount of epidemiologic, clinical and pathological evidence, moreover, incriminates this health hazard [asbestos] as one of the environmental sources of cancers of the lung … and more recently also of mesotheliomas of the pleura and the peritoneum." In this same document, "The numerous occupations and products associated with the production and utilization of asbestos provide illustration of the wide scope of the industrial health problem related to this mineral. … Asbestos rock mining, loading, shipping, crushing, milling, asbestos spinning, weaving, mixing, cutting, pressing, molding, plastering, cementing, spraying of steel construction, undercoating of automobiles, insulating pipes, etc., clothes, cloths, sheets, blankets, curtains, brake linings, yarns, cords, ropes, twines, ribbons, artificial snow, filler in rubber goods, plastics and roof coatings, filter cloths, filter pads, filter paper, artificial wood, tiles, shingles, cardboards, wall boards, partitions, panels, paper, clutch facings, clapboard, pipe coverings, pipes, insulation blocks, insulation jackets, gaskets, pump packings, electrical wire insulation, structural heat insulation, facings of acoustical building materials, catalyst supports in sulfuric acid and production, putties." (Hueper, 1965)

According to the EPA, "exposure levels below those allowed for asbestos workers, the risk of asbestosis is negligible.  Some scarring of lung tissue may appear on X-rays after many years of low exposure, but no impairment of respiratory function is likely to occur.  **However**, the incidence of lung cancer and

mesothelioma exceeds baseline rates even at very low exposure levels." (USEPA, 1983) {emphasis added} "Avoiding unnecessary exposure to asbestos is prudent." (USEPA, Guidance for controlling, 1985) "While lowering exposure lowers risk, there is no known level of exposure to asbestos below which health effects do not occur. ... Mesothelioma is a type of fatal cancer of the lining of the chest or abdominal cavity. It can be caused by very low exposures to asbestos. This cancer has occurred among brake mechanics their wives and their children." (USEPA, Auto Mechanics, 1986)

"There are data that show that the lower the exposure, the lower the risk of developing cancer. Excessive cancer risks have been demonstrated at all fiber concentrations studied to date. Evaluation of all available human data provides no evidence for a threshold or for a 'safe' level of asbestos exposure." "This recommended standard of 100,000 fibers >5 μm in length/$m^3$ is intended to (1) protect against the noncarcinogenic effects of asbestos, (2) materially reduce the risk of asbestos-induced cancer (only a ban can assure protection against carcinogenic effects of asbestos) and (3) be measured by techniques that are valid, reproducible, and available to industry and official agencies." (NIOSH, 1976) "Excessive cancer risks have been demonstrated at all fiber concentrations studied to date. Evaluation of all available human data provides no evidence for a threshold or for a 'safe' level of asbestos exposure. ... Studies of duration of exposure suggest that even at very short exposures periods (1 day to 3 months) significant disease can occur" (NIOSH, Workplace Exposure to Asbestos, 1980) In a 1991 joint EPA and National Institute of Occupational Safety and Health (NIOSH) document, "NIOSH contends that there is no safe airborne fiber concentration for asbestos.  NIOSH therefore believes that any detectable concentration of asbestos in the workplace warrants further evaluation and, if necessary, the implementation of measures to reduce exposures." (USEPA, Building Air, 1991) The U.S. Department of Health and Human Service/NIOSH has found that "Mesothelioma has occurred following short term asbestos exposures of only a few weeks, and can result from very low levels of exposure" (NIOSH, Report to Congress on Worker's Home Contamination, 1995).

OSHA's overview of asbestos hazard informs that their "Airborne levels of asbestos are never to exceed legal worker exposure limits. There is no 'safe' level of asbestos exposure for any type of asbestos fiber. Asbestos exposures as short in duration as a few days have caused mesothelioma in humans. Every occupational exposure to asbestos can cause injury of disease; every occupational exposure to asbestos contributes to the risk of getting an asbestos related disease." (OSHA, 2018)

"The Commission has noted that in the scientific literature there is general agreement that there is no known threshold level below which exposure to respirable free-form asbestos would be considered safe." (CPSC - Ban on Consumer Patching Compounds … Containing Respirable Free-Form Asbestos, 16 CFR Ch. 11 § 1304.5, 1977, Ed. Source 42 FR 63362). "The results of numerous measurements indicate that average concentrations of asbestos in ambient outdoor air are within the range of $10^{-8}$– $10^{-4}$ PCM f/mL." (ATSDR, 2001) There is no basis for accepting any workplace or non-occupational exposure to asbestos above ambient background as "safe." The WHO concludes there is no threshold exposure level below which exposure to asbestos dust would be free of hazard to health. (IPCS, WHO, 1998) (WHO, 2006) In a review from Dodson, "[t]he WHO stated that '[T]he human evidence has not demonstrated that there is a threshold exposure level for lung cancer or mesothelioma, below which exposure to asbestos dust would not be free of hazard to health.' The International Programme for Chemical Safety (IPCS) has reiterated this position." (Dodson, 2006)

"Exposures as short as a month may result in disease many years later, because the inhaled dust [asbestos], being mineral, tends to remain in the tissues." (Richmond, 1978) Edge states that "[m]alignant mesothelioma may follow relatively low and sometimes brief exposure to asbestos dust." (Edge, 1978) "Mesothelioma may occur following relatively brief or low-level exposures to asbestos, and most patients lack the histologic features of asbestosis, which is generally associated with heavier exposures to asbestos." Roggli notes from another study that found out of 144 mesothelioma patients, 6% of these patients were exposed to asbestos for less than 3 months. (Roggli, 1995) "A significant excess of mesothelioma was observed for levels of cumulative exposure that were probably far below the limits adopted in most industrial countries during the 1980s." (Iwatsubo, 1998). "There is no evidence of a threshold level below which there is no risk of mesothelioma. Low level exposures more often than not contain peak concentrations which can be very high for short periods of time." (Hillerdal, 1999).

As noted above, OSHA does not consider the current PEL's to be fully protective. "OSHA's risk assessment also showed that reducing exposure to 0.1 f/cc would further reduce, but not eliminate, significant risk." (OSHA FR, 1994) "No safe limit or 'threshold' of exposure is known.  Any exposure to asbestos carries some risk to health, and people exposed to low levels of asbestos for a very brief period have later contracted mesothelioma." (USEPA, 1980) Various cancers, including mesothelioma, are known to be caused by asbestos at very low lifetime doses. (USEPA Risk Assessment, 1986) (OSHA Risk Assessment,

1986) (Iwatsubo, 1998) (Hillerdal, 1999) (Hodgson, 2000) (Rodelsperger, 2001) (Goldberg, 2005) (MSHA, Federal Register, 2008) (Hodgson, 2010) (Lacourt, 2014) (Markowitz, 2015)

According to Agency for Toxic Substances and Disease Registry (ATSDR) in 2001, "[t]he results of numerous measurements indicate that average concentrations of asbestos in ambient outdoor air are within the range of $10^{-8}$ [0.00000001] [to] $10^{-4}$ [0.0001] PCM f/mL; levels in urban areas may be an order of magnitude higher than those in rural areas. … Indoor air concentrations of asbestos ranged from approximately $10^{-5}$ [0.00001] to $10^{-4}$ [0.0001] f/mL in a study of air concentrations measured in a total of 315 U.S. public and commercial facilities."

For comparative purposes of background levels to an occupational exposure level above background, consider an average background $1\times10^{-6}$ [0.000001] f/cc (1 f/m³) as compared to $1\times10^{-1}$ [0.1] f/cc (100,000 f/m³), using an average 20 m³/day of air breathed. Now consider a person breathing this background level (1 f/m³) of asbestos 20 m³ a day for 365 days for 70 years (1 X 20 X 365 X 70 = 511,000 total fibers breathed). Now consider a person breathing a level of (100,000 f/m³) for a one 24-hour period (1000,000 X 20 = 2,000,000 total fibers breathed). This means a person exposed to one 24-hours period to an occupational exposure of 0.1 f/cc will breath in almost four times the amount of asbestos fibers as compared to someone breathing in background levels of asbestos (0.000001 f/cc) for 70 years with no occupational exposure to asbestos.

Again, this report is not meant to be a dose reconstruction. For example and perspective purposes only, using the background lowest and highest (ambient) magnitude exposure range of $1\times10^{-8}$ (0.00000001) to $1\times10^{-4}$ (0.0001) fiber/mL, and a person's lifetime of 70 years, a lifetime exposure dose to ambient asbestos conditions, and no other asbestos exposure, a dose calculation magnitude range can be determined: $1\times10^{-8}$ (0.00000001) fiber/mL X 70 years = $1\times7^{-7}$ (0.0000007) fiber-year/mL; to $1\times10^{-4}$ (0.0001) fiber/mL X 70 years = $1\times7^{-3}$ (0.007) fiber-year/mL. The ATSDR further reports estimates of fiber-year/mL for the general population based on assumed exposure criteria for ambient outdoor air concentrations ($2\times10^{-6}$ PCM fiber/mL) and indoor air concentrations ($3\times10^{-6}$ PCM fiber/mL): 20 m³/day of air breathed, 70 years of exposure, 10% of time outdoors as **0.000014 fiber-year/mL**; and 20 m³/day of air breathed, 70 years of exposure, 90% of time indoors as **0.00019 fiber-year/mL**. (ATSDR, 2001) Combining the 10% outdoor with the 90% indoor lifetime dose yields a total lifetime dose of **0.000204 fiber-year/mL**

(0.000014 fiber-year/mL + 0.00019 fiber-year/mL). (ATSDR, 2001) If we extrapolate further from these ATSDR figures and compare someone exposed to 10 fibers/cc for only one work day and exposed to background levels of asbestos for the rest of their life ((10 f/cc X 8 hrs. X 1 yr.) / 2000 hrs. = 0.04 fiber-year/mL); meaning for one day exposed to 10 f/cc, that person has approximately 196 times the level of fiber-year/mL as compared to someone only exposed to background levels of exposure for 70 years. A study by McDonald states, "In most industrialized countries, the disease [mesothelioma] has increased much more rapidly in males than females, reflecting the impact of occupational asbestos exposure 30-40 yrs earlier. Backward extrapolation of these trends suggests that, before the diverging pattern began, mortality was about 1-2 per million population in both sexes." (McDonald, 1996) According to Hillerdal, "There might exist a background level of mesothelioma occurring in the absence of exposure ot [sic] asbestos, but there is no proof of this and this 'natural level' is probably much lower than the 1-2/million/year which has been often cited." (Hillerdal, 1999) Other authors have used this 1-2 per million estimate in their own reviews as well. (Iwatsubo, 1998) (Neumann, 2001) (Scherbakov, 2001) (Lemen, 2004)

From an industrial hygienist perspective, asbestos exposures above ambient background levels, as reflected in the literature, is to be avoided and any such exposure may contribute to disease in some individuals. The human respiratory system is not selective as to the source (product) of airborne asbestos during inhalation; therefore, if there actually is a lifetime dose-response relationship for some diseases, any asbestos body burden added by significant exposure above ambient contributes to increased risk of disease, regardless of the product types, manufacturers, worksites, or exposure averages. If no safe threshold of exposure exists for some asbestos-related conditions, such as mesothelioma, then the conclusion is the same.

5.   **Asbestos-containing Dust and Resuspension**

"Older occupational studies measured dust exposure in units of million particles per cubic foot (mppcf). This method did not distinguish fibrous from nonfibrous particles and used relatively low magnification, so only the largest particles and fibers were detectable. When a more accurate value is not available, it has been assumed that a concentration of 1 mppcf is equal to 3 PCM f/mL." (ATSDR, 2001) Depending on the percentage of asbestos in the product and the force imparted to it, resultant dust will contain varying

levels of asbestos. If a dust cloud is visible to the unaided eye, then the airborne concentration is well above 5 mppcf. (Dement Deposition, February 1998) Conversely, airborne asbestos concentrations can be very high even if dust is not visible in the air. "Usually the dust concentration must be from 8-10 million particles per cubic foot before its presence is visible in average lighting conditions." (Union Carbide, 1968) According to a review by Dodson et al., the point at which visible dust would have been visible in mppcf ranged from 10 - 40 depending on the work conditions at hand. (Dodson, 2006) Therefore, at a point at which a person would have visibly seen asbestos-containing dust arising from activities with asbestos-containing products (8 – 40 mppcf), one would have potentially been exposed to 24 f/cc to 120 f/cc.

The presence of visible dust released from an asbestos-containing product represents an asbestos exposure that is at least hundreds of times above highest background/ambient exposure levels (background level being 0.0001 f/cc.) "The results of numerous measurements indicate that average concentrations of asbestos in ambient outdoor air are within the range of $10^{-8}$– $10^{-4}$ PCM f/mL; levels in urban areas may be an order of magnitude higher than those in rural areas." (ATSDR, 2001) There is no basis for accepting any workplace or non-occupational exposure to asbestos above ambient background as "safe."

According to the USEPA, "The aerodynamic behavior of fibrous-shaped aerosol particles is governed by the interaction of opposing forces: a driving force such as is caused by gravitational acceleration, and the viscous resistant of the gaseous medium within which the particle moves." Asbestos fibers are very small and possess aerodynamic qualities such that the fibers, once released to the air, may remain suspended for hours, and hence remain in the breathing zone of workers and bystanders. "It is of interest to note that for fibers whose diameter is of the order of $0.1\mu m$, gravitational sedimentation occurs at the rate of only a few centimeters per hour, even though their length may be as much as $100\mu m$." (USEPA, 1978) The fibers may be carried by air currents to great distances from the original point of release. Fibers may eventually settle onto surfaces in the work area (either near or far from the release point, depending on air movement), and can be resuspended into the air when the surfaces onto which they settled are disturbed. This repeatable process can lead to very high airborne asbestos exposures. (USEPA, 1978) "Activities which disturb the debris or dust such as maintenance or custodial tasks are likely to re-entrain the asbestos, and this re-entrainment may cause personal exposure to airborne asbestos." (Millette and

Hays, Settled Asbestos Dust, 1994) There are no regulated limits for asbestos in settled dust. The potential for settled dust to create unacceptable exposures to airborne asbestos, however, is recognized by both the U.S. EPA and the U.S. OSHA in their respective regulations, guidance documents, and interpretations. As an example, "**[d]o not** dust with a brush … **Do not** dry sweep floors … **Do not** use an ordinary vacuum to clean up asbestos debris." (EPA, 1985) Asbestos is considered an inhalation hazard. Asbestos structures which are airborne in the breathing zone can be inhaled. Important exposure sources include the mining and milling of asbestos minerals, manufacture of asbestos-containing products, handling and shipping of those products, installation of ACMs, removal of ACMs, and disturbance of ACMs during operations and maintenance activities. Asbestos fibers and structures in settled dust can become airborne when the dust is disturbed and thereby pose an inhalation hazard. The resulting air concentrations can be significant. One of the most important sources of exposure related to in-place ACMs is disturbance of asbestos-containing settled dust.

The literature is flush with the hazard potential from asbestos dust. (National Safety Council, 1934-1949) (Bonsib, 1937) (Dreessen, 1938) (Fleischer, 1946) (Fischbein, 1949) (Doll, 1955) (Harries, 1968) (Lumley, 1971) (Sawyer, 1977) (USEPA, 1979) (Baldwin, 1982) (Keyes, 1991) (USEPA, Singer, 1992) (Keyes, 1992) (Ewing, 1992) (Ewing, 1993) (Keyes, 1994) (Hatfield, 1997) (Dodson, 2006)

## 6.  Bystander Exposure

"Bystander" is used in this report to mean any people who are in the vicinity of asbestos related work but not actually themselves manipulating the asbestos-containing products. These can be persons of other construction trades, laborers, vendors, delivery people, equipment operators, industrial process operators, managers, casual observers, etc. Exposure to airborne asbestos occurs to workers who repair, remove, or otherwise disturb asbestos-containing materials. Exposure also occurs to workers who clean-up asbestos debris and dust. While all of these activities are in progress, exposure to airborne fibers occurs to other people (bystanders) in the immediate vicinity and in some circumstances to people distant from the activities. People who were not directly involved in the manufacture, use, installation, repair, and removal of asbestos-containing products can be at risk. In the repair, renovation, construction, power production and shipbuilding industries it is very common for multiple trades to be working side by side, or in an overlapping manner. This is referred to loosely as sequencing. For example,

with regard to installation of asbestos-containing products, it would not be uncommon to see pipe fitters working near pipe insulators; it also would not be uncommon for white collar workers to episodically pass through this aforementioned area as a supervisor. In the course of a blue-collar worker's career it would not be uncommon for him/her to be exposed to varying degrees of airborne asbestos fibers, especially during the height of asbestos use, during the 1950's, 1960's, and early 1970's. (ATSDR, 2001) (Harries, 1968)

According to Selikoff et al., "A particular variety of environmental exposure may be of even greater concern. Asbestos exposure in industry will not be limited to the particular craft that utilizes the material. The floating fibers do not respect job classifications. Thus, for example, insulation workers undoubtedly share their exposure with their workmates in other trades; intimate contact with asbestos is possible for electricians, plumbers, sheet-metal workers, steamfitters, laborers, carpenters, boiler makers, and foremen; perhaps even the supervising architect should be included." (Selikoff, 1964). "Asbestosis and asbestos cancer hazards related to an inhalatory exposure to asbestos exists not only for asbestos workers proper engaged in the direct and regular production, processing, handling, and using of asbestos-containing materials, but also for the large number of individuals who may sustain such contacts on an incidental basis. Such persons may be employed permanently or temporarily in or near operations where asbestos and asbestos products are produced or handled and where they inhale, therefore, air polluted with asbestos dust (repairmen, maintenance men, engineers, mechanics, laboratory technicians, office workers, medical personnel, truckers, railroad workers, yardmen, construction workers, shipyard workers, automobile plant and garage employees, etc." (Hueper, 1965) According to Selikoff as it relates to the insulation industry, "Neoplasms have also been reported among individuals indirectly exposed to asbestos insulation work, as carpenters, steam fitters, and other building trade workers." (Selikoff, 1965) Brody reiterated Selikoff's bystander exposure concept in 1966; "The dangers he said, extend to workers in 'contiguous trades,' such as other construction workers and their families." (Brody, 1966) "First impressions of the problem would suggest that only those men continuously working with asbestos are at risk. In the dockyards these men would be the mattress workers, laggers, sailmakers working with asbestos cloth, asbestos sprayers, and strippers, and storeman. Experience has shown, and further consideration of the industry and processes should suggest, that many other men have been at risk." In this same 1968 study, asbestosis was discovered in other job

classifications like electrical fitter, engineer, and welder. Harries "attempted to show that as an industry the Navy uses large amounts of many different products containing asbestos in varied and difficult working conditions.  The work often gives rise to high dust concentrations and many people working near the different processes may be exposed to the hazard. We know that men other than those working directly with asbestos are contracting asbestosis." (Harries, 1968) "Indirect occupational exposure: Much of the evidence concerning disease associated with levels of exposure less than those usually encountered in insulation work is derived from observations of asbestosis and mesothelioma among workers indirectly exposed to asbestos. Such men are found in those trades which do not usually involve working with asbestos materials, but in which work is sometimes required in the same general areas where insulation is being applied or removed. Shipyards, construction sites, refineries and chemical plants, and power sources (both conventional and atomic) are prominent examples. Many mesotheliomas have been reported among current and former employees of shipyards. These individuals had never been asbestos insulation workers; rather, they had worked as painters, steamfitters, electricians, plumbers, carpenters, riggers, truckers, etc." (Selikoff, 1971). "The population at risk includes not only those engaged in the manufacture and use of asbestos products, but also bystanders and others limited to neighborhood or familial exposures." (Sawyer, 1977) Grandjean and Bach state, "Indirect exposure may occur at work when adjacent workers are exposed to hazards originating from fellow workers' activities." (Grandjean, 1986) "While most studies of asbestos and the development of human disease have focused on individuals occupationally exposed, there is an increasing body of evidence that non-occupational exposure, usually called environmental or bystander exposure, can lead to the development of asbestos-related disease." (Dodson, 2006)

The scientific literature reveals significant exposure to bystanders. (MDH, 1963) (Egan, 1970) (Harries, 1971) (Reitze, 1972) (Venable, 1974) (Haas, 1976) (Richmond, 1978) (Fischbein, 1979) (Kilburn, 1985) (Lerman, 1990) (Keyes, 1991) (Lilienfeld, 1991) (Ewing, 1992) (Keyes, 1992) (McKinnery, 1992) (Ewing, 1993) (Keyes, 1994) (Millette, 1995) (Millette, 1996) (Hatfield, 1997) (Hatfield, 1998) (Hatfield, US Gypsum Joint Compound, 1999) (Hatfield, Insulating Cement, 1999) (Hillerdal, 1999) (Gorman, 2004) (Dodson, 2006) (Ewing, 2007) Exposure to bystanders can be as high as to people actually doing the work with ACMs (asbestos-containing materials). (Harries, 1971) (Reitze, 1972) (Keyes, 1992) (Great Britain, 1935)

**7.   Take Home Exposures**

Domestic asbestos exposures and resulting mesothelioma disease was reported in in 1965, "[t]he group of nine, seven women, two men, whose relatives worked with asbestos, are of particular interest. The most usual history was that of the wife who washed her husband's dungarees or work clothes. … There seems little doubt that the risk of mesothelioma may arise from both occupational and domestic exposures to asbestos." (Newhouse, 1965) The New York Times mentions that "Dr. Selikoff noted that the dangers of exposure to asbestos dust were not limited to those who work directly with this ubiquitous insulator and filler material. The dangers, he said, extend to workers in 'contiguous trades,' such as other construction workers and their families." (Brody, 1966) Per discussion, mesothelioma disease is mentioned in people with "no direct contact" with asbestos-related work activities, washing overalls worn during these activities (Harries, 1968) "Personal protection: While asbestos dust may be harmful only when Inhaled, there are sound reasons to consider other appropriate personal protective measures, including special clothing, gloves and foot coverings. Thus, mesothelioma has been reported among individuals resident in the households of asbestos workers ("family cases of mesothelioma"). Employees of cleaning establishments handling asbestos-contaminated clothing have also suffered such disease. Personal protective measures will safeguard family contacts of asbestos insulation workers as well as others possibly subject to similar chance contact. The US Department of Labor's regulations call for special clothing when ceiling levels of 10 fibres/ml are exceeded, these to include whole body clothing, head coverings and foot coverings. Two separate clothes lockers are also required, so isolated "... as to prevent contamination of the employee's street clothes from his work clothes" (Selikoff, 1971). As it pertains to recommendations after asbestos spraying activities, "In order to prevent asbestosis and otherwise comply with good industrial hygiene practices, the following work practices should be immediately set up: … sprayer operators should wear protective clothing which is disposable or which is laundered separately in a manner so as not to prevent spread of breathable asbestos fibers to those persons who handle the contaminated clothing." (Newson, 1972). Regarding insulation removal during a unit "turnaround" in the petroleum industry, "[t]here are a number of items concerning these jobs that I feel deserve comment. Of first concern is the clothing contamination by asbestos dust which is almost unavoidable in this scope of removal operations. Not only are we violating the existing regulations concerning clothing by not providing such clothing and laundering it, but we are also failing to protect our

employees and the families of our employees from asbestos exposure. The matter of protection of contractor's employees is also worthy of consideration by our management" (Venable, 1974) Edge states, "Malignant mesothelioma may follow relatively low and sometimes brief exposure to asbestos dust." (Edge, 1978) "The risk has been documented extensively for certain occupational exposures, and there are reports that asbestos-associated disease also occurs in household contacts of asbestos workers." (Richmond, 1978) Chen states that "[w]e report this case to emphasize the association of malignant mesothelioma with a very limited exposure to asbestos." (Chen, 1978) In 1979, Anderson comments on a previous study from 1976 stating that "[a] source of home contamination in individual exposure was postulated as resulting from dust adhering to shoes, hair, and work clothes brought home for laundering. Change rooms and company laundered coveralls were not available at this plant." This 1979 study also notes that "[t]he observation that nearly one-half of the wives examined had abnormal x-rays is consistent with the hypothesis that the wives would have been most heavily exposed because they were responsible for the laundering of work clothes and resided in the household for the longest period of time." (Anderson, 1979) When speaking to the "inadequacy" of the 1976 PEL standard of 2 f/cc over an 8-hour TWA, NIOSH mentions "[r]egardless of the choice of a permissible exposure limit, the best engineering controls and work practices should be instituted, and protective clothing and hygiene facilities should be provided and their use required of all workers exposed to asbestos" (NIOSH, 1980). Grandjean and Bach state, "Indirect exposure of household members may occur when hazardous substances are carried home (e.g., in the clothing)." (Grandjean, 1986) "Families have also been exposed to asbestos when workers were engaged in mining, shipbuilding, insulating (e.g., pipe laggers and railway workers), maintenance and repair of boilers and vehicles, and asbestos removal operations." (NIOSH, 1995) "The fibre concentration in domestic exposure might be as high as in occupational exposure. Brushing clothes might give peaks of ≥100 fibres/ml. Ordinary vacuum cleaning is not effective in removing asbestos fibres, which can remain for years in the house and be airborne again whenever disturbed. Thus, domestic exposure is not low exposure." (Hillerdal, 1999) According to ATSDR, "You can bring asbestos home in the dust on your hands or clothes if you work in the mining or processing of minerals that contain asbestos, in asbestos removal, or in buildings with damaged or deteriorating asbestos." (ATSDR, 2001) According to Goldberg, "Concern used to be focused on the occupational environment, but it is now recognized that asbestos fibers are widely distributed in the general environment. Persons can be exposed to asbestos in different non-occupational circumstances: living

with asbestos workers, with regular exposure to soiled work clothes brought home; environmental exposure in the neighborhood of industrial sources (asbestos mines and mills, asbestos processing plants); passive exposure in buildings containing asbestos." (Goldberg, 2005) According to the U.S. Department of Health and Human Services, "In the past, families of asbestos workers potentially were exposed to high fiber levels from contaminated clothing brought home for laundering. People living in households with asbestos workers were found to have significantly elevated lung burdens of asbestos, often in the same range as found in individuals occupationally exposed to asbestos, such as shipyard workers." (USDHHS, 2011)

Regarding the resuspension of asbestos dust, the movement of a worker in a small unventilated room while wearing a laboratory coat contaminated with Marinite dust resulted in airborne asbestos concentrations ranging from 3.3 to 24.0 fibres/cm$^3$ (n=3). (Carter, 1970) According to Sawyer in 1977, the laundering of asbestos-contaminated clothing used during asbestos removal work activities in which various levels of dust control measures were utilized, produced a personal asbestos airborne level mean of 0.4 f/cc (n=12), with the highest level recorded as 1.2 f/cc. Stationary monitoring during picking up clothing, loading washer, and loading the dryer produced averages of 0.4 f/cc (n=4), 0.4 f/cc (n=5), and 0.0 (n=6), respectively. Sawyer further comments "[t]he laundry operation was closely monitored as an analog of domiciliary exposure. The data presented show consistently low counts, and suggest that exposure occurs as dry clothing is handled prior to washing. … If this quantitation of exposure is truly representative, then domiciliary malignancies may be the result of low-level exposure." (Sawyer, 1977)

In a 1999 study airborne asbestos exposure from asbestos-contaminated clothing was described. "One set of asbestos containing Kaylo pipe covering was used for contaminating the clothing." Another set of clothing was placed 2 feet from the work area. The section of Kaylo pipe was "cut and broken to create dust and debris" within a period of 10 minutes. Some of the dust and debris was observed to have landed on the clothing and the worker also wiped their hands on the clothing. Afterwards, the study area was decontaminated before the clothing handling and shaking activity. "The study of secondary exposure from work clothes consisted of shaking and brushing off each of the four items of clothing (2 shirts, 2 pants). The shaking and brushing of each item lasted approximately one minute. After each item was shaken, it was placed inside a washing machine." This activity altogether lasted 8 minutes. Personal airborne levels of exposure to asbestos were reported as 7.10 f/cc, 9.91 f/cc, 9.31 f/cc, and 8.57 f/cc;

Area airborne levels of exposure to asbestos were reported as 9.11 f/cc and 2.06 f/cc. The level of contamination on clothing was reported to be 204 thousand structures/cm$^2$ and 1.0 million structures/cm$^2$. (Longo II, 1999) A similar study was conducted in which a piece of Unibestos pipe covering was "cut and broken." Each shakeout of each article of clothing lasted 1 minute, and the whole process took 7 minutes. Also, airborne measurements were collected during the clothing contamination period. Personal airborne levels of exposure to asbestos while contaminating work clothes were reported as 161.32 f/cc and 134.79 f/cc; Area airborne levels of exposure to asbestos while contaminating work clothes were reported as 7.34 f/cc and 23.78 f/cc. Personal airborne levels of exposure to asbestos while shaking out contaminated work clothing were reported as 10.16 f/cc, 9.07 f/cc, 5.74 f/cc, and 6.90 f/cc; Area airborne levels of exposure to asbestos were reported as <0.01 f/cc and 3.27 f/cc. The level of contamination on clothing was reported to be 289 thousand structures/cm$^2$ and 347 thousand structures/cm$^2$. (Longo III, 1999)

In 2000, asbestos exposure was measured while "hand brushing the dust off a shirt and pants" after an electric wire brush gasket removal activity. This hand brushing activity lasted approximately 35 seconds. During this brushing off activity, personal exposure levels ranged from 3.0 to 4.3 fibers/cc (n=4), while areas samples ranged from 0.02 to 0.15 f/cc (n=4). (Hatfield, 2000)

In 2015, a study looked at the "potential for para-occupational, domestic, or take-home exposure from asbestos-contaminated work clothing." Clothing was fitted onto dummies, put into a chamber, and exposed for 6.5 hours to airborne concentrations of 11.4 f/cc (PCME). This clothing was then collected and subjected to shaking activities. Grade 7T asbestos fibers were "aerosolized in the chamber using a dust generation system … with fans running to assist in airborne mixing." Mean 5-minute and 15-minute concentrations (PCME) during active clothes handling and shake-out were 3.15 f/cc (1.24 – 6.24 f/cc, n=3) and 2.94 f/cc (1.17 – 5.05 f/cc; n=3), respectively. Airborne asbestos levels decreased post shaking activities, 15 minutes later, by 55%. Of note, neither the clothing fabric type nor its age "appeared to have a significant effect on the overall airborne chrysotile concentrations generated during clothes handling." (Sahmel, 2015) Of note, Grade 7 chrysotile asbestos is described as "a short (3 μm) fiber." (ATSDR, 2001)

These studies do not address other exposure concepts such as, asbestos dust accumulation over time,

and re-entrainment of asbestos dust from surfaces (e.g., potential cleanup of dust, other household surface disturbances), asbestos cross-contamination to other portions of a home (and subsequent exposures) or other clothing, and other human to human contact beyond laundering activities (e.g., hugs, transfer of dust to carpet or furniture), but rather focus on the exposure during and directly after laundering activities.

This theme of household or familial asbestos exposure from asbestos contaminated work clothes is described in several other instances. (Kober, 1924) (Gafafer, 1943) (Walsh-Healey, 1951) (Selikoff, 1965) (Kiviluoto, 1965) (OSHA, 1972) (Navratil, 1972) (Hinkle, 1973) (Anderson, 1976) (Haas, 1976) (Anderson, 1979) (Huncharek, 1989) (Lerman, 1990) (USEPA, 1990) (USDHH, 1995) (Bianchi, 2001) (Revell, 2002) (Dodson, 2006) (Dodson, 2012) (Ewing, 2007) (Ferrante, 2007) (D'Agostin, 2017)

## 8.  Fiber Type and Fiber Size

*Fiber Type*

According to Hueper, "Since, of the different types of asbestos, chrysotile represents approximately 95 per cent of the total asbestos produced, contact with this type of asbestos furnishes the chief cause of asbestos pneumoconiosis and cancer in most countries, and especially in the U.S.A. which mainly produces, imports, processes and used chrysotile. Contact with other types of asbestos, particularly amosite and crocidolite, is of comparatively minor and regional importance for occupational reasons. … The exposure data to be give apply, therefore, mainly, to chrysotile, although according to Lanza, all three types elicit the same kinds of biologic reactions. (Hueper, 1965) ATSDR states, "All forms of asbestos are hazardous, and all can cause cancer, but amphibole forms of asbestos are considered to be **somewhat** more hazardous to health than chrysotile."[1] {emphasis added} (ATSDR, 2001) Some experts contend that fiber type and length are extremely important with regard to potential exposure risk. In discussions about fiber type, OSHA states, "After a comprehensive review of the evidence submitted concerning the validity of the 1984 risk assessment, OSHA has determined that it will continue to rely on the earlier analysis. The Agency believes that the studies used to derive risk estimates remain valid and reliable, and that OSHA's decision to not separate fiber types for purposes of risk analysis is neither scientifically nor regulatorily incorrect. There are at least three reasons for OSHA's decision not to separate fiber types.

"A.     First, OSHA believes that the evidence in the record supports similar potency for chrysotile and amphiboles with regard to lung cancer and asbestosis. The evidence submitted in support of the claim that chrysotile asbestos is less toxic than other asbestos fiber types is related primarily to mesothelioma. This evidence is unpersuasive, and it provides an insufficient basis upon which to regulate that fiber type less stringently.

"B.     Second, as stated in the 1986 asbestos standard, even if OSHA were to accept the premise (which it does not), that chrysotile may present a lower cancer risk than other asbestos fiber types, occupational exposure to chrysotile asbestos still presents a significant risk of disease at the revised PEL (See 51 FR 22649, 22652). In particular, asbestosis, the disabling and often fatal fibrosis of the deep portions of the lung, is caused by exposure to all types of asbestos. The evidence on this is strong and no new information has been presented to contradict this. As stated above, OSHA estimated asbestosis risks at 0.2 f/cc exposures as an unacceptably high 5 cases per 1000 workers. Thus, asbestosis risks alone justify the regulation for chrysotile.

"C.     Third, the record shows that employees are likely to be exposed to mixed fiber types at most construction and shipyard industry worksites most of the time. Assigning a higher PEL to chrysotile would present the Agency and employers with analytical difficulties in separately monitoring exposures to different fiber types. Thus, regulating different fiber types at differing levels, would require more monitoring all the time and would produce limited benefits (51 FR 22682)." (OSHA, 1994)

As of 2018, OSHA reports that all asbestos fiber types can cause asbestos related disease. (OSHA, 2018) In a letter from the WHO, it is clearly stated that "all types of asbestos cause asbestosis, mesothelioma, and lung cancer." (WHO, 2006). A scientific Panel appointed by the World Trade Organization found that "on the basis of scientific evidence that 'no minimum threshold of level of exposure or duration of exposure has been identified with regard to the risk of pathologies associated with chrysotile, except for asbestosis.' The pathologies which the Panels identified as being associated with chrysotile are of very serious nature, namely lung cancer and mesothelioma." (WTO, 2001) According to Dr. Richard Lemen, "We are at a point in the history of asbestos usage where chrysotile is the predominant type asbestos produced and consumed in the world today; it constituted about 98.5% of US consumption in 1992. … A review of 92 consecutive cases of mesothelioma found that even while only 28.3% of the asbestos fiber

type in the lung was chrysotile, it was the major fiber type identified in the mesothelial tissue itself. These findings further suggest that lung burden analysis for determining fiber type in mesothelioma etiology may not be appropriate and that determining predominate fiber type in the mesothelial tissue is the more rational determinant." (Lemen, 2001) Nicholson concludes, "From studies in the United States and Great Britain, chrysotile has been shown to increase the risk of lung cancer and to produce mesothelioma in exposed workers." (Nicholson, 2001) Other literature express this notion. (Stayner, 1996) (Smith, 1996) (Landrigan, 1999) (Tossavainen, 1999) (Kashansky, 2001) (Shcherbakov, 2001) (Everatt, 2007) (Loomis, 2009) (IARC, 2009) (Beddington, 2011) (Kanarek, 2011) (Markowitz, 2015)

*Fiber Size*

According to Dodson and his research, the regulated fiber size (≥ 5μm) "selection criteria were based on 'practicality and theoretical considerations' rather than having a target of a 'more toxic' population of fibers." (Dodson, 2006) Marr mentions that "researchers also considered fibers greater than 10 microns the most harmful. This is not in agreement with recent studies in South Africa where authorities consider fibers less than 5 microns the most harmful." (Marr, 1964). According to Sawyer and his research, the "counting of only those fibers 5μm or longer is inappropriate. Airborne fiber sizes range from hundreds of microns to fibrils of submicron dimensions, and the size distribution of asbestos particles in human tissues studied by electron microscopy is in most part less than 5 μm." (Sawyer, 1977) "It is obvious that most fibres are too small to be seen by optical microscopy. The Asbestos Standard adopted by the Occupational Safety and Health Administration (OSHA) of the US Department of Labour is limited to optical microscopy and neglects to count or control fibres less than 5 μm long. On the other hand, accumulating evidence suggests that such small asbestos fibres may produce disease." (Rohl, 1977). According to NIOSH/OSHA, "[i]n recommending the primary use of light microscopy, the committee also wants to stress the inability of this method to detect short asbestos fibers to which workers are exposed. The toxicity of asbestos fibers shorter than the 5-micrometer detection limit of light microscopy cannot be dismissed on the basis of current scientific information." (NIOSH, 1980) In a 2001 study, researchers conducted fiber burden analysis in a series of individuals with mesothelioma who were 50 yr or less of age at time of diagnosis. They concluded that "[s]horter fibres were more abundant than longer fibres, and high concentrations of all fibre lengths tended to occur together." (McDonald, 2001) "The data presented argue that asbestos fibers od all lengths induce pathological responses and that caution should

be exerted when attempting to exclude any population of inhaled fibers, based on their length, from being contributors to the potential for development of asbestos -related diseases." (Dodson, 2003) Dodson additionally mentions that "inhaled asbestos fibers cause asbestos-related disease and most frequently consist of a mixture of asbestos types and sizes." (Dodson, 2006) "We concluded that such short, thin asbestos fibers should not be excluded from those contributing to the induction of human malignant mesothelioma. The present study supports that chrysotile asbestos can induce human malignant mesothelioma, since, in some of the mesothelioma cases, asbestos fibers detected in both the lung and mesothelial tissues, or lung tissue alone or mesothelial tissues alone were exclusively chrysotile fibers." (Suzuki, 2001) Additionally, the majority of the fibers in the lung and the mesothelial tumor tissue were less than 5µm in length. (Suzuki, 2002) Suzuki later states "that contrary to the Stanton hypothesis, short, thin, asbestos fibers appear to contribute to the causation of human malignant mesothelioma." (Suzuki, 2005) Dodson states that "[t]he fact that short fibers (< 5µm) have been shown to produce toxic effects in macrophages in vitro and to be fibrogenic tumorigenic in animals in vitro, and that they reach the site of mesothelioma development support the inappropriateness of discounting their role in asbestos-related disease as has been done." (Dodson, 2006) In 1980, NIOSH-OSHA commented that, "Chrysotile is as likely as crocidolite and other amphiboles to induce mesotheliomas after intrapleural injections, and also as likely to induce lung neoplasms after inhalation exposures. Human occupational exposures to all commercial asbestos fiber types, both individually and in various combinations, have been associated with high rates of asbestosis, lung cancer, and mesothelioma." (NIOSH-OSHA, 1980)

### 9. Asbestos-containing Friction Products

"Asbestos has-been used in brake linings and other friction products since the turn of the century, when metals, leather, and wood no longer were adequate. … The predominant type of asbestos used in brake linings is chrysotile, a hydrated magnesium silicate. … Passenger car and light truck drum brake linings, called segments, usually contain from 30 to 70 percent by weight of asbestos." (ASME, 1987) "The composition of automotive brake linings includes chrysotile asbestos fibre which comprises about 50% of the friction material." (Rohl, 1977) "Brake linings pose a potential hazard for asbestos exposure because they contain 33-73% asbestos." (Lorimer, 1976) "Commercial friction materials used in the United States for braking passenger cars and trucks contain an average composition of 50 percent chrysotile by weight." (Castleman, 1975) "Brake lining materials contain 40-60 per cent of asbestos." (Hickish, 1970)

"Asbestos fiber composition ranges from 40 to 60 percent of the final product by weight." (Anderson, 1982)

"Asbestos-based disc brake pads, like drum brake linings, are molded products containing asbestos fiber, fillers, additives, and resins. ... Currently, asbestos only comprises 15 percent of the OEM for disc brake pads; the balance of 85% is held by semi-metallics." (ICF, XIX. Disc Brake Pads (Light-Medium Vehicles), 1989) {OEM=original equipment market} "Although non-asbestos semi-metallic pads have nearly always been used for disc brakes for heavy vehicles in small proportions (Allied Automotive 1986, Carlisle 1986), in the past, asbestos-based pads were used to a greater extent. Asbestos disc brakes for heavy vehicles are now apparently only used to replace worn asbestos pads in the aftermarket (ICF 1986a, ICF 1985, Allied Automotive 1986, Carlisle 1986)." (ICF, XX. Disc Brake Pads (Heavy Vehicles), 1989) "Brake blocks are brake linings used on the drum brakes of heavy vehicles -- heavy trucks, buses, and heavy off-road vehicles. ... The heavy-vehicle drum brake consists of two curved metal "shoes" to which brake blocks are attached. ... Asbestos-based brake blocks contain approximately 1.16 lbs. of asbestos fiber per block on average (ICF l986a)." (ICF, XXI. Brake Blocks, 1989) "Clutch facings are friction materials attached to both sides of the steel disc in the clutch mechanism of manual-transmission vehicles. Two metal pressure plates flanking the disc are pressed against the clutch facings by springs when the clutch is engaged.  This pressure keeps the gears of the vehicle in position by means of a metal component that extends between the disc and the gears. ... Asbestos–based molded clutch facings currently produced contain approximately 0.26 lbs. of asbestos fiber per piece." (ICF, XXII. Clutch Facings, 1989)

"Asbestosis and asbestos cancer hazards related to an inhalatory exposure to asbestos exists not only for asbestos workers proper engaged in the direct and regular production, processing, handling, and using of asbestos-containing materials, but also for the large number of individuals who may sustain such contacts on an incidental basis. Such persons may be employed permanently or temporarily in or near operations where asbestos and asbestos products are produced or handled and where they inhale, therefore, air polluted with asbestos dust (repairmen, maintenance men, engineers, mechanics, laboratory technicians, office workers, medical personnel, truckers, railroad workers, yardmen, construction workers, shipyard workers, automobile plant and garage employees, etc." (Hueper, 1965)

According to a 1972 industrial hygiene study conducted by NIOSH, levels of asbestos exposure were measured during brake repair and maintenance. Personal samples collected while "Blowing-Off" front and back brake drums ranged from 0.8 f/cc to 3.0 f/cc (n=4), with a "General Air" level reported as 0.6 f/cc. Personal samples collected during "Re-Assembly" were 0.2 f/cc and 0.2 f/cc, with a "General Air" level reported as 0.9 f/cc. (NIOSH, USPHS, 1972) Regarding brake repair and maintenance activities, Roberts concludes in 1982, "[s]ince there is no known safe asbestos fiber exposure level, and clinical evidence from a study of union vehicular maintenance workers reports that over 25% had evidence of x-ray abnormalities consistent with asbestosis, the prudent conclusion is that a potential health hazard exists during the performance of brake maintenance operations. Therefore, appropriate control measures for reducing fiber exposures, especially during brake assembly cleaning, should be instituted at brake maintenance facilities." (Roberts, 1982)

According to Rohl, "Investigators in the past have expressed doubt as to whether chrysotile fibres can survive the high temperatures generated during braking (Lynch 1968, Hickish & Knight 1970, Hatch 1970). Chrysotile is alleged to be subjected to temperatures in excess of 800°C, which would cause its thermal transformation to forsterite or to an amorphous magnesium silicate phase. While 'hot spots' up to 1000°C may be attained (Carroll 1962), the heat distribution is nonuniform, and other processes, in addition to thermal wear, contribute to degradation of brake linings. For example, abrasion and macroshear may also cause physical breakdown (Burwell 1957, Mizutani et al. 1973). Accordingly, brake lining disintegration by these mechanisms may liberate partially altered or even unaltered chrysotile fibres." (Rolh, 1977) A review by Lemen, discusses the deposition of asbestos fibers in brakes, and states, "The US Public Health Service reported a study by Lynch [1968] of decomposition products from brake linings. It found that a small fraction of asbestos fibers survived intact after normal brake use. While this study indicated a small fraction of actual asbestos fiber is released during normal wear into the urban atmosphere, it did not address the actual release of asbestos fiber during servicing and repair of the actual brakes [Lynch, 1968]." Lemen continues, "The chemical composition of asbestos materials is changed by the high heat generated during the braking process. Asbestos can begin to change at temperatures around 600°C into its decomposition product, due to a loss of water, into a form of iron magnesium silicate material, the end form which is known as forsterite, a non-fibrous material. During this decomposition of asbestos into forsterite not all fibers are changed and some remain as true

asbestos fibers capable of causing disease." "Studies conducted by General Motors' researchers of brake wear debris demonstrate that 90,000 asbestos fibers per ng remain in that dust [Williams and Muhlbaier, 1980]. Fibers less than 5 μm in length outnumber fibers greater than 5 μm in length by a ratio of 300:1. This translates to approximately 300 billion asbestos fibers greater than 5 mm per g of wear debris and 90 trillion asbestos fibers less than 5 μm." (Lemen, 2004).

According to a 1986 EPA document, "Millions of asbestos fibers can be released during brake pad and clutch servicing. … Asbestos released into the air lingers around a garage long after a brake job is done and can be breathed in by everyone inside a garage, including customers." (USEPA, 1986) Concerning a report on the "International Conference on Health Hazards of Asbestos," "a total of 33 formal papers on the harmful effects of asbestos exposure were represented by medical and physical scientist from all over the world. … It is clearly evident that asbestos exposure is harmful not only to asbestos workers themselves but its effects also extend to their family members. … Any exposure to asbestos is considered dangerous." (Rhee, 1978) Concerns about exposure to asbestos-containing dust from automotive maintenance and repair work can be found in the other literature. (Huncharek, 1989) "Asbestos is found in motor vehicle brake materials throughout industry. Recognition of asbestos carcinogenic properties has currently resulted in substitution of less toxic fibers for some brake materials. However, asbestos is still used in a large number of brakes." (Sheehy, 1987) According to a 1987 study discussing the feasibility of asbestos in automobiles and trucks, authored by the American Society of Mechanical Engineers for the EPA, "Suitable non-asbestos materials are not available for all of these applications, and industry-wide substitution of non-asbestos materials in all existing brake designs would require considerable development. It is unrealistic to assume that all automakers will redesign all passenger car and truck braking systems around disc brakes in order to utilize semimetallic materials. … Adequate non-asbestos friction material formulations presently are not available for all vehicle systems. However, at the present rate of technical progress, most new passenger cars could be equipped with totally non-asbestos frictional systems by 1991, and most light trucks and heavy trucks with S-cam brakes, by 1992." (ASME, 1987)

In a review by Lemen, it was reported that "chrysotile asbestos was found in all dust samples taken from car brake drums, with 2-15% in each sample in both fiber and fibril forms, with average concentrations from blowing the dust of 16 fibers/ml of air" with measurable concentrations found 75 feet away. In

Lemen's review, it is noted that "fiber concentrations of 3.8 fibers/ml among New York brake repair workers" were found. Furthermore, "[g]rinding of the linings produced the most asbestos fiber release, some as high as 125 fibers/cm$^3$." Lemen concludes, "A review of the published peer reviewed literature reveals at least 165 cases of mesothelioma in end-product users [mechanics] of friction products … and that the results of the exposure studies, experimental studies, case reports, and findings from the equivocal epidemiological studies by no means exonerate the brake mechanic from being susceptible to a causal relationship between asbestos exposure and mesothelioma." (Lemen, 2004)

In a Millette study dealing with asbestos-containing brake shoes and brake disc pads manufactured by Ford, during the sanding of brake shoes, asbestos fiber levels were 2.2 fibers/cc (PCM), 54.0 structures per cubic centimeter (s/cc) (> 5μm, TEM); during the sweeping of dust and debris; asbestos fiber levels were 1.7 fibers/cc (PCM), 12.0 s/cc (> 5μm, TEM); during filing of grooves, asbestos fiber levels were 0.3 fibers/cc (PCM), 6.7 s/cc (> 5μm, TEM);  during the making of grooves in the disc pad for two minutes with a power grinder, asbestos fiber levels were 8.5 fibers/cc (PCM), 231.0 s/cc (> 5μm, TEM). Millette further concludes, "Sanding an asbestos-containing brake shoe friction product with a coarse sandpaper released high levels of asbestos fibers in the breathing zone of the sander. Sweeping the asbestos-containing dust and debris following sanding can release significant levels of asbestos fibers into the air (over 1 f/cc). Filing grooves into a brake disc pad also releases asbestos fibers into the air in the vicinity of the filer, but at a lower level than sanding. Using a power muffler grinder to cut the grooves in an asbestos-containing brake disc pad causes high levels of asbestos to be released." (Millette, 1996) Rohl states, "The composition of automotive brake linings includes chrysotile asbestos fibre which comprises about 50% of the friction material." In this paper, exposure ranges and means, reported in f/ml (PCM), from friction products during automotive brake repair include blowing dust from brake drums at a distance from 1 – 1.5 meters (m), in which the range was 6.6 to 24.9 f/ml with an average of 15.0 f/ml (n=4); at a distance from 1.5 – 3 m, in which the range was 2.0 to 4.2 f/ml, with an average of 3.3 f/ml (n=3); and at a distance from 3 – 6 m, in which the range was 0.3 to 4.8 f/ml with an average of 1.6 f/ml (n=2). Background samples collected 5 minutes after air jet blowing at a distance of 3.6 – 16 m, revealed a range from 0.1 f/ml to 0.2 f/ml with an average of 0.2 f/ml (n=2). Background samples collected 7-14 minutes after "air jet blowing" at a distance of 19.6 – 22.6 m, revealed an average of 0.1 f/ml (n=2). During truck brake repair, "renewing used linings by grinding" at a distance of 1 – 1.5 m, revealed a range

of 1.7 to 7.0 f/ml with an average of 4.8 f/ml (n=10). Background samples taken during grinding used linings at a distance of 3.3 m, the range was 1.2 to 1.7 f/ml with an average of 1.5 f/ml (n=2); at a distance of 8.3 m, the range was 0.6 to 1.0 f/ml with an average of 0.8 f/ml (n=2); and at a distance of 20 m, the level was 0.2 f/ml. Samples collected during "bevelling new linings" revealed a range from 23.7 to 72.0 f/ml, with an average of 37.3 f/ml (n=4). At a distance 2.4 m away from "bevelling new linings", a level of 0.6 f/ml is reported; at a distance of 3.4 m away, a range from 0.3 – 0.5 f/ml and an average of 0.4 (n=2) is reported; and at a distance of 9.1 m away, a level of 0.3 f/ml is reported. (Rohl, 1977)

In a review to the EPA titled "Asbestos Dust Control in Brake Maintenance," exposure levels, reported in f/cc (PCM), from working with asbestos-containing brake products are reported. The use of a compressed air gun for several studies resulted in a range of 0.14 to 2.69 f/cc with a TWA of 0.03 f/cc and an average peak level of 0.71 f/cc; a range of 0.91 to 15.0 f/cc with a TWA of 0.13 f/cc and an average peak level of 4.87 f/cc; a range of 6.6 to 29.8 f/cc with an average peak level of 16.00 f/cc; a level of 0.85 f/cc; a level of 0.33 f/cc with a TWA of 0.4 f/cc; and a range of 0.6 to 3.00 f/cc with an average peak level of 1.43 f/cc. The use of a dry brush or rag for two studies resulted in a range of 0.61 to 0.81 f/cc with a TWA of 0.19 f/cc and an average peak level of 0.70 f/cc; and a range of 1.3 to 3.6 f/cc with an average peak level of 2.5 f/cc. The use of a damp brush or rag resulted in a range of 0.67 to 2.62 f/cc with a TWA of 0.25 f/cc and an average peak level of 1.4 f/cc. The use of brake cleaner/compressed air resulted in a range of 0.25 to 0.68 f/cc with a TWA of 0.07 f/cc and an average peak level of 0.41 f/cc. (PEI Associates, 1985)

In another study, compressed air blown onto a wheel and brake assembly reported area levels at 3.17 and 2.48 f/cc (PCM), 5.39 and 11.75 (FIBERS> 5μm/cc, TEM), respectively. Personal samples ranged from 4.13 to 16.52 f/cc (PCM) (n=4) and <8.32 to 33.71 (FIBERS> 5μm/cc, TEM) (n=4), respectively. (Longo, 1998) In another similar report produced by Hatfield and Longo, they "conducted a study to determine exposures to airborne asbestos fibers generated while performing compressed air blowout on a brake assembly that contained non asbestos brake shoes, but contained residual asbestos contaminated brake dust from the previous shoe friction material." During the "1st Wheel Blowout" area samples ranged from 0.04 to 0.09 f/cc (PCM) (n=4), 1.32 to 3.98 (FIBERS> 5μm/cc, TEM) (n=4); while personal samples ranged from 0.52 to 1.03 f/cc (PCM) (n=4), 6.71 to 6.77 (FIBERS> 5μm/cc, TEM) (n=4). During the "2nd Wheel Blowout," area samples ranged from 0.07 to 0.11 f/cc with one sample overloaded (PCM) (n=4) and "None Detect" to 7.83 f/cc (FIBERS> 5μm/cc, TEM) (n=4); personal samples ranged from 0.56 to 1.72 f/cc

(PCM) (n=4) and 6.77 to 40.63 (FIBERS> 5µm/cc, TEM) (n=4). Thirty minutes after compressed air use, area samples ranged from 0.01 to 0.03 f/cc with one sample overloaded (PCM) (n=4) and 0.19 to 0.96 (FIBERS> 5µm/cc, TEM) (n=4). They concluded that "[d]uring this process, significant amounts of asbestos fibers are released into the air." (Hatfield, 2001)

According to Kakooei, asbestos fiber concentrations were evaluated "in the breathing zone of auto mechanics between July 2008 and December 2008." 60 breathing zone air samples were collected during car and truck brake maintenance and replacement activities in 30 brake repair and replacement auto shops (cars and trucks). "The main processes carried out during brake repair and replacement are remove wheel and drum, clean and remove brake parts and install brakes and drum. In the brake repair processes, accumulated brake dust must be cleaned away before the old pads and linings removed. … This is often done with a small brush under inadequate engineering controls such as local exhaust ventilation hoods. … If the old brake lining is still thick enough to be effective, the automotive mechanic may use a bench grinder to restore the surface, or deglaze the linings of oil and dirt." "The geometric means of the personal monitoring fiber concentrations were 0.92 PCM f/ml [range of 0.116-2.48 f/cc; n=32] and 0.46 PCM f/ml [range of 0.117-1.93 f/cc; n=28] respectively in car and passenger heavy truck auto shops. … The results of the current study indicate that repair asbestos containing brake pads and linings on cars and trucks has produced significant airborne asbestos." (Kakooei, 2011) A Korean study/review of asbestos hazards in many industries noted airborne asbestos exposure associated with "Repair of auto-vehicle brake lining" that ranged from 0.01 to 7.28 f/ml (n=63). (Choi, 2016)

In a study by Lorimer, the blowing out of brake drum dust from automobile brake assemblies resulted in asbestos airborne concentrations in the breathing zone ranging from 6.6 to 29.4 fibers/cc (n=4) at a distance of 3-5 feet, 2.0 to 4.2 fibers/cc (n=3) at a distance of 5-10 feet, and 0.4 to 4.8 fibers/cc (n=2) at a distance of 10-20 feet; "Background Sample" collected at varying distances (10-75 feet) and at different times post brake dust blowout (0-14 minutes) ranged from 0.1 to 0.8 fibers/cc. Garage brake lining maintenance work for trucks, including the renewal of used linings by grinding resulted in asbestos airborne concentrations in the breathing zone ranging from 1.7 to 7.0 fibers/cc (n=10); "background samples" ranged from 0.2 to 1.7 fibers/cc (n=5) with distances ranging from 10-60 feet. The beveling of new linings from trucks resulted in asbestos airborne concentrations in the breathing zone ranging from

23.7 to 72.0 fibers/cc (n=5); "background samples" at distances from 8-30 feet ranged from 0.3 to 0.6 fibers/cc (n=4). TEM analysis confirmed the presence of asbestos in airborne samples. (Lorimer, 1976)

According to meeting minutes for the Asbestos Study Committee, exposure to asbestos is mentioned as it relates to brake maintenance activities, "In many drilling and grinding operations without dust collectors, Committee members indicated that the 10 f/cc ceiling concentration has been exceeded … [regarding recent asbestos exposure survey] indicated that during radius grinding and drilling of brake linings that the airborne concentrations of asbestos fibers was in excess of the 10 fibers/cc ceiling value. … It is the view of most Members of the Committee that the fibers/cc (TWA) is exceeded in many areas such as inspection, drilling, and grinding where there is no adequate dust collection machinery. This could happen in garages where subsequent drilling and grinding is often required and where there is no adequate dust collection equipment." (ASC, 1973)

The US EPA states that "[w]hen grinding is done to renew used brake block linings, concentrations of up to seven million asbestos fibers per cubic meter can be released. Beveling new linings can release concentrations of up to 72 million fibers and light grinding of new linings of up to 4.8 million fibers." Regarding clutch repair, "Significant exposure can also occur during clutch repair. Since a mechanic's head is typically under the clutch assembly during clutch repair, asbestos often falls on a mechanic's face and clothing." (USEPA, 1986)

"Another potential source of asbestos release to air is from clutches and brakes on cars and trucks; a wide range of air concentrations of asbestos fibers (0.004–16.0 f/mL) has been reported in numerous air sampling studies of workplaces during maintenance and replacement of vehicle brakes (WHO 1998)." (ATSDR, 2001) According to Hickish, atmosphere samples during car brake service by a car were 1.12 and 1.42 fibers/cm$^3$; atmosphere samples during car brake service in a "dust cloud then by car" were 1.71 and 3.62 fibers/cm$^3$; personal samples during brake services ranged from 0.21 to 1.12 (n=6); personal samples during truck brake service during and after cleaning was 7.09 and 0.08 fibers/cm$^3$, respectively; and during clutch repair procedures during cleaning and after cleaning, personal asbestos airborne levels were 2.25 and 0.11 fibers/cm$^3$, respectively. (Hickish, 1970)

In a 2004 clutch sanding study, airborne asbestos concentrations were measured during the manual "rough-up" of a Borg Warner clutch friction surface with 80 grit sanding paper. The sanding occurred

from 3.5 to 4.5 minutes and the clutch box was unused prior to this study. Personal air samples, through PCM analysis, were reported to average 14.9 f/cc (n=3); areas samples were reported to range from 0.6 to 4.0 f/cc (n=4). "The sample of the clothing worn during the study showed a chrysotile contamination level of 642 billion asbestos structures. The concentration of chrysotile fibers greater than or equal to 5.0 micrometers was 200 billion. … This level of asbestos contaminated dust can be classified as severe and can be easily re-entrained into the breathing zone of a mechanic when the clutch plate is removed for the box." (Longo, 2004) In a 2012 Millette study, Borg Warner clutches were assessed for asbestos content and found to contain 30-50% chrysotile asbestos, while additional TEM-EDS analysis revealed the presence of 0.032% tremolite asbestos fibers. (Millette, 2012)

In a 2014 study, airborne asbestos levels were collected in two transmission shops. In addition to longer term personal air sampling, short term personal samples "were collected during the manipulation activities of clutch facings, and during cleaning activities." Area air samples were collected in the shops as well. Air samples were analyzed through PCM and TEM. Both transmission repair shops used asbestos-containing clutch facings, but one shop (TRS1) sporadically used non-asbestos containing clutch facings. Ventilation systems were either not used or rarely used in both transmission shops, and both shops used "manipulation equipment and material" such as Drills, countersinks, rivet machines, emery machines and sandpaper. Some level of shop cleaning occurred during this study, including water or dry brushing or broom. For the first transmission shop, reported as PCME, breathing zone levels of airborne asbestos ranged from 0.010 to 0.107 f/cc as an 8-hr TWA; the second shop reported a range from 0.024 to 0.195 f/cc as an 8-hr TWA. Short term personal sample means between the two shops ranged from 0.065 to 0.603 f/cc (n=4); these means, per workers, ranged from 0.021 to 1.653 f/cc. Area air sampling during clutch facing activities reported detectable airborne asbestos, and in one case, reported at 1.715 f/cc. The authors conclude, "In this study, we identified that the working conditions and use of asbestos-containing transmission products expose transmission mechanics to asbestos concentrations that exceed both the Colombian and OSHA standards. The potential consequences for health of these workers are of great concern … the exposure concentrations found are high. Thus, this group of transmission mechanics is at excess risk of developing asbestos-related diseases. Furthermore, workers that do not manipulate clutch facings may be exposed to high asbestos concentrations in the workplace." (Salazar, 2014)

Regarding clutch facings, "As fibers will undoubtedly continue to be knocked loose during the riveting and other similarly abusing operations, it will be necessary to periodically clean the riveting machines and work tables." Several other control measures to reduce exposure to clutch friction dust in this manufacturing setting are recommended: respirators, housekeeping to include vacuum cleaning of dust, engineering controls, impermeable bags or containers for clutch friction dust waste, and medical examinations. (National Loss Control, 1972)

According to meeting minutes for the Asbestos study Committee, exposure to asbestos is mentioned as it relates to brake box asbestos-containing dust, "Again the point was made that with undusted linings from a manufacturer it is likely that customer inspection, or possibly opening of cartons, could show airborne fiber concentrations in excess of 5 fibers/cc (TWA)." (ASC, 1973) Brake box asbestos-containing friction product dust, and its hazard is mentioned in several documents. (Rockwell, 1975) (Rockwell, 1977) (Rockwell, May 1983) (Rockwell, June 1983) (Brogan, 1984) In a 2004 study, free asbestos particles were collected from the surface of unused asbestos-containing brake materials and evaluated. This was accomplished by gently rinsing asbestos-containing brakes with pre-filtered water and that was then collected on filters for analysis. The author concluded that "any manipulation of new asbestos-containing brake components would be expected to yield free dust containing chrysotile asbestos of respirable size." (Atkinson, 2004) In a 2003 study clutch and brake friction material box dust was analyzed for asbestos content. Three out of four of the brake friction materials were determined to be asbestos-containing. Dust samples were collected from surface of the box from the three asbestos-containing brake material boxes as well as the surface of the metal and friction components. Dust samples were collected from the surface of the asbestos-containing clutch material box as well as the surface of the clutch itself. The asbestos content of dust in the boxes of identified asbestos-containing friction material ranged from 15% to 55%. The asbestos content in structures per box ranged from 2.2 billion to 641.9 billion. The author concluded, "Each of the friction component boxes tested demonstrated severe asbestos contamination in the dust. The chrysotile asbestos structures analyzed were primarily fibers and bundles with only 5 of the structures classified as a matrix. "It is clear from this data, that the amount of asbestos contaminated dust in each of the boxes tested was high enough to potentially cause any individual who opens these boxes and removes the product to receive a significant peak exposure to airborne asbestos fibers. Besides airborne asbestos structures, the handling of the contaminated products could also transfer

asbestos structures onto the hands and work clothing of the individual. This transfer from box to hands to clothing is another potential route of asbestos exposure to the person handling this product." (MAS, May 2003) The National Loss Control comments on this phenomenon from the manufacturing side at a Borg-Warner facility, "After thoroughly observing the operations associated with the manufacturing of the completed clutches, it is felt that a significant amount of the total asbestos exposures is coming from the loose fibers that are on the clutch facings. This idea is borne out somewhat by the exposure the clutch facing inspector received while checking several pallets of facings (sample #1). While working in in an area that is considerably cleaner than the general work table in the assembly area, he received an exposure that is higher than most other employees' exposures." "Exposures in excess of the current OSHA 8-hour average limit were found at over half of the locations tested." (National Loss Control, 1972) A Korean study/review of asbestos hazards in many industries noted airborne asbestos exposure associated with "Handling of auto-vehicle brake lining" that ranged from 0.16 to 5.64 f/ml. (Choi, 2016)

In a 2008 study reporting the exposure to asbestos-containing brake dust. **Testing I:** During brake pad box handling, asbestos airborne concentrations, during a 15-minute sampling period while handling 2, 4, 8, 12, 16, and 20 boxes, resulted in averages of 0.1, 0.123, 0.330, 0.438, 0.657, and 0.269 fibers/cc, respectively. During brake shoe box handling, asbestos airborne concentrations, during a 15-minute sampling period while handling 2, 4, 8, 12, and 17 boxes, resulted in averages of 0.059, 0.075, 0.102, 0.113, and 0.150 fibers/cc, respectively. During brake pad box handling, asbestos airborne concentrations, during a 30-minute sampling period while handling 6, 20, and 36 boxes, resulted in averages of 0.111, 0.374 fibers/cc, and "not applicable" respectively. During brake shoe box handling, asbestos airborne concentrations, during a 30-minute sampling period while handling 4 and 16 boxes, resulted in averages of 0.044 and 0.064 fibers/cc, respectively. **Testing II:** During brake pad box handling, asbestos airborne concentrations, during a 15-minute sampling period while handling 4 and 16 boxes, resulted in averages of 0.193 and 0.559 fibers/cc, respectively. During brake shoe box handling, asbestos airborne concentrations, during a 15-minute sampling period while handling 4 and 16 boxes, resulted in averages of 0.60 and 0.167 fibers/cc, respectively. The cleanup of dust produced from handling boxes (n=8) and the handling of asbestos-contaminated clothes (n=4) resulted in average airborne concentrations of 0.017 and 0.037 f/cc. During brake pad box handling, asbestos airborne concentrations, during a 30-minute sampling period while handling 4 and 16 boxes, resulted in averages of 0.104 and

0.297 fibers/cc, respectively. During brake shoe box handling, asbestos airborne concentrations, during a 30-minute sampling period while handling 4 and 16 boxes, resulted in averages of 0.040 and 0.167 fibers/cc, respectively. "Long-term" sampling (100 minutes), during brake pad box handling, asbestos airborne concentrations, while handling 4 and 16 boxes, resulted in averages of 0.044 and 0.180 fibers/cc, respectively. "Long-term" sampling (100 minutes), during brake shoe box handling, asbestos airborne concentrations, while handling 4 and 16 boxes, resulted in averages of 0.028 and 0.059 fibers/cc, respectively. The cleanup of dust produced from handling boxes during this "Long-term" (n=1) sampling period was 0.013 f/cc. (Madl, 2008) In a 2003 study that measured airborne asbestos concentrations from opening 15 brake shoe boxes and handling on a work table, PCM area samples (7 feet from source) ranged from 0.04 to 0.18 f/cc (n=4); PCME results were 0.13 and 0.03 f/cc (n=2). Personal samples ranged 0.27 to 0.67 f/cc (n=4); PCME results were 0.67 and 0.63 f/cc (n=2). (MAS, October 2003)

A MVA study entitled, Examination of Asbestos Fiber Releasability from a Cobra Brakeshoe stated in its results, "The brake pads were analyzed by polarized light microscopy (PLM) and found to contain approximately 30% chrysotile asbestos. Chrysotile asbestos fibers were seen protruding from the sides of the brake pads. … Asbestos fibers protrude and are available to be released from the brake pads upon rubbing or abrasion. The adhesive samplers collected chrysotile fibers that were easily released from the surfaces of the brake pads." (Millette, 1994) Also, in another MVA study entitled, Examination of Railroad Brakes stated in its results, "As received, the brakes were not friable. However, asbestos fibers protruded from their surfaces and Samples U1846 through U1855 released asbestos-containing dust when handled." (Millette, November 2009). Finally, in a MVA study entitled, Analysis for Amphibole in RR Brake stated in its results, "TEM analysis found amphibole asbestos fibers in Sample U1853 (UP907252-04) RR Brake "Anchor."" (Millette, December 2009) According to Internal Correspondence, Westinghouse Air Brake Division, "Cobra Shoe Engineering and Johns-Manville Research combined to run an elaborate series of dynamometer tests during which all the wear dust from various types of braking cycles was collected and analyzed. … The results of these tests show that almost all of the asbestos fiber is decomposed during brake applications. Less than one percent of the original asbestos fiber in the shoe remains as fiber in the wear dust and less than on tenth of that becomes airborne." The study looked at the wear during "1. Passenger car simulation 2. Commuter run simulation 3. Grade simulation 4. Heavy

freight simulation." The report then says, "In general, our conclusions can be stated as follows: 1. In almost all cases less than 1.0 per cent of the original fiber in the formula remains as recognizable chrysotile fiber in the wear dust. 2. In every instance less than 0.05 per cent of the original fiber remains as recognizable in the fraction of the dust which is potentially airborne." Finally, the report states, "These results are in good agreement with the previous work on automotive brake linings. Furthermore, they substantiate the hypothesis that the extreme heat and mechanical action of the breaking process is sufficient to destroy almost all the fiber as it is exposed at the wearing surface." (Farnsworth, 1976)

NIOSH, in 1975, warned of the hazards of working with motor vehicle brake and clutch assemblies. (NIOSH, 1975) The literature is replete with asbestos exposure above background levels in the friction products repair and maintenance industry and the manufacturing industry and/or methods for control. (AIHA, 1958) (Hickish, 1968) (NIOSH, Abex, 1972) (NIOSH, 1972) (NATLSCO, Jan. 1973) (NATLSCO, June 1973) (Castleman, 1975) (Johnson, 1976) (Rohl, 1976) (NATLSCO, 1978) (Johnson, 1979) (USCG, 1979) (Roberts, 1982) (Nicholson, 1984) (NATLSCO, 1986) (Cheng, 1986) (NATLSCO, 1988) (Moore, 1988) (Weir, 2001) (Paustenbach, 2003) (Lemen, 2004) (Dodson, 2006) (OSHA, 2006) (Sakai, 2006) (Boelter, 2007) (Millette, 2010) (Millette, 2010) (Cely-Garcia, 2012)

## 10. Conclusions

Based on the information detailed above and attached as appendices, I have been asked to evaluate Mr. John Brindell, Jr.'s exposures to asbestos-containing products. As to those exposures, I provide the following opinions.

A.       Based on my review of the case-specific information Mr. John Brindell, Jr. worked, personally with or as a bystander, to trailers, axles and friction products manufactured/supplied by Carlisle, Abex, Bendix, Eaton, Rockwell, Fruehauf, Great Dane, Strick, Utility, Wilson, Lufkin, and was exposed to asbestos during the repair and maintenance of these products, including the use of compressed air and grinders. Per all information reviewed for this case, based on my professional judgment, experience, and training, Mr. Brindell, Jr. would have been subjected to the following ranges of exposure (magnitudes), in f/cc, as expressed in scientific notation:

| Material Type and Activity | Personal (f/cc) | Bystander (f/cc) |
|---|---|---|
| General Repair and Maintenance (Heavy Machinery) | $1x10^{-2}$ to $1x10^{0}$ | $1x10^{-2}$ to $1x10^{0}$ |
| Grinding | $1x10^{-2}$ to $1x10^{1}$ | $1x10^{-1}$ to $1x10^{1}$ |
| Compressed Air Use | $1x10^{-2}$ to $1x10^{1}$ | $1x10^{-2}$ to $1x10^{1}$ |

B.      According to Section 9, and attached as appendices, based on industrial hygiene, scientific, regulatory, and other documents, these products were asbestos-containing.

C.      When these asbestos-containing products were installed, removed, cut, manipulated, repaired, or in any way disturbed, workers and bystanders were exposed to significant airborne concentrations of asbestos. Significant contamination of clothing from asbestos occurs during the installation, removal, cutting, manipulation, repairing, or in any way disturbing of an asbestos-containing product.

D.      Significant exposure to asbestos is due to the installation, removal, cutting, manipulation, repairing, or in any way disturbing of an asbestos-containing product in such a manner that airborne asbestos fiber concentration is released above background concentration. ATSDR reports asbestos background as a range between $10^{-8}$ to $10^{-4}$ PCM f/ml.

E.      When the asbestos products were installed, removed, cut, manipulated, repaired, or in any way disturbed, Mr. Brindell, Jr., while working with such products or as a bystander, was exposed to significant airborne concentrations of asbestos for each type of product.

F.      Airborne asbestos does not settle quickly from the air and can easily become re-entrained after it does settle.

G.      Since the 1930's, working with or around hazardous contaminants in the workplace, the need for engineering controls, appropriate training, or appropriate respiratory protection was recommended.

Asbestos was included among these workplace hazards. Good industrial hygiene practices would have included warnings.

H.      I found no evidence of appropriate engineering controls, appropriate training, adequate warnings, or appropriate respiratory protection during periods of significant exposure. The concepts of engineering controls, appropriate training, and appropriate respiratory protective equipment, working in concert, will reduce exposure to airborne asbestos.

I.      The dangers of exposure to asbestos-containing products have been well documented in the scientific literature. By the 1930s, asbestosis had been thoroughly documented in the industrial hygiene literature (Merewether, 1930). In 1955, the link between asbestos exposure and lung cancer had been firmly established in public health and industrial safety literature (Doll, 1955). In 1965, the link between asbestos exposure and mesothelioma had been firmly established in public health and industrial safety literature (Newhouse, 1965).

J.      Two case documents provided, "2020 04 29 Raymond Kain TSI and Eagle Affidavit" and "Brindell Exposure History", suggest potential exposure to thermal systems insulation aboard ship; however, more information is required to render an opinion about asbestos exposure, if any, aboard ship in this case. My opinions may be supplemented or changed if new evidence/information is presented to me.

I declare under penalty of perjury that the foregoing is true and correct.


Kenneth S. Garza, CIH, MS

VP Industrial Hygiene

# APPENDIX A

**John Brindell, Jr. Asbestos Exposure Report Reference Literature**

**1.  Introduction**

Agency for Toxic Substances and Disease Registry (ATSDR), <u>Toxicological Profile for Asbestos</u>, 2001.

Hueper, W.C., <u>Occupational Tumors and Allied Diseases</u>, Thomas in Springfield, Ill. 1942.

US Environmental Protection Agency (EPA), <u>Asbestos-Containing Material in School Buildings: A Guidance Document (Part 1)</u>, Publication Number C00090, March, 1979.

**2.  Industrial Hygiene**

DiNardi, Salvatore R., <u>Principles of Evaluating Worker Exposure: General Principles of Occupational Hygiene</u>, The Occupational Environment: Its Evaluation, Control, and Management, A Publication of the American Industrial Hygiene Association, 2003.

National Institute for Occupational Safety and Health (NIOSH), <u>Exposure Limits</u>, NIOSH Pocket Guide to Chemical Hazards, Department of Health and Human Services, Publication No. 2005-149, September 2007.

Occupational Safety and Health Administration (OSHA) Asbestos Regulations, <u>Occupational Exposure to Asbestos</u>, Federal Register, August 10, 1994.

Plog, Barbara A., et al., <u>Overview of Industrial Hygiene: Air Sampling</u>, Fundamentals of Industrial Hygiene, National Safety Council, 1996.

**3.  Recommendations and Regulations**

American Conference of Governmental Industrial Hygienists (ACGIH), TLV Documentation, 1946-1991.

American Conference of Governmental Industrial Hygienists (ACGIH), <u>TLVs and BEIs: Based on the Documentation of the Threshold Limit Values for Chemical Substances and Physical Agents & Biological Exposure Indices</u>, Cincinnati, OH, page 4, 2006.

American Conference of Governmental Industrial Hygienists (ACGIH), <u>TLVs and BEIs: Based on the Documentation of the Threshold Limit Values for Chemical Substances and Physical Agents & Biological Exposure Indices</u>, Cincinnati, OH, 2009.

American Industrial Hygiene Association (AIHA), <u>H-13. A Guide for Prevention of Industrial Disease</u>, April 1943.

Balzer, J.L., <u>Industrial Hygiene for Insulation Workers</u>, Journal of Occupational Medicine, Volume 10 No.1, p. 25-31, January 1968.

Balzer, J.L., et al., <u>The Work Environment of Insulating Workers</u>, reprinted from American Industrial Hygiene Association Journal, Volume 29, May/June 1968.

Dreessen, W.C., et al., <u>A Study of Asbestosis in the Asbestos Textile Industry</u> (Public Health Bulletin No. 241—August 1938). Washington DC: U.S. Government Printing Office, US Treasury Department, 1938.

Georgia Tech. Exhibit 1 - Chronology of Asbestos Legislation, 1995.

Great Britain, <u>Memorandum on the Industrial Diseases of Silicosis and Asbestosis</u>, London: H.M. Stationary Office, 1935.

Hueper, W.C., <u>Cancer in its Relation to Occupation and Environment</u>, Bulletin of the American Society for the Control of Cancer, 1943.

The Journal of the American Medical Association (JAMA), <u>Environmental Cancer</u>, Editorials, pp. 836-838, November 25, 1944.

Leathart, G.L., Sanderson, J.T., <u>Some Observations on Asbestosis</u>, Annual Occupational Hygiene, Pergamon Press Ltd., Vol. 6, pp. 65-74, 1963.

Marr, W.T., <u>Asbestos Exposure during Naval Vessel Overhaul</u>, Industrial Hygiene Journal, May/June, 1964.

Martonik, John F., et al., <u>The History of OSHA's Asbestos Rulemaking and Some Distinctive Approaches that They Introduced for Regulating Occupational Exposure to Toxic Substances</u>, AIHAJ, 2001.

Occupational Safety and Health Administration (OSHA) Asbestos Regulations, <u>Occupational Exposure to Asbestos</u>, Federal Register, August 10, 1994.

Sawyer, R.N., <u>Asbestos Exposure in a Yale Building</u>, Environmental Research, 13, 146-169, 1977.

Schall, E.L., <u>Present Threshold Limit Value in the U.S.A. for Asbestos Dust: A Critique</u>, Occupationl Health Program, New Jersey State Department of Health Trenton, N.J., 1965.

Selikoff, I., <u>Disease Prevention in Asbestos Inuslation Work</u>, International Labour Office, Geneva, 1971.

State of California, <u>Dusts, Fumes, Vapors and Gases: Safety Orders</u>, Department of Industrial Relations, Industrial Accident Commission, November 22, 1939, Revised July 20, 1945.

State of Louisiana, <u>Louisiana Worker's Compensation</u>, Act No. 582, House Bill No. 1098, pp. 1278-1281, 1952.

State of New Jersey, <u>Threshhold Limit Values for Dusts, Vapors, Fumes, Gases and Mists</u>, Safety Regulation No. 3, Bureau of Engineering & Safety, N.J. Department of Labor & Industry, October 30, 1958.

State of Pennsylvania, <u>The Pennsylvania Occupational Disease Act</u>, The General Assemby of the Commonwealth of Pennsylvania, Act No. 284, Pamphlet Law 566, January 1969.

State of Texas, <u>Maximum Permissible Concentrations of Atmospheric Contaminants in Places of Employment</u>, Occupational Health Regulations, Texas Department of Health, Division of Occupational Health, September 1957.

State of West Virginia, <u>Occupational and Industrial Health Regulations</u>, Public Health Laws of West Virginia, Ch. 5, pp. 505-511, 1951.

State of Wisconsin, <u>General Orders on Dusts, Fumes, Vapors and Gases</u>, Industrial Commission of Wisonsin, 1947.

Stokinger, Herbert E., American Industrial Hygiene Association Quarterly, 1956.

US Environmental Protection Agency (EPA), <u>How to Manage Asbestos in School Buildings: AHERA Designates Person's Self –study Guide</u>, January, 1996.

**4.  Airborne Asbestos Hazard**

Agency for Toxic Substances and Disease Registry (ATSDR), <u>Toxicological Profile for Asbestos</u>, 2001.

Beyer, David S., <u>The Mechanical Control of Occupational Diseases</u>, National Safety News, 1933.

Bonsib, Roy S., <u>Dust Producing Operations in the Production of Petroleum Products and Associated Activities</u>, Standard Oil Company (N. J.), July 1937.

Coburn, G.A, <u>Control of Hygienic Exposure</u>, Industrial Medicine, 1937.

Cook, Warren A., <u>The Occupational Disease Hazard, Evaluation in the Field</u>, Industrial Medicine, 1942.

Consumer Product Safety Commission (CPSC), Fed Register, Ban on Consumer Patching Compounds, 1977.

DiNardi, S.R. (editor), <u>The Occupational Environment: Its Evaluation, Control, and Management</u>, AIHA press, 2003.

Dodson, R.F., and Hammar, S.P (editors),  <u>Asbestos: Risk Assessment, Epidemiology, and Health Effects</u>, 2006.

Doll, R., <u>Mortality from Lung Cancer in Asbestos Workers</u>, British Journal of Industrial Medicine, 12 (81), 81-86, 1955.

Edge, J.R. & Choudhury, S.L., <u>Malignant Mesothelioma of the Pleura in Barrow-in-Furness</u>, Thorax, 33, 26-30, 1978.

Goldberg, M., M.D., et al., <u>Can Exposure to Very Low Levels of Asbestos Induce Pleural Mesothelioma</u>, INSERM Unite´ 687-IFR69Saint Maurice, France. American Journal of Respiratory and Critical Care Medicine, Vol. 172, pp. 939–943, 2005.

Hillerdal, G., <u>Mesothelioma: Cases Associated with Non-occupational and Low Dose Exposures [review]</u>, Occupational Environmental Medicine 8(8):505-13, 1999.

Hodgson, John T., et al., <u>The Quantitative Risks of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure</u>, Ann. Occup. Hyg., Vol. 44, No. 8, pp. 565-601, 2000.

Hodgson, John T., et al., <u>Mesothelioma Risk from Chrysotile</u>, Occup. Environ. Med., 2010.

Hueper, W.C. <u>Biological Effects of Asbestos. Section IV. Human Exposure to Asbestos: Community Studies</u>, Annals of the New York Academy of Sciences, 1965.

Industrial Hygiene Foundation (IHF). <u>Industrial Hygiene Digest, Literature and News (717) Wartime Operations Emphasize Industrial Hygiene Problems of Asbestos Industry</u>, 1943.

International Programme on Chemical Safety (IPCS), <u>Environmental Health Criteria 203: Chrysotile Asbestos, International Program on Chemical Safety, World Health Organization</u>, p. 107. www.inchem.org/documents/ehc/ehc/ehc203.htm, 1998.

Iwatsubo, Y., et al., <u>Pleural Mesothelioma: Dose-Response Relation at Low Levels of Asbestos Exposure in a French Population-based Case-Control Study</u>, American Journal of Epidemiology, Vol. 148, No 2, 1998.

The Journal of the American Medical Association (JAMA), <u>Environmental Cancer</u>, Editorials, pp. 836-838, November 25, 1944.

Lacourt, A., et al., <u>Occupational and Non-occupational Attributable Risk of Asbestos Exposure for Malignant Pleural Mesothelioma</u>, Thorax, 2014.

Lawrence, William E., <u>The Control of Fumes in Shipyards</u>, Transactions, 32 nd National Safety Congress, Volume II, 1943.

Lemen, Richard A., <u>Asbestos in Brakes: Exposure and Risk of Disease</u>, American Journal of Industrial Medicine, 2004.

Markowitz, Steven, <u>Asbestos-related Lung Cancer and Malignant Mesothelioma of the Pleura; Selected Current Issues. Seminars in Respiratory and Critical Medicine</u>, Vol. 36 No. 3, 2015.

McDonald, J.C., et al., <u>The Epidemiology of Mesothelioma in Historical Context</u>, European Respiratory Journal, 1996.

Merewether, E. R. A., et al., <u>Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry</u>, Home Office, Crown Copyright Reserved, 1930.

Merewether, E. R. A., et al., <u>Dust and the Lungs</u>, Industrial Medicine, Symposium No. 3, 1938.

Mine Safety and Health Administration (MSHA), <u>Asbestos Exposure Limit; Final Rule</u>, Federal Register / Vol. 73, No. 41 / Friday, February 29, 2008.

National Institute for Occupational Safety and Health (NIOSH), <u>Revised Recommended Asbestos Standards</u>, 1976.

National Institute for Occupational Safety and Health (NIOSH), <u>Workplace Exposure to Asbestos - Review and Recommendations</u>, 1980.

National Institute for Occupational Safety and Health (NIOSH), <u>Report to Congress on Worker's Home Contamination Study Conducted Under The Worker's Family Protection Act (29 U.S.C. 671a)</u>, 1995.

Neumann, V., et al, <u>Malignant Mesothelioma   German Mesothelioma Register 1987-1999</u>, Int. Arch. Occup. Environ Health, February 2001.

Newhouse, M.L. & Thompson, H., <u>Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area</u>, British Journal of Industrial Medicine, 22, 261-269, 1965.

Occupational Safety and Health Administration (OSHA), <u>Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite</u>, Federal Register / Vol. 51, No. 119 /Friday, June 20, 1986.

Occupational Safety and Health Administration (OSHA) Asbestos Regulations, <u>Occupational Exposure to Asbestos</u>, Federal Register, August 10, 1994.

Occupational Safety and Health Administration (OSHA), <u>Safety and Health Topics, Asbestos</u>, 2018.

Richmond, Julius B., Physician Advisory - Health Effects of Asbestos, Department of Health, Education, and Welfare, April 25, 1978.

Rodelsperger, Klaus, et al., Asbestos and Man-made Vitreous Fibers as Risk Factors for Diffuse Malignant Mesothelioma: Results from a German Hospital-based Case-controlled study, American Journal of Industrial Medicine, 39:262-275, 2001.

Roggli, Victor L., Malignant Mesothelioma and Duration of Asbestos Exposure: Correlation with Tissue Mineral Fibre Content, British Occupational Hygiene Society, 1995.

Sayers, R.R., What Industrial Dust are Harmful? Why?, Transactions, 26 th National Safety Congress, 1937.

Shcherbakov, Sergey V., et al., The Health Effects of Mining and Milling Chrysotile: The Russian Experience, Can. Mineral., Spec. Publ. 5, pp. 187-198, 2001.

US Environmental Protection Agency (EPA), Toxics Information Series: Asbestos, 1980.

US Environmental Protection Agency (EPA), Guidance for Controlling Asbestos-containing Materials in Buildings, EPA 560/5-83-002. March 1983.

US Environmental Protection Agency (EPA), Guidance for Controlling Asbestos-containing Materials in Buildings, EPA 560/5-85-024, June 1985.

US Environmental Protection Agency (EPA), Guidance for Preventing Asbestos Disease Among Auto Mechanics, EPA-560-OPTS-86-002, June 1986.

US Environmental Protection Agency (EPA), Airborne Asbestos Health Assessment Update, EPA/600/8-84/003F, June 1986.

US Environmental Protection Agency (EPA), Building Air Quality: A Guide for Building Owners and Facility Managers, December 1991.

Wagner, J.C., et al, Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province, British Journal of Industrial Medicine, 1960.

Walsh-Healey Standards, 1951.

World Health Organization (WHO), Letter from Susanne Webber Mosdorf to Joseph L. Dou,  May 5, 2006.

**5.    Asbestos-containing Dust and Resuspension**

Agency for Toxic Substances and Disease Registry (ATSDR), <u>Toxicological Profile for Asbestos</u>, 2001.

Baldwin, C. A., et al., <u>Asbestos in Colorado Schools</u>, Public Health Reports, July/August 1982.

Bonsib,  R.  S.  M.A.E.M.,  <u>Dust Producing Operations in the Production of Petroleum Products and Associated Activities</u>, Standard Oil Company (N.J.), July 1937.

Deposition of John Dement to David Palmer, et al., reproduced by facsimile from Andy Cantor, Esq. to Steve M. Hays, CIH, February 24, 1998.

Dodson, R.F., and Hammar, S.P (editors),  <u>Asbestos: Risk Assessment, Epidemiology, and Health Effects</u>, 2006.

Doll, R., <u>Mortality from Lung Cancer in Asbestos Workers</u>, British Journal of Industrial Medicine, 12 (81), 81-86, 1955.

Dreessen, W.C., et al., <u>A Study of Asbestosis in the Asbestos Textile Industry</u> (Public Health Bulletin No. 241—August 1938). Washington DC: U.S. Government Printing Office, US Treasury Department, 1938.

Ewing, W.M., Ewing, E.M., Hays, S.M., et al., <u>An Investigation of Airborne Asbestos Concentrations during Custodial and Maintenance Activities in a Boiler Room</u>, American Industrial Hygiene Conference, June 3, 1992.

Ewing,  W.,  Hays, S.M., Longo,  W., Millette, J., et al.,  <u>Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing</u>,  Environmental  Choices  Technical  Supplement, March/April 1993.

Fischbein, M., <u>Asbestos and Cancer of the Lung</u>, American Medical Association, 140(15), 1219-1220, 1949.

Fleischer, W.E., Viles, E.F.J., Gade, R.L. and Drinker, P., <u>A Health Survey of Pipe-covering Operations in the Construction of Naval Vessels</u>, Journal of Industrial Hygiene 28:9-16, 1946.

Harries, P.G., Asbestos Hazards in Naval Dockyards, The Annals of Occupational Hygiene, 11(2), 135-145, 1968.

Hatfield, R. L., and Longo, W. E., US Gypsum Surface Texture Work Practice Simulation Demonstration, Materials Analytical Services, Inc., 1997.

Keyes, D., Hays, S.M., Ewing, W., Millette, J., et al., Exposure to Airborne Asbestos Associated with Simulated Cable Installation above a Suspended Ceiling, American Industrial Hygiene Association Journal (52), November 1991.

Keyes, D., Chesson, J., Hays, S.M., et al., Re-entrainment of Asbestos from Dust in a Building with Acoustical Plaster, Environmental Choices Technical Supplement, August/July 1992.

Keyes, D., Ewing, W., Hays, S.M, et al., Baseline Studies of Asbestos Exposure During Operations and Maintenance Activities, Applied Occupational Environmental Hygiene, November 1994.

Lumley, K.P.S., Building Insulated with Sprayed Asbestos: A Potential Hazard, Ann. Occup. Hyg., 1971.

Millette, J.R. and Hays, S.M., Settled Asbestos Dust Sampling and Analysis, Lewis Publishers, Boca Raton, 1994.

National Safety Council, Transactions: Annual Safety Congress, 1934-1949.

Sawyer, R.N., Asbestos Exposure in a Yale Building, Environmental Research, 13, 146-169, 1977.

Union Carbide Corporation, Calidria Asbestos SG-130 and SG-210, 1968.

US Environmental Protection Agency (EPA), Asbestos-Containing Material in School Buildings: A Guidance Document (Part 1), Publication Number C00090, March 1979.

US Environmental Protection Agency (EPA), Letter from Henry Rosenberger, of the EPA to Henry Singer, of the GSA, December 29, 1992.

US Environmental Protection Agency (EPA), Asbestos in Buildings – Guidance for Service and Maintenance Personnel, EPA 560/5-85-018, July 1985.

US Environmental Protection Agency (EPA), <u>Sprayed Asbestos-Containing Materials in Buildings: A Guidance Document</u>, March 1978.

**6.  Bystander Exposure**

Agency for Toxic Substances and Disease Registry (ATSDR), <u>Toxicological Profile for Asbestos,</u> 2001.

Brody, Jane E., <u>Asbestos Dust Called a Hazard to at Least One-fourth of U.S.,</u> The New York Times, March 2, 1966.

Cross, A.A., et al., <u>Practical Methods for Protection of Men Working with Asbestos Materials in Shipyards</u>, Safety and Health in Shipbuilding and Ship Repair, September 2, 1971.

Depostion of  Jonathan M. Haas, Exhibit's 25, 27, 28, <u>Inter-office Correspondence</u> (1974-1976), August 7, 2014.

Depostion of  Charles Klein, Exhibit 16, <u>Michigan Department of Health (MDH), Construction Health Hazards (</u>1963), August 21, 2015.

Deposition of Fred S. Venable, Exhibit EXX-32, <u>Asbestos Exposure</u>, 1974.

Dodson, R.F., and Hammar, S.P (editors),  <u>Asbestos: Risk Assessment, Epidemiology, and Health Effects</u>, 2006.

Egan, Thomas F., Letter to "See Distribution List," Regarding Monokote exposure studies, August 5, 1970.

Ewing, W.M., Ewing, E.M., Hays, S.M., et al., <u>An Investigation of Airborne Asbestos Concentrations during Custodial and Maintenance Activities in a Boiler Room</u>, American Industrial Hygiene Conference, June 3, 1992.

Ewing, W., Hays, S.M., Longo, W., Millette, J., et al., <u>Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing</u>, Environmental Choices Technical Supplement, March/April 1993.

Ewing, W., et al., <u>Take Home Asbestos Exposure</u>, Presented at EIA 2007, Charlotte, NC. March 19, 2007.

Fischbein, A., M.D., et al., <u>Drywall Construction and Asbestos Exposure</u>, American Industrial Hygiene Association Journal (40), May, 1979.

Gorman, Thomas, et al., <u>Asbestos in Scotland</u>, International Journal of Occupational Environmental Health, 2004.

Grandjean, P. and Bach, E., <u>Indirect Exposures: The Significance of Bystanders at Work and at Home Use</u>, American Industrial Hygiene Association Journal, 47(12):819-824, December 1986.

Great Britain, <u>Memorandum on the Industrial Diseases of Silicosis and Asbestosis</u>, 1935.

Harries, P.G., <u>Asbestos Hazards in Naval Dockyards</u>, The Annals of Occupational Hygiene, 11(2), 135-145, 1968.

Harries, P.G., <u>Asbestos Dust Concentrations in Ship Repairing: A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards</u>, The Annals of Occupational Hygiene, 14, pp. 241-254, 1971.

Hatfield, R. L., and Longo, W. E., <u>US Gypsum Surface Texture Work Practice Simulation Demonstration</u>, Materials Analytical Services, Inc., 1997.

Hatfield, R.L. and Longo, W., <u>Audicote Mixing Workplace Simulation</u>, Materials Analytical Services, Inc., 1998.

Hatfield, R.L. and Longo, W., <u>Protocol for Work-Practice Simulation of Mixing, Applying, Sanding & Cleanup of Asbestos Containing Joint Compound</u>, Materials Analytical Services, Inc., 1999.

Hatfield, R.L. and Longo, W., <u>Pouring of Insulating Cement, Work Practice Study</u>, Materials Analytical Services, Inc., 1999.

Hillerdal, G., <u>Mesothelioma: Cases Associated with Non-occupational and Low Dose Exposures [review]</u>, Occupational Environmental Medicine 8(8):505-13, 1999.

Hueper, W.C., <u>Biological Effects of Asbestos. Section IV. Human Exposure to Asbestos: Community Studies</u>, Annals of the New York Academy of Sciences, 1965.

Keyes, D., Hays, S.M., Ewing, W., Millette, J., et al., <u>Exposure to Airborne Asbestos Associated with Simulated Cable Installation above a Suspended Ceiling</u>, American Industrial Hygiene Association Journal (52), November 1991.

Keyes, D., Chesson, J., Hays, S.M., et al., <u>Re-entrainment of Asbestos from Dust in a Building with Acoustical Plaster</u>, Environmental Choices Technical Supplement, August/July 1992.

Keyes, D., Ewing, W., Hays, S.M, et al., <u>Baseline Studies of Asbestos Exposure During Operations and Maintenance Activities</u>, Applied Occupational Environmental Hygiene, November 1994.

Kilburn, K. H., et al., <u>Asbestos Disease in Family Contacts of Shipyard Workers</u>,  AJPH, Vol. 75, No.6, June 1985.

Lerman, Y., et al., <u>Asbestos Related Health Hazards among Power Plant Workers</u>, British Journal of Industrial Medicine, 1990.

Lilienfeld, D. E., <u>Asbestos-Associated Pleural Mesothelioma in School Teachers: A Discussion of Four Cases</u>, Annals New York Academy of Sciences, 1991.

McKinnery, W. M. and Moore, R.W., <u>Evaluation of Airborne Asbestos Fiber Levels During Removal and Installation of Valve Gaskets and Packing</u>, American Industrial Hygiene Association, August 1992.

Millette, J.R., Mount, M.D., and Hays, S.M., <u>Releasability of Fibers of Asbestos from Asbestos-Containing Gaskets</u>, EIA Technical Journal, Fall 1995.

Millette, J.R., <u>Asbestos-Containing Sheet Gaskets and Packing</u>, Chapter 6, Asbestos Health Risks: Sourcebook on Asbestos Diseases (Volume 12), Michie Publishers, 1996.

Richmond, Julius B., <u>Physician Advisory - Health Effects of Asbestos</u>, Department of Health, Education, and Welfare, April 25, 1978.

Sawyer, R.N., <u>Asbestos Exposure in a Yale Building</u>, Environmental Research, 13, 146-169, 1977.

Selikoff, I., et al., <u>Asbestos Exposure and Neoplasia</u>, The Journal of the American Medical Association, April 6, 1964.

Selikoff, I., et al., <u>The Occurrence of Asbestosis Among Insulation Workers in the United States</u>, Annuals New York Academy of Sciences, 1965.

Selikoff, I., <u>Disease Prevention in Asbestos Inuslation Work</u>, International Labour Office, Geneva, 1971.

Selikoff, I., et al., <u>Application of Sprayed Inorganic Fiber Containing Asbestos: Occupational Health Hazards</u>, American Industrial Hygiene Association Journal, March 1972.

**7. Take Home Exposures**

Agency for Toxic Substances and Disease Registry (ATSDR), <u>Toxicological Profile for Asbestos</u>, 2001.

Anderson, H.A., et al., <u>Household-contact Asbestos Neoplastic Risk</u>, Mount Sinai School of Medicine, 1976.

Anderson, H.A., Lilis, R., Daum, S.M., & Selikoff, I.J., <u>Asbestosis Among Household Contacts of Asbestos Factory Workers</u>, Annals of the New York Academy of Sciences, 330, 387-400, 1979.

Bianchi, C., Brollo, A., Ramani, L., Bianchi, T., & Giarelli, L., <u>Asbestos Exposure in Malignant Mesothelioma of the Pleura: A Survey of 557 Cases</u>, Industrial Health, 39, 161-167, 2001.

Brody, J.E., <u>Asbestos Dust Called a Hazard To at Least One-Fourth of U.S.</u>, The New York Times, March 2, 1966.

Carter, R.F., <u>The Measurement of Asbestos Dust Levels in a Workshop Environment</u>, United Kingdom Atomic Energy Authority, AWRE Report No. 028/70, July 1970.

Chen, W. & Mottet, N.K., <u>Malignant Mesothelioma with Minimal Asbestos Exposure</u>, Human Pathology, 9(3), 253-258, 1978.

D'Agostin, Flavia, et al., <u>Pleural Mesothelioma in Household Members of Asbestos-exposed Workers in Friuli Venezia Giulia, Italy</u>, International Journal of Occupational Medicine and Enviromental Health, 2017.

Deposition of Fred S. Venable, Exhibit EXX-32, <u>Asbestos Exposure</u>, 1974.

Depostion of  Jonathan M. Haas, Exhibit's 25, 27, 28, <u>Inter-office Correspondence</u> (1974-1976), August 7, 2014.

Dodson, R.F. & Hammar, S.P. (editors), <u>Asbestos: Risk Assessment, Epidemiology, and Health Effects</u>, 2006.

Dodson, R.F. & Hammar, S.P. (editors), <u>Asbestos: Risk Assessment, Epidemiology, and Health Effects, Second Edition</u>, 2012.

Edge, J.R. & Choudhury, S.L., <u>Malignant Mesothelioma of the Pleura in Barrow-in-Furness</u>, Thorax, 33, 26-30, 1978.

Ewing, W., et al., <u>Take Home Asbestos Exposure</u>, Presented at EIA 2007, Charlotte, NC, March 19, 2007.

Ferrante, D., Bertolotti, M., Todesco, A., Mirabelli, D., Terracini, B. & Magnani, C., <u>Cancer Mortality and Incidence of Mesothelioma in a Cohort of Wives of Asbestos Workers in Casale Monferrato, Italy</u>, Environmental Health Perspectives, 115(10), 1401-1405, 2007.

Gafafer, W.M., D.Sc., <u>Manual of Industrial Hygiene and Medical Service in War Industries</u>, Division of Industrial Hygiene, National Institute of Health, United States Public Health Service, 1943.

Goldberg, M., M.D. and Luce, D., Ph.D., <u>Can Exposure to Very Low Levels of Asbestos Induce Pleural Mesothelioma</u>,  INSERM Unité 687-IFR69 Saint Maurice, France. American Journal of Respiratory and Critical Care Medicine, Vol. 172, pp. 939–943, 2005.

Grandjean, P. and Bach, E., <u>Indirect Exposures: The Significance of Bystanders at Work and at Home Use</u>, American Industrial Hygiene Association Journal, 47(12):819-824, December 1986.

Harries, P.G., <u>Asbestos Hazards in Naval Dockyards</u>, The Annals of Occupational Hygiene, 11(2), 135-145, 1968.

Hatfield, R. L., et al., <u>Secondary Asbestos Exposure From Work Clothing of Gasket Removal III</u>, Materials Analytical Services, Inc., November 2000.

Hillerdal, G., <u>Mesothelioma: Cases Associated with Non-occupational and Low Dose Exposures [review]</u>, Occupational Environmental Medicine 8(8):505-13, 1999.

Hinkle, R.C., OSHA Asbestos Compliance Questonnaire, Badin Works, May 29, 1973.

Huncharek, M., Capotorto, J.V. and Muscat, J., Domestic asbestos exposure, lung fibre burden, and pleural mesothelioma in a housewife, British Journal of Industrial Medicine, 46(5), 354–355, 1989.

Kiviluoto, R., Pleural Plaques and Asbestos: Further Observations on Endemic and Other Nonoccupational Asbestosis, Annals of New York Academy of Sciences, 1965.

Kober, G.M., M.D., LL.D. & Hayhurst, E.R., A.M., M.D., Ph.D., The Cause and Prevention of Occupational Diseases, Industrial Health, 1924.

Lerman, Y., et al., Asbestos Related Health Hazards among Power Plant Workers, British Journal of Industrial Medicine, 1990.

Longo, W.E., Ph.D. & Hatfield, R.L., Secondary Asbestos Exposure from Work Clothing II, Materials Analytical Services, Inc., April 1999.

Longo, W.E., Ph.D. & Hatfield, R.L., Secondary Asbestos Exposure from Work Clothing III, Materials Analytical Services, Inc., November 1999.

National Institute for Occupational Safety and Health (NIOSH), Workplace Exposure to Asbestos - Review and Recommendations, 1980.

National Institute for Occupational Safety and Health (NIOSH), Report to Congress on Worker's Home Contamination Study Conducted Under the Worker's Family Protection Act, Publication No. 95-123, September 1995.

Navratil, M., et al., Prevalence of Pleural Calcification in Persons Exposed to Asbestos Dust, and in the General Population in the Same District, Environmental Research, 1972.

Newhouse, M.L. & Thompson, H., Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area, British Journal of Industrial Medicine, 22, 261-269, 1965.

Newson, F.M., Utah State Division of Health, Report of Occupational Health Study, Howard Johnson Motor Lodge c/o Western States Insulation Company, October 17, 1972.

Occupational Safety and Health Administration (OSHA) Department of Labor, <u>Standard for Exposure to Asbestos Dust</u>, Federal Register Vol. 37, No. 110, June 7, 1972.

Revell, G., <u>Investigation Into The Effective Laundering Of Towels and Coveralls Used For Asbestos Work</u>, Environmental Measurement Group, 2002.

Richmond, Julius B., <u>Physician Advisory - Health Effects of Asbestos</u>, Department of Health, Education, and Welfare, April 25, 1978.

Sahmel, Jennifer, et al., <u>Airborne Asbestos Take-home Exposures During Handling of Chrysotile-contaminated Clothing Following Simulated Full Shift Workplace Exposures</u>, Journal of Exposure Science and Environmental Epidemiology, 2015.

Sawyer, R.N., <u>Asbestos Exposure in a Yale Building</u>, Environmental Research, 13, 146-169, 1977.

Selikoff, Irving J., et al., <u>Relation Between Exposure to Asbestos and Mesothelioma</u>, The New England Journal of Medicine, 1965.

Selikoff, I., <u>Disease Prevention in Asbestos Inuslation Work</u>, International Labour Office, Geneva, 1971.

US Department of Health and Human Services (DHHS), <u>Report to Congress on Workers' Home Contamination Study Conducted under the Workers' Family Protection Act (29 U.S.C. 671a)</u>, 1995.

US Department of Health and Human Services (DHHS), <u>Report of Carcinogens, 12th Ed.</u>, 2011.

US Environmental Protection Agency (EPA), <u>Managing Asbestos in Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials</u>, July 1990.

Walsh-Healey Public Contracts Act, <u>Safety and Health Standards</u>, U.S. Government Printing Office, 1951.

**8.   Fiber Type and Fiber Size**

Agency for Toxic Substances and Disease Registry (ATSDR), <u>Toxicological Profile for Asbestos</u>, 2001.

Beddington, John, <u>Classification of Chrysotile Asbestos</u>, Government Office for Science, London, England, May 11, 2011.

Dodson, R.F., et al., Asberstos Fiber Length as Related to Potential Pathogenicity: A Critical Review, American Journal of Industrial Medicine 44:291-297 (2003).

Dodson, R.F., and Hammar, S.P (editors),  Asbestos: Risk Assessment, Epidemiology, and Health Effects, 2006.

Everatt, R.P., et al., Occupational Asbestos Exposure Among Respiratory Cancer Patients in Lithuania, American Journal of Industrial Medicine, 50:455-463, 2007.

Hueper, W.C. Biological Effects of Asbestos. Section IV. Human Exposure to Asbestos: Community Studies. Annals of the New York Academy of Sciences, 1965.

International Agency for Research on Cancer (IARC), Special Report, Vol 10, Lyon, France, May 2009.

Kanarek, Marty S., Mesothelioma from Chrysotile Asbestos: Update, Ann. Epidemiol., 2011.

Kashansky, S.V., Domnin, S.G., Kochelayev, V.A., Monakhov, D.D., & Kogan, F.M., Retrospective View of Airborne Dust Levels in Workplace of a Chrysotile Mine in Rural, Russia, Industrial Health, 39, 51-56, 2001.

Landrigan, P.J., Nicholson, W.J., Suzuki, Y. & Ladou, J., The Hazards of Chrysotile Asbestos: A Critical Review, Industrial Health, 37, 271-280, 1999.

Lemen, R., Asbestos, Senate Hearing, July 31, 2001.

Loomis, D., et al., Lung Cancer Mortality and Fibre Exposures Among North Carolina Asbestos Textile Workers, Occupational and Environmental Medicine, Issue: Volume 66(8), pp 535-542, August 2009.

Markowitz, Steven, Asbestos-Related Lung Cancer and Malignant Mesothelioma of the Pleura: Selected Current Issues, Seminars in Respiratory and Critical Care Medicine, Vol. 36, No. 3, 2015.

Marr, W.T., Asbestos Exposure during Naval Vessel Overhaul, Industrial Hygiene Journal, May/June 1964.

McDonald, J.C., Armstrong, B.G., & Edwards, C.W., Case Referent Survey of Young Adults with Mesothelioma: I. Lung Fibre Analysis, Annals of Occupational Hygiene, 45, 513-518, 2001.

National Institute for Occupational Safety and Health (NIOSH)/OSHA, <u>Workplace Exposure to Asbestos, Review and Recommendations</u>, DHHS (NIOSH) Publication No. 81-103, 1980.

Nicholson, W.J., <u>The Carcinogenicity of Chrysotile Asbestos—A Review</u>, Industrial Health, 39, 57–64, 2001.

Occupational Safety and Health Administration (OSHA) Asbestos Regulations, <u>Occupational Exposure to Asbestos</u>, Federal Register, August 10, 1994.

Occupational Safety and Health Administration (OSHA), <u>Safety and Health Topics, Asbestos</u>, 2018.

Rohl, A. N. et al. (1977), <u>Asbestos Content of Dust Encountered in Brake Maintenance and Repair</u>, Proc. Roy. Soc. Med., Volume 70, January 1977.

Sawyer, R.N., <u>Asbestos Exposure in a Yale Building</u>, Environmental Research, 13, 146-169, 1977.

Shcherbakov, Sergey V., et al., <u>The Health Effects of Mining and Mill Chrysotile: The Russian Experience</u>, Can. Mineral., Spec. Publ. 5, pp. 187-198, 2001.

Smith, A.H. & Wright, C.C., <u>Chrysotile Asbestos is the Main Cause of Pleural Mesothelioma</u>, American Journal of Industrial Medicine, 30, 252-266, 1996.

Stayner, L.T., Dankovic, D.A., & Lemen, R.A., <u>Occupational Exposure to Chrysotile Asbestos and Cancer Risk: A Review of the Amphibole Hypothesis</u>, American Journal of Public Health, 86 (2), 179-186, 1996.

Suzuki, Y. & Yuen, S.R., <u>Asbestos Tissue Burden Study on Human Malignant Mesothelioma</u>, Industrial Health 2001, 39, 150-160.

Suzuki, Y. & Yuen, S.R., <u>Asbestos Fibers Contributing to the Induction of Human Malignant Mesothelioma</u>, Annals of the New York Academy of Sciences, 982, 160-176, 2002.

Suzuki, Y, Yuen, S.R. & Ashley, R., <u>Short, Thin Asbestos Fibers Contribute to the Development of Human Malignant Mesothelioma: Pathological Evidence</u>, International Journal of Hygiene and Environmental Health, 208, 201-210, 2005.

Tossavainen, A., et al., Health and Exposure Surveillance of Siberian Asbestos Miners: A Joint Finnish-American-Russian Project, American Journal of Industrial Medicine Supplement, 1:142-144, 1999.

World Health Organization (WHO), Position on Asbestos, 2006.

World Trade Organization (WTO), European Communities - Measures Affecting Asbestos and Asbestos-containing Products, 2001.

**9.  Asbestos-containing Friction Products**

Agency for Toxic Substances and Disease Registry (ATSDR), Toxicological Profile for Asbestos, 2001.

American Industrial Hygiene Association (AIHA) Journal, Asbestos, 1958.

American Society of Mechanical Engineers, Final Report on Analysis of the Feasibility of Replacing Asbestos in Automobile and Truck Brakes, Prepared for the Environmental Protection Agency, April 15, 1987.

Anderson, P.H. et al., Analysis of Fiber Release from Certain Asbestos Products, GCA Corporation, Prepared for US Environmental Protection Agency, December 1982.

Asbestos Study Committee (ASC), Minutes of the Meeting, 1973.

Atkinson, Mark A.L., et al., Evaluation of the Size and Type of Free Particulates Collected from Unused Asbestos-Containing Brake Components as Related to Potential for Respirability, American Journal of Industrial Medicine, 46:545-553, 2004.

Boelter, F. W., Spencer, J.W. and Simmons, C.E., Heavy Equipment Maintenance Exposure Assessment: Using a Time-Activity Model to Estimate Surrogate Values for Replacement of Missing Data, Journal of Occupational and Environmental Hygiene, Volume 4 Number 7, p. 525 – 537, July 3, 2007.

Brogan, P.A., Industrial Hygiene Survey of Asbestos Fiber Exposure at Conveyor Loading of Brake Assembly, Ford Motor Company, October 1, 1984.

Castleman, B., Camarota, L.A., Fritsch, A.J., Mazzocchi, S. & Crawley, R.G., <u>The Hazards of Asbestos for Brake Mechanics</u>, Public Health Reports, 90 (3), 254-256, 1975.

Cely-Garcia, Maria F., <u>Personal Exposure to Asbestos Fibers During Brake Maintenance of Passenger Vehicles</u>, Annals of Occupational Hygiene, Vol. 56, No. 9 pp. 985-999, 2012.

Cheng, V.K.I. and O'Kelly, F.J., <u>Asbestos Exposure in the Motor Vehicle Repair and Servicing Industry in Hong Kong</u>, Journal of the Society of Occupational Medicine, Volume 36, p. 104-106, 1986.

Choi, Sangjun, et al., <u>Developing Asbestos Job Exposure Matrix Using Occupation and Industry Specific Exposure Data (1984-2008) in Republic of Korea</u>, Safety and Health at Work, 2016.

Dodson, R.F., and Hammar, S.P., <u>Asbestos: Risk Assessment, Epidemiology, and Health Effects</u>, 2006.

Farnsworth, M.M., <u>Railroad Friction Products Corporation Asbestos Emissions</u>, Westinghouse Air Brake Division, February 16, 1976.

Hatfield, R. L. and Longo, W.E., <u>Brake Blow Out Study II</u>, Materials Analytical Services, Inc., January 2001.

Hickish, D.E., <u>Exposure to Asbestos Dust During Brake Maintenance Operations on Commercial Vehicles, Fleet Repair Garage, Dagenham</u>, Report 52/68, October 1968.

Hickish, D.E. and Knight, K.L., <u>Exposure to Asbestos During Brake Maintenance</u>, The Annals of Occupational Hygiene, Volume 13, p. 17-21, 1970.

Hueper, W.C., <u>Biological Effects of Asbestos. Section IV. Human Exposure to Asbestos: Community Studies</u>, Annals of the New York Academy of Sciences, 1965.

Huncharek, M., et al., <u>Pleural Mesothelioma in a Brake Mechanic</u>, British Journal of Industrial Medicine, Volume 46, p. 69-71, 1989.

ICF Incorporated, <u>Regulatory Impact Analysis of Controls on Asbestos and Asbestos Products, Final Report, Volume III, Appendix F, XIX. Disc Brake Pads (Light-Medium Vehicles)</u>, U.S Environmental Protection Agency, January 19, 1989.

ICF Incorporated, <u>Regulatory Impact Analysis of Controls on Asbestos and Asbestos Products, Final Report, Volume III, Appendix F, XX. Disc Brake Pads (Heavy Vehicles)</u>, U.S Environmental Protection Agency, January 19, 1989.

ICF Incorporated, <u>Regulatory Impact Analysis of Controls on Asbestos and Asbestos Products, Final Report, Volume III, Appendix F, XXI. Brake Blocks</u>, U.S Environmental Protection Agency, January 19, 1989.

ICF Incorporated, <u>Regulatory Impact Analysis of Controls on Asbestos and Asbestos Products, Final Report, Volume III, Appendix F, XXII. Clutch Facings</u>, U.S Environmental Protection Agency, January 19, 1989.

Johnson, P.L., <u>Preliminary Industrial Hygiene Survey at Auto Brake Clinic, Cincinnati, Ohio</u>, National Institute for Occupational Safety and Health (NIOSH), Report No. IWS-32.57, August 8, 1976.

Johnson, P., Zumwalde, R.D. and Roberts, D., <u>Industrial Hygiene Assessment of Seven Brake Servicing Facilities: Asbestos</u>, National Institute for Occupational Safety and Health (NIOSH), Cincinnati, Ohio, January 29, 1979.

Kakooei, Hossein, et al., <u>Evaluation of Asbestos Exposure during Brake Repair and Replacement</u>, Industrial Health, 49, 374-380, 2011.

Kauppinen, Timo, et al., <u>Exposure to Asbestos During Brake Maintenance of Automotive Vehicles by Different Methods</u>, American Industrial Hygiene Association, 499-504, 1987.

Lemen, R.A., <u>Asbestos in Brakes: Exposure and Risk of Disease</u>, American Journal of Industrial Medicine, Volume 45, p. 229-237, 2004.

Longo, William E. and Hatfield, Richard L., <u>Brake Blow Out Study</u>, Materials Analytical Services, Inc., October 8, 1998.

Longo, William E., et al., <u>Sanding of a Clutch Plate; Borg-Warner, A Work Practice Study</u>, Materials Analytical Services, Inc., 2004.

Lorimer, W.V. et al., <u>Asbestos Exposure of Brake Repair Workers in the United States</u>, The Mount Sinai Journal of Medicine, Volume 43 No. 3, May/June 1976.

Madl, A.K., _Exposure to Chrysotile Asbestos Associated with Unpacking and Repacking Boxes of Automobile Brake Pads and Shoes_, Ann. Occup. Hyg., Vol. 52, No. 6, pp. 463-479, 2008.

Materials Analytical Services, Inc. (MAS), _Clutch & Brakebox Dust Analysis_, May 2003.

Materials Analytical Services, Inc. (MAS), _Opening Asbestos Containing Brake Shoe Boxes, Work Practice Study_, October 18, 2003.

Millette, James R., _Examination of Asbestos Fiber Releasability from a Cobra Brakeshoe_, MVA Scientific Consultants, May 13, 1994.

Millette, James R., _Friction Product Fiber Release Studies_, MVA Scientific Consultants, May 1996.

Millette, James R., _Examination of Railroad Brakes_, MVA Scientific Consultants, November 24, 2009

Millette, James R., _Analysis for Amphibole in RR Brake_, MVA Scientific Consultants, December 2, 2009.

Millette, James R., et al., _Fiber Release During Activities Involving a Caterpillar Brake Band_, MVA Scientific Consultants, July 10, 2010.

Millette, James R., _Examination of Asbestos Fiber Releasability from a Cobra Brakeshoe_, MVA Scientific Consultants, May 13, 1994.

Millette, James R., et al., _Examination of Borg Warner "Borg & Beck" Clutch Plate for Asbestos_, MVA Scientific Consultants, July 20, 2012.

Moore, L.L., _Asbestos Exposure Associated with Automotive Brake Repair in Pennsylvania_, American Industrial Hygiene Association Journal, Volume 49, January 1988.

National Loss Control Service Corporation (NATLSCO), _Asbestos Fiber Study for Borg and Beck Division, Borg-Warner Corporation, Chicago, Illinois_, November 14, 1972.

National Loss Control Service Corporation (NATLSCO), _Asbestos Study for Ammco Tools, North Chicago, Illinois_, January 30, 1973.

National Loss Control Service Corporation (NATLSCO), _Asbestos Study for Ammco Tools, North Chicago, Illinois_, June 5, 1973.

National Loss Control Service Corporation (NATLSCO), Report of Industrial Hygiene Study for Ammco Tools, North Chicago, Illinois, January 6, 1978.

National Loss Control Service Corporation (NATLSCO), Industrial Hygiene Report for Ammco Tools, North Chicago, Illinois, October 2, 1986.

National Loss Control Service Corporation (NATLSCO), Industrial Hygiene Report for Hennessy Industries, Inc., Ammco Tool Training Center, North Chicago, Illinois, November 3, 1988.

National Institute for Occupational Safety and Health (NIOSH), Criteria for a Recommended Standard…Occupational Exposure to Asbestos, HSM 72-10267, 1972.

National Institute for Occupational Safety and Health (NIOSH), Cincinnati Municipal Garage, Automobile Brake servicing Operation, January 28, 1972, USPHS Survey, John M. Dement, March 16, 1972

National Institute for Occupational Safety and Health (NIOSH), Cincinnati, Ohio, U.S.P.H.S. Survey at Abex Corporation, American Brakeblock Division, Winchester, Virginia, Report No. IWS-32.25E, February 1972.

National Institute for Occupational Safety and Health (NIOSH), Current Intelligence Bulletin 5: Asbestos Exposure during Servicing of Motor Vehicle Brake and Clutch Assemblies, DHHS (NIOSH) Publication Number 78-127, August 8, 1975.

National Institute for Occupational Safety and Health (NIOSH), Health Hazard Evaluation Report, HETA 84-262-1734, Friction Division Products, Trenton, New Jersey, September 1986.

Nicholson, W. J., Investigation of Health Hazards in Brake Lining Repair and Maintenance Workers Occupationally Exposed to Asbestos, NIOSH Contract 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, 1984.

Occupational Safety and Health Administration (OSHA), Asbestos-Automotive Brake and Clutch Repair Work, Safety and Health Information Bulletin, 2006.

Paustenbach, D.J., Richter, R.O. Finley, B.L. and Seehan, P.J., An Evaluation of the Historical Exposures of Mechanics to Asbestos in Brake Dust, Applied Occupational and Environmental Hygiene, Volume 18, p. 786–804, 2003.

PEI Associates, Inc., <u>Asbestos Dust Control and Brake Maintenance,</u> US Environmental Protection Agency (EPA) Office of Pesticides and Toxic Substances, September 30, 1985.

Rhee, S.K., <u>P. Tsang's Report on International Conference on Health Hazards of Asbestos</u>, Bendix Research Laboratories, July 26, 1978.

Roberts, D. R., et al., <u>Industrial Hygiene Summary Report of ASbeestos Exposure Assessment for Brake Mechanics</u>, November 22, 1982.

Rockwell International to Abex Corporation, Too Much Asbestos Dust in the Boxes, May 19, 1975.

Rockwell International to Abex Corporation, RW Complains About One Cup of Asbestos Dust in Brake Boxes, October 26, 1977.

Rockwell International to Abex Corporation, Excessive Dust in ASB Brake Boxes, May 16, 1983.

Rockwell International to Abex Corporation, Excessive Dust in Boxes is Severe Problem, June 1, 1983.

Rohl, A.N., Langer, A.M., Wolff, M.S., & Weisman, I.,  <u>Asbestos Exposure during Brake Lining Maintenance and Repair</u>, Environmental Research, 12, 110-128, 1976.

Rohl, A. N. et al. (1977), <u>Asbestos Content of Dust Encountered in Brake Maintenance and Repair</u>, Proc. Roy. Soc. Med., Volume 70, January 1977.

Sakai, K., Hisanaga, N., Shibata, E., Ono, Y. & Takeuchi, Y., <u>Asbestos Exposures during Reprocessing of Automobile Brakes and Clutches</u>, International Journal of Occupational and Environmental Health, 12, 95-105, 2006.

Salazar, Natalia, et al., <u>Asbestos Exposure among Transmission Mechanics in Automotive Repair Shops</u>, Ann. Occup. Hyg., 1-15, 2014.

Sheehy, J.W., <u>In-depth Survey Report: Control Technology for Brake Drum Service Operations</u>, National Institute for Occupational Safety and Health, Report No. ECTB 152-18b, February 1987.

US Coast Guard, <u>Asbestos Exposure Control</u>, July 24, 1979.

US Environmental Protection Agency (EPA), <u>Guidance for Preventing Asbestos Disease among Auto Mechanics</u>, EPA-560-OPTS-86-002, June 1986.

Weir, F.W., Tolar, G. and Meraz, L.B., <u>Characterization of Vehicular Brake Service Personnel Exposure to Airborne Asbestos and Particulate</u>, Applied Occupational and Environmental Hygiene, Volume 16(12), p. 1139–1146, 2001.

**10. Case Documents from Counsel**

"2019 12 20  Brindell - Responses to Master Rogs & RFP"

"2020 02 19 Poleto J. Keith Vol. 1 Exh. A"

"2020 02 19 Poleto J. Keith Vol. 1 Exh. B"

"2020 02 19 Poleto J. Keith Vol. 1 Exh. C"

"2020 02 19 Poleto J. Keith Vol. 1 Exh. D"

"2020 02 19 Poleto, J. Keith Vol. I"

"2020 02 20 Poleto, J. Keith Vol. II"

"2020 04 29 Raymond Kain TSI and Eagle Affidavit"

"Brindell - Social Security Records"

"Brindell Exposure History"

# APPENDIX B





**KENNETH S. GARZA, CIH, MS**
***Vice President, Industrial Hygiene***

***GHP, Inc.***
***11550 IH-10 West, Suite 234***
***San Antonio, Texas 78230***
***Phone – 210-824-5600***
***Fax – 210-824-8420***
***Cell – 210-392-1863***
***E-mail – kgarza@ghp1.com; Web address – www.ghp1.com***

EDUCATION:
Bachelor of Science in Biology, Minor in Chemistry, St. Mary's University, San Antonio, 2001
Master of Science in the Environmental Science and Management, University of Texas at San Antonio, 2006

LICENSES AND CERTIFICATIONS:
Certified Industrial Hygienist, #10082; Texas Licensed Asbestos Consultant, #105702; Florida Licensed Asbestos Consultant, #AX108; Texas Licensed Mold Assessment Consultant, #MAC0379

PROFESSIONAL SUMMARY:
Mr. Garza has over eighteen years of experience in various aspects of the environmental industry which include:

Conducted/Managed numerous inspections for the determination of asbestos-containing materials, and the development of abatement protocols for the removal of asbestos-containing materials, asbestos dose reconstruction.

Conducted/Managed numerous microbial investigations with an emphasis on causation.  In addition, he has conducted/managed numerous visual inspections for the purpose of developing Microbial Remediation Plans, as well as the composition of those plans. Conducted/Managed numerous remediation projects from the selection of the contractor to the receipt of satisfactory post remediation samples and closeout reports. Conducted/Managed Legionella sampling and evaluation.

Conducted/Managed classic Industrial Hygiene (IH) work for purpose of assessing potentially harmful agents to occupants in the residential and occupational settings.  These agents include, but are not limited to, formaldehyde, xylene, respirable dust, carbon black (soot), fly-ash, volatile organic compounds (VOC's), nicotine residue, pesticides, inorganic acids, sodium hydroxide, trichloroethylene, chromic acid, and ammonia. Literature research related to environmental and industrial hygiene issues.

Client Base:  Healthcare, Hospitality and Insurance Industries; School Systems, Commercial and Residential Properties, Law Firms.

MEMBERSHIPS:
Alamo Chapter, Air and Waste Management Association, 2004-2009, 2012
Texas Association of Health Care Facilities Management, 2007-2009
North Chamber of Commerce, San Antonio, 2009
American Industrial Hygiene Association, 2009-2021
American Board of Industrial Hygiene, 2012-2021

PUBLICATIONS:
Garza, Kenneth S. & Lannan, Robert. "Toxic Mold Litigation: Perspectives on Excessive Mold Growth in Hotels." Hotel Business Review, Best Practices in Hotel Management & Operations; December 8, 2019.

Garza, Kenneth S. "The Use of Blue Crocidolite in a 'Salt Cake' Plant." The Official Newsletter of the Environmental Information Association (EIA); Volume 11, Issue 3, May/June 2012.

# APPENDIX C

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Law Offices of Pries & Roy, PLC. | Civil Action No. 4:08-CV-03340 | Doctor's Hospital 1997, L.P., et al. v. Beazley Insurance Co., Inc. | The United States District Court for the Southern District of Texas Houston Division | Yes July 1, 2009 | Yes February 17, 2010 | 08214.00 |
| Law Office of Simon Eddins & Greenstone, LLP. | Cause No. 2008 - 58697 | Roy Legget and Wanda Legget v. Bondex International, Inc., et al. | District Court, Harris County, Texas, 11th Judicial District | Yes April 14, 2009 | None | 07079.06 |
| Law Offices of Paul A. Weykamp | Civil Action No. MDL 875 | Jessie Leonard v. AC&S, Inc., et al. | Eastern District of Pennsylvania | Yes March 8, 2011 | None | 10307.00 |
| Law Offices of Paul A. Weykamp | Civil Action No. MDL 875 | Charles King v. AMCHEM, Inc., et al. | Eastern District of Pennsylvania | Yes March 8, 2011 | None | 10307.01 |
| Law Offices of Paul A. Weykamp | Civil Action No. MDL 875 | Jimmie Dale Davis v. AMCHEM, Inc., et al. | Eastern District of Pennsylvania | Yes March 8, 2011 | None | 10307.02 |
| Law Offices of Paul A. Weykamp | Civil Action No. MDL 875 | Raymond Stevens v. AMCHEM, Inc., et al. | Eastern District of Virginia, Newport News Division | Yes March 8, 2011 | None | 10307.03 |
| Law Offices of Paul A. Weykamp | Civil Action No. MDL 875 | Robert Jacobs v. AC&S, Inc., et al. | Eastern District of Pennsylvania | Yes March 8, 2011 | None | 10307.04 |
| Law Offices of Paul A. Weykamp | Civil Action No. MDL 875 | Lawrence G. Parham v. AC&S, Inc., et al. | Eastern District of Pennsylvania | Yes March 8, 2011 | None | 10307.05 |
| Law Offices of Paul A. Weykamp | Civil Action No. MDL 875 | Phillip E. Holmes v. AC&S, Inc., et al. | Eastern District of Pennsylvania | Yes March 8, 2011 | None | 10307.06 |

1

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Cascino Vaughan Law Offices | MDL Docket No. MDL 875 | Anderson v. Bechtel Corporation, et al. | United States District Court for the Eastern District of Pennsylvania | Yes December 12-13, 2011 | Pending | 11266.01 |
| Morgan & Morgan, LLC | C.A. No. 11C-02-034 ASB | Donald Strefling, Barbara Strefling v. Advanced Auto Parts, et al. | The Superior Court of the State of Delaware in and for New Castle County | Yes July 24, 2012 | None | 10303.06 |
| Morgan & Morgan, LLC | Civil Action No. 03-C-9600 | Patricia D. Little, et al. v. A.O. Smith Corporation, et al. | Circuit Court of Kanawha County, West Virginia | Yes January 15, 2013 | None | 10303.07 |
| Morgan & Morgan, LLC | Civil Action No. 12-C-922 KAN | Ellen Thompson, et al. v. A.O. Smith Corporation, et al. | Circuit Court of Kanawha County, West Virginia | Yes January 15, 2013 | None | 10303.08 |
| Waters, Kraus & Paul | No. 112CV220636 | Raymon R. Uribes and Elia B. Uribes v. 3M Company, et al. | The Superior Court of the State of California in and for the County of Santa Clara | Yes April 17, June 2-3, 7-8, 2013 Hearing – June 12-13, 2013 | Yes June 24-25, 2013 | 12294.02 |
| Waters, Kraus & Paul | Case No. BC 481 282 | Michael Sherman v. BASF Catalyst LLC, et al. | Superior Court of the State of California for the County of Los Angeles | Yes August 23, 29, 2013 | None | 12294.04 |
| Waters, Kraus & Paul | Case No. RG12659674 | John J. Depree v. BASF Catalysts LLC., et al. | Superior Court of the State of California for the County of Alameda | Yes October 4, 2013 | Pending | 12294.05 |
| Morgan & Morgan, LLC | Case No. 2012 CA 005489 A | David Lloyd Snavely v. 3M Company, et al. | Superior Court of the District of Columbia | Yes November 21, 2013 | Pending | 13030.12 |

**Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza**

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Chandler McNulty, LLP | Cause No. 2013-13447-MDL | Jones v. The Goodyear Tire & Rubber Co. et al. | District Court, Harris County, MDL Asbestos Court | Yes December 10, 2013 | Pending | 13170.00 |
| Morgan & Morgan, LLC | Case No. 24-X-12-000433 | Richard Martin Czapp, et al. v. AC&R Insulation Co., et al. | In the Circuit Court of Baltimore City | Yes January 21, 2014 | Pending | 10303.11 |
| Waters, Kraus & Paul | Case No. JCCP4674 | Mavis G. Manuel v. BASF Catalysts, LLC, et al. | Superior Court of the State of California, For the County of Los Angeles | Yes March 3, 2014 | Pending | 12294.00 |
| Weitz & Luxenberg | No. BC519273, No. JCCP4674 | Nader Kordestani, et al. v. 3M Company, et al. | Superior Court in the State of California, County of Los Angeles | Yes March 24-25, 2014 | None | 13220.01 |
| Dubose Law Firm | Case No. 13-L-1767 | Byron Nelson, et al. v. Air & Liquid Systems Corp., et al. | In the Circuit Court of the Third Judicial, Circuit Madison County, IL. | Yes April 10, 2014 | None | 12345.06 |
| Gori Julian & Associates, P.C. | Case No. 12-L-1291 | James C. Miller v. Alcatel-Lucent USA, Inc., et al. | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes June 25, 2014 | None | 14034.00 |
| The Lanier Law Firm | No. 617926 | Freddie Loden v. The McCarthy Corporation, et al. | 19th Judicial District Court for the Parish of East Baton Rouge, State of LA | Yes September 5, 2014 | Pending | 14033.00 |
| Weitz & Luxenberg | Case No. RG14718404 | Robert Adams v. Asbestos Corporation Limited, et al. | Superior Court of the State of California, For the County of Alameda | Yes October 27, 31, 2014 | Yes November 25, 2014 & December 1, 2014 | 13220.04 |

3

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Weitz & Luxenberg | Case No. 2:14-CV-04977-R-PJW | Howard & Joann Utech v. Asbestos Corporation Ltd., et al. | United States District Court, Central District of California | Yes April 3, 2015 | Yes February 9, 2017 | 13220.07 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC. | Civil Action No. 14-C-1371 KAN | Patsy R. Arbaugh, et al. v. 3M Company, et al. | In the Circuit Court of Kanawha County, West Virginia | Yes June 3, 2015 | None | 14293.16 |
| Weitz & Luxenberg | Case No. RG13664264 | Shirley Espino (SUC/WD; Alfred) v. BorgWarner Corporation, et al. | In the Superior Court of the State of California in and for the County of Alameda | Yes June 15, 2015 | None | 13220.08 |
| Karst & Van Oiste, LLP. | 190201/2012 | Linda Vellucci and Estate of John Vellucci v. Borg-Warner Corp. | Supreme Court of the State of New York, county of New York | Yes June 25, 2015 | None | 13189.19 |
| Karst & Van Oiste, LLP. | 190087/2014 | Walter Miller v. ATK Launch Systems Group | Supreme Court of the State of New York, county of New York | Yes June 25, 2015 | Yes September 17, 2015 | 13189.18 |
| Patten, Wornom, Hatten & Diamonstein, L.C. | Case No. CL14-01383P-03 | Earl W. Chapman v. John Crane Inc., et al. | Virginia: In the Circuit Court for the City of Newport News | Yes July 21, 2015 | None | 12272.04 |
| Martzell & Bickford | Case No. 13-8497 | Jerry Cambre v. Huntington Ingalls, Inc., et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes October 6, 2015 | Pending | 08139.35 |

### *Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Weitz & Luxenberg | Case No. BC580695 | Farid Malek v. Blackmer Pump, et al. | Superior Court of the State of California in and for the County of Los Angeles | Yes November 10, 2015 | Yes January 26-27, 2016 | 13220.12 |
| Karst & Van Oiste, LLP | Case 14-2-08075-1 SEA | Patrick Hickey and Vickie Hickey vs. American Biltrite, Inc.; et al. | Superior Court of Washington for King County | Yes January 4, 2016 | Pending | 13189.16 |
| Karst & Van Oiste, LLP | Case No. BC516879 | Jackie S. Hammond, et al., v. Asbestos Corporation Limited, et al. | Superior Court of the State of California For the County of Los Angeles | Yes February 16, 2016 | Yes April 18, 2016 | 13189.14 |
| Martzell & Bickford | No. 13-12146 | Leroy Henry v. Cooper/T. Smith Stevedoring Company, Inc., et al. | Civil District Court for Parish of New Orleans, State of Louisiana | Yes March 10, 2016 | Pending | 08139.41 |
| Scheuermann & Jones, LLC; Martzell & Bickford | Case No. 2014-8969 | Frank S. Romano, Sr. and Lynne Rome Romano v. Metropolitan Life Insurance Company, et al. | Civil District Court of Parish of Orleans, State of Louisiana | Yes February 22, 2016 & March 14, 2016 | Yes March 18, 2016 | 15210.01 |
| Bailey Peavy Bailey | Case No. 13 L 1445 | Wanda Evers v. A.W. Chesterton Company, et al. | Circuit Court of Third Judicial Circuit Madison County, Illinois | Yes April 9, 2016 | Pending | 15338.05 |
| Morgan & Morgan, LLC | Case No. 24X15000796 | Robert E. Ludlow, Sr., and vs. 3M Company, et al. | In the Circuit Court for Baltimore City | Yes May 16, 2016 | Pending | 10303.14 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Martzell, Bickford & Centola, A.P.C. | Case No. 14-11125 | Barbara Falgout Matherne, et al., v. Huntington Ingalls Incorporated, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes June 1, 2016 | Pending | 08139.50 |
| Heard Robins Cloud, LLP | Docket No. 629, 539 | Dorthy Monk Standley, et al. v. Continental Can Company, et al. | 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana | Yes June 6, 2016 | No | 15174.03 |
| Simmons Hanly Conroy L.L.P | Case Nos. JCCP4647 BC602346 | Louis Lowell et al., v. ABB INC., et al. | Superior Court of the State of California, County of Los Angeles | Yes July 19, 2016 & August 1, 2016 | Pending | 12320.13 |
| Martzell, Bickford & Centola, A.P.C. | Docket No. 740-833 | Timothy Boyd, et al. v. Burmaster Land Development Company, LLC, et al. | 24th Judicial District Court for the Parish of Jefferson, State of Louisiana | Yes July 27, 2016 | Pending | 08139.52 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2015-2883 C/W 2015-00877 | Michelle Talbot Rogers v. Huntington Ingalls Incorporated, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes August 15, 2016 | Pending | 08139.51 |
| Dean, Omar & Branham, LLP | Case No. 2015-3732 | Thomas H. Hayden, et al. v. 3M Company, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes August 17, 19, & September 12, 2016 | Pending | 15182.03 |
| Karst & Von Oiste, LLP | Case No. 1:14-CV-13000-RGS | Richard Shaw, et al. v. Warren Pumps LLC, et al. | United District Court for the District of Massachusetts | Yes August 18, 2016 | Pending | 13189.22 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC. | Case No. 2014-53830 | Thomas John Prezioso, et al. v. Cyprus Amax Minerals Company, et al. | 11th Judicial District Court of Harris County, Texas | Yes August 22, 2016 | Pending | 14293.21 |
| Landry & Swarr, LLC | Case No. 2:16-CV-00308 | David W. Colletti v. Bendix, et al. | United District Court Eastern District of Louisiana | Yes August 23, 2016 | Pending | 15368.02 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2014-4295 | Robert Jean Oddo Sr. v. Taylor-Seidenbach, Inc., et al. | Civil District Court, Parish of Orleans, State of Louisiana | Yes September 15, 2016 | Pending | 08139.39 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2000-14332 | Water J. Hotard v. A.P. Green Industries, Inc., et al. | Civil District Court, Parish of Orleans, State of Louisiana | Yes September 16, 2016 | No | 08139.38 |
| Weitz & Luxenberg | Case No. JCCP4674/BC615188 | Melvin Jones v. Borg Warner Morse TEC, et al. | Central Civil West LAOST Asbestos Cases Court of the County of Los Angeles, State of California | Yes September 20, 2016 | Yes October 26, 2016 | 13220.13 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC. | Case No. 2011-27191-ASB | Bryan V. Holman, et al. v. Alcoa, Inc., et al. | 11th Judicial District Court of Harris County, Texas | Yes September 23 & October 21, 2016 | Pending | 07079.61 |
| Bailey Peavy Bailey Cowan Heckaman | Case No. 14-L-676 | Gregory Guerrero, et al. v. American Optical Corporation, et al. | Circuit Court of Third Judicial Circuit Madison County, Illinois | Yes October 3, 2016 | Pending | 15338.06 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| DuBose Law Firm | Case No. D140327-C | Judy Wayne Peabody/Ryan, et al. v. Able Supply Company, et al. | 11th Judicial District Court of Harris County, Texas | Yes October 6, 2016 | Pending | 12345.17 |
| Simmons Hanly Conroy L.L.P | Case No. 15-L-1288 | Gerald David Green/Nahoko v. A.W. Chesterton Company, et al. | Circuit Court of the Third Judicial Circuit Madison County, Illinois | Yes October 24, 2016 | Pending | 12320.18 |
| Valles Law Firm PLLC | Case No. 1522-CC10653 | William Ferrell Jr., et al. v AEDC Public Affairs, et. al | Circuit Court State of Missouri Twenty-second Judicial Circuit | Yes November 2, 2016 | Pending | 16018.01 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Case No. 2014-52886 | Richard A. Hawk v. BNSF Railway Company, et al. | District Court 17th Judicial District Tarrant County, Texas | Yes November 9 & February 17, 2016 | Pending | 14293.33 |
| Black Law Group, PLLC | Case No. 1422-CC09407 | Yolanda Sample, et al. v. American Biltrite, Inc. et.al. | Circuit Court of the City of St. Louis State Missouri | Yes November 11, 2016 | Pending | 16108.01 |
| Simmons Hanly Conroy, LLC | Case No. 15-L-513 | Carol Cote, et al. v. A.W. Chesterton Company, et al. | Circuit Court Third Judicial Circuit Madison County Illinois | Yes November 14, 2016 | Pending | 12320.19 |
| Simmons Hanly Conroy, LLC | Case No. 1522-CC01036 | Susan Highfill v. Allied Manufacturing Co, et al. | Circuit Court State of Missouri Twenty-second Judicial Circuit | Yes November 14, 2016 | Pending | 12320.19 |
| Dean, Omar and Branham, LLP | Case No. 2016-CP-00849 | Sebastian Paterniti, et al. v. Asbestos Corporation LTD, et al. | Court of the Common Pleas for the Fifth Judicial Circuit County of Richland, South Carolina | Yes November 16, 2016 | Pending | 15182.05 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. CC-14-01246-A | Don L. Thomison and Angela Thomison v. Borg-Warner Morses Tec Inc. | 11th Judicial District Court of Harris County, Texas | Yes December 8, 2016 | Pending | 14293.36 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. 2014-02782 | Garland Dale Pepper v. ABB, Inc. et al. | 11th Judicial District Court of Harris County, Texas | Yes December 14, 2016 | Pending | 07079.84 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. 2013-69551 | Martin Banda v. DAP Products, Inc., et al. | 11th Judicial District Court of Harris County, Texas | Yes January 3, 2017 | Pending | 14293.42 |
| Simmons Hanly Conroy, LLC | No. 1622-CC00071 | Vincent Otten v. A.W. Chesterton Company, Inc., et al. | Circuit Court for the State of Missouri Twenty-Second Judicial Circuit | Yes January 9, 2017 | No, settled | 12320.15 |
| Martzell, Bickford & Centola, A.P.C. | Docket No. 2015-31636 | Clarence P. Gallien, Jr. v. Huntington Ingalls Industries, Inc., et al. | Civil District Court for the Parish of Orleans State of Louisiana | Yes January 13, 2017 | Pending | 08139.56 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. CC-14-05593-B | Robert Elmer McCartney and Roberta McCartney v. ASCO Valve, Inc. et al. | 11th Judicial District Court of Harris County, Texas | Yes January 19, 2017 | Pending | 14293.23 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | C.A. No. N14C-02-152 ASB | Leon Holman v. Armstrong Int'l, Inc., et al. | Superior Court of the State of Delaware in and for New Castle County | Yes January 31, 2017 | Pending | 14293.27 |
| The Law Offices of Peter G. Angelos, P.C. | Case No. 24X15000318 | Raymond Greenhill v. ACands, Inc., et al. [Case Affected: Concetta Schatz] | Circuit Court for Baltimore City | Yes February 1, 2017 | Pending | 14248.05 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Valles Law Firm PLLC | No. 14-L-1505 | Nellie Taylor…Alton Taylor v. 4520 Corp., Inc, et al. | Circuit Court Third Judicial Circuit Madison County, Illinois | Yes February 6, 2017 | Pending | 16018.04 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. 2012-38123 | Billy H. Dickson v. Guard-Line, Inc., et al. | District Court of Harris County, 11th Judicial District in the District Court of Dallas County | Yes February 17, 2017 | Pending | 07079.64 |
| Weitz & Luxenberg | Case No. BC635249 | Arlin Anderson vs. Air & Liquid Systems Corporation, et al. | Superior Court of the State of California for the County of Los Angeles | Yes March 28, 2017 | Yes April 26-27, 2017 | 13220.15 |
| Dean, Omar and Branham, LLP | C/A No. 2016-CP-40-06351 | David Lamar Taylor vs. 3M Company f/k/a Minnesota Mining and Manufacturing, et al. | Court of Common Pleas: State of South Carolina for the Fifth Judicial Circuit County of Richland | Yes March 31 & May 4, 2017 | Pending | 15182.07 |
| Martzell, Bickford & Centola, A.P.C. | No. 16-3579 | James Becnel | Civil District Court for the Parish of Orleans State of Louisiana | Yes April 4, 2017 | Pending | 08139.53 |
| SWMK Law, LLC | Case No. 1622-CC09651 | Terrance Hardaway vs. 84 Lumber, et al. | State of Missouri in the Twenty Second Judicial Court St. Louis Missouri | Yes April 7 , 2017 | Pending | 14078.05 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Case No. 15 CV 373 | Patrica Carroll vs. ABB, Inc., et al. | In the United States District Court, Western District of Wisconsin | Yes May 25, 2017 | Pending | 14293.58 |

### *Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Martzell, Bickford & Centola, A.P.C. | No. 2014-3195 | Rudolph Narcisse vs. Huntington Ingalls Incorporated, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes June 9, 2017 | Pending | 08139.58 |
| Dean, Omar and Branham, LLP | Case No. 16-2-18554-1 SEA | Philip Carl Unick vs. 3M Company, et al. | The Superior Court of the State of Washington in and for the County of King | Yes June 22, 2017 | Pending | 15182.11 |
| Dean, Omar and Branham, LLP | Civil Action No. 1:15-CV-130 | Dale Jolly/Edward McSwain vs. Air & Liquid Systems Corporation, et al. | United States District Court for the Western District of North Carolina | Yes July 6, 2017 | Pending | 15182.06; 15182.13 |
| Dubose Law Firm | No. 2013-2388 | Elizabeth Gailyne Sutherland vs. Alma Plantation, LLC, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes July 14, 2017 | Pending | 12345.08 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. 2015-60651 | Arthur Thomas Ward, Deceased, and Virginia Sue Ward vs. Ashcraft Company, Inc., et al. | District Court of Harris County, Texas, Asbestos MDL Court | Yes July 31, 2017 | Pending | 14293.37 |
| Weitz & Luxenberg | Case No. JCCP 4674/BC519273 | Nader Kordestani and Sherry Kordestani vs. 3M Company, et al. | Superior Court of the State of California for the County of Los Angeles | Yes March 21, 2014 | Yes August 10, 2017 | 13220.01 |

**Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza**

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Cascino Vaughan Law Offices | Case No. 10-CV-156-PP, 13-CV-1456-CNC | Daniel Ahnert, Deceased, and Beverly Ahnert vs. Employers Insurance Company of Wausau, et al. | United States District Court for the Eastern District of Wisconsin, Milwaukee Division | Yes August 11, 2017 | Pending | 11266.55 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. CC-14-02693-B | Walter R. Clements et al. vs. Asco Valve, Inc., et al. | District Court of Harris County, Texas, 11th Judicial District | Yes August 16, 2017 | Pending | 14293.28 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. 2016-02488-ABS | Kenneth E. Phipps, et al. vs. CBS Corporation, et al. | District Court of Harris County, Texas, 11th Judicial District | Yes August 17, 2017 | Pending | 14293.51 |
| Gori Julian & Associates, P.C. | Case No. 16-L-286 | Bernard Kunes vs. A.O. Smith Corporation, et al. | Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes August 24, 2017 | Pending | 14034.03 |
| Black Law Group, PLLC | Case No. D-101-CV-2016-00479 | D. Maria Schmidt, for the Estate of Donald August Guarienti vs. Bradbury Stamm Construction Inc., et al. | State of New Mexico, County of Santa Fe, First Judicial District | Yes August 31, 2017 | Pending | 16108.02 |
| Simmons Hanly Conroy, LLC | Case No. 16-L-0745 Case No. 17-L-0121 | Chester Depowski, Jr., Deceased vs. Ameron International Corporation, et al. Albert Marinelli and Gail Marinelli vs. Ameron International Corporation, et al. | State of Illinois, Circuit Court of the Third Judicial Circuit, Madison County | Yes September 11, 2017 | Pending | 12320.25 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| The Law Offices of Peter G. Angelos, P.C. | Case No. 24X17000015 | David Cartwright, Clayton V. Russell, Jr., Deceased, et al., vs. AC ANDS, Inc., et al. | Circuit Court for Baltimore City, Maryland | Yes September 13, 2017 | Pending | 14248.08 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. 2016-15523-ASB | Marion Dean Jordan, Jr., vs. Armstrong International, Inc., et al. | District Court of Harris County, Texas, 11th Judicial District | Yes September 27, 2017 | Pending | 14293.46 |
| SWMW Law, LLC | Case No.: 1522-CC09967 | Michael Bateman, as Surviving Heir of James Bateman, Deceased vs. 84 Lumber Company, et al. | Circuit Court of the City of St. Louis, State of Missouri, Twenty-Second Judicial Court | Yes October 3, 2017 | Pending | 14078.09 |
| Jacobs & Crumplar, P.A. | C.A. No. N16C-03-079 | Philip Lavelle, et al. v. The Ford Motor Company, et al. | In the Superior Court of the State of Delaware | Yes October 23, 2017 | Pending | 16348.02 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2106-9604 c/w 2107-2187 | Wayne Bourgeois vs. Huntington Ingalls Inc., et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes November 1-2, 2017 | Pending | 08139.54 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Cause No. 2015-60651 | Virginia Sue Ward, et al. vs. Ashcraft Company, Inc., et al. | In the District Court of Harris County, Texas, Asbestos MDL Court | Yes November 10, 2017 | Pending | 14293.37 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2017-03460 | Cheryl Bergeron vs. Huntington Ingalls, Inc., et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes November 20, 2017 | Pending | 08139.60 |

### *Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Valles Law Firm PLLC | Case No. 1722-CC00708 | Alan Moore, et al. vs. ABB, Inc., et al. | In the Circuit Court, State of Missouri, Twenty-Second Judicial Court (City of St. Louis) | Yes November 21, 2017 | Pending | 16018.06 |
| Dean, Omar and Branham, LLP | Case No. 1:15-cv-00936 | James Michael Hess vs. CBS Corporation, et al. | In the United States District Court for the Middle District of North Carolina | Yes November 27, 2017 May 1, 2019 | Pending | 15182.09 |
| Gori Julian & Associates, P.C. | Case No. 16-L-1456 | Carl Rhymer and Donna Rhymer, et al. vs. A.O. Smith Corporation, et al. | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes November 28, 2017 | Pending | 14034.06 |
| Simmons Hanly Conroy, LLC | Case No. 17-L-851 | Charles Holland vs. Illinois Central Railroad Company, et al. | State of Illinois, In the Circuit Court of the Third Judicial Circuit, Madison County | Yes December 15, 2017 | Pending | 12320.26 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 129-719 | Elvie Corsey, et al. vs. Morton International, LLC, et al. | 16th Judicial District Court, Parish of Iberia, State of Louisiana | Yes January 11, 2018 | Pending | 08139.59 |
| Baron & Budd, P.C. | Cause No. 16AO-CC00095 | Elizabeth Ann Comer vs. CBS Corporation, etc., et al. | In the Circuit Court of Jasper County, Missouri | Yes April 20 & May 10, 2017, January 12, 2018 | Pending | 13315.03 |
| Cascino Vaughan Law Offices | Case No. 12-CV-13189 | John Brezonick vs. A.W. Chesterton, et al. | State of Wisconsin, Circuit Court Branch 11, Milwaukee County | Yes May 5, 2017, January 17-18, 2018 (Hearing) | Pending | 13087.00 |

14

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Martzell, Bickford & Centola, A.P.C. | Case No. 06-14390 | Madeline Royal, et al. vs. Northrup Grumman Systems Corp., et al. | Civil District Court, Parish of Orleans, State of Louisiana | Yes January 31, 2018 | Pending | 08139.62 |
| Valles Law Firm PLLC | Case No. 17-L-003354 | Christopher Nelson, et al., vs. A. O. Smith Corporation, et al. | In the Circuit Court of Cook County, Illinois, County Department, Law Division | Yes February 8, 2018 | Pending | 16018.05 |
| Law Office of Simon, Greenstone, Panatier, Bartlett, PC | Civil Action No. 4:17-cv-00561 | Clark Collins, et al., vs. Kraft Foods Group, Inc., et al. | United States District Court, Southern District of Texas, Houston Division | Yes February 9, 2018 | Pending | 07079.66 |
| Simmons Hanly Conroy, LLC | Case No. 26 L 843 | Gary Iben, et al., vs. A.W. Chesterton Company, et al. | In the Circuit Court of the Third Judicial Circuit, Madison County, Illinois | Yes March 16, 2018 | Pending | 12320.28 |
| Dean, Omar and Branham, LLP | File No. 1:16-CV-01077 | Franklin Delenor Finch, et al., vs. BASF Catalysts, LLC, et al. | In the United States District Court for the Middle District of North Carolina | Yes March 30, 2018 | Pending | 15182.14 |
| The Lanier Law Firm | Case No. 2016-2376 | Jacob Burg Adams vs. A.W. Chesterton Co., et al. | Civil District Court for the Parish of Orleans, State of Louisiana, Section: 5, Division "B" | Yes April 20, 2018 | Pending | 14033.05 |
| Simmons Hanly Conroy, LLC | Case No. 16-L-1724 | Kathy Jennings, et al., vs. A.W. Chesterton Company, et al. | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes April 30, 2018 | Pending | 12320.29 |
| Weitz & Luxenberg P.C. | Case No. BC681335 | Dominic Vilardo v. ABB Inc., et al. | Superior Court of the State of California for the County of Los Angeles | Yes May 24, 2018 | Pending | 13220.17 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Dean, Omar and Branham, LLP | Case No. 2017-CP-42-04429 | Jerry Howard Crawford, et al., vs. Celeanese Corporation, et al. | State of South Carolina, Court of Common Pleas, County of Spartanburg, Seventh Judicial Circuit | Yes May 30, 2018 | Pending | 15182.21 |
| Bailey Peavy Bailey Cowan Heckaman PLLC | Case No. PC-2017-1721 | David Kaplan, et al. vs. A.O. Smith Corp., et al. | State of Rhode Island Superior Court | Yes June 8, 2018 | Pending | 15338.10 |
| Law Office of Simon, Greenstone, Panatier PC | Cause No. 2015-25111 | Jerry Lee Brimberry, at al. vs. Anco Insulations, Inc., et al. | In The District Court of Harris County, 11th Judicial Court | Yes June 11, 2018 | Pending | 14293.48 |
| Law Office of Simon, Greenstone, Panatier PC & Martzell, Bickford & Centola, A.P.C. | Case No. 95-783 | Martha May Lee, et al., vs. American Supply Co. of Morgan City, Inc., et al. | 15th Judicial District Court, Parish of Vermilion, State of Louisiana | Yes June 13, 2018 | Pending | 08139.57 |
| Simmons Hanly Conroy, LLC | Cause No. 1622-CC10750 | Allen Cain, et al., vs. A.W. Chesterton Company, et al. | In the Circuit Court, State of Missouri, Twenty-Second Judicial Court (City of St. Louis) | Yes June 20, 2018 | Pending | 12320.33 |
| Simmons Hanly Conroy, LLC | Cause No. 1722-CC00403 | Jimmy D. Hasty, Sr., et al., vs. A.W. Chesterton Company, et al. | In the Circuit Court, State of Missouri, Twenty-Second Judicial Court (City of St. Louis) | Yes June 20, 2018 | Pending | 12320.34 |
| Simmons Hanly Conroy, LLC | Cause No. 1722-CC10983 | James Fiebiger, et al., vs. A.W. Chesterton Company, et al. | In the Circuit Court for the City of St. Louis, Twenty-Second Judicial | Yes June 21, 2018 | Pending | 12320.27 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| | | | Court, State of Missouri | | | |
| Simmons Hanly Conroy, LLC | Case No. 16-L-0393 | Susan H. Schaberg, et al., vs. A.W. Chesteron Company, et al. | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes June 21, 2018 | Pending | 12320.35 |
| SWMW Law, LLC | Cause No. 1722-CC03797 | Billy McIntosh, et al., vs. Advance Auto Parts, et al. | In the Circuit Court, State of Missouri, Twenty-Second Judicial District (City of St. Louis) | Yes June 22, 2018 | Pending | 14078.11 |
| SWMW Law, LLC | Cause No. 1722-CC101915 | Laura Hummel, Chad Huff, et al., vs. 4520 Corp., Inc., et al. | In the Circuit Court, State of Missouri, Twenty-Second Judicial District (City of St. Louis) | Yes June 22, 2018 | Pending | 14078.12 |
| Law Office of Simon, Greenstone, Panatier PC | Cause No. 2015-57614-ASB | Walter Pesina, et al., vs. Airwell-Fedders North America, Inc., et al. | In the District Court of Harris County, Texas, 11th Judicial District | Yes July 5, 2018 | Yes September 25, 2018 | 14293.50 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2017-11412 | Moses Powell vs. Cooper/T. Smith Stevedoring Company, Inc., et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes July 23, 2018 | Pending | 08139.63 |
| Law Office of Simon, Greenstone, Panatier PC | Cause No. 2013-34778 | Johnny Ray Crober, et al., vs. AK Steel Corp., et al. | In the District Court of Harris County, Texas, 11th Judicial District | Yes July 27, 2018 | Pending | 14293.32 |
| The Law Offices of Peter G. Angelos, P.C. | Civil No.: 1:16-cv-03912-CCB | John C. Dugger, et al., vs. A&L Systems Corporation, et al. | In the United States District Court for the District of Maryland | Yes July 30, 2018 | Pending | 14248.09 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Law Office of Simon, Greenstone, Panatier PC | Law No. LACE128117 | Michael Gary Pringle, et al., vs. Afton Pumps, Inc., et al. | In the Iowa District Court for Scott County | Yes July 31, 2018 | Pending | 14293.74 |
| Dean, Omar and Branham, LLP | Cause No.: 16SL-CC04705 | Ruth Ann Borrowman, et al. vs. Certainteed Corporation, et al. | In the Circuit Court of the County of St. Louis, Twenty-first Judicial Circuit, State of Missouri | Yes August 24, 2018 | Pending | 15182.12 |
| Simmons Hanly Conroy, LLC | Case No.: 17-L-220 | Dalton J. Cantrelle Sr., et al., vs. A.W. Chesterton Company, et al. | In the Circuit Court of the Third Judicial Circuit, Madison County, Illinois | Yes August 27, 2018 | Pending | 12320.31 |
| Dean, Omar and Branham, LLP | Case No, CJ-2016-208 | Kelly Donaghey, et al., vs. Continental Motors, Inc., et al. | In the District Court of Pontotoc County, State of Oklahoma | Yes August 31, 2018 | Pending | 15182.20 |
| SWMW Law, LLC | Case No. 1622-CC10186 | Mary Lea Kennedy, Robert Hare, et al., vs. Advance Auto Parts, Inc., et al. | In the Circuit Court of the Twenty-Second Judicial Circuit (St. Louis City) | Yes September 10, 2018 | Yes, April 5, 2019 | 14078.13 |
| The Lanier Law Firm | Cause No. 2013-43263 ASB | Steve Brents, et al., vs. AO Smith Corporation, et al. | In the District Court of Harris County, Texas, 11th Judicial District | Yes September 13, 2018 | Pending | 14033.06 |
| Simmons Hanly Conroy, LLC | Cause No. 1722-CC11161 | Michael Reed, et al., vs. A.O. Smith Corporation, et al. | In the Circuit Court, State of Missouri, Twenty-Second Judicial Circuit | Yes September 17, 2018 | Pending | 12320.36 |
| Law Office of Simon, Greenstone, Panatier PC | Case No. 60CV-14-424 | Cleon Nolan Edwards, et al., vs. ABB, Inc., et al. | In the Circuit Court of Pulaski County, Arkansas, Thirteenth Division | Yes October 8, 2018 | Pending | 14293.72 |

**Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza**

| Client or Attorney & Location | Case Number | Names of Parties | Where Case was Filed | Deposition | Trial | GHP Project Number |
|---|---|---|---|---|---|---|
| Law Office of Simon, Greenstone, Panatier PC | Cause No. 2015-18629-ASB | Axel Cockrill vs. Bechtel Alcoa, Inc., et al. | In the District Court 11th Judicial District Harris County, Texas | Yes October 15, 2018 | Pending | 14293.40 |
| Baron & Budd, P.C. | Cause No. 2018-04835-ASB | Hubert Lee Shepard, et al., vs. Ameron International Corp., et al. | In the District Court of Harris County, Texas, 11th Judicial District | Yes October 17, 2018 | Pending | 13315.04 |
| Law Office of Simon, Greenstone, Panatier PC | Cause No. 2016-13659-ASB | Bonnie Lou Mayfield, John Rash, et al., vs. American Biltrite Inc., et al. | In the District Court of Harris County, Texas, 11th Judicial District | Yes October 19, 2018 | Pending | 14293.47 |
| Weitz & Luxenberg P.C. | Case No. BC699945 | Houshang Sabetian, et al., vs. Air & Liquid Systems Corporation, et al. | Superior Court State of California, County of Los Angeles, Unlimited Jurisdiction, Spring Street Courthouse | Yes October 23, 2018 November 16, 2018 December 18, 2018 | Yes February 22, 2019 | 13220.18 |
| Maune Raichle Hartley French & Mudd, LLC | Case No. 2017-8981 | Anthony J. Licciardi, III vs. Taylor-Seidenbach, Inc., et al. | Civil District Court for the Parish of New Orleans, State of Louisiana | Yes October 30, 2018 | Pending | 18176.01 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2014-4958 | John Bolden vs. Huntington Ingalls Incorporated, et al. | Civil District Court for the Parish of Orleans, State of Louisiana, Section: 11 | Yes November 6, 2018 | Pending | 08139.64 |

19

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| | | | | | | |
|---|---|---|---|---|---|---|
| Baron & Budd, P.C. | Cause No. 2018-35837-ASB | Dale Hale, et al., vs. Western Pulp Products Co., et al. | In the District Court of Harris County, Texas, 11th Judicial District | Yes November 19, 2018 | Pending | 13315.06 |
| Ron Austin Law, LLC | Case Number 2015-08422 | Earl J. Gisclair, Sr. vs. Huntington Ingalls Incorporated, et al. | Civil District Court, Parish of Orleans, State of Louisiana | Yes November 28, 2018 | Pending | 18208.01 |
| Cascino Vaughan Law Offices | Case No. 16-CV-1390 | Steven Ebel, special administrator vs. Sprinkmann Sons & Grunau Company | In the Circuit Court of Milwaukee County, State of Wisconsin | Yes November 29, 2018 | Pending | 13087.06 |
| Weitz & Luxenberg P.C. | Case No. RG17886625 | Alex Williams vs. Dana Companies, et al. | Superior Court of the State of California for the County of Alameda | Yes December 6, 2018 | Pending | 13220.20 |
| Weitz & Luxenberg P.C. | Case No. BC696433 | Ervan Groves, et al. vs. ABB, Inc., et al. | Superior Court of the State of California for the County of Los Angeles | Yes December 13, 2018 | Yes April 3, 2019 | 13220.21 |
| Law Office of Simon, Greenstone, Panatier PC | No. CJ-2015-5853 | Thurman Lee Hester vs. Alfa Laval, et al. | In the District Court of Oklahoma County, State of Oklahoma | Yes January 15, 2019 | Pending | 14293.82 |
| Simmons Hanly Conroy, LLC | Case No. 2018L 000705 | Ronald Parks, et al. vs. A.O. Smith Corporation, et al. | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes January 18. 2019 | Pending | 12320.39 |
| The Lanier Law Firm | Case No. 1822-CC00 321 | Martin F. Boyer, et al. vs. 3M Co. (f/k/a Minnesota, Mining & Manufacturing Co.), et al. | In the Circuit Court, State of Missouri, Twenty-Second Judicial Circuit (City of St. Louis) | Yes January 25, 2019 | Pending | 14033.08 |
| Law Office of Simon, Greenstone, Panatier PC | Case No. CJ-2017-107 | Peggy Madren, et al. vs. Montello, Inc., et al. | In the District Court of Caddo | Yes February 14, 2019 | Pending | 14293.57 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| | | | County, State of Oklahoma | | | |
|---|---|---|---|---|---|---|
| Law Office of Simon, Greenstone, Panatier PC | File No. 1:16-CV-00953 | Linda Fulton Southern, et al. vs. Alcatel-Lucent USA Inc., et al. | In the United States District Court for the Middle District of North Carolina, Greensboro Division | Yes February 15, 2019 | Pending | 14293.80 |
| Simmons Hanly Conroy, LLC | Case No. 17-L-1686 | Albert Manring, et al. vs. 3M Company, et al. | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes March 4, 2019 | Pending | 12320.37 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2018-9726 | Theresa Robinson vs. Huntington Ingalls Incorporated, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes March 18, 2019 | Pending | 08139.65 |
| Dean, Omar and Branham, LLP | Case No. CJ-2016-57 | Brennan James Atkeson, et al. vs. Union Carbide Corporation, et al. | In the District Court of Pontotoc County, State of Oklahoma | Yes March 29, 2019 | Pending | 15182.23 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2017-11205 | Irma Hannegan vs. PPG Industries, Inc., et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes April 2, 2019 | Pending | 08139.66 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2017-10551 | Thomas Borne vs. Huntington Ingalls, Inc., et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes April 23, 2019 | Pending | 08139.67 |
| Nemeroff Law Firm | Cause No. 2007-30131-ASB | Kevin W. Willhelm, Larry Joe Floyd, et al. vs. American Honda Motor Co., Inc., et al. | In the District Court, 11th Judicial District, Harris County, Texas | Yes May 6, 2019 | Pending | 18006.02 |
| Weitz & Luxenberg P.C. | LASC CASE NO. BC 715172 | Apostolos Agrios, et al. vs. 3M Company, et al. | Superior Court of the State of | Yes June 10, 2019 | Pending | 13220.24 |

**Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | California, County of Los Angeles | | | |
| Dubose Law Firm | Case No. CJ-2018-00026 | Richard McClendon, et al. vs. Chevron Phillips Chemical Company, LP, et al. | In the District Court of Creek County, State of Oklahoma | Yes June 11, 2019 | Pending | 12345.24 |
| Karst & Von Oiste, LLP | No. 17-2-13898-3-SEA | Janet Hutchins, Charles Requa, et al. vs. Atlantic Richfield Company, et al. | In the Superior Court of the State of Washington for King County | Yes June 14, 2019 | Pending | 13189.29 |
| Black Law Group, PLLC | No. D-101-CV-2018-01675 | Tom Jimmy Montoya, et al. vs. American Equipment Manufacturing, et al. | First Judicial District Court, County of Santa Fe, State of New Mexico | Yes June 20, 2019 | Pending | 16108.04 |
| Simmons Hanly Conroy, LLC | No. 18-L-1220 | Carol Scott, et al. (James Scott deceased) vs. A.O. Smith Corporation, et al | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes August 5, 2019 | Pending | 12320.47 |
| The Law Offices of Peter G. Angelos, P.C. | Case No. 24X18000231 | Walter L. Akehurst, et al., vs. ACandS, INC., et al. | In the Circuit Court for Baltimore City | Yes August 8, 2019 | Pending | 14248.11 |
| Simmons Hanly Conroy, LLC | No. 2019-2167 | Dennis M. Jeter vs. Ameron International Corporation, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes August 9, 2019 | Pending | 12320.42 |
| SWMW Law, LLC | Case No. 1822-CC03511 | Robert Suter, et al. vs. 4520 Corp., Inc., Successor-In-Interest to Benjamin F. Shaw Company, et al. | In the Circuit Court, State of Missouri, Twenty-Second Judicial Circuit (City of St. Louis) | Yes August 12, 2019 | Pending | 14078.15 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Law Office of Simon, Greenstone, Panatier PC | Cause No. 2013-66124-ASB | Lakeisha Rucker Wilson, Gregory Brian Wilson, et al. vs. Dow Chemical Company, et al. | In the District Court, Harris County, Texas 11th Judicial District | Yes August 22, 2019 | Pending | 07079.76 |
|---|---|---|---|---|---|---|
| Law Office of Simon, Greenstone, Panatier PC | Cause No. CC19-00662-C | Paul Konapelsky, et al. vs. Kaiser Gypsum Company, Inc., et al. | In the District Court of Harris County, Texas, 11th Judicial District | Yes August 27, 2019 | Pending | 14293.86 |
| Weitz & Luxenberg P.C. | Case No. BC89137 | Richard Tyler, et al. (Robert Tyler deceased) vs. Algoma Hardwoods, Inc., et al. | Superior Court of the State of California for the County of Los Angeles | Yes August 29, 2019 | Pending | 13320.19 |
| Baron & Budd, P.C. | Cause No. 2015-43126-ASB | Dovie Klein, et al. (Charles Klein deceased) vs. CBS Corporation, f/k/a Viacom, Inc. (successor-by-merger to Westinghouse Electric Corporation), et al. | In the District Court of Harris County, Texas, 11th Judicial District | Yes September 6, 2019 | Pending | 13315.09 |
| Weitz & Luxenberg P.C. | Case No. BC712874 | Ruby Kaylor vs. Aurora Pump Company, et al., | Superior Court of the State of California for the County of Los Angeles | Yes September 13, 2019 | Pending | 13220.25 |
| SWMW Law, LLC | Cause No. 1722-CC11037 | Carole Bergeman, et al. (Robert Bergeman deceased) vs. Bird Corporation, et al. | In the Circuit Court State of Missouri, Twenty-Second Judicial Circuit (City of St. Louis) | Yes September 30, 2019 | Pending | 14078.16 |
| Weitz & Luxenberg P.C. | Case No. RG17868697 | Robert Skelton, et al. (Wanda Skelton deceased) vs. Allied | Superior Court of the State of California for the County of Alameda | Yes October 1, 2019 | Pending | 13220.26 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Fluid Products Corp., et al. | | | | |
| Gori Julian & Associates, P.C. | Case No. 20180290 | Dennis Peltier, et al. vs. 3M Company, et al. | Civil District Court, Parish of Lafayette, State of Louisiana | Yes October 3, 2019 | Pending | 14034.08 |
| Law Office of Simon, Greenstone, Panatier PC | Cause No. 2019-15985-ASB | Mary Prezioso, et al. (Thomas Prezioso deceased) vs. Cyprus Amax Minerals Company, et al. | In the District Court of Harris County, Texas 11th Judicial District | Yes October 7, 2019 | Pending | 14293.21 |
| Simmons Hanly Conroy, LLC | Civil Action No. 18-361 / Case No. C665093 | James T. McAllister, Jr. vs. McDermott, Inc., et al. | United States District Court, Middle District of Louisiana, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana | Yes October 8, 2019 | Pending | 12320.32 |
| Simmons Hanly Conroy, LLC | Case No. 19STCV00653 | Gerald Wilson, et al. vs. ABB, Inc., et al. | Superior Court of the State of California for the County of Los Angeles | Yes October 21, 2019 | Pending | 12320.48 |
| Simmons Hanly Conroy, LLC | Case No. 19 L 117 | Joseph Carneghi vs. A.O. Smith Corporation, et al. | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes October 28, 2019 | Pending | 12320.44 |
| Simmons Hanly Conroy, LLC | Case No. 19 L 401 | Donald Field, et al. vs. A.O. Smith Corporation, et al. | In the Circuit Court, Third Judicial Circuit, Madison County, Illinois | Yes October 28, 2019 | Pending | 12320.50 |
| Simmons Hanly Conroy, LLC | Cause No. 1822-CC10568 | Deanna Gatson, et al. (Grant Hilburn deceased) vs. A.W. | In the Circuit Court, State of Missouri, Twenty-Second | Yes October 31, 2019 | Pending | 12320.41 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| | | Chesterton Company, et al. | Judicial Circuit (City of St. Louis) | | | |
|---|---|---|---|---|---|---|
| Law Office of Simon, Greenstone, Panatier PC | File No. 1:15-CV-00448-WO-JLW | Nancy Effinger, et al. (James Effinger deceased) vs. Air & Liquid Systems Corporation, et al. | United States District Court, Middle District of North Carolina, Greensboro Division | Yes November 4, 2019 | Pending | 14293.91 |
| Law Office of Simon, Greenstone, Panatier PC | Civil Action No. 1:18-CV-00410-LCB-LPA | Larry Woolard, et al. vs. Carrier Corporation, et al. | In the United States District Court for the Middle District of North Carolina, Greensboro Division | Yes November 4, 2019 | Pending | 14293.90 |
| The Law Offices of Peter G. Angelos, P.C. | Consolidated Case No. 24X19000010 | John Huber, et al. vs. Union Carbide Corporation, et al. | In the Circuit Court for Baltimore City | Yes November 22, 2019 | Pending | 14248.13 |
| The Law Offices of Peter G. Angelos, P.C. | Consolidated Case No. 24X19000010 | John Huber, et al. vs. Union Carbide Corporation, et al. | In the Circuit Court for Baltimore City | Yes November 22, 2019 | Pending | 14248.14 |
| The Law Offices of Peter G. Angelos, P.C. | Consolidated Case No. 24X19000010 | John Huber, et al. vs. Union Carbide Corporation, et al. | In the Circuit Court for Baltimore City | Yes November 22, 2019 | Pending | 14248.15 |
| Law Office of Simon, Greenstone, Panatier PC | Cause No. 2019-28496-ASB | Elizabeth Stoner, et al. (Gregory Stoner deceased) vs. Kaiser Gypsum Company, Inc. | In the District Court of Harris County, Texas, 11th Judicial District | Yes December 12, 2019 | Pending | 14293.83 |
| The Law Offices of Peter G. Angelos, P.C. | Civil Action No. DKC 18-2590 | Amanda Brooke Hailey, et al. (Charles Shockley deceased) vs. Air and Liquid Systems Corporation, et al. | In the United States District Court for the District of Maryland | Yes January 15, 2020 | Pending | 14248.12 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| Law Office of Simon, Greenstone, Panatier PC | Case No. 16 L 5625 | Joyce DuQuette, et al. (Thomas DuQuette deceased) vs. ALFA Laval, Inc., et al. | In the Circuit Court of Cook County, Illinois | Yes January 17, 2020 | Pending | 14293.99 |
|---|---|---|---|---|---|---|
| Cheek Law Firm | Case No. 2018-8518 | Booker W. Holmes vs. Albert Bossier, Jr., et al. | Civil District Court, Parish of Orleans, State of Louisiana | Yes January 24, 2020 | Pending | 19407.02 |
| Simmons Hanly Conroy, LLC | Case No. 19-L-0975 | Patrick L. Barron Sr. vs. A.W. Chesterton Company, et al. | In the Circuit Court. Third Judicial Circuit, Madison County, Illinois | Yes January 28, 2020 | Pending | 12320.54 |
| Simmons Hanly Conroy, LLC | Case No. 19-012541 | Johnny Pinkston, et al. vs. Air & Liquid Systems Corporation, Buffalo Pumps Division, et al. | In the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida | Yes February 4, 2020 | Pending | 12320.52 |
| Dean, Omar and Branham, LLP | C/A No. 1:18-CV-00091 | Sharon Whitehead, et al. (James Whitehead deceased) vs. Air & Liquid Systems Corp., et al. | In the United States District Court for the Middle District of North Carolina | Yes February 7, 2020 | Pending | 15182.26 |
| Nemeroff Law Firm | Case No. 2019-04640 | Judith Lunn vs. McCarty Corporation, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes February 20, 2020 | Pending | 18006.03 |
| Black Law Group, PLLC | Case No. D-101-CV-2018-00408 | Lee Hunt, et al. (Valerio Lucero deceased) vs. Public Service Company of New Mexico, et al. | First Judicial District Court, County of Santa Fe, State of New Mexico | Yes February 24, 2020 | Pending | 16108.05 |
| Weitz & Luxenberg P.C. | Case No. 19STCV36610 | Barbara Franklin vs. Blue Bird Corporation, et al. | Superior Court – State of California, County of Los Angeles | Yes February 26, 2020 | Pending | 13220.32 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

| | | | | | | |
|---|---|---|---|---|---|---|
| Simmons Hanly Conroy, LLC | Case No. 19-10545 | Henry Pete vs. Boland Marine and Manufacturing Company, LLC, et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes February 28, 2020 | Yes October 20, 2020 | 12320.53 |
| Waters & Kraus, LLP | Cause No. 2018-51048-ASB | Donna L. Hunt (Jerry Hunt deceased), et al. vs. Certainteed Corporation, et al. | In the District Court, 11th Judicial District, Harris County, Texas | Yes March 4, 2020 | Pending | 12294.09 |
| Napoli Shkolnik PLLC | Case No. C681782 | Larry Thibodeaux vs. BP America, F/K/A Standard Oil Indiana, A/K/A Amoco, et al. | 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana | Yes April 29, 2020 | Pending | 16094.03 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 20219-12389 | Karen Soulet vs. Lou-Con, Inc., et al. | Civil District Court for the Parish of Orleans | Yes June 5, 2020 Cont. June 10, 2020 | Pending | 08139.69 |
| Baron & Budd, P.C. | Case No. 79251 | Edward J. Ruffin, Jr. vs. Entergy Louisiana, LLC, et al. | 18th Judicial District Court for the Parish of Iberville | Yes June 11, 2020 | Pending | 13315.16 |
| Simmons Hanly Conroy, LLC | Case No. 911322 | Rebecca Armstrong, et al. vs. A.W. Chesterton Co., et al. | In the Court of Common Pleas, Cuyahoga County, Ohio | Yes July 1, 2020 | Pending | 12320.49 |
| Law Office of Simon, Greenstone, Panatier PC | Case No. 834506 | Shirley Leonard (Norman Leonard deceased), et al. vs. Arvinmeritor, Inc., et al. | In the Court of Common Pleas, Cuyahoga County, Ohio | Yes August 10, 2020 | Pending | 14293.73 |
| Martzell, Bickford & Centola, A.P.C. & The Gori Law Firm | Civil Action No. 18-9421 | Jennifer E. Knight (Wayne Knight deceased), et al. vs. Huntington Ingalls Incorporated, et al. | United States District Court, Eastern District of Louisiana | Yes August 25, 2020 | Pending | 08139.70 14034.14 |
| Simmons Hanly Conroy, LLC | Case No. 2020-00881 | Brent Deaville vs. Anco Insulations, Inc., et al. | Civil District Court for the Parish of | Yes August 31, 2020 | Pending | 12320.57 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

|  |  |  | Orleans State of Louisiana |  |  |  |
|---|---|---|---|---|---|---|
| Simmons Hanly Conroy, LLC | Case No. 19-L-1513 | John Pietrzyk, et al. vs. A.W. Chesterton Company, et al. | In the Circuit Court Third Judicial Circuit Madison County, Louisiana | Yes September 10, 2020 | Pending | 12320.55 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2016-2795 | Mary Bordelon vs. Atlantic Richfield Company, et al. | Fifteenth Judicial District Court for the Parish of Lafayette, State of Louisiana | Yes September 18, 2020 | Pending | 08139.68 |
| Maune Raichle Hartley French & Mudd, LLC | Case No. 2020 L 001867 | Charles A. Homolka, et al. vs. Crane Co., et al. | In the Circuit Court of Cook County, Illinois | Yes September 22, 2020 | Pending | 18176.02 |
| Martzell, Bickford & Centola, A.P.C. | Case No. 2020-813 | Clarence Wilson, Sr. vs. Cooper/T. Smith Stevedoring Company, Inc., et al. | Civil District Court for the Parish of Orleans, State of Louisiana | Yes October 5, 2020 | Pending | 08139.73 |
| Simmons Hanly Conroy, LLC | Case No. 19STCV10781 | Carolyn Wassinger, et al. vs. Air & Liquid Systems Corporation, Buffalo Pumps Division, et al. | Superior Court of the State of California for the County of Los Angeles | Yes October 28, 2020 November 3, 2020 | Pending | 12320.56 |
| Robins Cloud LLP | Cause No. 2017-16080 | Leonardo Juardo Hernandez vs. Austin Industries, Inc., et al. | In the District Court of Harris County, Texas 11th Judicial District | Yes November 10, 2020 | Pending | 15174.09 |
| Simmons Hanly Conroy, LLC | Case No. CACE-20-001331 | Charles Sidney Toney, Jr., et al. vs. 3M Company, et al. | In the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida | Yes November 17, 2020 | Pending | 12320.59 |
| Shrader & Associates, LLP | Civil Action No.: 4:18-cv-04229 | Ila Frentz (James LaFrentz deceased), | United States District Court, Southern District of | Yes November 19, 2020 | Pending | 15128.07 |

*Testimony/Deposition Experience Since 2009 (Updated January 19, 2021) – Kenneth S. Garza*

|  |  | et al. vs. 3M Company, et al. | Texas, Houston Division |  |  |  |
| --- | --- | --- | --- | --- | --- | --- |
| The Gori Law Firm | Case No. 2019-2514 | Antoine Semien, et al. vs. PPG Industries, Inc., et al. | Civil District Court for the Parish of Orleans | Yes December 1, 2020 | Pending | 14034.15 |
| Robins Cloud LLP | Cause No. 2017-53674-ASB | Dario Talamantes, Jr., et al. vs. Exxon Mobil Corporation, et al. | In the District Court, Harris County, Texas Asbestos MDL Court | Yes January 19, 2021 | Pending | 15174.10 |

# APPENDIX D

## GHP LITIGATION HOURLY RATE SCHEDULE

*December 10, 2019*

| | |
|---|---|
| Technical Support | $65.00 per hour |
| Support Services | $75.00 per hour |
| Project Coordinator 1 | $100.00 per hour |
| IH Tech | $90.00 per hour |
| CADD with Operator or Arch Tech | $100.00 per hour |
| Industrial Hygienist or Construction Administrator | $100.00 per hour |
| Architectural or Engineering Graduate | $115.00 per hour |
| Sr Industrial Hygienist | $115.00 per hour |
| Registered Architect / Engineer | $125.00 per hour |
| Associate Project Manager | $125.00 per hour |
| Project Coordinator 3 | $150.00 per hour |
| Project Manager | $165.00 per hour |
| Sr Project Manager | $200.00 per hour |
| Senior Manager / Certified Industrial Hygienist (CIH) | $250.00 per hour |
| Principal Architect / Engineer / CIH | $400.00 per hour |

Reimbursement for project-related expenses at cost times 1.20 multiplier.

Payment due within thirty (30) days of receipt of invoice.
Interest on accounts over thirty (30) days past due is 1.5% per month.
Rates are effective Jan 1, 2019 (revised July 2019)

# APPENDIX E

Deposition Summary of Jonathan Keith Poleto

Table of Contents

Background ................................................................................................................................. 1

Puerto Rican Marine Management, PRMMI (October 1979-1996) .............................................. 1

  Brake Work ............................................................................................................................... 3

    Carlisle Brakes ....................................................................................................................... 7

    Abex Brakes ......................................................................................................................... 10

    Bendix Brakes ...................................................................................................................... 10

    Eaton Axles .......................................................................................................................... 11

    Rockwell Axles ..................................................................................................................... 11

    Trailers ................................................................................................................................. 11

  Health and Safety ................................................................................................................... 14

**Background**

Mr. Jonathan Keith Poleto was born on February 25, 1958 and lives at 114 Oak Court, Westwego, Louisiana at the time of deposition (Vol I, Pg. 10).

Mr. Poleto worked with Mr. John Brindell, "I've been knowing him most of my life mainly from work. He was my supervisor" (Vol I, Pg. 11, 82). "Before I worked for him, I knew him from before that. '77 maybe. … It's a round guess. That's when I graduated, so it was around that time. … We used to hunt together"; neither he nor Mr. Brindell ever reloaded their own shotgun shells (Vol I, Pg. 82-83, 200; Vol II, Pg. 238).

**Puerto Rican Marine Management, PRMMI (October 1979-1996)**

Mr. Poleto worked for Puerto Rican Marine Management, PRMMI, beginning in October 1979 until he retired in 1996 in "maintenance for the 18 wheel trailers for the company"; he was hired on as a mechanic (Vol I, Pg. 11-12, 81-82, 97; Vol II, Pg. 218). It is estimated that Mr. Poleto and Mr. Brindell worked together from 1979 to 1981 (Vol II, Pg. 286). Mr. Brindell was his supervisor over the entire maintenance department and was already working there when he began; he does not know when Mr. Brindell stopped working, "Not exactly. I'd say six to eight years after I started. Probably closer to eight years. I'm not sure" (Vol I, Pg. 12, 84-85, 91, 95, 130, 195; Vol II, Pg. 218). "I don't know what else he did. He did paperwork and he would hound us"; he does not know who was responsible for ordering parts for the maintenance department (Vol I, Pg. 96, 113, 195).

He recalls the company "was a – sea containers and cargo trailers that came off the rail or the highway, they came into our terminal. We did all maintenance on them. They went onto a ship and went directly to Puerto Rico. That's how the people in Puerto Rico got their goods, food, and whatnot. … It's a shipping industry. We ship sea containers and road trailers directly to Puerto Rico" (Vol I, Pg. 12, 93, 136).

The main shop was located at the Port of New Orleans on France Road and the corporate office was across the street from the main shop; Mr. Brindell's office was in the "shop where we were. … It had a door, but I don't know if he closed it or not. It was always open. … I would say it was probably half a day he would – office work, half the day he would be in the shop" (Vol I, Pg. 89-91, 104, 195; Vol II, Pg. 218-220, 231-232, 243, 281-282, 301). "Four hours out of the day is about the time he spent in the shop, and he would

Deposition Summary of Jonathan Keith Poleto

go periodically here or there to each bay, talk to the guys, shoot the bull. … He didn't like being in an office" (Vol II, Pg. 299, 301). Mr. Brindell worked mostly "8 to 5" but he would sometimes stay during overtime, "It was kind of like voluntary for him to be there. He stayed sometimes, sometimes he didn't" (Vol I, Pg. 140).

Mr. Poleto did not have any prior experience performing maintenance work prior to being hired and "learned there"; Mr. Brindell taught him "sometimes … The repair work. The brakes, do them correctly. The landing gear that supported the front of the trailer, how to do it correctly" (Vol I, Pg. 97-98).

Mr. Poleto recalls performing his work "[i]nside the terminal, it was a big cement yard that would accommodate 3,000 trailers maybe. And we had a front shop and a rear shop and a mechanic shop for the yard trucks. We had yard trucks. We had a shop next to us for that. Our shop was a suspension shop for all the underneath of the trailer: The wheels, brakes, axles, landing gear, lights. That was our responsibility. … The back shop did the structure to the boxes themself. … [The yard shop h]andled all the yard equipment. It was mostly the motors and stuff like that, you know, for the trucks and the forklifts" (Vol I, Pg. 13; Vol II, Pg. 219-220).

Mr. Poleto worked in the "front shop in charge of the suspensions and everything on the units. That's what our shop was responsible for. It was a four-bay shop. You had four bays. Each bay had two mechanics. … Mr. Brindell was responsible for all the shops, but he was mainly in our shop. Our shop was like the hub. … He was in charge of all of them, but he mainly stayed in the front shop because that's where – the head shop. We had the parts department there. It was next to the mechanic shop, all that, so forth" (Vol I, Pg. 14-16, 99-102, 105-106, 113, 115, 130, 195; Vol II, Pg. 281).

Mr. Poleto does not know who owned the building he worked in, "I assume Puerto Rican Marine unless they were leasing it. I don't know" (Vol II, Pg. 221). He does not know that the Port of New Orleans had anything to do with the trailers, brake pads, or equipment used in the building, "I don't know anything about that" (Vol II, Pg. 221).

There were "some fans" for ventilation in the front shop, "A couple. … No, no, just the one next to where you are working will blow on you"; the fans were "portable on a stand. You put them wherever you working, aim it on you to cool you off. … [T]hey didn't move. You had to face it where you wanted it to go.

Page 2 of 15

Deposition Summary of Jonathan Keith Poleto

… I wanted the fan to blow on me and a lot of times, it would blow the dust away" (Vol I, Pg. 105, 167; Vol II, Pg. 243-245).

Mr. Poleto does not recall there being any pipes, or insulated pipes, running through the shop (Vol II, Pg. 239-240).

Mr. Poleto worked as a mechanic performing "brake jobs. We didn't do the tires, we had separate people did tires. We did brake jobs, suspensions, springs, axles, brake boosters, wiring, lights, and the landing gear, the dolly wheels that raise the front of the trailer" (Vol I, Pg. 14, 115; Vol II, Pg. 281). He estimates brake work was "70, 75 percent of the time. That was the most common work we did" (Vol II, Pg. 281).

Mr. Poleto worked ten-hour days, 6am to 5pm, Monday through Friday, "Sometimes you work – well, we work the weekends mainly on the ship. That's when they load and off-load the ship. We had to be there for breakdowns" (Vol I, Pg. 26, 139-140).

Mr. Poleto recalls there was a cleaning crew that came in after hours to clean the shop "[o]nce in a while. … Not very often. Maybe twice a year. We were responsible for cleaning it ourselves. … Mostly swept" (Vol II, Pg. 241-242). He recalls using a product called "FLOOR-DRY" that was used when "you had an oil spill"; he does not recall using any products that would keep the dust down when sweeping (Vol II, Pg. 242).

**Brake Work**

Mr. Poleto describes the types of brake work he performed, "Well, we would inspect all the units in the yard and if they needed brakes, they would be written up for brakes. And then you bring them through the shop and you perform brake jobs. Sometimes you change the pads, the shoes, sometimes the drums needed replacing, sometimes you had to change – I mean, we did everything. … Each – each axle is – there is tandem axle on a trailer: A front axle, a rear axle. Each axle had two, four, six, eight brake shoes, four per axle, four per each axle. … The axle is what the wheels mount onto that rolls down the road. … And then you had the brake liners and the cam that made them operate and the brake drum and the hub and wheels. Two wheels per side, so eight wheels on two axles" (Vol I, Pg. 17-18).

Deposition Summary of Jonathan Keith Poleto

There were eight brake shoes on a trailer, four on each side and two per hub; they were held in place by an "anchor pin that hold them on the front side and the cam was on the backside. And they had rollers that attached to the shoe itself that when the air booster was applied from the truck pulling it, the booster would push the cam, the cam would turn and would push the roller pins out and make the brakes touch the drum and stop the trailer" (Vol I, Pg. 18-19).

He recalls the following **brand names of brake shoes and brake linings**: "Mostly Carlisle, some Abex. … We had some Bendix. Carlisle was the most popular, most common" (Vol I, Pg. 19, 29-30).

Regarding **brands or manufacturers of axles**, he recalls, "Majority of the axles were Eaton, you had some Rockwells" (Vol I, Pg. 19). The axles were stored in the trailer next to the shop and most of them "came bare. You had to put everything on them" (Vol I, Pg. 116).

He recalls the **trailers** were manufactured by many different companies: "Fruehauf, Strick, Great Dane, Utility. … There was probably 15, 18 different ones. … We had Wilson. … Lufkin. … We had some Fontaine. … Hyundai. … Travis Body & Trailer. … Vanguard"; he does not know who owned the trailers (Vol I, Pg. 19-20, 50, 117-119, 171; Vol II, Pg. 225-226, 236-238, 248, 271, 273, 287-290). He does not know the maintenance or ownership history of any particular trailer prior to him working on it (Vol I, Pg. 199, 201-202; Vol II, Pg. 258, 275-276, 295).

Mr. Poleto describes a **typical brake job**: "The units in the shop, you would have to jack up both axles, put a jack stand, four jack stands to support every wheel. Then you would take each wheel off with a master nut in the center, you take the oil bath cap off, take the master nut off. The whole hub assembly with the brake drum and the two wheels would pull off with a dolly, a special dolly you took them off. Then once you had that off, there was the worn brake shoes and sometimes worn or cracked drums. So then we would blow all that stuff off, blow all that out to get it to where we could inspect it and see what needed to be done" (Vol I, Pg. 20).

He used an **air hose** to blow "[a]ll the dust so you can read the numbers and see what's going on"; the dust went "[o]n the ground, in the air, all over. … Yeah. It was a dust cloud. You could blow it out your nose for a half hour afterwards. … [The dust came from t]he brake shoes, probably. Yeah, had to be" (Vol I, Pg. 20-21, 28, 137, 163-164). He believes Mr. Brindell was exposed to the dust that was blown out from

Deposition Summary of Jonathan Keith Poleto

the air hose "[b]ecause that shop was all closed in. Had four walls – I mean, they had walls all around, they had a roof that came down. Only thing that opened was the garage doors and he was constantly walking the floor and that dust was always in the air. Everybody in that shop got mega exposed" (Vol I, Pg. 28-29, 173). He recalls Mr. Brindell would have been about 4-5 feet away from him while he was blowing off drums or hubs; he knew where he was because "I would turn around and talk to him while I'm doing my work" (Vol I, Pg. 172, 174).

No one instructed him on how to use compressed air to blow out the brake drums, "You are a mechanic. It's self taught" (Vol I, Pg. 157). Although the trucks traveled on roads and on ships, Mr. Poleto believes the dust that was blown out was "mostly from the brakes"; he does not know what the dust was comprised of and never tested the dust (Vol I, Pg. 137, 178-179, 196; Vol II, Pg. 253). The dust was "mostly from the brake shoes disintegrating over time. … They had some dirt and dust on them, yeah" (Vol II, Pg. 253).

Once the dust was blown out, he would be able to inspect the brake drum to determine if it needed to be replaced, "You would unbolt the drum from the hub, throw it out and get a new drum, put it on, blow everything off real good, get it all nice and clean before you reassemble everything. … Yeah, we remove all the shoes. … Blow it all off, **wire brush** it real good with a wire brush and blow it all off again, put the new shoes on and grease all the grease fittings" (Vol I, Pg. 22, 152, 168). He used the wire brush "on the end of the axle where the brake shoes attached to the spindle. … You had to wire brush that because some of the grease would come from the – the hub and they make the brake dust stick to it. You'd have to wire brush it all off and then blow it" (Vol I, Pg. 168-169).

Mr. Poleto recalls using the compressed air to blow the dust off of himself and was never told by anyone not to do that, "No. That's the easiest way to clean" (Vol I, Pg. 164).

Although he did not wear a dust mask while using the compressed air to blow off the brakes, he recalls he would sometimes use a "shop rag and cover your face, yeah, sometimes when it was really bad because after you did it, you'd go to the bathroom and blow your nose and gag and spit all that stuff out"; he used "[l]ittle red rags that they supplied to you. The uniform company gives them to the shop. … They're tough" (Vol I, Pg. 165-166). He would sometimes hold his breath while blowing off the brakes, it took around 30

Deposition Summary of Jonathan Keith Poleto

seconds to a minute to blow out a single drum and the dust would dissipate within a "minute or two" (Vol I, Pg. 166-167).

He would sometimes have to "**grind bevels** on the corners" of the new brake shoes to get them to fit on the drum, "The pads on the brake shoe. … You bevel the edges because they were like this thick and they come around like this both sides, and they were totally the same thickness all the way through. So with a brand new drum was thick. To get it back on, it would hit and it wouldn't let you go on, so you would bevel the edges where they came to the end. You 45 degree the edge with a **grinder** and then the drum would go right back on" (Vol I, Pg. 23, 152-153, 169). The grinding of the new shoe created dust, "Plenty more dust. … Big dust cloud" (Vol I, Pg. 24). He did not always have to grind the materials to make them fit, "[s]ometimes" they fit, and he did not have to grind them; he estimates this happened "[p]robably 50/50" (Vol I, Pg. 152-153, 169, 182-183). "Sometimes. Depends how old the drum was. Some – if it would be a old drum, it would be – you know, still be real thick. Then you'd have to" (Vol I, Pg. 169). Grinding a new brake pad would take about 15 minutes; he does not recall having to saw or cut into any new brake materials (Vol I, Pg. 154-155).

Mr. Poleto recalls using his own tools and had a handheld grinder that "stayed in my tool box at work"; he was provided with grinders if he needed one (Vol I, Pg. 154). He recalls using **Dewalt** and **Makita** electric grinders (Vol I, Pg. 154).

The work was scheduled by week so they would have all brake jobs in one week and work with a partner mechanic to get them done, "you could probably do four a day. … Four – four units and doing complete brake job, all four wheels, both axles, eight shoes"; the work required two people "to do everything. A lot of times the pins that held the shoe in themself, you have to heat them up to get them up. They freeze inside. Yeah, took two people to do all that" (Vol I, Pg. 24-25, 36; Vol II, Pg. 282-283).

In a year's time, Mr. Poleto and his partner estimates doing a "[t]housand" brake jobs and Mr. Brindell was there supervising, "That was Sergeant Carter. He was behind your back watching you. He was supervisor, so he went through, constantly went through the shop each day, make sure everybody was doing their, their work, getting their work out" (Vol I, Pg. 26-27, 36, 106, 198). Mr. Poleto recalls performing as much as 4 brake jobs a workday (Vol. I, Pg. 25). He does not know the exact number of

Deposition Summary of Jonathan Keith Poleto

times Mr. Brindell was present while he was performing a brake job, "I don't have an exact number or no times that he was present. … How I'm going to have an exact number? … I didn't count how many times he came in the shop"; "I'm sure he was present, but I can't give you an amount of time" (Vol I, Pg. 203-204, 206-208; Vol II, Pg. 231-232). Mr. Brindell would help with the brake jobs occasionally, "If we got in a bind maybe, but not too often. He was mostly supervisor, just watching, make sure you were getting your work out" (Vol I, Pg. 27).

He recalls going to the "parts room" to get brake pads and would request "X for Y truck and what was available to use"; he did not request any specific brand of brake pads, "No, I didn't do that. I went and told them I needed brakes for this particular unit, this particular axle" (Vol I, Pg. 146).

Mr. Poleto recalls the trailers went "all over. They went on the roads here. They went to the rail yard. From the rail yard, they put them on a train. They wind up in California. Put them on a ship. They go on a ship, they go to Puerto Rico. They don't usually leave the island but, I mean, they go all over" (Vol I, Pg. 179). Regarding whether he ever did a "**repeat brake job** on a particular trailer", he recalls, "It's – it's – it's not too often, but sometimes you do. If you painted something a certain way on it or something, you would remember it"; he does not specifically recall performing this repeat work on a Utility brand trailer (Vol I, Pg. 179).

### Carlisle Brakes

Mr. Poleto worked with Carlisle brand of brake shoes, "that was the most popular one" and he knew they were Carlisle brakes because the name was "stamped on the shoe or if they came in a box, it was on the box. … Carlisle brake parts" (Vol I, Pg. 29-30, 40, 140-142, 147-148). "When they came in a box, sometimes they come in bulk, but you always knew because on the liner it is that digital electronic markings in there. It was wrote in there" (Vol I, Pg. 40, 141-142, 147-148). There were two brake pads in a box, "Enough for one wheel" (Vol I, Pg. 149). A brand new box of Carlisle brake pads were not dusty; he does not recall seeing any information or documents that the brake pads contained asbestos and he does not know when they stopped using asbestos in the brake material, "I don't know when it happened. … I know the newer ones don't have it anymore, but I don't know when it happened" (Vol I, Pg. 150-151, 171, 187).

Deposition Summary of Jonathan Keith Poleto

He recalls Carlisle brakes were being used in 1979 when he started work and in 1981 around the time Mr. Brindell left (Vol I, Pg. 143). The Carlisle brakes were delivered by truck; he does not recall any names on the trucks or the companies that operated the trucks (Vol I, Pg. 144).

He does not recall a specific size of the brakes, "I don't know if they had a size. By telling them what axle you had, they knew what brakes went on it. ... Oh, it is wide as this book, eight inches, ten inches. And a radius about like this, so from here to here radius because the drum itself was this big (indicating). ... It's not like a car. I mean, it is big. ... Four times bigger than a car" (Vol I, Pg. 30-31).

He describes the Carlisle brake: "You had a metal component went around like this and there was a C on this end where it rolled on the cam pins, and there was a round circle on this end where the holding pin held it to the axle. And it was two pieces of metal two inches wide next to each other that came around like this, a flat piece of metal went over it and the shoes were riveted to the metal, the pads, the ... the liner (indicating). Three quarters of an inch to an inch" (Vol I, Pg. 31-32).

Mr. Poleto believes the pads contained asbestos, "I'm sure they did back in the day, yeah"; no one at PRMMI told him they contained asbestos, he heard about it on tv, "All what you see on the television today" (Vol I, Pg. 32, 122).

Mr. Poleto **removed Carlisle brakes** from Eaton axles while at PRMMI in the same manner as previously described, "All the brakes pretty much use the same tools. ... An impact – air impact wrench. Half-inch air impact wrench, sockets. ... A pin pusher, which is the big C-shaped clamp with a big threaded rod in the middle. And if the pins wasn't frozen, you could put it on the pin that secured the brake shoe to the axle and it would push it out. But a lot of times from being on the ships with the saltwater, they would freeze up and you would have to heat them up real good with a torch, get them red hot and then push them out" (Vol I, Pg. 32-33).

He was not always able to identify an "old, used piece of brake material as Carlisle" but recalls "[s]ometimes if it wasn't damaged too bad, you'd have – you'd have part of the writing left on it and you can tell that way"; he specifically recalls removing old Carlisle brake material but cannot recall specifically seeing Mr. Brindell there watching or supervising that work, "It's hard to say" (Vol I, Pg. 155, 157). He estimates removing old Carlisle brake material "[t]wenty-five percent of the time" and knew it was Carlisle

Page 8 of 15

Deposition Summary of Jonathan Keith Poleto

because he "[c]ould still see the name and most – most Rockwell axles and Eaton axles had Carlisle on them. … From the manufacturer. … When you buy a unit, everything is together. … We didn't buy it that way, but that's how it was put together when it was new. … Whenever they buy a trailer, you buy a trailer new. … Everything is on it. … Most of them had Carlisle brakes on them" (Vol I, Pg. 156-157).

Before using any of these tools, he used an air hose and "blew everything off and took the snap pins out"; this created a "[l]ot of dust" and Mr. Brindell was in the area when this occurred, "He was always in and out of the shop, yes. We were blowing them off with 120 pounds of pressure if you need to know that. The air, that's what the air pressure was set at" (Vol I, Pg. 34).

After removing the old brakes, he installed new Carlisle brakes in the same manner as previously described, "Like I told you before, we had to bevel the edges, grind the edges down when we changed to put new drums. It was too tight a fit" (Vol I, Pg. 35). The grinding caused "[p]lenty of dust that he could see, and he recalls Mr. Brindell was there, "I am sure he got into some of the dust" (Vol I, Pg. 35-36).

He recalls being "[a]lmost constantly" in and around dusty conditions from blowing out Carlisle brakes, "Ten times a day. … Because not only what I'm doing, what the guy next to me is doing and the guy next to that and the guy next to that, so you was constantly in that dust" (Vol I, Pg. 37-38). He was in dusty conditions from grinding and beveling the Carlisle brakes a "[c]ouple times a day. … Talking about a whole year. Hard to say. Five hundred times, is that fair if I said a thousand on brake jobs? Because we didn't grind every one" (Vol I, Pg. 38).

Regarding Mr. Brindell's exposure to the dusty conditions, he recalls, "Well, if we worked an 8-hour day, I would say he would be in the shop probably close to four of those hours. He was constantly patrolling. … If we did a thousand brake jobs, he would be – well, he wasn't in there the whole time, so say 4 or 500. … Per year" (Vol I, Pg. 39-40).

Mr. Poleto does not recall seeing Mr. Brindell handle, remove, or install a Carlisle brake pad, "I didn't see him" (Vol I, Pg. 141). He does not believe Mr. Brindell handled the ordering of any parts; he does not know where the parts came from, "I'm a mechanic. I have no idea what went on in the office" (Vol I, Pg. 143-144).

Deposition Summary of Jonathan Keith Poleto

**Abex Brakes**

Mr. Poleto recalls working with Abex brakes "some" and the process was the same as previously described, "Everything the same. … All brake jobs, everything the same way. … We use an air hose on all brake jobs"; the same dusty conditions were created, he could see the dust, and Mr. Brindell was present (Vol I, Pg. 41-44; Vol II, Pg. 258-259, 261). In a year, he estimates the same amount of time that Mr. Brindell was exposed to the dust, "What I told you before, 4 or 500. Use that for a reference. … I know he used to complain because we used to get his white shirt dirty" (Vol I, Pg. 44, 158-159).

He had to grind and bevel the pads in the same manner as previously described and the conditions were dusty, he could see the dust, and Mr. Brindell was present during those times, the same as previously described (Vol I, Pg. 45-46; Vol II, Pg. 261).

The old brake shoes were "full of dust and – yeah. Nasty, yeah"; the brand name of the old brakes that were removed was not always visible, "You can't see them all the time. Sometimes you can. … We usually didn't pay attention to that. We took them off and discarded them" (Vol II, Pg. 261-262).

He knew the brake was Abex because "[a]ll the brake pads had some kind of stamping on them as to who made them. Might be a sticker, it might be engraved in the pad itself" (Vol I, Pg. 42; Vol II, Pg. 259-260).

He does not know if the word "asbestos" was on Abex packaging, "I didn't read it. I didn't read the print on the box. … I don't know if it was on there or not. I didn't read it" (Vol II, Pg. 262).

He does not specifically recall Mr. Brindell personally handling, installing, or removing an Abex product, "I didn't see him with my eyes. … Not with my eyes" (Vol II, Pg. 258-259, 261).

**Bendix Brakes**

Mr. Poleto recalls working with Bendix brakes in the same manner as previously described (Vol I, Pg. 46).

Deposition Summary of Jonathan Keith Poleto

### Eaton Axles

Mr. Poleto worked with Eaton axles and knew they were Eaton because "[t]here was a football-shaped tag on every axle right in the middle, told you who made them. … Either said Eaton or Rockwell" (Vol I, Pg. 47; Vol II, Pg. 265, 268). He describes that attached to the axle were the "brakes, the hub assembly, and the wheels" (Vol I, Pg. 48). He does not know if the brakes on the Eaton axles were Eaton brakes, "No, I couldn't say if they were or not. Not a lot of markings on old brakes. All that gets worn off" (Vol I, Pg. 48; Vol II, Pg. 265).

The brake shoes on Eaton axles were removed in the same manner as previously described, "The same way we did all the other – everything was done the same way. Heat them up if they frozen, use the pin-driving tool. … A brake job is a brake job no matter whose equipment you are using. They are all the same" (Vol I, Pg. 49).

He does not know how long an Eaton axle was on a trailer before he worked on it and he does not know the maintenance history (Vol II, Pg. 265-266).

### Rockwell Axles

Mr. Poleto worked with Rockwell axles in the same manner as previously described, "No difference. No difference" (Vol I, Pg. 50). He recalls there was a difference between Rockwell and Eaton axles, "Well, they each took a different shoe. One shoe would have a notch in the back. It was offset a little bit. … The Eaton axle had an offset. The Rockwell axle was smooth on the shoe itself. It is something that you wouldn't notice because a lot of times you got the wrong shoe from the parts department, you go put it on and then the drum won't go on because it's the wrong one. It was a half-inch difference on the diameter. That was the only difference they had between the two" (Vol I, Pg. 50).

### Trailers

Mr. Poleto worked on several trailers and knew which trailer it was because the name was written "across the front. They all had identification labels on them. Great Dane had, you know, everybody had their own logo" (Vol I, Pg. 50-51, 57-58, 60-61, 64, 75).

Deposition Summary of Jonathan Keith Poleto

On **Fruehauf** trailers, he worked on "[a]ll suspension underneath with brakes, brake jobs, landing gear, electrical wiring and lights, any welding the trailer, any cracks or anything" (Vol I, Pg. 51, 115, 188, 190-191; Vol II, Pg. 254-255). The brake jobs were performed in the same manner as previously described with the same tools (Vol I, Pg. 51-52). He had to use the air hose on the brakes and had to grind and bevel the brakes which created dusty conditions, he could see the dust and Mr. Brindell was present during this work (Vol I, Pg. 52-54). He recalls working specifically on the Fruehauf trailers but not "that many. It wasn't as many Fruehauf trailers as some of the other things. … There was just numerous different kinds of trailers" (Vol I, Pg. 55). He recalls the "Fruehaufs were the more common. We worked on a lot of Fruehaufs. … Fruehauf seemed like the most popular ones" (Vol II, Pg. 255). In one year, he estimates working on about a thousand trailers that would come through the shop, "Yeah, that's just in my bay. And you got three other bays, so I am not vouching for what those people had" (Vol I, Pg. 55-56). He estimates performing about 400 brake jobs a year on the Fruehauf trailers and recalls the conditions were "[d]usty" and Mr. Brindell was present "[a] lot of times" (Vol I, Pg. 57). He does not know if there was a "repeat brake job" specifically on a Fruehauf trailer (Vol II, Pg. 257).

Mr. Poleto recalls working on **Strick** trailers, doing the same type of work as previously described (Vol I, Pg. 57-58; Vol II, Pg. 246, 295-296). There was "[p]lenty dust when using the air hose from "[b[lowing off the brakes and the brake drum" and "[m]ore dust" when he had to grind and bevel the brake pads (Vol I, Pg. 58-59). He estimates being in those dusty conditions about 400 hundred times a year, "If there was a thousand units total, I will say about 400 were probably Strick, 400 were probably Fruehauf" (Vol I, Pg. 60). Mr. Brindell was around for this work the same as previously described (Vol I, Pg. 60; Vol II, Pg. 296). Mr. Poleto has a specific recollection of working on a Strick trailer performing a brake job while Mr. Brindell was present, "Yeah. He was making fun of the name"; he does not recall when this occurred or what part of the brake job process he was in when Mr. Brindell was present (Vol II, Pg. 296-297). He does not know the maintenance history of any of the Strick trailers and does not recall working on a brand new one (Vol II, Pg. 246-247).

He recalls working on **Utility** trailers "at times" doing the same type of work as previously described, "Same thing I did with all the other brake jobs. Use the same tools, take them off, blow them off, clean it up, put new stuff on it"; there was dust in the air (Vol I, Pg. 61-62). He would grind and bevel the edges of the new brake pads to install, as previously described, and there was dust that Mr. Brindell was around

Page 12 of 15

Deposition Summary of Jonathan Keith Poleto

(Vol I, Pg. 63). He estimates working on the Utility trailers in those dusty conditions about 200 times (Vol I, Pg. 64).

Mr. Poleto recalls working on **Great Dane** trailers doing the same type of work as previously described, "The same as all the rest. Brake jobs" (Vol I, Pg. 64-65, 67; Vol II, Pg. 271-272, 277, 295). The conditions when working on the trailers was dusty, the same as previously described and Mr. Brindell was present "[p]eriodically" (Vol I, Pg. 65-70; Vol II, Pg. 278-279). He estimates working on the Great Dane trailers about 100 times (Vol I, Pg. 68-69). Regarding the old brake parts that he removed, he recalls, "Sometimes you would see them and you would see the writing on it, sometimes you wouldn't. … Carlisle most of the time. … That was the most common" (Vol II, Pg. 277-278).

He recalls working on **Wilson** trailers doing the same type of work as previously described, "Yes, the same as all the rest" (Vol I, Pg. 70-71; Vol II, Pg. 248-249). There was dust in the air and Mr. Brindell was present (Vol I, Pg. 71-73). He estimates Mr. Brindell was present while he was working on Wilson trailers about 100 times (Vol I, Pg. 73-74; Vol II, Pg. 249). He does not know if there was a "repeat brake job" specifically on a Wilson trailer, "I couldn't answer that question" (Vol II, Pg. 254).

Mr. Poleto recalls working on **Lufkin** trailers doing the same type of work as previously described; he never saw any paperwork regarding the ownership or lease of Lufkin trailers (Vol I, Pg. 75-76; Vol II, Pg. 225-227). The Lufkin trailers were "older trailers", and he believes there was asbestos "from the wheels now that I know it was in the brakes" (Vol II, Pg. 228). The conditions were dusty when he was working on the trailers, the same as previously described and Mr. Brindell was present "at times" (Vol I, Pg. 77-78). He estimates Mr. Brindell was present while he was working on Lufkin trailers about 100 times; he never "personally" saw Mr. Brindell work on a Lufkin trailer (Vol I, Pg. 78; Vol II, Pg. 227, 230). He recalls performing "some welding" work on the Lufkin trailers but does not know how often he performed that work (Vol II, Pg. 228-229). He recalls the axles on the Lufkin trailers were "[p]robably Eaton" because "Eaton was one of the most popular" (Vol II, Pg. 230). He does not recall the manufacturer of the brake pads he removed, but he installed Carlisle brake pads because "[t]hat's who we used mostly" (Vol II, Pg. 230-231).

Deposition Summary of Jonathan Keith Poleto

**Health and Safety**

Mr. Poleto does not recall there being a safety department or anyone that worked there that was responsible for safety; he was not provided any safety training prior to working there (Vol I, Pg. 96-97). He recalls attending safety meetings "[e]very once in a while. … Mr. Brindell would run some of them. Sometimes shop foreman would do it" (Vol I, Pg. 120, 184). He recalls the topics that were discussed, "OSHA type things, picking your air lines up off the floor, don't leave them stretched out because OSHA would get – they don't like any lines across the floor that you can trip on. Stuff like that. Basic safety things" (Vol I, Pg. 120). Mr. Poleto is familiar with OSHA but did not have knowledge of any regulations in the early 1970s regarding the hazards of asbestos, "I didn't know"; he was never provided with any training materials about working with or around asbestos (Vol I, Pg. 106-107, 121).

Mr. Poleto did not wear a mask while in the shop, "Well, they didn't supply a mask when I first started there because for the first say five or six years I was there, we were working strictly for – directly for the Puerto Rican government. Then after about the fifth year, the union came in and took us and once we went union, they were a lot more conscious of safety and stuff, so then you got masks and ear protection and all that once they came in"; he does not recall seeing Mr. Brindell wearing a mask while in the shop, "No, he never had a mask on" (Vol I, Pg. 41, 79-80, 111, 121, 137-138). He does not recall the brand names or manufacturers of any of the dust masks that were provided later (Vol I, Pg. 145).

He does not recall seeing any warnings on the boxes from Carlisle, or any brake brands, about the hazards of asbestos, "Not back in those early days, early years, no. … We didn't learn about that until later on"; "They may have been on there. We took the boxes off and put the brakes on. We didn't pay attention to it. … I don't know if they were on there or not. … I opened the box, got my parts, put them on, did my job" (Vol I, Pg. 40-41, 78-79, 148-149, 159, 161).

He does not recall seeing the word "asbestos" or "metallic" on any brake shoe, box, or bag, "I can't say I saw that because I didn't read it"; he believes the metallic brake shoes were "the tougher ones that eat the drums up" (Vol I, Pg. 187; Vol II, Pg. 257-258).

He does not recall seeing any warnings about the hazards of asbestos on any of the trailers or axles he worked on (Vol I, Pg. 79).

Page 14 of 15

Deposition Summary of Jonathan Keith Poleto

He recalls the company issued uniforms for the mechanics from a service, "Cintas. … I took mine off at work. … Most people wore them home, but I took mine off"; there was a locker room and the employees had lockers, but Mr. Brindell did not have a locker in the locker room or in his office and he did not wear a uniform, "White shirt, slacks, and a tie. Sometimes a coat" (Vol I, Pg. 108-110, 158).

Mr. Poleto first became aware of the potential hazards of asbestos "[w]hen I started seeing it on the television probably. … I don't remember anybody saying anything when we were working" (Vol I, Pg. 152, 187; Vol II, Pg. 235-236). He does not know for sure that he worked with anything that contained asbestos, "At that time I did not know. … No, I don't. I just know what I see that asbestos was everywhere. … On the television. They're always talking about the bad asbestos, how bad it was. … That [ads run by plaintiff attorneys] and some of the educational shows that show you all about how they make things. … How it's made, National Geographic stuff" (Vol II, Pg. 235-236).

He was never told by anyone at PRMMI to wear a mask while grinding brake materials or that not wearing a dust mask could be hazardous to his health (Vol I, Pg. 153). He was never provided with any documents related to friction materials or work practice guides (Vol I, Pg. 162).

He expects PRMMI to have provided safety materials or devices and did not expect the Port of New Orleans to provide those materials, "I don't think it was up to the port" (Vol II, Pg. 223). He has no information that the Port of New Orleans "used or handled any asbestos-containing products or materials" (Vol II, Pg. 224).